Jacob A. Walker (SBN 271217)
**BLOCK & LEVITON LLP**
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

Attorney for Plaintiff

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAURICE L. TWITCHELL, Individually and on Behalf of All Others Similarly Situated, | Case No._____ |
| Plaintiff, | |
| vs. | **CLASS ACTION** |
| | **COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| ENOVIX CORPORATION; HARROLD RUST; STEFFEN PIETZKE; CAMERON DALES and THURMAN J. RODGERS | |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

1.     Plaintiff Maurice L. Twitchell, ("Plaintiff'"), by and through his attorneys, individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Enovix Corporation ("Enovix" or "the Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Enovix common stock (or Rodgers Silicon Valley Acquisition Corp. ("RSVAC") common stock prior to July 15, 2021) between February 22, 2021, through January 3, 2023, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.     Enovix purports to design, develop, and manufacture silicon-anode lithium-ion batteries using proprietary 3D cell architecture, which the Company claims allow its batteries to achieve higher energy density. Enovix hopes to customize and deliver its batteries to other companies which can then incorporate them into their consumer electronics, such as wearable smartwatches, VR headsets, laptop computers, mobile phones, and electric vehicles. Since launching in 2007, the Company has focused on developing and commercializing its batteries. It did not generate any revenue from its products until the second quarter of 2022.

3.     On February 22, 2021, Enovix announced plans to become a publicly traded company. At that time, Enovix set an "ambitious goal" to both develop its own U.S.-based manufacturing line and to begin delivering products to customers (thereby recognizing its first product revenue) by the second quarter of 2022.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS               2

4.      Five months after this announcement, on July 15, 2021, Enovix became a publicly traded company. Rather than go public through a traditional initial public offering ("IPO"), Enovix used a novel method that sidesteps the normal regulatory framework and shareholder protections of the traditional IPO. Enovix merged with a special purpose acquisition company ("SPAC"), a public shell corporation with no business of its own other than to acquire a private company. On July 14, 2021, Enovix was officially acquired by RSVAC, which then changed its name to Enovix Corporation. As a result of this "de-SPAC" transaction, RSVAC's publicly-traded shares became shares of Enovix when trading opened on the Nasdaq Global Select Market ("Nasdaq") the following day.

5.      RSVAC's Chairman and Chief Executive Officer, Defendant Rodgers, stayed on as a member of Enovix's board of directors following the de-SPAC transaction.

6.      Enovix raised $405 million from investors through its de-SPAC merger with RSVAC. In a July 14, 2021 press release, the Company announced that the gross cash proceeds raised through the transaction would "allow Enovix to build out its first two production facilities to support demand from blue chip customers in the global mobile computing market while continuing to develop cells for Electric Vehicles (EVs)."

7.      Throughout the Class Period, starting with statements made at the time of the de-SPAC, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Enovix's revenues and ability to manufacture its proprietary battery technology.

8.      For Enovix, developing advanced battery technology was not enough. The Company would also have to create a process to manufacture its batteries at a large enough scale to satisfy the needs of its customers. Otherwise, it could not monetize its proprietary technology. To borrow the Company's own words, it hoped to "evolve from a company focused predominantly on R&D to a company capable of volume production and commercialization."

9.      Enovix's CEO, Defendant Harrold Rust, stressed the importance of manufacturing in statements made when the Company went public. In a July 14, 2021 press release, Rust stated that Enovix was "focused on producing the first advanced silicon-anode lithium-ion battery for

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    3

mass-market applications from our U.S. manufacturing facility." Defendant Rodgers added: "We believe that Enovix will be the first to deliver at scale due to its proprietary 3D cell architecture, world-class team and automated manufacturing. With five design wins with major technology leaders, Enovix is years ahead of other battery companies. Even better, it has a plan to maintain that lead."

10.   Just months before the merger, Enovix had received key equipment to establish its first manufacturing line at its "Fab-1" facility in Fremont, California. Although Enovix had previously produced and delivered sample batteries using its pilot production line, the pilot line produced only 20 batteries per day. Building a full-scale production facility was therefore a key step to producing batteries at a commercial level. Because of the global COVID-19 pandemic, the Company resorted to chartering a Ukrainian Antonov An-124, one of the largest cargo planes on the planet, to ensure that its equipment reached Fab-1 on schedule. Enovix thereby narrowly avoided a three-month delay in the buildout of its Fab-1 facility, a delay that would have prevented the Company from having a single manufacturing line in place by the time it went public in July 2021.

11.   In November 2021, Enovix announced to its investors that it had begun developing a second automated production line at its Fab-1 facility. This was a significant development for Enovix. The second line, it told investors, would be a "workhorse" focusing on batteries for mobile electronics, such as laptops and smartphones, thereby supporting Enovix's "ramp" to achieve meaningful scale and revenue in the consumer electronics market starting in 2023.

12.   Enovix assured its investors in a March 2022 letter that moving from the R&D to the production phase would "distinguish us from other advanced battery companies that have claimed technology breakthroughs but remain years away from commercialization." Revenue was just on the horizon, according to Defendants, and thanks to its use of sample batteries to drum up customer interest, the Company already had a $1.5 billion "revenue funnel" that it could tap into as soon as it could produce at scale.

13.   To that end, Enovix also began to develop plans for a second production facility, Fab-2. Defendants told investors that Fab-2 would take lessons from Fab-1 and use different

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    4

equipment, purportedly to occupy a smaller footprint and save the Company from having to rent a larger, more expensive space, while also delivering products more efficiently. However, Fab-2's buildout was still years away. Near-term revenue – expected to be $6-12 million in 2022 and to "ramp" up in 2023 – would be driven by Fab-1.

14.    On August 10, 2022, Enovix announced that it had met its February 2021 goal of recognizing its first product revenue by Q2 2022. The Company had brought in $5.1 million in revenue in the quarter. As the Company acknowledged, however, barely any of that revenue came from delivering products to customers. $5 million of the $5.1 million in revenue was attributable to completing the initial phases of a product development program with a single customer and qualified as "service revenue."

15.    At the same time Enovix announced that it had achieved revenue for the first time, Defendants also acknowledged that they would need to "increase our manufacturing yield metrics." Accordingly, to "prioritize Fab-1 improvements in the third quarter" of 2022, Defendants announced that they would be "taking the line down for portions of the quarter to improve individual process modules and install planned battery conveyance." Defendants stated that their "goal" was to "do the needed work in Q3 to position us for the start of our production ramp to close the year." Defendant Rust told investors that Fab-1 would be "the workhorse of our output next year" and to expect the revenue "ramp" to begin in Q4 2022, after the "improvements" had been made to Fab-1.

16.    In reality, and as Defendant Rodgers would later concede, Fab-1 did not need to be "improved" as much as it needed to be fixed. Fab-1's supposedly "automated" manufacturing lines were beset by problems that required significant manual intervention to produce batteries. In addition, machines that were meant to yield 550 batteries per hour could only complete around 100.

17.    Defendants obscured these issues from Enovix's shareholders. While boasting that Enovix had built a "functioning factory" that would produce "millions of units" for customers in 2023, Defendants explained away the necessary production line shut-downs as being merely a way to "install planned battery conveyance" and "improve individual process modules" to optimize the

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                5

lines for the expected ramp-up in production. They did not inform investors that the lines were not running anywhere close to their intended levels and could not produce at scale absent dramatic changes.

18. On November 1, 2022, Enovix announced its financial results for the third quarter of 2022. Enovix revealed that in the quarter, it realized just $8,000 in revenue. Moreover, it revealed that it would be "dialing back" its work on improving the Gen1 lines in favor of shifting its focus to its future Gen2 lines because the supposed improvements were not having the desired results on output. Consequently, Enovix "anticipate[d] achieving lower overall output from Fab-1 in 2023." In fact, Enovix revealed, it anticipated producing fewer than one million batteries in 2023.

19. On this news, Enovix fell from a close of $18.87 per share on October 31, 2022, to $10.53 per share by the close of trading on November 2, 2022, a 44% decline.

20. On November 7, 2023, Enovix announced that Defendant Rodgers would assume the role of Executive Chairman. In a statement released that day, Defendant Rodgers criticized his own company for a "lack of clear and transparent investor communications" and conceded: "We have poorly communicated on the status of Fab-1."

21. Defendant Rust subsequently departed as Chief Executive Officer on December 29, 2022.

22. On January 3, 2023, Defendant Rodgers held a special presentation for investors via conference call. On the call, Rodgers revealed that the Company's second production facility and Gen2 lines would be delayed by several additional months because of the equipment failures experienced in the Fab-1 lines.

23. On this news, Enovix's share price dropped 41% from a close of $12.12 per share on January 3, 2022 to a close of $7.15 on January 4, 2022.

24. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    6

**JURISDICTION AND VENUE**

25.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

26.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

27.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

28.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

29.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

30.     Plaintiff acquired and held shares of the Company at artificially inflated prices during the class period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

31.     Defendant Enovix is a Delaware corporation with its principle place of business in Fremont, California. The Company trades on the Nasdaq stock exchange under the ticker symbol ENVX. Enovix purports to design and manufacture silicon-anode lithium-ion batteries.

32.     Defendant Harrold Rust co-founded Enovix in 2007 and served as the Company's Chief Executive Officer and President from the Company's founding until December 29, 2022.

33.     Defendant Steffen Pietzke has served as Enovix's Chief Financial Officer since joining the Company in April 2021.

34.     Defendant Cameron Dales has served as Enovix's Chief Commercial officer since 2018. Prior to assuming this role, Dales served as Enovix's vice president of operations starting in 2009 and additionally as vice president of business development starting in 2011. Dales is responsible for overseeing Enovix's manufacturing strategy.

35.     Defendant Thurman J. Rodgers has served on Enovix's board of directors since 2012. He has also served as the Chief Executive Officer and Chairman of the Board of RSVAC, the SPAC that merged with Enovix in July 2021, since September 2020. On November 7, 2022, Rodgers was elevated from his position as Chairman of the Board to Executive Chairman of Enovix. Rodgers held 21.4 million shares of Enovix as of November 7, 2022.

36.     Collectively, Rust, Pietzke, Dales, and Rodgers are referred to throughout this complaint as the "Individual Defendants".

37.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their position with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**SUBSTANTIVE ALLEGATIONS**

38.     Enovix is a technology company that develops and manufactures silicon-anode lithium-ion batteries using a proprietary 3D stacking architecture that it claims increases energy density and helps the batteries maintain a high cycle life.

39.     The Class Period begins on February 22, 2021. On that day, Enovix announced plans to go public via a merger with RSVAC, which would see RSVAC's shares converted into

shares of Enovix. In a presentation announcing the merger, filed with the SEC, Enovix included a slide purporting to show its "Fab 1 Schedule." The schedule indicated that Fab 1's equipment "Bring Up" would be fully completed by Q2 2022, and a red box was placed around one particular event, "First Revenue," set to occur in Q2 2022.

40.      Defendants' statements in the February 22, 2021 customer presentation identified above were materially false and misleading when made. Enovix's Fab-1 equipment was defective and therefore the Company could not have a functioning factory by Q2 2022. Moreover, it was misleading to tout that Enovix could achieve revenue by Q2 2022 without disclosing that the Company would only be able to achieve token service revenue by that time, not sustainable product revenue from producing and shipping units.

41.      On July 14, 2021, Enovix completed its de-SPAC merger with RSVAC. In a press release announcing the merger, Defendant Rust stated:

> Enovix's public company debut marks a significant milestone in our effort to design and manufacture next generation 3D Silicon™ Lithium-ion batteries with energy densities that are five years ahead of current battery technologies. ***We are focused on producing the first advanced silicon-anode lithium-ion battery for mass-market applications from our U.S. manufacturing facility***. Simply put, the world needs a better battery and we look forward to powering the industries of the future.

42.      The italicized portion of Defendant Rust's statement identified above was materially false and/or misleading when made. At that time, Enovix's only manufacturing line was beset by defects and technical problems that prevented the Company from manufacturing its batteries at scale. It was misleading for Rust to state that Enovix was focused on using its U.S. manufacturing facility to produce batteries for "mass-market applications" without disclosing that its manufacturing lines were unreliable.

43.      In the same July 14, 2021 press release, Defendant Rodgers was quoted as saying:

> ***Enovix has succeeded where others have failed***. Every major trend in technology is bottlenecked by energy density — from 5G phones to artificial intelligence to electric vehicles. ***Developing and manufacturing a 100% active silicon anode has long been a goal of the battery industry because it dramatically increases performance. We believe that Enovix will be the first to deliver at***

> *scale due to its proprietary 3D cell architecture, world-class team*
> *and automated manufacturing. With five design wins with major*
> *technology leaders, Enovix is years ahead of other battery*
> *companies. Even better, it has a plan to maintain that lead.*

44. The italicized portions of Defendant Rodgers' statement identified above were materially false and/or misleading when made. At that time, Enovix's only manufacturing line was beset by defects and technical problems that prevented the Company from manufacturing its batteries at scale. It was misleading for Rodgers to tout that Enovix could "deliver at scale" because of its "automated manufacturing" or that it was "years ahead" of other companies without disclosing that Enovix's manufacturing lines were incapable of delivering on his promises. As he would later concede, the lines were not even automated.

45. On July 15, 2021, referring to Enovix's Fremont, California manufacturing facility, Defendant Rust told reporters:

> The realization that not only do we have an amazing kind of
> technology, architecture and battery that's kind of unheralded out
> there, but we also have a way to make it — I think that's
> something that people are going to be really struck by.
>
> \*       \*       \*
>
> We're super tangible — we have this entire factory almost put
> together...while certainly we've got our work to do ahead of us, it's
> not just some leap of faith. It's executing on a plan.

46. Defendant Rust's statements identified above, including that Enovix "ha[d] a way to make" its batteries and had an "entire factory almost put together," were materially false and misleading when made. While touting Enovix's ability to manufacture batteries, Rust failed to disclose that, at that time, Enovix's manufacturing line was beset by defects and problems that prevented the Company from manufacturing its batteries at scale.

47. On August 10, 2021, Enovix published its first "Letter to Our Shareholders," detailing its activities and financial results for the second quarter of 2021, Enovix's last full quarter as a private company before the de-SPAC merger. That letter, signed by Defendants Rust and Pietzke, stated:

1
2
3
4
5
6
7
8
9
10
11
12
13
14

> We are committed to creating the first facility in the world to be capable of volume production of advanced Lithium-ion batteries with a 100% active silicon anode using a 3D cell architecture.
>
> *          *          *
>
> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. This line includes a combination of Enovix-designed proprietary equipment from tier one U.S.-based factory automation vendors as well as standard battery industry production equipment. This equipment incorporates our proprietary laser patterning, stacking, and constraining processes that uniquely manage the expansion of a 100% active silicon anode, replacing the traditional winding processes found in conventional Li-ion cell manufacturing.
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery. The second step is a characterization process, or tool and process bring-up. This is a rigorous phase gate process developed and effectively used by several of our strategic partners and members of our management team to successfully scale up multiple high-volume production factories.

15
16
17
18
19

48.     Defendants' statements identified above, including that Enovix was creating a facility "capable of volume production" of its batteries was materially false and misleading when made. It was misleading for Defendants to tout, in detail, the Company's progress setting up Fab-1 without disclosing that Enovix's manufacturing line was beset by defects and problems that prevented the Company from manufacturing its batteries at scale.

20
21

49.     On November 8, 2021, Enovix released another Letter to Our Shareholders, detailing Q3 2021. That letter, also signed by Defendants Rust and Pietzke, stated:

22
23
24
25

> ***We made meaningful progress this quarter in the scale-up of our advanced battery production facility ("Fab-1") in Fremont, California.*** Importantly in September we began to manufacture battery cells from the first automated production line installed in Fab-1. . . . ***This positions us to deliver 100% active silicon anode lithium-ion batteries with energy densities years ahead of the competition.***

26
27
28

> Meeting this key milestone will allow us to ship production-quality samples for qualification to customers by the end of Q4 2021. It also allows us to begin the process of having our cells certified by third parties for safety and abuse testing. Both are necessary steps

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    11

before we can go into full production. ***We remain on track for first commercial production in Q1 2022 and first product revenue in Q2 2022.***

50.     The statements identified above in italics were materially false and/or misleading when made. It was disingenuous for Defendants to tout "meaningful progress" in the scale up of Enovix's Fab-1 manufacturing facility or that the company was "position[ed]" to deliver batteries ahead of its competition when its manufacturing equipment was not capable of producing batteries at scale. Furthermore, it was misleading to tout that Enovix was "on track" to record its "first product revenue in Q2 2022" when Enovix was not positioned to begin delivering products to consumers or realizing revenue in anything beyond a nominal level.

51.     The November 8, 2021 letter also stated:

> Fab-1 was fully equipped during the quarter, and by September we were able to produce the first batteries from our first automated production line. The line is now moving into a qualification stage in which our equipment engineering, process engineering and quality teams are driving enhancements throughout the line to prepare us for initial volume production next year.

52.     The statements identified above were materially false and/or misleading when made. It was misleading to state that Fab-1 was "fully equipped" without disclosing that the equipment was not functioning properly and would not be able to achieve "volume production."

53.     The same November 8, 2021 letter stated:

> We have also begun installing our second production line in Fab-1, which will initially be focused on large form factor cells for mobile electronics such as mobile communications and laptops. We expect this line to be a workhorse for qualification samples in 2022 to support our ramp with large cell mobile electronics customers in 2023.

54.     The statements identified above were materially false and/or misleading when made. The second production line at Fab-1 could not meaningfully support a "ramp" that would allow Enovix to penetrate the mobile electronics market and begin to realize revenue because its manufacturing equipment and process were unreliable. In fact, the second production line was

never completed. Enovix chose not to install the second half of the line because it had not yet solved the problems with the equipment in the first line.

55.     On March 3, 2022, Enovix released its Q4 2021 Letter to Our Shareholders. In that letter, signed by Defendants Rust and Pietzke, Defendants stated:

> In January, we shipped the first samples from our first automated production line to a lead customer for qualification. ***We expect to recognize first product revenue in Q2 2022. We believe moving into production will distinguish us from other advanced battery companies that have claimed technology breakthroughs but remain years away from commercialization.***

56.     The statements identified in italics above were materially false and/or misleading when made. It was misleading for Defendants to assert that Enovix's ability to produce batteries "distinguish[ed]" the Company from other companies that were "years away from commercialization," when Enovix's manufacturing equipment and process were faulty and unreliable. Furthermore, it was misleading to tout that Enovix would to record its "first product revenue in Q2 2022" without disclosing that this revenue would be nominal and would not represent scaled production or an ability to reliably generate any further revenue. In fact, the revenue would not represent product revenue but would instead primarily consist of service revenue.

57.     Also in the March 3, 2022 letter, Defendants stated:

> We continue to experience more indications of demand than we can supply for several years. ***Our revenue funnel increased to $1.5 billion at the end of Q4 2021, up from $1.3 billion at the end of Q3 2021.***
>
> *       *       *
>
> ***The speed by which we capture this demand will ultimately be governed by how fast we qualify customers, improve our manufacturing processes and bring on additional capacity***.
>
> ***We are prioritizing customer qualification and manufacturing improvements ahead of scaling capacity. Our team has identified opportunities for manufacturing performance improvements as we have brought up the first production line.*** This learning has enabled our engineers to design a next-generation pilot line and a next-generation production line that shares the same process

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    13

kernels but will be faster, more energy and capital efficient, and will occupy a smaller footprint.

58.     The statements identified in italics above were materially false and/or misleading when made. It was misleading for Enovix to disclose its $1.5 billion revenue funnel and to state that the "speed by which [it] capture[d] this demand" would depend on improvements to its manufacturing process without disclosing that Enovix's manufacturing equipment was too faulty and unreliable to allow the Company to supply enough batteries to tap into its purported revenue funnel. Furthermore, it was misleading for Defendants to speak of "manufacturing improvements" when, in fact, what was needed were fixes for problems that prevented the manufacturing lines from operating as intended.

59.     The March 3, 2022 letter also stated:

> ***We have commenced deliveries from Fab-1 to our lead customers. Getting to this point was not easy. We have overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia.*** Fab-1 features a first-of-its-kind line for battery production. As a result, every day we solve problems needed to improve yield and output. Simultaneously, this work is providing valuable learning, improving our processes and equipment for future lines.

60.     The statements identified in italics above were materially false and/or misleading when made. Enovix had not yet "overcome" the problems with its equipment and manufacturing lines, and was not at a point where it could deliver product to its customers at a commercial scale. Touting Enovix's limited, token deliveries as achievements without disclosing these facts misled investors into believing that that Enovix was close to commercialization and revenue generation when in fact it could do little more than produce samples or limited batches of its products.

61.     On May 11, 2022, Enovix released its Q1 2022 Letter to Our Shareholders. In that letter, signed by Defendants Rust and Pietzke, Defendants stated that "[d]uring the first quarter of 2022," Enovix had achieved "two very important milestones." The first of which was producing "advanced 3D Silicon$^{TM}$ lithium-ion batteries for customers from our first production

line for customer qualification." Defendants also disclosed that the Company would begin work

on its second manufacturing facility, Fab-2, and Fab-2's second-generation "Gen2" production

lines using lessons learned from the Fab-1 facility in Fremont:

> Meeting demand requires us to build a highly automated
> manufacturing platform and then replicate it in multiple facilities
> across the globe over the next several years. This begins next year
> with our Fab-2 facility.
>
> *      *      *
>
> ***Elements of the Gen2 manufacturing line are designed to occupy
> half the footprint of Gen1 equivalents while increasing output
> significantly. These improvements are a direct result of
> incorporating what we learned from operating Gen1 equipment
> over the last year in Fremont. . . . These space savings and
> efficiency gains allowed us to avoid leasing a huge million-
> square-foot facility for Fab-2 earlier this year.***

62.     The statements identified in italics above were materially false and/or misleading

when made. It was misleading to explain the differences in the planned Gen2 lines at the Fab-2

facility as being driven by a desire to lease a smaller space and achieve efficiency gains when in

fact Enovix had to pivot away from its Gen1 lines because they did not work and the equipment

could not produce at scale.

63.     The May 11, 2022 letter also stated:

> With production underway, our focus in Fab-1 is on increasing
> volumes and yields. ***The large majority of the process steps that
> make up Fab-1 operate today at very high yields. A small number
> are yielding below 95%, and we have a documented plan to drive
> these to their targeted yields.*** Delivering to plan is a journey of
> many incremental improvements that our operations team
> undertakes daily. These learnings have given us confidence to
> move forward with purchases for Fab-2.

64.     The statements identified in italics above were materially false and/or misleading

when made. Defendants obscured the problems Enovix was experiencing with production at Fab-

1 by stating that the "large majority" of the steps at Fab-1 were operating "at very high yields"

while only a "small number [we]re yielding below 95%." Regardless of the statistics Enovix

selectively chose to disclose, the steps that were failing were significant and stood in the way of

scaled production. Some of the equipment at Fab-1 was producing at just 18% of its planned capacity.

65.     On August 10, 2022, Enovix released its Letter to Our Shareholders for the second quarter of 2022. That letter, signed by Defendants Rust and Pietzke, announced that Enovix would be "prioritizing manufacturing improvements over shipments" in Q3 2022 which would include "taking portions of our first production line down to install planned automated conveyance and implementing throughput and reliability enhancements for multiple process modules."

66.     The August 10, 2022 letter also stated: "We expect to exit 2023 producing annualized output of single-digit millions of units from both manufacturing lines combined in Fab-1."

67.     Defendants' statement identified above was materially false and/or misleading when made. Fab-1 was beset by technical problems and defects and was not in a position to deliver millions of units in 2023.

68.     Also on August 10, 2022, Enovix held its 2Q 2022 earnings call. Participating in the conference call were Defendants Rust and Pietzke. In his opening remarks, Rust announced:

> In February 2021, when we announced plans to become a publicly traded company, we set an ambitious goal to bring up and qualify our first-of-a-kind battery production line in the US what we call Fab-1 and then to deliver our first commercial products and recognize product revenue in the second quarter of this year. ***Today, I'm pleased to report that we accomplished that goal and have since delivered of batteries from Fab-1 to multiple customers and distributors***.
>
> *           *           *
>
> ***While we continue to work on moving customers through our funnel towards orders, we are focused on improving the output of our factory to meet future demand. We made solid improvement in output and yield during the quarter, but we need to increase our manufacturing yield metrics***. There is no easy path when bringing up a first-ofa-kind manufacturing line.

69.     The statements identified in italics above were materially false and/or misleading when made. It was misleading for Rust to tout that Enovix had achieved its goal of recognizing

revenue by Q2 2022 without disclosing that it had only done so on a token level and was not capable of sustaining deliveries or revenue generation because its manufacturing lines were faulty. It was also misleading to state that Enovix was focused on "moving customers through our funnel towards orders" without disclosing that Enovix could not supply product to meet those prospective orders. Likewise, disclosing that Enovix had "made solid improvement in output and yield" without disclosing that the lines still could not produce at scale would have misled a reasonable investor into believing the manufacturing process was already "solid" and functional, but that Enovix was now working to make it more efficient.

70.     Also, during the August 10, 2022 call, Defendant Rust told investors that Enovix would be "prioritizing Fab-1 improvements in the third quarter. This includes taking the line down for portions of the quarter to improve individual process modules and install planned battery conveyance. Our goal is to do the needed work in Q3 to position us for the start of our production ramp to close the year." Defendant Pietzke added that Enovix had therefore "lowered the top end of the [revenue guidance] range [from $6-12 million down to $6-8 million] given we are prioritizing improvements in Fab-1 over shipments in the third quarter."

71.     Defendants Rust's and Pietzke's statements identified above were materially false and/or misleading when made. Fab-1 did not merely need to be "improve[d]." It did not function properly and could not deliver at scale. It was misleading to tell investors that Fab-1's production lines would be partially taken down to allow for efficiency improvements when in fact necessary fixes were needed to correct for defects. Moreover, it was misleading to state that Enovix's revenue guidance would be lowered because of these "improvements," as if the Company was simply foregoing present revenue to invest in the future, when in fact the lines were being taken down to address problems and defects that prevented Enovix from delivering product and generating revenue.

72.     Later on during the August 10, 2022 call, Defendant Rust stated that Fab-1 would be "the workhorse of our output next year" and told investors "I think the safer assumption is [the Fab-2 lines will] start producing revenue in the first half of 2024. That's kind of our current view. Obviously, we'll be working as much as we can to try to pull that in, but I would think

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    17

about next year as really being more of a Fab-1 event from a revenue standpoint." Later in the

call, Rust provided some guidance on Fab-1's expected output: "[O]ur current thinking is Fab-1

on its own between the couple of lines we have here is producing something in the single-

million-digit units this next year."

73.     Defendant Rust's statements identified above were materially false and/or

misleading when made. Fab-1 could not serve as a "workhorse" and was not well positioned to

drive revenue or deliver millions of units in 2023 because it was so beset by technical problems

and defects that the company was resorting to shutting it down in Q3 2022.

74.     Also, during the August 10, 2022 call, Defendant Rust spoke about the large

customers who formed part of Enovix's revenue funnel. Regarding these customers, or "large

strategics" as he termed them, Rust said:

> *[D]uring the quarter, we actually shipped cells from Fab-1 to two
> of those large strategics, which we think is a great omen. And
> each one of these in principle could generate enough demand to
> kind of fill this up for a number of years. So, it's a tremendous
> opportunity.* It's great to see them really pulling. And then, also in
> their mind kind of getting through the tech qual part and *then
> realizing we've got a functioning factory, it really puts us on a
> whole new conversation with them.*

75.     Defendant Rust's statements identified above in italics were materially false

and/or misleading when made. While Enovix could ship limited batches and samples to

customers, it could not produce batteries in sufficient volumes to meet customer demand.

Moreover, it was misleading to tout Enovix's "functioning factory" as an advantage in

conversations with customers when Enovix's factory was not functioning.

76.     On September 8, 2022, Defendant Dales participated in the Cowen Global

Transportation & Sustainable Mobility Conference. Dales spoke about Enovix's recent purported

successes in the second quarter of 2022:

> We shipped our first cells last quarter. It's not a meaningful
> amount of volume relative to what these companies ultimately ship
> every day. But why it's super important to them and why I think
> it's created an acceleration in how they're behaving is because in
> order to get to a commercial product, no matter kind of what level
> is that, there's 100 things that you have to get right. It's not just a

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                           18

lab experiment. It's not just the energy density. It's all the different requirements. It's quality, it's reliability, it's the commercial aspect of things.

*And so, when a company finally breaks through and checks all of those boxes at the same time and has a real commercial product, it's a change in the status of that technology going from kind of R&D project to real commercial project.*

77.     Defendant Dales' statement identified above in italics, particularly that Enovix had "a real commercial product," was materially false and/or misleading when made. While Enovix could ship limited batches and samples to customers, it could not produce batteries at a commercial level because of deficiencies in its manufacturing lines.

**The Truth Begins to Emerge**

78.     On November 1, 2022, Enovix released its Letter to Our Shareholders for Q3 2022. The letter reported that Enovix's revenues for the third quarter were just *eight thousand dollars* ($8,000), compared with a GAAP loss of $82.0 million. Enovix's $8,000 in revenue was a far cry from the $5.1 million Defendants had celebrated in Q2 2022. The letter explained that the revenue came from "a modest number of batteries shipped to customers for qualification programs and pre-production and end-product builds." Enovix was not in fact delivering commercial products on any meaningful scale, but rather "[t]he majority of batteries shipped during the quarter were samples that did not generate revenue."

79.     The letter also disclosed that the "improvements" Enovix had partially shut down Fab-1 to implement had not been successful, and that the Company was now pivoting towards prioritizing its next generation manufacturing lines:

As we highlighted in last quarter's Shareholder Letter, we made a conscious decision to focus on manufacturing improvements over shipments in Fab-1 during the third quarter. . . . Given the wide gap in expected performance between our Gen1 and Gen2 and the slower-than-expected improvements on our Gen1 manufacturing equipment, we have now concluded that the incremental effort necessary to drive higher throughput on Gen1 technology is better spent on the critical yield and productivity learning necessary for a strong launch of our Gen2 Autoline. *As a result, we are dialing back Gen1 throughput enhancement activities and anticipate achieving lower overall output from Fab-1 in 2023 in favor of focusing on the Gen2 Autoline, which is the engine for our future scaling.*

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    19

\* \* \*

> In the third quarter, we worked to optimize our first production line
> ("Line 1") in Fab-1 for higher yield and throughput, bring up our
> second production line in Fab-1 ("Line 2"), and complete our
> learnings for Gen2. ***We expect Fab-1 improvement activities to
> extend into 2023, but at a slower rate given the decision to
> redirect resources to Gen2. Given this, we expect to exit 2023 at a
> run rate of under one million battery cells produced from the
> Gen1 equipment at Fab-1.***

80.     The pivot to Gen2 lines suddenly and dramatically changed the perceived timeline for Enovix to commercialize its batteries and achieve revenue. As Defendant Dales had explained during the Cowen Global Transportation & Sustainable Mobility Conference, producing batteries for Original Equipment Manufacturers ("OEMs") was a multi-stage process that involved substantial testing: "With [large strategics], there's a multiyear process of just qualifying the technology to make sure that the technology really works." While Enovix had cleared some of these "hurdles" with the batteries produced on its Gen1 lines, giving up on the Gen1 lines in favor of trying again with the Gen2 lines meant starting the qualification process over again. The November 1, 2022 letter told investors: "We expect that certain customers may require up to several months to qualify the Gen2 line before accepting product that is manufactured on that line." Moreover, Enovix did not expect to even receive equipment for its Gen2 lines until the second half of 2023.

81.     A November 2, 2022 post to Motley Fool entitled "Why Enovix Stock Plunged Today," explained that investors "weren't expecting an announcement the company will put more effort into Gen2 technology over improving Gen1 technology. This likely means that revenue scaling will take longer than expected." The post went on to explain that "management said that Gen2 production is expected to start in late 2023 at best. This means the company will need to survive on the $349 million in cash on the balance sheet until then, which may be a stretch. The company has used over $91 million in cash in the first three quarters of the year and will spend more on installing capacity next year."

82.     On this news, Enovix fell from a close of $18.87 per share on October 31, 2022, to $10.53 per share by the close of trading on November 2, 2022, a 44% decline.

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    20

83.     On November 7, 2022, Enovix announced that Defendant Rodgers would become the Company's Executive Chairman. In a statement released that day, Rodgers told investors:

> [W]e lowered our 2023 revenue projection in a confusing manner that erroneously implied that there were bigger problems with our technology. Our revenue projections were lowered because our Fab-1 manufacturing ramp was delayed in our first year of production. This is an unacceptable execution problem which I will discuss.
>
> However, as I look back on the decisions the company made, I would make the same calls again. For example, when Harrold Rust called me and said that Enovix Fab-1 would be delayed by at least three months due to the COVID-related shipping malaise unless we spent $1.4 million to charter the world's largest airplane, a Ukrainian AN-124, to fly over 55 tons of Fab-1 equipment to Silicon Valley in one shot, I said, 'Brilliant, do it.' Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.
>
> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems. In my new position, I will have the time to create better strategic decisions. I cannot promise that we will not be surprised technically, but I can promise there will be fewer unforced execution errors.
>
> My appointment in no way implies that we intend to micromanage the Company. The board's objective has always been to guide the company to become a successful public company – not micromanage it. I plan to initiate and directly manage some key upstream strategic business decisions that are new to the young management team. . . .
>
> The delay and projected underperformance of Fab-1. ***We have poorly communicated on the status of Fab-1***. I have heard from many investors that the delay and projected underperformance of Fab-1 must be the result of some catastrophic technology problem. For the record: Fab-1 is going to work and ship a lot of batteries to our customers – period. I will personally be in all Fab-1 reviews, because Fab-1 is not only critical to the Company, but also to our

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    21

customers, some of whom are designing products right now that could not exist without Enovix battery performance. . . .

The delay of the Gen2 autoline, the Enovix "copy exact" engine for economic scaling. An astute investor tracked me down on my car phone just before the Enovix board meeting last Friday. His question was, 'What's holding up the Gen2 line?' My answer was, 'T.J. Rodgers.'

The management team at Enovix is laser-focused on quickly placing the rest of the Gen2 purchase orders, but I have demanded detailed proof that the team is rigorously following the EPR process before I allow those POs to go to the board (that's the "Executive" part of my new title). I believe this intervention will put Gen2 online sooner at a higher level of performance.

84.    On December 29, 2022, Enovix announced that Defendant Rust would retire as President and CEO of the Company and as a member of the Board of Directors. Rust would be replaced that same day by Dr. Raj Talluri.

85.    On January 3, 2023, Defendant Rodgers hosted a "special presentation to shareholders" via conference call. On that call, Rodgers provided more information on the first production line at Fab-1 and its disappointing output:

[Line 1 is] a Fremont wearables line, meaning make small batteries, uses the same heads, but *is nonfunctional for automation point of view*. *That means its rated capacity of 550 UPH [Units Per Hour] is really more like 100, and obviously, that wreaks havoc with output and promises*.

86.    Line 2, meanwhile, was incomplete according to Rodgers. "It's only a partial line. We only built half the line," he told investors on the January 3, 2023 call, "we didn't want to commit to the second half of the Line 2, until Line 1 worked." Rodgers went on:

[Fab-1] then goes to [producing] 22.5 [batteries per] second[] when we lost the automation and the UPH dropped from 550 to 100, and *it then went to 72 seconds* when the OEE dropped because of the lack of automation and the need to do manual stuff in the yield problem. *So, what we started out as the battery every 2 seconds ended up battery every 72 seconds, the battery minute roughly, and that's been the problem and it's got multiple causes*.

One piece of equipment was "rated at 550" UPH, but Rodgers told investors: "we don't think that machine if we worked on it forever would be over 200."

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    22

87.     Because of the problems with Lines 1 and 2, and the consequent failure to build additional production lines, Rodgers confirmed that Fab-1 was "doing less than 10% of what it should be doing."

88.     Rodgers also, on the January 3, 2023 call, announced further delays to the Gen2 manufacturing lines, which could be traced back to the problems with Fab-1 and Gen1:

> Gen2 equipment owners will prove to the board, in bold, that they've embedded all the learning from Gen1. So, ***Gen1 is not working the way we wanted to*** . . . And Gen2 can't have any of those problems and you have to prove to the board that.

> \*        \*        \*

> ***Gen2 is going to work and Gen1 doesn't.***

89.     Rodgers acknowledged that the buildout of the Gen2 lines would be delayed by several months, to the end of 2023 or beginning of 2024. The revenues from the Gen2 lines that investors had previously been told to expect in early 2024 were therefore no longer possible.

90.     On this news, Enovix's share price dropped 41% from a close of $12.12 per share on January 3, 2022 to a close of $7.15 on January 4, 2022.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Enovix common stock between February 22, 2021, and January 3, 2023, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

92.     The members of the Class are so numerous that joinder of all members is impracticable. Investors purchased millions of shares of Enovix during the class period. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

93.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      a.  Whether the Exchange Act was violated by Defendants;

      b.  Whether Defendants omitted and/or misrepresented material facts;

      c.  Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      e.  Whether the price of the Company's stock was artificially inflated; and

      f.  The extent of damage sustained by Class members and the appropriate measure of damages.

94.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

95.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

96.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUD ON THE MARKET**

97.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

      a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

      b.  The omissions and misrepresentations were material;

      c.  The Company's common stock traded in efficient markets;

d.  The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.  Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

98.  At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

99.  The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

100.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**LOSS CAUSATION**

101.  On November 1, 2022, Defendants disclosed that Enovix would shift its focus from its Gen1 lines to developing its Gen2 lines and accordingly reduced its projections for Fab-1 production in 2023. On this news, Enovix fell from a close of $18.87 per share on October 31, 2022, to $10.53 per share by the close of trading on November 2, 2022, a 44% decline.

102.  On January 3, 2023, Defendant Rodgers hosted a special presentation for investors. During this presentation, he announced that Enovix's Gen2 manufacturing lines would be further

delayed because of the need to avoid the same problems plaguing the Gen1 lines. On this news, Enovix's share price dropped 41% from a close of $12.12 per share on January 3, 2022 to a close of $7.15 on January 4, 2022.

### CAUSES OF ACTION

### <u>Count I</u>
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

103.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

104.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

105.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

106.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### <u>Count II</u>
### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants)

107.    Plaintiff repeats and re-alleges each and every allegation contained above, except for those made under Count I, as if fully set forth herein.

108.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents where false or misleading statements were made and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)    awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)    awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)    awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

January 6, 2023                                          **BLOCK & LEVITON LLP**

COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS                    27

/s/ Jacob A. Walker
Jacob A. Walker (SBN 271217)
400 Concar Drive
San Mateo, CA 94402
(650) 781-0025 phone
jake@blockleviton.com

*Counsel for Plaintiff*