Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs and the Class*

*[Additional Counsel on Signature Page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | Case No: 3:23-cv-00071-SI |
| | CLASS ACTION |
| | **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | JURY TRIAL DEMANDED |
| This Document Relates To: All Actions | |

Lead Plaintiffs Gary Kung, Discovery Global Opportunity Master Fund Ltd., and Discovery Nymeria Master Fund, Ltd., and named Plaintiffs Robert G. Lee, and Traci Selke (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege in this consolidated complaint the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by their counsel, which included, inter alia: review and analysis of Defendants' public statements, public documents, conference calls, and announcements, United States Securities and Exchange Commission ("SEC") filings, and wire and press releases published by and regarding Enovix Corporation ("Enovix") or Rodgers Silicon Valley Acquisition Corp. ("RSVAC")[1]; media and analyst reports and advisories about the Company; interviews with confidential witnesses; information from related court filings; and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1.      Plaintiffs bring this action as a federal securities class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class defined as all persons and entities that purchased the publicly traded common stock of Enovix or RSVAC between June 24, 2021 and January 3, 2023, both dates inclusive ("Class Period").[2] Plaintiffs bring claims individually and on behalf of the Class pursuant to Sections 10(b) and 20(a) of the Exchange Act.

---

[1] As described in further detail below, Enovix merged with RSVAC in July 2021, with the merged company renamed "Enovix Corp." For the purposes of this complaint, references to the "Company" are to the publicly traded company: pre-merger RSVAC and/or post-merger Enovix. References to "Enovix" are to pre- and/or post-merger Enovix.

[2] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a majority ownership interest at any time.

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

2.     Enovix is an early-stage technology company that purports to design, develop, and manufacture a new type of lithium-ion ("Li-ion") battery that is smaller and stronger than conventional Li-ion batteries. It seeks to accomplish this through a new battery design that uses silicon-anodes and a proprietary 3D cell architecture, which Enovix claims allows its batteries to achieve higher energy density. Enovix hopes to customize and deliver its batteries to other companies that can incorporate the batteries into their consumer electronics, such as wearable smartwatches, VR headsets, laptop computers, mobile phones, and electric vehicles.

3.     However, developing advanced battery technology does not generate revenues on its own. Enovix also had to create a process to manufacture its new batteries at a large enough scale to satisfy the needs of its customers.

4.     For example, a manufacturer of smart watches might have interest in Enovix's newly designed battery. If the watch manufacturer wanted to incorporate the new batteries into its watches, it might re-design its smart watch to be compatible with the new battery. However, before undertaking that investment it would need assurance that Enovix could reliably manufacture enough batteries in enough time to meet the watchmaker's production needs. Thus, if the smart watch manufacturer intended to make one million smart watches with Enovix's new batteries, it would need to know that Enovix could reliably and timely supply one million commercial-grade batteries. Otherwise, the smart watch manufacturer would not invest in redesigning its watches to work with the new batteries. Accordingly, in order to monetize its proprietary technology, Enovix had to be able to reliably manufacture a high volume of its new batteries. To borrow the Company's own words, it hoped to "evolve from a company focused predominantly on R&D to a company capable of volume production and commercialization."

5.     In February 2021, Enovix announced its plans to become a public company. Rather than going public through a traditional (and more strictly regulated) initial public offering ("IPO"), Enovix merged with Rodgers Silicon Valley Acquisition Corp. ("RSVAC"), a public special purpose acquisition company known as a "SPAC" or "blank check" company. A SPAC is a public shell corporation whose lone stated purpose is to acquire a private company.

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

6.     RSVAC and Enovix entered into a merger agreement in what is known as a "de-SPAC" transaction. RSVAC's shareholders approved a proposed de-SPAC merger transaction with Enovix (the "Merger") at a special meeting of RSVAC stockholders in July 2021, pursuant to a Proxy Statement filed with the SEC and disseminated to investors. The post-Merger Company adopted the name Enovix Corporation.

7.     When the Merger was announced, Enovix set an "ambitious goal" to both develop its own U.S.-based manufacturing line and to begin delivering products to customers (generating the Company's first product revenue) by the second quarter of 2022. In February 2021, Enovix disclosed to its investors the rate of manufacturing output that would be necessary to meet its projected revenues. Specifically, Enovix projected it would manufacture one battery every two seconds, which would require four manufacturing lines capable of producing 550 units per hour ("UPH").

8.     To ensure that its manufacturing facilities could meet these specifications, Enovix told investors it would follow industry standard equipment procurement protocols including a Factory Acceptance Test ("FAT") and a Site Acceptance Test ("SAT") for the new manufacturing equipment installed at Enovix's highly touted "Fab-1" production facility in Fremont, California. Enovix used equipment vendors located in China to help design and fabricate Enovix's custom-made manufacturing equipment that would be used to produce Enovix's new batteries. The FAT and SAT are industry standard procedures specifically designed to mitigate the risks inherent in using vendors to make brand new custom-designed manufacturing equipment that would be installed at a different factory thousands of miles away.

9.     The FAT required the equipment vendor to set up and run the new manufacturing equipment at the vendor's factory and test it to make sure that it could produce at the quality and volume necessary to meet the customer's (Enovix's) specifications. Conducting the FAT ensured that any initial problems or deficiencies could be corrected before the equipment left the vendor's factory. These adjustments are much less expensive and time-consuming when addressed at the FAT stage, as opposed to when problems arise after the equipment has been delivered and installed in the customer's manufacturing facility.

10.     The SAT is a second important test that is run after the equipment is shipped to the customer's manufacturing facility or "site." To conduct the SAT, a team of engineers from the equipment vendor travel to the customer's facility, ensure that the equipment is properly installed and configured, and then test the equipment again to ensure that it can produce at the quality and quantity necessary to meet the customer's specifications.

11.     During the Class Period, Enovix falsely represented to investors that the new manufacturing equipment for Fab-1 would be, or was already, subjected to both a FAT and SAT. For example, in an investor presentation announcing the proposed Merger (incorporated by reference into the Proxy Statement), Defendants claimed that the "Fab-1 Equipment" was "At Vendor Factory Acceptance Test (FAT)," provided schedules for the FAT and SAT, and told investors that the equipment "must perform to specification at the vendor's factory before shipment to Enovix [the FAT] and must pass another test after installation at the Enovix site [the SAT]."

12.     Similarly, in August 2021, Defendants issued a "Letter to Our Shareholders" that claimed that the Fab-1 equipment was delivered, installed, and "is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing *already performed* at the vendor's facility before taking delivery." During an earnings call that same day, Defendant Rust, Enovix's Chief Executive Officer ("CEO") purported that, with respect to the Fab-1 equipment, "[w]e have a pretty rigorous set of both factory and site acceptance things we have to go through and *I would say there's no red flags there*."

13.     In truth, Enovix had failed to conduct these important equipment procurement protocols in a misguided effort to hasten delivery of the Fab-1 equipment before the Merger closed. The FAT and SAT, which were necessary to ensure that Enovix's manufacturing equipment could produce batteries in the quantity and quality needed to meet specifications, simply did not take place.

14.     The FAT and SAT were particularly important to Enovix and its investors because the Fab-1 equipment was designed to produce a brand-new product using new technology, so it was critical to thoroughly test this new custom-made manufacturing equipment. However, Defendants had a significant competing interest. Enovix was proposing to mass produce a new battery that had never

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

been manufactured before. To show that the Company was capably executing its plan and progressing toward real revenues, Defendants wanted to tell public investors *before* the proposed Merger that the Fab-1 manufacturing equipment was already installed at its Fremont facility.

15.     Defendants' plans hit a major snag when in April 2021, the Company faced a potential three-month delay in the delivery of its Fab-1 equipment due to global supply chain disruptions amidst the COVID-19 pandemic. Determined to announce the installation of the Fab-1 equipment before the planned Merger, the Company spent $1.4 million chartering a Ukrainian Antonov An-124, one of the largest cargo planes on the planet, to avoid shipping delays and fly the Fab-1 equipment to California.

16.     Critically, the decision to hasten the equipment delivery involved a serious trade-off that was never disclosed to investors. In order to avoid the potential delay, Enovix decided to waive the FAT. Accordingly, the equipment was loaded on a cargo plane and shipped from China to California without first making sure it met Enovix's specifications at the vendor's factory.

17.     Defendants also failed to disclose to investors that when the equipment arrived, Enovix did not conduct the SAT. The engineers from Enovix's China-based vendors were not allowed to travel to the U.S. (due to the pandemic). Accordingly, they did not install or configure the equipment, nor did they test it at the Fremont site to ensure that it could meet Enovix's specifications. Instead, Enovix tried to have its own in-house employees and local contractors attempt to install and configure the complex, custom-made, brand new manufacturing equipment upon which the Company's revenue generating capabilities depended.

18.     Unsurprisingly, as a result of skipping the FAT and SAT, Enovix's new Fab-1 manufacturing equipment encountered myriad problems, disruptions, and delays in beginning and ramping up production. Fab-1 never came remotely close to producing batteries at the rates and volumes necessary for commercial sales, and the Company never came remotely close to meeting its projected revenue timeline.

19.     The fact that Enovix had bypassed the crucial FAT and SAT steps in installing the Fab-1 equipment was not disclosed to investors until November 2022, when Defendant Rodgers— the Company's Chairman of the Board—finally came clean about what happened, and the source of the problems with Fab-1's inability to meet its production specifications. Rodgers admitted that he

1    and Defendant Rust made the decision to fly the Fab-1 equipment out to California and skip the FAT.

2    Rodgers admitted that "[o]ur decision violated our sacred Equipment Procurement Review (EPR)

3    specification by waiving a key milestone called Factory Acceptance Test (FAT)…***we decided to***

4    ***waive the FAT milestone and catch up later.***" Rodgers explained that "[t]he catch up would have

5    occurred at the Site Acceptance Test (SAT) milestone, … [but instead of using the vendor's

6    engineers] we installed our equipment with our employees and local contractors. ***We are still paying***

7    ***for the months we gained and then gave back due to equipment problems.***"

8         20.    Defendant Dales described the decision to fly the Fab-1 equipment from China to

9    California ahead of the Merger as a "***massive shortcut***" for setting up the Fab-1 factory. As Dales

10   explained, the decision was driven by Defendants' preoccupation with installing the equipment ahead

11   of the Merger, because to them "***[t]he time was just so valuable.***"

12        21.    In August 2022, Defendants vaguely acknowledged that they would need to "increase

13   our manufacturing yield metrics." Enovix announced that it would be "taking the [Fab-1] line down

14   for portions of the quarter to improve individual process modules and install planned battery

15   conveyance." Even then, after Enovix had misled investors into thinking the Company had a viable

16   manufacturing platform predicated on the necessary quality control and testing, Enovix and its senior

17   executives still did not come clean about the corners that had been cut to ensure equipment was

18   delivered before the Merger.

19        22.    In reality, and as Defendant Rodgers would later concede, Fab-1 did not merely need

20   to be "improved." It was never able to perform as necessary and ultimately had to be completely

21   abandoned. Having waived the critical FAT and SAT equipment procurement protocols—contrary to

22   what Defendants represented to investors—Fab-1 could not perform according to the Company's

23   specifications. Production lines that were meant to yield 550 batteries per hour could produce only

24   50-100 UPH over a year after the equipment was installed. Rather than produce one battery every two

25   seconds, as the Company needed to do to meet its projections, Fab-1 could only produce one battery

26   every 72 seconds.

27        23.    On November 1, 2022, Enovix revealed that it realized just *eight thousand dollars* in

28   revenue in the third quarter of 2022. Moreover, it revealed that it would be "dialing back" its work

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

on improving the "Gen1" lines at Fab-1 in favor of shifting its focus to its future "Gen2" lines because the supposed "improvements" to Fab-1 were not having the desired results on output. Consequently, Enovix "anticipate[d] achieving lower overall output from Fab-1 in 2023." In fact, Enovix revealed that it anticipated producing fewer than one million batteries in 2023—only a small fraction of the quantity it would produce if it were in fact manufacturing one battery every two seconds and running multiple lines at 550 UPH.

24.     This adverse news shocked the market, as Enovix's share price fell $7.46 the following day, a 41% decline. This news partially revealed the risk that was concealed by Defendants' failure to disclose the truth about Fab-1 being rushed into production without the requisite testing—that the manufacturing equipment would not perform to specifications and the Company simply would not be able to produce batteries at commercial levels.

25.     A few days later, Enovix announced that Defendant Rodgers would assume the role of Executive Chairman. In a statement released that day, Defendant Rodgers criticized his own company for a "lack of clear and transparent investor communications" and conceded: "We have poorly communicated on the status of Fab-1." He admitted, for the first time—and contrary to Defendants' specific representations to the contrary—that he and Defendant Rust had knowingly waived the FAT for the Fab-1 equipment, and that Enovix had not conducted the SAT either.

26.     Then, three days later, the Company announced it was bringing in an outsider to serve as a new Chief Operating Officer. The next month, Defendant Rust was replaced as Enovix's Chief Executive Officer by another Company outsider.

27.     Finally, after the close of trading on January 3, 2023, Defendant Rodgers gave a special presentation for investors. In the presentation, Rodgers revealed new, adverse information, including that the Company's second production facility and Gen2 lines would be delayed by several additional months because of the equipment failures experienced in the Fab-1 lines.

28.     During the presentation, Rodgers directly addressed the Company's "lack of clear and transparent investor communications" concerning Fab-1, "that led some of our investors to say we're outright dishonest with them." Rodgers conceded that "***I think they were reasonably misled.***"

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

29.     On this adverse news, Enovix's share price dropped another 41%, falling $4.97 per share. This news revealed new information showing the full scope of the materialized risks concealed by Defendants' misrepresentations and omissions—that Fab-1's inability to function would cause later and planned additional manufacturing processes to falter, further hampering Company growth.

30.     As a result of Defendants' violations of the securities laws, Plaintiffs and the Class lost a significant portion of the value of their investment. The Company's stock price traded at over $20 per share at the beginning of the Class Period, upon the announcement of the Enovix acquisition. The redemption value of RSVAC shares at the time the Merger was approved was approximately $10 per share. By the time the truth was revealed at the end of the Class Period, the Company's stock had fallen to $7.15.

## JURISDICTION AND VENUE

31.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

33.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

34.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading public filings and statements were made in or issued from this District and the Company's headquarters are located in this District.

35.     In connection with the acts, transactions, and conduct alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet, and the facilities of a national securities exchange.

## PARTIES

36.     Lead Plaintiff Gary Kung ("Kung"), as set forth in his certification on file with the Court (Dkt. No. 17-3) and incorporated by reference herein, purchased Enovix common stock at artificially inflated prices during the Class Period and was damaged thereby.

37.     Lead Plaintiff Discovery Global Opportunity Master Fund Ltd. ("Discovery Global"), as set forth in its certification on file with the Court (Dkt. No. 7-2) and incorporated by reference herein, purchased Enovix common stock at artificially inflated prices during the Class Period and was damaged thereby.

38.     Lead Plaintiff Discovery Nymeria Master Fund, Ltd. ("Discovery Nymeria"), as set forth in its certification on file with the Court (Dkt. No. 7-2) and incorporated by reference herein, purchased Enovix common stock at artificially inflated prices during the Class Period and was damaged thereby.

39.     Named Plaintiff Robert G. Lee, as set forth in his certification attached hereto as Exhibit 1, purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged thereby.

40.     Named Plaintiff Traci Selke, as set forth in her certification attached hereto as Exhibit 2, purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged thereby.

41.     Defendant Enovix purports to design, develop, and manufacture silicon-anode lithium-ion batteries. The Company is a Delaware corporation with principal executive offices located in Fremont, California. The Company's common stock trades on NASDAQ under the ticker symbol "ENVX."

42.      Defendant Harrold Rust co-founded Enovix in November 2006 and served as the Company's CEO and President from the Company's founding until December 29, 2022. Rust also served as Chairman of Enovix's board of directors prior to the Merger and as a member of Enovix's board of directors following the Merger.

43.     Defendant Steffen Pietzke has served as Enovix's Chief Financial Officer ("CFO") since joining the Company in April 2021.

44.     Defendant Cameron Dales served as Enovix's Chief Commercial Officer and General Manager from September 2018 to February 2023. Prior to assuming this role, Dales served as Enovix's Vice President of Operations starting in 2009 and as Vice President of Business Development starting in 2011. Dales was responsible for overseeing Enovix's manufacturing strategy.

45.     Defendant Thurman J. Rodgers has served on Enovix's board of directors since 2012. He also served as the CEO and Chairman of the Board of RSVAC from its creation in September 2020 through the Merger. Rodgers was named as the incoming Chairman of the Board of Enovix in the Proxy Statement. On November 7, 2022, Rodgers was elevated from his position as Chairman of the Board to Executive Chairman of Enovix. Rodgers held 21.4 million shares of Enovix stock as of November 7, 2022.

46.     Rust, Pietzke, Dales, and Rodgers are collectively referred to herein as the "Officer Defendants."

47.     Defendant Emmanuel T. Hernandez served as RSVAC's CFO and a member of RSVAC's board of directors at all relevant times prior to the Merger. Hernandez was also named as an incoming director of Enovix, and the chairman of its audit committee, in the Proxy Statement.

48.     Defendant Lisan Hung served as RSVAC's Corporate Secretary and a member of RSVAC's board of directors and its audit committee since December 1, 2020, and at all relevant times prior to the Merger.

49.     Defendant Steven J. Gomo served as a member of RSVAC's board of directors and its audit committee chairman since December 1, 2020, and at all relevant times prior to the Merger.

50.     Defendant John D. McCranie served as a member of RSVAC's board of directors since December 1, 2020, and at all relevant times prior to the Merger. McCranie was also named as an incoming director of Enovix, and a member of its audit committee, in the Proxy Statement.

51.     Defendant Joseph I. Malchow served as a member of RSVAC's board of directors and its audit committee since December 1, 2020, and at all relevant times prior to the Merger.

52.     Defendant Betsy Atkins served as a member of Enovix's board of directors since January 2021 and was named as an incoming director of Enovix in the Proxy Statement.

53.    Defendant Pegah Ebrahimi served as a member of Enovix's board of directors since July November 8, 2021.

54.    Defendant Gregory Reichow served as a member of Enovix's board of directors since November 2020. Reichow was also a member of RSVAC's Technical Advisory Board prior to the Merger. Reichow was named as an incoming director of Enovix in the Proxy Statement.

55.    Defendants Rust, Pietzke, Dales, Rodgers, Hernandez, Hung, Gomo, McCranie, Malchow, Atkins, Ebrahimi, and Reichow are collectively referred to herein as the "Individual Defendants."

56.    Enovix is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

## CONFIDENTIAL WITNESSES

57.    Plaintiffs' investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

58.    Former Employee 1 ("FE1") worked as a Production Manager for Enovix from October 2020 to December 2021. FE1 worked at Enovix's facility in Fremont, CA, and reported to Dan Kistner, Enovix's Director of Manufacturing Operations. FE1 was in charge of the pilot line that assembled prototypes of Enovix's lithium-ion batteries.

59.    Former Employee 2 ("FE2") worked as a Senior Staff Member – Metrology for Enovix from November 2022 to February 2023. FE2 worked at Enovix's facility in Fremont, CA. FE2 focused on Enovix's Fab-1 line's metrology capabilities. FE2 described metrology as an analysis system that involved parameter measurements which are "crucial for the functionality of your product."

60.    Former Employee 3 ("FE3") worked as a Senior Director of Operations for Enovix from October 2021 to the summer of 2022. FE3 worked at Enovix's facility in Fremont, CA, and reported to Boris Bastien, Enovix's Vice President of Operations. According to FE3, FE3 and Bastien were brought in by Enovix specifically to bring the Company's Fab-1 line to the mass production level it was designed for, at a full commercial manufacturing volume.

61.     Former Employee 4 ("FE4") worked as a Senior Program Manager – New Product Introduction for Enovix from August 2021 to September 2022. FE4 worked at Enovix's facility in Fremont, CA, and reported to Florence Chen, Enovix's Senior Director – New Product Introduction. FE4 served as the liaison between Enovix and prospective customers during the qualification process for battery products. FE4 communicated with prospective customers about their custom battery products and applications.

62.     Former Employee 5 ("FE5") worked as a Senior Principal Equipment Engineer for Enovix from September 2020 to March 2021. FE5 previously worked for Enovix as a Principal Equipment Engineer from April 2019 to September 2020. FE5 worked at Enovix's facility in Fremont, CA. FE5 was involved as a manufacturing equipment engineer with Enovix's Fab-1 line.

63.     Former Employee 6 ("FE6") worked as a Controls Engineer for Enovix from June 2022 to December 2022. FE6 worked at Enovix's facility in Fremont, CA. FE6 worked on improving output for manufacturing equipment at Enovix's Fab-1 facility. FE6's responsibilities also included supporting process engineers who were working on improving the percentage of batteries made by the Fab-1 equipment that successfully met the Company's design specifications.

64.     Former Employee 7 ("FE7") worked as a Manufacturing Manager for Enovix from October 2020 to December 2021. FE7 worked at Enovix's facility in Fremont, CA, and reported to Shane Kistner, Operations Manager. FE7 worked on improving the "yield" of the Company's pilot line. "Yield" refers to the number of batteries that meet specifications out of the total number of batteries produced. FE7's responsibilities also involved relaying information gleaned from working on the pilot line to other employees working on Fab-1 to support their efforts to increase the yield on Fab-1. FE7 regularly communicated with engineers working to improve the yield of Fab-1.

**COMPANY BACKGROUND**

**RSVAC and the De-SPAC Merger with Enovix**

65.     RSVAC was a public special purpose acquisition company, also known as a "SPAC" or "blank check" company. RSVAC was formed in September 2020, per its initial registration statement, "for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities."

66.     RSVAC's initial registration statement stated that "given the experience of our management team, our acquisition and value creation strategy will be to identify, acquire, and build a Silicon Valley-based technology company with applications in the energy or industrial sectors."

67.     RSVAC completed its IPO of 23 million "Units" at $10.00 each on December 4, 2020. Each Unit consisted of one share of RSVAC common stock and one half of a redeemable warrant. One full warrant entitled the holder to purchase one share of the Company's common stock for $11.50. Prior to the Merger, RSVAC's common stock, Units, and warrants traded on NASDAQ under ticker symbols RSVA, RSVAU, and RSVAW, respectively. RSVAC's IPO generated gross proceeds of $230 million, which was placed into a trust account for the purpose of redeeming shares or, in the event of a successful business combination, contributing capital to the acquired operating company.

68.     As RSVAC's Chairman and CEO, Rodgers had a significant financial incentive to find a target company, acquire it, and maintain the Company's stock price after the transaction. On September 24, 2020, RSVAC issued an aggregate of 5,750,000 shares of common stock (the "Founder Shares") to an entity controlled by Rodgers (Rodgers Capital LLC), for an aggregate purchase price of $25,000. Rodgers agreed not to sell the shares until the earlier to occur of: (A) one year after the completion of Business Combination or (B) subsequent to a Business Combination, if the last reported sale price of the Company's common stock equaled or exceeded $14.00 per share for any 20 trading days within any 30-trading day period commencing at least 150 days after Business Combination. At $14 per share, Rodgers stood to gain $80 million upon selling those shares.

69.     By early 2021, RSVAC had identified Enovix as a potential company to acquire. As an early-stage Silicon Valley technology company, Enovix met RSVAC's stated investment criteria.

70.     On February 22, 2021, RSVAC and Enovix entered into a merger agreement in what is known as a "de-SPAC" transaction. After receiving detailed proxy communications—including, *inter alia*, assurances that all of Enovix's newly-designed manufacturing equipment would be, or had been, subjected to both an FAT and SAT—RSVAC's stockholders approved the de-SPAC merger transaction with Enovix at a special meeting of RSVAC stockholders held on July 12, 2021.

71.     The Merger was effected by the merger of an RSVAC subsidiary with and into pre-Merger Enovix, with Enovix surviving the combination as a wholly owned subsidiary of RSVAC.

Following the consummation of the Merger, RSVAC changed its name to Enovix Corporation and pre-Merger Enovix changed its name to Enovix Operations Inc. Each outstanding share of pre-Merger Enovix common stock was converted into the right to receive a number of shares of the Company's common stock at a conversion ratio set forth in the merger agreement, and all outstanding warrants and options to purchase pre-Merger Enovix common stock were converted into warrants and options to purchase a number of shares of the Company's common stock, as set forth in the merger agreement.

72.      Prior to, and but for, the consummation of the Merger, RSVAC's shareholders were entitled to redeem their shares for a *pro rata* portion of the trust account funds, which was approximately $10 per share at the time of the Merger. The Merger closed on July 14, 2021, with the Company's stock trading at slightly over $20 per share.

73.      Concurrent with the Merger agreement, RSVAC also entered into a Private Investment in Public Equity ("PIPE") financing agreement, whereby RSVAC agreed to issue and sell, in a private placement to close immediately prior to the closing of the Merger, 12.5 million shares of RSVAC common stock for $14.00 per share, for a total of $175 million.

74.      Accordingly, between the SPAC holdings (which would be contributed to the post-Merger Company) and PIPE financing, the de-SPAC Merger with RSVAC presented Enovix with a potential influx of $405 million in cash that could be used to finance Enovix's ongoing operations and the build-out of its manufacturing capabilities.

### Enovix Had to Manufacture Batteries at Commercial Levels to Generate Revenues

75.      Enovix is an early-stage technology company that develops and manufactures a new type of Li-ion battery that is purportedly smaller and stronger than existing Li-ion batteries. It does so by using silicon anodes and a proprietary 3D stacking architecture that it claims increases energy density and helps the batteries maintain a high cycle life.

76.      Enovix claims that its new Li-ion battery lasts longer than conventional Li-ion batteries and is five years ahead of current industry production.[3]  Specifically, by designing a Li-ion

---

[3] According to the Proxy Statement, based on "a 30-year Li-ion battery industry trajectory of modest (4.36%) annual Li-ion battery energy density improvements… and Enovix's estimated greater energy

battery that deploys a silicon anode, and constructing the battery using 3D battery cell architecture, Enovix claimed to be able to manufacture Li-ion batteries with 27%-110% higher energy density as measured by battery power (in watts) and battery size (in volume). In essence, Enovix claimed it could make a smaller, stronger Li-ion battery.

77.     Enovix started developing its technology in early 2007 at a small facility in Fremont, California. In 2012, Enovix moved to a larger facility in Fremont and began work on the manufacturing approach and plans for its products. Between 2012 and 2017, Enovix procured and installed pilot production equipment that could produce small quantities of Li-ion batteries to provide to potential customers as samples, but not at commercially viable levels.

78.     According to the Proxy Statement, at the time of the Merger Enovix was "a development stage company that has no product revenue to date and has incurred a net loss of $39.7 million for the year ended December 31, 2020 and $16.2 million for the period ended March 31, 2021. As of March 31, 2021, [Enovix] had an accumulated deficit of $223.4 million."

79.     Enovix's CEO, Defendant Harrold Rust, stressed the importance of manufacturing in statements made when the Company went public. In a July 14, 2021 press release, Rust stated that Enovix was "focused on producing the first advanced silicon-anode lithium-ion battery for mass market applications from our U.S. manufacturing facility." Defendant Rodgers added: "We believe that Enovix will be the first to deliver at scale due to its proprietary 3D cell architecture, world-class team and automated manufacturing. With five design wins with major technology leaders, Enovix is years ahead of other battery companies. Even better, it has a plan to maintain that lead."

80.     Although Enovix had previously produced and delivered sample batteries using its pilot production line, the pilot line produced only 20 batteries per day—nowhere near the amount needed to support commercial sales operations. Building a full-scale production facility was therefore the key step to producing batteries at a commercially viable level and meeting revenue projections.

---

density of at least 27%, it would require five years for the industry to reach energy densities equivalent to Enovix's current batteries."

81.     Enovix planned to sell its new battery to Original Equipment Manufacturers ("OEMs"), who would incorporate the battery into consumer electronics such as smart watches, headsets, laptop computers, mobile phones and electric vehicles.

82.     In order to sell its new Li-ion batteries, Enovix had to have them "qualified" by the OEMs. Through the qualification process, OEMs would try the newly designed batteries in their own consumer products to ensure that they functioned as intended. If the batteries functioned as represented, OEMs would design their consumer products to incorporate the new Li-ion batteries. However, before designing their consumer products for compatibility with the new batteries, OEMs need assurance that Enovix could manufacture quality batteries in the quantities needed to satisfy their own production needs. If Enovix could demonstrate its ability to do so, OEMs would place purchase orders commensurate with large-scale consumer product manufacturing.

83.     Before an OEM would "qualify" Enovix's new Li-ion battery, Enovix had to provide them with batteries manufactured on the same production line that would be used to fill the order. Enovix also had to demonstrate that its manufacturing facility was able to produce a sufficient number of batteries to timely fill a purchase order. Thus, Enovix needed to have a functioning manufacturing line meeting mass production specifications before it could begin generating revenue from product sales and meeting its financial projections.

84.     FE4 confirmed that the qualification process involved a number of steps. One early step was to prove to the customer that the Fab-1 line could manufacture a batch of batteries to meet that customer's custom-designed specifications for the battery. The next step then involved ramping up manufacturing to prove that Enovix could produce large quantities of the battery that also met customers' specifications. For example, in this high-volume qualification step, a customer would ask Enovix to produce 10,000 or 20,000 batteries by a certain date that the customer would then test themselves to ensure the products met the customer's specifications.

**The Factory Acceptance Test (FAT) and Site Acceptance Test (SAT) Were Critical Steps in Procuring New Manufacturing Equipment**

85.     Manufacturing a new product—like a newly designed battery—that has never before been manufactured is a complex process because it requires custom-designed manufacturing

equipment. Such equipment, designed and produced by engineers at equipment vendors, has countless opportunities for "bugs" and other errors. To reduce such errors, companies purchasing newly designed manufacturing equipment have equipment procurement protocols that include two key quality control tests: The Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT"). These tests are designed to ensure that the new manufacturing equipment meets performance requirements, and to mitigate the significant risks that the equipment will not perform as needed.

86.    The FAT is performed offsite at the equipment vendor's factory to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications. The new manufacturing equipment is set up at the vendor's factory and then tested by the vendor's engineers in accordance with a detailed plan agreed upon by the purchaser and the equipment vendor.

87.    The main objective of the FAT is to ensure that the equipment can manufacture at the speeds and quality necessary to meet the customer's manufacturing needs. In the event that the FAT reveals manufacturing deficiencies, they can be corrected much more easily and cheaply at the vendor's facilities. Once the equipment is shipped out and installed in the buyer's factory, it becomes much more costly and difficult to fix problems with the equipment. Conducting the FAT greatly reduces the risk that manufacturing equipment will not produce as designed and paves the way for on-site troubleshooting *before* the equipment is transported and installed at the customer's facility.

88.    The first step in conducting the FAT is a written plan detailing all of the customers' specifications and what level of equipment performance is needed to meet the customer's expectations. The parties agree on an inspection plan and a set of procedures. Manufacturing data is recorded by the equipment manufacturer to verify that it meets the customer's specifications, and the data are submitted to the customer for review.

89.    According to FE5, requirements for a FAT and/or SAT are typically part of the contract signed by an equipment purchaser and the vendor. The criteria for what will be tested during the FAT and SAT are typically negotiated and agreed upon about a year prior to when the tests are conducted. While changes can be made to the criteria, that would have to be negotiated between the purchaser and vendor.

90.     The SAT is the next critical quality control procedure. It provides an opportunity to confirm that the performance experienced during the FAT can be replicated at the customer's site after the equipment is installed and configured. Typically, the working conditions at the equipment vendor's location are not the same as the working conditions at the customer's location. The SAT requires the equipment to be installed in the customer's facility and for it to run through an actual production at the customer's location.

91.     To conduct the SAT, the equipment vendor sends representatives—typically the same engineers who designed the system and conducted the FAT—to install the equipment, configure it, conduct tests, and verify that the equipment operates correctly. The SAT ensures that the equipment is installed correctly and is properly integrated with the customer's supporting systems—like computer networks—and makes sure the customer's productivity specifications are met. If production or quality problems are detected at the SAT, the equipment vendor has the responsibility to resolve it.

92.     FE5 explained that in the manufacturing industry, conducting a FAT and SAT on new equipment is "all risk mitigation." FE5 confirmed that with respect to the FAT, "you want to test [new manufacturing equipment] at the factory because it's cheaper to fix it at the factory than at your site," and for the SAT, testing the equipment to ensure it is working properly upon delivery, "is easier to do before the integrators (suppliers) go home." As FE5 explained, "if you skip the tests (FAT and SAT), you're not mitigating the risks."

93.     Indeed, according to General Electric, "Factory and Site Acceptance Tests are an essential part of the project development cycle." The reason is self-evident. A poor or rushed—or nonexistent—FAT or SAT will result in undiscovered non-conformities, which can then be corrected only after the equipment is installed and the problem emerges, which will disrupt equipment performance and project schedules. In sum, FATs and SATs will almost always save money and time over fixing issues as they come up in the field.

94.     As detailed below, Defendants specifically told investors that the Company's manufacturing equipment was subjected to an FAT and SAT and that there were no "red flags." In reality, as Defendant Rodgers later admitted, Defendants Rodgers and Rust intentionally *waived* the

FAT and SAT in a misguided effort to have the new equipment installed ahead of the Merger. As a result, the Company's manufacturing equipment never performed as needed and it was never able to manufacture at the quality and quantity needed to meet projected financial performance.

## DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE COMPANY'S FAB-1 MANUFACTURING EQUIPMENT

95.    On June 24, 2021, the Company issued a Proxy Statement and Prospectus (a single document bearing both titles) soliciting shareholder approval of the Merger between RSVAC and Enovix, as well as other proposals related to the Merger ("Proxy Statement"). One the same date, the Company filed the Proxy Statement with the SEC on Form 424B3. The Proxy Statement was incorporated into and formed part of a Registration Statement filed by RSVAC with the SEC on Form S-4. The Registration Statement was filed on March 8, 2021 and declared effective, after a series of amendments, on June 24, 2021. The Registration Statement was signed by Defendants Rodgers, Hernandez, Gomo, McCranie, Hung, and Malchow.

96.    The Proxy Statement stated that "the disinterested members of the board of directors of RSVAC [*i.e.,* excluding Rodgers] have unanimously approved and adopted the Merger Agreement and the transactions contemplated therein and unanimously recommends that RSVAC stockholders vote 'FOR' adoption and approval of the Business Combination Proposal, 'FOR' the Nasdaq Proposal, 'FOR' the Directors Proposal, 'FOR' the Charter Amendment Proposal, 'FOR' the Advisory Proposals and 'FOR' the Incentive Plan Proposals presented to RSVAC stockholders in this proxy statement/prospectus, and 'FOR' the Adjournment Proposal, if presented."

97.    The Proxy Statement referred investors to the Company's prior SEC filings, among other things, under the heading, "WHERE YOU CAN FIND MORE INFORMATION." Specifically, the Proxy Statement told investors that "[w]e file reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read RSVAC's SEC filings, including this proxy statement/prospectus, over the Internet at the SEC's website at http://www.sec.gov." Accordingly, the Proxy Statement incorporated by reference all of RSVAC's SEC filings predating the Proxy Statement.

98.    On February 22, 2021, Enovix released an investor presentation in connection with the announcement of its plans to go public via the Merger with RSVAC. The presentation was filed by RSVAC as Exhibit 99.2 to a Current Report filed with the SEC on Form 8-K on February 22, 2021. Defendant Hernandez signed the 8-K. Defendants Rust and Rodgers signed the presentation.

99.    In the February 22, 2021 investor presentation, Enovix discussed its first commercial battery fabrication line, Fab-1, and explained that the manufacturing specifications for that line would be to manufacture one "3D battery every 2.0 seconds" and to run lines that could produce 500 units per hour ("500 UPH lines."). The investor presentation stated that "Fab-1 [is] being equipped now," and told investors that to ensure that the equipment being manufactured could produce Li-ion batteries at these speeds, the equipment would be subjected to a FAT and SAT.

100.    The February 22, 2021 investor presentation stated that the newly designed manufacturing equipment was already at the FAT stage. Indeed, the presentation included a slide expressly stating that the "Fab-1 Equipment" was "*At Vendor Factory Acceptance Test (FAT).*" The presentation explained that during the FAT, "Equipment must perform to specification at the vendor's factory before shipment to Enovix and must pass another test after installation at the Enovix site."

101.    These statements, when incorporated by reference into the Proxy Statement, were false and misleading because Defendants failed to disclose that Enovix had waived the FAT for its Fab-1 manufacturing equipment, and failed to conduct the SAT. Accordingly, the Fab-1 equipment did not perform to specification at the vendor's factory before shipment to Enovix, as it was not tested at all. Likewise, the equipment did not pass another test after installation at the Enovix site, as this second test (the SAT) was not conducted.

102.    The February 22, 2021 investor presentation also included a slide purporting to show its "Fab 1 Schedule." The schedule identified the planned date ranges for the FAT and SAT for each manufacturing function (electrode fabrication, assembly, packaging, and testing). The FATs for all of the manufacturing functions were indicated to have started before the presentation. The presentation further explained that given the Fab-1 schedule, "First Revenue" was expected in Q2 2022. A second fabrication line, "Fab-2," was expected to follow with first revenue approximately one year later, in Q2 2023.

103.    These statements, when incorporated by reference into the Proxy Statement, were false and misleading because Defendants failed to disclose that Enovix waived the FAT for its Fab-1 manufacturing equipment and failed to conduct the SAT. Accordingly, the date ranges provided for the FATs and SATs misleadingly implied that those tests were conducted according to the schedule provided. It was thus misleading to project "First Revenue" in Q2 2022 based on the schedule provided, as the FAT and SAT were not conducted, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever.

104.    Although the Company's decision to waive the FAT and fly the Fab-1 equipment to California ahead of the Merger occurred in April 2021[4], after the statements in the February 2021 investor presentation were made, Defendants incorporated those statements into the Proxy Statement after the decision was made. Defendants' failure to disclose in the Proxy Statement that the Company had waived the FAT and failed to conduct the SAT rendered the February 2021 statements misleading when they were incorporated into the Proxy Statement.

105.    The Proxy Statement stated that:

> Fab-1 is Enovix's current production factory, for which Enovix started procuring equipment in 2020. ***All critical equipment for fabrication has arrived and is currently assembled. Enovix expects Fab-1 to be fully operational by the end of 2021 and to begin production by Q1 2022, with first production revenue in Q2 2022.***

106.    The highlighted statements were misleading because Defendants failed to disclose that Enovix waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Accordingly, Defendants could not have reasonably expected Fab-1 to be "fully operational" in 2021, to begin production by Q1 2022, or to achieve first production revenue in Q2 2022.

107.    The Proxy Statement also contained the following purported risk disclosure, which was inadequate and misleading:

---

[4]    *See,    e.g.,*    https://enovix.medium.com/ahead-of-the-crowd-going-above-supply-chain-delays-45d16778e95e

***Enovix relies on a new and complex manufacturing process for its operations: achieving production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***

Although Enovix has developed its Li-ion battery technology, Enovix relies heavily on a new and complex manufacturing process for the production of its lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes. This will require Enovix to bring up a first-of-its-kind automated production line to produce its batteries. ***It may take longer than expected to install, qualify and release this line and require modifications to the equipment to achieve its goals for through put and yield. The work required to develop this process and integrate equipment into the production of Enovix's lithium-ion battery cells is time intensive and requires Enovix to work closely with developers and equipment providers to ensure that it works properly for Enovix's unique battery technology. This integration work will involve a significant degree of uncertainty and risk and may result in the delay in the scaling up of production or result in additional cost to Enovix's battery cells.***

108.   The highlighted statements were misleading, and the purported risk disclosure was inadequate, because Defendants failed to disclose that Enovix waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Moreover, it was misleading to say that Enovix was required to work closely with developers and equipment providers to ensure that the equipment and process work properly, when Enovix bypassed the very procedural safeguards alluded to in that statement – the FAT and SAT. This generic warning of vague "uncertainty and risk" that "may" result in delaying the scaling up of production was insufficient to apprise investors of the specific risks already incurred by waiving the FAT and failing to conduct the SAT.

109.   On August 10, 2021, Enovix issued its first "Letter to Our Shareholders," detailing its activities and financial results for the second quarter of 2021, Enovix's last full quarter as a private company before the de-SPAC merger. The letter was attached as an exhibit to a current report filed on Form 8-K with the SEC. Defendants Rust and Pietzke signed the letter, and Pietzke signed the 8-K.

110.   The August 10, 2021 "Letter to Our Shareholders" stated that:

- 23 -

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification. ***The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery.*** …

111.    These statements were false and misleading because Defendants failed to disclose that (1) Enovix waived the FAT for its Fab-1 manufacturing equipment and thus the factory acceptance testing was not "already performed"; and (2) Enovix failed to conduct the SAT for its Fab-1 manufacturing equipment and thus Fab-1 was not "now undergoing" a qualification process that included the "site acceptance test." These false statements concealed the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever.

112.    Also on August 10, 2021, during an earnings call discussing Enovix's quarterly results for the second quarter of 2021, Defendant Rust made the following statement:

> As many of you saw during our showcase last month, we are on track to start production at Fab-1 in the first quarter of 2022, resulting in product revenue in the second quarter of 2022. ***Last quarter, we were able to navigate the global supply chain constraints and receive all key equipment for our first production line. This required heroic efforts, including a critical decision to charter Antonov An-124, one of the world's largest cargo planes, to fly over 60 tons of manufacturing equipment from Asia to San Francisco. We managed industry-wide supply chain issues and installed and started qualifying our equipment in the midst of a global pandemic.***

113.    These statements were misleading because Defendants failed to disclose that (1) the "critical decision" to fly the Fab-1 equipment to California also entailed waiving the FAT on its Fab-1 manufacturing equipment; and (2) Enovix failed to conduct the SAT for its Fab-1 manufacturing equipment, which was a crucial part of qualifying the Company's Fab-1 equipment. Thus, Rust's statement that Enovix "started qualifying our equipment in the midst of a global pandemic" was at least misleading or outright false. These misleading statements concealed the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever.

114.    During the same earnings call, Rust responded as follows to a question from an analyst from Colliers Securities:

> Q: … as you look at the latest capacity test, how is your proprietary equipment sort of stacking up against your expectations on capacity? Better or worse? Any detail around that would be great.
>
> A: Yes, I think we're pleased overall in terms of the equipment and its ability to do its intended function. … ***We have a pretty rigorous set of both factory and site acceptance things we have to go through and I would say there's no red flags there.*** …

115.    The highlighted statement was false and misleading because Rust failed to disclose that Enovix had waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment. Thus, it was misleading to say the Company had to complete those tests, when it had already decided that it did not have to. Rust's statement that "there's no red flags there" falsely implied that Enovix had conducted the FAT and SAT with at least satisfactory results, when in truth the tests were not conducted at all. These false and misleading statements concealed the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever.

116.    On September 9, 2021, at the Cowen 14th Annual Global Transportation & Sustainable Mobility Conference, Defendant Rust made the following statement in response to an analyst's question:

> … we started ordering equipment for this factory in Fremont. We've got a roughly 50,000 square foot building here where we're putting on our first production lines that equipment has been all installed for the last several months. The last pieces came in. ***We're in the middle of qualifying, which means basically testing out of each piece of equipment, making sure it's operating as optimum operating point, making sure we understand where the process windows are. That's going on quite well.*** We expect that work will take us into the fourth quarter, to finish that work.

117.    These statements were false and misleading because Rust failed to disclose that Enovix had waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment. The statements misleadingly implied that the Fab-1 equipment was currently engaged in a qualifying process that included conducting both the FAT and SAT, and that the process was "going on quite

well." In truth, the FAT and SAT were not conducted at all. These false and misleading statements concealed the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever.

118. On March 3, 2022, Enovix released its Q4 2021 Letter to Our Shareholders. In that letter, signed by Defendants Rust and Pietzke, Defendants stated:

> We have commenced deliveries from Fab-1 to our lead customers. Getting to this point was not easy. ***We have overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia.*** Fab-1 features a first-of-its-kind line for battery production. As a result, every day we solve problems needed to improve yield and output. Simultaneously, this work is providing valuable learning, improving our processes and equipment for future lines.

119. These statements were misleading because Defendants failed to disclose that Enovix had waived the FAT and failed to conduct the SAT for its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Thus, it was misleading to state that the Company had "overcome…extended shipping times" when in reality it did so by waiving the FAT, or that it had "overcome…intermittent vendor support" when the Company had completely foregone conducting the SAT with the vendor's engineers.

120. The Q4 2021 Letter to Our Shareholders also stated that "We made significant progress in 2021 by equipping our first factory, allowing us to start commercial production and remain on track for our first product revenue by Q2 2022."

121. This statement was false and misleading because Defendants failed to disclose that Enovix had waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Thus, it was false to claim that Enovix was "on track" to meet its goals for realizing its first product revenue by Q2 2022, and misleading to say the Company had made "significant progress" in "equipping" Fab-1 without disclosing the failure to complete the critical FAT or SAT.

122.    On March 25, 2022, Enovix filed its annual report for 2021 on Form 10-K with the SEC ("2021 10-K"). Defendants Rust, Pietzke, Rodgers, Atkins, Hernandez, Ebrahimi, McCranie, and Reichow signed the 2021 10-K.

123.    In the 2021 10-K, Enovix stated that "After proving out our manufacturing capability at Fab-1 and leveraging our learning to improve our manufacturing processes, our plan is to expand capacity across multiple facilities and focus on localized production in proximity to our customers."

124.    This statement was false and misleading because Defendants failed to disclose that Enovix had waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Thus, it was false and misleading to say that Enovix had "prov[ed] out [its] manufacturing capability at Fab-1."

125.    The 2021 10-K also contained the following purported risk disclosure, which was inadequate and misleading:

> ***We rely on a new and complex manufacturing process for our operations: achieving production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***
>
> Although we have developed our Li-ion battery technology, we rely heavily on a new and complex manufacturing process for the production of our lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes. This will require us to bring up a first-of-its-kind automated production line to produce our batteries. ***It may take longer than expected to install, qualify and release this line and require modifications to the equipment to achieve our goals for throughput and yield. The work required to develop this process and integrate equipment into the production of our lithium-ion battery cells is time intensive and requires us to work closely with developers and equipment providers to ensure that it works properly for our unique battery technology. This integration work will involve a significant degree of uncertainty and risk and may result in the delay in the scaling up of production or result in additional cost to our battery cells.***

126.    The highlighted statements were misleading, and the purported risk disclosure was inadequate, because Defendants failed to disclose that Enovix waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment

would not perform to the Company's specifications on the timeline Defendants provided, if ever. Moreover, it was misleading to say that Enovix was required to work closely with developers and equipment providers to ensure that the equipment and process work properly, when Enovix bypassed the very procedural safeguards alluded to in that statement – the FAT and SAT. This generic warning of vague "uncertainty and risk" that "may" result in delaying the scaling up of production was insufficient to apprise investors of the specific risks already incurred by waiving the FAT and failing to conduct the SAT.

127.    The 2021 10-K also stated, under the heading of "Key Trends, Opportunities and Uncertainties":

> Currently, we are building out our Fab-1 at our headquarters in Fremont, California. We have commenced deliveries of qualification cells from Fab-1. ***Challenges associated with building out Fab-1 include extended shipping times, supply chain constraints and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions imposed on certain countries in Asia.*** Fab-1 features a first-of-its-kind line for battery production. As a result, every day we solve problems needed to improve yield and output. Simultaneously, this work is providing valuable learning, improving our processes and equipment for future lines.

128.    The highlighted statement was misleading because Defendants failed to disclose that Enovix had waived the FAT and failed to conduct the SAT for its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Thus, it was misleading to state that the Company faced challenges including "extended shipping times, supply chain constraints and intermittent vendor support," when the Company's attempts to address those challenges entailed waiving the FAT and failing to conduct the SAT with the vendor's engineers.

## PLAINTIFFS AND THE CLASS WERE DAMAGED WHEN THE CONCEALED RISKS MATERIALIZED

129.    Defendants' false and misleading statements and omissions about Fab-1, as identified above, concealed the material risks that Fab-1 would experience severe delays and setbacks, materially delaying the Company's stated timeline for recognizing its first meaningful revenue from the production and sale of its batteries. When Defendants finally began to gradually reveal that those

1    concealed risks had materialized, it caused Enovix's share price to fall precipitously, harming

2    Plaintiffs and the Class.

3         130.    In the second half of 2022, Enovix began to gradually reveal that the risks concealed

4    by Defendants' failure to disclose that they had bypassed the FAT and SAT were materializing. The

5    continued setbacks to the Fab-1 manufacturing equipment delayed not only the Company's goal of

6    recognizing material product revenue by Q2 2022, but also pushed back the development of Enovix's

7    second lines and next generation of manufacturing equipment, which had been expected to build upon

8    the original Fab-1 line's success.

9         131.    In August 2022, Enovix announced that it had met its February 2021 goal of

10    recognizing its first product revenue by Q2 2022, as the Company had brought in $5.1 million in

11    revenue in the quarter. However, barely any of that revenue came from delivering products to

12    customers. $5 million of the $5.1 million in revenue was attributable to completing the initial phases

13    of a product development program with a single customer and qualified as "service revenue."

14         132.    At the same time, Defendants vaguely acknowledged that they would need to "increase

15    our manufacturing yield metrics." Accordingly, to "prioritize Fab-1 improvements in the third

16    quarter" of 2022, Defendants announced that they would be "taking the line down for portions of the

17    quarter to improve individual process modules and install planned battery conveyance." Defendants

18    stated that their "goal" was to "do the needed work in Q3 to position us for the start of our production

19    ramp to close the year." Defendant Rust told investors that Fab-1 would be "the workhorse of our

20    output next year" and to expect the revenue "ramp" to begin in Q4 2022, after the "improvements"

21    had been made to Fab-1.

22         133.    In reality, as Defendant Rodgers would reveal a few months later, Fab-1 did not simply

23    need to be "improved." It was never able to perform as necessary and needed to be completely

24    abandoned. Having waived the critical FAT and SAT equipment procurement protocols—contrary to

25    what Defendants represented to investors—Fab-1 was unable to perform according to the Company's

26    specifications.

27         134.    As FE6 confirmed, by June 2022 the machinery in the area of Fab-1 in which FE6

28    worked was producing less than 10% of the expected production rate. While the equipment in FE6's

assigned area was expected, per Enovix's original specifications, to produce 550 batteries per hour, by June 2022 it was still producing only 30-40 batteries per hour. By December 2022, FE6 reported that Enovix had increased production numbers in FE6's area of Fab-1 to approximately 100 batteries per hour, but this was still a "far cry" from the original specifications. In FE6's estimation, having worked to improve the production capacity of Fab-1 for several months in the last half of 2022, the Fab-1 manufacturing equipment was never going to be capable of producing more than 200 UPH even if all of the attempted improvements were successful.

135.    FE6 also reported that production numbers for Fab-1, such as the UPH rates, were readily available at any given time because the Fab-1 machinery automatically generated those numbers in automated reports. According to FE6, Enovix had a "whole data pipeline set up to look at the number of batteries made and quality of the batteries. There were several dashboards that showed all that information." FE6 explained that "everyone" at Enovix had access to these production reports.

136.    On November 1, 2022, after the close of trading, Enovix released its Letter to Our Shareholders for Q3 2022. The letter reported that Enovix's revenues for the third quarter were just *eight thousand dollars*. The letter explained that the revenue came from "a modest number of batteries shipped to customers for qualification programs and pre-production and end-product builds." Enovix was not, in fact, manufacturing or delivering batteries on a commercial scale, but rather "[t]he majority of batteries shipped during the quarter were samples that did not generate revenue."

137.    Although not yet fully disclosing the nature and extent of its manufacturing problems and that Enovix was unable to manufacture batteries at the speed and output necessary, the letter cryptically disclosed that the "improvements" that Enovix had partially shut down Fab-1 to implement had not been successful, and that the Company was now pivoting towards prioritizing its next generation manufacturing lines:

> As we highlighted in last quarter's Shareholder Letter, we made a conscious decision to focus on manufacturing improvements over shipments in Fab-1 during the third quarter. … Given the wide gap in expected performance between our Gen1 and Gen2 and the slower-than-expected improvements on our Gen1 manufacturing equipment, we have now concluded that the incremental effort necessary to drive higher throughput on Gen1 technology is better spent on the critical yield and productivity learning necessary for a strong launch of our

Gen2 Autoline. ***As a result, we are dialing back Gen1 throughput enhancement activities and anticipate achieving lower overall output from Fab-1 in 2023 in favor of focusing on the Gen2 Autoline, which is the engine for our future scaling.***

138.    The November 1, 2022 letter further stated that the total production run rate for 2023 would be under one million battery cells—less than 10% of the production it said would result from producing a battery every two seconds:

> In the third quarter, we worked to optimize our first production line ("Line 1") in Fab-1 for higher yield and throughput, bring up our second production line in Fab-1 ("Line 2"), and complete our learnings for Gen2. ***We expect Fab-1 improvement activities to extend into 2023, but at a slower rate given the decision to redirect resources to Gen2. Given this, we expect to exit 2023 at a run rate of under one million battery cells produced from the Gen1 equipment at Fab-1.***

139.    FE2 was hired at Enovix to increase the yield rate for each stage of the process on the Fab-1 line overall, but FE2 explained that the work was not intended to transition the Fab-1 line to commercial production levels, but rather for developing the Fab-2 line. According to FE2, whatever improvements they made to the Fab-1 line were used to inform the work being done to prepare the Fab-2 line for commercial production levels.

140.    The news that there would be dramatically lower output from Fab-1 in and that the company would "redirect" to Gen2 lines suddenly and dramatically changed the perceived timeline for Enovix to commercialize its batteries and achieve revenue. As Defendant Dales explained during the Cowen Global Transportation & Sustainable Mobility Conference, producing batteries for Original Equipment Manufacturers ("OEMs") was a multi-stage process that involved substantial testing: "With [large strategics], there's a multiyear process of just qualifying the technology to make sure that the technology really works." While Enovix had cleared some of these hurdles with the batteries produced on its Gen1 lines, giving up on the Gen1 lines in favor of trying with new and untested Gen2 lines meant starting the qualification process over again.

141.    The November 1, 2022 letter told investors: "We expect that certain customers may require up to several months to qualify the Gen2 line before accepting product that is manufactured on that line." Moreover, Enovix did not expect to even receive the new manufacturing equipment for its Gen2 lines until the second half of 2023.

142.    A November 2, 2022 post to Motley Fool entitled "Why Enovix Stock Plunged Today," explained that investors "weren't expecting an announcement the company will put more effort into Gen2 technology over improving Gen1 technology. This likely means that revenue scaling will take longer than expected." The post went on to explain that "management said that Gen2 production is expected to start in late 2023 at best. This means the company will need to survive on the $349 million in cash on the balance sheet until then, which may be a stretch. The company has used over $91 million in cash in the first three quarters of the year and will spend more on installing capacity next year."

143.    On this news, Enovix fell from a close of $17.99 per share on November 1, 2022, to $10.53 per share by the close of trading on November 2, 2022 on unusually high trading volume, a 41% decline.

144.    While the disclosure of these delays and production problems was news to investors, these issues with Fab-1 had been present since the prior year, shortly after Enovix installed the equipment after failing to conduct the FAT or SAT. FE3 explained that they and their direct supervisor were brought in by Enovix to bring to the Fab-1 line to a full commercial manufacturing volume because when FE3 joined Enovix in October 2021, the Fab-1 line "was not producing." By the time FE3 left Enovix in summer 2022, the Fab-1 line was still not producing at levels the company needed. As FE3 described it, "there was progress," but "not substantial enough to meet the needs of what was proposed."

145.    On November 7, 2022, Enovix announced that Defendant Rodgers would take on a new, more directly involved role as the Company's Executive Chairman. In a statement released that day, Rodgers admitted to investors that "We have poorly communicated on the status of Fab-1," explaining:

> [W]e lowered our 2023 revenue projection in a confusing manner that erroneously implied that there were bigger problems with our technology. Our revenue projections were lowered because our Fab-1 manufacturing ramp was delayed in our first year of production. This is an unacceptable execution problem which I will discuss.
>
> However, as I look back on the decisions the company made, I would make the same calls again. For example, when Harrold Rust called me and said that Enovix Fab-1 would be delayed by at least three months

due to the COVID-related shipping malaise unless we spent $1.4 million to charter the world's largest airplane, a Ukrainian AN-124, to fly over 55 tons of Fab-1 equipment to Silicon Valley in one shot, I said, 'Brilliant, do it.' *Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.*

*The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.*

146.    That same day, Cowen and Company issued an analyst report highlighting this portion of Rodgers' statement, underlining the importance to investors of the newly revealed fact that Enovix failed to conduct the FAT and SAT for the Fab-1 equipment:

Mr. Rodgers noted that while he approved this decision [to expedite delivery of Fab-1 equipment via air freight], and would make the same call again, it violated the Factory Acceptance Test milestone of the company's internal EPR because COVID restrictions prohibited engineers from flying to China to observe equipment running at full speed before approving delivery. Enovix was hopeful to make up for this under the Site Acceptance Test milestone by having vendor engineers check equipment at Enovix facilities, but travel restrictions forced internal engineers and local contractors to handle installment.

147.    FE4 corroborated that in August 2021, the Company was attempting to use in-house employees or independent contractors to complete the work of attempting to fully qualify the Fab-1 manufacturing equipment, struggling for months to get its manufacturing equipment to work as it was supposed to. At that point, FE4 explained that "we didn't have the right people working on those machines to get it to where it needed to be in the time it needed to be done."

148.    When FE2 began working at Enovix in November 2022, they began an "intensive time looking at [the] metrology capabilities" of the Fab-1 line, and after "a couple of days I looked at that line, and it was clear to me it was a pilot line…even though they called it a 'fab' line." FE2 quickly recognized that the line would never be revenue-generating, but was instead better suited for smaller

scale production. FE2 recalled that the Company interrupted the Fab-1 production line often, which slowed production down.

149.    FE3 confirmed that when a new type of manufacturing line is built that makes use of newly designed and untested machinery, as was the case for Enovix's Fab-1, typically the first line is used as a pilot manufacturing line to inform the next line, which would be used for commercial production.

150.    FE4 also reported that Enovix was unable to meet the high-volume production stage requirements for any of its potential customers with Fab-1, as they were "unable to produce the required quantities."

151.    On November 10, 2022, Enovix announced that it was bringing in Ajay Marathe, a Company outsider, as Chief Operating Officer ("COO").

152.    On December 29, 2022, Enovix announced that Defendant Rust would "retire" as President and CEO of the Company and as a member of the Board of Directors. Enovix replaced Rust that same day.

153.    On January 3, 2023, after the close of trading, Defendant Rodgers hosted a "special presentation to shareholders" via conference call. During his presentation, Rodgers revealed that the Company's board had discussed changing the Company's CEO as early as August 5, 2022, discussed a mechanism for changing the Company's CEO on October 3, 2022, commenced the formal launch of the Company's CEO search on November 4, 2022, and confirmed the decision to hire Rust's replacement on December 24, 2022. According to Rodgers' presentation, Defendant Rust was fully informed of each of these steps. This indicates that the end of Rust's tenure at Enovix was more akin to a termination than a "retirement," as the timing of the discussions about replacing Rust as CEO coincided with the production issues with Fab-1 coming to a head in late 2022.

154.    During Defendant Rodgers' January 3, 2023 special presentation, Rodgers directly addressed the Company's "lack of clear and transparent investor communications" concerning Fab-1, "that led some of our investors to say we're outright dishonest with them." Rodgers conceded that "*I think they were reasonably misled.*"

155.    Rodgers also provided more information on the first production line at Fab-1 and its disappointing output:

> [Line 1 is] a Fremont wearables line, meaning make small batteries, uses the same heads, but is nonfunctional for automation point of view. That means its rated capacity of 550UPH [Units Per Hour] is really more like 100, and obviously, that wreaks havoc with output and promises.

156.    Line 2, meanwhile, was incomplete according to Rodgers. "It's only a partial line. We only built half the line," he told investors on the January 3, 2023 call, "we didn't want to commit to the second half of the Line 2, until Line 1 worked." Rodgers went on:

> [Fab-1] then goes to [producing] 22.5 [batteries per] second[] when we lost the automation and the UPH dropped from 550 to 100, and it then went to 72 seconds when the OEE dropped because of the lack of automation and the need to do manual stuff in the yield problem. So, what we started out as the battery every 2 seconds ended up battery every 72 seconds, the battery minute roughly, and that's been the problem and it's got multiple causes.

157.    According to Rodgers, one piece of equipment was "rated at 550" UPH, but Rodgers admitted that "we don't think that machine if we worked on it forever would be over 200," corroborating FE6's estimate. Due to the problems with the manufacturing equipment at Enovix's Fab-1 facility, Rodgers also confirmed (as FE6 reported) that Fab-1 was "doing less than 10% of what it should be doing."

158.    During the same presentation, Rodgers also announced further delays to the Gen2 manufacturing lines, which could be traced back to the problems with Fab-1 and its "Gen1" production lines:

> Gen2 equipment owners will prove to the board, in bold, that they've embedded all the learning from Gen1. So, Gen1 is not working the way we wanted to… And Gen2 can't have any of those problems and you have to prove to the board that.
>
> *       *       *
>
> Gen2 is going to work and Gen1 doesn't.

159.    Rodgers acknowledged that the buildout of the Gen2 lines would be delayed by several months, to the end of 2023 or beginning of 2024. The revenues from the Gen2 lines that investors had previously been told to expect in early 2024 were therefore no longer possible.

- 35 -

160.    During the same presentation, an analyst from B. Riley Securities asked specifically about Defendant Rodgers' statement from November 7, 2022 concerning the Company's violations of its EPR with respect to the Fab-1 equipment. In response, the Company's new COO, Marathe, explained that:

> So this time instead of just saying, okay let's give you the PO and hope for the best and let them give us a machine, which kind of works and we will see it or not. This time, we are building proofs of concepts, which means smaller machines that represent the heads, as T.J. mentioned, which are actually working in action, and we have seen those. You see the videos of those. Our engineers are over there many, many times. And many of them actually. I'm going there personally also this month where I'll be visiting these guys and establishing relationships with the CEOs myself.

161.    In other words, skipping the FAT and SAT for the Fab-1 equipment contributed materially to the major delays and inability of Fab-1 to achieve the Company's production goals. Instead of "hop[ing] for the best" by letting the equipment vendors "give us a machine," which Enovix may not see in advance, as the Company did by waiving the FAT and failing to conduct the SAT, going forward the Company's engineers would be going to the equipment vendors' facilities to see the next generation of equipment before it is shipped and installed in the Company's facility, as completing the FAT and SAT processes would help avoid the problems that plagued Fab-1.

162.    During the same presentation, Marathe confirmed the critical importance of conducting the FAT, explaining that the Company's confidence in its production lines "becomes at the very high point when we finish doing the factory acceptance test. When we're actually at the vendor, the machine is working, is running. It's running both the sprint UPH. It's running the uptime, it's running those types of things improved, actually seeing it. That's when typically the confidence is high and you start triggering the long lead time items."

163.    In other words, conducting the FAT provides a company with the confidence necessary to support significant investments of time and money into the equipment installation and qualification process. When Enovix failed to conduct the FAT for its Fab-1 manufacturing equipment, it lacked the necessary confidence to make these major investments and foreseeably ran into serious delays and operating problems when attempting to ramp up the Fab-1 equipment for commercial scale

production. Accordingly, waiving the FAT (and the SAT, which serves a similar purpose) was a material fact that Defendants failed to disclose to investors until November 2022.

164.     In response to the news disclosed in the January 3, 2023 presentation, Enovix's share price dropped 41% from a close of $12.12 per share on January 3, 2023 to a close of $7.15 on January 4, 2023 on unusually high trading volume.

165.     This significant decline was due, at least in part, because the disclosure of new information revealed the full scope of the materialized risks concealed by Defendants' omissions of the facts that the Company skipped the FAT and SAT—that Fab-1's inability to function would cause later and planned additional manufacturing processes to falter, further hampering Company growth.

166.     Moreover, Rodgers' admission that investors had been misled was material negative information in and of itself. Reasonable investors purchase a company's stock, at least in part, because they believe that company's management is honest and forthright. Thus, Rodgers' admission that Enovix investors were "reasonably misled" by Defendants' prior statements negatively impacted the value of the Company and its shares.

## ADDITIONAL ALLEGATIONS SHOWING DEFENDANTS' FALSE AND MISLEADING STATEMENTS WERE MADE WITH SCIENTER

167.     Plaintiffs allege that each of the false and misleading statements and omissions identified above was made with Defendants' knowledge or severely reckless disregard of the falsity of those statements.

168.     The scienter of the Individual Defendants and other employees and agents of the Company is imputed to the Company under *respondeat superior* and agency principles. This is particularly true with respect to Defendants Rust, Rodgers, and Dales, each senior officers and/or directors of the Company who were sufficiently senior in the organization that it is proper to impute their scienter to Enovix.

169.     Several material adverse facts underlying the falsity or misleading nature of Defendants' statements were already known to, or recklessly disregarded by, Defendants at the time the statements were made, supporting a strong inference that Defendants acted knowingly or with severe recklessness in making those statements.

170.    For example, Defendants Rodgers and Rust made numerous statements regarding the purported FAT and SAT processes that they knew were false and misleading. *See supra* ¶¶103, 105, 108, 110, 113, 115, 117, 119, 121, 123, 126, 128, and 130. As Rodgers admitted in his November 7, 2022 statements to investors, he and Rust made and approved the decision to waive the FAT in April 2021, and the decision not to conduct the SAT in the months thereafter. Rust's statement to investors during the August 10, 2021 earnings call that "***there's no red flags***" in the FAT and SAT for Enovix's Fab-1 equipment was thus knowingly (and demonstrably) false; the same goes for the statement in the August 2021 Letter to Shareholders that the SAT followed "factory acceptance testing ***already performed*** at the vendor's facility before taking delivery."

171.    A cogent and compelling inference of scienter is also appropriate because Defendants were incentivized to deliver their Fab-1 equipment before the Merger closed, and so it could close. Defendants thus had reason not to inform the market of the full consequences of the shortcuts they took to ensure the closing of the Merger—that they had cut corners on the Company's EPR procedures—as well as concealing the material risks inherent in that decision. Concealing those actions and concomitant risks helped ensure that RSVAC shareholders would approve the Merger proposal, and that Enovix would gain access to over $400 million in outside financing to fund its operations, which were not yet generating any revenues.

172.    Rodgers also had a significant personal financial incentive in finding a target company, acquiring it, and taking it public. This is because he held 5.75 million RSVAC Founder Shares that could only monetize – for up to $80 million – after RSVAC completed a "Business Combination" like the Merger.

173.    Similarly, Dales held approximately 1,000,000 shares of Company stock upon the consummation of the Merger, and he sold approximately 15% of it during the Class Period in less than three months between August 5, 2022 and November 1, 2022. Those sales, at prices artificially inflated by fraud, would not have been possible but for the Merger. Moreover, the timing of the sales coincides with the period when the Fab-1 equipment's repeated failures to reach its production specifications was coming to a head, and immediately before Enovix began to disclose those problems to the market. Thus Dales, like Rodgers, was financially motivated and thus incentivized to cut

corners in prematurely getting inadequately tested Fab-1 equipment shipped from China and installed in Fremont, and concealing from investors the attendant risks in taking those shortcuts. Dales capitalized on the Company's inflated stock price by selling substantial amounts of stock right before the Company revealed that the concealed risks had begun to materialize.

174.    Moreover, at the time of the Merger, Defendant Rodgers was a member of the board of directors of Enovix, and owned, through a trust, approximately 11.3% of all then-outstanding Enovix common stock. In May 2021, Enovix issued a $15 million bridge note to a trust for which Defendant Rodgers was the trustee. The proceeds from the Bridge Note were intended to provide working capital funds to help support Enovix's operations. The Company intended to repay the bridge note upon the closing of the Merger. According to the Proxy Statement, "if the Merger did not close by October 25, 2021, Enovix may not have sufficient funds to repay the loan and will need to pursue a forbearance arrangement with the lender or some other arrangement to meet its obligations under the Bridge Note."

175.    Thus, Defendant Rodgers was particularly incentivized to obtain approval of the Merger. If it did not close – which was a very real threat had Defendants disclosed that they had bypassed the critical FAT and SAT processes just to get the new equipment to Fremont on time – Rodgers risked adverse and negative consequences to a trust for which he served as trustee. Rodgers was thus put in a difficult situation – either make sure the Merger closed or risk violating his fiduciary duties to this trust.

176.    In a September 2021 article published on *FreightWaves*, a transportation industry publication, Defendant Dales was quoted as describing the decision to fly the Fab-1 equipment from China to California ahead of the merger as a "***massive shortcut***" for setting up the Fab-1 factory.[5] In the interview, Dales explained that "[w]e were faced with a choice: Accept a three-month delay and delay the startup of our factory … or try to find some creative way around the backlog." As Dales

---

[5] Kulisch, Eric, "Lithium battery maker airlifts assembly line to leapfrog port congestion," *FreightWaves*, *available at* https://www.freightwaves.com/news/lithium-battery-maker-airlifts-assembly-line-to-leapfrog-port-congestion

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

described, the airlift operation "involved premium pricing relative to other modes of transportation, but from an ROI perspective it was kind of a no-brainer for us. ***The time was just so valuable.***"

177.   Dales' statements underline his knowledge of, and/or involvement in, the decision to fly out the Fab-1 equipment ahead of the Merger, and the fact that the decision was made for the purpose of having the equipment shipped and installed ahead of the Merger, which allowed Defendants to tout their new manufacturing capabilities to investors.

178.   Indeed, Defendants knew (or should have known) that Enovix needed the Merger to go through in order to continue its operations, further buttressing the strong inference that Defendants were motivated to close regardless of whether investors knew the truth about the FAT and SAT and the risks posed by forgoing them. According to the Proxy Statement:

> Enovix has incurred losses since inception and has an accumulated deficit of $223.4 million. These conditions raise substantial doubt about Enovix's ability to continue as a going concern. The ability to continue as a going concern is dependent upon generating profitable operations in the future and/or obtaining the necessary financing to meet Enovix's obligations and repay its liabilities arising from normal business operations when they become due. Enovix believes that the successful completion of the Business Combination will eliminate this doubt and enable Enovix to continue as a going concern.

179.   The Officer Defendants' involvement in the day-to-day operations of the Company's Fremont factory further supports an inference of scienter, particularly as to Defendant Rust. FE1 described Rust as being "deeply involved" in the operations at the Company's Fremont facility, noting that Rust was at the facility every day and that Rust regularly went out onto the factory floor and talked with employees. FE3 also reported seeing Rust on the Fremont factory floor "more than once a day, beginning and end. He was in tune with things. He was in communication."

180.   According to FE3, Rust was closely engaged with the process of trying to get the line producing at the level they needed. FE3 recalled that Rust attended daily engineering and operations meetings at Fremont, during which time senior engineering and operations managers updated Rust and others on the status of the Fab-1 line. FE1 recalled that Defendant Dales attended these same daily meetings. FE3 noted that the status reports shared at those meetings included reports about the production problems Fab-1 was facing, and the discussion topics centered on: "where the bottle neck

is, what the problem is, what's going on that day," as well as "projections for output" for the day and upcoming time periods. FE7 also sometimes attended these daily meetings, where the Company's management received reports about, and discussed, how many batteries the Fab-1 line produced in certain areas, how much material was used, and the throughput levels of each manufacturing area. According to FE7, anyone who attended the meetings would have known that Fab-1 was struggling to produce a reasonable yield of quality batteries.

181.    This inference of awareness or reckless disregard of material, contrary facts extends beyond the Officer Defendants. According to the Proxy Statement, prior to recommending the Merger, "the RSVAC Board of Directors discussed the material results of its due diligence activities with respect to Enovix, which included extensive meetings and calls and detailed review of," among other things, Enovix's "factory configuration, capacity utilization models, throughput of the factory, the level of automation, yields, manpower plans and detailed cost models," and its "capital expenditure plans, timing of delivery and installation of equipment."

182.    Finally, another relevant factor that creates a strong inference of scienter is the core operations inference, insofar as it would be absurd for Enovix's senior management to be unaware that the Company waived the FAT and SAT and that, as a result, there was a material risk that Company's Fab-1 facility would be non-functional. During the Class Period, Enovix made one product – Li-ion batteries – out of a single factory in Fremont: Fab-1. That factory and the Company's executive offices shared the same facility.

183.    Moreover, it was critical to the Company's development for the Fab-1 manufacturing line to produce as stated and "ramp up" to a commercial level necessary to sustain the growth purportedly demanded by Enovix's customers. Consequently, any problem with the manufacturing output and performance of Fab-1 was a warning that Enovix itself may not be able to survive.

## CLASS ACTION ALLEGATIONS

184.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class.

185.    Throughout the Class Period, shares of the Company's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this

time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of shares of the Company's common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Enovix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

186.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

187.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

188.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    (a) whether Defendants violated the federal securities laws as alleged herein;

    (b) whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

    (c) whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

    (d) whether Defendants acted negligently, knowingly, or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;

    (e) whether the price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

1    (f) whether the members of the Class have sustained damages and, if so, what is the proper

2    measure of damages.

3    189.    Plaintiffs will rely in part upon the presumption of reliance established by the fraud-

4 on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made

5 public statements of material fact that were false, misleading, or were rendered misleading because

6 of Defendants' failure to disclose material facts necessary to prevent such statement from being

7 misleading; (b) as a result of the false and misleading statements and omissions of material fact, the

8 Company's common stock traded at artificially inflated prices during the Class Period; (c) Plaintiffs

9 and other members of the Class purchased or otherwise acquired the Company's common stock

10 relying on the integrity of the market price of the Company's common stock and market information

11 relating to the Company, and have been damaged thereby.

12    190.    During the Class Period, the artificial inflation of the Company's common stock was

13 caused by Defendants' material misrepresentations and omissions as described above, causing the

14 damages sustained by Plaintiffs and the other members of the Class. Defendants' material

15 misrepresentations and omissions created an unrealistically positive assessment of the Company and

16 its business, operations, and prospects, causing the price of the Company's common stock to be

17 artificially inflated at all relevant times, including when Plaintiffs and other members of the Class

18 purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed,

19 that disclosure negatively affected the value of the Company's common stock, dissipating the

20 artificial inflation and damaging Plaintiffs and other members of the Class.

21    191.    The market for the Company's common stock was an efficient market at all times

22 during the Class Period for the following reasons, among others:

23    (a) Defendants made public misrepresentations or failed to disclose material facts during

24    the Class Period;

25    (b) As a regulated issuer, the Company filed periodic public reports with the SEC;

26    (c) The Company regularly communicated with public investors by means of established

27    market communication mechanisms, including through regular dissemination of

28    Current Reports in their SEC filings;

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

(d) The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 11.2 million shares of the Company's common stock, or roughly 7.2% of Enovix's total shares outstanding, were traded weekly during the Class Period, permitting a very strong presumption that its shares traded on an efficient market;

(e) During the Class Period, the Company's common stock met the requirements for listing, and were listed and traded on the NASDAQ, a highly efficient and automated market;

(f) The Company was covered by multiple securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

(g) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

192.    Based on the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's common stock shares. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and thus are entitled to a presumption of reliance.

193.    Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

195.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

### COUNT I
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Defendants Enovix, Rust, Rodgers, and Dales)

196.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

197.    This Count is asserted against Defendants Enovix, Rust, Rodgers, and Dales (the "10(b) Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

198.    During the Class Period, the 10(b) Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or recklessly disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

199.    The 10(b) Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

200.    The 10(b) Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

201.    Rust, Rodgers, and Dales, who are the senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and Class.

202.    As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of the 10(b) Defendants' false and misleading statements and omissions.

203.    Had Plaintiffs and members of the Class been aware that the market price of the Company's common stock had been artificially inflated by the 10(b) Defendants' false and misleading statements and by the material adverse information which they did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

204.    As a result of the wrongful conduct alleged herein, Plaintiffs and members of the Class have suffered damages in an amount to be established at trial.

205.    By reason of the foregoing, Enovix, Rust, Rodgers, and Dales have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

206.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

207.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

208.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

209.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

210.    The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

211.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for relief and judgment, as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, designating Plaintiffs as class representatives and Plaintiffs' counsel as class counsel;

B.    Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class prejudgment and post-judgment interest and their reasonable costs and expenses incurred in prosecuting this action, including reasonable attorneys' fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demands a trial by jury.

Dated: July 7, 2023                                  Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice*)

Josh Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick (*pro hac vice*)
Marc B. Kramer (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 597-2800
Email: lrolnick@rksllp.com
Email: mkramer@rksllp.com
Email: amenkova@rksllp.com

*Co-Lead Counsel for Plaintiffs and the Class*

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

**CERTIFICATE OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 S. Grand Avenue, Suite 2450 Los Angeles, CA 90071. I am over the age of eighteen.

On July 7 2023, I electronically filed the foregoing CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record. Executed on July 7, 2023.

*/s/Laurence M. Rosen*

Consolidated Class Action Complaint for Violations of the Federal Securities Laws