Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | Case No: 3:23-cv-00071-SI |
| | CLASS ACTION |
| | **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| | JUDGE:    Hon. Susan Illston |
| | DATE:    December 8, 2023 |
| | TIME:    10:00 a.m. |
| | CTRM:    Videoconference Only |
| This Document Relates To: All Actions | |

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT ...............................................................................................1

FACTUAL BACKGROUND....................................................................................................3

    A.    Enovix and its Brand-New Battery Technology.........................................................3

    B.    Conducting the FAT and SAT Help Assure That New Manufacturing Equipment Can Perform According to Specifications.............................................4

    C.    Unbeknownst to Investors, Defendants Waived the FAT and SAT to Have the Fab-1 Equipment Installed Before the Merger ...................................................5

    D.    Defendants Falsely Told Investors that Enovix Conducted the FAT and SAT ...............................................................................................................................6

    E.    The Risks Concealed by Defendants' False and Misleading Statements Materialize, and Rodgers Admits to Waiving the FAT and SAT............................8

ARGUMENT ............................................................................................................................9

    I.    The Complaint Alleges Actionable False and Misleading Statements and Omissions..................................................................................................................10

        A.    The Complaint Specifies Each of Defendants' False and Misleading Statements .........................................................................................11

        B.    The Complaint Adequately Alleges that Defendants Made False and Misleading Statements and Omissions of Material Facts.........................12

            1.    Defendants' Statements that Enovix Actually Conducted a FAT and SAT Were False...............................................................13

            2.    Defendants' Risk Disclosures Misleadingly Omitted Material Facts...................................................................................16

            3.    Defendants Made Misleading Statements about Equipment Qualifying and Testing While Omitting that they had Waived the FAT and SAT ...........................................................17

    II.    The Complaint Alleges a Cogent and Compelling Inference of Scienter..............18

        A.    The Complaint Alleges Knowing or Severely Reckless Conduct .............19

        B.    The Complaint Alleges Defendants' Motive to Commit Securities Fraud   20

        C.    The Core Operations Theory Further Supports a Strong Inference of Scienter .....................................................................................................22

    III.    The Complaint Pleads Loss Causation on January 3, 2023 ...................................23

    IV.    The Complaint Adequately Alleges a Section 20(a) Claim...................................24

CONCLUSION........................................................................................................................25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

**TABLE OF AUTHORITIES**

**Pages**

**Cases**

*3226701 Canada, Inc. v. Qualcomm, Inc.*,
   2017 WL 971846 (S.D. Cal. Jan. 27, 2017) ..............................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................................................9

*Asher v. Baxter Int'l Inc.*,
   377 F.3d 727 (7th Cir. 2004) ....................................................................................................22

*Azar v. Yelp, Inc.*,
   2018 WL 6182756 (N.D. Cal. Nov. 27, 2018)......................................................................21, 23

*Baker v. SeaWorld Ent., Inc.*,
   423 F. Supp. 3d 878 (S.D. Cal. 2019) .......................................................................................18

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008)........................................................................................10, 18, 19

*Brody v. Transitional Hospitals Corp.*,
   280 F.3d 997 (9th Cir. 2002)........................................................................................16, 17, 18

*Buttonwood Tree Value Partners, LP v. Sweeney*,
   2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) .........................................................................22

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
   964 F. Supp. 2d 1128 (N.D. Cal. 2013) ....................................................................................24

*Cho v. UCBH Holdings, Inc.*,
   890 F. Supp. 2d 1190 (N.D. Cal. 2012) ....................................................................................22

*Dura Pharm., Inc.v. Broudo*,
   544 U.S. 336 (2005) ..................................................................................................................23

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003)...................................................................................................25

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
   63 F.4th 747 (9th Cir. 2023)..............................................................................10, 11, 13, 25

*Hsu v. Puma Biotech., Inc.*,
   2018 WL 4945703 (C.D. Cal. Oct. 5, 2018) .............................................................................14

*In re Alphabet, Inc. Sec. Litig.*,
   1 F.4th 687 (9th Cir. 2021)........................................................................................................16

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020)................................................................................22

*In re ChinaCast Educ. Corp. Sec. Litig.*,
809 F.3d 471 (9th Cir. 2015)......................................................................................................19

*In re Digi Int'l, Inc. Sec. Litig.*,
6 F. Supp. 2d 1089 (D. Minn. 1998) ..........................................................................................22

*In re Facebook, Inc. Sec. Litig.*,
2023 WL 6857600 (9th Cir. Oct. 18, 2023) ....................................................................16, 17, 24

*In re Fastly, Inc. Sec. Litig.*,
2021 WL 5494249 (N.D. Cal. Nov. 23, 2021).............................................................................12

*In re Fibrogen, Inc. Sec. Litig.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022).........................................................................22, 23

*In re Gilead Sci. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008)..................................................................................................9, 10

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) .......................................................................................19

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) .........................................................................................17

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) .....................................................................................25

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011).........................................................................................13

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2018) .......................................................................................25

*In re Portal Software, Inc. Sec. Litig.*,
2005 WL 1910923 (N.D. Cal. Aug. 10, 2005)............................................................................20

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017)......................................................................................................21

*In re Rigel Pharms., Inc. Sec. Litig.*,
2009 WL 5125344 (N.D. Cal. Dec. 21, 2009) ...........................................................................11

*In re Talis Biomedical Corp. Sec. Litig.*,
2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ...........................................................................18

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022)....................................................................................................21

- iii -

*Lorenzo v. S.E.C.*,
  587 U.S. ——, 139 S. Ct. 1094 (2019) .................................................................................20

*Maiman v. Talbott*,
  2010 WL 11421950 (C.D. Cal. Aug. 9, 2010) ......................................................................22

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
  513 F.3d 702 (7th Cir. 2008) .................................................................................................22

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) .................................................................................................................10

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) .................................................................................................10

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ..................................................................................20

*Nguyen v. Radient Pharms. Corp.*,
  2011 WL 13141630 (C.D. Cal. Oct. 26, 2011) .....................................................................20

*No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003 ..................................................................................................21

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
  730 F.3d 1111 (9th Cir. 2013) ...............................................................................................24

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
  2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) .........................................................................21

*Rabkin v. Lion Biotechs., Inc.*,
  2018 WL 905862 (N.D. Cal. Feb. 15, 2018).....................................................................24, 25

*Rudolph v. UTStarcom*,
  2008 WL 4002855 (N.D. Cal. Aug. 21, 2008).......................................................................24

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008)..................................................................................................22

*Schueneman v. Arena Pharm., Inc.*,
  840 F.3d 698 (9th Cir. 2016)...................................................................................10, 15, 17

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011).................................................................................................14

*Senn v. Hickey*,
  2005 WL 3465657 (D.N.J. Dec. 19, 2005) ............................................................................21

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011)...............................................................................................9, 10

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................................................10, 19, 20

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) ...........................................................................................................15

*Veal v. LendingClub Corp.*,
  2020 WL 3128909 (N.D. Cal. June 12, 2020) ...................................................................16

*Vernazza v. S.E.C.*,
  327 F.3d 851 (9th Cir. 2003).............................................................................................18

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021)............................................................................................14

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011)............................................................................................20

*Zhou v. Faraday Future Intelligent Elec. Inc.*,
  2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) ............................................................14, 15

**<u>Statutes</u>**

15 U.S.C. § 78t(a) ......................................................................................................................25

15 U.S.C. § 78u-4(b)........................................................................................................11, 12, 18

**<u>Regulations</u>**

17 C.F.R. § 240.10b5-1(c)(1)(i)(B) .............................................................................................21

17 C.F.R. § 240.12b-23(e) ..........................................................................................................15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

Plaintiffs submit this memorandum of points and authorities in opposition to Defendants' motion to dismiss the Consolidated Class Action Complaint (ECF No. 84, "Complaint").[1]

**PRELIMINARY STATEMENT**

Enovix Corporation ("Enovix" or the "Company") is an early-stage technology company whose financial future depended on the success of its only product, a new type of lithium-ion battery. Enovix needed custom-made manufacturing equipment for their "Fab-1" production facility to produce batteries at commercially viable rates and amounts. Defendants touted to investors that the equipment had been delivered and was being installed at Fab-1, after conducting critical quality control tests on the equipment which revealed "no red flags," and thus the Company was on track to finally generate product revenue the next year. In truth, Defendants had waived those tests in order to rush delivery of the equipment ahead of a merger taking the Company public, concealing the material risk that the equipment would not be able to produce to the Company's specifications. When those risks materialized as equipment problems and delays plagued the Fab-1 production lines, Enovix's stock price plummeted, harming investors.

The Fab-1 equipment needed to produce Enovix's batteries at rates and in amounts high enough to satisfy the needs of their customers, and to attract investors. To assure investors that the Fab-1 equipment could perform as required, Defendants repeatedly told investors that this equipment was subject to two important, industry-standard tests: the Factory Acceptance Test ("FAT") and the Site Acceptance Test ("SAT"). The purpose of these tests is to mitigate the risks that the equipment might fail to operate according to specifications: promptly identifying and addressing any operational issues first at the vendor's factory (FAT) and then again upon delivery at the production facility (SAT). After providing these assurances, Enovix raised over $400 million and went public by merging with a special purpose acquisition company, or "SPAC." Defendant Rodgers, Enovix's Executive Chairman, ultimately admitted to investors that Fab-1 was unable to meet required specifications and that he and Defendant Rust (Enovix's CEO) had deliberately

---

[1] References to "Defs.' Mot." are to Defendants' motion to dismiss the Complaint (ECF No. 89). Citations to "¶" are to paragraphs in the Complaint. References to Exs. A-D are to the exhibits attached to the Declaration of Joshua Baker, filed concurrently herewith.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

waived the FAT and SAT to ensure that the equipment was delivered before the SPAC merger closed.  The news that Enovix's manufacturing equipment was not producing batteries in the amounts, and at the speed, necessary was first revealed in November 2022, causing the price of Enovix stock to fall $7.46, or 41%.  Then, in January 2023, Rodgers gave a "special presentation" to shareholders revealing that the Fab-1 manufacturing equipment was "doing less than 10% of what it should be doing" and that the decision to waive the FAT and SAT contributed materially to the major delays and impairments of Fab-1's production output.  Rodgers also conceded that "*I think [investors] were reasonably misled*" as to the progress and functionality of Fab-1.  In response to these disclosures, Enovix's stock price fell by nearly $5 per share, another 41% drop.

Defendants ask the Court to ignore their own admissions that they waived the FAT and SAT, misled investors, and had clear motives to do so specifically as to the status and capability of Fab-1.  Defendants' arguments in support of dismissal lack merit and should be rejected.

*First,* Defendants' straw man argument that Plaintiffs allege that "Enovix conducted no testing at all," Defs.' Mot. 2, grossly misconstrues the Complaint, which makes no such allegation. Nor is it necessary to render Defendants' statements false and misleading.  The Complaint alleges that Defendants assured investors that they conducted a FAT and SAT, specifically, when in fact they had waived those tests.  Enovix's risk disclosures were also misleading and omissive.  Enovix warned investors that installing and qualifying the Fab-1 line "may take longer than expected" because it "requires Enovix to work closely with developers and equipment providers."  In fact, Defendants bypassed that work in order to rush the equipment to Fab-1 in advance of the go-public merger, securing $400 million in cash that came with it.  Defendants also trumpeted the obstacles Enovix overcame to ship Fab-1 and begin production, while omitting the material fact that they accomplished that feat only by waiving the FAT and SAT, thereby misleading investors.

*Second*, the Complaint's allegations of scienter are clear and compelling.  The same Enovix executives who waived the FAT and SAT falsely told the market (or caused Enovix to do so) that those tests had actually occurred.  This deliberate indifference to the truth when in possession of contrary facts is the epitome of scienter under the securities laws.  Defendants also had significant financial motives to commit fraud, as Enovix needed the de-SPAC merger to fund its continued

operations, the merger allowed Rodgers to monetize millions of insider shares, and Defendant Dales sold 15% of his Enovix stock for $2.6 million, nearly nine times his base salary. The core operations theory bolsters these allegations, as it would be absurd to infer that Defendants did not know that they had waived the FAT and SAT for the Company's manufacturing equipment at its only production facility for its only product.

*Finally*, Defendants are wrong that the Complaint fails to allege loss causation in connection with the revelations in the January 2023 special presentation. The Complaint alleges that the special presentation revealed to investors that they "were reasonably misled" about Fab-1 and that skipping the FAT and SAT contributed materially to major delays and impairments of its production, causing Enovix's stock price to plunge by 41%. This is more than sufficient to allege loss causation under the Ninth Circuit's permissive standards.

The Complaint lays out clear and compelling allegations of securities fraud. The Court should deny Defendants' motion to dismiss in its entirety.

## FACTUAL BACKGROUND

### A.    Enovix and its Brand-New Battery Technology

In 2020, Defendant Rodgers created Rodgers Silicon Valley Acquisition Corp. ("RSVAC"), a public special purpose acquisition company known as a "SPAC" or "blank check" company, to raise money from investors to be used in acquiring a private company and taking it public. On February 21, 2021, RSVAC announced that it would merge with Enovix (the "Merger"), an early-stage technology company based in Fremont, California. ¶¶2, 5, 41. Enovix had invented a new type of lithium-ion ("Li-ion") battery that was smaller and stronger than ordinary Li-ion batteries. ¶2. The new battery had a unique design using new silicon anode technology.

The Merger was consummated on July 21, 2021, when shareholders approved a "de-SPAC" transaction whereby RSVAC merged with Enovix. The Merger provided more than $400 million in sorely needed cash as Enovix transitioned to commercializing its new battery technology. ¶74.

Enovix had never manufactured its new batteries at commercial (*i.e.*, revenue-generating) scale. The Company needed to design and install custom manufacturing equipment that could produce the new batteries in the amounts and at the speeds necessary for commercial production.

This is because Enovix's customers were original equipment manufacturers ("OEMs"), who would incorporate the Company's batteries into consumer electronics like smart watches and mobile phones. ¶81. These OEMs needed to "qualify" the batteries by not only testing their compatibility with their products, but also to confirm that Enovix could manufacture batteries in the quantities needed to meet the OEMs' own production needs, with volumes in the hundreds of thousands or millions. *See* ¶4. Enovix needed to provide its potential customers with enough batteries to test *and* it had to demonstrate its commercial production capabilities by manufacturing those batteries on the same production line that would be used to fill the OEMs' orders. ¶83.

**B.      Conducting the FAT and SAT Help Assure That New Manufacturing Equipment Can Perform According to Specifications**

Enovix's customers required the Company's batteries to be manufactured and supplied on a commercial scale, so it was critical to meeting the Company's revenue projections that the new manufacturing equipment would meet performance requirements "out of the box." ¶85. Enovix planned to install this equipment at its "Fab-1" facility in Fremont. ¶8. The specifications for the equipment were to produce one battery every two seconds on a set of four lines that could produce 500 units per hour. ¶99. Based on those rates and the installation timeline, Enovix projected that it would generate meaningful product revenue by the second quarter of 2022. ¶130.

Given the importance of Fab-1, the Company's first manufacturing facility, Enovix sought to assure investors that its new manufacturing equipment could manufacture the new batteries at the speed and in the amounts necessary for commercial production. Enovix told investors that its newly designed manufacturing equipment would be subject to two industry-standard quality control tests: the Factory Acceptance Test and Site Acceptance Test. ¶85. These tests are designed to ensure that the equipment can reliably meet production specifications and to mitigate the substantial risks involved in designing and installing the new equipment. *Id.*

The FAT is conducted at the vendor's facility. ¶86. It confirms that the new equipment is designed properly, functions correctly, and meets the customer's specifications. *Id.* Any manufacturing problems that arise at the FAT are significantly easier and less costly to correct at the vendor's factory. For Enovix, the FAT required that the new Fab-1 equipment be tested at the vendor's factory in China, where Enovix's staff and engineers would observe and test the equipment

- 4 -

at full speed. ¶¶87, 145, 160, 162 (confidence in the equipment is "at the very high point when we finish doing the factory acceptance test, . . . [w]hen we're actually at the vendor").

The SAT occurs after the equipment is shipped to the purchaser's facility. ¶91. It ensures that the performance observed during the FAT is replicable after the equipment has been transported, installed, and configured by the vendor's engineers at the customer's site. ¶90. Enovix's SAT milestone required the Company's Chinese vendors to send their engineers to Fremont to install and configure the new equipment at Fab-1 and verify that it operates properly. ¶¶91, 145. As a former Enovix employee explained, conducting a FAT and SAT on new manufacturing equipment is "all [about] risk mitigation." ¶92. "If you skip the tests (FAT and SAT), you're not mitigating the risks." *Id.*

**C.    Unbeknownst to Investors, Defendants Waived the FAT and SAT to Have the Fab-1 Equipment Installed Before the Merger**

Defendants told investors that Enovix's Fab-1 equipment was subject to a FAT and SAT, that the tests were "already performed," and that they did not reveal any "red flags." ¶¶12, 94, 114. That was not true. As Rodgers, Enovix's Executive Chairman, eventually admitted, two months before the start of the Class Period he and Defendant Rust, the Company's CEO and President, had personally decided to *waive* the FAT and SAT so that the Fab-1 equipment could be shipped to the United States and installed before the de-SPAC Merger closed. ¶145.

By April 2021, Enovix's Fab-1 equipment was stuck at vendor facilities in China. ¶145. Because of "COVID-related shipping malaise," Rodgers and Rust knew that Fab-1 "would be delayed by at least three months," and that Enovix's Chinese vendors had "stopped receiving guests due to COVID," so Enovix could not send its own engineers to Chinese facilities to conduct the FAT. *Id.* The Merger was scheduled to close just three months later. ¶70. If Enovix was not able to get its Fab-1 equipment to its Fremont facility before the Merger, it would imperil the as-yet-unapproved Merger and the $400 million in sorely needed operating capital from the SPAC funds, because Enovix would not be able to tell investors that it had "install[ed] and beg[a]n qualifying [its] first production line at our headquarters in Fremont" during the quarter. *E.g.*, ¶¶110, 178.

Because of these pressures, Rodgers and Rust secretly decided to take a "massive shortcut" by waiving the FAT and SAT and chartering a massive cargo plane to airlift the manufacturing

- 5 -

equipment to California. ¶176. Over a year later, in November of 2022—after Enovix finally revealed that it could not manufacture batteries at anywhere close to the speeds and amounts needed for commercial production—Rodgers admitted to investors that Enovix elected to "waiv[e]" the "key milestone called [FAT]," which "required that a team of Enovix engineers fly to multiple Chinese factories, and personally approve each piece of Fab-1 equipment running at full speed before [Enovix] approved shipment." ¶145. Once the equipment arrived at Fremont, Rodgers and Rust then waived the SAT. *Id.* (the "[SAT] milestone, . . . required [vendor] engineers to come to Enovix to demonstrate full functionality"). Without the Chinese vendor's engineers, Enovix was forced to install the equipment with its own "employees and local contractors." ¶¶145, 147.

By waiving the FAT and the SAT, Enovix was able to install the Fab-1 equipment in the second quarter of 2021, and the Merger closed promptly thereafter. ¶¶70-74. The Merger allowed Rodgers to monetize his holdings of up to 5.75 million "founder shares" worth $80 million. ¶¶172, 174. It also allowed Defendant Dales to sell 150,000 shares of Enovix stock for $2.6 million, nearly nine times his salary, just before bad news came out about Fab-1. ¶¶172-73.

**D.** **Defendants Falsely Told Investors that Enovix Conducted the FAT and SAT**

Despite having waived the FAT and SAT to ensure they could get Fab-1 equipment rush-delivered to California ahead of the Merger, Defendants repeatedly told investors that Enovix had conducted the FAT and SAT. Each of these false and misleading statements and omissions are detailed in the Complaint. ¶¶95-128.

***False statements that Enovix had conducted the FAT and a SAT***. Defendants repeatedly stated that Enovix had conducted the FAT and SAT, when it had not. For instance, the Company's Proxy Statement (soliciting shareholder support for the Merger) incorporated an investor presentation that stated that the Fab-1 equipment was "At Vendor Factory Acceptance Test (FAT)." ¶100. In August 2021, Defendants misrepresented that "[w]ith the equipment for Line 1 installed, our factory [Fab-1] is now undergoing qualification. The first step in this process is ***a site acceptance test*** to confirm the individual pieces of equipment are meeting performance requirements. This follows ***factory acceptance testing already performed*** at the vendor's facility." ¶110. Rust reiterated the falsehood during an earnings call that same day, telling investors—in

response to a question about manufacturing capacity—that Defendants were pleased "in terms of the equipment and its ability to do its intended function" because Enovix has "a pretty rigorous set of both factory and site acceptance things we have to go through and I would say *there's no red flags there*." ¶114. Telling investors there had been a FAT and SAT and that they revealed no red flags—when in fact those tests did not take place—is patently false and misleading.

*Misleading risk disclosures that failed to adequately disclose the risks inherent in waiving the FAT and SAT*. Defendants also issued inadequate and misleading "risk disclosure" statements which gave the false impression Enovix had conducted rigorous Factory and Site Acceptance Testing and failed to adequately disclose the risks entailed by waiving those tests. For example, in the Proxy Statement and the Company's 2021 annual report, Defendants stated that there was a risk that installing and qualifying the Fab-1 line "may take longer than expected" because, among other things, the work required to do so is "time intensive" and "requires Enovix to work closely with developers and equipment providers to ensure that it works properly for Enovix's unique battery technology." ¶107-08. This statement misleadingly omitted the risks that had already arisen when Defendants elected to bypass those very requirements by waiving the FAT and SAT.

*Misleading statements falsely implying that Enovix performed rigorous testing that ensured the Fab-1 manufacturing equipment would perform as forecast*. Defendants also made numerous statements that gave investors the false impression that the Company had overcome significant obstacles to install and successfully test the Fab-1 equipment—when in fact Defendants had simply cut corners by waiving the FAT and SAT. For instance, during Enovix's August 2021 earnings call, Rust touted the "heroic" efforts the Company made to fly the Fab-1 equipment to California as Enovix "navigate[d] global supply chain constraints." ¶112. Rust, however, failed to disclose the material fact that the Company was able to do so only by waiving the critical FAT and SAT milestones. ¶113. In a March 2022 shareholder letter, Defendants again touted having "overcome obstacles" like "intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia." ¶118. But Defendants failed to disclose the material fact that the way they had "overcome" these obstacles was to waive critical equipment testing, concealing the material risk that Fab-1 would not be able to meet manufacturing specifications.

**E.    The Risks Concealed by Defendants' False and Misleading Statements Materialize, and Rodgers Admits to Waiving the FAT and SAT**

Defendants' failure to disclose their decision to waive the FAT and SAT concealed the material risk that Fab-1 would encounter significant production problems and delays, such that it would fail to achieve commercial production capacity.  Enovix's inability to manufacture its new batteries in amounts and at speeds necessary for commercial production would imperil the Company's stated goal of recognizing product revenue by the second quarter of 2022 as well as push back the development of Enovix's next generation ("Gen-2") manufacturing equipment, which was expected to build upon Fab-1's success.  ¶130.

In the second half of 2022, Enovix began to reveal to investors that it was not able to manufacture its new batteries at anywhere near the required specifications.  In August 2022, Enovix announced that it had met its goal of generating revenue in the quarter, bringing in $5.1 million.  ¶131.  Defendants highlight this "success," Defs.' Mot. 9, but in fact 98% of that revenue ($5 million) was "service revenue," not sales from manufacturing and delivering new Li-ion batteries to customers.  ¶131.  In reality, Fab-1 was producing less than 10% of its expected production rate at that time—only thirty to forty batteries per hour.  ¶134.

On November 1, 2022, Enovix released its financial results for the third quarter of 2022, which revealed that revenues for the quarter were just *eight thousand dollars*.  ¶136.  Although Enovix did not disclose the full nature and extent of its manufacturing problems, the Company shocked investors by revealing that it was effectively abandoning Fab-1 in favor of Gen-2 manufacturing, including because Fab-1 was generating less than 10% of its projected production.  ¶138.  In other words, Fab-1—which had never been properly tested—did not work.  In response to this news, the price of Enovix's stock plummeted 41%.  ¶143.

On November 7, 2022, Enovix announced that Rodgers (previously the Chairman of Enovix's board of directors) would take on a more active role as Executive Chairman.  ¶145.  In a candid statement announcing his appointment, Rodgers conceded that Enovix "poorly communicated on the status of Fab-1."  *Id.*  Rodgers also admitted that he and Rust made the decision to skip the FAT and SAT and airlift the Fab-1 equipment from China in April 2021:

> Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment.  But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.

> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors.  We are still paying for the months we gained and then gave back due to equipment problems.

*Id*.  Securities analysts following the Company highlighted this stunning admission.  ¶146.  On December 29, 2022, Enovix announced that it was replacing Rust as President and CEO of the Company.  ¶¶152-53.

On January 3, 2023, Rodgers provided a "special presentation to shareholders" via conference call.  ¶153.  Rodgers directly acknowledged Defendants' "lack of clear and transparent investor communications" concerning Fab-1.  ¶154.  He conceded that Defendants' statements about Fab-1 "led some of our investors to say we're outright dishonest with them," admitting that "***I think they were reasonably misled***."  *Id.*  Rodgers's special presentation provided further details about Fab-1's disappointing output, including that it was "nonfunctional from [an] automation point of view." ¶155.  It also announced further delays to the development of the Gen-2 manufacturing lines, due to the ongoing problems and delays with Fab-1.  ¶158.  On this news, Enovix's stock price fell another 41%, damaging investors.  ¶164.

## ARGUMENT

A motion to dismiss under Rule 12(b)(6) tests only whether the factual allegations in the complaint "plausibly suggest an entitlement to relief."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact. . . .  [S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings."  *In re Gilead Sci. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).  If there are competing, plausible

explanations advanced by defendants and plaintiffs, the complaint survives a motion to dismiss. *Starr*, 652 F.3d at 1216.[2]

A motion to dismiss a complaint for violation of § 10(b) and Rule 10b-5 will be denied so long as the plaintiff alleges: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 37-38 (2011).[3]  While a securities fraud complaint is subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a court considering a motion to dismiss claims for securities fraud must assess the complaint "in its entirety," accepting all well-pled factual allegations as true and construing those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Gilead*, 536 F.3d at 1055.

## I.    The Complaint Alleges Actionable False and Misleading Statements and Omissions

Statements of material fact are actionable in the securities fraud context if they are either false or misleading.  *Matrixx*, 563 U.S. at 37.  Falsity can be shown by pointing to a statement that "directly contradict[s] what the defendant knew at that time." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023).  A statement is "misleading" if it "would give a reasonable investor the impression of a state of affairs that differs in a material way from one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (marks omitted).  Even literally true statements may mislead, due to their context and manner of presentation.  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  Moreover, once a company chooses "to tout positive information to the market, [it is] bound to do so in a manner that wouldn't mislead investors, including [by] disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).

---

[2] Internal citations and quotations are omitted unless otherwise indicated.

[3] Defendants concede the "in connection with," reliance, and economic loss elements of the claim.

**A.      The Complaint Specifies Each of Defendants' False and Misleading Statements**

Defendants claim that the Complaint does not "sufficiently identify" the statements Plaintiffs challenge as false or misleading.  Defs.' Mot. 12.  A cursory review of the Complaint shows that is not true.  The PSLRA requires that Plaintiffs "specify each statement alleged to have been misleading," as well as "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).  The Complaint easily satisfies this standard, by clearly identifying each statement that Plaintiffs allege was false or misleading by breaking out in thirteen separate paragraphs the specific statements that Plaintiffs challenge.  ¶¶100, 102, 105, 107, 110, 112, 114, 116, 118, 120, 123, 125, and 127.  Each of those paragraphs is followed by another paragraph explaining what specific part(s) of the preceding statement was false or misleading as well as the factual bases therefor.  ¶¶101, 103, 106, 108, 111, 113, 115, 117, 119, 121, 124, 126, 128.  The law requires nothing more.  *See Forescout Techs.*, 63 F.4th at 769 (declining to "impose an impossibly high burden on securities action plaintiffs").

Defendants' arguments to the contrary fail.  For example, Defendants highlight Paragraph 118, Defs.' Mot. 12, which contains a quote from Enovix's March 2, 2022 letter to its shareholders, in which Enovix had bragged about "overcoming" shipping delays related to COVID without disclosing the whole truth—that it had done so only by waiving vital performance-control tests.  Paragraph 118 sets forth the following misleading statement:  "***We have overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia.***"  ¶118 (emphasis in Complaint).  In the very next paragraph, the Complaint explains that "it was misleading to state that [Enovix] had 'overcome . . . extended shipping times' when in reality it had waived the FAT, or that it had 'overcome . . . intermittent vendor support' when the Company had completely foregone conducting the SAT with the vendor's engineers."  ¶119.  These allegations, which Defendants simply ignore, make clear that Plaintiffs are challenging the italicized and bolded statement as well as the grounds therefor.

Defendants cite cases that involved complaints that are far less particularized (and more confusingly drafted) than Plaintiffs' Complaint here.  In *In re Rigel Pharms., Inc. Sec. Litig.*, 2009 WL 5125344, at *7 (N.D. Cal. Dec. 21, 2009), all of the alleged false and misleading statements

- 11 -

were set forth in two paragraphs that contained "extensive block quotes with multiple statements." Those block quotes covered three pages of the complaint (*see* Ex. A at 11-14), contained multiple paragraphs that were irrelevant and not even arguably misleading, and were not followed by an explanation of the "reason or reasons why the statement[s were] misleading."  15 U.S.C. § 78u-4(b)(1).  Similarly, the court in *3226701 Canada, Inc. v. Qualcomm, Inc.*, 2017 WL 971846, at *14 (S.D. Cal. Jan. 27, 2017) could not "discern which particular statements Plaintiff intend[ed] to base its claim on" because the complaint "lump[ed] several paragraphs of statements together and stat[ed] in conclusory terms why all of" them were false.  *See* Ex. B ¶¶147-167 (twenty-four separate block quotes before any explanation why the statements were false).  Finally, in *In re Fastly, Inc. Sec. Litig.*, 2021 WL 5494249, at *10 (N.D. Cal. Nov. 23, 2021), the complaint confusingly used bold and italic font to emphasize language the plaintiffs did not contest as false. *See* Ex. C ¶¶53-63 (seventeen separate block quotes before any explanation as to falsity).  Even then, the *Fastly* court declined to dismiss the complaint solely based on inartful pleading.  2021 WL 5494249, at *10.

### B.    The Complaint Adequately Alleges that Defendants Made False and Misleading Statements and Omissions of Material Facts

The Complaint's core theory is simple:  Defendants misled investors about the risks in achieving commercial production capabilities at Fab-1 by misrepresenting that the Company had conducted a FAT and SAT, which it had not.  ¶¶15-19, 111.  Defendants' representations regarding the FAT and SAT were material to investors.  As the Complaint details, the key risk facing Enovix was that it was attempting to manufacture a newly designed battery on a commercial scale.  That required new manufacturing equipment that could produce a large volume of batteries at high speed. The FAT and SAT were important tests designed to mitigate the risks that the newly designed equipment may not be able to meet the Company's production requirements, so Defendants' false statements that the FAT and SAT were conducted were important.  *E.g.*, ¶111.  In addition, Defendants also issued misleading risk disclosures and made other statements that concealed the material risk that the Fab-1 equipment would not be able to perform to specification, due to Rodgers' and Rust's decision to waive the FAT and SAT.  *E.g.*, ¶¶107, 112, 118, 125.

- 12 -

Rather than grapple with the particularized allegations in the Complaint, Defendants attempt to mischaracterize Plaintiffs' allegations as an assertion that Enovix "conducted no testing at all." Defs.' Mot. 1.  Plaintiffs need not and do not make any such allegation.  This case does not rest on a broad and vague assertion that equipment was never tested at any point in any capacity.  The Complaint alleges that Defendants told investors that they had conducted and completed the FAT and SAT processes, as required, on the Fab-1 manufacturing equipment and there were no "red flags." ¶¶15-19, 94.  In truth, Defendants had waived both tests, and as a result of bypassing these critical quality assurance tests the Fab-1 equipment was never able to manufacture batteries at anywhere remotely close to the rates required for commercial production.  These failures forced Enovix to abandon Fab-1 and reallocate their efforts and resources to a new manufacturing facility. Whether Enovix engaged in some other form of testing at some other point—facts which are neither alleged nor implied in the Complaint—has no bearing on the falsity of Defendants' statements and omissions regarding the FAT and SAT.

1. **Defendants' Statements that Enovix Actually Conducted a FAT and SAT Were False**

Defendants repeatedly misrepresented that Enovix carried out a FAT and SAT for the Fab-1 equipment.  In the Proxy Statement, Defendants said that Fab-1 equipment was "At Vendor Factory Acceptance Test (FAT)." ¶100.  In an August 2021 letter to shareholders, Defendants said "factory acceptance testing [was] already performed at the vendor's facility."  ¶110.  Then, in an earnings call that same day, Rust referenced Enovix's "pretty rigorous set of both factory and site acceptance things" that turned up "no red flags."  ¶114.  In reality, Rodgers and Rust had waived the FAT and SAT in April 2021, months before Defendants made each of these statements.  Enovix did not send its engineers to China for the FAT, and it did not bring its Chinese vendors' engineers to Fremont to help install and configure Fab-1 or to conduct the SAT. Allegations of such "outright misstatements of historical fact" plainly show falsity, *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811-12 (C.D. Cal. 2011), because these statements "directly contradict[] what defendant[s] knew at the time." *Forescout Techs.*, 63 F.4th at 764.  Indeed, Rodgers conceded that investors "were reasonably misled" by Defendants' statements about the status and capability of Fab-1. ¶154.

Defendants argue that these misrepresentations are not actionable because the Complaint does not allege that the Fab-1 equipment "was not tested at all."  Defs.' Mot. 14-15.  Once again, Defendants grossly misconstrue Plaintiffs' allegations which require no such facts to plead falsity. The Complaint alleges that conducting the FAT required Enovix's staff to travel to China, and conducting the SAT required its Chinese vendors' engineers to come to California.  Indeed, that is based on Rodgers' own characterization of the tests.  ¶145 (FAT "required that a team of Enovix engineers to fly to multiple Chinese facilities, and personally observe each piece of Fab-1 equipment running at full speed"; SAT "required [the Chinese vendors'] engineers to come to Enovix to demonstrate full functionality").  Rodgers clearly spelled out what steps were required for the FAT and SAT, and he admitted in no uncertain terms that those steps did not happen because he and Rust waived the FAT and SAT.  Whether or not *any* type of "testing" occurred is entirely beside the point.[4]  Allegations that a statement "differs dramatically" from the true facts are sufficient to allege falsity.  *See Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 WL 13800633, at *6 (C.D. Cal. Oct. 20, 2022) (cited at Defs.' Mot. 14); *Hsu v. Puma Biotech., Inc.*, 2018 WL 4945703, at *8 (C.D. Cal. Oct. 5, 2018) (holding that where defendant "chose to make statements directly inconsistent with the information he did have," a "triable issue of fact" exists as to falsity).

Defendants' related argument that "references to factory and site acceptance testing did not create the impression" that Enovix would send engineers to Asia is similarly misguided and, in any event, inappropriate on a Rule 12(b)(6) motion.  To the extent there is a reasonable dispute as to how investors understood a specific term is a question of fact inappropriate to resolve now.  *SEC v. Todd*, 642 F.3d 1207, 1220 (9th Cir. 2011).  Contrary to Defendants' characterization, Defs.' Mot.

---

[4] For this reason, there is no merit to Defendants' argument that courts "routinely reject" attempts to ascribe specific significance or meaning to terms used in public statements.  Defs.' Mot. 15. Here, Plaintiffs need not provide any implicit meaning to the terms of Defendants' statements because Defendants have unequivocally defined the terms themselves.  *Wochos v. Tesla, Inc.,* merely stands for the unremarkable proposition that where a plaintiff "claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest," it must plead facts to show why.  985 F.3d 1180, 1193 (9th Cir. 2021) (rejecting argument that "'manufacturing equipment' actually means 'automatic manufacturing equipment'").  Here, Plaintiffs are *not* challenging the literal meaning of FAT or SAT; they have plead facts to show what investors and Defendants themselves understood those terms to mean.  ¶¶86, 91, 145, 160-63.

16-17, it would not have been "unreasonable" for an investor to understand that the FAT required Enovix staff to travel to China, or that the SAT required the Chinese vendors' engineers to visit the Fab-1 facility. Rodgers himself said that is what the FAT and SAT "required." ¶145. That investors shared the same understanding is facially *reasonable*, and there is no basis in the Complaint to infer otherwise. In addition, investors could reasonably believe that Enovix would fly a team of engineers to China for the FAT because the Company boasted that it had spent $1.4 million to charter "the world's largest airplane" to "fly over 55 tons of Fab-1 equipment" from China to Fremont "in one shot." ¶145. Defendants purported to be pulling out all the stops to import and install Fab-1 quickly in unique circumstances—it is not unreasonable as a matter of law for an investor to have understood that to mean sending engineers to China to conduct industry-standard quality assurance testing on critical custom-made manufacturing equipment.[5]

Finally, Defendants argue that their February 22, 2021 statement that the Fab-1 equipment was "at Vendor Factory Acceptance Test (FAT)," ¶¶97-100, was not incorporated into the Proxy Statement. Defs.' Mot. 13. Defendants are wrong. A public filing does not need to say "incorporation by reference" to incorporate earlier-filed information, it need only include an "express statement clearly describing the specific location" of the information. 17 C.F.R. § 240.12b-23(e). The Proxy Statement does just that, directing investors to "WHERE YOU CAN FIND MORE INFORMATION," specifically including "RSVAC's SEC filings," at the SEC website. ¶97. Even if the February 2021 statement was not incorporated into the Proxy Statement, however, Defendants' failure to disclose that Rodgers and Rust waived the FAT by not sending Enovix engineers to China is an omission of material fact necessary to render the February 2021 statement not misleading. *See Zhou*, 2022 WL 1380063, at *15-16 (proxy statement actionable "based on the omission of information necessary to enable shareholders to understand" statement).[6]

---

[5] Defendants point to Enovix's stock price increase (of $0.45, *see* Defendants' Ex. 20) following Rodgers' November 7 statements as "suggesting that news was not material." Defs.' Mot. 17. Whether Defendants' statements were material to investors is a consummate issue of fact that cannot not be resolved on this motion. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (materiality assessment is "peculiarly one[] for the trier of fact").

[6] Defendants concoct yet another straw man by arguing that "Enovix never gave investors the impression it would send its engineers to China for factory acceptance testing," so "Plaintiffs cannot

## 2.    Defendants' Risk Disclosures Misleadingly Omitted Material Facts

The Complaint also alleges that Defendants made false and misleading risk disclosures that failed to disclose material facts about Defendants' waiver of the FAT and SAT.  In both the Proxy Statement and 2021 10-K, Defendants told investors that it "***may*** take longer than expected to install, qualify and release [Fab-1] and require modifications to the equipment to achieve its goals for through put and yield"; "[t]he work required to develop this process and integrate equipment . . . is time intensive and requires Enovix to work closely with developers and equipment providers to ensure that it works properly for Enovix's unique battery technology"; and "[t]his integration work will involve a significant degree of uncertainty and risk and ***may*** result in the delay in the scaling up of production or result in additional cost to Enovix's battery cells." ¶¶107, 125 (emphasis added).  These statements were inadequate and misleading for multiple reasons.

Disclosures that warn of risks that "could" or "may" occur are misleading when the issuer knows that those risks have materialized.  *In re Facebook, Inc. Sec. Litig.*, 2023 WL 6857600, at *9 (9th Cir. Oct. 18, 2023) ("[T]he problem is that Facebook represented the risk of improper access to or disclosure of Facebook user data as purely hypothetical when that exact risk had already transpired[.]"); *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703-04 (9th Cir. 2021).  As such, it was misleading for Defendants to say that it "may" take longer to qualify Fab-1, and that "delay in the scaling up of production" "may result," because Defendants knew the decision to waive the FAT and SAT already created those material risks.[7] ¶¶108, 126.  Moreover, it was misleading for Enovix to say that quality assurance testing with its equipment providers could cause delay when Defendants decided not to work with those providers, as required for the FAT and SAT, which were

base a fraud claim on the fact that Enovix did not disclose its decision to not send employees to China." Defs.' Mot. 19.  First, Rodgers himself said that the FAT "required" Enovix's employees to travel to China.  ¶145.  Second, Plaintiffs do not assert that Defendants had a freestanding duty to disclose whether its engineers would travel to China.  Their duty to disclose was based on their own false and misleading representations. *Arena Pharms.*, 840 F.3d at 705-06.  Thus, this case is unlike *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) and *Veal v. LendingClub Corp.*, 2020 WL 3128909, *6-7 (N.D. Cal. June 12, 2020) which involved "incomplete" statements that did not give rise to liability because there was no duty to disclose.

[7] Even if the delays and impairments at Fab-1 had not yet materialized when the statements were made, the *risks* of those problems had. *Facebook*, 2023 WL 6857600, at *9 ("Our case law does not require harm to have materialized for a statement to be materially misleading.").

- 16 -

designed to avoid production delays.  This gave reasonable investors the false impression that the Company would not cut corners to make sure Fab-1 worked, when the exact opposite was true.

Defendants again miss the point by arguing that "Plaintiffs appear to allege that Enovix should have disclosed more details about its factory and site acceptance testing, such as engineers traveling to China." Defs.' Mot. 18.  Plaintiffs allege that Enovix misled investors by telling them that Fab-1 "may" take longer than expected to install—when Defendants knew that they had taken specific actions (waiving the FAT and SAT) which created that specific risk, and it *was already* taking longer—and that Enovix was "work[ing] closely with . . . equipment providers"—when Defendants had elected to do the exact opposite.  ¶¶108, 126.  *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 836 (N.D. Cal. 2014) is inapposite.  The *Intuitive Surgical* court found that it was not misleading for an issuer to fail to disclose the "specific number of product liability lawsuits" it faced, when the company had "continually warned that [it] faced significant risk of product liability claims and that, in fact, products liability claims had been made against [it] in the past." *Id*.  In contrast, Plaintiffs do not merely allege that the disclosures should have provided more detail.  Rather, they allege that by saying installation "may" take longer—when skipping the FAT and SAT already created that specific risk—and that Enovix was working "closely" with "equipment providers"—when it took steps to avoid doing so—the disclosures "created an impression of a state of affairs that differed in a material way from the one that actually existed." *Facebook*, 2023 WL 6857600, at *9 (quoting *Brody*, 280 F.3d at 1006)*.*  These allegations state a claim.

### 3. Defendants Made Misleading Statements about Equipment Qualifying and Testing While Omitting that they had Waived the FAT and SAT

It is misleading for a company to "tout positive information to the market" but fail to "disclos[e] adverse information that cuts against the positive information." *Arena Pharms.*, 840 F.3d at 705-06.  Here, Enovix made numerous statements that highlighted the efforts the Company made to get Fab-1 equipment to California and begin testing and qualifying it. *See, e.g.*, ¶¶112, 118 (highlighting "heroic" efforts the Company made to "navigate global supply chain constraints" and "overcome obstacles"); ¶116 (equipment testing "going quite well").  But each of these statements omitted the material fact that Rodgers and Rust had waived the FAT and SAT.  ¶¶113, 117, 119.  In these circumstances the failure to disclose that fact was particularly misleading because it was

- 17 -

only due to the waiver of FAT and SAT that the equipment was even able to be shipped on time at all. The securities laws do not condone this type of pernicious sleight of hand—ginning up investor support by highlighting events that were only made possible by creating undisclosed material risks.

Defendants again fall back on their argument that these statements are not necessarily false because Enovix may have actually done some form of testing. Defs.' Mot. 20-21. The argument fails here as well. Plaintiffs do not assert that Enovix "should have explicitly mentioned that it did not send . . . engineers to China in addressing these obstacles." *Id.* at 21. Rather, the Complaint alleges that, having elected to speak on how the Company had "overcome" similar "obstacles," Defendants undertook the duty to disclose that it did so only by waiving critical quality control tests. *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 940 (S.D. Cal. 2019) (noting that the defendant "could have remained silent about the dispute" but it "could not represent that there was no controversy here because all the data was favorable"). Omitting that Enovix had also brushed aside key milestones of the FAT and SAT in addition to spending millions to charter a huge jet or working around the clock to get Fab-1 up and running "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists," *Brody*, 280 F.3d at 1006; ¶145.[8]

## II.    The Complaint Alleges a Cogent and Compelling Inference of Scienter

The Complaint alleges facts supporting a strong inference that each of the Section 10(b) Defendants—Rust, Rodgers, Dales, and Enovix—acted with scienter. To plead scienter, "Plaintiffs must 'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive or with deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987 (quoting 15 U.S.C. § 78u-4(b)(2)); *Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003) (section 10(b) claims "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud"). Scienter is adequately pled where the inference of fraud

---

[8] This case is unlike *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *28 (N.D. Cal. Dec. 9, 2022). The relevant statements in that case were vague representations that the defendant was in the "final stages" of validating certain manufacturing lines in August 2021—a process that "presumably includes a number of steps"—so it was not possible to plead falsity without alleging specific facts that the issuer "had not yet begun the process of validating" those lines by August 2021. *Id.* Here, Defendants repeatedly said Enovix had conducted the FAT and SAT, which it had not. Moreover, the plaintiffs in *Talis* relied on a third party's definition of "validation," *id.* at *27, while the Complaint here relies on Defendants' own definition of FAT and SAT. ¶¶145, 162.

is at least *equally* as likely as any non-culpable explanation of the alleged conduct. *Tellabs*, 551 U.S. at 314. The appropriate inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 322-23 (emphasis in original).

### A.      The Complaint Alleges Knowing or Severely Reckless Conduct

The Complaint alleges that Rust, Rodgers, Dales, and Enovix each knew, or recklessly disregarded, that their statements to investors were false and misleading.[9] Rodgers admitted that he and Rust made the decision to waive the "key milestone[s]" of the FAT and SAT for the Fab-1 equipment, which "violated our sacred Equipment Procurement Review (EPR) specification." ¶145. Despite knowing that they had waived the FAT and SAT, Rodgers and Rust then made or caused Enovix to make false and misleading statements and omissions stating that Enovix *had* conducted the FAT and SAT for the Fab-1 equipment. Dales was also involved in, or knowledgeable of, the decision to take a "massive shortcut" by waiving the FAT and SAT. ¶176. These executives knew facts contradicting their statements at the time those statements were made, thus they acted with at least "deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987; *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate . . . is classic evidence of scienter.").[10]

Plaintiffs need not allege "specific reports" from Enovix employees "informing Defendants" that the FAT and SAT were waived. Defs.' Mot. 23. Here, Plaintiffs need not rely on such circumstantial allegations: these executives made the decision to waive the FAT and SAT and then told investors that the tests had been conducted. The only plausible inference is that they knew or recklessly disregarded that their statements were false or misleading.[11]

---

[9] Defendants do not dispute that the scienter of Rodgers, Rust, and Dales is properly imputed to Enovix. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

[10] Defendants' claim that they did not know waiving the FAT and SAT would create a material risk that Fab-1 would fail to perform to specifications, Defs.' Mot. 22-23, ignores Plaintiffs' allegations that mitigating that very risk is the precise aim and purpose of conducting those tests. ¶¶85-94.

[11] Defendants' alternative inference of "good faith," Defs.' Mot. 25, is implausible in light of these allegations and requires the Court to accept Defendants' unsupported countervailing factual inferences—that Enovix purportedly *could have* conducted the FAT or SAT remotely—which are

**B.        The Complaint Alleges Defendants' Motive to Commit Securities Fraud**

The Complaint also alleges Defendants' motive to commit securities fraud, which "may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Defendants had strong financial incentives to deceive investors as to the status and production timeline of Fab-1.

Enovix was an early-stage technology company that was not yet generating any appreciable revenues on its own, and thus was reliant on outside financing such as the $400 million that the Merger would provide. ¶171. The Proxy Statement disclosed that "Enovix has incurred losses since inception and has an accumulated deficit of $223.4 million," and thus, while "substantial doubt [exists] about Enovix's ability to continue as a going concern . . . Enovix believes that the successful completion of the [Merger] will eliminate this doubt and enable Enovix to continue as a going concern." ¶178. Defendants' misrepresentations and omissions helped ensure that the Merger would close and that Enovix would have access to capital that it sorely needed to maintain its operations. Consummating the Merger also allowed Rodgers to monetize his RSVAC Founder Shares for up to $80 million. ¶172. Rodgers was also the trustee for a trust that loaned $15 million to Enovix, which Enovix may not have been able to repay if the Merger did not close. ¶174. These allegations go far beyond generic corporate motives. Defs.' Mot. 24. Courts have found that similar facts support a common-sense inference of scienter. *E.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 (N.D. Cal. 2020) (motive to raise capital due to "substantial doubt about [the company's] ability to continue as a going concern" supported scienter).[12]

In addition, Dales sold 15% of his stock holdings during the Class Period in less than a three-month span, "coincid[ing] with the period when the Fab-1 equipment's repeated failures to reach its production specifications was coming to a head, and immediately before Enovix began to

---

found nowhere in the Complaint. Defendants' argument that they said the Fab-1 equipment was "at" the FAT stage in February 2021, Defs.' Mot. 25, does not negate Rodgers' admission that he and Rust ultimately waived the FAT and SAT in April 2021, before the start of the Class Period.

[12] *See also WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011) (allegation that company "needed continued infusion of investment capital" supported finding of scienter), *abrogated on other grounds by Lorenzo v. S.E.C.*, 587 U.S. ——, 139 S. Ct. 1094 (2019); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011) (allegations that a company's "ability to continue operating was dependent upon raising additional capital" supported finding of scienter); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (similar).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

disclose those problems to the market." ¶173.  Dales earned over $2.6 million from the sales, nearly *nine times* his base salary.[13]  Courts have found sales of similar size and with suspicious timing probative of scienter.  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) (scienter allegations "reinforced" by allegations of proceeds from stock sales equaling "more than seven times his FY 2012 salary").[14]

Defendants argue that Dales is exculpated because his stock sales were made pursuant to a 10b5-1 plan, but they fail to show the plan's terms, including the date it was adopted.  *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *18-19 (N.D. Cal. Nov. 27, 2018) ("Without reviewing [the] … actual trading plan, the Court cannot determine whether these [SEC] requirements were met, and cannot conclude that the plan negates any inference of scienter." (citing 17 C.F.R. § 240.10b5-1(c)(1)(i)(B))); *Tableau,* 2019 WL 2360942, at *6.  Insiders like Dales can easily game 10b5-1 plans by entering into them while in possession of material non-public information or shortly before the relevant sales.  *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022) ("such plans can be manipulated easily for personal financial gain and thus cannot rebut the inference that personal financial gain was a motive for Defendants' material misrepresentations").  Thus, the existence of a 10b5-1 plan, standing alone, cannot negate scienter.

As to the other Defendants, the Ninth Circuit has made clear that "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period."  *No. 84 Employer-Teamster Joint Council Pension Tr. Fund v. Am. West Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).  There is no merit to Defendants' argument that Rodgers' stock purchases during the Class Period somehow negate his scienter, Defs.' Mot. 24.  *See Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10,

---

[13] The sales proceeds are calculated from the quantities and prices disclosed in Dales' Forms 4 filed with the SEC.  *See* ECF No. 89-18 (Defendants' Ex. 17).  Dales' base salary was $301,537.44.  *See* Ex. D (Amended and Restated Employment Agreement between Enovix and Dales).

[14] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *5 (S.D.N.Y. Mar. 4, 2019) (sales of 13% and 17% of stock holdings supported scienter); *Senn v. Hickey*, 2005 WL 3465657, at *6 (D.N.J. Dec. 19, 2005) (defendant's sale of 11.8% of stock holdings with suspicious timing supported inference of scienter), *adhered to on reconsideration*, 2006 WL 1891756 (D.N.J. July 10, 2006).

2012) (rejecting the argument "that a strong inference of scienter is negated by" defendants' class period stock purchases); *Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012) ("[C]ourts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud[.]").[15]  Defendants also fail to provide any context for Rodgers' stock purchases.  They cannot negate a strong inference of scienter with these underdeveloped fact-intensive arguments.  *See, e.g.*, *Maiman v. Talbott*, 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010) ("Defendants have not provided sufficient context of the stock purchases reflected in the Form 4s.  Thus, . . . such purchases would not negate the strong inference of scienter."); *In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1097 n.5 (D. Minn. 1998) (same).

**C.    The Core Operations Theory Further Supports a Strong Inference of Scienter**

The "core operations" theory further bolsters Plaintiffs' scienter allegations.  *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).  Core operations "allows a court to impute" scienter when "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter."  *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at *29-31 (N.D. Cal. July 15, 2022) (applying core operations theory where concealed issues concerned the defendants' "flagship product").

Here, it would be absurd to suggest that Rodgers, Rust, and Dales were unaware that they had decided to waive the FAT and SAT for the Fab-1 equipment.  ¶182.  Moreover, Enovix made

---

[15] Contrary to Defendants' argument, Defs.' Mot. 24-25, it is reasonable to infer that Defendants would continue to conceal the fact that they waived the FAT and SAT, hoping that Fab-1 would nevertheless succeed on their promised timeline and that the concealed risks would not materialize. Defendants' argument "confuses expected with realized benefits."  *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).  Defendants "may have thought that there was a chance" that Fab-1 would still be able to achieve its production goals despite bypassing the FAT and SAT, in which case "the benefits of concealment might exceed the costs."  *Id.*  "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble.  It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing."  *Id.*; *see also Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 728 (7th Cir. 2004) ("[T]he truth was bound to come out quickly, but the securities laws forbid foolish frauds along with clever ones."); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 n.12 (N.D. Cal. Nov. 4, 2020) (defendants "may have hoped that the situation in China would improve, a hope that does not justify misleading investors").

a single product out of a single factory, Fab-1, in the same facility as the Company's executive offices. *Id.* The timely success of Fab-1's commercial-scale manufacturing capabilities was critical to the Company's development in order to qualify its batteries and produce them for customers. ¶183. Rust and Dales were also intimately involved in the day-to-day operations of Fab-1 and kept closely apprised of the status of any testing (or lack thereof) and the ensuing problems and delays encountered with the manufacturing equipment. ¶¶179-80. These allegations are sufficient to show that Fab-1 "is such a central component of [the company's] operations that Defendants can be presumed to have knowledge of the problems with [it]." *Azar*, 2018 WL 6182756, at *20-21 ("along with other allegations in the complaint, Plaintiffs' core operations allegations are sufficient to raise a strong inference of scienter"); *Fibrogen*, 2022 WL 2793032, at *30-31.

### III.    The Complaint Pleads Loss Causation on January 3, 2023

Plaintiffs allege two loss causation events: the Company's November 1, 2022 letter to its shareholders (¶¶136-43) and Rodgers' January 3, 2023 special presentation to shareholders (¶¶153-64). Defendants do not challenge that the Complaint adequately alleges loss causation as to the November 1, 2022 letter. That is sufficient to deny the motion to dismiss as to loss causation.

Contrary to Defendants' arguments, Defs.' Mot. 25, the Complaint also adequately alleges loss causation as to the January 2023 special presentation. The Complaint alleges that the special presentation disclosed "new information reveal[ing] the full scope of the materialized risks concealed by Defendants' omissions of the facts that the Company skipped the FAT and SAT —that Fab-1's inability to function would cause later and planned additional manufacturing processes to falter, further hampering Company growth." ¶¶164-65. The Complaint alleges that the special presentation revealed to investors that: (1) they "were reasonably misled" as to the progress and functionality of Fab-1 (¶154); (2) due to equipment problems, Fab-1 was "doing less than 10% of what it should be doing (¶157); (3) the "Gen1" production lines at Fab-1 were "not working the way we wanted to" (¶158); and (4) that skipping the FAT and SAT for the Fab-1 equipment contributed materially to the major delays and impairments of Fab-1's production output (¶¶160-61). In response to this news, Enovix's stock price fell 41%. ¶164. These facts are more than sufficient to allege loss causation. *Dura*, 544 U.S. at 347 (at the pleading stage a plaintiff need

only provide "some indication of the loss and the causal connection that he has in mind."); *Rudolph v. UTStarcom*, 2008 WL 4002855, at *4 (N.D. Cal. Aug. 21, 2008) ("[L]oss causation is a fact-intensive inquiry better suited for determination at trial than at the pleading stage[.]").

Defendants also misapprehend the law, which does not require a corrective disclosure to allege loss causation. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) ("Disclosure of the fraud is not a sine qua non of loss causation."). As this Court has recognized, "[a] plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Rabkin v. Lion Biotechs., Inc.*, 2018 WL 905862, at *15 (N.D. Cal. Feb. 15, 2018) (Illston, J.) (denying motion to dismiss on loss causation grounds). Here, the Complaint alleges that "Defendants' false and misleading statements and omissions about Fab-1 . . . concealed the material risks that Fab-1 would experience severe delays and setbacks," and that when "those concealed risks [] materialized, it caused Enovix's share price to fall precipitously." ¶129. That is sufficient to allege loss causation under a materialization of the risk theory in the Ninth Circuit. *E.g., Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145 (N.D. Cal. 2013) (finding loss causation may be pled with allegations that a misrepresentation or omission concealed a risk "that materialized and played some part in diminishing the market value of the security").

Finally, Plaintiffs' allegations here closely resemble those in the Ninth Circuit's recent decision in *Facebook*, 2023 WL 6857600, at *15. In *Facebook*, the court found that allegations of a stock drop after a disappointing earnings report were sufficient to plead loss causation where investors plausibly alleged a connection between the poor earnings and the impact of undisclosed scandals, even when earnings report was preceded by an earlier revelation of the scandals. *Id.* The Complaint contains like allegations with respect to January 3, *see* ¶129, which are more than sufficient to carry Plaintiffs' minimal burden to plead loss causation.

## IV.    The Complaint Adequately Alleges a Section 20(a) Claim

The Complaint adequately alleges control person liability as to each of the Individual Defendants. To state a claim under Section 20(a), Plaintiffs must allege (1) a primary violation of

the Exchange Act, and (2) that the individual defendants directly or indirectly controlled the entity liable for the primary violation.  15 U.S.C. § 78t(a); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1053-54 (N.D. Cal. 2008).  Defendants' only challenge to Plaintiffs' Section 20(a) claims is that there is no primary violation.  Defs.' Mot. 25. The Complaint adequately states a claim for a primary violation by Enovix, as detailed above, and thus also alleges Section 20(a) claims.  *Forescout Techs.*, 63 F.4th at 781.

There is also no merit to Defendants' throwaway argument, stashed in a footnote, that the Complaint fails to adequately allege the Individual Defendants' control.  Defs.' Mot. 25 n.10.  "Whether a defendant is a control person is an intensely factual question, and a plaintiff will survive a motion to dismiss on allegations that individual defendants, by virtue of their position, could and did control and influence the company."  *Rabkin*, 2018 WL 905862, at *19.  Here, the Complaint alleges that the Individual Defendants were officers and directors of Enovix or RSVAC at all relevant times, directly participated in the management of Enovix and RSVAC and conducted their respective business affairs, and signed or directly made the false statements alleged herein.  ¶¶42-54, 95, 98, 109, 118, 122, 207-210.  This is more than sufficient to satisfy Plaintiffs' light burden to allege control.  *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2018) (Illston, J.) ("[N]umerous courts have found that allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status.").

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.  If the Court grants any part of Defendants' motion, it should provide Plaintiffs leave to amend the Complaint, their first consolidated pleading in this case.  *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to replead routinely granted in securities cases).

DATED: October 27, 2023

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: */s/ Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Email: pkim@rosenlegal.com
        jbaker@rosenlegal.com

**ROLNICK KRAMER SADIGHI LLP**

Lawrence M. Rolnick
Marc B. Kramer (*pro hac vice*)
Brandon Fierro (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
bfierro@rksllp.com

*Lead Counsel for the Class*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI