# EXHIBIT A

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
CHRISTOPHER P. SEEFER (201197)
DANIEL J. PFEFFERBAUM (248631)
S. ASHAR AHMED (256711)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
chriss@csgrr.com
dpfefferbaum@csgrr.com

Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re RIGEL PHARMACEUTICALS, INC. SECURITIES LITIGATION | ) ) ) | No. 3:09-cv-00546-JSW |
| | ) | <u>CLASS ACTION</u> |
| This Document Relates To: | ) ) | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL |
| ALL ACTIONS. | ) ) | SECURITIES LAWS |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

**TABLE OF CONTENTS**

| | Page |
|---|---|
| I. INTRODUCTION | 1 |
| II. JURISDICTION AND VENUE | 6 |
| III. PARTIES | 6 |
| IV. DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE R788 PHASE IIa CLINICAL TRIAL | 10 |
|    A. Prior to the Class Period, Rigel Was Conducting a Phase IIa Clinical Trial to Evaluate the Efficacy and Safety of R788, the Company's Lead Product Candidate and a Potential Treatment for Rheumatoid Arthritis | 10 |
|    B. December 13, 2007: Defendants Represent that R788 Demonstrated Statistically Significant Results in Treating Rheumatoid Arthritis During the Phase IIa Clinical Trial but Failed to Disclose Material Adverse Information about the Safety of R788 and Differing Response Rates by Patients in Mexico and the United States | 11 |
|    C. February 1, 2008: The Registration Statement Issued by Rigel Was Materially False and Misleading Because It Incorporated the December 13, 2007 Press Release | 35 |
|    D. February 11, 2008: Gower Makes Materially False and Misleading Statements about the Phase IIa Clinical Trial During the BIO CEO & Investor Conference | 38 |
|    E. July 8, 2008: Rodriguez Makes Materially False and Misleading Statements about the Phase IIa Clinical Trial During the Collins Stewart 4th Annual Growth Conference | 40 |
|    F. October 27, 2008 and February 3, 2009: Rigel's Stock Price Declines Substantially After It Begins to Reveal the Previously Concealed Adverse Information about the Phase IIa Clinical Trial and Its Impact on the Company's Condition and Future Prospects | 41 |
| V. LOSS CAUSATION | 43 |
| VI. CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE | 46 |
| VII. NO SAFE HARBOR | 48 |
| VIII. PRAYER FOR RELIEF | 52 |
| IX. JURY DEMAND | 53 |

## I.    INTRODUCTION

1.     This is a securities class action on behalf of all persons who acquired the securities of Rigel Pharmaceuticals, Inc. ("Rigel" or the "Company") between December 13, 2007 and February 3, 2009 (the "Class Period"), including all persons who acquired the common stock of Rigel pursuant and/or traceable to a false and misleading registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's February 2008 offering (the "Offering").  This action asserts strict liability claims under the Securities Act of 1933 ("1933 Act") and fraud claims under the Securities Exchange Act of 1934 (the "1934 Act") against Rigel, its senior insiders and the investment banks which underwrote the Offering  (collectively, "defendants").

2.     Rigel is a clinical-stage drug development company that discovers and develops novel, small-molecule drugs for the treatment of inflammatory/autoimmune diseases and cancer, as well as viral and metabolic diseases.  The Company was founded in 1996 and is based in South San Francisco, California.

3.     Before the Class Period, Rigel was developing a new drug, R788, for the treatment of rheumatoid arthritis ("RA"), an autoimmune disease characterized by chronic inflammation that affects multiple tissues but typically produces its most pronounced symptoms in the joints.  R788 was the Company's lead product candidate, and Rigel was conducting a Phase IIa clinical trial to evaluate the safety and preliminary clinical efficacy of R788 in patients with active RA despite methotrexate therapy.  The clinical trial was a multi-center, randomized, double-blind, placebo-controlled, ascending-dose study involving 189 patients in the United States and Mexico.  The patients were divided into three approximately equal-size cohorts receiving 50, 100 or 150mg of R788 twice a day.  The clinical trial was conducted over a 12-week treatment period in patients who had RA for at least 12 months.

4.     On December 13, 2007, Rigel issued a press release and held a conference call (attended by defendants James M. Gower ("Gower"), Elliott B. Grossbard ("Grossbard"), Donald G. Payan ("Payan"), Raul R. Rodriguez ("Rodriguez") and Ryan D. Maynard ("Maynard")) touting the positive summary results of the recently completed clinical trial of R788.  The press release was an

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                                                          - 1 -

exhibit to a Form 8-K filed with the United States Securities and Exchange Commission ("SEC") the same day. The Company reported that R788 demonstrated statistically significant results in treating RA patients in the Phase IIa clinical trial and also reported adverse safety data regarding R788's effect on blood pressure, liver enzymes, neutropenia, diarrhea and gastrointestinal side effects.

5. The positive results of the Phase IIa clinical trial reported in the December 13, 2007 press release and conference call were repeated to the market in reports issued by analysts following the Company. The analysts increased their price target for the Company's stock and reported that they expected the price of the Company's stock to increase due to the positive reported results. They were right. In response to the announcement of the summary results of the Phase IIa clinical trial, Rigel's common stock price more than tripled in one day, from $8 per share to $25.95.

6. The positive statements made by defendants on December 13, 2007, however, were materially false and misleading because defendants failed to report critical adverse information about the Phase IIa clinical trial. Specifically, they failed to disclose that: (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in average blood pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007), which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (6) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. This adverse information was not publicly disclosed until October 27, 2008.

7. Gower, Grossbard, Payan, Rodriguez and Maynard knew it was important to report the positive results for the R788 Phase IIa clinical trial for several reasons. R788 was the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                                          - 2 -

Company's lead product candidate, the worldwide market for RA drugs exceeded $13 billion in 2007 and Rigel was racing to develop the first oral pill for RA before Pfizer Inc. ("Pfizer").

8. Gower, Grossbard, Payan, Rodriguez and Maynard also knew that Rigel needed to raise additional funds and that the false and misleading statements about the R788 Phase IIa clinical trial – and the inflated stock price those false and misleading statements caused – would allow Rigel to raise substantially greater funds than if the adverse information were disclosed.

9. Moreover, Gower, Grossbard, Payan, Rodriguez and Maynard knew that Rigel would become insolvent if it did not raise additional capital. The Company reported net losses every year since its December 2000 initial public offering ("IPO"). After reporting a net loss of $74.3 million in 2007, Rigel reported just $44.5 million of cash and $82.2 million of capital at December 31, 2007. Additional losses were projected for 2008 and Rigel reported a $132.3 million net loss in 2008 which would have rendered the Company insolvent if it did not raise additional capital in February 2008.

10. Gower, Grossbard, Payan, Rodriguez and Maynard knew that the Company's stock price would likely decline if they disclosed the adverse information about the Phase IIa clinical trial because the Company's stock price declined 40% after it reported the results of Phase IIa clinical study of R788 in patients with immune thrombocytopenic purpura ("ITP") on November 9, 2007. Analysts following the Company reported the price decline was due to concerns about R788's adverse event profile, particularly the gastrointestinal side effects.

11. Gower, Grossbard, Payan, Rodriguez and Maynard also knew that they would receive higher salaries, bonuses and stock option awards, and that the value of their existing stock options would increase substantially, if Rigel reported positive results from the Phase IIa clinical trial. As detailed below, the compensation of Gower, Grossbard, Payan, Rodriguez and Maynard was directly dependent on the results of the R788 Phase IIa clinical trial, and they each received salary increases, bonuses and stock awards at the end of 2007 due to the reported positive results of the R788 Phase IIa clinical trial and the inflated price of the Company's stock caused by their false and misleading statements about the R788 Phase IIa clinical trial.

12. Defendants took advantage of the inflated stock price caused by their false and misleading statements and omissions on December 13, 2007, by causing Rigel to issue five million

shares of Rigel stock at $27 per share in an offering that raised $135 million. On January 24, 2008, Rigel filed with the SEC an S-3ASR Registration Statement and Form 424B3 Preliminary Prospectus for the Offering, which incorporated by reference the materially false and misleading December 13, 2007 Form 8-K. On February 1, 2008, Rigel filed with the SEC a Form 424B5 Prospectus that also incorporated by reference the December 13, 2007 press release and repeated the false and misleading summary results of the Phase IIa clinical trial. Absent the false and misleading statements about the results of the Phase IIa clinical trial, Rigel's stock price would not have increased and the Company would not have been able to complete the Offering at $27 per share.

13. The four underwriter defendants (as defined *infra* ¶¶37-40) were paid more than $7 million to underwrite the Offering and failed to require disclosure of the adverse information about the Phase IIa clinical trial. Public investors relied on the underwriter defendants to conduct a reasonable investigation and to obtain and verify the information contained in the Registration Statement and to make sure essential facts about the Company were disclosed. Indeed, the underwriter defendants had access to the adverse information at a critical time in Rigel's corporate life – when it was seeking to raise capital. The underwriter defendants either knew about the adverse information and failed to require its disclosure or did not know by failing to conduct a reasonable investigation and independently verifying the representations in the Registration Statement. Either way, the underwriter defendants failed to meet their "gatekeeper" function of protecting investors.

14. After the Offering, Gower and Rodriguez continued to tout the positive results of the Phase IIa clinical trial but concealed the adverse information related to the trial. On February 11, 2008, Gower touted the positive results of the Phase IIa clinical trial of R788 during the BIO CEO & Investor Conference. On July 8, 2008, Rodriguez touted the positive results of the Phase IIa clinical trial of R788 during the Collins Stewart 4th Annual Growth Conference. As a result, the Company's stock price continued to trade at artificially inflated prices.

15. On October 27, 2008, Rigel presented the full results of the R788 Phase IIa clinical trial at a meeting of the American College of Rheumatology ("ACR") and on an investor conference call. Those results included the adverse information omitted from the Company's December 13, 2007 press release, as well as from the Registration Statement and the presentations on February 11,

2008 and July 8, 2008.  When this adverse information was finally disclosed, Rigel's stock price plunged 38% in a single day, from $14.41 to $8.84.

16.     Analysts following the Company issued reports in which they downgraded the Company's stock and wrote that the adverse information about the R788 Phase IIa clinical trial raised significant concerns about the efficacy and safety of the drug, whether Rigel would be able to close a partnership deal and the ultimate commercialization of R788.  Gower stated that Rigel remained in detailed licensing discussions with several potential partners and expected a lucrative partnership in early 2009.

17.     On February 3, 2009, however, Rigel announced that it would delay partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce.  The price of the Company's stock declined 9.3%, from $7.17 on February 2, 2009 to $6.50 on February 3, 2009.  Rigel subsequently announced the results of the Phase IIb clinical studies, including a report on July 23, 2009 that one of the Phase IIb clinical studies failed to meet efficacy endpoints because patients did not report significantly higher ACR response rates than the placebo group.  Rigel has also announced that it will not conduct partnership discussions until 2010.

18.     The following chart (which is also attached hereto) illustrates how defendants' false and misleading statements and omissions about the Phase IIa clinical trial caused the price of Rigel's stock to be artificially inflated and how class members were damaged when the full results of the study – and its impact on Rigel's current and future business prospects – were revealed to the market:

Rigel Pharmaceuticals, Inc.
November 1, 2007 to March 2, 2009

## II.  JURISDICTION AND VENUE

19.     The claims alleged herein arise under §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5), and §§11, 12(a)(2) and 15 of the 1933 Act (15 U.S.C. §§77k, 77l(a)(2) and 77o).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act and §27 of the 1934 Act.

21.     Venue is proper pursuant to §22 of the 1933 Act and §27 of the 1934 Act.  The Company is located in this District, and the false and misleading statements were made in this District.

## III.  PARTIES

22.     Lead plaintiff Inter-Local Pension Fund GCC/IBT acquired the common stock of Rigel pursuant or traceable to the Offering as described in the attached certification and was damaged thereby.

23.     Defendant Rigel is headquartered in South San Francisco, California.  The Company was incorporated in Delaware in 1996 and completed its IPO in December 2000, issuing five million shares at $7 per share.  In 2Q07, Rigel completed a public offering of 5.75 million shares of common stock at $9.75 per share that raised net proceeds of $52.3 million.  The Company completed another

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                        - 6 -

public Offering in February 2008, issuing five million shares at $27 per share. Its stock trades in an efficient market on the NASDAQ under the symbol "RIGL."

24. Defendant James M. Gower was, at all relevant times, Chairman of the Board and Chief Executive Officer ("CEO") of the Company. Gower made false and misleading statements about the results of the R788 Phase IIa clinical trial in the December 13, 2007 press release, during the Company's December 13, 2007 conference call and during the February 11, 2008 conference call. He also signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

25. Defendant Ryan D. Maynard was, at all relevant times, Chief Financial Officer ("CFO") of the Company. Maynard attended the December 13, 2007 conference call, during which defendants Gower and Grossbard made false and misleading statements about the results of the R788 Phase IIa clinical trial, and signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

26. Defendant Donald G. Payan was, at all relevant times, Executive Vice President of Discovery and Research of the Company. He is a medical doctor and was a co-founder of the Company. Payan attended the December 13, 2007 conference call, during which defendants Gower and Grossbard made false and misleading statements about the results of the R788 Phase IIa clinical trial, and signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

27. Defendant Raul R. Rodriguez was, at all relevant times, Executive Vice President and Chief Operating Officer ("COO") of the Company. Rodriguez attended the December 13, 2007 conference call, during which defendants Gower and Grossbard made false and misleading statements about the results of the R788 Phase IIa clinical trial, and made false and misleading statements about the results of the R788 Phase IIa clinical trial during the July 8, 2008 Collins Stewart 4th Annual Growth Conference.

28. Defendant Elliott B. Grossbard was, at all relevant times, Executive Vice President and Chief Medical Officer of the Company. Grossbard made false and misleading statements about the results of the R788 Phase IIa clinical trial in the December 13, 2007 press release and during the

Company's December 13, 2007 conference call. He was a contributing author for an article on the R788 Phase IIa clinical trial that was published in *Arthritis & Rheumatism*, Vol. 58, No. 11, November 2008. According to the article, Grossbard participated in the design of the R788 Phase IIa clinical study, had full access to the data from the study, analyzed and interpreted the data from the study, was a member of the publication committee and prepared the manuscript.

29. Defendant Jean Deleage ("Deleage") was, at all relevant times, a director of the Company. Deleage signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

30. Defendant Bradford S. Goodwin ("Goodwin") was, at all relevant times, a director of the Company. Goodwin signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

31. Defendant Gary A. Lyons ("Lyons") was, at all relevant times, a director of the Company. Lyons signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

32. Defendant Walter H. Moos ("Moos") was, at all relevant times, a director of the Company. Moos signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

33. Defendant Hollings C. Renton ("Renton") was, at all relevant times, a director of the Company. Renton signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

34. Defendant Peter S. Ringrose ("Ringrose") was, at all relevant times, a director of the Company. Ringrose signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

35. Defendant Stephen A. Sherwin ("Sherwin") was, at all relevant times, a director of the Company. Sherwin signed or authorized the signing of the false and misleading Registration Statement for the Company's February 2008 Offering.

36. The defendants referenced above in ¶¶24-35 are referred to herein as the "Individual Defendants."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                                     - 8 -

37. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") operates as an investment bank in the United States. Its businesses include securities underwriting, sales and trading, investment banking, private equity, alternative assets, financial advisory services, investment research, and asset management. Credit Suisse acted as an underwriter in connection with the Offering.

38. Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is an investment bank and full-service investment firm. Oppenheimer acted as an underwriter in connection with the Offering.

39. Defendant Thomas Weisel Partners LLC ("Thomas Weisel") is an investment bank founded in 1998 focused primarily on the growth sectors of the economy. Thomas Weisel acted as an underwriter in connection with the Offering.

40. Defendant Jefferies & Company, Inc. ("Jefferies") is a full-service global investment bank and institutional securities firm focused on growing and middle-market companies and their investors. Jefferies provides clients with capital markets and financial advisory services, institutional brokerage, securities research and asset management. Jefferies acted as an underwriter in connection with the Offering.

41. Pursuant to the 1933 Act, the defendants referenced in ¶¶37-40 above are referred to herein as the "Underwriter Defendants."

42. The Underwriter Defendants are *strictly liable* for the false and misleading statements in the Registration Statement. In connection with the Offering, the Underwriter Defendants drafted and disseminated the Registration Statement and were paid over *$7 million* in gross fees in connection therewith. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

**IV.    DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE R788 PHASE IIa CLINICAL TRIAL**

**A.    Prior to the Class Period, Rigel Was Conducting a Phase IIa Clinical Trial to Evaluate the Efficacy and Safety of R788, the Company's Lead Product Candidate and a Potential Treatment for Rheumatoid Arthritis**

43.    In the Company's 2007 Form 10-K, Rigel describes itself as a clinical-stage drug development company that discovers and develops novel, small molecule drugs for treatment of inflammatory/autoimmune diseases, cancer and viral diseases.  In 2007, the Company was developing multiple small molecule drug candidates whose specialized mechanisms of action were intended to provide therapeutic benefits for a range of inflammatory/autoimmune diseases, as well as cancers.

44.    According to the Company's 2007 Form 10-K, R788 was the Company's lead product candidate and was being developed to treat RA, an autoimmune disease characterized by chronic inflammation that affects multiple tissues but typically produces its most pronounced symptoms in the joints.  The Company reported on its website that RA was a progressive disease often leading to chronic pain and severe, incapacitating disabilities by causing the body's immune system to become inflamed, which in turn destroys soft tissue and erodes bone and cartilage.  Rigel also reported that RA is often progressive and debilitating and affects nearly 2.1 million people in the United States.

45.    Rigel reported in its 2007 Form 10-K that treatments other than R788 had significant potential side effects and other shortfalls, including gastrointestinal complications and kidney damage.  Most RA patients receive multiple drugs depending on the extent and aggressiveness of the disease, and most patients also eventually require some form of disease modifying anti-rheumatic drug ("DMARD"), including methotrexate.

46.    Rigel focused its RA program on the development of a safe oral DMARD.  Prior to the Class Period, Rigel was conducting a Phase IIa clinical trial to evaluate the safety and preliminary clinical efficacy of R788 in patients with active RA despite methotrexate therapy.  The

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW

Company described the design of the clinical study in its December 13, 2007 press release as follows:

> The clinical trial was a multi-center, randomized, double blind, placebo controlled, ascending dose study involving 189 patients in three approximately equal size cohorts receiving 50, 100, or 150 mg po bid. Within each cohort, patients were assigned on a 3:1 basis to R788 or placebo. The clinical trial was conducted over a 12 week treatment period in patients who had RA for at least 12 months. These patients had active disease despite receiving adequate stable doses of methotrexate over the preceding 6 months. All of the patients continued to receive their same stable dose of methotrexate throughout the clinical trial period and extension. Efficacy assessments for each participant were based on the American College of Rheumatology criteria, which denote at least a 20% (ACR 20) improvement, at least a 50% (ACR 50) improvement, or at least 70% (ACR 70) improvement, from the baseline assessment at the end of the 12-week treatment period. The ACR measurement factors include, reported physician and patient global assessment of disease activity, patient reported pain score, and any change in C-reactive protein (CRP) in the patients' blood. The primary efficacy endpoint for the study was the percent of patients who were ACR 20 responders at the end of week 12. Secondary efficacy endpoints were ACR 50 and ACR 70 scores as well as Disease Activity Score (DAS) at the end of week 12.

47. In the Company's September 6, 2006 press release, Rigel reported that it had initiated enrollment and dosing for the R788 Phase IIa clinical trial. In the Company's April 11, 2007 press release, Rigel reported that it had completed the 50mg dose group in the Phase IIa clinical trial, was enrolling patients in the 100mg dose group and expected to receive results from the completed clinical trial in the second half of 2007. In the Company's November 6, 2007 press release, Rigel announced that it would report the results of the Phase IIa clinical trial by the end of the year.

**B. December 13, 2007: Defendants Represent that R788 Demonstrated Statistically Significant Results in Treating Rheumatoid Arthritis During the Phase IIa Clinical Trial but Failed to Disclose Material Adverse Information about the Safety of R788 and Differing Response Rates by Patients in Mexico and the United States**

48. <u>False Statement</u>: On December 13, 2007, the Company issued a press release entitled "Rigel's R788 Demonstrates Significant Improvement in Rheumatoid Arthritis in Phase IIa Clinical Study; Achieves Statistically Significant ACR20, ACR50 & ACR70 Results." The press release was also an exhibit to a Form 8-K that Rigel filed with the SEC on December 13, 2007. The release stated in part:

> Rigel Pharmaceuticals, Inc. . . . today announced that its oral syk kinase inhibitor, ***R788*** (*tamatinib fosdium*), ***has demonstrated statistically significant results in treating Rheumatoid Arthritis (RA) patients in a recently completed Phase 2 clinical trial***. ***Groups treated with R788 at 100mg and 150mg po bid (orally, twice***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW

*daily), showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group.* The efficacy results for the 100mg and the 150mg dose groups were fairly comparable. Dramatically, the onset of the effect in these dose groups occurred as early as one week after initiation of therapy. We believe that the significant ACR scores and good tolerability observed in this clinical trial, and the further benefit of oral delivery may make R788 a favorable alternative to the currently marketed biological agents.

\*       \*       \*

*"This clinical study has shown that R788 treatment can achieve impressive ACR response rates,"* said Elliott Grossbard, M.D., senior vice president of medical development at Rigel. "In this clinical trial both the 100mg and 150mg doses improved arthritis symptoms and did so quickly. We plan to initiate the next clinical trial with R788 in RA in 2008," he added.

Efficacy Results\*

| Treatment Assigned po bid | Number (N) | ACR 20 % (N) | ACR 50 % N) | ACR 70 % (N) | DAS28-CRP 2.6, % (N) |
|---|---|---|---|---|---|
| Placebo | 47 | 38% (18) | 19% (9) | 4% (2) | 17% (8) |
| 50 mg | 46 | 32% (15) | 17% (8) | 2% (1) | 20% (9) |
| 100 mg | 49 | 65% (32) (p=.008) | 49% (24) (p=.002) | 33% (16) (p<.001) | 35% (17) (p=.005) |
| 150 mg | 47 | 72% (34) (p<.001) | 57% (27) (p<.001) | 40% (19) (p<.001) | 47% (22) (p<.001) |

\*       \*       \*

James M. Gower, chairman and chief executive officer of Rigel said, "*These very important clinical trial results are a major milestone for Rigel as we establish the potential of R788 in RA and its value as an alternative to current therapies*. In addition, given these results and the recent results in ITP, *we believe that R788 may be a useful drug in the treatment of autoimmune diseases*."

**Safety Results**

*The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests, and gastrointestinal (GI) side effects.* Dose reduction (to one half the assigned dose, by taking the drug once per day) was pre-specified in the protocol, contingent on neutrophil counts and/or liver function tests. Notably, a vast majority of the patients (19 out of 21) who had their dose reduced, successfully completed the clinical trial with minimal safety issues.

*The key safety results are shown in the table below*:

| | Placebo po BID N=47 | 50mg po BID N=46 | 100mg po BID N=49 | 150mg po BID N=47 |
|---|---|---|---|---|
| Completed Study at Reduced Dose (N) | 1 | 0 | 5 | 13 |
| Dropouts (N): | 11 | 6 | 6 | 8 |
|   Withdrew Consent | 6 | 3 | 2 | 1 |
|   Adverse Event | 2 | 1 | 3 | 6 |
|   Other | 3 | 2 | 1 | 1 |
| Neutropenia (N) Requiring dose reduction | 0 | 0 | 5 | 10 |
| ALT > 3XULN (N) | 2 | 0 | 0 | 3 |
| Diarrhea (N) (severity moderate or greater) | 0 | 3 | 2 | 10 |
| Upper GI side effects (N) (gastritis, nausea, dyspepsia) (severity moderate or greater) | 2 | 1 | 2 | 12 |
| Hypertension (N) (severity moderate or greater) | 0 | 0 | 2 | 0 |

49. On December 13, 2007, the Company also held a conference call attended by defendants Gower, Grossbard, Payan, Maynard and Rodriguez. During the call, defendants Gower and Grossbard repeated the positive results of the Phase IIa clinical trial:

[Gower:] We were very pleased to be able to announce *highly statistically significant results of a Phase 2 trial of 788 in patients with rheumatoid arthritis*. And I would like to introduce Dr. Elliot Grossbard to take us through the study results. Elliot?

\* \* \*

[Grossbard:] The efficacy results are shown in the graph on the handout that many of you may have downloaded. *As you can see, the highly significant effect for both the ACR 20, 50, 70 and DAS28 score.* The p values are uniformly less than .008, usually less than .001. Of note, although not included in this graph, is that the onset of the effect was within one week, and you could see significant differences between the patients at one week after the initiation of treatment.

*We have concluded that the 100 milligram and 150 milligram dose groups have impressive and statistically significant improvements over placebo*, and that the onset occurs very, very early. The efficacy results for the two effective doses were fairly comparable, and the 100 milligrams bid dose kind of caught up by the end so that they were really equivalent. The 50 milligram dose [does] not appear to be much better than placebo, and so overall there was a good dose response.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:09-cv-00546-JSW
- 13 -

*With regard to safety, which is going to be a close focus of the future program, because I think this study fairly establishes with certainty that this drug is effective in rheumatoid arthritis.*

We had a number of dose reductions in the study, either due to ALP elevations, or much more commonly, neutrophil counts below 1500. Typically I would ask the sites to hold the drug until the ALP came back towards normal, or the neutrophil count went above 1500, and then they would restart at half the dose.

Of the patients who had their doses reduced, and overall there were about 20 or close to 20 in the study, 18 of those 20 finished the study at the reduced dose. And the ACR 20 response rate in that group was greater than 80%, and the ACR 50 response rate was greater than 50%. So it would appear that at least in patients who are responding you can reduce the dose significantly, ameliorate some of the concerns and still maintain a very significant clinical effect.

In terms of dropouts, there were more dropouts in the placebo group than in any R788 group. Most of those in the placebo were under the category withdrew consent, which often, if not always, means the patients were unsatisfied with the way their treatment was going. At the 150 milligram dose we had a number of dropouts for adverse events.

*The incidence of neutropenia, as I mentioned, was modest. In the 100 milligram dose I think there were five patients out of the 49, but it was a much higher percentage of the dose 150 milligrams twice a day.*

*In terms of ALP elevations greater than three times the upper limit of normal, which is the marker that FDA recently recommended in their guidelines for development of new (technical difficulty) there were two patients in the placebo group who had ALP elevations, and three in the high dose group, and none in the two intermediate groups.* The most prevalent side effect beyond neutropenia in the high dose group was a combination of gastrointestinal side effects, diarrhea and nausea, dyspepsia and so on.

*The incidence of reported moderate hypertension was quite low*, although the way case report forms are filled out an occasional patients [sic] had a notation for his systolic blood pressure increase, and an occasional one had diastolic blood pressure increase. And it is hard to know exactly what that means, so I'm reporting to you here those where the case report forms noted, hypertension of moderate severity. So in conclusion we think the 100 milligram dose was well tolerated. The 150 milligram dose somewhat less so. But with dose reductions almost all the patients were able to finish the study.

The most common side effects were neutropenia and gastrointestinal side effects and they are most prevalent in the 150 milligram bid dose.

I think – my personal opinion is that *this study establishes with very little uncertainty that this drug at 100 milligrams a day – 100 milligrams twice a day or more is highly effective in the treatment of rheumatoid arthritis in terms of clinical signs and symptoms*. We have not investigated the question of bone erosions and joint damage – we will in a future study.

The benefits are seen quickly, as early as one week after treatment. And the fact that we're talking here about pills and not injections make this a very interesting compound going forward into our next set of studies.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW

- 14 -

50. The positive results of the Phase IIa clinical trial reported in the December 13, 2007 press release and conference call were repeated to the market in reports issued by analysts following the Company, including reports issued on December 13, 2007 by CIBC World Markets ("CIBC") analyst Brian Abrahams, Jefferies analyst Adam A. Walsh and Credit Suisse analyst Michael Aberman, M.D. Abrahams reported that CIBC expected upside in Rigel's stock price because the results of the Phase IIa clinical trial provided "strong proof-of-concept for systemic Syk kinase inhibition in rheumatoid arthritis, and unlocks the potential for the agent to be used in other chronic autoimmune conditions as well."

51. Credit Suisse analyst Aberman increased the price target of Rigel stock from $12 to $25 and wrote, "It is hard to imagine better results than Rigel achieved with R788 in RA and we think this compound has a good chance of becoming a blockbuster for autoimmune diseases." Jefferies analyst Walsh increased the price target for Rigel stock from $16 per share to $19 per share.

52. The analysts were correct. Rigel's stock price more than tripled, from $8 per share on December 12, 2007 to $25.95 on December 13, 2007, the day defendants announced the results of the Phase IIa clinical trial. By comparison, the peer group declined 0.9% and the NASDAQ declined 0.1%.[1]

53. <u>Reasons Why Gower, Grossbard, Payan, Rodriguez and Maynard Knew the Statements Made on December 13, 2007 Were Materially False and Misleading</u>: Gower, Grossbard, Payan, Rodriguez and Maynard knew the statements made about the R788 Phase IIa clinical trial on December 13, 2007 were materially false and misleading for the following reasons:

54. **Failure to report adverse information.** Gower, Grossbard, Payan, Rodriguez and Maynard failed to report critical adverse information about the Phase IIa clinical trial. Specifically, they failed to disclose that: (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no

---

[1] The peer group is the NASDAQ Biotechnology Index. In the Company's 2007 Form 10-K, Rigel compared its stock price to the NASDAQ and the NASDAQ Biotechnology Index.

patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in average blood pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007), which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (6) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. This adverse information was not publicly disclosed until October 27, 2008.

55. **Failure to report ACR response data by country.** On December 13, 2007, Rigel reported the overall ACR response data as follows:

| | Placebo | 50MG | 100MG | 150MG |
|---|---|---|---|---|
| # of patients | 47 | 46 | 49 | 47 |
| ACR20 | 18 (38%) | 15 (33%) | 32 (65%) | 34 (72%) |
| ACR50 | 9 (19%) | 8 (17%) | 24 (49%) | 27 (57%) |
| ACR70 | 2 (4%) | 1 (2%) | 16 (33%) | 19 (40%) |

56. However, Rigel failed to report the ACR response data by country until October 27, 2008, when it revealed the following:

| | Placebo | 50MG | 100MG | 150MG |
|---|---|---|---|---|
| # of U.S. patients | 25 | 46 | 21 | 5 |
| ACR20 | 6 (24%) | 15 (33%) | 11 (52%) | 2 (40%) |
| ACR50 | 1 (4%) | 8 (17%) | 6 (29%) | 2 (40%) |
| ACR70 | 0 (0%) | 1 (2%) | 3 (14%) | 2 (40%) |

| | Placebo | 50MG | 100MG | 150MG |
|---|---|---|---|---|
| # of Mexican patients | 22 | 0 | 28 | 42 |
| ACR20 | 12 (55%) | 0 (0%) | 21 (75%) | 32 (76%) |
| ACR50 | 8 (36%) | 0 (0%) | 18 (64%) | 25 (60%) |
| ACR70 | 2 (9%) | 0 (0%) | 13 (46%) | 17 (40%) |

57. In addition, on October 27, 2008, Grossbard acknowledged he knew about the differing response rates on December 13, 2007:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW

The issue of Mexico/US interaction before the study – I think we actually mentioned this at our original discussion on the Web after the study was over. I was concerned that there might be such an interaction.

And so, I requested before the study was unblinded that we do a country interaction and it turned out there was one. And the issue of the interaction was that *the placebo rate was much higher in Mexico than in the US. And the response rate was much higher in Mexico than in the US.*

58. Further, according to the November 2008 article about the Phase IIa clinical trial published in *Arthritis & Rheumatism*, Grossbard participated in the design of the study.

59. The differing response rates was important information because it indicated that the higher response rates by Mexican patients may have overstated the dose response. In fact, numerous analysts reported this was important information when the Company disclosed it for the first time on October 27, 2008. In an October 28, 2008 report, RBC Capital Markets ("RBC") analyst Jason Kantor wrote that the impact of the Mexican data may have overstated the dose response:

*The formal presentation of the R788 Phase IIa data and subsequent investor event at ACR were confounded by two disclosures*: 1) a dose-dependent increase in mean systolic blood pressure of 3-5 mmHg at 100mg; and 2) *higher placebo and on-treatment response rates among patients treated in Mexico vs the US*.

\* \* \*

• **Response rates differ by geography.** The drug clearly worked in both the US and Mexico, and the benefit over placebo was similar in both countries. However, patients in Mexico had higher response rates in both the placebo treated arms. *The higher response rates at the Mexican sites may have contributed disproportionately to the benefit observed at the higher doses*, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico.

\* \* \*

In the Phase IIa dose-ranging trial, 189 moderate-to-severe RA patients were dosed twice daily (BID) for 3 months at three doses vs. placebo. The trial was conducted in the US and Mexico with approximately 50% in each countr[y]. *The company provided the ACR response data by country for the first time. Patients in Mexico had a higher response rate in both placebo and treatment arms than the US patients.* The placebo group and the 100mg group were relatively evenly split between US and Mexican patients. However, there were no Mexican patients treated at the 50mg dose and approximately 70% of the 150 mg dose was enrolled in Mexico.

We do not view the efficacy differences as being a significant clinical or regulatory risk. The drug clearly worked in both the US and Mexico, and the benefit

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:09-cv-00546-JSW

- 17 -

over placebo was similar in both countries. Moreover, this phenomenon has been reported in other clinical trials for RA drugs.

*The main concern is that the impact of the Mexican data may have been to overstate the dose response.* Patients in Mexico had higher response rates in general, and they represented a larger portion of the population at increasing doses. The investment thesis for R788 in RA is based largely on the very robust efficacy results and strong dose response.

60. Credit Suisse analyst Aberman also wrote in a report issued on October 27, 2008 that Rigel had presented the differences in efficacy in Mexico versus the United States for the first time and that it was a particular concern because the ratio of Mexican patients to U.S. patients was higher in the higher-dosing groups, which could skew the data in favor of R788:

One of the first areas of concerns that was raised from today's data presentation was the fact that patients enrolled in Mexico had a higher placebo response rate than in the US. A high placebo response could also lead to higher treatment response. *This is a particular concern since the ratio of Mexican patients to US patients was higher in the higher dosing groups, which could skew the data in favor of R788.*

61. **Failure to report that R788 caused an increase in blood pressure.** On December 13, 2007, Rigel reported that two patients in the 100mg cohort experienced moderate hypertension. In addition, Grossbard stated that "[t]he incidence of reported moderate hypertension was quite low," but neither he nor any of the other defendants attending the December 13, 2007 conference call disclosed the magnitude of the "moderate hypertension" or whether the incidence of reported moderate hypertension was dose dependent like the increase in neutropenia, the elevation of liver enzymes and the gastrointestinal side effects. Analysts noted this important difference. In his December 13, 2007 report, Credit Suisse analyst Aberman wrote that there was "no evidence of dose dependent hypertension."

62. In fact, Gower, Grossbard, Payan, Rodriguez and Maynard knew that five patients – not two – experienced hypertension and that there was a dose-dependent increase in mean systolic and diastolic blood pressure. During the October 27, 2008 ACR investor update, Grossbard acknowledged that five patients (not three, as reported on December 13, 2007) experienced hypertension, that there was a dose-dependent increase in blood pressure, that the increase was "of crushing importance to everybody" at the ACR conference, that additional studies would be

necessary to get more precise estimates and that "the final word on blood pressure's pretty far down the road":

> [T]here were a total of *five patients* in the two high dose groups that the investigators wrote hypertension.
>
> * * *
>
> Then there's a question of blood pressure. And we have noted, and it is in the paper coming out in the next two weeks, that *our drug at doses of 100mg twice a day, for example, over 12 weeks, has an average increase in blood pressure of about 4mm systolic relative to their baseline*.
>
> * * *
>
> *I believe it's real and I believe there's an effect on blood pressure.* The magnitude of the effect that we measured in this study in the 100 mg twice a day dose was about 4 mm.
>
> The studies we're doing now are much larger. We'll get another estimate from those studies. And it's possible over time we would end up doing an ambulatory blood pressure study to get an even more precise estimate of the blood pressure effect. So that's where we stand on blood pressure.
>
> * * *
>
> It's every person compared to his baseline that detects it. And so doing that, we had seven different changes from the baseline, one for each visit, and then we averaged them to get this number that we've given to you. The diastolic number is a little smaller than 4 mm. It was 2 mm or 3 mm [for the three patients in the 100 mg cohort]. Systollic number was 4 mm to 5 mm [for the three patients in the 100 mg cohort].
>
> * * *
>
> The systolic was about 8 mm and the diastolic was about 4 mm [for the two patients in the 150 mg cohort]. That's my recollection.
>
> * * *
>
> *And when the drug was withdrawn at the end of the study, at the end of the 12 week period, it came pretty much down to baseline.* So *I believe it's a real effect.* I just can't be precise about the magnitude of the effect, whether it's going to turn out to be three or five or seven. That's just harder to know because we at it that hard as part of this study.
>
> We're paying more attention to it now in a Phase 2b study and I – my guess is it'll probably be a little better as we get large numbers and we've now alerted investigators to the fact that blood pressure can be a side effect and that they should treat it when it occurs and so on and so forth. But that's a prediction, it's not a fact.
>
> * * *

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:09-cv-00546-JSW

- 19 -

It depends on the dose.  The dose of 100 mg twice a day, it was four, and the dose 150 twice a day, it was seven to eight.  And it would depend if it was sitting, if it was standing.  But qualitatively, those are the way the numbers go.  *It's dose dependent.  There's no question about it.*

\*     \*     \*

*In the course of the study, five patients either had antihypersensitive treatment initiated, or had their blood pressure medicine changed as a result of the blood pressure that was observed during the study*, which coincided usually with the five patients – I don't want to say it was person to person, but it coincided with the *five patients who were identified as having the adverse event of hypertension.*

\*     \*     \*

When we do the next study we're going to have 400 or 500 patients for fairly long periods of time.  So *I know it's of crushing importance to everybody here* whether its three or five, but that's not going to be the final word on blood pressure. *The final word on blood pressure's pretty far down the road.*

63. The dose-dependent increase in blood pressure was important because (1) it might signal an increase in cardiovascular risk; (2) the mechanism was not well understood; and (3) it could be a stumbling block for some pharmaceutical companies in considering licensing the drug.  In fact, when this information was first disclosed on October 27, 2008, several analysts noted their concern.

64. In his October 28, 2008 report, RBC analyst Jason Kantor downgraded the stock due to "heightened safety concerns for R788" and noted that: (1) the previously undisclosed increase in blood pressure was viewed as a "potentially significant concern" to independent physicians attending the October 27, 2008 ACR conference; and (2) the new negative information caused one pharmaceutical company to walk away from a potential partnership with Rigel.  Kantor also reported that the defendants stated during the webcast that the blood pressure data was available to potential partners throughout the process:

The formal presentation of the R788 Phase IIa data and subsequent investor event at ACR were confounded by two disclosures: 1) *a dose-dependent increase in mean systolic blood pressure of 3-5 mmHg at 100mg*; and 2) higher placebo and on-treatment response rates among patients treated in Mexico vs the US.  Based on our conversations with the company, one principle investigator, and other physicians, we believe *the perceived risk/benefit ratio has worsened slightly, and in the absence of new data, concerns are likely to persist*.  We still anticipate a partnership in early 2009, but no longer expect a deal sooner in 2008.  We are downgrading to Sector Perform, Speculative Risk, and would not be aggressively buying on the current weakness.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW
- 20 -

- **Increase in blood pressure.** *Rigel previously disclosed a modest increase in hypertensive adverse events with R788, and now disclosed a dose-dependent increase in average blood pressure. The blood pressure increase is somewhat concerning in that 1) it may signal an increase in cardiovascular risk; 2) the mechanism is not well understood; and 3) it could be a stumbling block for some pharma companies in considering licensing the drug. In speaking to some independent physicians at the conference, the blood pressure issue was viewed as a potentially significant concern.*

\*      \*      \*

- **R788 partnership in early 2009.** According to management, Rigel remains in detailed licensing discussions with several potential partners, and confirmed that *the blood pressure data has been available to potential partners throughout the process.* Management continues to expect a lucrative partnership in early 2009, pending successful completion of the thorough QT study. The company emphatically stated that no QT prolongation signal has been observed so far. A partnership would be a catalyst for outperformance.

65. Kantor also wrote that the dose-dependent increase in mean systolic and diastolic blood pressure was surprising and raised several concerns:

As reported in prior top-line results, there were dose-dependent increases in several important adverse events, specifically neutropenia, elevated liver enzymes, GI side effects, and hypertension. However, *what surprised us was that there was a dose-dependent increase in mean systolic and diastolic blood pressure.* The clinical significance of the increased blood pressure is unclear, but we have several concerns:

1.      An increase in blood pressure raises the potential concern of increased cardiovascular events in larger trials or future commercial experience. This increases both clinical and regulatory risk.

2.      The mechanism of the blood pressure increase is unknown, which could raise additional regulatory concerns. One of the principle investigators suggested that the effect could be due to cross reactivity with the VEGF receptor. If there is a physiologically measurable impact on VEGF, it could raise further safety concerns.

3.      The blood pressure increase appears to be inseparable from efficacy because a slight increase is also observed at the low, non-efficacious dose.

4.      There is a steep dose-related increase in blood pressure.

5.      The increase in blood pressure may necessitate a larger and longer Phase III program, and may limit ultimate commercial uptake of the drug.

6.      Potential cardiovascular risk could limit partnering opportunity. Rigel management informed us that potential partners have had access to this data for some time, and in fact *at least one potential partner was discouraged enough to walk away.*

66. Credit Suisse analyst Aberman also reported on October 27, 2008 that the magnitude of the increase in blood pressure was disclosed for the first time and that there was "no question" the increase in blood pressure was "one of the risks of the program":

> The next most important topic of debate at ACR was the issue of R788's blood pressure elevation. Specifically, the mean increase in blood pressure elevation over baseline was 4mmHg in the 100 mg PO BID group, which is the highest dose moving forward in the Phase IIb trials enrolling. ***With the FDA's increased scrutiny over cardiac toxicity and the well known association of elevated blood pressure with cardiac events, this toxicity is not a non-issue***.

*     *     *

> Perhaps more important, we understand that ***at least one investigator not involved in the R788 program suggested that this level of elevated BP would be a show stopper clinically***.

*     *     *

> Lastly, ***one area that has raised concern is the magnitude of the BP rise in those patients who had hypertension as an adverse event***. While the complete patient level data were not disclosed, the company disclosed that the ***BP went up as much as 20-30 mmHg. This magnitude is concerning in that it could precipitate significant morbidity acutely, such as a cardiac event***. While the rate of hypertension as an adverse event was relatively rare, ***this is probably the biggest risk to the program and one that bears watching in the Phase IIb program***.

67. On November 3, 2008, Rigel reported its financial results for the quarter ending September 30, 2008. The Company also held its first-ever earnings conference call, but the focus of the call was the toxicity concerns with R788 following the ACR presentation. Analysts following the Company asked numerous questions about the increase in blood pressure and then issued reports. Credit Suisse analyst Aberman issued a report on November 3, 2008, in which he wrote that, "[b]ased on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we think this will not wane until (1) a commercial partnership is signed in 1H09; and/or (2) Phase IIb data are released in 3Q09." He also wrote that "There is no question that the elevated blood pressure seen in the Phase IIa is a risk for the long term prospects of R788."

68. **Increase in Liver Enzymes:** On December 13, 2007, Rigel reported that there was a dose-dependent increase in alanine aminotransferase ("ALT") (liver enzymes) in three patients in the 150mg cohort and none in the 50mg or 100mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that nine patients experienced a dose-

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW
- 22 -

dependent increase in ALT – two patients in the 50mg cohort, three patients in the 100mg cohort and four patients in the 150mg cohort.

69. Analysts noted the difference. On October 28, 2008, Oppenheimer analyst Abrahams issued a report in which he wrote the following:

> ACR data highlighted neutropenia and LFT elevations as potential risks worth watching. ***Neutropenia was slightly higher than previously reported and not completely confined to the first several weeks, and LFT elevations were associated with R788.*** While ***R788's side effect profile is not benign, as suggested by prior data***, we believe it is acceptable thus far.

70. While Abrahams noted that the December 2007 data "suggested a possible association with LFT elevations," he wrote that the data presented on October 27, 2008 "showed mild dose-dependent ALT elevations greater than 1.2x ULN at all doses, ***which confirms R788's association with LFT increases***, in our opinion." He also wrote that "there are clearly some additive liver abnormalities as evidenced by the increase in patients who had LFT levels of more than 1.2X ULN."

71. **Neutropenia:** On December 13, 2007, Rigel reported that 15 patients experienced a dose-dependent increase in neutropenia – five patients in the 100mg cohort and ten patients in the 150mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 20 patients experienced neutropenia – one in the 50mg cohort, five in the 100mg cohort and 14 in the 150mg cohort.

72. Like the other adverse safety data, analysts noted the difference. For example, Oppenheimer analyst Abrahams wrote the following in his October 28, 2008 report:

> ***Full phase IIa data showed an increase in neutropenia from previously reported top-line data. . . . There were five additional cases of neutropenia in the full phase IIa data.***

73. **Gastrointestinal side effects:** On December 13, 2007, Rigel reported that 15 patients experienced upper gastrointestinal side effects – one in the 50mg cohort, two in the 100mg cohort and 12 in the 150mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 35 patients experienced upper gastrointestinal side effects – four in the 50mg cohort, 14 in the 100mg cohort and 17 in the 150mg cohort.

74. **Diarrhea:** On December 13, 2007, Rigel reported that 15 patients experienced diarrhea – three in the 50mg cohort, two in the 100mg cohort and 10 in the 150mg cohort. However, during the October 27, 2008 ACR presentation and in the November 2008 article, it was reported that 34 patients experienced diarrhea – five in the 50mg cohort, eight in the 100mg cohort and 21 in the 150mg cohort.

75. **Gower, Grossbard, Payan, Rodriguez and Maynard knew about the adverse safety data on December 13, 2007 because the Phase IIa clinical trial was completed.** All of the above adverse information was known by Gower, Grossbard, Payan, Rodriguez and Maynard on December 13, 2007 because the study was complete and the data was in. In fact, during the December 13, 2007 conference call, Grossbard acknowledged that the December 13, 2007 press release was an abstract of the November 2008 article in *Arthritis & Rheumatism* that disclosed (1) the differing response rates between patients in Mexico and the United States; and (2) the significantly worse adverse safety information.

76. Further, Rigel was a small company. According to the Company's 2007 Form 10-K, Rigel had 159 employees as of December 31, 2007. According to the Company's April 8, 2008 Proxy Statement, Gower, Grossbard, Payan, Rodriguez and Maynard were its most senior executives. They were the highest paid officers in the Company, and each attended the December 13, 2007 conference call. Given the importance of the R788 Phase IIa clinical trial to the Company's success and the senior positions of Gower, Grossbard, Payan, Rodriguez and Maynard, it would be absurd to suggest they did not know about the adverse information that was concealed from investors until October 27, 2008.

77. Yet, the differing response rates and significantly worse safety information was not disclosed on December 13, 2007. When Jefferies analyst Walsh asked, during the December 13, 2007 conference call, when Rigel would report more comprehensive data than reported in the press release, Grossbard said that he would be working very closely with Dr. Weinblatt to write the article that was published in *Arthritis & Rheumatism* in November 2008 and that the publication of the article would be the next significant statement about the results of the R778 Phase IIa clinical trial.

78. **Gower, Grossbard, Payan, Rodriguez and Maynard knew the undisclosed adverse safety data was important.** Gower, Grossbard, Payan, Rodriguez and Maynard knew the undisclosed safety data was important to the Company's financial results. Rigel reported in its 2007 Form 10-K that it must demonstrate the safety of any drug before it could be approved for commercial sale:

> Our ongoing development activities are and will continue to be subject to extensive regulation by numerous governmental authorities in the United States and other countries, including the Food and Drug Administration, or FDA, under the Federal Food, Drug and Cosmetic Act.
>
> *          *          *
>
> Our failure, or the failure of our strategic partners, to adequately demonstrate the safety and efficacy of our products under development will prevent receipt of FDA and similar foreign regulatory approval and, ultimately, commercialization of our products.

79. Following the Company's December 13, 2007 press release and conference call, analysts that followed Rigel also reported that a key risk to the Company's stock price was adverse safety data. For example, CIBC analyst Abrahams reported on December 13, 2007 that "key risks" to the Company's 12- to 18-month stock price target included the "emergence of an unacceptable safety signal with R788."

80. In the November 2008 article on the R788 Phase IIa clinical trial published in *Arthritis & Rheumatism* (of which Grossbard was a contributing author), it was written that the Phase IIa clinical trial was designed to evaluate the safety and preliminary clinical efficacy of R788 in patients with RA despite methotrexate therapy and that all patients were monitored for adverse events and serious adverse events. Moreover, it was stated in the article that "*whether the adverse events seen in this study, including gastrointestinal intolerance, neutropenia, effects on blood pressure, and liver enzyme elevations, will be a major issue in longer studies of RA patients will also need to be determined.*" Yet, none of this information was disclosed on December 13, 2007.

81. **R788 Critical to Rigel's Success.** Gower, Grossbard, Payan, Rodriguez and Maynard also knew that R788 was critical to Rigel's success. As reported by the Company in its 2007 Form 10-K, R788 was its lead product candidate for treating RA. During Rigel's November 3, 2008 conference call, Gower stated that R788 was the Company's "flagship product candidate." The

pipeline report on the Company's website confirms that the development of R788 for RA had progressed farther than any other drug under development.



82.     Gower, Grossbard, Payan, Rodriguez and Maynard also knew that R788 could be very profitable.  The Company reported on its website that the worldwide market for RA drugs exceeded $13 billion in 2007.  After Rigel reported the incomplete results of the Phase IIa clinical study on December 13, 2007, analysts reported that the market potential of R788 in both RA and other autoimmune indications was substantial.  CIBC analyst Abrahams estimated worldwide end-use sales of R788 could exceed $650 million by 2013.

83.     Gower, Grossbard, Payan, Rodriguez and Maynard knew that Rigel was competing with Pfizer to develop the first oral pill for RA and that Pfizer was ahead in its clinical testing.  In his October 23, 2007 report, CIBC analyst Abrahams wrote that "the most important potential competitors to R788 are the other targeted oral agents in clinical development" and singled out Pfizer's drug candidate, CP-690,550:

> Pfizer's candidate is in late phase II testing and is somewhat further ahead of Rigel's program . . . .

*     *     *

Among the mid-stage oral small molecules for RA, we believe Pfizer's CP-690,550 demonstrated extremely strong efficacy results in a 6-week monotherapy trial . . . .

84.     At the October 7, 2008 JMP Securities LLC Healthcare Focus Conference, defendant Maynard acknowledged Rigel's fierce competition with Pfizer to develop the first oral pill for RA in response to an analyst's question:

We have a got a good look at Pfizer's compound they're presenting at ACR as well. They are presenting on their three-month data and it looks pretty good. We are not sure exactly what the safety profile will look like for six months. But at three months with what they have shown, it looks pretty good. *And we're definitely going to be in a horserace with Pfizer.*

*We want to beat them to the market with our compound. They're slight ahead of us but we think we have an opportunity to catch up.* But they're definitely who we think of when we think of the lead in this space. We want to be the first oral . . . on the market because there will be a value attributed to that.

85.     In a December 16, 2008 report, Collins Stewart analyst Salveen J. Kochnover also noted that Pfizer's drug candidate was in direct competition with Rigel's R788:

On the competitor front, R788 is facing direct competition in RA from Pfizer's oral JAK3 inhibitor, CP-690,550. Pfizer recently presented data from a Phase 2 trial at the ACR meeting in October . . . and expects to initiate two Phase 3 trials in 1Q09, placing Pfizer's compound >6 months ahead of R788 in development.

86.     On June 15, 2009, Adam Feurstein reported on TheStreet.com that Rigel and Pfizer were "locked in a race to develop the first oral pill for RA" and that Pfizer's oral RA drug was "already in phase III studies."

87.     **RBC analyst Kantor reports this lawsuit is warranted.** After the initial complaint in this lawsuit was filed, RBC analyst Kantor issued a report on February 24, 2009 in which he maintained RBC's "Underperform rating and cautious outlook on RIGL shares based on: 1) a delay in the expected partnership for R788 until after the Phase IIb data in Q3:09; 2) a dwindling cash balance; and 3) limited visibility regarding safety signals in the upcoming TASKi2 and TASKi3 trials, whose results are expected in July and August, respectively." He also noted the filing of the first complaint in this lawsuit and wrote the following:

We typically do not put much emphasis on these types of lawsuits because they are often frivolous. However, the concerns raised in the suit are similar to those we raised at the time the data was presented (please refer to our note titles "Safety

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                                           - 27 -

Concerns Heightened Following Phase IIa Presentation to ACR" published on October 28, 2008 for more details).

88. **Gower, Grossbard, Payan, Rodriguez and Maynard knew Rigel needed to raise funds to avoid insolvency.** In addition to knowing about the undisclosed adverse safety information and the differing response rates by patients in Mexico and the United States, Gower, Grossbard, Payan, Rodriguez and Maynard knew Rigel needed to raise funds given the Company's deteriorating financial condition. Indeed, in every Form 10-Q filed by Rigel in 2007, the first risk factor reported was that Rigel needed additional capital in the future to sufficiently fund its operations and research. For example, Rigel reported the following in its 3Q07 Form 10-Q filed with the SEC on November 6, 2007:

*We will need additional capital in the future to sufficiently fund our operations and research.*

We have consumed substantial amounts of capital to date, and operating expenditures are expected to increase over the next several years as we expand our research and development activities. We believe that our existing capital resources and anticipated proceeds from current collaborations will be sufficient to support our current operating plan through at least the next 12 months. *In the foreseeable future, our operations will require significant additional funding in large part due to our research and development expenses, future preclinical and clinical-testing costs, and the absence of any meaningful revenues.* The amount of future funds needed will depend largely on the timing and structure of potential future collaborations. *We do not know whether additional financing will be available when needed, or that, if available, we will obtain financing on terms favorable to our stockholders or us.* As of September 30, 2007 and December 31, 2006, our cash, cash equivalents and available-for-sale securities were $112.5 million and $104.5 million, respectively.

To the extent we raise additional capital by issuing equity securities, our stockholders could at that time experience substantial dilution. To the extent that we raise additional funds through collaboration and licensing arrangements, we may be required to relinquish some rights to our technologies or product candidates, or grant licenses on terms that are not favorable to us.

89. In fact, Gower, Grossbard, Payan, Rodriguez and Maynard knew Rigel would become insolvent if it did not raise funds. After reporting a net loss of $74.3 million in 2007, Rigel reported just $44.5 million of cash and $82.2 million of capital at December 31, 2007. Rigel's February 2008 Offering raised $127.5 million for the Company, but Rigel reported a $132.3 million net loss in 2008. Thus, absent the $127.5 million raised in the February 2008 Offering, Rigel would have become insolvent before the end of 3Q08. Rigel reported a $99 million net loss for the nine months

ending September 30, 2008, which would have more than depleted the $82.2 million of capital the Company reported as of December 31, 2007.

90. Gower, Grossbard, Payan, Rodriguez and Maynard also knew disclosure of the adverse safety information and differing response rates of patients in Mexico and the United States would make raising funds more difficult, if not impossible. Indeed, the stock price declined 50% following the disclosure of the adverse information on October 27, 2008. Instead of disclosing the full results of the Phase IIa clinical trial, Gower, Grossbard, Payan, Rodriguez and Maynard concealed the adverse information about R788, and the Company's stock price increased from $8 per share on December 12, 2007 to $25.95 on December 13, 2007. Then, in February 2008, Rigel sold five million shares for $27 per share for net proceeds of $127.5 million. If Gower, Grossbard, Payan, Rodriguez and Maynard disclosed the adverse safety information, the Company's stock price would not have increased, and Rigel could not have sold the five million shares for $27 per share and may not have been able to raise any funds.

91. Gower, Grossbard, Payan, Rodriguez and Maynard also knew that the Company's stock price would decline if they reported the adverse safety information about the Phase IIa clinical trial because that is precisely what occurred on November 9, 2007 when Rigel announced the results of its Phase IIa clinical study of R788 in patients with ITP. The Company reported that a majority of the patients involved in the clinical study responded favorably to R788 and that the clinical study showed that R788 could improve platelet counts in ITP. Following the release of this information, the Company's stock price declined 14.1% from $11.04 on November 8, 2007 to $9.48 on November 9, 2007. By December 4, 2007, the Company's stock price had declined to $6.67.

92. Analysts attributed the decline to concerns about adverse safety data. For example, after the Company's December 4, 2007 R788 Phase IIa ITP conference call, Jefferies analyst Walsh wrote in a December 5, 2007 report that Rigel shares had plummeted 40% since the Phase IIa ITP results were announced on November 9, 2007 due to concerns about R788's adverse event profile, particularly the gastrointestinal side effects.

93. **Need for partnership to raise funds.** Gower, Grossbard, Payan, Rodriguez and Maynard also knew that it was important for investors to believe that the Company would be able to

establish a partnership with a pharmaceutical or biotechnology company because such a partnership would provide the funds necessary to continue the development of R788 for RA. Rigel reported in its 2007 Form 10-K that one of its strategies was to "establish strategic collaborations with pharmaceutical and biotechnology companies to develop and market our product candidates." In addition, the Company reported that its future funding requirements depended on many uncertain factors, including the "ability to establish new collaborations and to maintain . . . existing collaboration partnerships" and that most of its expected future revenues were contingent upon collaborative and license agreements.

94.     Wall Street analysts following the Company also reported that a partnership was important. For example, in his December 13, 2007 report, Credit Suisse analyst Aberman wrote that "a commercial partnership in Europe and/or Asia should also be a corporate goal *for 2008* on the strength of [the R788 Phase IIa clinical trial] data."

95.     During the October 27, 2008 ACR investor update, Gower stated that Rigel was still on track for putting partnership in place in the early part of 2009 and that the Company needed to get the partnership in place before the second half of 2009.

> *[S]till on track for what we've been saying all along, which is putting the partnership in place as early as the early part of next year.* I doubt it will be this year. It's certainly not in our control that it would be. But *we need to get the partnership put in place, ideally a few months before we go to the end-of-Phase 2b meeting and start the Phase 3s, which starts in the second half of next year.*
>
> So the ideal world to me would be around about end of the first quarter next year or something like that we'd be able to announce a partnership. And we – the *discussions have been progressing pretty well. So no change*. Doesn't mean somebody will not freak out about the credit crisis. But the nice thing is that *most of the folk we've been talking about it with, with deals of this size, they've been very nice deals for us,* if comes out of their self-generated cash.

96.     Analysts following the Company noted the importance of those assurances. In a report issued on October 28, 2008, RBC analyst Kantor wrote that management stated that the Company continued to expect a lucrative partnership in *early 2009.* Oppenheimer analyst Abrahams wrote in a October 28, 2008 report that "importantly, management reiterated its timelines for a partnership for R788 . . . . Management continues to believe that a partnership could be completed

*by late-1Q09*." Abrahams wrote that the timeline was achievable and that the terms of the partnership could be substantial, including $100-$150 million up front.

97. SIG Susquehanna ("SIG") analyst Derek Jellinek wrote in an October 28, 2008 report that "management has indicated a key strategic goal is to secure partnership for R788 and has noted significant interest in the franchise from multiple parties, with several rounds of term sheet reviews already undertaken." In addition, Jellinek wrote that he believed "expectations are high for deal consummation by 1H09 and for deal economics to exceed partnerships such as the Vertex/JNJ deal for Telaprevir for the treatment of hepatitis C ($165 mln up-front; $380 mln in milestones . . . .)" and that "[a]nything less may be construed as a disappointment and could pressure shares."

98. On November 3, 2008, Gower admitted that potential partners knew about the blood pressure data before October 27, 2008 and had concerns about it. But Gower also stated that a partnership was still expected in early 2009. Analysts again issued reports noting the importance of those assurances. Credit Suisse analyst Aberman issued a report on November 3, 2008 that stated the following:

> The earnings were not the focus on the call, rather it was an opportunity to revisit toxicity concerns with R788 following the ACR meeting.

> \* \* \*

> Based on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we think this may not wane until (1) a commercial partnership is signed in 1H09, and/or (2) Phase IIb data are released in 3Q09.

99. RBC analyst Kantor issued a report on November 3, 2008, in which he wrote the following:

> With recent safety concerns arising from ACR, a lucrative partnership would alleviate many investor concerns. Rigel forecasts completing a partnership in early 2009, likely after completing the formal Qt study.

100. Oppenheimer analyst Abrahams issued a report on November 3, 2008, in which he wrote the following:

> Importantly, mgmt reiterated that partnership discussions remain on track . . . .

> \* \* \*

> Mgmt said R788's safety profile has had no impact on partnership discussions, timing, or deal structure. Mgmt noted term sheets are actively being

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                      - 31 -

exchanged, and have been since ACR. Importantly, while BP effects have been a point of discussion with partners, they have not been singled out as a particularly concerning side effect.

101. Similar reports were issued on November 4, 2008 by Jefferies analyst Walsh and SIG analyst Jellinek.

102. On February 3, 2009, however, Rigel reported that it would *delay* partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce. The price of the Company's stock declined 9.3% from $7.17 on February 2, 2009 to $6.50 on February 3, 2009, compared to a 1.8% *increase* in the peer group and a 1.5% *increase* in the NASDAQ. On July 9, 2009, Rigel reported that it would not conduct corporate partnership discussions until 2010.

103. **Defendants' Compensation:** Gower, Grossbard, Payan, Rodriguez and Maynard also knew that they would receive higher salaries, bonuses and stock option awards, and that the value of their existing stock options would increase substantially, if Rigel reported positive results from the Phase IIa clinical trial. According to the Company's Proxy Statement filed with the SEC on April 8, 2008, Rigel's "performance driven compensation program" consisted of three components: base salary, short-term cash incentive compensation (*i.e.* bonuses) and long-term equity incentive compensation. For 2007, the amount of each component was based upon the achievement of Company goals and objectives related to (1) the clinical development of Rigel's new product candidates; (2) expansion of the Company's pipeline; and (3) Rigel's cash position at the end of 2007.

104. The April 8, 2008 Proxy Statement confirms that defendants Gower, Grossbard, Payan, Rodriguez and Maynard each received salary increases, bonuses and stock awards at the end of 2007 because Rigel achieved significant milestones with regard to clinical development, and the first significant milestone listed was the reported results of the R788 Phase IIa clinical trial. As shown in the following chart, Gower, Grossbard, Payan, Rodriguez and Maynard each received substantial salary increases:

| Defendant | 2007 Salary | 2008 Salary | % Increase |
|-----------|-------------|-------------|------------|
| Gower | $500,000 | $600,000 | 20% |
| Payan | $420,000 | $483,000 | 15% |
| Grossbard | $390,000 | $450,200 | 15.4% |
| Rodriguez | $380,000 | $430,000 | 13.2% |
| Maynard | $260,000 | $300,000 | 15.4% |

105. In addition, it was reported in the April 8, 2008 Proxy Statement that individuals were eligible to receive a bonus of 0% to 60% of their 2007 base salary but that Gower, Grossbard, Payan, Rodriguez and Maynard each received bonuses that were substantially greater than 60% of their 2007 base salaries due to the Company's exceptional success in 2007, including the reported results of the R788 Phase IIa clinical study. Further, it was reported in the April 8, 2008 Proxy Statement that while the stock price was not expressly stated as a goal under the 2007 non-equity incentive plan in determining bonuses, the $25.39 closing price of Rigel's stock on December 31, 2007 was considered. As alleged above, the Company's stock price more than tripled from $8 per share on December 12, 2007 to $25.95 on December 13, 2007 as a result of defendants' false and misleading statements about the R788 Phase IIa clinical trial. The following chart shows the bonuses received by Gower, Grossbard, Payan, Rodriguez and Maynard:

| Defendants | Bonus | % of 2007 Salary |
|------------|-------|------------------|
| Gower | $600,000 | 120% |
| Payan | $420,000 | 100% |
| Grossbard | $351,000 | 90% |
| Rodriguez | $380,000 | 100% |
| Maynard | $208,000 | 80% |

106. Gower, Grossbard, Payan, Rodriguez and Maynard also received additional stock awards on January 31, 2008. Further, it was reported in the April 8, 2008 Proxy Statement that options generally vested over a four-year period from the date of the grant but that the options granted in January 2008 vested monthly over a one-year period:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW
- 33 -

| Defendants | Options awarded in 1/07 | Options awarded in 1/08 | % Increase |
|---|---|---|---|
| Gower | 100,000 | 165,000 | 65% |
| Payan | 80,000 | 140,000 | 75% |
| Grossbard | 80,000 | 130,000 | 62.5% |
| Rodriguez | 80,000 | 125,000 | 56.25% |
| Maynard | 50,000[2] | 75,000 | 50% |

107. The increase in the Company's stock price caused by the false and misleading statements about the R788 Phase IIa clinical trial also increased the value of the stock options owned by Gower, Grossbard, Payan, Rodriguez and Maynard. As of December 31, 2007, Gower, Payan, Grossbard, Rodriguez and Maynard owned options to purchase millions of the Company's shares. Many of the options were "out-of-the-money" until the false and misleading statements about the R788 Phase IIa clinical trial caused the price of Rigel's stock to increase from $8 per share on December 12, 2007 to $25.95 on December 13, 2007:

| Defendant | Options | Exercise price |
|---|---|---|
| **Gower** | 50,000 | $1.80 |
| | 270,000 | $8.25 |
| | 80,000 | $17.66 |
| | 15,000 | $22.17 |
| | 200,000 | $24.56 |
| | 60,000 | $7.40 |
| | 100,000 | $11.73 |

| Defendant | Options | Exercise price |
|---|---|---|
| **Payan** | 3,334 | $1.80 |
| | 250,000 | $8.25 |
| | 40,000 | $17.66 |
| | 11,250 | $22.17 |
| | 93,000 | $24.56 |
| | 55,000 | $7.40 |
| | 80,000 | $11.73 |

| Defendant | Options | Exercise price |
|---|---|---|
| **Grossbard** | 150,000 | $8.25 |
| | 35,000 | $17.66 |
| | 32,222 | $22.17 |
| | 65,000 | $24.56 |
| | 60,000 | $7.40 |
| | 27,778 | $9.56 |
| | 80,000 | $11.73 |

[2] Does not include the supplemental promotion option grant of 56,911 shares awarded to Maynard upon his promotion from Vice President and Acting CFO to Vice President and CFO in January 2007.

| Defendant | Options | Exercise price |
|---|---|---|
| **Rodriguez** | 150,000 | $8.25 |
| | 75,000 | $17.66 |
| | 12,500 | $22.17 |
| | 55,000 | $24.56 |
| | 65,000 | $7.40 |
| | 43,889 | $9.56 |
| | 80,000 | $11.73 |

| Defendant | Options | Exercise price |
|---|---|---|
| **Maynard** | 7,504 | $8.15 |
| | 11,895 | $23.00 |
| | 60,000 | $23.32 |
| | 4,600 | $7.88 |
| | 90,000 | $10.20 |
| | 1,000 | $9.56 |
| | 106,911 | $11.73 |

108. The exercise price of the options received on January 31, 2008 was $26.45. The value of those options declined when the Company's stock price fell after the full results of the R788 Phase IIa clinical trial were disclosed on October 27, 2008. But Gower, Grossbard, Payan, Rodriguez and Maynard received additional options in 2009 with a substantially lower exercise price to replace the "out-of-the-money" options granted on January 31, 2008:

| Defendant | Options Awarded on 3/30/09 | Exercise Price |
|---|---|---|
| Gower | 190,000 | $6.49 |
| Payan | 145,000 | $6.49 |
| Grossbard | 115,000 | $6.49 |
| Rodriguez | 115,000 | $6.49 |
| Maynard | 150,000 | $6.49 |

**C. February 1, 2008: The Registration Statement Issued by Rigel Was Materially False and Misleading Because It Incorporated the December 13, 2007 Press Release**

109. Plaintiff's claims for the false and misleading statements and omissions in the Registration Statement for the February 2008 Offering are brought under §§11, 12(a)(2) and 15 of the 1933 Act and are grounded in strict liability and negligence only. Plaintiff does not assert claims of fraud or deliberate misconduct with respect to the false and misleading statements and omissions in the Registration Statement for the February 2008 Offering.

110. On or about January 24, 2008, Rigel filed with the SEC a Form S-3ASR Registration Statement and Form 424B3 Prospectus with the SEC for the Offering. The Form S-3ASR

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW
- 35 -

Registration Statement was signed by Gower, Maynard, Payan, DeLeage, Goodwin, Lyons, Moos, Renton, Ringrose and Sherwin.

111. On February 1, 2008, Rigel filed with the SEC a Form 424B5 Prospectus for the Offering.

112. The Registration Statement contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations. Specifically, the Registration Statement provided "the following documents filed with the SEC are incorporated by reference . . . . Our current report on Form 8-K, filed with the SEC on December 13, 2007." The Form 8-K Rigel filed with the SEC on December 13, 2007 included the December 13, 2007 press release quoted above.

113. In addition, the Form 424B5 Prospectus contained the following statements:

> We recently completed a Phase 2, multicenter, ascending dose, randomized, double-blind, placebo-controlled, dose-ranging study evaluating three doses of R788 over a 12-week period in RA patients. All of these patients continued to receive their same previously scheduled dose of methotrexate. ***In this clinical trial, R788 demonstrated statistically significant efficacy results in treating RA patients at two dose levels.*** Efficacy assessments for each participant were based on the American College of Rheumatology criteria which denote a 20% (ACR 20) improvement, at least a 50% (ACR 50) improvement, or at least a 70% (ACR 70) improvement from the baseline assessment at the end of the 12-week treatment period. Groups treated with R788 at 100mg and 150mg po bid (orally, twice daily) showed higher ACR20, ACR50, ACR70 and DAS28 response rates than the placebo group. ***The most common clinically meaningful adverse events noted in the clinical trial were dose-related neutropenia, mild elevations of liver function tests and gastrointestinal side effects.*** Dose reduction (to one-half the assigned dose by taking the drug once per day) was pre-specified in the protocol and contingent on neutrophil counts and/or liver function tests. Notably, a vast majority of the patients who had their dose reduced successfully completed the clinical trial with minimal safety issues. We expect to initiate a Phase 2b clinical trial evaluating dosing and x-rays of bones over a 24-week period. We also expect to initiate a second Phase 2b clinical trial treating a sub-population of RA patients with R788 by the end of the first half of 2008.

114. On February 6, 2008, at least five million shares of Rigel stock were sold to the public at $27.00 per share, raising $135 million.

115. Reasons why the Registration Statement contained untrue statements of material fact or omissions: The Registration Statement contained untrue statements of material facts or omitted to state facts necessary to make the statements made therein not misleading because it failed to include the adverse information about the Phase IIa clinical study described in ¶¶53-74. The Registration

Statement failed to disclose that: (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in average blood pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007), which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (6) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. This adverse information was not publicly disclosed until October 27, 2008.

116. As reported in the Form 8-K filed with the SEC on February 14, 2008, the Rigel board of directors approved the bonuses awarded to Gower, Grossbard, Payan, Rodriguez and Maynard on February 11, 2008, just days after the Company raised $127.5 million that it needed to prevent Rigel from becoming insolvent in 2008.

117. The four Underwriter Defendants that were paid more than $7 million to underwrite the Offering failed to require disclosure of the adverse information about the Phase IIa clinical trial. According to Rigel's January 31, 2008 press release, Credit Suisse was the sole book-runner for the Offering with Thomas Weisel, Jefferies and Oppenheimer, acting as co-managers. According to the January 31, 2008 Underwriting Agreement between Rigel and the Underwriter Defendants, Rigel provided the Underwriter Defendants with a "General Disclosure Package" that included, among other things, a listing of the Company's clinical trials and "descriptions of the results of the studies, tests and trials."

118. Public investors relied on the Underwriter Defendants to conduct a reasonable investigation and to obtain and verify the information contained in the Registration Statement and to make sure essential facts about the Company were disclosed. Indeed, the Underwriter Defendants

had access to the adverse information at a critical time in Rigel's corporate life – when it was seeking to raise capital. The Underwriter Defendants either knew about the adverse safety information and failed to require its disclosure or did not know by failing to conduct a reasonable investigation and independently verifying the representations in the Registration Statement. Either way, the Underwriter Defendants failed to meet their "gatekeeper" function of protecting investors.

119. The Underwriter Defendants purchased the five million share for $25.5825 and sold the shares to the public for $27 per share. As a result, the Underwriter Defendants received $7,087,500 from the Offering.

**D.      February 11, 2008: Gower Makes Materially False and Misleading Statements about the Phase IIa Clinical Trial During the BIO CEO & Investor Conference**

120. On February 11, 2008, at the BIO CEO & Investor Conference, defendant Gower made the following statements:

The Phase II study that we announced in December was a study on 190 patients, double-blind, placebo-controlled in 30 centers in the US and Mexico. *We saw rather unprecedented numbers in terms of the ACR scoring. As you can see on the chart, significantly different as is noted by the stars in both the 100 milligram orally BID dose and 150 milligram orally BID dose across the board and all of ACR20, ACR50, ACR70 and DAS scoring. Rather spectacular numbers for the higher two dose groups specifically in the ACR50's and '70s where we got between 50 and 60% ACR50 response and over one-third ACR70's at 90 days which is relatively unprecedented in these kind of studies if you want to look at previous studies done in these same populations with the same protocol.*

This was a very strict intense treat protocol. And done using the same protocols that have been used for pretty much everything from Enbrel on forward, certainly the same protocols and the same, some of the same groups used in the studies done in the last few years with Rituxan and Orencia for approvals IL-6 and the JAK3's in terms of study. So you can never compare studies directly one-to-one that aren't done in exactly the same time but these are using the same protocols and the same approach so they should be roughly comparable.

*The safety results were also good. We did have two dose dependent toxicities that were noted. One was neutropenia, which we've known from the animal studies on forward that we carry a certain amount of neutropenia along with the mechanism of this growth comes most likely from its ability to regulate adhesion molecules and the monocytes.* And there you are seeing a dose dependent matter that increased from about slightly under 10% to just under 20% of between the higher two dose groups.

We had prespecified a protocol based dose reduction, which cut the dose in half for any patients that got a grade 2 neutropenia. This is a neutrophil count of 1500. We didn't see any grade 3 or grade 4 neutropenias in the study, and as many of you know those are the ones that are associated with infections. But because this

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                                                    - 38 -

was an early study we wanted to be extra cautious and we cut the dose in half. But when those patients hit a neutrophil count of 1500, all of those patients however did fine on the reduced dose. Actually we got, if you look at those as a group although we didn't – this is not prespecified as a statistical endpoint, their ACR20 at 90 days was 82% and those that continued on the study with the dose reductions. So they did quite well and maintained the efficacy and the neutropenia has not recurred nor has anyone dropped off the study because of neutropenia. But it is something which is not uncommon for this patient population. As many of you know, RA patients are predisposed to neutropenia. Methotrexate adds to it. Wheat appears added to that. That is something the rheumatologists have to watch but doesn't seem at this point to be something that is not manageable.

*The other thing that we saw that seems dose-related was lower GI disturbance, also something fairly common in this disease.* Methotrexate alone as you would notice in the placebo group, those were all methotrexate plus a dummy 788, has a number of patients that have lower GI symptoms. We had a modest number in the intermediate dose group, slightly higher number in the upper dose group. As with the neutropenia no patients found this uncomfortable enough to want to drop off the study. None were hospitalized. None had to be rehydrated. But certainly it is a tolerance issue. Everything else that showed up is no different between the placebo group and the control group on the safety elements of the study. So, so far, so good.

121.    Reasons why Gower knew his statements at the BIO CEO & Investor Conference were materially false and misleading: Gower knew his statements during the BIO CEO & Investor Conference were materially false and misleading because he continued to conceal the adverse information about the Phase IIa clinical study described in ¶¶53-74.

122.    Gower failed to disclose that: (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in average blood pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007), which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:09-cv-00546-JSW

(6) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. This adverse information was not publicly disclosed until October 27, 2008.

**E.      July 8, 2008: Rodriguez Makes Materially False and Misleading Statements about the Phase IIa Clinical Trial During the Collins Stewart 4th Annual Growth Conference**

123.    On July 8, 2008, at the Collins Stewart 4th Annual Growth Conference, defendant Rodriguez made the following statements:

Speaking of that, we last year started – reported a Phase II RA clinical trial. This is the data we reported in December of last year. This is a three-month study looking at R788 in patients with active RA all on a methotrexate background. It's a three-month study looking at those signs and symptoms.

What we saw, and you see in this graph, is that *we had some dramatic improvement in the signs and symptoms looking at ACR20, ACR50, and ACR70 at the 100 milligram and the 150 milligram dose groups.* This is all b.i.d. The 50 looked pretty much like placebo. The others looked quite dramatically.

In fact compared to other TNF agents or other products that are in the market now or in development now, *this is in the higher range of those efficacy measures. So very dramatic improvement.* We also saw a couple of things that we saw the benefit occur within the first two weeks of therapy. That is, even within the first week, we are able to see a dramatic improvement in signs and symptoms into the trial. That was sustained throughout the three months of the trial. So very nice results. Per the protocol, if we ran into any trouble with say neutropenia or elevated liver enzymes, the protocol required us to cut the dose in half. That is what occurred in a few cases.

*You see some of the safety background on these various doses in this chart. We had some cases of neutropenia, five in the 100 milligram and 10 in the 150 milligram dose groups that required the dose to be reduced.* A few liver enzymes elevated in 150 milligram. I should note that all the patients that had their dosage reduced, about 18 of them, completed the trial and their ACR20 scores, 82% of them met their ACR20 scores. So they had a very nice benefit even though their dose was reduced.

So effectively, if you had a benefit it occurred early in the trial and then if you needed your dose reduced it didn't seem to undermine the benefit that you did receive. So we were very satisfied with this. *We had some GI side effects and they were somewhat random and transient, more in the 150 than the 100. A bit of hypertension here and there, but, basically, a fairly good safety profile.*

*The 100 milligram dose group had a very nice and profound efficacy result and a pretty good safety profile.* So that is going to be the lead dose that we go forward. However, the drug does have a very good PKA; we have about a 17-hour half-life. So we are going to try to push that a little bit and see if once a day works.

124.    Reasons why Rodriguez knew his statements at the Collins Stewart 4th Annual Growth Conference were materially false and misleading: Rodriguez knew his statements during the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS – 3:09-cv-00546-JSW                                                                                  - 40 -

Collins Stewart 4th Annual Growth Conference were materially false and misleading because he continued to conceal the adverse information about the Phase IIa clinical study described in ¶¶53-74.

125. Rodriguez failed to disclose that: (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in average blood pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007), which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (6) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. This adverse information was not publicly disclosed until October 27, 2008.

      **F.    October 27, 2008 and February 3, 2009: Rigel's Stock Price Declines Substantially After It Begins to Reveal the Previously Concealed Adverse Information about the Phase IIa Clinical Trial and Its Impact on the Company's Condition and Future Prospects**

126. On October 27, 2008, the Company presented the full results of the Phase IIa clinical trial at the ACR meeting and during a conference call that was attended by Gower, Grossbard, Payan, Rodriguez and Maynard. The Company disclosed the differing response rates between patients in the United States and Mexico and the adverse safety data regarding R788's effect on blood pressure, liver enzymes, neutropenia, diarrhea and gastrointestinal side effects.

127. In response to this previously undisclosed negative information, the price of the Company's stock declined 38% from $14.41 on October 24, 2008 to $8.84 on October 27, 2008. Analysts following the Company issued reports in which they wrote that the previously undisclosed

negative information raised questions about the efficacy and safety of the drug and caused the stock price to plummet.

128. In an October 28, 2008 report, RBC analyst Jason Kantor downgraded the stock due to "heightened safety concerns for R788," and noted that (1) the impact of the Mexican data may have overstated the dose response, (2) the previously undisclosed increase in blood pressure was viewed as a "potentially significant concern" to independent physicians attending the October 27, 2008 ACR conference, and (3) the new negative information caused one pharmaceutical company to walk away from a potential partnership with Rigel.

129. Similar reports were issued by SIG analyst Jellinek, Oppenheimer analyst Abrahams, Jefferies analyst Walsh, Merrill Lynch analyst Andrew Berens and Credit Suisse analyst Aberman. Credit Suisse analyst Aberman reported that Rigel had presented the differences in efficacy in Mexico versus the United States for the first time and that it was a particular concern because the ratio of Mexican patients to U.S. patients was higher in the higher dosing groups which could skew the data in favor of R788. He also reported that the magnitude of the increase in blood pressure was disclosed for the first time and that there was no question the increase in blood pressure was one of the risks of the program. Aberman wrote that it was an issue because of the FDA's increased scrutiny over cardiac toxicity and the well known association of elevated blood pressure with cardiac events. He also wrote that one investigator suggested that the elevated blood pressure would be a show stopper clinically.

130. Merrill Lynch analyst Andrew Berens reported that the detailed presentation revealed a modest, dose-related blood pressure increase with R788, an imbalance in response rates noted at the Mexican trial sites, and more granularity on elevated liver enzymes noted with R788, which were likely to increase regulatory risk for the drug and which could delay a partnership with a large pharmaceutical/biotech company.

131. On November 3, 2008, Rigel reported its financial results for the quarter ending September 30, 2008. The Company also held its first ever earnings conference call but the focus of the call was the toxicity concerns with R788 following the ACR presentation. Analysts following the Company asked numerous questions about the increase in blood pressure and then issued reports.

Credit Suisse analyst Aberman issued a report on November 3, 2008 in which he wrote that "[b]ased on the questions on the call, investors clearly remain wary over the toxicity profile of R788 and we think this may not wane until (1) a commercial partnership is signed in 1H09, and/or (2) Phase IIb data are released in 3Q09." He also wrote that "There is no question that the elevated blood pressure seen in the Phase IIa is a risk for the long term prospects of R788."

132.    During the October 27, 2008 and November 3, 2008 conference calls, Gower assured investors that Rigel was still on track for putting a partnership in place in the early part of 2009 and that the Company needed to get the partnership in place before the second half of 2009.  On February 3, 2009, however, Rigel announced that it would delay partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce.  The price of the Company's stock declined 9.3%, from $7.17 on February 2, 2009 to $6.50 on February 3, 2009, compared to a 1.8% *increase* in the peer group and a 1.5% *increase* in the NASDAQ.

## V.    LOSS CAUSATION

133.    The false and misleading statements and omissions caused and maintained the artificial inflation in Rigel's stock price throughout the Class Period.  During the Class Period, defendants made materially false and misleading statements about the Phase IIa clinical trial and failed to disclose adverse data related to the clinical trial.

134.    The false and misleading statements and omissions caused Rigel's stock to trade at artificially inflated prices.  After the Company reported the false and misleading results of the Phase IIa clinical trial on December 13, 2007, Rigel stock price more than tripled, from $8 per share on December 12, 2007 to $25.95 per share on December 13, 2007, compared to a 0.9% *decline* in the peer group and a 0.1% *decline* in the NASDAQ.  The stock continued to trade at artificially inflated prices, which allowed the Company to issue five million shares for $27 per share in February 2008.

135.    Rigel made two partial disclosures on October 27, 2008 and February 3, 2009 that disclosed some of the previously concealed problems and some of the impact those problems were having on Rigel's financial condition and would have on the Company's future results.  The partial disclosures caused Rigel's stock price to decline significantly more than the changes in the peer

group and the NASDAQ. As a result, the price declines following the partial disclosures provide a measurement of class members' economic losses.

136. On October 27, 2008, Rigel disclosed the full results of the Phase IIa clinical study, including that (1) patients in Mexico had higher response rates in both the placebo and treated arms than the U.S. patients, which may have contributed disproportionately to the overall reported benefit observed at the higher doses, as nearly all patients in the 150mg cohort and no patients in the 50mg cohort were from Mexico; (2) there was a dose-dependent increase in average blood pressure of 20-30mmHg in five patients (not two, as reported on December 13, 2007), which was important because it could signal an increase in cardiovascular risk, the mechanism that caused the increase was not well understood and the increase in blood pressure could be a stumbling block for some pharmaceutical companies that were considering licensing the drug; (3) nine patients (not three, as reported on December 13, 2007) experienced increased liver enzymes compared to patients taking the placebo; (4) 20 patients (not 15, as reported on December 13, 2007) experienced neutropenia; (5) 34 patients (not 15, as reported on December 13, 2007) experienced diarrhea; and (6) 35 patients (not 15, as reported on December 13, 2007) experienced upper gastrointestinal side effects. On this news, Rigel's stock dropped 38.7% from the previous day's closing price of $14.41, to $8.84. By comparison, the peer group declined 5.3% and the NASDAQ declined 3%. Thus, some of the inflation of Rigel's stock price was removed upon the negative disclosures, causing economic loss (damages) to investors.

137. However, the Company's stock price remained artificially inflated because Rigel did not reveal the full extent of the Phase IIa clinical trial on the Company's ability to partner with a pharmaceutical company for the continued development of R788. In fact, during the October 27, 2008 and November 3, 2008 conference calls, Gower assured investors that Rigel was still on track for putting a partnership in place in the early part of 2009 and that the Company needed to get the partnership in place before the second half of 2009.

138. On February 3, 2009, however, Rigel disclosed that it would delay partnership discussions regarding R788 until after results from its Phase IIb clinical studies were available and that the Company laid off 36 employees, or 20% of its workforce. The price of the Company's stock

declined 9.3%, from $7.17 on February 2, 2009 to $6.50 on February 3, 2009, compared to a 1.8% increase in the peer group and a 1.5% increase in the NASDAQ.

139. The declines in Rigel's stock price as the bad news was incrementally disclosed, revealing the true state of the Company's condition, were directly related to defendants' prior misrepresentations and omissions. Each partial disclosure of adverse facts that removed inflation from Rigel's stock price (thereby causing damages) was directly related to the false statements and omissions about the Phase IIa clinical trial and their impact on the Company's financial condition and future prospects.

140. The declines in Rigel's stock price following the partial disclosures compared to the changes in the peer group and NASDAQ negate any inference that the losses suffered by class members were caused by changed market or industry conditions or Company-specific facts unrelated to the fraudulent conduct. The following chart (which is also attached hereto) illustrates the changes in Rigel's stock price during the Class Period compared to the peer group and the NASDAQ:



## VI.    CLASS ACTION ALLEGATIONS AND FRAUD-ON-THE-MARKET PRESUMPTION OF RELIANCE

141.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Rigel securities during the Class Period, including persons who acquired the common stock of Rigel pursuant and/or traceable to the false and misleading Registration Statement, and were damaged thereby (the "Class").  Excluded from the Class are defendants, directors and officers of Rigel and their families and affiliates.

142.    The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were approximately 31 million to 36.7 million outstanding shares owned by hundreds, if not thousands, of persons.  Thus, the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

143.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions which may affect individual Class members include:

(a)    Whether the 1933 and 1934 Acts were violated by defendants;

(b)    Whether defendants engaged in a fraudulent scheme and omitted and/or misrepresented material facts;

(c)    Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether defendants knew or recklessly disregarded that their statements were materially false and misleading;

(e)    Whether the prices of Rigel securities were artificially inflated;

(f)    Whether defendants' fraudulent scheme, misrepresentations and omissions caused Class members to suffer economic losses, *i.e.*, damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

144.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class purchased Rigel common stock during the Class Period and sustained damages from defendants'

wrongful conduct. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

145. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results. Class members have not indicated an interest in prosecuting separate actions as none have been filed. The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable. No difficulties are likely to be encountered in the management of this action as a class action.

146. In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class members have suffered disparate damages, the fraudulent scheme and the misrepresentations and omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action because all Class members relied on the integrity of the market and are entitled to the fraud-on-the-market presumption of reliance.

147. The market for Rigel's common stock was open, well developed and efficient at all relevant times. Rigel's stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market. As a regulated issuer, Rigel filed periodic public reports with the SEC. Rigel regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

148. As alleged herein, the change in the price of Rigel's stock – compared to the changes in the peer group and NASDAQ – in response to the release of unexpected material positive and

negative information about the Company shows there was a cause-and-effect relationship between the public release of the unexpected information about Rigel and the price movement in the Company's stock. The average weekly trading volume of Rigel's stock during the Class Period was approximately 4.25 million shares, or 11.6% of total outstanding shares. Numerous analysts followed Rigel, attended the Company's conference calls and issued reports throughout the Class Period. The Company was eligible to register and did register securities on Form S-3 during the Class Period.

149. As a result of the foregoing, the market for Rigel common stock promptly digested current information regarding Rigel from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Rigel common stock during the Class Period suffered similar injury through their purchases of Rigel common stock at artificially inflated prices and the subsequent revelations concerning declines in price, and a presumption of reliance applies.

**VII. NO SAFE HARBOR**

150. Rigel's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

151. Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Rigel who knew that the FLS was false. None of the historic or present tense statements made by defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## COUNT I

### For Violations of Section 10(b) of the 1934 Act and Rule 10b-5
### Against Defendants Rigel, Gower, Maynard, Payan, Grossbard and Rodriguez

152. Plaintiff incorporates ¶¶1-151 by reference.

153. During the Class Period, defendants named in this Count disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

154. These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes, and artifices to defraud;

(b) Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Rigel securities during the Class Period.

155. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rigel securities. Plaintiff and the Class would not have purchased Rigel securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

156. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Rigel securities during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the 1934 Act
### Against Rigel and the Individual Defendants

157. Plaintiff incorporates ¶¶1-156 by reference.

158. The Individual Defendants acted as controlling persons of Rigel within the meaning of §20 of the 1934 Act. By virtue of their positions and their power to control public statements about Rigel, the Individual Defendants had the power and ability to control the actions of Rigel and its employees. Rigel controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## COUNT III

### For Violations of Section 11 of the 1933 Act
### Against All Defendants, Except Grossbard and Rodriguez

159. Plaintiff repeats and realleges each and every allegation contained above.

160. This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except Grossbard and Rodriguez. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

161. The Registration Statement was false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

162. Rigel is the registrant for the Offering. As issuer of the shares, Rigel is strictly liable to plaintiff and the Class for the misstatements and omissions.

163. The Individual Defendants named herein were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants named in this Count signed or authorized the signing of the Registration Statement. None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

164. By reason of the conduct herein alleged, each of these defendants violated, and/or controlled a person who violated, §11 of the 1933 Act.

165. Plaintiff acquired Rigel shares pursuant and/or traceable to the Registration Statement for the Offering.

166. Plaintiff and the Class have sustained damages. At the time of their purchases of Rigel shares, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to October 27, 2008. Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

## COUNT IV

### For Violations of Section 12(a)(2) of the 1933 Act
### Against All Defendants, Except Grossbard and Rodriguez

167. Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. For purposes of this Count, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the 1933 Act.

168. By means of the defective Prospectus, defendants named in this Count assisted in the sale of shares of the Company's securities to plaintiff and other members of the Class.

169. The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendants owed plaintiff and the other members of the Class who purchased Rigel securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

170.    Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time it acquired the Company's securities.

171.    By reason of the conduct alleged herein, defendants violated §12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, plaintiff and the other members of the Class who purchased Rigel common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of Rigel stock. Accordingly, plaintiff and the other members of the Class who hold such stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares seek damages to the extent permitted by law.

## COUNT V

### For Violations of Section 15 of the 1933 Act
### Against the Individual Defendants, Except Grossbard and Rodriguez

172.    Plaintiff repeats and realleges each and every allegation contained above.

173.    This Count is brought pursuant to §15 of the 1933 Act against the Individual Defendants, except Grossbard and Rodriguez.

174.    Each of the Individual Defendants named in this Count was a control person of Rigel by virtue of his position as a director and/or senior officer of Rigel which allowed each of these defendants to exercise control over Rigel and its operations.

175.    Each of the Individual Defendants was a participant in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding plaintiff and the members of the Class damages and interest;

C.      With respect to Count IV, ordering rescission or rescissory damages for purchasers of Rigel common stock in the Offering;

D.      Awarding plaintiff's reasonable costs, including attorneys' fees; and

E.      Awarding such equitable and/or injunctive or other relief as the Court may deem just and proper.

## IX.     JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: July 24, 2009

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
CHRISTOPHER P. SEEFER
DANIEL J. PFEFFERBAUM
S. ASHAR AHMED


_____/s/_____
CHRISTOPHER P. SEEFER

100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiffs

S:\CasesSD\Rigel Pharmaceuticals\cPT00060007.doc

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW                                                                                          - 53 -

# Attachment 1

# Rigel Pharmaceuticals, Inc.

## November 1, 2007 to March 2, 2009



**2/1/08:** Rigel files Prospectus for offering of 5 million shares at $27 per share

**2/11/08:** Gower presentation at the BIO CEO & Investor Conference

**7/11/08:** Rodriguez presenation at Collins Stewart 4th Annual Growth Conference

**11/9/07-12/4/07:** Stock price declines 40% from $11.04 to $6.67 due to safety concerns about R788 ITP study results announced on 11/9/07.

**12/13/07:** Stock price increases 224% from $8.00 to $25.95 after Rigel reports incomplete results for the R788 Phase IIa clinical trial for treatment of RA

**10/27/08:** Stock price declines 39% from $14.41 to $8.84 after Rigel announces the full results of the R788 Phase IIa clinical trial for treatment of RA.

**2/3/09:** Stock price declines 9.3% from $7.17 to $6.50 after Rigel announces delay in partnership and 20% reduction in force.

Class Period: 12/13/07 - 2/3/09

# Attachment 2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

INTER-LOCAL PENSION FUND GCC/IBT ("Plaintiff") declares:

1.  Plaintiff has reviewed a complaint and authorized its filing.

2.  Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

See attached Schedule A.

5.  (a)  Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Operative Plasterers and Cement Masons Int'l Assoc. Local 262 Annuity Fund v. Lehman Brothers Holdings Inc., et al.,* No. 08-CV-5523 (S.D.N.Y.)
*Coyne v. General Electric Company, et al.,* No. 3:08-cv-01135-SRU (D. Conn.)

(b)  Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corporation, et al.,* No. 1:08-cv-11889 (D. Mass)

(c)  Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*Reimer v. Ambac Financial Group, Inc., et al.,* No. 1:08-cv-00411-NRB (S.D.N.Y.)
*In re First Marblehead Corporation Sec. Litig.,* No. 08-10612-JLT (D. Mass.)

RIGHT.

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _5_ day of _February_, 2009.

INTER-LOCAL PENSION FUND
GCC/IBT

By: _Lawrence C. Drinkhill_

Its: _Executive Director_

- 2 -

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/31/2008 | 3,590 | $27.00 |
| 02/01/2008 | 900 | $27.37 |
| 02/01/2008 | 1,200 | $27.36 |

# Attachment 3



# Rigel Pharmaceuticals, Inc.

## Indexed vs NASDAQ Composite, NASDAQ Biotechnology Indices
### October 1, 2007 to October 31, 2007

# CERTIFICATE OF SERVICE

I hereby certify that on July 24, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I further certify that I caused this document to be forwarded to the following designated Internet site at: http://securities.csgrr.com/.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 24, 2009.

/s/
CHRISTOPHER P. SEEFER

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
100 Pine Street, 26th Floor
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)

E-mail: ChrisS@csgrr.com

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS –
3:09-cv-00546-JSW

## Mailing Information for a Case 3:09-cv-00546-JSW

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **John C. Dwyer**
  dwyerjc@cooley.com,giovannonib@cooley.com

- **Shannon Marie Eagan , Esq**
  seagan@cooley.com

- **William S. Freeman**
  galancr@cooley.com,freemanws@cooley.com,dvance@rigel.com

- **Jerry L. Marks**
  jmarks@milbank.com

- **Matthew Paul Montgomery**
  mattm@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Sundeep Ravindra Patel**
  spatel@cooley.com

- **Erik David Peterson**
  epeterson@csgrr.com

- **Daniel Jacob Pfefferbaum**
  DPfefferbaum@csgrr.com,aserros@csgrr.com,nrogers@csgrr.com,khuang@csgrr.com

- **Darren Jay Robbins**
  e_file_sd@csgrr.com

- **Christopher Paul Seefer**
  chriss@csgrr.com,jdecena@csgrr.com,vcordial@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,mburch@csgrr.com,e_file_sd@csgrr.com

- **Paul Michael Torres**
  ptorres@milbank.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)