# EXHIBIT B

KESSLER TOPAZ
  MELTZER & CHECK, LLP
Eli R. Greenstein (Bar No. 217945)
Jennifer L. Joost (Bar No. 296164)
Paul A. Breucop (Bar No. 278807)
Rupa Nath Cook (Bar No. 296130)
egreenstein@ktmc.com
jjoost@ktmc.com
pbreucop@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

Andrew L. Zivitz (*Pro Hac Vice*)
Jonathan F. Neumann (*Pro Hac Vice*)
azivitz@ktmc.com
jneumann@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

LABATON SUCHAROW LLP
James W. Johnson (*Pro Hac Vice*)
Michael H. Rogers (*Pro Hac Vice*)
Matthew J. Hrutkay (Bar No. 297485)
James T. Christie (*Pro Hac Vice*)
jjohnson@labaton.com
mrogers@labaton.com
mhrutkay@labaton.com
jchristie@labaton.com
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:  (212) 818-0477

*Attorneys for the Public Employees
Retirement System of Mississippi and
Co-Lead Counsel for the Proposed
Class*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 3226701 CANADA, INC., Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>QUALCOMM, INC., STEVEN M. MOLLENKOPF, DEREK K. ABERLE, GEORGE S. DAVIS, VENKATA S.M. RENDUCHINTALA, CRISTIANO R. AMON, and TIM MCDONOUGH,<br><br>Defendants. | Case No. 15-CV-2678-MMA (WVG)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge:  Hon. Michael M. Anello |

# TABLE OF CONTENTS

TABLE OF ABBREVIATIONS ......................................................................... v

I. NATURE OF THE ACTION ................................................................. 2

II. JURISDICTION AND VENUE............................................................. 7

III. PARTIES ............................................................................................... 8

    A. Lead Plaintiff ............................................................................... 8

    B. Defendants.................................................................................... 8

    C. Relevant Non-Parties ................................................................ 12

        1. Confidential Witnesses ................................................... 12

        2. Other Relevant Non-Parties ........................................... 14

IV. FACTUAL BACKGROUND AND SUBSTANTIVE
ALLEGATIONS.................................................................................. 14

    A. Qualcomm Was a Leader in the Telecommunications
Industry...................................................................................... 14

        1. The Birth of the Snapdragon and the "System-on-a-
Chip" ............................................................................... 16

    B. Qualcomm's Competitive Advantage Was Heavily
Dependent Upon the Success of its Premium-Tier
Snapdragon Processors .............................................................. 18

    C. Key Benchmarks in the Development of an SoC ......................... 22

    D. Qualcomm Rushes Its Plan for the Snapdragon 810 and
Makes a Major Change in its Design Strategy by Using
Non-Customized Designs for the 810's CPU Due to
Pressure from Samsung and Apple............................................. 25

    E. The Snapdragon 810's Accelerated Timeline and Hasty
Design Led to Undisclosed Overheating Problems in the
Chip ........................................................................................... 28

    F. Initial Testing of the Snapdragon 810 in March 2014
Revealed Performance and Overheating Issues ........................... 30

    G. Despite Design Shortcuts and Initial Tests Showing  the
810 Was Failing, Qualcomm Falsely Touted Snapdragon
810's Current Performance and Functionality .............................. 31

    H. Defendants Were Aware of the Unprecedented
Overheating Problems that Continued to Plague the
Snapdragon 810 Throughout the Class Period............................. 32

I. Even After Limited Commercial Release, Qualcomm Identified Abnormal Overheating Issues When Testing 810 Samples ............................................................................. 34

J. Samsung Told Defendants in October 2014 That it Would Not Use the Snapdragon 810 in the Galaxy S6 .............................. 36

K. Qualcomm Pushed Snapdragon 810 to Commercial Launch in Spite of Known Thermal Issues that Negatively Affected the Chip's Performance ................................................................. 37

    1. Qualcomm Falsely Denied Rumors of Overheating in the 810 in December 2014 ..................................................... 37

    2. Defendants' Launch Snapdragon 810 Commercially Despite Known Design Flaws and Overheating Problems ................................................................................. 38

    3. Investors Finally Learned That Samsung Was Not Using the 810 in the Galaxy S6 ............................................ 39

    4. Defendants Blatantly Misled Investors by Aggressively Denying Overheating Issues and Continuing to Tout the 810 ........................................................................................ 40

    5. More Devices Overheated, Causing OEMs to Suffer Losses ...................................................................................... 41

    6. Frustrated by Repeated Questions Regarding the 810's Thermal Issues, Defendants Again Denounce "False Rumors" as "Rubbish" ............................................................ 42

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ................... 43

A. The April 2014 Misleading Statements and Omissions .................. 44

B. The August 2014 Misleading Statements and Omissions ............... 45

C. The November and December 2014 Misleading Statements Regarding the 810's Capabilities and Omissions Regarding Its Overheating Problems ................................................................. 46

D. December 2014 and January 2015 Misleading Statements and Omissions Ignore and Misleadingly Deny Rumors of Overheating ........................................................................................ 50

E. The January 28, 2015 False and Misleading Statements and Omissions ........................................................................................... 52

F. Defendants Falsely and Misleadingly Continue to Blatantly Deny Overheating Problems .............................................................. 56

G. Qualcomm Falsely and Misleadingly States that the Snapdragon 810 is "Cooler than Ever" .......................................... 57

H. The March 2, 2015 Misleading Statements and Omissions ............. 60

I. Defendants Continue Issue False and Misleading Statements During and After April 22, 2015 Earnings Announcement .................................................................................... 64

VI. THE RELEVANT TRUTH BEGINS TO EMERGE ............................... 68

VII. SCIENTER ALLEGATIONS ................................................................. 73

A. Defendant Renduchintala's Actual Knowledge of Adverse Issues with the Snapdragon 810, Which is Imputed to Qualcomm, Supports a Finding of Scienter ................................... 74

B. The Individual Defendants' Senior-Level Positions, Responsibilities, and Technical Backgrounds Support a Strong Inference of Scienter ................................................. 77

C. The Individual Defendants Knew or Were Deliberately Reckless in Disregarding Information Concerning the Company's Core Operations .......................................................... 81

1. The Snapdragon 810 Was The Linchpin of Qualcomm's QCT Operations ................................................................. 81

2. Given the Importance of the First Silicon, Defendants Knew or Were Deliberately Reckless in Disregarding the 810 Test Results ................................................................. 82

3. Samsung Was Qualcomm's Most Important Customer Relationship Throughout the Class Period ......................... 83

D. The Fact That Virtually All of Qualcomm's Internal Information About the 810 Demonstrated The Existence of Overheating Issues Supports a Strong Inference of Scienter .......... 84

E. Defendants Amon and McDonough's Unequivocal Denials of Any Problems With the Snapdragon 810 Support A Strong Inference of Scienter ....................................................... 85

VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE ........................................................ 86

IX. LOSS CAUSATION .............................................................................. 87

X. CONTROLLING PERSON ALLEGATIONS ......................................... 94

XI. CLASS ACTION ALLEGATIONS ......................................................... 96

XII. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ................................................... 98

XIII. CAUSES OF ACTION ........................................................................... 100

XIV. PRAYER FOR RELIEF ......................................................................... 105

XV.   JURY DEMAND ...................................................................................... 105

## **TABLE OF ABBREVIATIONS**

CDMA .......................................................Code Division Multiple Access

CES ..........................................................Consumer Electronics Show

CPTH........................................................Crashes Per Thousand Hours

CPU ..........................................................Central Processing Unit

CS date ......................................................Customer Ship date

CSRR.........................................................Customer Ship Readiness Review

FC..............................................................Feature Complete

GHz ...........................................................Gigahertz

MSM ........................................................Mobile Station Modem

MTBF.........................................................Mean Time Between Failures

MTP...........................................................Mobile Test Protocol

OEM...........................................................Original Equipment Manufacturer

QCT............................................................Qualcomm CDMA Technologies

QTL............................................................Qualcomm Technology Licensing

SoC............................................................System on a Chip

SoD............................................................Silicon on Dock

Court-appointed Lead Plaintiff the Public Employees Retirement System of Mississippi ("Mississippi"), by and through its undersigned counsel, files this Amended Class Action Complaint for Violations of the Federal Securities Laws asserting claims individually and on behalf of all individuals or entities that purchased or otherwise acquired the publicly traded common stock of Qualcomm between April 7, 2014 and July 22, 2015, inclusive (the "Class Period"), and were damaged thereby, against Qualcomm, Incorporated ("Qualcomm" or the "Company") and Steven M. Mollenkopf, Derek K. Aberle, George S. Davis, Venkata S.M. Renduchintala, Christiano Amon, and Tim McDonough (collectively, the "Individual Defendants"; together with Qualcomm, the "Defendants"). Lead Plaintiff alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.

Lead Plaintiff's information and belief concerning matters other than itself and its own acts are based upon, among other things, a review and analysis of: reports filed by Qualcomm with the U.S. Securities and Exchange Commission ("SEC"); press releases and other public statements issued by Qualcomm and the Individual Defendants; securities analysts' reports about Qualcomm; media and news reports related to Qualcomm; data and other information concerning Qualcomm securities; other publicly available information concerning the Company and the Individual Defendants; an investigation conducted by and through Lead Plaintiff's attorneys and their investigators, which included interviews of numerous former employees of Qualcomm; and consultation of Professor Scott Thompson ("Thompson"), an industry consulting expert in electrical engineering, computer science and the manufacturing of silicon semiconductors. Lead Plaintiff believes that substantial additional evidentiary

support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.  This action arises from Defendants' misrepresentations and fraudulent course of conduct surrounding Qualcomm's premium-tier microprocessor—the "Snapdragon 810" ("Snapdragon 810" or "the 810"). In April 2014, Qualcomm launched the Snapdragon 810 to much hype and fanfare and touted the chip as its "highest performing platform to date" that would "enable an exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets." Based on Defendants' representations of the current performance and readiness of Snapdragon 810, the financial media hailed the chip as "the next step in Qualcomm's dominance of the high-end smartphone market" that would purportedly drive growth in Qualcomm's chip business in 2015 and beyond.

2.  Throughout the Class Period (April 7, 2014 through July 22, 2015), Defendants continued to falsely represent the performance of Snapdragon 810 and its likelihood of success, including that it "deliver[s] high levels of compute performance at low power," is "engineered to use less power and remain cooler," and "will completely change the next generation of user experience[]…." Defendants also represented that Snapdragon 810's performance capabilities would allow the Company to "maintain [its] leadership position in the premium tier [of smartphones]" based upon industry expectations that manufacturers of high-tier smartphones would "[b]uild] around Qualcomm Snapdragon 810 processors." Indeed, Defendants' continuous stream of misleadingly bullish statements regarding the Snapdragon 810 were highly material to investors, as Qualcomm was relying heavily on the Snapdragon 810 to maintain market share and strengthen growth in its highly lucrative Qualcomm CDMA Technologies

("QCT") business—a segment accounting for the vast majority (70% in 2014) of the Company's overall revenues.

3. Unbeknownst to investors during the Class Period, however, Defendants knew, but failed to disclose, that the Snapdragon 810 was plagued with design and operational problems from inception, including severe and highly abnormal overheating problems[1] that fundamentally compromised its performance and functionality and called into question the ultimate viability of the chip. Defendants also knew that the design and operational problems afflicting the 810 were driven by the Company's rash decision to alter Qualcomm's usual production and testing methodology in direct response to competitive pressures caused by Apple's sudden announcement of a 64-bit processor in its iPhone 5. Compounding these issues even further, Defendants promised Qualcomm's most important customer—Samsung—that the Company would **accelerate** significantly the usual timeline for development, testing, and ultimate delivery of the 810 chip, all of which significantly impacted the chip's overall performance and functionality.

4. Despite these serious, but undisclosed, problems, Defendants knowingly rushed Snapdragon 810 to market and continued to take aggressive shortcuts in its typical design process, making it almost certain that the chip would overheat and/or compromise functionality crucial to the chip's overall success. Even when rumors of overheating problems began to surface in late 2014 and early 2015, Defendants continued to mislead investors by vigorously **denying** that any problems existed at all and falsely representing that "everything with Snapdragon 810 remains on track" and "there aren't any significant technical

---

[1] The terms "thermal" problems and "overheating" problems are used interchangeably herein, and refer to the excessive overheating of silicon semiconductors and processors.

issues that will cause a delay." Media outlets reiterated these false statements, reporting that "Qualcomm has **denied that any of these rumors are true….**"

5. In addition to deliberately concealing the overheating problems themselves, Defendants also failed to disclose that the problems had caused Samsung to drop the chip altogether from its flagship premium tier smartphone, the Galaxy S6. Because Samsung accounted for a large percentage of the total premium tier market for smartphones, Qualcomm's loss of Snapdragon 810 product share in the Galaxy S6 not only cost the Company an estimated $1.3 billion or more in potential revenues from millions of Galaxy S6 phones, it also was a huge blow to the Company's marketing of the 810 and raised questions about the ability of Snapdragon 810 to drive overall profits in Qualcomm's all-important QCT segment. Likewise, the loss of share in the Samsung flagship product revealed concerns about Qualcomm's ability to deliver in its future products the performance expectations that the Company promised investors.

6. On January 20, 2015, reports of rumors began to surface suggesting that Samsung might drop Snapdragon 810 from its S6 due to overheating problems. Although a few analysts discussed the rumors and the initial partial disclosure caused Qualcomm's stock price to decline on the news, Qualcomm and Samsung both failed to confirm or deny the validity of report.

7. On January 28, 2015, Qualcomm disclosed that it was significantly lowering its outlook for QCT "largely driven by the effects of," among other things, "[e]xpectations that **our Snapdragon 810 processor will not be in the upcoming design cycle of a large customer's flagship device**." Analysts uniformly confirmed that the "large customer" was Samsung and that the "flagship device" was the Galaxy S6. Following this second partial disclosure of adverse news, the Company's stock price plummeted over 10%, wiping out

billions of dollars in market capitalization in a single trading day and causing significant damage to Qualcomm investors.

8. Despite these partial disclosures of adverse news relating to Snapdragon 810 in January 2015, however, Qualcomm's stock price remained artificially inflated by Defendants' continuous and steady barrage of false representations, omissions, and deceptive denials regarding the 810's systemic overheating problems and the true reasons for Samsung's rejection of the chip for its Galaxy S6 smartphone. For example, without even mentioning the 810's overheating problems, Defendants falsely stated that the Samsung loss was an "isolated" event limited to "one account" and "one portion of their portfolio" and represented that "*Snapdragon 810 is performing well*," "our design momentum for the Snapdragon 810 processor remains robust," and "[a]ny concerns about the 810 terms of design traction really are probably limited to one OEM[2] versus anything else."

9. Even when analysts specifically pressed Defendants during the Company's January 2015 conference call to explain the "heart of the 810 issue" and confirm whether the rumored overheating problems were cause for concern or had anything to do with Samsung's decision to drop the 810, Defendants continued to affirmatively mislead investors: "*On the 810, I'll be very clear, this device is working the way that we expected to work* and we have design traction that reflects that….[s]o we are quite pleased with how that is performing." Analysts confirmed that "[m]anagement noted on the call that the loss was likely not due to the 810 overheating, but rather the lack of differentiation with their application processor."

---

[2] An original equipment manufacturer ("OEM") is a company that, as relevant here, manufactures the final mobile device product, and includes companies such as Samsung, Foxconn (which manufactures the Apple iPhone), LG, and others.

10. Incredibly, throughout the spring and early summer of 2015, following the partial (but misleading) disclosures regarding Snapdragon 810 and the Samsung loss, Defendants' misrepresentations and deceptive conduct surrounding the 810 became even bolder and more aggressive. For example, in the wake of what it self-servingly described as "false rumors" of overheating problems, Defendants doubled down on their falsehoods, stating that "*[t]he rumors are <u>rubbish</u>, there was <u>not an overheating problem</u> with the Snapdragon 810 in commercial devices*…" and "[t]he Snapdragon 810 processor is *performing as expected and we have not observed <u>any abnormal thermal issues</u>*." The Company's recurrent false and vigorous denials to investors were unequivocal and overwhelmed any rumors of overheating: "*[c]ategorically, we don't see any problem with the chip.*"

11. Indeed, to further conceal the Snapdragon 810 problems, Defendants went so far as to issue a specific Qualcomm press release entitled "Snapdragon 810 processor: cooler than ever," that falsely bragged about the *lack* of heat issues in the 810: "[a] cooler smartphone means a better performing smartphone….[i]f you want the best of both worlds, higher performance with lower power, than you want a Snapdragon 810 powered smartphone." The Company made similarly false statements during multiple investor conference calls, stating "*[n]ot only is the Snapdragon 810 processor designed to deliver more performance and better experiences, but it's also engineered to use less power and remain cooler*."

12. On July 22, 2015, the last day of the Class Period, Qualcomm disclosed that, as a result of the problems with the Snapdragon 810 and the resulting loss of share in the Samsung Galaxy S6, the Company's QCT segment would again miss expectations by a wide margin, and that as a result of the 810's failures, QCT's competitive outlook for the remainder of the year had been

significantly weakened. The Company admitted that "*in terms of the 810*, I think probably *the biggest single impact* as we look at the year… again, much like the fourth quarter, *it's almost entirely attributable to changes in the premium tier and certainly, the socket loss*[3] *at a major vertical customer [Samsung]*." Analysts agreed: "we suspect that the performance issues that have plagued the S810-based phones have also been a factor, as we believe a number of OEMs have delayed launches as they work through some issues."

13. Upon this final disclosure, Qualcomm's stock price declined another 3.75% to close at $61.78 per share—more than 25% lower than the Class Period high of $81.97—causing further damages to investors. Qualcomm's stock price has never fully recovered from Defendants' misconduct and now hovers around $50 per share.

## II.    JURISDICTION AND VENUE

14. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 C.F.R. § 240.10b-5.

15. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

16. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). The Company maintains its principal place of business in this District, and did so throughout the Class Period, and many of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in or were issued from this District.

---

[3] "Socket loss" refers to the loss of Qualcomm's share of chips that would be included in an OEM's handset, here the Samsung Galaxy S6.

17.     In connection with the acts alleged in this Complaint, Qualcomm and the Individual Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

18.     Lead Plaintiff Mississippi Public Employees Retirement System was established in 1952 and provides retirement and related benefits for all Mississippi state and public education employees, officers of the Mississippi Highway Safety Patrol, and certain elected officials, among others.  As of June 30, 2015, Mississippi oversaw approximately $25.4 billion in assets on behalf of more than 394,000 members and their beneficiaries.  Mississippi purchased Qualcomm common stock during the Class Period, as set forth in the certification[4] previously filed with the Court, and suffered damages as a result of the federal securities law violations alleged herein.  By order dated February 19, 2016, the Court appointed Mississippi as the Lead Plaintiff in this action.

### B.    Defendants

19.     Defendant Qualcomm is a corporation organized under the laws of the State of Delaware, and maintains its principal executive offices at 5775 Morehouse Drive, San Diego, California.  Founded in 1985, Qualcomm develops, designs, licenses, and markets worldwide its digital communications products and services, primarily through its two main business segments; Qualcomm CDMA Technologies ("QCT") and Qualcomm Technology Licensing ("QTL"), described in further detail in ¶¶ 34-36, *infra*.  At all relevant times, Qualcomm common

---

[4] An updated certification from Mississippi is attached as Exhibit A hereto.

stock was traded under the ticker symbol "QCOM" on the NASDAQ Stock Market ("NASDAQ"), which is an efficient market.

20.    Defendant Steven M. Mollenkopf ("Mollenkopf") has served as the Chief Executive Officer ("CEO") of Qualcomm since March 2014, and as a member of the Company's Board of Directors since December 2013.  He served as Qualcomm's President and Chief Operating Officer ("COO") from November 2011 through March 2014.  During the Class Period, he certified Qualcomm's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis.

21.    Mollenkopf has a B.S. in Electrical Engineering from Virginia Tech and an M.S. in Electrical Engineering from the University of Michigan.  He began his career at Qualcomm in 1994 as an engineer and held a number of technical positions within the Company before being appointed CEO.  In his previous role as COO, Mollenkopf led the Company's chipset business (QCT segment) while the Snapdragon 810 was in its initial development stages.  Accordingly, he was in a position to know, and did know, about the details of that product's design, testing, marketing to Qualcomm's primary original equipment manufacturer ("OEM") customers,[5] and ultimate commercial launch, including the unprecedented overheating problems.

22.    Defendant Derek K. Aberle ("Aberle") has served as the President of Qualcomm since March 2014.  During the Class Period, he spoke to investors and securities analysts regarding the Company on a regular basis. He joined Qualcomm in December 2000, and prior to becoming President of Qualcomm he held numerous executive positions in Qualcomm's QTL segment, including Executive Vice President and Group President of Qualcomm between November

---

[5]    Original Equipment Manufacturers, or OEMs are companies that manufacture the final mobile device product, and includes companies such as Samsung, Foxconn (which manufactures the Apple iPhone), LG, and upcoming Chinese OEMs ZTE, Huawei, and Xiaomi.

2011 and March 2014. As a member of the Company's Executive Committee, Aberle helps to "drive Qualcomm's overall global strategy." Accordingly, he was in a position to know, and did know, about the details of the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

23. Defendant George S. Davis ("Davis") is currently an Executive Vice President and Chief Financial officer ("CFO") of Qualcomm. During the Class Period, Defendant Davis certified Qualcomm's periodic financial reports filed with the SEC and spoke with investors and securities analysts regarding the Company on a regular basis. As a member of the Company's Executive Committee, Davis helps to "drive Qualcomm's overall global strategy." Accordingly, he was in a position to know, and did know, about the details of the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems. Prior to joining Qualcomm, Davis served as CFO at Applied Materials, a component electronics manufacturer that supplies equipment, services and software to manufacturers of semiconductor chips. He joined Qualcomm in March 2013.

24. Defendant Venkata S.M. "Murthy" Renduchintala ("Renduchintala") was, at all relevant times an Executive Vice President of Qualcomm, and Co-President of the Company's QCT division. He holds a Doctorate in Digital Communications and an M.B.A. from the University of Bradford in the United Kingdom. Prior to joining Qualcomm, he served as Vice President and General Manager of the Cellular Systems Division at Skyworks Solutions, Inc. He joined Qualcomm in 2004 and served as Co-President of Mobile and Computing Products at Qualcomm from June 2012 through October 2012. As discussed in detail below, Renduchintala was in a position to know, and did know, about the

810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

25. Defendant Cristiano R. Amon ("Amon") currently serves as the Executive Vice President of Qualcomm Technologies, Inc., and is the President of QCT. He is also a member of the Company's executive committee. During the Class Period, Defendant Amon spoke to investors and securities analysts regarding the Company on a regular basis.

26. Defendant Amon was appointed Co-President of QCT (with Defendant Renduchintala) on July 27, 2012, and in that role was responsible for the oversight of activities related to Qualcomm's semiconductor business. He holds a Bachelor's degree in electrical Engineering from Universidade Estadual de Campinas in São Paulo, Brazil. Amon joined Qualcomm in 1995 as an engineer after working at other telecommunications firms such as Vésper, NEC, Ericsson and Velocom. Prior to becoming Co-President of QCT, he was Qualcomm's Senior Vice President of Product Management with QCT where he was responsible for managing the Company's wireless chipset portfolio. In a Qualcomm press release announcing Amon's promotion to head of QCT, Mollenkopf highlighted Amon's importance to QCT stating "Cristiano has been managing QCT's product roadmap since 2008 - a period of unprecedented growth and innovation for Qualcomm and the industry." As discussed in detail below, Amon was in a position to know, and did know, about the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

27. Defendant Tim McDonough ("McDonough") currently serves as a Senior Vice President, Global Marketing at Qualcomm. From September 2010 through October 2015, including at all times during the Class Period, McDonough served as Vice President of Worldwide Marketing for Qualcomm. McDonough

describes his role (on his LinkedIn profile) as a chief marketing officer for Qualcomm's QCT segment responsible for "product marketing, branding, public relations, events, online marketing, and analyst relations" for the Company's Snapdragon line of mobile processors.  During the Class Period, Defendant McDonough spoke regularly on behalf of the Company with investors and securities analysts.  McDonough joined Qualcomm in 2010 after having served in a managerial role with Microsoft.  As discussed in detail below, McDonough was in a position to know, and did know, about the 810's design, testing, marketing to Qualcomm's primary OEM customers, and ultimate commercial launch, including the unprecedented overheating problems.

### C.    Relevant Non-Parties

#### 1.    Confidential Witnesses

28.    CW 1 is a former Qualcomm employee and software engineer who worked for the Company from 2004 through November 2015.  CW 1 worked in various capacities for more than ten years, including as a Technical Account Manager, which put him in direct contact with product engineering, sales, and marketing.  In this role he also worked in Qualcomm's Digital Signal Processor ("DSP") program, which worked on the Snapdragon 810.  Indeed, CW 1 was in a position to know, and did know, about the problems with the 810, as well as the Company's overall relationships with its largest OEM customers, including Samsung.   CW 1 reported to Kuntal Sampat, Qualcomm's Director of Engineering and Steve Brightfield, the Director of Product Management.

29.    CW 2 is a former Qualcomm Senior Staff Engineer in the Company's San Diego headquarters.  He worked for Qualcomm for more than eight years, and interacted regularly with OEMs Samsung, LG, and Sony to coordinate the launch of the Snapdragon 810 in their respective product offerings.  During his work on the Snapdragon 810 project, CW 2 reported to the Project

Engineer Rajeev Pal ("Pal") who reported to Defendant Renduchintala. In connection with his work with Samsung, LG, and Sony, CW 2 was responsible for the release of the Snapdragon 810 to commercial stage production for those OEMs, and met with those clients on a weekly basis to discuss their respective commercial launches of products incorporating the Snapdragon 810. Thus, CW 2 was in a position to know, and did know, about the testing and development of the Snapdragon 810, as well as the status of the Company's discussions with OEMs to whom it was negotiating the sale and use of the Snapdragon 810, and ultimate commercial launch of the 810.

30. CW 3 is a former Senior Staff Engineer in the Company's San Diego headquarters. CW 3 worked at Qualcomm in various engineering capacities for more than 20 years. Before and during the Class Period, CW 3 was responsible for assessing product test needs for upcoming chipsets, including the Snapdragon 810, including test planning, special test requirements, and IT resource planning. In this capacity, he was also responsible for aggregating the various test results for the 810 from members of the Product Test Group and submitting those test results to Pal (who then sent them to Defendant Renduchintala), and others. CW 3 reported to the Head of Product Testing Syed Ahsan, who reported to Vice President of Engineering, Rashmi Char. Char reported to Tony Schwartz, Qualcomm's SVP of Engineering in the QCT segment, who in turn reported to James "Jim" Thompson, who in turn reported to Defendant Murthy. In this position, CW 3 was in a position to know, and did know, about testing of all QCT chipsets, (specifically including the 810), including allocation of resources (both human and financial) necessary for all stages of testing, and comparative performance of Qualcomm chipsets based on testing results.

### 2.    Other Relevant Non-Parties

31.    Samsung Electronics Co., Ltd. ("Samsung") is a multinational electronics company headquartered in Suwon, South Korea. Samsung designs, manufactures and sells, among other things, consumer electronics (such as smartphones) and electronic components such as silicon semiconductors (including microprocessors like the Snapdragon 810).[6] Thus, in its capacity as an OEM, it was a Qualcomm customer and purchased Snapdragon processors; and in its capacity as a chip designer and manufacturer, it was a Qualcomm competitor. Throughout the Class Period, Samsung designed, marketed, and sold to consumers the most popular premium-tier smartphones including the Galaxy S series.  Sales of Samsung's mobile devices made up approximately 25% and 22% of global market share in 2014 and 2015, respectively.

32.    Rajeev Pal was the Project Engineer for the Snapdragon 810.  In this role, he was the Qualcomm employee to whom CW 2 reported and to whom CW 3 forwarded product testing results.  According to CW 2, Pal reported to Defendant Renduchintala.  CW 3 also stated that all of the test groups submitted their reports to Pal and all 810 data flowed through him.  In fact, both CWs 2 and 3 stated that as Defendant Renduchintala's subordinate, Pal regularly reported the progress of the 810 directly to him.

## IV.    FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.    Qualcomm Was a Leader in the Telecommunications Industry

33.    Qualcomm was founded in 1985 in La Jolla, California, with the simple intention to provide "quality communications."  The Company developed a mobile communications network based primarily on so-called Code Division Multiple Access ("CDMA") technology, which now is utilized in every mobile

---

[6] The four primary companies that manufacture silicon semiconductors are: Samsung, Taiwan Semiconductor Manufacturing Company ("TSMC"), Intel, and GlobalFoundries.

device currently on the market. As a result, after going public on the NASDAQ in 1991, the Company has become one of the largest and most successful telecommunications companies in the world.

34. The Company operates through two main segments: QCT and QTL. According to the Company's fiscal year 2014 ("FY14") Form 10-K, filed with the SEC on November 5, 2014, QCT is a leading developer and supplier of integrated circuits. An integrated circuit, also called a chip or microprocessor, is a semiconductor wafer on which millions or billions of tiny resistors, capacitors, and transistors are fabricated for the purpose of processing data. These circuits are used in virtually all electronic devices, including specifically, mobile phones. Qualcomm designs, markets, and sells a particular type of mobile phone integrated circuit known as a "mobile station modem" or MSM integrated circuit, which allows a mobile device to process data for, *inter alia*, playing games, operating a digital camera, or streaming video, and to connect to one of several generations of wireless networks (hereafter "mobile processor").

35. Before and during the Class Period, Qualcomm sold mobile processors through its QCT segment to OEMs such as Samsung (and many others) for use in cellular phones, smartphones, and other mobile devices such as tablets.[7] These mobile processors had the capacity of connecting to both third generation or "3G" wireless networks and the faster, more advanced fourth generation or "4G/LTE" wireless networks. For fiscal year 2014, Qualcomm's QCT segment shipped 861 million mobile processors worldwide and generated 70% of the Company's total revenues, or $18.7 billion.

36. Much of Qualcomm's success has been the result of its design and development of an extensive range of technologically advanced mobile

---

[7] The terms "smartphone" and "mobile device" are used interchangeably herein to refer to any and all mobile wireless data processing devices (including smartphones, tablets, and "phablets" – devices that function as both a phone and a tablet).

processors, which have been incorporated into smartphones since the late 1990s. By the end of 2013, Qualcomm's sales represented 64% of the overall mobile processor market and 94% of the 4G/LTE mobile processor market. Qualcomm also had a significant one to two year technological lead on its nearest competitors, launching its fourth and fifth generation of 4G/LTE mobile processors when its competitors only were announcing their first generation. Coupled with the explosive growth in the smartphone market—from 122 million smartphones sold in 2007 to more than 1.4 billion sold in 2015—the Company's purportedly superior mobile processors and command of the relevant market share made Qualcomm one of the most important partners of OEMs who design and manufacture the most sought-after (and most expensive) premium-tier smartphones, such as Apple, Samsung, and LG.

### 1. The Birth of the Snapdragon and the "System-on-a-Chip"

37. Qualcomm seized the opportunity for technology leadership in smartphones by designing the Snapdragon series of all-in-one processors known as "System on a Chip" ("SoC"). An SoC is a type of mobile processor that aggregates multiple, different processors onto a single piece of silicon that works collectively to allow the smartphone to maximize the speed of data processing, improve power efficiency, and create an overall enhanced user experience. Prior to the development of the SoC, most mobile devices included a number of different processors tailored to specific functions, *e.g.*, gaming or playing video. The SoC allowed for each of these separate processors to be included on one chipset, leading to the development of (and demand for) thinner and smaller mobile devices.

38. Each function of a mobile device (*e.g.,* placing a call, sending a text, playing a game, or connecting to the internet) is performed by a distinct

"functional block" in an SoC.  A picture representing the functional blocks found in the Snapdragon 810 is set forth below:

39.     Although each of a SoC's functional blocks is important to the overall performance of a mobile device, the central processing unit or CPU is the "brains" of a smartphone, and is central to its functionality.  It governs how quickly a device can perform various functions, and determines how well a device can perform multiple different functions simultaneously.  Accordingly, a processor's ability to correctly process the millions of bits of data per second that flow through it at ever-increasing speeds is central to its utility.  Modern SoCs have multiple "cores," or distinct units that work in concert as the devices' CPU regulates its operations for more efficient processing.

40.     Each functional block, and in particular the CPU, processes data by utilizing the electrical energy from billions of transistors to digitize the data signals.  This electrical energy creates heat within the circuits of the functional blocks and occasionally causes mobile devices to run warm when these blocks are

in use. As the "brains" of the device, the CPU is more likely to emanate heat than other functional blocks on the SoC.

41. There is a threshold, however, at which the heat becomes so excessive that it threatens the other functional blocks, the overall device (and its user's skin) and, importantly, the utility of the CPU itself. In the latter instance, the software controlling the SoC has a built in safety mechanism that shuts down the entire CPU or one or more of its "cores"—a unit of the CPU that reads and executes program instructions—to prevent further damage. Once engaged, this safety mechanism slows down the SoC's overall processing speed, efficiency, and other capabilities until the unit cools down.

42. In devices with multi-core CPUs, the software controlling the SoC may shut down the most-strained cores (which are sometimes more powerful), while allowing the slower, less strained cores to process incoming data. This automated shutdown of strained cores shifts the work onto the other cores, which typically operate at slower speeds and usually results in slower data processing. Known in the industry as "throttling," shifting to slower cores can be a means of preventing thermal damage to the chip. However, "throttling" also may result in a device that resets at random intervals and utilizes slower speeds for functions processed by the remaining cores. When the heat generated by the CPU is consistently excessive, such thermal issues may prevent the device from performing as originally designed or, in the case of a sale to an end user, as advertised.

**B.     Qualcomm's Competitive Advantage Was Heavily Dependent Upon the Success of its Premium-Tier Snapdragon Processors**

43. As a leader in SoC processors, Qualcomm was strongly positioned to benefit from the growth of smartphone sales, and from high demand for increasingly fast data and processing capabilities into thinner smartphones and other mobile devices. While Qualcomm was not the only company to develop an

SoC, its Snapdragon series was advertised as the most technologically advanced and generally considered the industry leading chipset for mid- to premium tier smartphones. Indeed, the Snapdragon platform (including its expansion into new mobile and server technologies) represented one of the Company's fundamental strategies to grow QCT.

44. Since 2007, Qualcomm has released four different series of Snapdragon mobile processors—the 200 series, 400 series, 600 series, and the 800 series—each of which included the capability of accessing both 3G and 4G/LTE wireless networks, something that Qualcomm's competitors were not able to do until at least the second half of 2014. This was significant because by the end of 2013, some of the largest smartphone markets in the world—the United States, Europe, and China (with nearly 1 billion subscribers alone) had launched lightning fast 4G/LTE wireless networks and Qualcomm had the only 4G/LTE SoC for premium-tier smartphones. Additionally, prior to 2014, each Snapdragon processor relied on a customized CPU and gaming processor unit or GPU, which further set it apart from other SoCs available on the market. Not only was Qualcomm's expertise in developing these individual processors unparalleled, but its competitors typically used "off-the-shelf" processors, which were not designed with any particular device in mind. By 2014, one billion devices had shipped with Qualcomm's Snapdragon processors.

45. The Snapdragon 800 series in particular purportedly was designed with the most powerful and efficient processing capabilities for use in OEMs' premium-tier smartphones, which were intended for subscribers in the US, Europe, and China, among other markets with 4G/LTE wireless networks. OEMs paid a premium for the Snapdragon 800 series given the level of design, customization, technology, and raw processing power these mobile processors

purportedly provided.  As a result, Qualcomm's profit margins on the 800 series generally were higher than the other Snapdragon series.

46.    In mid-2013, Qualcomm began work on its latest generation of the Snapdragon 800 series—commercially known as the Snapdragon 810. Qualcomm initially designed the Snapdragon 810 to represent the next generation in power efficiency, processing speeds, and technical capabilities, including, critically, the ability to seamlessly connect to 4G/LTE networks.  As described by CW 3, the Snapdragon 810 was intended to be Qualcomm's "Cadillac" processor. In fact, Qualcomm promoted it in that manner to OEMs and the market.  A successful launch of the Snapdragon 810 was essential to the Company's competitive position—ensuring that a significant share of Qualcomm chips would continue to be included in the designs of virtually all of the premium-tier smartphone handsets—as well as to its revenues and profit margins, as the Company generated as much as 60% more in revenues for the Snapdragon 810 than its predecessors.

47.    Several broader market forces emerged in 2014 and 2015, however, that adversely impacted QCT's ability (i) to compete with processor manufacturers going forward, and (ii) to continue increasing its profit margins.

48.     The first was the emergence of other less-expensive SoC processors offered by smaller competitors.  These new players already had emerged as a significant competitor for chips in the low- and mid-tier smartphone market, giving OEMs more options when selecting a chipset for their mobile devices. One such competitor, MediaTek, was developing a premium-tier SoC with 4G/LTE capabilities that would compete directly with Qualcomm's premium-tier Snapdragon processors, including the 810.  This presented significant competitive pressure for Qualcomm, especially within China, which, at the time, had one billion mobile device subscribers.

49.     Another factor affecting QCT's ability to reap higher profit margins on its mobile processors was the lower average sales prices or "ASPs" for smartphones. This was largely the result of increased smartphone demand in China with the launch of 3G networks in 2009 and then 4G/LTE networks in 2014. Lower sales prices meant tighter margins for OEMs and greater scrutiny on costs. As a result, OEMs became more cognizant of the value of a mobile device's components as compared to its cost. Thus, OEMs only would choose more expensive and complex processors for their premium-tier smartphones if those processors actually delivered substantial improvements in operating performance.

50.     A third factor affecting QCT's bottom line was the growth of so-called "in-house" SoC solutions with similar power and 4G/LTE connectivity at such large OEMs as Samsung and Huawei. Prior to the start of the Class Period, Samsung and Huawei both utilized prior versions of Snapdragon processors for their premium tier smartphones. Qualcomm's ability to keep its largest customer, Samsung, and one of the largest Chinese OEMs, Huawei, from permanently eschewing Qualcomm SoCs in favor of their in-house SoC solutions hinged on the Company's ability to deliver cutting-edge products that performed noticeably better than these OEMs' own processor designs.

51.     Thus, during the Class Period, Defendants knew Qualcomm needed a strong 800 series Snapdragon chipset in order to cement the Company's technological leadership and expertise, differentiate itself from its competitors, justify the cost of its premium-tier SoC, and convince its most important customers to continue to look outward for chipset solutions.

## C.    Key Benchmarks in the Development of an SoC

52.    According to Thompson, an expert in electronic engineering and semiconductor manufacturing,[8] the timeline for developing a mobile processor is dependent on a multi-month process for fabricating silicon wafers and includes multiple steps which vary little from company to company. Moreover, given the complexity of designing, testing, and launching an SoC, it is possible to identify the likely production timeline of a chip based on its commercial launch date.  As a result, based on his expertise and experience manufacturing and developing chips similar to those at issue here, Thompson is able to identify with reasonable degree of certainty the production timeline of the Snapdragon 810 given its planned launch dates for Samsung in November 2014 and the actual launch dates for LG in January 2015.

53.    The initial conceptual and design stages for the development of an SoC (like the 810) focuses primarily on identifying various performance requirements that the chip is intended to satisfy.  High-level goals that are evaluated at this stage include power, heat, chip frequency, and instruction size (*e.g.*, 64-bit or 32-bit).  This stage is performed in conjunction with consultations with OEMs to whom Qualcomm intends to market and sell the respective SoC.

54.    After the conceptual and design stages are complete, a company fabricates sample chips from silicon based on the final approved design, which is known as "first silicon."  So-called "fabless" semiconductor companies like Qualcomm engage a foundry, such as the Taiwan Semiconductor Manufacturing Company, to fabricate the first silicon.  According to CW 3, first silicon also was known within Qualcomm as "Silicon on Dock," or SoD.

55.    According to Thompson, first silicon is considered the most important, closely monitored, and heavily scrutinized milestone for an SoC

---

[8] Professor Thompson's Curriculum Vitae is attached as Exhibit B hereto.

because of the hundreds of millions of dollars, thousands of man-hours, and nearly two-year lead time that must be invested just to get the processor to the "first silicon" stage. The process of creating this first silicon (also known as the "bring up" phase) typically takes three months, primarily because of the extensive and microscopic layering of silicon involved in the manufacturing process. Based on the 810's commercial launch schedule and complexity, Thompson notes that the first silicon was likely delivered no later than March 2014. Specifically, Thompson stated that the 810 first silicon was likely delivered no later than March because (i) Qualcomm would have possessed the first silicon at least several weeks prior to issuing its April 7, 2014; and (ii) Qualcomm would have needed at least 9 months between receiving the first silicon and LGs first 810 device launch date of January 5, 2015 for production. Thompson also notes that in light of Samsung's November 2014 launch date, and the need for 9 months between first silicon and launch, Qualcomm more likely would have received the first silicon in January or February 2014.

56. Testing of the chipset and its various components begins immediately after receipt of the first silicon. First silicon represents the first opportunity to test the chip's design under so-called typical conditions of use. According to Thompson, test result data regarding key performance metrics (including power, heat, and processing speeds) is typically known about one week after testing begins. Given that the initial testing of the first silicon is such a key benchmark for any semiconductor company (including Qualcomm), Thompson confirmed that the results of tests of these key metrics are heavily scrutinized, monitored, and almost always communicated to the Company's key executives, such as the Individual Defendants here. In the case of the 810, any testing problems encountered during the first silicon testing should have been discovered shortly after receipt of the first silicon by no later than March 2014.

57. Thompson's timeline is substantially corroborated in large part by CW 3. CW 3 identified four key milestones in Qualcomm's development of its chipsets: (i) Silicon on Dock (*i.e.*, first silicon), which refers to the point in time Qualcomm received the first samples of the chipset for testing; (ii) Feature Complete ("FC"), which refers to the point in time when the chipset has all of its software components installed; (iii) Commercial Sampling, which refers to the date samples of the SoC is sent to OEMs; and (iv) Customer Ship date ("CS date"), which refers to the date the finished chipsets are delivered to OEMs.

58. According to CW 3, Qualcomm typically provided the final chipset design to the chip fabricator (*i.e.*, Taiwan Semiconductor Manufacturing Company) for "tape-out" or initial fabrication of the chipset approximately three months before Qualcomm receives the SoD or first silicon. This is similar to what Thompson refers to as the "bring up" stage, which also occurred roughly three months before receipt of the first silicon. Likewise, CW 3 confirmed that after receiving the SoD, Qualcomm began testing the chipset.

59. According to CW 3, Qualcomm had two test groups—the Software Component Test Group and CW 3's group, the Product Test Group. The Software Component Test group had sub-groups, each of which tested the software for individual functional blocks of the chipset (*e.g.*, the modem or the GPU), beginning very shortly after Qualcomm received the SoD. The Product Test Group was responsible for testing the entire chipset, including all of its software components, after FC and prior to the CS date. Qualcomm typically reached the FC milestone within three months of SoD, according to CW 3.

60. CW 3 identified two metrics that the Product Test Group utilized when conducting their tests: (i) Crashes Per Thousand Hours (of testing) ("CPTH"), and (ii) Mean Time Between Failures ("MTBF"). These metrics indicated how stable a chipset was during testing. According to CW 3, a

successful chipset has a higher MTBF and lower CPTH—*i.e.*, the chipset runs for longer between failures, with fewer crashes over the testing period. CW 3 stated that the Product Test Group sometimes was brought in shortly after receipt of SoD to identify big picture issues, given the Product Test Group had a better reputation for identifying problems with a chipset than the Software Component Test Group. This was especially so in the case of the Company's key products, such as the Snapdragon 810.

61. After FC, and while the Product Test Group was testing the chipset, Qualcomm engaged in Commercial Sampling, releasing the chipset with all of its software components to OEMs for their own testing. CW 3 stated that Qualcomm had the option make modifications to the chipset based on the OEMs' test results. Commercial Sampling, including both OEMs' testing and the Company's subsequent modifications, took approximately three months.

62. Prior to the CS date and after testing was complete, CW 3 stated that Qualcomm customarily held one or more customer ship readiness review ("CSRR") meetings, during which the Company made a "go" or "no go" decision with respect to approving large-scale commercial production of the SoC. CSRR meetings, which CW 3 noted typically took place three to six months before the customer launched the device utilizing the subject chipset, were attended by a broad cross-section of the teams necessary to develop the subject chipset. According to CW 3 the CSRR meetings included a discussion of whether the relevant chipset was meeting key benchmarks, including, specifically, CPHT and MTBF.

### D. Qualcomm Rushes Its Plan for the Snapdragon 810 and Makes a Major Change in its Design Strategy by Using Non-Customized Designs for the 810's CPU Due to Pressure from Samsung and Apple

63. The development of the Snapdragon 810 began in mid-2013. During the initial planning stages for the 810, Qualcomm identified the mobile devices in

which the processor was to be incorporated and then designed the processor to match the technological specifications and capabilities of those devices. In this instance, Samsung's much-anticipated Galaxy S6 was one of the key "wins" Qualcomm coveted for the 810. Initially, Qualcomm planned to launch the 810 commercially in January 2015.

64. According to CW 2, in 2013, Samsung surprised Qualcomm, demanding that Qualcomm have the 810 ready for commercial launch November 2014, two months earlier than previously planned. In fact, according to CW 2, Samsung threatened to walk away from the deal and use its own in-house SoC in place of the 810 if Qualcomm could not deliver on the accelerated launch date. Qualcomm thus risked losing out on the Galaxy S6 business and future Samsung flagship products if it refused these demands, creating pressure to significantly alter its typical design process and production timeline.

65. Qualcomm and Samsung have had an extensive and complicated relationship. Samsung historically has purchased chipsets from Qualcomm for some of the most popular smartphones in the world. Indeed, as the Company's second-largest customer, Samsung accounted for an estimated 12% of Qualcomm's sales FY14. At the same time, however, Samsung also is a competitor, developing, manufacturing, and marketing rival SoCs to the same set of OEMs to which Qualcomm sells Snapdragon processors. Given this relationship, which was worth billions of dollars to Qualcomm, it had no choice but to accede to Samsung's demand to accelerating the commercial launch date of the 810. As CW 1 explained it: "Samsung pushed them, and Qualcomm did what they needed to do to win their business."

66. Qualcomm originally designed the 810 to be fabricated in a 20 nm node utilizing a 32-bit processor. 32-bit refers to the speed at which a chipset can process data. 20 nm refers to the size of each of the billions of transistors that are

included in the chipset. This size of the transistor affects the total heat generated by a processor in that 20 nm transistors require more energy (and therefore generate more heat) to switch from the "on" and "off" positions, than smaller nodes such as 14 nm.

67. In September 2013, however, Apple shocked the market by unveiling the iPhone 5S with a first-ever 64-bit mobile processor. When operating at the same speeds, a 64-bit chipset processes data at double the rate of a 32-bit chipset, making the 64-bit chipset a more powerful processor. This, combined with Samsung's demand for a compressed design and production timeline, created even more pressure for Qualcomm.

68. Indeed, Qualcomm eventually agreed with other industry leaders that "[t]he mobile hardware and software ecosystem is already moving in the direction of 64-bit . . . ," and less than two weeks after the Apple rumor first surfaced, Samsung announced that it would be adopting 64-bit architecture in its upcoming Galaxy S6. As a result, in order for the 810 to be state of the art and, more importantly, used by Samsung in the Galaxy S6, Qualcomm decided that it needed to design and manufacture the 810 as a 64-bit chipset.

69. The unexpected shift to 64-bit architecture caught Qualcomm flat-footed and created great pressure. One of the key differentiators and reasons for the outstanding performance of the Snapdragon series was Qualcomm's customized CPU core design. Although Qualcomm typically used a "reference design" from ARM for its cores, this design was historically customized through design and software modifications made by Qualcomm, which were intended to optimize the overall seamless functionality of the various functional blocks on the SoC unit. However, the Company had not yet designed a customized 64-bit CPU core for its Snapdragon processors, wrongly predicting that the market was not poised to move to 64-bit chips so quickly. As one Qualcomm employee put it:

"The 64-bit Apple chip hit us in the gut . . . . We were slack-jawed, and stunned, and unprepared."[9]

70. Despite Qualcomm's lack of viable customized technology, Defendant Renduchintala made the decision to make the 810 a 64-bit chipset by no later than December 2013, which allowed at least three months for Qualcomm to "tape-out" the processor, or fabricate the first silicon. Renduchintala's decision was influenced by his close relationship with Samsung, which he developed during his prior role as an Engineering Lead. As a result, Defendant Renduchintala ensured that Samsung received somewhat favorable treatment compared with other OEMs – specifically with respect to pricing and timing of commercial launch. Thus, as the CWs confirmed, it was Renduchintala who made the final decision to make the 810 a 64-bit chip. By late January 2014, Renduchintala's decision to include a 64-bit CPU in the 810 had been reported in industry media.

### E. The Snapdragon 810's Accelerated Timeline and Hasty Design Led to Undisclosed Overheating Problems in the Chip

71. In order to quickly transform the 810 from a 32-bit SoC to a 64-bit SoC and still meet Samsung's accelerated launch date, Qualcomm knowingly deviated from its historical practice of relying on customized CPU cores for its Snapdragon processors and utilized instead an off-the-shelf, ARM design CPU core for the 810. Prior to the 810, Qualcomm almost always customized the CPU's core to ensure a smooth and efficient functioning SoC. Qualcomm's sudden decision to completely deviate from its typical design process, and use an off-the-shelf core in the 810, would prove to be a key contributor to the overheating problems that eventually plagued the Snapdragon 810.

72. The design of components for the 810 also impacted the overheating problem. For instance, the Snapdragon 810's CPU was designed to have eight

---

[9] http://blog.hubspot.com/opinion/qualcomm-apple-64-bit-chip-hit-us-in-gut

"cores" or distinct processing units that worked in concert to regulate the phone's operations. In the 810, the cores are paired in a "big.LITTLE" configuration, wherein four more-powerful cores (manufactured by ARM, and called Cortex-A57 ("A57")), operating at a speed of approximately 2.0GHz,[10] are paired with four less-powerful cores (also manufactured by ARM, and called Cortex-A53 ("A53")) operating at a slower 1.6GHz. Under typical circumstances, this "big.LITTLE" structure helps the CPU to manage its heat generation by (i) passing along simple, less taxing functions to the smaller cores, which operate at slower speeds, utilizing less energy, and (ii) directing the more complicated and taxing functions to the more powerful cores, which operate at higher speeds, while still allowing each of the cores to operate simultaneously.

73.     However, the Cortex-A57 was prone to overheating, especially when manufactured with 20nm transistors. In fact, some in the industry were skipping the A57 altogether because it did not operate well in chipsets fabricated in a 20 nm node. By choosing to use an "off the shelf" A57 without customization in a 20 nm node, Qualcomm knew that overheating problems were nearly certain (and arguably inevitable) given the 810's design.

74.     Indeed, according to Thompson, although the 810 could theoretically operate at extremely high speeds, when put under any kind of significant demand at those speeds (*i.e.*, lots of data at high speeds), which is typical for the present day smartphone user, the primary CPUs (the four A57s) would overheat and force themselves to either slow or shutdown, placing the processing demand on the secondary four A53 CPUs, reducing the load on the four A57s so that they could cool down. Despite this known correlation between the clock speed and the

---

[10] Processor speed is measured in gigahertz ("GHz") units to measure the frequency of the current that passes through the processor's transistors; 1GHz=1 billion alternating currents per second. In a processor, this is known as "clock speed." Thus, the A57 processed approximately 2 billion currents per second.

overheating issues, the Company could not significantly curtail the chip's top speed to the levels needed to resolve the unit's excessive heat (because the 810's performance would degrade). CW 3 confirmed that when the 810 was running at 2GHz, it was overheating and shutting down.

### F. Initial Testing of the Snapdragon 810 in March 2014 Revealed Performance and Overheating Issues

75. Qualcomm received the first silicon for the Snapdragon 810 in February or March 2014 at which time, according to CW 3, the Company began testing the chip. The timing of Qualcomm's receipt of the first silicon for the 810 is corroborated by Thompson's chip development timeline. *See* ¶¶ 52-57, *supra*.

76. CW 3 reported that Qualcomm utilized two forms of testing on the first silicon: (i) software component testing, which typically begins after the first silicon is received and looks at the SoC's individual software components, including the modem, GPU, and multimedia ("Software Component Testing"); and (ii) testing the entire product, which typically is conducted by the Product Test Group on the entire chipset after Software Component Testing is complete and prior to commercial release ("Product Group Testing").

77. The Product Test Group began testing the 810 in March 2014. CW 3 confirmed that the Product Test Group was brought in to test the 810 prior to the completion of Software Component Testing because the Product Test Group had a reputation for resolving problems that the individual software component test groups often could not.

78. CW 3 received all of the reports generated by the Product Test Group and, beginning in March 2014, was responsible for drafting a weekly email containing a snapshot of all of the testing data for that week, including the number of crashes and issues identified with the most recent software builds (i.e., versions). CW 3 sent these emails to a wide distribution list within the Company, including to his supervisor's boss, VP Rashmi Chari. He also reported his

understanding that Pal had access to the data in these weekly emails. CW 3 further confirmed that the data CW 3 compiled was utilized for presentations to "executive teams."

79. According to CW 3, the Product Test Group's March 2014 tests identified a number of performance issues, including thermal issues, and confirmed that every aspect of the 810 was failing. Although CW 3 noted that it was not necessarily unusual to see such issues at first silicon, CW 3 confirmed that Qualcomm was unable to resolve the issues identified in March 2014 by the Product Test Group (including overheating in the CPU) for more than nine months, according to the documents reviewed by CW 3 during the December 2014 CSRR processes. *See* ¶ 62, *supra*. CW 3 also reported that in his 22 years at Qualcomm, "I have not seen any other chip set get this much attention."

**G. Despite Design Shortcuts and Initial Tests Showing the 810 Was Failing, Qualcomm Falsely Touted Snapdragon 810's Current Performance and Functionality**

80. Notwithstanding the problems identified in Qualcomm's March 2014 testing of the Snapdragon 810, on April 7, 2014, Qualcomm publicly introduced the 810 to the public, heralding it as the Company's "highest performing platform to date, completing [its] lineup of 64-bit enabled, LTE-equipped chipsets for premium computing mobile devices," and noted that the 810 "enable[s] an exceptional overall user experience with seamless connectivity and *industry-leading power efficiency* for flagship smartphones and tablets." Qualcomm also described the 810 as "tightly integrated and optimized for exceptionally low power consumption that does not sacrifice performance" despite the fact that the Company rashly accelerated the development timeline, deviated from its standard methodology, and knew by no later than March 2014 that every aspect of the 810 was failing and that the chip was not currently performing as represented. Indeed, as set forth in greater detail below, the

problems with the 810, including the thermal issues, continued throughout the Class Period.

81. The investment and financial media latched onto and repeated Defendants' statements. For example, on April 7, 2014, Bloomberg published an article "Qualcomm to Debut New Mobile Chips Setting Higher Bar for Rivals," which highlighted the 810's performance. Bloomberg also highlighted that the 810 was the biggest update to the Company's high-tier Snapdragon processors, meant to maintain Qualcomm's position as the market's primary supplier of high-end processors for high-tier mobile devices, "where its chips dominate."

82. Likewise, on April 9, 2014, Motley Fool published an article which reiterated the importance of Qualcomm's continued dominance of the mid- to high-tier smartphone market. It explained that "Qualcomm's launch of new high-end 64-bit chips is likely to secure its future dominance," and noted that the 810 was part of the Company's ongoing effort to remain well-ahead of competitors, and that this latest development would allow Qualcomm to "tighten its existing stranglehold" on the global market.

**H. Defendants Were Aware of the Unprecedented Overheating Problems that Continued to Plague the Snapdragon 810 Throughout the Class Period**

83. CW 2 began working on the Snapdragon 810 project, or as it was internally known, Code 8094, in May 2014 as a Senior Staff Engineer on a team responsible for one of the 810's software sub-systems. Each of these software sub-systems generated a daily report. Along with Qualcomm management, CW 2 also received several so-called root cause analysis reports that discussed the 810's thermal issues. Likewise CW 2 received over 1,000 emails daily, many of which discussed thermal issues with the 810. In fact, CW 2 recalls that reports addressing the Snapdragon 810's thermal issues were generated on a daily basis.

84. Additionally, each engineer responsible for a software sub-system for the Snapdragon 810, including CW 2, participated in daily "Target Scrum" meetings between at least during May 2014 until November 2015. These meetings, which were attended by Pal (a Snapdragon 810 Project Engineer), focused on issues the engineers were experiencing with the Snapdragon 810 including, specifically, thermal issues. In addition to the daily Target Scrum meetings, CW 2 attended weekly status meetings during which reports regarding the 810 were presented the status of the project was discussed, including the plans for the 810 for the following week.

85. During the same time period, CW 2 also was aware that Pal regularly gave Defendant Renduchintala Snapdragon 810 project updates during weekly Principals Meetings. CW 2 participated in some of these meetings, including telephonically after being told to dial-in by Pal. One of CW 2's professional colleagues, a Qualcomm Technical Account Manager, would advise CW 2 about issues discussed at those meetings CW 2 did not personally attend. According to CW 2, slides were presented at these meetings to show Defendant Renduchintala, among others, what issues the Snapdragon 810 was facing.

86. CW 2 stated that by no later than June 2014 he was personally aware that the Snapdragon 810 was experiencing more severe than normal thermal issues. CW 2 also stated that based on his understanding, Defendant Renduchintala was fully aware of the thermal issues with the 810 by no later than June 2014 because (i) Pal provided him with information regarding the 810 project, including reports that demonstrated that there were thermal issues with the 810, and (ii) Defendant Renduchintala was responsible for allocating additional resources to try to address these issues. Specifically, CW 2 confirmed that Defendant Renduchintala personally called for more engineers and financial resources during the summer of 2014 to address the 810's thermal issues.

### I. Even After Limited Commercial Release, Qualcomm Identified Abnormal Overheating Issues When Testing 810 Samples

87. By July 2014, CW 3 reported that "everyone was in a panic" regarding the large number of issues with the 810. As a result, CW 3 confirmed that the 810 received far greater resources—*e.g.*, more people, more hardware, more lab space—than the Company usually provided and involved a lot of people running around. CW 3 further stated that with respect to the abnormal thermal problems with the 810, they were "throwing everything at it" but that the problems would not go away.

88. Significantly, CW 3 confirmed that the amount and frequency of software builds, *e.g.*, versions of the software used for the SoC, being tested was more than 10 times greater for the 810 than any prior chipset. Specifically, CW 3 confirmed that while Qualcomm typically tested three software builds per week (or approximately one build every two days), but with the 810, the Company tested five to six software builds a day, including on weekends.

89. CW 3 also stated that Pal, who had access to his weekly snapshot email of 810 testing updates, was providing this information to Defendant Renduchintala by no later than July 2014.

90. In August 2014, Qualcomm sent Samsung and the other OEMs who intended to use the 810 in their flagship devices, samples of the SoC to test in their prototypes. CW 2 stated that there were rumors circulating among the OEMs, including LG, regarding the thermal issues with the Snapdragon 810 in August 2014. CW 2 also reviewed OEM customer testing reports, which documented overheating issues with the 810.

91. According to CW 2, the Company conducted a number of additional tests to determine if the thermal issues were caused by the 810 or the OEMs' prototype mobile devices. CW 2 confirmed that in almost every instance, Qualcomm confirmed that the thermal issues were not caused by the OEMs'

mobile device designs. The only common thread among these observed overheating problems was the Snapdragon 810.

92. CW 2 further stated that the OEMs themselves also discovered that the thermal issues were not caused by their mobile device prototypes after analyzing the 810 in a "Mobile Test Protocol" device or MTP. According to CW 3, MTPs are test devices developed by Qualcomm (and per CW 2 the OEMs) that are two to three times the size of a typical mobile device and are used to tests chipsets in more real-world settings. Due to their sheer size, MTPs are better at dissipating heat than a typical real-world mobile device, so they did not accurately reflect how the chip would actually perform on a smaller, real-world device. Despite using larger devices, however, Qualcomm's and the OEMs' MTPs still exhibited overheating issues when testing the Snapdragon 810. This was a stark red flag indicating to Defendants that the Snapdragon 810's thermal problems would be even worse on a normal-sized phone.

93. CW 1 confirmed that there were a lot of internal discussions at Qualcomm in September/October 2014 about thermal issues with the Snapdragon 810, including during lunch meetings with other engineers. CW 1 further stated that Company insiders were discussing these issues in 3Q14.

94. According to CW 2, between September 2014 and November 2014, Defendant Renduchintala specifically raised questions regarding the 810's abnormal thermal issues (questions demonstrating Renduchintala's substantive knowledge of the thermal issues and their extensive history), prompting Pal to schedule ad hoc conference calls (sometimes on the weekends) in which Pal, CW 2, and sometimes Defendant Renduchintala himself participated. CW 2 specifically recalled one such meeting in September 2014 wherein Pal referred to the 810 as a "piece of crap." CW 2 recalled another call in November 2014 wherein Defendant Renduchintala asked, "What is the root cause of the thermal

issues?" For *ad hoc* conference calls in which Defendant Renduchintala did not directly participate, CW 2 understood that the information provided by CW 2 and the other participants to Pal was provided by Pal to Defendant Renduchintala.

95. Moreover, based on information provided to CW 3 by the Senior Director of the Product Test Group during weekly Product Test Group meetings, CW 3 reported that, during the November/December 2014 timeframe, Defendant Renduchintala received daily written reports, the "bulk" of which discussed the 810's abnormal thermal issues—which still were not resolved—and the efforts being taken to correct them, and Renduchintala at least in December 2014, attended daily Snapdragon scrum meetings where the 810's thermal issues were discussed. According to CW 3, the 810's thermal issues instigated the daily reports. CW 3 also reported that in December 2014, he was asked by his superior to retrieve Product Test Group reports on the 810 going back to March 2014 for Pal's review. Those reports documented the performance problems with the 810, including thermal issues.

**J.      Samsung Told Defendants in October 2014 That it Would Not Use the Snapdragon 810 in the Galaxy S6**

96. CW 2 noted that in August 2014, there were rumors circulating within Qualcomm that Samsung was aware of the Snapdragon 810's thermal issues and would use its own chip instead of Snapdragon 810 chips from Qualcomm. CW 1 reported that colleagues and co-workers were stating that Samsung was dropping the Snapdragon 810 because of these overheating issues in Q314. During this period, CW 2 met with his counterpart at Samsung, with whom he had a cordial relationship, to discuss the rollout of the Snapdragon 810. In October 2014, during one of those weekly meetings, CW 2's counterpart at Samsung confirmed the rumor that Samsung planned to abandon the 810 because of the thermal issues.

97. Within one to two weeks of that meeting, CW 2 attended a meeting with Defendant Renduchintala and other engineers. During the meeting CW 2 asked Defendant Renduchintala if it was true that Samsung was abandoning the 810. Defendant Renduchintala replied that it was true and that all teams should stop working on the Samsung Snapdragon 810 commercial launch. At the same time, CW 1 also noted discussions among colleagues—other Qualcomm engineers—during lunch meetings indicating that Samsung was dropping the Snapdragon 810 from its plans because of the overheating issues.

98. Despite knowing that Samsung, the OEM with the largest global smartphone market share, had dropped the Snapdragon 810 for its Galaxy S6, Samsung's highly anticipated flagship device, during the Company's November 19, 2014 Analyst Day, Defendant Amon falsely told investors:

> *Snapdragon processors continue to set the design point for the premium tier has been a number of flagship devices across many of the OEMs. I won't list them all, but I think it's very clear that we'll be able to maintain our leadership position in the premium tier.*

**K. Qualcomm Pushed Snapdragon 810 to Commercial Launch in Spite of Known Thermal Issues that Negatively Affected the Chip's Performance**

**1. Qualcomm Falsely Denied Rumors of Overheating in the 810 in December 2014**

99. On December 4, 2014, *Business Korea* published an article titled, "Unexpected Hurdle: Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG," which reported that it was "unclear whether . . . the supply of the Snapdragon 810 will exist in the first half of next year due to technical problems such as overheating and a decline in speed." Specifically, the article quoted an "industry source" who stated two days earlier: "Qualcomm is faced with hard-to-solve problems. The Snapdragon 810 overheats when it reaches a specific voltage" and that for that reason, among others, "it is unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6

[and] the G4. . . ."  According to the article, while "Samsung is likely to solve the problem by featuring its own Exynos chips in the Galaxy S6,[ ]LG seems to be in trouble" because "it won't be easy for LG to find an alternative chip for the G4;" given it's "focus on premium smartphones" LG "badly need[s] the Snapdragon 810."

100.  In response, Defendants falsely denied these rumors to several media outlets, including *TechRadar*, *Tom's Hardware*, and *Gadgets 360* and confirmed that "everything with the Snapdragon 810 remains on track" for commercial launch in 1Q15.  These denials continued into early January 2015 when Defendant Aberle confirmed that Qualcomm was "on track with the 810" during his January 5, 2015 presentation at the Company's press conference at the Consumer Electronics Show ("CES") in Las Vegas.  Two days later, *Tom's Hardware* updated an earlier article to note, "[w]e had an opportunity to speak with Tim Leland [Qualcomm's VP of Product Management] . . . about these rumors regarding Snapdragon 810's performance.  According to him, . . . ***there aren't any significant technical issues that will cause a delay***."

### 2. Defendants' Launch Snapdragon 810 Commercially Despite Known Design Flaws and Overheating Problems

101.  After all of the 810's software components had been installed (known as "Feature Complete" or "FC") and the product testing was complete, the Company conducted one or more CSRR meetings ("CSRR"), which were attended by representatives of the various groups, including the Product Test Group.  During this meeting, which typically took place three to six months prior to commercial launch (comporting with typical industry timing protocols), the various representatives would discuss whether the unit was ready to ship to OEMs, making either a "go" or "no go" decision.  Crashes Per Thousand Hours and Mean Time Between Failures were among the key testing metrics discussed at the CSRR to assess readiness to ship.  Several CSRRs for the Snapdragon 810

took place in November and December 2014, just prior to the approval for commercial production, and showed abnormally high Crashes Per Thousand Hours and abnormally low Mean Time Between failures. Significantly, Defendants' made the final decision to go ahead with commercial production by December 2014, knowing that the chip had severe overheating problems that rendered impotent the performance the Company promised from its purportedly cutting-edge design.

102. LG launched the first smartphone incorporating the Snapdragon 810—the G Flex 2—at CES on January 5, 2015. According to CW 2, Qualcomm pressured LG to launch the G Flex 2 in January 2015. Qualcomm did so, CW 2 reported, despite knowledge of abnormal thermal issues with the 810. CW 2, who supported LG for the release, explained that Qualcomm still had not resolved the overheating problems with the 810 in January 2015, even up to a few days prior to the product's commercial launch. Neither Qualcomm nor LG originally intended to launch the G Flex 2 this early.

103. These thermal issues in the G Flex 2 caused LG's 2Q15 earnings to drop by 60%. In fact, the Android Authority article "Flashbacks and Forecasts: LG in 2016," published on January 22, 2016, noted in its post-hoc analysis that LG's 2Q15 "earnings slump[ed] by 60% YoY, making Q2, 2015 LG's lowest quarterly profit in a year and a half." The article further noted that 2Q15 "was the quarter in which the Snapdragon 810 and G Flex 2's poor [market] reception were felt most acutely[,]" and LG even "slip[ped] out of the global top five smartphone vendors . . . ." Significantly, LG only recognized $172,000 in profit in its mobile device division in 2Q15, and it had a "staggering loss" of $68 million in 3Q15.

**3.      Investors Finally Learned That Samsung Was Not Using the 810 in the Galaxy S6**

104. On January 20, 2015, *Bloomberg* posted an article titled, "Samsung Said to Drop Qualcomm Chip From Next Galaxy S," reporting that Samsung

"will use its own microprocessors in the next version of the Galaxy S smartphone" because the Snapdragon 810 "overheated during the Korean company's testing," based on statements from "people with direct knowledge of the matter." Both Qualcomm and Samsung refused to comment on the *Bloomberg* article.

105. Less than ten days later, on January 28, 2015, the Company released its results for 1Q15 and shocked investors by announcing that they expected a "large customer" not to use the Snapdragon 810 in its "flagship device." Analysts immediately saw through Qualcomm's half-hearted attempt to disguise the identity of the large OEM. As the Company later confirmed in May 2015, the "large customer" was Samsung and the "flagship device," was the Galaxy S6.

106. Defendants were quick to dispel any indication that Samsung had dropped the 810 because the SoC had thermal issues. For example, during a subsequent earnings conference call, Defendant Mollenkopf falsely asserteed that the 810 "is working the way that we expected [it] to work"; while Defendant Aberle added that the issue was "isolated really to one account and one portion of their portfolio." In a follow up statement to the media, Defendant Amon was far more unequivocal, telling CNET on January 31, 2015, "***Categorically, we don't see any problem with the chip.***" Despite Defendants' best efforts to contain the damage that resulted from losing the Galaxy S6, the price of the Company's common stock dropped by 10.58% in a single day on extremely heavy volume.

**4. Defendants Blatantly Misled Investors by Aggressively Denying Overheating Issues and Continuing to Tout the 810**

107. Given the significant stock price decline following the loss of Samsung, Defendants began issuing coordinated statements, the intended effect of which was to falsely convince the industry, analysts, and investors alike that the 810 was not plagued by overheating issues. For example, on February 2, 2015,

Qualcomm issued a press release titled, "Qualcomm Snapdragon 810 Processor Powers Premium Tier Mobile Experiences of 2015," which included not only laudatory (and false) statements by Defendant Renduchintala confirming that the 810 "didn't compromise on performance, connectivity and entertainment," but also direct quotations from key OEMs confirming that they intended to use the 810 in upcoming products. Significantly, neither of the OEMs that had the option of utilizing its own SoC for its upcoming devices—Samsung and Huawei—chose to speak out in support of the 810. The false and misleading press release had the intended effect; on February 2, 2015, the price of Qualcomm's common stock rose by 5%.

108. Qualcomm also posted an article on its website titled, "Snapdragon 810 processor: *cooler than ever*," which purported to describe a "test" the Company had conducted to debunk the persistent rumors that the 810 had overheating problems. In the article, Qualcomm proclaimed that the 810 was "*engineered to use less power and remain cooler*." As described in the press release, the "test" looked at whether functional blocks *other than* the CPU *(e.g.*, the GPU and the video processor) exhibited abnormal thermal results. The Company did not provide the results of its test of the CPU functional block; if it had, it likely would not have been able to falsely proclaim the 810 as "cooler than ever."

**5.     More Devices Overheated, Causing OEMs to Suffer Losses**

109. On March 2, 2015, HTC unveiled the second flagship device to incorporate the Snapdragon 810, the M9, at the Mobile World Congress. Similar to LG's G Flex 2 smartphone, the M9 was widely reported to have overheating problems that caused subsequent performance problems—problems which the Company had vigorously (and falsely) denied. Further, users of the M9 also

demonstrated through the use of benchmarks that the phones were performing objectively poorly because of overheating and throttling.

110.   Additionally, there were reports of problems with Xiaomi's flagship, the Mi Note Pro, shortly after those devices were made available to consumers. Like LG and HTC, Xiaomi paid a price for using the 810 in its premium-tier product.  Six months after the end of the class period, on January 16, 2016, the *Wall Street* Journal reported that "[t]he lack of its own high-end chip technology also proved to be a competitive disadvantage for Xiaomi last year" when reports of the 810's overheating problems "dampened sales of Xiaomi's most expensive handset yet, the 2,299 yuan ($349) Mi Note," analysts said.

111.   Sony's flagship devices—the Xperia Z3+ and Z4—likewise performed poorly due to the 810, causing Sony to suffer losses in its flagship devices.  According to a July 30, 2015 article by Android Police, "the mobile division responsible for Xperia-branded phones and tablets saw its worst sales numbers in three years."  The article added that sales for Sony's 1Q15 "fell 16%" and Sony only "moved 7.2 million Xperia devices in the quarter, a 23% drop from [that] time last year."   In a February 6, 2016 retrospective, Android Authority explicitly blamed the Snapdragon 810 calling it "the bane of many flagship phones in 2015 . . . , affecting the LG G Flex 2, Xperia Z3+ and HTC One M9 in the first few months of the year."

112.   Ultimately, despite all the rumors and reported problems, Defendants continued to vehemently deny the overheating issues with the 810.

### 6.   Frustrated by Repeated Questions Regarding the 810's Thermal Issues, Defendants Again Denounce "False Rumors" as "Rubbish"

113.   On April 28, 2015, LG announced that its next flagship device, the G4, would use the Snapdragon 808, a chip that was actually designed to be *less* powerful than the 810, according to Company specifications.  Originally, as

confirmed by CW 2, LG had agreed to use the Snapdragon 810 in the G Flex 2 and the G4 but after the G Flex 2 had experienced overheating problems due to the 810, LG made the decision to go with the Snapdragon 808 instead. Indeed, it made no sense for LG to utilize an inferior processor for one of its flagship devices. As it had with other rumors regarding the 810's overheating problems, Qualcomm quickly denied that LG had recently shunned the 810 for the 808 in the G4, stating, "[t]he decisions on which chipset to put on which handset come from over a year ago."

114. At around the same time, media outlets, including *ars technica*, began releasing the results of recent benchmark tests they had run, comparing the 810's performance and heat generation to results other SoCs. These tests revealed that after running for a very short period—*e.g.*, 30 seconds—the auto-shutdown feature for the four largest cores (the A57s) kicked in, severely throttling the performance and speed of the device. As explained herein, this "throttling" was the result of the 810 CPU overheating.

115. In response to the benchmark tests results and LG's decision to utilize the 808 for the G4, Defendant McDonough gave an interview to *Forbes* magazine on May 6, 2015. During the interview, McDonough called the rumors surrounding the 810 "rubbish" and "false," stating, unequivocally that "there was not an overheating problem with the[] 810 in commercial devices." Approximately six weeks later, McDonough gave another interview, this time to *ExtremeTech*, wherein he stated, "The Snapdragon 810 processor is performing as expected and *we have not observed any abnormal thermal issues*."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

116. As set forth in ¶¶ 80-82, *supra*, the Snapdragon 810 was Qualcomm's marquee product during the Class Period and analyst and investors viewed it as the Company's most important and profitable chipset. Because

Qualcomm generated the majority of its revenues from the sale of chipsets, including the Snapdragon series, and had obtained the highest profits from its premier 800 series Snapdragon chipsets, the perceived success of Snapdragon 810 was highly material to investors and crucial to Qualcomm's overall growth. Defendants intended the Snapdragon 810 for use in all of the top-of-the-line premier smartphones for some of the largest OEMs in the world, including Samsung, LG, HTC, and Xiaomi. The Snapdragon 810 also was intended to "epitomize[] [Qualcomm's] premium tier leadership" for 64-bit, 4G/LTE chipsets. While most of Qualcomm's competitors were only launching their *first* generation 4G/LTE chipsets in 1Q14, Qualcomm's launch of Snapdragon 810 in April 2014 represented its *fifth* generation 4G/LTE chipset, creating a significant competitive advantage that was closely watched by investors. As a result, Defendants' representations set forth below in ¶¶ 117, 119, 123-125, 131-135, 139-142, 161-162, and 168-174, repeatedly touting the design, power, efficiency, viability and overall success of the Snapdragon 810 processor and denying that the Snapdragon 810 had any abnormal thermal issues or overheating problems were highly material to investors.

### A. The April 2014 Misleading Statements and Omissions

117. On April 7, 2014, Qualcomm announced the Snapdragon 810 in a press release titled, "Qualcomm Announces 'The Ultimate Connected Computing' Next-Generation Snapdragon 810 and 808 Processors." In the press release, Qualcomm stated:

> The Snapdragon 810 and 808 processors are Qualcomm Technologies highest performing platform to date, completing Qualcomm Technologies' lineup of 64-bit enabled, LTE-equipped chipsets for premium mobile computing devices. ***The Snapdragon 810 and 808 processors enable an exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets***.

\* \* \*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 15-CV-2678-MMA (WVG)

44

> The Snapdragon 810 processor, as Qualcomm Technologies' **highest performing Snapdragon platform to date**,

118. The statements set forth above in ¶ 117 were materially false and misleading or omitted to state material information when made. Rather than enabling an "exceptional overall user experience with seamless connectivity and industry-leading power efficiency for flagship smartphones and tablets," or being Qualcomm's "highest performing Snapdragon platform to date," as set forth in ¶¶ 75-82, *supra*, Defendants knew or were deliberately reckless in not knowing that initial testing of the Snapdragon 810 demonstrated that every aspect of the chip was failing as a result of the existence of myriad issues, including overheating. Thus, Defendants' representations regarding the *current* performance and *actual* capabilities of the chip were materially misleading and created a false impression of the true state of readiness of the Snapdragon 810. Additionally, these statements were materially false and misleading because they omitted the material fact that Defendants knew or were deliberately reckless in not knowing that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek, and placed serious doubt on Qualcomm's ability to maintain its dominant market position with flagship mobile devices.

**B.    The August 2014 Misleading Statements and Omissions**

119. On August 26, 2014, Qualcomm published an article on its corporate website titled, "How ARM architecture and Snapdragon processors are supporting the 64-bit future of mobile." In the article, Qualcomm stated:

> The thing is, a mobile processor is so much more than a CPU, ***Snapdragon processors integrate the essential technologies to enable great mobile experiences***; technologies like an LTE-advanced modem, GPU, DSP, and a lot more. It's a comprehensive package, an entire system right there on a chip. That way our processors can choose the right engine for the right job. We call it heterogeneous computing, and it is designed to make for better performance and more efficient

battery usage. . . . Snapdragon processors with integrated 64-bit ARM CPUs, when combined with the benefits of the ARM ecosystem and the many other custom technology blocks, *will completely change the next generation of user experience. For the best.*

120. The statements set forth above in ¶ 119 were materially false and misleading or omitted to state material information when made. Rather than enabling an "great mobile experience," and "better performance and more efficient battery usage," as set forth above in ¶¶ 83-89, *supra*, Defendants knew or were deliberately reckless in not knowing that the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810.

121. Moreover, the "next generation of user experience" was not changing "for the best" but in fact, was in serious jeopardy because of the abnormal and severe overheating issues that Qualcomm's next generation chip was currently facing. These statements were materially false and misleading because they omitted the material fact that Defendants knew or were deliberately reckless in not knowing that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek, and placed serious doubt on Qualcomm's ability to maintain its dominant market position with flagship mobile devices.

**C.    The November and December 2014 Misleading Statements Regarding the 810's Capabilities and Omissions Regarding Its Overheating Problems**

122. On November 5, 2014, Qualcomm filed its financial results for fiscal year 2014 on Form 10-K with the SEC (the "FY14 Form 10-K"), which was signed by Defendants Mollenkopf and Davis.

123. With respect to the Snapdragon 810, the FY14 Form 10-K stated:

Each Snapdragon processor is a highly integrated, mobile optimized system on a chip incorporating our advanced technologies, including a high performance central processing

unit (CPU), digital signal processor (DSP), graphics processing unit (GPU) and modem, multimedia subsystems, including high fidelity audio, high-definition video and advanced imaging capabilities, a hardware-based security suite and highly accurate location positioning engines. ***Our CPU cores are designed to deliver high levels of compute performance at low power, allowing manufacturers to design slim and powerful devices with longer battery life between charges. . . . The heterogeneous compute architecture of our Snapdragon processors is designed to ensure that the CPU, DSP and GPU work efficiently together, each being powered up and utilized only when needed, which enhances the processing capacity, speed and efficiency of our Snapdragon processors and the battery life of devices using our processors.***

124. On November 19, 2014, Qualcomm held its 2014 Analyst Meeting in New York. During the meeting, Defendant Amon provided the following update concerning the Company's Snapdragon products:

Snapdragon traction, I think we talk about that every year and it's a very important metric for us. I think the start with the premium tier. ***Snapdragon processors continue to set the design point for the premium tier has been a number of flagship devices across many of the OEMs. I won't list them all, but I think it's very clear that we'll be able to maintain our leadership position in the premium tier.*** And a metric in this slide, which I think important to highlight is how we feel about the pipeline. So we have over 1,000 devices announced or commercially available in fiscal year 2014, but the pipeline of designs in development of the Snapdragon platform is over 800 models. And I think that traction on Snapdragon processor has basically continued to enable us to develop into our business model and I would talk about that at the end of my presentation.

125. Defendant Renduchintala also stated:

But what does 4K mean really technically? Well, the Snapdragon 810 that we announced a few months ago handles 4K content natively. Now, we're not up sampling 1080p here, we're actually dealing with native 4K content. And what that means is that when you're dealing with 4K native content, you're having to handle over 7 times more data than in a 1080p capable handset. And the architecture that supports the user experiences must be able to move multi-gigabytes of data around the system flawlessly and every element in that system design risks becoming a bottleneck to delivering those mind-blowing experiences. So what is required beyond just superlative IP is the system expertise to integrate all of the IP in a form that unleashes the inherent capability of all those course and really drives 4K towards an elevated user experience.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 15-CV-2678-MMA (WVG)

47

Now, we've worked very hard at Qualcomm to create all that expertise that underpins the ability to deliver and manipulate 4K data natively, and we've architected all of our premium to APs with 4K native content in mind. And Snapdragon 810 epitomizes our premium tier leadership, we believe. It delivers best-in-class LTE, it delivers a complete UltraHD experience, it provides leading camera capability, and it provides immersive and mind-blowing gaming experiences.

126. Analysts at Canaccord subsequently highlighted the importance of these statements in a December 3, 2014 report to investors titled, "Anticipate 20% Handset RF TAM CAGR from 2014-2016 Due to Ramping LTE Growth and 2G to 3G Migration; Avago, Skyworks, Qorvo And Qualcomm Should Benefit":

During Qualcomm's analyst day on November 19, we were impressed by the QCT presentations from Cristiano Amon and Murthy Reduchintala regarding Qualcomm's competitive position in the market and its leadership position in fully integrated application processor and modem technologies through its multi-mode LTE-Advanced/LTE/HSPA+/EV-DO solutions. Based on continued Snapdragon and thin modem momentum in F2015 [among other things] . . . we anticipate healthy QCT sales growth during the next several years. Given Qualcomm's new high-tier thin modem introduction on November 19, with subsequent next-gen Snapdragon SoCs leveraging this leading baseband architecture expected to follow soon, we anticipate these higher-ASP and likely better margin chipsets will ship in volume into next-gen leading global smartphone programs at Samsung and at other leading smartphone OEMs in 1H/F'15 time frame.

127. On December 2, 2014, Qualcomm posted an article on its corporate website and Snapdragon blog titled, "Get to know the Snapdragon 810 processor." A link to this entry also is one of two Snapdragon entries featured prominently on the Company's current product webpage for the Snapdragon 810. According to the article:

***Many of the flagship smartphones released next year are expected to be built around Qualcomm® Snapdragon™ 810 processors*** which means they'll include a variety of features designed to give you the most cutting-edge experience possible. We're proud to be a part of the technology that makes it easier to stay productive while putting entertainment in the palm of your hand. Most importantly, it's technology that helps you connect with people and enhances your everyday life.

> The Snapdragon 810 is the ultimate connected mobile computing processor with 64-bit computing, designed to support the most advanced mobile user experiences. 64 bit capable processing helps prepare you and your device for the upcoming wave of cutting-edge applications and new computing environments, designed to reinvent the way you multitask and keep up with the latest trends in smartphone computing. We've put together a list of a few of the features that really show off the power of the Snapdragon 810. . . .

128. The statements set forth above in ¶¶ 123-125 and 127 were materially false and misleading or omitted to state material information when made. Far from providing "better performance and more efficient battery usage," and enhanced "processing capacity, speed and efficiency," as explained in detail in ¶¶ 83-94, *supra*, Defendants knew or were deliberately reckless in not knowing that the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device incorporating and relying on the 810 chipset.

129. Likewise, Defendants' assertions that the Snapdragon 810 would allow Qualcomm "to maintain [its] leadership position in the premium tier" and "epitomizes [the Company's] premium tier leadership," and that "[m]any of the flagship smartphones released next year are expected to be built around" the Snapdragon 810 were also materially false and misleading because, for the reasons set forth in ¶¶ 96-98, *supra*, Defendants knew or were deliberately reckless in not knowing that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's abnormal thermal issues. The (then undisclosed) loss of such the premier smartphone from one of the two largest smartphone OEMs in the world, who itself was capable of eschewing Qualcomm's premium tier chipsets for its own, internally fabricated components, was a huge blow to the Company's "leadership position in the premium tier." Additionally, these statements were materially false and misleading because they omitted the material fact that Defendants knew or were deliberately reckless in

not knowing that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

### D. December 2014 and January 2015 Misleading Statements and Omissions Ignore and Misleadingly Deny Rumors of Overheating

130. On December 4, 2014, *Business Korea* published an article titled, "Unexpected Hurdle:  Problems in Qualcomm Snapdragon Set Alarm Bells Ringing for Samsung, LG" reported that according to an internal source "[t]he Snapdragon overheats when it reaches a specific voltage" and for that reason, among others, it was "unclear if the Snapdragon 810 will be used in premium smartphones like the Galaxy S6, the G4, and the Xperia Z4."

131. Thereafter, on December 8, 2014, TechRadar published a statement from Qualcomm in a update to a December 6, 2014 article titled, "Galaxy S6 and LG G4 facing delays thanks to Snapdragon 810 defects?," debunking reports of overheating problems with the Snapdragon 810 first published by *Business Korea*:  "We won't comment on any of the rumor or speculation you referenced but I can tell you that *everything with Snapdragon 810 remains on track* and we expect commercial devices to be available in 1H 2015."

132. On the same day, Gadgets 360 also posted an article on December 8, 2014, titled "Qualcomm Rubbish Rumours of Snapdragon 810 Delays and Issues," which included similar representations from Qualcomm concerning Snapdragon 810 :

> Following last week's report that Qualcomm is facing several issues with its Snapdragon 810 chipset that might cause a delay in its rollout, Jon Carvill, Senior Director of Public Relations at Qualcomm, finally cleared the air by *stating that everyone is on track*.

> Carvill refused to give his take on the several speculations, but said that, "*I can tell you that everything with Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015.*"

133. Likewise, Tom's Hardware posted an article titled, "Snapdragon 810 May Face Delays, But Qualcomm Denies Rumors Are True," stating, "***Qualcomm has denied that any of these rumors*** [initially identified in the *Business Korea* article] ***are true*** in a short but clear statement to Tom's Hardware: '***Snapdragon 810 remains on track and we expect commercial devices to be available in 1H 2015***.'"

134. Qualcomm officially unveiled the Snapdragon 810 at the Consumer Electronics Show (CES). According to a January 22, 2015 *Wall Street Journal* article, during the Company's CES press conference on January 5, 2015, Defendant Aberle confirmed that the processor had "good traction" with device makers and noted, "***We feel like we are on track with the 810***." Additionally, a live blog of Qualcomm's CES press conference posted on www.anandtech.com noted that at 3:42 PM EST during the Q&A session following Aberle's presentation, "someone is asking about issues with power consumption of Snapdragon 810," to which Aberle responded at 3:43 PM EST: "We try not to comment too much on rumors. ***We're on track with the 810 and LG is planning to launch the G Flex 2 in the near future with 810***."

135. On January 7, 2015, Tom's Hardware updated an earlier article to include a statement from Qualcomm's VP of Product Management, Tim Leland: "We had an opportunity to speak with Tim Leland . . . about these rumors regarding Snapdragon 810's performance. According to him, while there are always engineering challenges to overcome when bringing new technology to market, ***there aren't any significant technical issues that will cause a delay***."

136. On January 10, 2015, Morningstar issued a report titled, "Qualcomm's Chip Market Share Appears Solid Despite CES Announcements From Rivals," noting that "design wins into Apple's iPhones and Samsung's Galaxy S devices will be more important products in terms of gauging

Qualcomm's chip market over time." Thereafter, on January 20, 2015, William Blair issued a report titled, "Multiyear Capital Return Initiatives Make it a Compelling Investment, Despite Headwinds on the Litigation," in which it stated: "We, like the rest of the investment community, are concerned about the potential risks of the ongoing [license model related] litigation; however, we believe there are multiple compensating factors that make Qualcomm a compelling buy" including "stronger leadership position in the chipset front."

137. The statements set forth above in ¶¶ 131-135 were materially false and misleading or omitted to state material information. Far from being "on track" and not subject to "any significant technical issues that will cause a delay," as provided in ¶¶ 83-95, Defendants knew or were deliberately reckless in not knowing that the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device incorporating and relying on the 810 chipset. Likewise, Defendants' assertions that the Snapdragon 810 "would be in commercial devices to be available in 1H 2015" in response to the *Business Korea* article which questioned whether the 810 would be "used in premium smartphones like the Galaxy S6," were materially false and misleading because, for the reasons set forth in ¶¶ 96-98, *supra*. Defendants knew or were deliberately reckless in not knowing that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat.

**E.     The January 28, 2015 False and Misleading Statements and Omissions**

138. On January 28, 2015, Qualcomm announced its financial results for three months ended December 28, 2014 , holding a same-day conference call for analysts the discuss the results (the "1Q15 Conference Call").

139. During the 1Q15 Conference Call, Defendant Mollenkopf provided the following update on the Snapdragon 810:

[O]ur view of the long-term strategic environment and QCT's leadership position remains strong. . . . *our design momentum for the Snapdragon 810 processor remains robust* with more than 60 products in the pipeline, including the recently announced LG G Flex2 and the Xiaomi Mi Pro Note. *Snapdragon 810 is performing well*, and we look forward to a growing number of devices to be launched by our customers throughout the year.

140. Defendant Mollenkopf also stated, "*the 810 is actually doing quite well. Any concerns about the 810 terms of design traction really are probably limited to one OEM versus anything else.*" He further noted, "I want to be clear, too, I think *the 810* we think *is going to be quite strong in terms of design traction*, and it will be in a lot of devices. As I said, it will be over 60 devices."

141. During the 1Q15 Conference Call, Defendant Mollenkopf had the following exchange with Citigroup analyst, Ehud Gelblum ("Gelblum") regarding the Snapdragon 810:

GELBLUM: . . . can we just hit at the heart of the 810 issue? Has obviously been a lot of news in the press about overheating. If we could just kind of hit on – is it your – just want to confirm is it your opinion or thought process that the issues with that flagship device happened on a compatibility issue or incompatibility issue between the 810 and that particular device and that any other device, those issues are not a concern? If you could just give us a little detail on why that might be to let us kind of get a feeling as to maybe there is nothing particularly wrong with the 810 per se, but that it just happened to be a matchup with that one device – that would be helpful. . . .

MOLLENKOPF: . . . *On the 810, I'll be very clear, this device is working the way that we expected to work* and we have design traction that reflects that. If you look at the number of designs, over 60, it has essentially won all the premium designs across multiple ecosystems – in China, Windows Mobile, as well as Android. So *we are quite pleased with how that is performing.*

We – *there is concern, as you mentioned, it's really related to one OEM,* and I don't think you should extend that to imply that something has changed fundamentally between us and that OEM. And of course, that OEM has a number of different models that we feel well-positioned across our entire product tiers. *So I think that's going to be a great product for us.* We are going to follow that, up as I mentioned in my script, with a device that returns to our internally developed CPU with integrated modem and our – going at the latest

nodes. So I don't think we see any change in strategy, and *we are quite pleased with that device*. We just wish we had one more design.

142. Subsequently, Defendant Aberle had the following exchange with Arete Research analyst, Brett Simpson ("Simpson") regarding the Snapdragon 810:

> SIMPSON: Just on QCT, at the high end the situation with the 810 share loss, is this really focused on one launched device with this OEM? Or will it be something that you see impacting other flagship launched devices with this OEM throughout the year? . . . .

> ABERLE: . . . on your first question about the 810 in a particular account, *I would think if it as isolated really to one account and one portion of their portfolio.* I can't really talk about what would happen in the future; it's really a better question for them versus us. Broadly in the industry, I think *we are quite pleased with the design traction*, and we just would love to see them take more share versus some other folks in the – see the premium tier growing more would be great for that product, I think is really the key.

143. The next day, analysts repeated Defendants' representations, including their attempt to downplay Samsung's decision not to use Snapdragon 810 in its premiere Galaxy S6 phone, their denials that the loss was due to overheating issues, and their representations that it was an isolated issue that would not spread to other customers. Deutsche Bank, for instance, reported that "[t]he loss of a socket at Samsung was a clear negative for their SOC; however we do not believe it is as bad as feared. Management noted on the call that the loss was likely not due to the 810 overheating, but rather the lack of differentiation with their application processor. Samsung has a substitute (e.g. Exynos), where other OEMs do not."

144. Similarly, on January 30, 2015, Morningstar noted that "[d]espite the Samsung loss, we still see Qualcomm remaining the clear-cut wireless chip leader for the foreseeable future, and tend to think of the 810 issue as isolated in nature." The next day, Morningstar added: "[r]eports suggest that Qualcomm's

Snapdragon 810 chip was overheating, causing Qualcomm to make the switch, but we think the jury is still out on the root cause of Samsung's switch.  Other OEMs are adopting the 810 in their flagship phones, while Samsung has incentive to switch to internal processors for potential cost savings.  We don't anticipate Qualcomm losing many more key customers or having production quality issues in future chipsets…."

145.   The statements set forth above in ¶¶ 139-142 were materially false and misleading or omitted to state material information.  Far from "performing well" or "working the way [Defendants] expected," as explained above in ¶¶ 83-95, Defendants knew or were deliberately reckless in not knowing that the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device relying on the 810 chipset.

146.   Likewise, Defendants' assertions that "any concerns" with the 810 were "limited to" or "related to one OEM" were materially false and misleading because, for the reasons set forth in ¶¶ 96-99, *supra*, Defendants knew or was reckless in not knowing that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat and that other OEMs were concerned about using the 810 chipset in their devices.  Indeed, as set forth above, despite agreeing to the use the 810 in its premium tier devices, LG backtracked as a result of the 810's abnormal thermal issues and utilized the slower, prior generation Snapdragon 808.  Additionally, these statements were materially false and misleading because Defendants knew or were reckless in not knowing that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

**F.    Defendants Falsely and Misleadingly Continue to Blatantly Deny Overheating Problems**

147.    On January 29, 2015, Re/code published an article titled "Qualcomm Exec Denies Any Problems With Snapdragon 810," which  quoted Amon as saying *"We don't see any problem with the 810. . . . I think there is a lot of misinformation out there."*    Re/code stated that Amon "also added that the company isn't making any special versions of the 810, as had been rumored, and that *the existing chip is "performing very well."*

148.    On January 31, 2015, CNET published an article titled, "Qualcomm's Mobile Dominance Shaken Srom Loss Of Flagship Phone," which included the following quote from Amon: *"There's a lot of rumor and misinformation about the 810 . . . . Categorically, we don't see any problem with the chip."*

149.    On February 1, 2015, the *Wall Street Journal* published an article titled, "Samsung's Own Chips Were Factor in Blow to Qualcomm," which included the following statement from Defendant Amon from Friday, January 30, 2015:  "*There is a lot of misinformation out there about what is really happening . . . . We feel very confident about the 810's leadership*."

150.    Seeking to further debunk rumors regarding the Snapdragon 810's abnormal thermal issues, Qualcomm issued a press release on February 2, 2015, which included numerous statements from OEMs and the Company touting the Snapdragon 810.    Titled, "Qualcomm Snapdragon 810 Processor Powers Premium Tier Mobile Experiences of 2015," the press release was intended to, and had the effect of, reassuring analysts and investors that there were no issues with the Snapdragon 810.

151.    The February 2, 2015 press release included quotes from major OEMs, including LG, HTC, Sony, Motorola Mobility (owned by Lenovo), OPPO, and Xiaomi, purportedly praising the Snapdragon 810.    Additionally,

Defendant Renduchintala stated, "*The smartphone experience . . . will be defined by products that don't compromise on performance, connectivity and entertainment, and Snapdragon 810 will be at the heart of enabling these features* . . . . With a growing design pipeline currently in excess of 60 devices, we're excited about the innovation our OEM customers will unlock for consumers who demand superior mobile experiences in 2015."

152. On February 6, 2015, *Forbes* published an article titled, "Samsung On A Possible Collision Course With Qualcomm," which included the following quote from McDonough: "*Snapdragon 810 is progressing as expected* . . . . *We've won 60 designs. It's a pretty sizeable number, it'll power the majority of premium Android and Microsoft phones*."

**G.  Qualcomm Falsely and Misleadingly States that the Snapdragon 810 is "Cooler than Ever"**

153. On February 12, 2015, Qualcomm posted a report on its website and Snapdragon blog authored by Marketing Senior Manager Adam Kerin, titled, "*Snapdragon 810 processor: cooler than ever*" which further attempted to address concerns that the 810 had abnormal thermal issues by comparing an unidentified "pre-commercial smartphone with Snapdragon 810" and "a commercial smartphone with [a previous generation of Snapdragon 800 processors]." To this day, Qualcomm still maintains a link to this report on Qualcomm's product webpage for the Snapdragon 810.[11] The report stated:

> For months we've talked about improved Snapdragon 810 performance, including the new Qualcomm Adreno 430 GPU with 30 percent more performance and 20 percent lower power than previous generation. *But now we get to show you that devices with Snapdragon 810 can also be cooler.* Don't take my word for it, let's take a look at the results.

154. According to Qualcomm, "after about 20 minutes of gaming, the [previous generation of Snapdragon 800 series processor] has hit the thermal

---

[11] https://www.qualcomm.com/products/snapdragon/processors/810

ceiling. At over 30 minutes of gaming, ***the Snapdragon 810 smartphone still has additional headroom.***" Qualcomm added that "[t]he story is the same with 4K video capture. After about 5 minutes of continuous recording, the . . . smartphone [with a previous generation of Snapdragon 800 processor] approaches the skin temperature threshold, ***while the Snapdragon 810 smartphone is well below the limit.***"

155. Based on the results of the Company's tests, Qualcomm stated, "***A cooler smartphone means a better performing smartphone. When a device hits the thermal threshold, it will throttle performance to cool down. If you want the best of both worlds, higher performance with lower power, than you want a Snapdragon 810 powered smartphone***." In the report, Qualcomm also stated:

> Whether you've been using a Qualcomm Snapdragon powered mobile device since our earliest days and thinking about an upgrade, or wondering what all the commotion is about. I'm pleased to tell you that ***one of the best has gotten even better. Not only is the Snapdragon 810 processor designed to deliver more performance and better experiences, but it's also engineered to use less power and remain cooler***.

156. Qualcomm then stated that readers should "***[c]heck out the 'cool' new Snapdragon 810 smartphones*** already announced, like the LG G Flex2 and Xiaomi Mi Note Pro, stay tuned for the upcoming products from Motorola, Sony, HTC, OPPO, and Microsoft."

157. On February 12, 2015, Trusted Reviews also published an article titled "Qualcomm rubbishes Snapdragon 810 Overheating Concerns," which recounted Trusted Reviews' conversations with Tim Leland, Qualcomm's Vice President of Product Management, and Defendant McDonough regarding Snapdragon's overheating issues. According to the article, "Qualcomm has spoken out on the recent spate of Snapdragon 810 rumours, ***stating its latest System on Chip (SoC) offering hasn't suffered from production delays or overheating issues***." The article quoted Defendant McDonough as stating:

The exterior temperature of an 810 device is actually lower than it is for an 800 device—and the 800 was a flagship that everybody shipped . . . . Part of the reason we wanted to show you the thermal data is that *we are not going to spend a lot of our time chasing rumours . . . . Usually rumours are wrong and you never get to the truth, so it is nice for use to be able to start with the truth . . . . If the 800 was the gold standard, we're beating the gold standard and we feel good about that.*"

158.   Adding to McDonough's comments, Leland stated:

If you look at the Snapdragon 800—a very successful processor for Qualcomm—if you look at the target zones while playing Asphalt 8 at 30 frames per second, you can see after 15 to 20 minutes you start getting to the high end of that range of target zone for thermal design.

*However, with the Snapdragon 810, using lessons learned from the 800, we have been able to extend the timeframe before you're in that upper thermal zone while still enjoying 30 fps.*

*With the 810 you can go for more than half an hour.* That's quite a lot of time for something that is generally considered a short-burst gaming experience.

159.   Also on February 12, 2015, Defendant Aberle spoke on behalf of Qualcomm at the Goldman Sachs Technology & Internet Conference.  During his remarks, Defendant Aberle stated:

Without speaking specifically about Samsung, obviously we did talk about in this particular design cycle the 810 not landing one of the flagship designs.  Although on the flipside *we've had a tremendous amount of traction with the part.*

We've got over 60 designs and so really the part is performing exceedingly well.  We're happy with the performance, we're happy with the traction across the OEM base.  It's really isolated to an important but one design in one account.

160.   During his presentation, Defendant Aberle had the following exchange with a Goldman Sachs analyst, Simona Jankowski ("Jankowski"), regarding the Snapdragon 810:

JANKOWSKI:  And I did want to just try to clear up that point specifically about the 810 not getting into the one large marquee design win.  On the call you said that it was performing as expected, but at the same time there have been reports in the supply chain that there were some overheating or power management issues.

Could you just clarify for us, were those issues just popping up specific to that one customer and that one design win just relative to how that particular system design was interacting with the chip's characteristics? Or was that decision just completely unrelated to any potential issues on the chip and just more of a strategic decision by the customer?

ABERLE: Our feeling is *it's probably more the latter*. If you look at – the phones have already launched. The LG phone has launched with the 810 in it already. *So obviously it's performing well*.

You've got to be careful – rumors come through the rumor mill and you've got to be careful at times when people look at – you're bringing up a new part on a new node and they might sample something at a particular point in time isn't reflective of the end performance of the device.

And so, where we are now I think we feel like the part is performing as expected. It's won a tremendous amount of design, so if there was a problem I think you'd be seeing it more broadly outside of that one account.

## H. The March 2, 2015 Misleading Statements and Omissions

161. On March 2, 2015, Defendants Amon and Renduchintala, among others, presented at the GSM Association Mobile World Congress on behalf of Qualcomm. During a related questions and answers period, the following exchange between RBC Capital Markets analyst Mark Sue ("Sue") and Defendants Amon and Renduchintala took place:

SUE: . . . . Gentlemen, every year, like clockwork, we would come to the show and Qualcomm's Snapdragon would be designed in a slew of major flagship releases or smartphones. This year is a little bit different, so going forward do you feel that may be something has structurally changed? How can we regain -- Qualcomm regain its leadership in that [role]?

RENDUCHINTALA: . . . Mark, I would say that *outside of one device this year is going to be like every other year here.* If you walk around the show I think you will see a number of flagships used of major OEMs that use our leading technology. And I think that maybe as a contrast in one particular one won't be showcasing our technology this year.

But I think, if you look at the rest of our traditional partners, you will see a very vibrant network of new products that use our technology. *So I think you will be fairly surprised at how broadly and how pervasively our technology is being used across a number of flagship [trends]*.

\* \* \*

AMON: So just to add to your question on Snapdragon; one thing, just to provide some quantification, if you look at today the Snapdragon 810 we had said publicly that we have a pipeline of 60 different designs.

As Murthy outlined, we have one design loss but it's still with that major OEM. There's a number of Snapdragon designs in their portfolio.

And I also would like to call the attention of a number of high-end OEMs also coming from China, upcoming OEMs that have been going into the premium tier also designing Snapdragon 810. So the number of different designs we have with 810 is over 60.

162. Shortly thereafter, Defendant Renduchintala and BMO Capital Markets analyst, Tim Long ("Long") had the following exchange regarding Snapdragon:

LONG: . . . . just going back to the large customer who chose not to use Snapdragon, could you talk a bit about if they are using other Snapdragon and a lot of modems as well? How do you think about the risk of them making the same decisions, whether it's use their own technology, cofab, whatever?

\* \* \*

RENDUCHINTALA: . . . I think there were very specific circumstances around that OEM's decision about the decisions they made on the Snapdragon 810. *It was really, if you remember, the genesis of the Snapdragon 810 change of plan was triggered by a move to 64-bit.* And given that we didn't want to disturb the trajectory of our own custom CPU development in that domain, which you'll find in the 820 we talked about today, we decided to use a more standard approach to that scenario.

So I think you can regard – we regard the Snapdragon 810 engagement with that OEM as a one-off and *we are confident that the technologies, capabilities, and differentiation, both in the applications processor side and in the modem side, are going to provide very, very compelling value propositions going forward*. So for us, of course, the threat of different silicon solutions being evaluated against Snapdragon will always exist, *but we are pretty confident that we have a portfolio of technologies on both the AP side and on the modem side that will continue to make that portfolio very, very competitive.*

We are very, very clear that our roadmap and the general trajectory and value that will be putting into our Snapdragon

roadmap is in no way, shape, or form impaired from the past. And the Snapdragon 810 really is just a factor of being caught in a very, very rapid change in technology paradigm where we didn't want to sacrifice our long-term roadmap for doing something expedient and short-sighted.

163. Defendant Aberle's statement that "We are getting a lot of traction with the [Snapdragon] 810 processor" was repeated and included in a March 2, 2015 article published by VentureBeat titled, "Qualcomm shows off deep learning for mobile devices and ultrasonic fingerprint scanning."

164. As Qualcomm intended, analysts repeatedly adopted and reiterated Defendants' statements to investors. On March 2, 2015, for example, BMO Capital Markets published a report confirming that "Management believes the [Samsung] loss is a one-off, and noted other wins with Samsung." Several weeks later, in a report dated March 26, 2015, Trefis reiterated Defendants' representations :

Qualcomm is hopeful that it will not be affected much [by the loss of Samsung], as LG Electronics and the Chinese smartphone manufacturer Xiaomi have decided to use its chipsets for their respective devices. Though Qualcomm expects the above factors to impact its QCT . . . revenue growth and operating margins in the near-term product cycle, its view of the long-term strategic environment and QCT's leadership position remains strong. The design momentum for the Snapdragon 810 processor remains robust, with more than 60 products in the pipeline, including the recently announced LG G Flex2 and the Xiaomi Mi Pro Note.

165. Additionally, Trefis affirmed this analysis in an April 20, 2015 report entitled "Qualcomm's Q2 2015 Earning Preview: Increasing Competition to Lower Guidance in 2015," stating "Qualcomm claims to have already addressed many of the initial product challenges . . . and continues to further enhance the performance of this chip. It expects to see a broad range of devices successfully launch and drive volume with this chip in the future. The design momentum for the Snapdragon 810 processor remains robust, with more than 60 products in the pipeline…." Indeed, in a report dated April 20, 2015, Deutsche

Bank repeated Qualcomm's mantra that "the Snapdragon 810 overheating issue was never true…."

166. The statements set forth above in ¶¶ 161-162 were materially false and misleading or omitted to state material information. Far from not "compromising on performance" or "performing exceedingly well" or "progressing as expected," for the reasons stated in ¶¶ 83-95 above, Defendants knew or were reckless in not knowing that the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device relying on the 810 chipset. Additionally, Defendants' characterization of rumors concerning the 810's abnormal thermal problems as "misinformation" materially false and misleading for the same reasons. Likewise, the February 2, 2015 press release, which Defendants issued in order to quell rumors regarding the abnormal thermal problems already identified in the 810 was itself materially false and misleading for these same reasons.

167. Further, Defendants' assertion that Samsung's decision was "just completely unrelated to any potential issues on the chip," that "any concerns" with the 810 were "limited to" or "related to one OEM" were materially false and misleading because, for the reasons set forth in ¶¶ 96-99, *supra*, Defendants knew or were deliberately reckless in not knowing that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat and that other OEMs were concerned about using the 810 chipset in their devices. Indeed, as set forth above, despite agreeing to the use the 810 in its premium tier devices, LG backtracked as a result of the 810's abnormal thermal issues and utilized the slower, prior generation Snapdragon 808. Additionally, these statements were materially false and misleading because Defendants knew or were deliberately reckless in not knowing that the existence of overheating issues

in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

### I. Defendants Continue Issue False and Misleading Statements During and After April 22, 2015 Earnings Announcement

168. On April 22, 2015, Qualcomm announced its financial results for the three months ended March 31, 2015 ("2Q15"). On a related conference call with analysts, Defendant Mollenkopf stated:

> With respect to the roadmap, *we remain confident that our differentiated Snapdragon processor* and modem leadership *positions us well across multiple price tiers and customer segments entering the next product cycle.* In the premium tier, *we are very pleased with the design traction on the Snapdragon 810, with over 60 designs having won the key premium design slots, with the exception of Samsung.*

> Since our last earnings call, LG has begun shipping the innovative G Flex 2; Sony has announced the incredibly thin Xperia Z4 phone and tablet; and Xiaomi has announced the Mi Note 4 with category-nine carrier aggregation. Recent teardowns and press reports correctly highlight the advantages delivered by our integrated approach.

169. On April 28, 2015, Defendant McDonough denied to CNET that LG had changed its decision to use the Snapdragon 810 for its G4 device (in favor of the Snapdragon 808) because of the overheating problems: "*The decisions on which chipsets to put on which handsets come from over a year ago.*" On the same date, an article on ExtremeTech reported that a Qualcomm marketing executive, Michelle Leyden Li, said that the Snapdragon 810 did not have a problem.

170. On May 6, 2015, McDonough gave an interview to *Forbes* regarding the Snapdragon 810. During the interview, McDonough stated as follows:

> *The rumours are rubbish, there was not an overheating problem with the Snapdragon 810 in commercial devices . . . .* If that's true, which we're saying it is, why was there so much rumour? Why was someone *spreading false information about the 810?* Our point of view is that those rumours happened with the LG G Flex 2 and Qualcomm 810 being first to market with the premium-tier application processor. Then somebody decided to put out *some false rumours* about that, which is unfortunate but sometimes that's

how business is done.  That has forced us to spend a lot of time addressing *the false rumours*.

171.   When asked to comment on "the unusual benchmarking results and heat issues" related to HTC One M9 during the interview with *Forbes*, McDonough responded:

> Everything you're saying is fair.  But we all build pre-released products to find bugs and do performance optimization.  So when pre-released hardware doesn't act like commercial hardware, it's just part of the development process.
>
> *I think someone very artfully took that and used it to fuel the rumors and took something that's completely normal and sent it to some less sophisticated news outlets to give them a story.*

172.   On May 27, 2015, Defendant Renduchintala presented at the Cowen Technology, Media & Telecom Conference on behalf of Qualcomm.  During his remarks, he represented the following regarding the Snapdragon 810:

> And I think *the device in the market has performed to our expectations and to the expectations of that of our customers.*  We have won over 60 flagship designs.  Of course, *there is one major one we didn't win and I think that is more to do with the alternatives that were available at that point in time that used technology choices that quite frankly when we made the decision on the 810 we didn't feel were available to us in an economically viable opportunity.*  And I think the competitive dynamic brought to bear showed that, at the end of the day in the alternatives that existed for a certain one OEM, they chose to go a different route.
>
> *But in terms of the performance of the 810, we have been very pleased with the flagship designs that have been launched on that product*, the LG 2Flex, the HTC M19, the Xiaomi Note Pro.  *I think all devices [] show the device performing in stellar fashion.*

173.   During the conference, Defendant Renduchintala had the following exchange with a Cowen & Co. analyst, Tim Arcuri ("Arcuri") regarding the Snapdragon 810:

> ARCURI:  . . . Can we just talk just for one more moment about the 810?  And I think both LG and HTC, they have talked publicly recently and they've said that they are trying to combat the heating issues that they have seen from the chip in their phones with some software.  Sounds like they are doing some thermal throttling and they have been public about this.

But, of course, you don't get the performance when you do that either and if you look at the benchmarks against the phone that is using a captive solution, they are not seeing that issue. So can you talk whether there has been any incremental expenses that you have had to bear because I think many people are sort of looking at how QCT margins have come down and they've gotten a lot lower than people thought they would? If people could be convinced that this is a one-time issue and there were a number of cascading issues that sort of coalesced right now to basically drive QCT margins down to a cyclical low, then I think people could get much more excited about investing in the stock because you're going to see this big snapback. So can you address whether there are any sort of incremental expenses having to support your other customers that did in fact design in 810?

DEFENDANT RENDUCHINTALA: . . .Well, first of all, any processor that has significant capability has the kind of horsepower that the Snapdragon 810 requires software to keep it in thermodynamic balance. That has been true in the past; it is going to be true in the future. And I think what people tend to forget is that *every processor goes through some degree of management of the [crescent] state of its processing assets, throttling if you call it*. And you can see that when you compute synthetic benchmarks.

But what you tend to find is that, in most user-driven experience, that dynamic is so under the surface of visibility, it is almost transparent. It is something that naturally happens and really what we are focused on is delivering a great user experience and the way we manage our system resources to keep thermal in balance while interesting in synthetic benchmarks has very little to do with how it relates to direct user experience.

As it relates to any extra expense, we have shipped commercially the 810 with a fairly sophisticated suite of software *to be able to keep that platform in thermodynamic balance*. And what we have spent is we have spent quite a bit of time with our customers educating them as to how to use that and making sure it was used to the best effect in all products.

So I think what you are seeing now is I think a number of designs on the 810 where the understanding of that software and the way to manage that software has really been able to be used in a manner where it has shown the capability of the processor in its full regale and I think there's been a number of tests both in the gaming and in the video area where people have done the likes of torture testing where we have shown extremely competitive performance compared to 14 FinFET type performance. *So I think at the end of the day the combination of well hardened software together with a well-balanced system architecture I think leads to a great user experience*.

174. On June 30, 2015, McDonough gave an interview to *ExtremeTech* regarding the Snapdragon 810. During the interview, after being asked to respond to incidences of Sony's Xperia Z3+ overheating, McDonough stated, "***The Snapdragon 810 processor is performing as expected and we have not observed any abnormal thermal issues***." McDonough further noted that the Company had not done anything unusual to create V2.1 of the Snapdragon 810.

175. The statements set forth above in ¶¶ 168-174 were materially false and misleading or omitted to state material information. For example, Defendants' characterization of the reports the 810 was exhibiting abnormal thermal problems as "rubbish" or "false," and their repeated assertions that (i) "there was not an overheating problem with the Snapdragon 810," (ii) they had "not observed any abnormal heating issues," and (iii) the 810 was "performing in stellar fashion" and "to our expectations" were materially false and misleading when made because, as explained above in ¶¶ 83-95, Defendants knew or were reckless in not knowing that the Snapdragon 810 suffered from overheating issues, which materially affected the performance, speed, efficiency, and battery life of the Snapdragon 810 and, in turn, any device relying on the 810 chipset. Further, Defendants' assertion that Samsung's decision had "more to do with the alternatives that were available at that point in time" than any issues with the 810 were materially false and misleading because, for the reasons set forth in ¶¶ 96-99, *supra*, Defendants knew or was reckless in not knowing that Samsung had decided not to use the Snapdragon 810 in its Galaxy S6 due to the 810's propensity to overheat and that other OEMs were concerned about using the 810 chipset in their devices. Indeed, as set forth above, despite agreeing to use the 810 in its premium tier devices, LG backtracked as a result of the 810's abnormal thermal issues and utilized the slower, prior generation Snapdragon 808. Additionally, these statements were materially false and misleading because

Defendants knew or were reckless in not knowing that the existence of overheating issues in the Snapdragon 810 made it more likely that Qualcomm would lose its one to two year technological lead time over its competitors, including MediaTek.

## VI. THE RELEVANT TRUTH BEGINS TO EMERGE

176. The relevant truth and foreseeable risks concealed by Defendants misconduct and their false representations and omissions during the Class Period began to be revealed and/or partially materialized after the close of trading on January 20, 2015. On that date, Bloomberg published an article titled "Samsung Said to Drop Qualcomm Chip from Next Galaxy S," which reported on rumors, sourced from people with knowledge of the matter, saying that "Samsung . . . will use its own microprocessors in the next version of the Galaxy S smartphone, dropping its use of a Qualcomm Inc. chip that overheated during the Korean company's testing.". Additionally, Bloomberg noted that according to these rumors, "Samsung . . . tested a new version of Qualcomm's Snapdragon chip, known as the 810, and decided not to use it." Neither Qualcomm nor Samsung confirmed nor denied the reports.

177. In response to this partial disclosure, Qualcomm's common stock fell $0.89 per share, or 1.23% from a close $72.48 per share on January 20, 2015 to a close of $71.59 per share on January 21, 2015 on heavy volume.

178. Analysts attributed the 1.23% decline to Bloomberg's unconfirmed report that Samsung would not use the Snapdragon 810 in the Galaxy S6. Although unconfirmed, analysts nonetheless acknowledged the importance of the reports, noting that the loss of the Samsung's flagship device would be a blow to Qualcomm. Moreover, many analysts considered it unlikely that Samsung would drop the Snapdragon 810 entirely from all Galaxy S6 models, predicting that it would still use the Snapdragon 810 in different versions of the Galaxy S6. Some

analysts suggested that Samsung would use, at least, some Qualcomm components, such as modems, in the Galaxy S6. For example:

- On January 21, 2015, Susquehanna reported that "[o]f course, Samsung will have many different versions of both the GS6 and the Note this year, and *we still expect QCOM's Snapdragon to represent half of this volume . . . . However, based on the share shift expectations . . . , we believe this change will represent an incremental negative $800 mln to QCOM's QCT revenue this year, . . .* since the chips sold to Samsung's high end are among QCOM's most profitable chipsets.

- In a report issued the same day, Morningstar commented on the Bloomberg article stating: "*If accurate, the design loss and overheating problems are a bit of a blow for Qualcomm* but not a devastating one, in our view . . . . [I]t remains possible that the 810 could solve its problems and be included in some models of the S6 that are launched later in the year. . . . *If overheating problems with the 810 continue to loom our concerns around Qualcomm's chip business would understandably rise . . . . We will await Qualcomm's earnings report on Jan. 28 for further insight into these reported overheating problems, as well as potential share loss at Samsung.*"

- Also on January 21, 2015, Cowen and Company commented that: "this press report speculates that Samsung will use Exynos for ALL models—we consider this UNLIKELY . . . . [T]hus, our view remains unchanged— *our best guess is that Samsung will likely launch the Galaxy S6 in Korea with its own Exynos but slightly delay shipments in other regions to accommodate QCOM's delayed schedule . . . .* If the 810 does not end up in ANY Galaxy S6 units over the course of F2015 (as speculated by this most recent article), *QCT would likely need to replace ~30-40MM high-end chip shipments through share gains at other OEMs (roughly ~3-4% of our current 990MM F2015 estimate chip shipments).*"

- On January 22, 2015, Credit Suisse stated that: "*We doubt Samsung [will] entirely shift away from the high-end* given superior integration and modem technology at QCOM. Overall, *we* estimate *the loss at Samsung, offset by more thin modem sales, will cause a revenue headwind of some $1.3bn,* which we believe has been largely anticipated by the company.

179. Despite this partial disclosure of adverse news which removed some of the artificial inflation in Qualcomm's stock price, its stock price remained artificially inflated due to Defendants' continuous affirmative denials of

overheating problems with Snapdragon 810, their misrepresentations and omissions regarding the true reasons for the loss of Samsung, and their repeated false statements regarding the design, performance and success of Snapdragon 810.

180. The relevant truth and foreseeable risks concealed by Defendants misconduct and their false representations and omissions during the Class Period was further revealed and/or partially materialized after the close of trading on January 28, 2015. On that date, Qualcomm issued a press release revealing for the first time that the Company would have to lower "outlook for the second half of fiscal 2015 in our semiconductor business, QCT, *largely driven by* the effects of," among other things, "*[e]xpectations that our Snapdragon 810 processor will not be in the upcoming design cycle of a large customer's flagship device.*" Analysts uniformly confirmed that the "large customer" was Samsung and that the "flagship device" was the upcoming Galaxy S6, facts the Company itself confirmed in March 2016.

181. In response to this partial disclosure, the price of Qualcomm's common stock declined by $7.01 per share, or 10.58% from a close of $70.99 per share on January 28, 2015 to $63.69 per share on January 29, 2015 on heavy volume.

182. Analysts uniformly attributed the 10.58% decline in Qualcomm's stock price on January 29, 2015 to the Company's revelation that Samsung would not utilize the Snapdragon 810 in the Galaxy S6. For example:

- RBC Capital's January 29, 2015 report stated that "missing out on the Samsung S6 means yet another round of estimate cuts for Qualcomm . . . . For Qualcomm, our CY16 EPS declines sharply from $5.85 to $5.25. Price target adjusts to $75."

- On January 29, 2015, Susquehanna's reported that "QCOM now expects that their Snapdragon 810 processor will not be in the upcoming Galaxy S6" and although Susquehanna "had highlighted this issue . . . in

early December . . . the outcome turned out to be even worse than [they] had initially feared."

- On January 29, 2015, Oppenheimer also commented that "a convergence of multiple elements is negatively impacting its FY outlook and will likely weigh on the shares" highlighting that "[h]eadwinds/challenges include a missed design at Samsung . . . ."

- Morningstar "cut Qualcomm's fair value estimate by $5 to $75 per share" on January 30, 2015, noting that "the far bigger news was the firm's dim outlook for the second half of fiscal 2015, as the company confirmed recent reports that its Snapdragon 810 processor has been designed out of Samsung's upcoming Galaxy S6 smartphone" and that "the loss of the full processor is the primary cause for the company slashing its full-year revenue forecast by $0.8 billion and EPS by $0.30."

183. Despite this partial disclosure of adverse news which removed some of the artificial inflation in Qualcomm's stock price, the Company's stock price remained artificially inflated due to Defendants' continuing affirmative denials of overheating problems with the Snapdragon 810, their misrepresentations and omissions regarding the true reasons for the loss of the Samsung Galaxy S6, and their repeated false statements regarding the design, performance and success of Snapdragon 810.

184. The relevant truth and/or foreseeable risks concealed by Defendants' misconduct was further disclosed and/or materialized after the close of trading on July 22, 2015. On that date, Qualcomm issued a press release announcing the Company had *again* reduced its guidance for its "semiconductor business, QCT, in the fiscal fourth quarter compared to our prior expectations *driven primarily* by factors impacting premium-tier demand, including: increased concentration within the premium tier causing reduced demand for certain OEM devices that include our chipset; lower demand for our premium-tier chipsets from a vertical customer [*i.e.*, Samsung]; and lower sell through in China of certain handset models using our premium-tier chipsets." During the conference call, Defendant

Davis had the following exchange with Tavis McCourt, a Raymond James & Associates analyst:

> McCOURT: . . . I was wondering if there's any way you could *quantify the impact of the 810 issues*, whether it's some of your customers choosing to use prior generation chips or any expenses that you've had to incur that are kind of abnormal related to that?
>
> \* \* \*
>
> DAVIS: . . . The -- *in terms of the 810*, I think probably *the biggest single impact* as we look at the year -- first off, again, much like the fourth quarter, *it's almost entirely attributable to changes in the premium tier and certainly, the socket loss at a major vertical customer* [Samsung]. And so that would typically have been a customer for the 810 for their new generation devices. But it's also been a factor of the impacts that are happening in the premium tier overall that we are seeing SKUs other than the leading SKUs that are not selling through at the levels that customers thought, that are impacting some of our premium tier chipsets as well. So the only other thing from a cost standpoint is, we have had some increased E&O, and *certainly some portion of 810 is a part of that*. But overall, it's really been more a function of the significant shift in demand that we've seen throughout the year.

185. Following these additional disclosures of the relevant truth and/or materialization of foreseeable risks concealed and/or obscured by Defendants' prior misrepresentations and omissions, the price of Qualcomm common stock declined by $2.41 per share, or 3.75%, from a close of $64.19 on July 22, 2015, to close at $61.78 per share on July 23, 2015, on extremely heavy trading volume of 37,879,800 shares.

186. Analysts directly attributed the 3.75% stock price decline to the ongoing design, performance and overheating issues with the Snapdragon 810. For example:

- On July 23, 2015, Scotiabank reported that "*[l]osing the Samsung Galaxy S6 socket is having a double impact* on Qualcomm since it doesn't participate in the S6 shipments and because handset OEMs that do use Qualcomm chipsets may be losing share to Samsung and Apple (who both use their own chips to various degrees)." Scotiabank added that "[n]ot only is revenue lower from losing the socket, but the Galaxy S6 and

iPhone are likely causing lower sales for OEMs that are using the Snapdragon. The ***resulting inventory buildup*** is expected to result in fewer MSM shipments in Q4 – the company is guiding to a 45M unit QOQ decline due to these challenges."

- Likewise, Susquehanna stated in its July 23, 2015 reported that "QCOM's outlook was materially worse than expectations, and reflected many of the fundamental challenges for which we have been concerned for several quarters[,]" identifying "Samsung's decision to vertically integrate" as one of the "root causes of these challenges." Susquehanna added, "we also suspect that ***the performance issues that have plagued the S810-based phones have also been a factor, as we believe a number of OEMs have delayed launches as they work through some issues***."

- In a July 27, 2015 report, Morgan Stanley commented that "in 2015, Qualcomm lost meaningful share in high-end handsets after ***the company experienced multiple design losses with their Snapdragon 810 chip, particularly at market leader Samsung.***" Morgan Stanley further reported "that poor performance of Qualcomm's most recent family of chips, particularly the Snapdragon 810, and associated share losses may be attributable, at least in part to Qualcomm's accelerated push to introduce an octacore processor to the market."

- On August 4, 2015, Morgan Stanley stated "[t]he concerns aren't new . . . , but the reality is that the market has now decided that they will only get worse on the back of 2 primary disappointments: 1) ***Qualcomm lost more share at Samsung*** to Exynos than the company anticipated at the beginning of FY15, and 2) emerging market demand might be slightly worse than expected."

## VII. SCIENTER ALLEGATIONS

187. As more fully alleged above, numerous facts give rise to a strong inference that, throughout the Class Period, Defendants knew or were deliberately reckless in not knowing that the statements identified above were materially false and misleading when made and/or omitted material facts necessary to make those statements not misleading. In particular, Defendants (i) knew that the public documents and statements issued and disseminated in the name of the Company were false and misleading; (ii) knew that these statements or documents were

issued and disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws.

188.    As set forth elsewhere herein in detail, Defendants participated in the fraudulent scheme by Qualcomm by means of their control over and receipt or dissemination of the Company's materially false and misleading statements, and their associations with the Company that made them privy to material nonpublic information about Qualcomm.

### A.   Defendant Renduchintala's Actual Knowledge of Adverse Issues with the Snapdragon 810, Which is Imputed to Qualcomm, Supports a Finding of Scienter

189.    Throughout the Class Period, Defendant Renduchintala was Co-President of Qualcomm's QCT division, responsible for the technical aspects of the Company's products, including chipset development and testing (*e.g.*, the development and testing of the Snapdragon 810).    According to CW 3, Renduchintala also maintained a relationshipwith Qualcomm's most important QCT customer—Samsung—by virtue of his previous work on several Qualcomm projects with Samsung, including as Engineering Lead.    As Co-President of QCT, Renduchintala supervised a considerable staff, including Project Engineer, Rajeev Pal, and Executive Vice President of Engineering, James "Jim" Thompson. Renduchintala, in turn, reported directly to Defendant Mollenkopf, the CEO of Qualcomm.

190.    In his role as Co-President, Renduchintala exercised great control and decision-making authority.    In fact, CW 3 described Renduchintala as having implemented a "do this, do this" culture in QCT, enabling him to directly control the segment "with an iron fist," and "like a drill sergeant."    When Apple shocked the market by moving to a 64-bit mobile processor in September of 2013, for example, it was Renduchintala's decision to include a 64-bit processor in the

Snapdragon 810 and change the course of Qualcomm's flagship product indefinitely.

191. As early as March 2014, Qualcomm's QCT engineers, under Renduchintala's direction and control, became focused on the timely development and production of the Snapdragon 810. To this end, they generated daily reports, circulated "root cause analysis reports" regarding Snapdragon 810's thermal issues, participated in daily "Target Scrum" meetings concerning the 810, attended weekly status meetings wherein status reports regarding the 810 were circulated, reviewed OEM customer testing reports, and sporadically participated in weekly "Principals Meetings" and *ad hoc* conference calls with their superiors. The Snapdragon 810 became such a priority, in fact, that CW 2 stated that he received over 1,000 emails daily, many of which concerned the thermal issues in the 810. CW 3 similarly stated that, in his 22 years at Qualcomm, he had "not seen any other chip set get this much attention."

192. Like his team, Renduchintala was highly focused on the success of the Snapdragon 810. In an April 7, 2014 interview to Tirias Research founder and principal analyst Jim McGregor, for instance, Renduchintala acknowledged the importance of the Snapdragon 810 to the Company, describing it as a "game changing device" that "maintains our leadership in terms of low power and not compromising performance." Accordingly, throughout the Class Period, Renduchintala actively monitored the progress and failures of the 810 by: receiving copies of daily reports from various teams, including *Thermal Engineering Test Reports* from the Product Test Group (which was also sent to other senior-level executives) (according to CW 3), staying up-to-date on the daily "Target Scrum" meetings, and attending weekly "Principals Meetings" wherein he received updates from Pal regarding the Snapdragon 810 project and reviewed slides regarding the status and strategies for the project. *See* ¶¶ 84-86,

*supra.* Renduchintala also participated in *ad hoc* conference calls during which he specifically inquired about the 810's thermal issues.

193. By June 2014, Renduchintala was directly aware that the Snapdragon 810 was experiencing abnormal thermal issues. Not only had he been fully apprised of the issues through weekly meetings, calls, and reports, but, beginning in March 2014, the QCT division began extensive testing and remediation of the chip. Notably, while Qualcomm typically tested chipsets three software builds a week, the Snapdragon 810 was being tested five to six software builds *a day,* including on weekends. As Co-President of the division, Renduchintala was personally responsible for allocating resources—including people, hardware, and lab space—for this testing and remediation and, thus, had actual knowledge thereof.

194. Renduchintala's actual knowledge of Snapdragon 810's issues continued through December 2014. CW 2 stated that he participated in *ad hoc* conference calls with Pal and sometimes Renduchintala, from September to December of 2014, regarding the thermal issues with the 810. During one such telephonic meeting in November of 2014, CW 2 specifically recalls Renduchintala inquiring about the root causes of the thermal issues in the 810. Likewise, CW 3 noted that, during the same time period, Renduchintala received daily written reports concerning the thermal issues and remediation efforts for the Snapdragon 810.

195. In his capacity in reporting to Defendant Mollenkopf, Defendant Renduchintala would have kept Mollenkopf apprised of the thermal problems with the 810, and the progress – or lack thereof – towards their resolution. Additionally, as Defendant Amon's Co-President of QCT, he would have updated Amon about the status of QCT's most important product.

196. Defendant Renduchintala's statements and/or omissions of material information were made with actual knowledge and on behalf of the Company. Accordingly, his knowledge or deliberate recklessness of their falsity is imputed to and binding upon the Company.

**B.      The Individual Defendants' Senior-Level Positions, Responsibilities, and Technical Backgrounds Support a Strong Inference of Scienter**

197. Defendants' senior-level positions and responsibilities, and engineering or technical backgrounds supports a strong inference that each Defendant knew or was deliberately reckless in not knowing that their statements were materially false or misleading by virtue of the omission of material information.

198. Throughout the Class Period, Defendant Mollenkopf was the CEO of Qualcomm—the most senior position at the Company—with "overall responsibility for Qualcomm, including all lines of business and all functional groups in the Company." Prior to his promotion to CEO, Mollenkopf had served over 20 years with the Company, including a stint in Qualcomm's QCT division. As noted by the Company, Mollenkopf "oversaw a number of Qualcomm's investments in technologies that have propelled smartphones into the mainstream and made smartphones the indispensable tools they are today. During Mollenkopf's tenure, Qualcomm has become a leader in a broad range of mobile technologies, including computing, graphics, multimedia chipsets, and 3G and 4G modems."

199. Prior to and during the Class Period, Defendant Aberle, Qualcomm's President, had "oversight for all business divisions across the organization" and "formulating and driving key strategies for diversifying and growing the Company in both [the] core businesses as well as new business opportunities." Defendant Aberle was placed in this position after having "provided exceptional

leadership and oversight for all activities associated with Qualcomm's technology and IP licensing business." Defendant Aberle reported directly to Defendant Mollenkopf.

200. At all relevant times, Defendant Davis held the position of Qualcomm's Chief Financial Officer. In this executive position, Defendant Davis was responsible for, *inter alia*, "leading Qualcomm's . . . investor relations . . . [and] helping to drive Qualcomm's overall global strategy."

201. By virtue of their high-level executive positions, Defendants Mollenkopf, Aberle, and Davis directly participated and were involved in both the management and day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company's core operations, including its QCT division, key products, and customers.

202. Defendant Amon was Co-President of the Company's QCT division (a title he shared with Defendant Renduchintala), and was directly responsible for the design, production, marketing, and sale of the Snapdragon 810 during the Class Period. As Co-President of QCT, Defendant Amon "provided exceptional leadership in expanding QCT's product roadmap - positioning Qualcomm as the industry leader in mobile technology" and "developing deep and strategic customer relationships critical to the Company's long-term success."

203. More specifically, CW 3 confirmed that Amon was the primary executive charged with customer relationships—he was responsible for interaction with and marketing to OEM customers about Qualcomm's QCT products. Accordingly, during his tenure with the Company, Defendant Amon was privy to adverse confidential, undisclosed information related to QCT's products, like the Snapdragon 810, and any issues with those products, including, specifically, abnormal thermal problems. Likewise, as the executive responsible for customer relationships, Defendant Amon was privy to adverse confidential,

undisclosed information related to the OEMs to which Qualcomm hoped to sell the 810, including the internal testing conducted by the OEMs and the status of the Company's negotiations with its customers.

204. Defendant McDonough acted as Qualcomm's Vice President of Worldwide Marketing throughout the Class Period. Defendant McDonough described his role at the Company "CMO" for QCT, "[r]esponsible for Qualcomm's ~$15B chipset business." In this role, McDonough explained that he brought "together product marketing, branding, public relations, events, online marketing and analyst relations for [Qualcomm's] leading LTE and Qualcomm Snapdragon mobile processor products." As VP of Worldwide Marketing, he also "[s]uccessfully secured gold standard position[s] with OEMs and [the] mobile industry, [and] grew [and] aided consumer awareness to ~30%." Thus, as the *de facto* Chief Marketing Officer of Qualcomm's QCT division Defendant McDonough had access to adverse confidential, undisclosed information concerning QCT's strategic product development and market, including the Company's efforts to respond to rumors regarding the 810 and information related specifically to the OEMs to which Qualcomm hoped to sell the 810 and those negotiations.

205. Each of the Individual Defendants were sufficiently qualified and/or trained to understand the design, development, and functionality of the Snapdragon 810 and recognize the existence and severity of the 810's underlying thermal problems. As Defendant Mollenkopf acknowledged, the Company has a "very engineering driven culture," and "[a]ll the senior execs are technical." Defendants Mollenkopf, Amon, and Renduchintala, for example, were engineers by trade. Further, according to the Company's website, Defendant Mollenkopf "is a published IEEE [Institute of Electrical and Electronics Engineers] author and holds seven patents in areas such as power estimation and measurement, multi-

standard transmitters, and wireless communication transceiver technology". Defendant McDonough operated under the belief that "great marketers combine technical product knowledge and customer insight for breakthrough results." Thus, in addition to understanding QCT's operations and relationships with its key customers, the Individual Defendants had a deep understanding of technical reports and internal testing results related to the Snapdragon 810, to which they had access.

206. The Individual Defendants controlled the contents of, and had ultimate authority over, the Company's public statements and omissions during the Class Period. Each was provided with, or had access to, copies of the documents or were aware of oral statements alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Moreover, at all relevant times, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the statements at issue in this case, approved or ratified these statements, and were aware or were deliberately reckless in not knowing that these statements were being issued regarding the Company. As a result, the Individual Defendants had ultimate authority for the accuracy of Qualcomm's corporate statements, and are therefore responsible and liable for the representations contained therein or omitted therefrom.

207. Thus, given their respective positions, technical expertise, and access to material non-public information concerning the Company, each Individual Defendant knew or were deliberately reckless in not knowing that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made were materially false, misleading, and deceptively inaccurate.

## C.     The Individual Defendants Knew or Were Deliberately Reckless in Disregarding Information Concerning the Company's Core Operations

208.    As Qualcomm's most senior executives with direct control and supervision over its business, operations and public statements, the Individual Defendants were knowledgeable about Qualcomm's core business operations and key information identified below.

### 1.     The Snapdragon 810 Was The Linchpin of Qualcomm's QCT Operations

209.    QCT was one of the Company's two main business segments during the Class Period, accounting for more than 70% of Qualcomm's revenues in 2014 (or $18.7 billion) and nearly 68% of the Company's revenues in 2015.   The Snapdragon series of mobile processors were key or "flagship" products for QCT and Qualcomm.   Included in over one billion devices shipped by 2014, Snapdragon mobile processors dominated the mid- to premium-tier smartphone markets in the United States, Europe, and China.

210.    The 800 series was the most important Snapdragon series of mobile processors for at least two reasons.   *First*, the 800 series included Qualcomm's most technologically advanced chipsets.   With customized CPU cores, advanced gaming and video capabilities, and lightning fast 4G/LTE connectivity, the Snapdragon 800 series was technologically superior to other chipsets on the market. *Second*, Qualcomm recognized significantly higher margins on its 800 series mobile processors as compared to its other products.   Thus, a successful 800 series chipset could garner Qualcomm higher profits.

211.    Moreover, the relative importance of the Snapdragon 810—the latest in the 800 series—was heightened during the Class Period as a result of Apple's sudden shift from a 32-bit processor to 64-bit processor and the downward trend of smartphones ASPs.   With the 810, everyone was looking to see whether Qualcomm could develop a competitive 64-bit mobile processor. Likewise, given

the 810's higher cost, it was important that it worked flawlessly in OEMs' flagship devices so as to ensure the OEMs did not choose a cheaper processor to avoid a margin squeeze. Thus, throughout the Class Period, the success of the Snapdragon 810 was of critical importance to the Company's technological leadership, competitive advantage, and profit margins.

212. Accordingly, the Individual Defendants knew or were deliberately reckless in not knowing the following material information concerning the Snapdragon 810: (i) Apple's shift from 32-bit to 64-bit was unexpected and caught the Company flat-footed without a fully customized 64-bit CPU to use in the Snapdragon 810, (ii) the risk of using "off-the-shelf" ARM Cortex-A57 cores in the 810, given that the A57s already had demonstrated thermal issues when rendered in 20 nm, and (iii) the margin for error for the 810 was virtually non-existent given the need to maintain the Company's technological advantage and the OEMs' willingness to pay the high cost of the latest iteration of the 800 series.

**2. Given the Importance of the First Silicon, Defendants Knew or Were Deliberately Reckless in Disregarding the 810 Test Results**

213. As further explained in ¶¶ 52-56, *supra*, according to Plaintiffs' expert, Professor Thompson, the receipt of the first silicon was an extremely important event in the development of a chipset. After spending hundreds of millions of dollars and one to two years engineering a final design, this was the first time the Individual Defendants would have been able to see if the Snapdragon 810 was viable. Initial testing of the first silicon—the results of which were typically available approximately one week after the receipt of the first silicon—would have provided the Individual Defendants with data that was a key indicator for the relative commercial success of one of their flagship chips— the 810. Accordingly, the Individual Defendants, each of whom were responsible for developing, marketing, and selling the 810, knew or were deliberately reckless

in disregarding the results of the initial tests following the receipt of first silicon, including those conducted by the Product Test Group, which demonstrated that the 810 was experiencing myriad performance issues.

214. Once the severity of the issues with the Snapdragon 810 was revealed, diagnosing the source of and finding a solution for the abnormal thermal results became QCT and Qualcomm's top priority. Indeed, the Company devoted considerable time and resources, including more money, engineers, and lab time, and conducted significant testing, including tasking the Product Test Group to begin testing several months early and testing nearly 10 times more software builds every week trying to fix the 810. The stakes for Qualcomm grew exponentially higher once rumors began circulating regarding the 810's propensity for overheating began circulating in early December 2014. As a result, the Individual Defendants knew or were deliberately reckless in not knowing at least the following information: (i) daily and weekly reports detailed abnormal thermal results for the 810 over at least a nine-month period without resolution; (ii) neither the Software Testing Group nor the Product Test Group could identify the source of the 810's abnormal thermal results; (iii) OEMs also were identifying and reporting to QCT thermal issues with the 810; and (iv) Qualcomm commercially launched the 810 in January 2015 without diagnosing— let alone solving—the reason for the 810's abnormal thermal results.

### 3. Samsung Was Qualcomm's Most Important Customer Relationship Throughout the Class Period

215. As discussed in detail above, Samsung's business represented 12% of QCT's sales in FY14. Samsung had the largest market share of any of the OEMs selling premium-tier smartphones. Its Galaxy S series competed head-to-head with Apple's iPhone in most markets. Qualcomm's Snapdragon 805 was used in the Galaxy S5, which had sales of 12 million devices in just three months after launch. Samsung's Galaxy S6 was one of the key "wins" for Qualcomm's

next 800 series chipset—the Snapdragon 810. Samsung also was a significant competitor of the Company, designing and manufacturing its own SoC chipsets to rival Qualcomm's Snapdragon mobile processors. In fact, Samsung used its ability to manufacturer its own chipsets as leverage when negotiating with Qualcomm. Winning and maintaining Samsung's business was therefore a critical component of Qualcomm's business model throughout the Class Period.

216. As a result, the Individual Defendants knew or were deliberately reckless in not knowing at least the following facts: (i) in order to capture Samsung's business for the Galaxy S6, Qualcomm had to agree to shorten its production timeline for the 810 by two months, agreeing to release the chipset commercially in November 2014; (ii) in order to be considered for the Galaxy S6, the 810 needed to be a 64-bit chipset; and (iii) in October 2014, Samsung decided to use its own Exynos chipset in the Galaxy S6.

### D. The Fact That Virtually All of Qualcomm's Internal Information About the 810 Demonstrated The Existence of Overheating Issues Supports a Strong Inference of Scienter

217. The sheer amount of information and reports about the 810's thermal issues available to the Individual Defendants on a daily and weekly basis over at least a nine-month period supports a strong inference that the Individual Defendants knew or were deliberately reckless in not knowing of the problems with the 810.

218. For example, QCT compiled daily and weekly reports over at least a nine-month period (between March 2014 and December 2014), many of which were sent to senior executives like Defendant Renduchintala, and *all* of which demonstrated that the Snapdragon 810 exhibited abnormal thermal issues. Likewise, QCT scheduled a large number of daily and weekly meetings, as well as *ad hoc* meetings specifically convened by or on behalf of Defendant Renduchintala, to discuss the 810's thermal problems over at least a six-month

period (June 2014 to December 2014). Further, Qualcomm's key customers—the OEMs who had expressed interest in using the 810 in their flagship devices—had discovered and reported to QCT that the chipset had thermal issues.

219. Had the Individual Defendants done any due diligence prior to touting the 810's performance or denying rumors regarding the 810's propensity to overheat, they would have known the truth—the 810 suffered from debilitating abnormal thermal issues. As a result, the large number and, importantly, the consistency of these reports confirm that the Individual Defendants either knew they were misleading investors or were making statements without any reasonable basis.

### E. Defendants Amon and McDonough's Unequivocal Denials of Any Problems With the Snapdragon 810 Support A Strong Inference of Scienter

220. Beginning in January 2015, in response to rumors regarding the 810's propensity to overheat and the real reason Samsung refused to use the 810 in the Galaxy S6, Defendants Amon and McDonough issued strident and unequivocal denials. For example, between January 29 - 31, 2015, months after Qualcomm had known of the Samsung loss due to the 810 overheating, Defendant Amon affirmatively and unequivocally denied any problems with the Snapdragon 810. He stated: "*We don't see any problem with the 810. . . . I think there is a lot of misinformation out there;*" and later added, "*Categorically, we don't see any problem with the chip.*"

221. Similarly, on May 6, 2015, in response to the release of certain benchmark tests results comparing the 810's performance and heat generation to other SoCs, and LG's decision to utilize the 808 for the G4 because of the 810's propensity to overheat, Defendant McDonough gave an interview to *Forbes* magazine wherein he stated that "*[t]he rumuors are rubbish, there was not an overheating problem with the Snapdragon 810 in commercial devices…*". Just

six weeks later, Defendant McDonough gave another interview wherein he stated, "The Snapdragon 810 processor is performing as expected and *we have not observed any abnormal thermal issues*."

222. In making such unequivocal statements, Defendants knew, or were deliberately reckless in not knowing, the actual circumstances concerning the subject of their statements. Indeed, had Defendants Amon and McDonough done any due diligence regarding the 810 prior to making these statements they would have known that the 810 had experienced thermal issues that took more than a year to partially resolve through the stealth issuance of version 2.1 and that Samsung decided to use its Exynos chipset because of the 810's abnormal thermal issues.

## VIII. THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

223. The statutory safe harbor and the bespeaks caution doctrine applicable to forward-looking statements under the Private Securities Litigation Reform Act of 1995 do not apply to the misrepresentations and omissions alleged in this Complaint.

224. None of Defendants' historic or present-tense statements alleged herein was a forward-looking statement because none was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present-tense statements when made.

225. To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, these statements were not accompanied by meaningful cautionary

language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

226. Defendants are also liable for any false or misleading forward-looking statement alleged herein, or portion thereof, because at the time each forward-looking statement was made, the speaker knew the forward-looking statement was false or misleading, or the forward-looking statement was authorized and approved by an executive officer of Qualcomm who knew that the forward-looking statement was false.

## IX.   LOSS CAUSATION

227. As a result of Defendants' materially false and misleading statements, omissions of material facts, and fraudulent course of conduct, as alleged in ¶¶ 117, 119, 123-125, 131-135, 139-142, 161-162, 168-174, Qualcomm's publicly traded common stock traded at artificially inflated prices during the Class Period. Specifically, Defendants' misrepresentations and omissions regarding Snapdragon 810, including, *inter alia*, its design, performance, overheating problems, adoption in OEMs' devices, overall viability, and success, as well as the reasons for and implications of the Samsung Galaxy S6 design caused and/or maintained the artificial inflation in Qualcomm's stock price during the class period. Relying on the integrity of the market price for Qualcomm common stock and public information relating to Qualcomm, Lead Plaintiff and other Class members purchased or otherwise acquired Qualcomm common stock at prices that incorporated and reflected Defendants' misrepresentations and omissions of material fact alleged herein. As a result of their purchases of Qualcomm common stock during the Class Period at artificially

inflated prices and the removal of that inflation upon the partial disclosures set forth in ¶¶ 176-186, *supra*, Lead Plaintiff and the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

228. Defendants' false and misleading statements, material omissions and course of conduct had their intended effect, directly and proximately causing Qualcomm common stock to trade at artificially inflated prices during the Class Period, including as high as $81.97 per share on July 23, 2014. Those misrepresentations and omissions of material fact that were not immediately followed by an upward movement in the price of Qualcomm common stock served to maintain the price of Qualcomm common stock at an artificially inflated level.

229. Had Defendants been truthful about these matters during the Class Period, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Qualcomm securities at the artificially inflated prices at which they traded. It was entirely foreseeable to the Defendants that misrepresenting and concealing these material facts from the public would artificially inflate the price of Qualcomm securities.

230. The economic losses, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class were a direct, proximate, and foreseeable result of Defendants' materially false and misleading statements and omissions of material fact, which artificially inflated the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed and/or the risks previously concealed by Defendants' material misstatements and omissions materialized.

231. Defendants' false and misleading statements and omissions about the Snapdragon 810, including, *inter alia,* its performance, design, overheating problems, adoption in OEM devices, overall viability and success, as well as the

reasons for and implications of the loss of the Samsung Galaxy S6 design caused and/or maintained the artificial inflation in Qualcomm's stock price throughout the Class Period until the relevant truth concealed and/or obscured by Defendants' misconduct were revealed to the market. These revelations occurred through at least three partial corrective disclosures: January 20, 2015, January 28, 2015 and July 22, 2015, as detailed in ¶¶ 176, 180, and 184. The timing and magnitude of the declines in the price of Qualcomm common stock, as detailed herein, negate any inference that the loss suffered by Lead Plaintiff and the Class was caused by changed market conditions or other macroeconomic factors unrelated to Defendants' fraudulent conduct.

232. As set forth in ¶¶ 176, on January 20, 2015 after the close of trading, Bloomberg published an article titled "Samsung Said to Drop Qualcomm Chip from Next Galaxy S," stating that, according to unconfirmed reports, Samsung would *"use its own microprocessors in the next version of the Galaxy S smartphone,"* and that Samsung allegedly had dropped the Snapdragon 810 because it "overheated during the Korean company's testing." As described above in ¶¶ 178, analysts focused on the importance of this development while acknowledging that the reports were unconfirmed by either Qualcomm or Samsung. This lack of confirmation, combined with Defendants' continued misrepresentations and omissions relating to Snapdragon 810 and its purported success with OEMs such as Samsung, caused much of the artificial inflation to remain in Qualcomm's stock price.

233. The loss of the Galaxy S6 reported in the January 20, 2015 Bloomberg article was a foreseeable consequence of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions of the Snapdragon 810's overheating issues and poor performance alleged herein. Moreover, the January 20, 2015 disclosures revealed new information that was

previously concealed and/or obscured by the Defendants' misstatements, omissions and fraudulent course of conduct. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Snapdragon 810, including that the Snapdragon 810 was a successful chip adopted by numerous OEMs and would be featured in Samsung's Galaxy S6. Additionally, Samsung's decision to drop the Snapdragon 810 from its Galaxy S6 smartphone was substantially caused by, and directly related to, the severe overheating problems and design flaws plaguing the Snapdragon 810 since its inception. Thus, the January 20 disclosure also partially (but incompletely) revealed both the facts concealed and/or misrepresented by Defendants and the materialization of the known foreseeable risks surrounding the Snapdragon 810 that Defendants deliberately and/or recklessly concealed from investors.

234. As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by the Defendants' fraud, the price of Qualcomm common stock declined by $0.89 per share, or 1.23% from a close $72.48 per share on January 20, 2015 to a close of $71.59 per share on January 21, 2015 on heavy volume, thereby partially removing a portion of the artificial inflation in Qualcomm common stock.

235. Numerous analysts issued reports concerning the Bloomberg report and Samsung's unconfirmed decision not to use the Snapdragon 810 in its flagship device. ¶¶ 178. For instance, Morningstar stated that if the Bloomberg report was accurate, "the design loss and overheating problems are a bit of a blow for Qualcomm . . . ." Susquehanna purported to quantify the potential negative impact of losing the Galaxy S6 stating that "we believe this change will represent an incremental negative $800 mln to QCOM's QCT revenue this year . . . ." These reports confirmed that the disclosure of this new information and/or

foreseeable materialization of the risk caused the negative investor inferences drawn from the January 20, 2015 Bloomberg article.

236. Although this partial disclosure of adverse news caused some artificial inflation to be removed from Qualcomm's stock price, the stock price remained artificially inflated because Qualcomm had not yet confirmed the Samsung loss and continued conceal material facts relating to Samsung and Snapdragon 810.

237. As set forth in ¶¶ 180, a second partial disclosure occurred on January 28, 2015 after the close of trading. On that day, Qualcomm issued a press release announcing that the Company had lowered its "outlook for the second half of fiscal 2015 in [its] semiconductor business, QCT, largely driven by the effects of" *inter alia*, including "[e]xpectations that [the] Snapdragon 810 processor w[ould] not be in the upcoming design cycle of a large customer's flagship device[.]" Analysts uniformly reported—and the Company later confirmed—that this statement meant that Samsung would not be using the Snapdragon 810 in its upcoming flagship device—the Galaxy S6.

238. The loss of the Galaxy S6 confirmed in the January 28, 2015 Press Release was a foreseeable consequence of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions of the Snapdragon 810's overheating issues and poor performance alleged herein. Moreover, the January 28, 2015 disclosures revealed new information that was previously concealed by the Defendants' misstatements, omissions and fraudulent course of conduct. These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions surrounding Snapdragon 810, including its purported overall success and adoption in flagship devices of key OEMs such as Samsung. Samsung's decision to drop the Snapdragon 810 from its Galaxy S6 smartphone and Qualcomm's

reduced outlook for QCT were significantly the result of, and directly connected to, the severe overheating problems and design flaws plaguing the Snapdragon 810 since its inception. Thus, the January 28 disclosure also partially (but incompletely) revealed both the facts concealed and/or misrepresented by Defendants and the materialization of the known foreseeable risks surrounding the Snapdragon 810 that Defendants deliberately and/or recklessly concealed from investors.

239. As a direct and proximate result of these partial corrective disclosures and/or materializations of foreseeable risks concealed by Defendants' fraud, the price of Qualcomm common stock declined by $7.30 per share, or 10.28% on extremely heavy trading volume, thereby partially removing additional inflation in Qualcomm common stock.

240. Numerous analysts issued negative reports concerning Samsung's decision not to use the Snapdragon 810 in its flagship device. *See* ¶¶ 182, *supra*. On January 29, 2015, for instance, RBC Capital reduced its EPS outlook, stating that "missing out on the Samsung S6 means yet another round of estimate cuts for Qualcomm . . . ." Morningstar reduced its "fair value estimate" noting that "the firm's dim outlook for the second half of fiscal 2015, as the company confirmed recent reports that its Snapdragon 810 processor has been designed out of Samsung's upcoming Galaxy S6 smartphone." Oppenheimer highlighted that "[h]eadwinds/challenges include a missed design at Samsung . . . ." These reports confirmed that the disclosure of this new information and/or foreseeable materialization of the risk caused the negative investor inferences drawn from the January 28, 2015 Press Release.

241. Despite this partial disclosure relating to Snapdragon 810 and the resulting stock price decline caused by Defendants' prior misstatements, omissions and misconduct, however, Qualcomm's stock price remained

artificially inflated due to Defendants' continuous and repeated denials of overheating problems with the Snapdragon 810, their misrepresentations and omissions regarding the true reasons for the loss of Samsung, and their misleading statements regarding the Snapdragon 810. *See* ¶¶ 183.

242. The third, and final, partial disclosure occurred on July 22, 2015. On that day after the close of trading, Defendants issued a press release announcing that the Company reduced its guidance for its QCT business due in substantial part to "increased concentration within the premium tier causing reduced demand for certain OEM devices that include our chipset; *lower demand for our premium-tier chipsets from a vertical customer [Samsung]*; and lower sell through in China of certain handset models using our premium-tier chipsets."

243. The Company itself directly attributed the reduction of QCT guidance in substantial part to issues relating to Snapdragon 810 and the impact of losing Samsung's flagship Galaxy S6. The Company admitted that "*in terms of the 810*, I think probably *the biggest single impact* as we look at the year… again, much like the fourth quarter, *it's almost entirely attributable to changes in the premium tier and certainly, the socket loss at a major vertical customer [Samsung]*." Analysts also connected the adverse QCT news to the Samsung loss and overheating problems with the Snapdragon 810. As Susquehanna stated: "we suspect that the performance issues that have plagued the S810-based phones have also been a factor, as we believe a number of OEMs have delayed launches as they work through some issues."

244. The lack of QCT product demand announced in the July 22, 2015 Press Release was a foreseeable consequence of, and within the zone of risk concealed by, the Defendants' misrepresentations and omissions concerning the Snapdragon 810. As set forth in ¶¶ 45-46, *supra*, the Snapdragon 810 was Qualcomm's most important chip impacting the "premium tier" of its business.

Indeed, analysts cited the relationship between the loss of Samsung and reduced demand in the premium tier and the issues surrounding Snapdragon 810. Scotiabank, for instance, reported that "[n]ot only is revenue lower from losing the socket, but the Galaxy S6 and iPhone are likely causing lower sales for OEMs that are using the Snapdragon," noting that "the *resulting inventory buildup* is expected to result in fewer MSM shipments in Q4." Moreover, the July 22, 2015 disclosures revealed new information that was previously concealed by the Defendants' misstatements, omissions and misconduct relating to Snapdragon 810.

245. As a direct and proximate result of these final corrective disclosures and/or materializations of the risk concealed by the Defendants' fraud, the price of Qualcomm common stock declined by $2.41 per share, or 3.75% on extremely heavy trading volume. These disclosures, more fully described above in ¶ 184, further removed additional artificial inflation in Qualcomm's stock price attributable to Defendants' misrepresentations and omissions concerning the Snapdragon 810.

## X.  CONTROLLING PERSON ALLEGATIONS

246. By virtue of the Individual Defendants' positions of management and control within the Company, they had access to undisclosed adverse information about Qualcomm's operations and performance, including information regarding the existence and severity of abnormal thermal issues with the Snapdragon 810 and the corresponding loss of a major customer, as particularized herein. The Individual Defendants ascertained such information through Qualcomm's internal corporate documents, conversations, and connections with each other and with corporate officers and employees, attendance at Board of Directors meetings, including committees thereof, and

through reports and other information provided to them in connection with their roles and duties as Qualcomm officers, directors, and managers.

247. The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, and knew or recklessly disregarded that there were material misstatements and omissions contained therein. Because of their Board or executive or managerial positions with Qualcomm, each of the Individual Defendants had access to the adverse undisclosed information about Qualcomm's operations and performance, including information regarding the severe and abnormal thermal issues with the Snapdragon 810 and the loss of a major customer, as particularized herein, and knew (or were deliberately reckless in not knowing) that these adverse events rendered the positive representations made by or about Qualcomm and its business, or adopted by the Company, materially false and misleading.

248. The Individual Defendants, because of their positions of control and authority as officers or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and is therefore primarily liable for the representations therein.

249. As officers, directors, and controlling persons of a publicly held company whose common stock is registered with the SEC pursuant to the Exchange Act, and is traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly

disseminate accurate and truthful information with respect to the Company's operations and performance, including information regarding the severe and abnormal thermal issues with the Snapdragon 810 and the loss of a major customer, as particularized herein, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based on truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## XI.   CLASS ACTION ALLEGATIONS

250.   Lead Plaintiff brings this action on behalf of itself and as a class action, pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all persons and entities that, during the Class Period, purchased or otherwise acquired the publicly traded common stock of Qualcomm and were damaged thereby. Excluded from the Class are Defendants, members of Defendants' immediate families (as defined in 17 C.F.R. § 229.404, Instructions (1)(a)(iii) and (1)(b)(ii)), any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

251.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class. At the end of the Class Period, Qualcomm had more than 1.5 billion shares of common stock issued and

outstanding, owned by thousands of persons, and actively traded on the NASDAQ. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Record owners and other members of the Class may be identified from records maintained by Qualcomm or its transfer agent, and may be notified of the pendency of this action by a combination of published notice and first-class mail, using the techniques and form of notice similar to that customarily used in class actions arising under the federal securities laws.

252. There is a well-defined commonality of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a) whether Defendants' actions as alleged herein violated the federal securities laws;

(b) whether Defendants' statements and/or omissions issued during the Class Period were materially false and misleading;

(c) whether Defendants knew or were deliberately reckless in not knowing that their statements were false and misleading;

(d) whether and to what extent the market prices of Qualcomm publicly traded common stock were artificially inflated and/or distorted before and/or during the Class Period due to the misrepresentations and/or omissions of material fact alleged herein; and

(e) whether and to what extent Class members sustained damages as a result of the conduct alleged herein, and the appropriate measure of damages.

253. Lead Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class purchased or otherwise acquired

Qualcomm publicly traded securities during the Class Period and similarly sustained damages as a result of Defendants' wrongful conduct as alleged herein.

254. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class action securities litigation to further ensure such protection, and intends to prosecute this action vigorously. Lead Plaintiff has no interests that are adverse or antagonistic to those of the Class.

255. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the damages suffered by each individual member of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members to seek redress for the wrongful conduct alleged herein. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

## XII. LEAD PLAINTIFF AND CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

256. Lead Plaintiff and members of the Class are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Qualcomm common stock traded in efficient markets;

(d) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Qualcomm common stock; and

(e) Without knowledge of the misrepresented or omitted facts, Lead Plaintiff and other members of the Class purchased or otherwise

acquired Qualcomm common stock between the time that Defendants made material misrepresentation and omissions and the time the concealed risks materialized or the true facts were disclosed.

257. At all relevant times, the market for Qualcomm common stock was open and efficient for the following reasons, among others:

(a)   as a registered and regulated issuer of securities, Qualcomm filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information;

(b)   Qualcomm regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)   Qualcomm was followed by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; and

(d)   Qualcomm common stock met the requirements for listing, and was listed and actively traded on highly efficient markets, including NASDAQ, where the Company's common stock trades under the ticker symbol "QCOM."

258. As a result of the foregoing, the markets for Qualcomm common stock promptly digested current information regarding Qualcomm from all publicly available sources, and the prices of Qualcomm's stock reflected such information.

259. Based upon the materially false and misleading statements and omissions of material fact alleged herein, Qualcomm common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and the other members of the Class purchased Qualcomm common stock relying upon the integrity of the market price of Qualcomm common stock and other market information relating to Qualcomm.

260. Under these circumstances, all purchasers of Qualcomm common stock during the Class Period suffered similar injuries through their purchases at artificially inflated prices, and a presumption of reliance applies.

261. Further, at all relevant times, Lead Plaintiff and other members of the Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings. Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Qualcomm common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XIII. CAUSES OF ACTION

### COUNT I

**Asserted Against All Defendants for
Violations of Section 10(b) of the Securities Exchange
Act of 1934 and SEC Rule 10b-5 Promulgated Thereunder**

262. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of Lead

Plaintiff and all other members of the Class against Qualcomm and the Individual Defendants.

263. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, regarding the intrinsic value of Qualcomm common stock, as alleged herein; (ii) artificially inflate the price of Qualcomm common stock; and (iii) cause Lead Plaintiff and other members of the Class to purchase Qualcomm common stock at artificially inflated prices that did not reflect their true value. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

264. Defendants directly and indirectly, by the use of means and instrumentalities of interstate commerce, the mails, and/or the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain the artificially inflated price of Qualcomm common stock in violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

265. Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Qualcomm's value and performance, which included the making of untrue statements of material facts and omitting material facts necessary in order to make their statements, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein. Defendants did not

have a reasonable basis for their alleged false statements and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Qualcomm common stock during the Class Period.

266. Defendants are liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements and omissions included in press releases, conference calls, SEC filings, news media, blogs, and Qualcomm's website.

267. Defendants are further liable for the false and misleading statements made by Qualcomm's officers, management, and agents in press releases, conference calls, conferences with investors and analysts, news media, blog reports, and Qualcomm's website, as alleged above, as they either made or controlled such statements and had ultimate authority and responsibility for the contents thereof.

268. Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing from the investing public the relevant truth, and misstating the intrinsic value of Qualcomm common stock. By concealing material facts from investors, Defendants maintained the Company's artificially inflated common stock prices throughout the Class Period.

269. In ignorance of the fact that the price of Qualcomm common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements and omissions made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Qualcomm but not disclosed in public statements by Qualcomm during the Class Period, Lead Plaintiff and the other members of the Class purchased or acquired

Qualcomm common stock during the Class Period at artificially high prices and were damaged when that artificial inflation was removed from the price of Qualcomm common stock.

270. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff, the other members of the Class, and the marketplace known of the truth concerning the Company's conduct and the intrinsic value of Qualcomm's common stock, Lead Plaintiff and other members of the Class would not have purchased or acquired their Qualcomm common stock, or, if they had purchased or acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

271. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

272. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and/or acquisitions of Qualcomm common stock during the Class Period.

## COUNT II

### Asserted Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

273. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiff and all other members of the Class against the Individual Defendants.

274. At all relevant times during the Class Period, as set forth in ¶¶ 20-27, *supra*, Defendant Mollenkopf was the Company's CEO and a member of the Company's Board of Directors; Defendant Aberle was the Company's President; Defendant Davis was the Company's Executive Vice President and CFO;

Defendant Renduchintala was an Executive Vice President of Qualcomm, and Co-President of the Company's QCT division; Defendant Amon was also an Executive Vice President of Qualcomm and Co-President of the Company's QCT division; and Defendant McDonough was the Company's Senior Vice President, Global Marketing.  As such, the Individual Defendants had regular access to non-public information about Qualcomm's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

275.  The Individual Defendants acted as controlling persons of Qualcomm and the other Individual Defendants within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of Qualcomm's day-to-day operations, and/or knowledge of statements filed by the Company with the SEC and/or disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company and its executives, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.

276.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

277. In particular, each of these Individual Defendants had direct and supervisory involvement in and control of the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular conduct and transactions giving rise to the securities violations as alleged herein, and exercised the same.

278. As set forth above, Qualcomm and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts, statements and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Qualcomm common stock during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiff and the members of the Class damages and interest thereon;

C. Awarding Lead Plaintiff's and the Class's reasonable costs, including attorneys' and experts' fees; and

D. Awarding such equitable, injunctive or other relief that the Court may deem just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury.

Respectfully submitted,

Dated:  April 29, 2016          LABATON SUCHAROW LLP

By:    */s/ James W. Johnson*
       James W. Johnson (*Pro Hac Vice*)
       Michael H. Rogers (*Pro Hac Vice*)
       Matthew J. Hrutkay (Bar No. 297485)
       James T. Christie (*Pro Hac Vice*)
       jjohnson@labaton.com
       mrogers@labaton.com
       mhrutkay@labaton.com
       jchristie@labaton.com
       140 Broadway
       New York, New York  10005
       Telephone:  (212) 907-0700
       Facsimile:  (212) 818-0477

       *Attorneys for the Public Employees*
       *Retirement System of Mississippi and*
       *Co-Lead Counsel for the Proposed Class*

       KESSLER TOPAZ
         MELTZER & CHECK, LLP
       Eli R. Greenstein (Bar No. 217945)
       Jennifer L. Joost (Bar No. 296164)
       Paul A. Breucop (Bar No. 278807)
       Rupa Nath Cook (Bar No. 296130)
       egreenstein@ktmc.com
       jjoost@ktmc.com
       pbreucop@ktmc.com
       One Sansome Street, Suite 1850
       San Francisco, CA 94104
       Telephone: (415) 400-3000
       Facsimile: (415) 400-3001

       -and-

       Andrew L. Zivitz (*Pro Hac Vice*)
       Jonathan F. Neumann (*Pro Hac Vice*)
       azivitz@ktmc.com
       jneumann@ktmc.com
       280 King of Prussia Road
       Radnor, PA 19087
       Telephone: (610) 667-7706
       Facsimile: (610) 667-7056

       *Attorneys for the Public Employees*
       *Retirement System of Mississippi and*
       *Co-Lead Counsel for the Proposed Class*

JOHNSON & WEAVER, LLP
Frank J. Johnson (Bar No. 174882)
frankj@johnsonandweaver.com
Shawn E. Fields (Bar No. 255267)
shawnf@ johnsonandweaver.com
600 West Broadway, Suite 1540
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Liaison Counsel for the Class*

John Gadow
Blake A. Tyler
GADOW / TYLER, PLLC
511 E. Pearl Street
Jackson, Mississippi 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667

607 Corinne Street, Suite C-2
Hattiesburg, Mississippi 39401
Telephone: (601) 475-1234
Facsimile: (601) 510-9667

*Counsel for Public Employees
Retirement System of Mississippi*

---

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
CASE NO. 15-CV-2678-MMA (WVG)