# EXHIBIT C

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
  – and –
LAURIE L. LARGENT (153493)
CAROLINE M. ROBERT (254293)
ALEXI H. PFEFFER-GILLETT (313709)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
crobert@rgrdlaw.com
agillett@rgrdlaw.com

Lead Counsel for Lead Plaintiff

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re FASTLY, INC. SECURITIES LITIGATION | Case No. 4:20-cv-06024-PJH |
| | CLASS ACTION |
| This Document Relates To: | Judge: Hon. Phyllis J. Hamilton |
| ALL ACTIONS. | Courtroom: 3 |
| | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | DEMAND FOR JURY TRIAL |

4825-8326-7812.v1

# TABLE OF CONTENTS

Page

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND AND SUMMARY OF THE ACTION .......................................3

    A. Fastly's Business...........................................................................................3

    B. By the Start of the Class Period TikTok, Fastly's Largest Customer, Is Being Investigated by CFIUS as a National Security Threat ...............................5

    C. By the Start of the Class Period, Other National Security Investigations Are Being Called for and U.S. Government Is Increasingly Banning Use of TikTok ........................................................................................................8

    D. Defendants Fail to Disclose that TikTok Is Fastly's Single Largest Customer and the Material Risk Fastly's Business Faces as a Result of TikTok's Problems...........................................................................................11

    E. Investors Learn About TikTok Being Fastly's Largest Customer but Defendants Continue to Conceal the Full Truth About the Impact of TikTok's Geopolitical Problems on Fastly's Business ........................................12

    F. On October 14, 2020 Defendants Are Forced to Make a 3Q20 Earnings Pre-Announcement and Withdraw Guidance Due to Loss of TikTok Business ......................................................................................................13

III. JURISDICTION AND VENUE .........................................................................14

IV. PARTIES ...........................................................................................................14

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...............................................................................................16

    A. Defendants' False and Misleading Statements Made in Fastly's 1Q20 Shareholder Letter and During the 1Q20 Investor Call on May 6, 2020...............16

    B. Defendants' False and Misleading Statements Made in Fastly's 1Q20 Form 10-Q on May 8, 2020 ...........................................................................20

    C. Defendants' False and Misleading Statements Made During an Investor Presentation on June 2, 2020 .......................................................................24

    D. Defendants' False and Misleading Statements Made During the 2Q20 Investor Call and in Fastly's Shareholder Letter on August 5, 2020....................25

    E. Defendants' False and Misleading Statements Made During a CNBC Interview on August 6, 2020........................................................................27

    F. Defendants' False and Misleading Statements Made in Fastly's 2Q20 Form 10-Q on August 7, 2020.......................................................................28

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH

- i -

4825-8326-7812.v1

**Page**

    G.    Defendants' False and Misleading Statements Made During the August 11 and 12, 2020 Roadshows ...................................................................................32

    H.    The October 14, 2020 Disclosures.......................................................................34

VI.    POST-CLASS PERIOD REVELATIONS .........................................................................36

VII.    ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER .......................................38

    A.    Defendants Knew that as Fastly's Largest Customer, TikTok Was of Central Importance to Fastly's Operations ..............................................................38

    B.    Defendants Monitored TikTok's Business and Revenue Contribution ................39

    C.    The U.S. Government's Investigation and Banning of TikTok Was Publicly Reported on, Before and During the Class Period.................................40

    D.    Fastly Had Strong Motive to Conceal the Unsustainable Nature of TikTok's Business Because It Was Attempting to Secure Desperately-Needed Operating Cash Through a Public Stock Offering...................................40

    E.    Fastly Had a Motive to Conceal Its Reliance on TikTok in Order to Use Its Stock as a Currency to Fund Its Acquisition of Signal Sciences .........................42

    F.    Insider Trades Further Support Scienter ...............................................................42

VIII.    LOSS CAUSATION AND ECONOMIC LOSS ..............................................................43

IX.    THE PSLRA SAFE HARBOR DOES NOT APPLY.......................................................48

X.    ADDITIONAL CONTROL PERSON ALLEGATIONS...................................................48

XI.    LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE..................................................................................................................49

COUNT I ......................................................................................................................................51

    For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants .................................................................................................51

COUNT II .....................................................................................................................................52

    For Violation of Section 20(a) of the Exchange Act Against Defendants Bixby and Lares..................................................................................................................52

PRAYER FOR RELIEF ...............................................................................................................52

JURY TRIAL DEMAND ..............................................................................................................53

Lead Plaintiff Andrew Zenoff ("Lead Plaintiff") alleges the following based upon the investigation of Lead Plaintiff's counsel, which included a review of the United States Securities and Exchange Commissions ("SEC") filings by Fastly, Inc. ("Fastly" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases and other public statements issues by the Company, and media reports about the Company and its industry. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    INTRODUCTION

1.    This is a federal securities class action brought on behalf of a proposed class of all purchasers and acquirers of Fastly common stock between May 6, 2020 and October 14, 2020 (the "Class Period"), against Fastly, its chief executive officer ("CEO") Joshua Bixby, and chief financial officer ("CFO") Adriel Lares (collectively, "Defendants"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Headquartered in San Francisco, Fastly runs a serverless edge cloud platform that provides its customers with a content delivery network ("CDN") that quickly pushes traffic around the internet so its customers can help consumers shop online or watch videos on applications and websites.

3.    The Class Period starts on May 6, 2020, when, after market close, Defendants announced Fastly's first quarter 2020 ("1Q20") earnings and impressed investors with a reported 38% increase in revenue growth year-over-year for the quarter due to increased traffic on its platform. Defendants, however, failed to disclose that Fastly's revenue growth was driven by its single largest customer, China-based ByteDance, the operator of the wildly popular video sharing application TikTok, who at the time was under threat of shut down in the United States due to fears that the data it collects from its users could be used by the Chinese government. Instead of disclosing that TikTok had become Fastly's single largest customer in 1Q20, and that the U.S. bans it was facing posed a material risk to Fastly's revenues, Defendants repeatedly touted the Company's revenue growth, the strength of its enterprise customers and demand for its edge based platform, while omitting any mention of TikTok and the risk it posed to Fastly's revenues.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                                    - 1 -
4825-8326-7812.v1

4.      Defendants were motivated to conceal this information about TikTok because Fastly – who was cash strapped and reporting negative cash flow since its May 2019 initial public offering ("IPO") – was at the time planning a public stock offering, which closed less than three weeks after Defendants' misleading statements on May 6, giving Fastly over $270 million in critically needed proceeds from the sale of its stock at artificially inflated prices.

5.      On August 5, 2020, Defendants publicly admitted the embattled TikTok had in fact been Fastly's largest customer for the first half of 2020 and that "any ban of the TikTok app by the U.S. would create uncertainty around our ability to support this customer[,]" and "the loss of [TikTok's] traffic would have an impact on our business." In response to this news, Fastly's stock price plummeted 17.7%. Defendants, however, continued to mislead investors because although they warned on August 5 that Fastly's revenues could be impacted because of the uncertainty surrounding TikTok's fate in the U.S., they failed to disclose that TikTok was already moving traffic from Fastly's platform to non-U.S. platforms, that there was a material risk that Fastly would not be able to quickly replace the lost traffic with other customers as they earlier promised investors they could do, and as such that the Company's third quarter 2020 ("3Q20") and fiscal year ("FY") 2020 guidance had no reasonable basis.

6.      On October 14, 2020, the truth about TikTok removing its traffic from Fastly's platform was disclosed when Defendants were forced to pre-announce Fastly's 3Q20 earnings due to a significant loss of TikTok revenue and their inability to backfill that lost revenue. The Company surprised analysts by announcing that Fastly's 3Q20 revenues would be significantly less than previously guided and withdrawing the Company's FY 2020 guidance Defendants gave just two months earlier. In response to this news, Fastly's share price declined sharply, by almost 30%, on the highest trading volume day since Fastly became a public company. As a result of Defendants' fraud, by October 15, 2020, Fastly lost over three billion in shareholder equity value and investors suffered.

## II.    BACKGROUND AND SUMMARY OF THE ACTION

### A.    Fastly's Business

7.    Fastly is an "edge-based" computing platform that enables its customers to deliver content like websites and applications ("apps") from Fastly's servers rather than their own. Fastly's data centers are strategically located in close proximity to users, which makes the platform good for content delivery and edge computing.  As an edge-based computing platform, Fastly's platform allows developers to build applications on the Company's servers which creates a better experience for users and reduces lag time.  Fastly's edge cloud platform allows its "customers to create great digital experiences quickly, securely, and reliably by processing, serving, and securing [its] customers' applications as close to their end-users as possible – at the edge of the internet."

8.    Founded in March 2011, Fastly went public in May 2019.  Fastly sold over 12.9 million shares for $16 per share which raised approximately $192.5 million for the Company. Although Fastly's revenue growth increased from the time of the IPO to the start of the Class Period, the Company was netting millions of dollars in losses during the same time frame.

9.    Fastly's customers include established enterprises, mid-market companies and digital innovators.  During the Class Period, Fastly touted the list of customers that used its platform:

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                         - 3 -
4825-8326-7812.v1

10. Fastly generates substantially all of its revenue from charging its customers based on their usage of Fastly's edge cloud platform. Under this usage-based revenue model, Fastly's revenues grew as its customers' websites and applications delivered and processed more traffic on Fastly's platform.

11. Fastly monitors its customer usage through the use of various key metrics that are regularly reported to investors. For example, one of Fastly's key reported metrics is Dollar-Based Net Expansion Rate ("DBNER"), which represents how much existing customer revenues grow year-over-year. Another is Net Retention Rate ("NRR"), which measures the net change in monthly revenue from existing customers year-over-year.

12. Fastly's revenue is primarily driven by its "enterprise" customers, who Fastly defines as large customers generating in excess of $100,000 over the previous 12-month period. According to the Company's SEC filings, its enterprise customers were "critical to our long-term success." Thus, Fastly closely monitors its enterprise customer usage through various key metrics such as total enterprise customer count, average enterprise customer spend and percentage of revenue generated by enterprise customers. According to Fastly's FY 2019 10-K, its enterprise customers represented 87% of the Company's revenue for 2019.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 4 -

13. Before and during the Class Period, Fastly had significant customer concentration with its 10 largest customers generating 29% of 2019 revenue.

14. In the period leading up to the Class Period, ByteDance, the owner and operator of TikTok, was one of Fastly's largest enterprise customers. In 2017, ByteDance, a Chinese technology firm headquartered in Beijing, acquired U.S.-based social video app Musical.ly, which was the Western version of Asia's TikTok at the time. TikTok merged with Musical.ly in August 2018 and was relaunched as TikTok.

15. ByteDance uses Fastly's platform to deliver videos on the TikTok app. The speed and security of Fastly's platform made Fastly a preferred provider for TikTok content. By December 2019, TikTok had over 507 million global users and by October 2019, close to 40 million U.S. users.

16. As the popularity and growth of TikTok skyrocketed in 2019, its usage of Fastly's platform also rapidly increased and more and more of Fastly's platform capacity was used by TikTok. By the start of 2020, unbeknownst to investors, Fastly was becoming more dependent on TikTok traffic for its revenue growth and by the end of 1Q20, TikTok had become Fastly's single largest customer, accounting for over 10% of Fastly's revenues.

### B. By the Start of the Class Period TikTok, Fastly's Largest Customer, Is Being Investigated by CFIUS as a National Security Threat

17. At the same time TikTok was becoming Fastly's single largest customer, TikTok's popularity had already sparked serious national security concerns due to fears that the data it collects from users could be used by the Chinese government. According to TikTok's privacy policy, the app "automatically collects" users' IP addresses, geolocation-related data, unique device identifiers, browsing and search history, and cookies. While most social media apps have similar policies, the fact that TikTok's owner, ByteDance, was China-based, made its data access potentially troubling for the U.S. because of the rapid increase in TikTok's popularity. In January 2018, TikTok was used by about 11 million Americans and a year later that number doubled to about 27 million. By June 2020, TikTok's total number of U.S. active users had risen to more than

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 5 -

91 million; by the fourth quarter of 2019 TikTok became the second-most downloaded app in the United States on Apple's App Store.

18.    On October 9, 2019, *The Washington Post* reported that Senator Marc Rubio requested an investigation into TikTok from the Committee on Foreign Investment in the United States ("CFIUS") to investigate the national security implications of ByteDance's acquisition of TikTok's precursor, Musical.ly.  *The Washington Post* reported that "Rubio's quest for a CFIUS probe could resonate with the White House in the midst of its trade war with China," in light of the fact that the preceding month, "the Trump administration proposed new rules that would enhance the powers of CFIUS, particularly with an eye on scrutinizing Chinese investment in areas including technology."   On November 1, 2019, news outlets, including *Reuters* and *The Washington Post*, reported that CFIUS had launched an investigation into TikTok over national security concerns and had started to review ByteDance's acquisition of TikTok's precursor, Musical.ly, which had not been previously cleared by CFIUS.

19.    CFIUS is a cross-government group that reviews proposed foreign investments in the United States, including mergers, acquisitions and takeovers, to determine whether they threaten U.S. national security.  As part of its authority, CFIUS can require transactions be restructured, modified, or even blocked to mitigate a national security threat.  Thus, the initiation of a CFIUS investigation into ByteDance's acquisition of Muiscal.ly/TikTok meant that TikTok could be facing a shut-down of its operations in the United States, a forced sale to a U.S. company with a large cloud infrastructure that competes with Fastly, or other adverse action that could severely curtail its ability to do business in the United States, including business with Fastly.  For example, as reported in *The New York Times*, in January 2016, a Chinese investor's purchase of a majority stake in a unit of the Dutch electronics company Philips known as Lumileds was terminated following CFIUS's investigation due to the committee's findings of national security concerns.  In 2018, under the Trump Administration, legislation was issued by Congress that gave the executive branch new powers to reject foreign investments in U.S. companies if they are deemed to affect national security.

20. By the time TikTok was being investigated by CFIUS, the U.S. and China had been in a two-year long trade war that involved heightened tariffs on imports from China, blocked mergers involving Chinese companies and divestitures of Chinese companies' ownership in U.S. firms based on national security concerns.

21. For example, by 2017, media outlets were widely reporting on CFIUS's crackdown of Chinese investments in the U.S. under the Trump administration. On September 13, 2017, *The New York Times* and *Reuters* reported President Trump blocked the Chinese-backed private equity firm Canyon Bridge Capital Partners from buying Lattice Semiconductors, a U.S.-based chipmaker after CFIUS had recommended against the acquisition. On January 2, 2018, *The New York Times* and *Reuters* reported the acquisition of Moneygram, the money transfer company, by the Chinese electronic payments company Ant Financial, was terminated because CFIUS did not approve of the merger. On March 13, 2018, *The Wall Street Journal* reported the Trump administration issued a presidential order preventing the Singapore-based Broadcom from purchasing Qualcomm, a U.S. semiconductor company, after a CFIUS review raised national security concerns. On March 27, 2019, *The Wall Street Journal* reported that CFIUS forced Chinese gaming company Beijing Kunlun Tech Co. Ltd. to give up control of Grindr, an American dating app due to national security concerns about the Chinese firm's access to U.S. citizen personal data. This marked the first time the United States asserted that foreign control of a social media app could have national security implications. On April 4, 2019, CNBC reported that China-based iCarbonX agreed to divest its acquisition of U.S. health-care-data company PatientsLikeMe after CFIUS raised concerns about access to U.S. citizen personal data. A *Washington Post* article noted on November 11, 2019 that with respect to TikTok, "CFIUS could demand divestment, as occurred with Grindr and PatientsLikeMe." On March 6, 2020, *The Washington Post* reported that following a CFIUS review, Trump ordered Chinese company Beijing Shiji Information Technology to divest all ownership of U.S. hotel-software company StayNTouch, on national security concerns due to the Chinese investor's access to StayNTouch's hotel-guest data.

### C. By the Start of the Class Period, Other National Security Investigations Are Being Called for and U.S. Government Is Increasingly Banning Use of TikTok

22. By October 2019, U.S. lawmakers were also demanding that national intelligence officials investigate TikTok. On October 24, 2019, *The Washington Post* and other news sources reported that Senate Democratic leader Charles E. Schumer (N.Y.) and Republican Sen. Tom Cotton (Ark.) sent a joint letter to the acting Director of National Intelligence, Joseph Maguire, warning that TikTok could pose a national security risk, and calling on regulators and intelligence agencies to investigate the app on national security grounds and present their findings to Congress. The joint letter stated that "TikTok is a potential counterintelligence threat we cannot ignore" as China-based ByteDance could be compelled "to support and cooperate with intelligence work controlled by the Chinese Communist Party" and "there is no legal mechanism for Chinese companies to appeal if they disagree with a request."

23. By late 2019 the U.S. was also actively banning the use of TikTok on government devices. For instance, on December 16, 2019, the U.S. Navy banned TikTok from all government-issued devices saying it represented a "'cybersecurity threat.'" In a "'cyber awareness'" message that same day, the Defense Department urged Pentagon employees to uninstall the app because it could potentially expose personal data to "'unwanted actors.'" Two days later, on December 18, 2019, the Air Force released an email from Naval Network Warfare Command in Suffolk, Virginia, telling sailors and Marines that they would be blocked from accessing Navy Marine Corps Intranet services if they have TikTok on their iPhones or iPads.

24. On December 31, 2019, news sources reported the U.S. army also banned the use of TikTok, which Army spokeswoman Lt. Col. Robin Ochoa said was "'considered a cyber-threat.'" According to *The Washington Post*, "[t]he Army's ban and the rare notice from the Pentagon, which does not generally issue policy measures on individual social media services, reflects deeply rooted doubts throughout Washington about TikTok and its Chinese parent, ByteDance."

25. By end of January 2020, news sources reported that the Air Force, Marine Corps, Coast Guard, State Department and Department of Homeland Security followed in the path of the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1
- 8 -

U.S. Navy and U.S. Army and had all banned TikTok. And news sources reported on February 23, 2020, that Transportation Security Administration ("TSA") banned its employees from using TikTok.

26. As 2020 continued, so did the problems TikTok was facing in the U.S. On March 13, 2020, news sources reported that Sen. Josh Hawley (R-Mo.) ("Hawley") introduced legislation in the U.S. Senate that would prohibit all federal employees from using or downloading TikTok. The legislation, S.3455, was referred to the Committee on Homeland Security and Governmental Affairs on March 12, 2020. During a hearing of the Senate Judiciary Committee's Subcommittee on Crime and Terrorism, which he chaired, Hawley stated that the proposed legislation "'is a necessary step to protect the security of the United States and the data security of all Americans.'"

27. By July 2020, the Trump administration also announced that it was considering banning the use of TikTok in the United States. On July 7, 2020, *The Washington Post* reported that Secretary of State Mike Pompeo announced the U.S. was considering banning TikTok, and warned it puts "'your private information in the hands of the Chinese Communist Party.'" When asked in a Fox News interview on July 6, 2020, if the U.S. should be looking at banning TikTok, Pompeo stated: "'We are taking this very seriously and we are certainly looking at it.'" That same day, Trump affirmed Pompeo's remarks, stating that his administration is "'looking at'" banning the app.

28. On July 10, 2020, news sources reported that the Democratic and Republican national committees cautioned staffers about using TikTok. And on July 28, 2020, news sources reported that the Joe Biden 2020 presidential campaign instructed its staff to delete TikTok for security reasons.

29. In early August 2020, based on the results of the CFIUS investigation, the Trump administration announced its plan to ban TikTok if the Chinese-owned platform was not sold to U.S. buyers by September 15, which Forbes called a "final ultimatum." Then, on August 6, 2020, President Trump issued Executive Order 13942 to address national security threats posed by TikTok. The executive order stated that TikTok "automatically captures vast swaths of information from its users," such as location data and browsing and search histories, which

"threatens to allow the Chinese Communist Party access to Americans' personal and proprietary information – potentially allowing China to track the locations of Federal employees and contractors, build dossiers of personal information for blackmail, and conduct corporate espionage." The executive order provided that certain transactions with ByteDance would be prohibited by September 20, 2020 if TikTok were not sold to Microsoft or another American corporation by then, and required the Secretary of Commerce to identify the transactions subject to these prohibitions by that date. The Associated Press reported on August 6, 2020, that "[w]hile the wording of the orders is vague and appears to have been rushed out, some experts said it appears intended to bar the popular app[] from the Apple and Google app stores, which could effectively remove [it] from distribution in the U.S."

30. In addition to actions taken in the U.S., several other countries were also taking action against TikTok due to data security concerns. For example, on June 29, 2020, *The New York Times* reported that India banned TikTok. In a June 29, 2020 statement, India's Ministry of Electronics and Information Technology stated that the app was "'stealing and surreptitiously transmitting users' data in an unauthorized manner to servers which have locations outside India.'" "'The compilation of these data, its mining and profiling by elements hostile to national security and defense of India, which ultimately impinges upon the sovereignty and integrity of India, is a matter of very deep and immediate concern which requires emergency measures,'" the statement added.

31. Similarly, in June 2020, the European Data Protection Board assembled a task force to investigate TikTok's handling of private data as well as to assess security risks in connection with the app. In July 2020, both the European Union and Turkey's Personal Data Protection Authority launched an investigation into TikTok's privacy policies and how the platform handles personal data. Also, in July 2020, several legislators in Australia expressed concern over TikTok privacy issues and a possibility of the Chinese government having access to users' data. Prime Minister Scott Morrison declared the Federal Government was looking "'very closely'" at TikTok.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

- 10 -

**D.  Defendants Fail to Disclose that TikTok Is Fastly's Single Largest Customer and the Material Risk Fastly's Business Faces as a Result of TikTok's Problems**

32.  Despite knowing about the well-publicized consequences TikTok was facing in connection with the CFIUS investigation and that it was being increasingly banned in the U.S., Defendants failed to publicly disclose that TikTok had become Fastly's single largest customer in 1Q20, and was continuing to do the same in second quarter 2020 ("2Q20"), and the major risk TikTok posed to Fastly's revenues.  Instead, in statements to investors between May 6, 2020 and the beginning of August 2020, Defendants repeatedly touted Fastly's revenue growth, the strength of its enterprise customers and the demand for Fastly's platform, while omitting any mention of TikTok and the risk its posed to Fastly's revenues.  ¶¶51-96.

33.  While the Company did recognize its dependence on a select few customers in its quarterly report for the period ended March 31, 2020 that was filed on Form 10-Q with the SEC on May 8, 2020, Fastly did not disclose the identity of any of these customers and instead asserted that the Company's "accounts receivable credit risk exposure is limited."  ¶68.  Moreover, while Fastly warned of other generic risks the Company faced, Defendants failed to disclose in the 1Q20 Form 10-Q that the revenue from TikTok could be negatively impacted because of the ongoing investigation by CFIUS and the increasing bans being implements by the U.S. government.  ¶¶63-70.

34.  Defendants were motivated to conceal from investors that TikTok was Fastly's single largest customer by 1Q20, and a major risk to Fastly's revenues, so they could take advantage of Fastly's inflated stock price to facilitate a public stock offering shortly after Fastly's May 6, 2020 earnings announcement.  In response to Fastly's impressive revenue growth for 1Q20 and increased guidance reported on May 6, Fastly's stock price jumped 45.7% to close at $33.58 on May 7, 2020.  On May 28, 2020, just a few weeks after the 1Q20 earnings announcement, Defendants completed the public offering of 6.9 million shares of Fastly common stock, which was then trading at an artificially inflated price of $40.60 per share, to obtain $274 million in

proceeds. These proceeds were critical to Fastly's operations as the Company was cash strapped and had been operating with negative cash flow since its IPO in May 2019.

### E. Investors Learn About TikTok Being Fastly's Largest Customer but Defendants Continue to Conceal the Full Truth About the Impact of TikTok's Geopolitical Problems on Fastly's Business

35. On Fastly's August 5, 2020 2Q20 earnings call (after market close), Defendants revealed that TikTok was Fastly's single largest customer for the first half of 2020. In fact, over the six-month period ended June 30, 2020, TikTok traffic accounted for 12% of Fastly's revenue and for the three month period ended June 30, 2020 TikTok represented 13% of Fastly's revenue.

36. The revelation on August 5, 2020 that TikTok was such a major portion of Fastly's revenue stream shocked and concerned investors. In response to this news, Fastly's share price fell to a closing price of $89.64 on August 6, 2020, $19.28 or 17.7%, off its previous day's closing price of $108.92. After market close on August 6, 2020, President Trump issued Executive Order 13942, titled "Addressing the Threat Posed by TikTok . . . ," which formalized the TikTok ban to take effect in 45 days. Fastly's share price continued to fall an additional $10.31 or 11.5%, to close at $79.33 on August 7, 2020. These drops, totaling $29.59 per share, represented a 27.2% reduction in value from close on August 5, 2020 to close on August 7, 2020.

37. While Defendants warned investors on the August 5, 2020 earnings call that any ban of the TikTok application by the U.S. could result in Fastly losing TikTok's traffic, Defendants remained upbeat, telling investors not to worry because Fastly would be able to quickly backfill any lost TikTok traffic if such a situation were to occur. Defendants' also increased Fastly's 2020 full year guidance to mitigate the impact of the negative news.

38. Defendants, however, continued to mislead investors as they knew, but failed to disclose during the August 5, 2020 earnings call, that TikTok was already moving traffic off of Fastly's platform to other non-U.S. CDN's because of the investigations and bans TikTok was experiencing in the U.S. As a February 10, 2021 *Seeking Alpha* article revealed, TikTok was moving traffic away from Fastly as early as "the end of Q2 2020." Additionally, by August 5, TikTok had undertaken efforts to reduce reliance on third-party CDN platforms such as Fastly's,

by creating its own CDN, which put Fastly's future revenue from TikTok at further risk. And while Defendants led investors to believe Fastly could quickly fill any lost TikTok revenue, that was not the case. Defendants failed to disclose the substantial risk they faced in filling that loss because Fastly had become increasingly reliant on TikTok's revenue as its largest customer and Fastly was dependent on only nine other large customers for another 20% of its revenue. Also, by the beginning of 3Q20, the usage and revenue generated by some of Fastly's other enterprise customers were declining. Moreover, in the first six months of 2020, TikTok's use of Fastly's platform was rapidly increasing due to TikTok's growing popularity, which put constraints on Fastly's platform and caused Fastly to turn down business that it could not recover or use to backfill TikTok revenue loss.

39. Defendants were again motivated to conceal from investors this bad news about TikTok in order to use Fastly's inflated stock price to facilitate a critical acquisition to expand Fastly's security portfolio. Specifically, on August 27, 2020 Defendants announced that Fastly was acquiring Signal Sciences for $200 million in cash and approximately $575 in Fastly stock.

40. In addition, Defendants were able to personally take advantage of their fraudulent conduct. During the Class Period, Bixby and Lares profited from insider trading, collectively selling over 330,000 shares of their Fastly stock for over $22 million in proceeds – all the while they knew, but failed to disclose, that by 1Q20 TikTok had become Fastly's single largest customer, and the risks that posed to Fastly's revenues, and that by 2Q20 TikTok was already shifting traffic away from Fastly's platform, which could not be quickly filled.

**F. On October 14, 2020 Defendants Are Forced to Make a 3Q20 Earnings Pre-Announcement and Withdraw Guidance Due to Loss of TikTok Business**

41. On October 14, 2020, Defendants were forced to pre-announce Fastly's 3Q20 revenue results due to a "significant reduction" in TikTok revenue. Defendants lowered 3Q20 revenue by $4 million (mid-point) because of the TikTok traffic loss and withdrew the FY 2020 guidance they had previously given on August 5, 2020, just two months earlier, telling investors that the prior guidance could not be relied upon.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH - 13 -
4825-8326-7812.v1

42. Investors were again surprised by Defendants' disclosure about TikTok, this time concerning the loss of TikTok business and Fastly's inability to backfill that lost revenue, contrary to what was previously represented. In response to the news, Fastly's share price plunged over 27% from a close of $123.18 on October 14, 2020 to a close of $89.70 on October 15, 2020, on a volume of close to 60 million shares, the highest single day trading volume since Fastly became a publicly traded company in May 2019.

## III. JURISDICTION AND VENUE

43. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa) because Lead Plaintiff's claims arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

44. Venue is proper in this district pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Fastly maintains its corporate headquarters in this district. Additionally, many of the acts charged herein, including the preparation and dissemination of materially false or misleading information, occurred in substantial part in this district.

45. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the Internet, and the facilities of the national securities markets.

## IV. PARTIES

46. Lead Plaintiff Andrew Zenoff purchased Fastly common stock at artificially inflated prices during the Class Period and was damaged by the conduct alleged herein.[1]

47. Defendant Fastly is a provider of an edge cloud platform that purportedly enables "customers to create great digital experiences quickly, securely, and reliably by processing, serving, and securing [its] customers' applications as close to their end-users as possible." Fastly

---

[1] An updated certification reflecting Lead Plaintiff's relevant transactions in Fastly common stock with respect to the operative Class Period is attached hereto.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH - 14 -
4825-8326-7812.v1

is a Delaware corporation with its principal executive offices located at 475 Brannan Street, Suite 300, San Francisco, CA 94107. Fastly common stock is listed and trades on the New York Stock Exchange ("NYSE"), an active market, under the ticker symbol "FSLY." During the Class Period, Fastly, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock. The Company has established and regularly publicizes the availability of a website at www.Fastly.com, on which it maintains an Investor Relations section where SEC filings, press releases, conference call recordings, investor presentations, shareholder letters, financial statements and information, corporate governance policies, descriptions of its business, and other information about the Company is made available to investors.

48. Defendant Joshua Bixby ("Bixby") is, and was at all relevant times, the CEO of Fastly. Bixby first joined the Company in a part-time advisory role in 2013 and has been on the executive leadership team at Fastly since December 2015. He previously served as President of Fastly from May 2017 to February 2020 and was appointed as CEO on February 18, 2020. As CEO, Bixby had the power to authorize or approve publicly disseminated information about the Company and was regularly quoted in Fastly's press releases, regularly spoke on Fastly's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, regularly made live presentations at analyst-sponsored investor conferences, and signed or authorized all of Fastly's reports filed with the SEC.

49. Defendant Adriel Lares ("Lares") is, and was at all relevant times, the CFO of Fastly. Lares has been the CFO of Fastly since May 2016. As CFO, Lares had the power to authorize or approve publicly disseminated information about the Company, regularly spoke on Fastly's quarterly earnings calls to discuss financial results with Wall Street analysts and investors, made live presentations at analyst sponsored investor conferences, and signed or authorized all of Fastly's reports filed with the SEC.

50. Defendants Bixby and Lares are collectively referred to herein as the "Individual Defendants."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

51. During the Class Period, Defendants materially misled investors, thereby maintaining and inflating the price of Fastly common stock, by publically issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements not false and misleading.

### A. Defendants' False and Misleading Statements Made in Fastly's 1Q20 Shareholder Letter and During the 1Q20 Investor Call on May 6, 2020

52. The Class Period begins on May 6, 2020 when Fastly filed a Form 8-K signed by Lares with the SEC, attaching a shareholder letter, announcing its 1Q20 financial results. In the shareholder letter, the Company and Lares reported Fastly's "[s]trong top-line growth with revenue of $63 million, up 38% year-over-year."

53. In the 1Q20 shareholder letter, the Company and Lares provided more details on the strength of Fastly's 1Q20 performance, commenting on the strength of Fastly's customer base and demand for Fastly's platform, reporting that the Company's customers were thriving and that the Company was driving revenue expansion through its enterprise customers. Defendants also attributed Fastly's results to increased internet usage due to social distancing measures that were implemented in the second half of March 2020. In the shareholder letter, Defendants stated in part:

> *We generated $63 million in revenue, up 38% year-over-year, and increased our enterprise customer count to 297 from 288 in the previous quarter. We continued to drive expansion within our customer base with a DBNER of 133% and our average enterprise customer spend continued to increase to $642,000 from $607,000 in the previous quarter. These results were primarily driven by continued strong business fundamentals and further adoption of our edge cloud platform by enterprise organizations across multiple verticals and geographies, including high margin verticals such as FinTech and ecommerce. Additionally, this momentum was supplemented by increased internet usage as social distancing measures were implemented in the second half of March. Suffice it to say, the internet and our business are thriving*, in part due to our ability to serve as a trustworthy partner for innovative enterprises around the globe.
>
> . . . *We partner with the most technologically advanced and creative companies who we believe will not only weather this storm, but will continue to thrive in this environment*. . . .

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 16 -

Despite the current global economic uncertainty, *we remain confident in the demand for our mission-critical services and the continued growth of our business in 2020 and the years to come. As such, we have raised guidance for 2020 and expect to make further progress on our path to profitability*.

54.     The Company and Lares further reported on the Company's enterprise customers as Fastly's "growth driver," its "partnering with large companies that have the capability and available budget to increase engagement," the "visibility and stability" of its enterprise customers, the increase in enterprise customer revenue due to platform usage expansion, and the "stickiness" of its platform with a net retention rate of 130% for 1Q20:

> *Enterprise customers continue to be our primary revenue and growth driver, generating 88% of our trailing twelve-month revenue for the calendar year. We are focused on partnering with large companies that have the capability and available budget to increase engagement on our platform* . . . . In addition to these [enterprise] customers having the quickest ramp in usage and the highest demand for ancillary product and features, *they're also more likely to provide us with a certain degree of visibility and stability relative to other market segments in uncertain times*.

> During the first quarter of 2020, our enterprise customer count increased to 297, up from 288 in the previous quarter. *This increase was driven by new large customers, as well as existing customers that expanded their usage of the platform*.

> *        *        *

> In addition to expanding our enterprise customer base, we are also focused on expanding our existing enterprise customers' engagement. For the first quarter, average enterprise customer spend increased to $642,000 from $607,0001 in the previous quarter. *The increase in spending is driven by usage on our platform and further adoption of optimization and security products such as Media Shield, Cloud Optimizer, WAF, and our TLS services*.

> *        *        *

> *We further demonstrated the stickiness of our edge cloud platform with a Net Retention Rate[2] (NRR) of 130% in Q1 2020*. NRR measures the net change in monthly revenue from existing customers in the last month of the period compared to the last month of the same period one year prior, and includes revenue contraction due to billing decreases or customer churn, revenue expansion due to billing increases, but excludes revenue from new customers.

55.     In the 1Q20 shareholder letter, Defendants announced increased guidance for FY 2020, from $255-$265 million in total revenues to $280-$290 million, from ($43)-($33) million in non-GAAP operating losses to ($20)-($10) million and from ($0.43)-($0.32) in non-GAAP net loss per share to ($0.15)-($0.08).

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                              - 17 -
4825-8326-7812.v1

56. The Company and Lares attributed the increased FY 2020 guidance to expected "continued customer expansion" due to increased internet traffic from social distancing measures and emphasized that they "remain optimistic about the demand . . . and the underlying growth of our business":

> *As we mentioned earlier, we saw continued customer expansion on our platform which was bolstered by increased internet traffic from social distancing measures in Q1. We expect this trend to continue into Q2 and future periods.* Despite the current global economic uncertainty, *we remain optimistic about the demand for our mission-critical services and the underlying growth of our business.* Accordingly, we raised guidance for the full-year 2020.

57. On May 6, 2020, Fastly also hosted a conference call to discuss its 1Q20 results wherein Defendants essentially repeated the statements made in Fastly's 1Q20 shareholder letter concerning Fastly's strong 1Q20 performance:

- Bixby reported on the "strong first quarter results with continued top line growth," *driven by "enterprise customers generating 88% of our trailing 12-month total revenue" and "existing customers . . . continuing to rely on us more*."

- Bixby stated "We delivered strong first quarter results with continued top line growth generating $63 million in revenue, up 38% year-over-year. *We continue to see strong customer adoption of our edge cloud platform and security products by both new and existing customers across multiple verticals.*"

- Bixby reported, "Our enterprise customer count grew to 297, up from 288 last quarter, *with average enterprise customer spend also increasing to $642,000, up from $607,000 in the previous quarter. . . . Our existing customers are continuing to rely on us more as reflected in a consistently strong dollar-based net expansion rate of 133%.*"

- Bixby stated, "As I touched upon in the shareholder letter, *Fastly's platform is playing an important role as we continue to operate in these uncertain times. As social distancing measures increased over the March period, we continued to see increased traffic across the Internet and our platform, which certainly provides an additional boost to our results.*"

- Bixby stated, "*We are partnering with the most technologically advanced and creative companies, who we believe will not only weather the storm, but will continue to thrive in this environment.*"

58. On the call, analysts specifically asked Lares about Fastly's path to profitability "given what's going on in the world." In response, Lares emphasized that Defendants "fe[el] good

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
- 18 -
4825-8326-7812.v1

about or path to profitability," "if not maybe a little bit more confident about it" and that "nothing's changed," other than being "incrementally more confident":

> [ANALYST:] Makes perfect sense to me. Maybe if I can just follow up with a quick one for Adriel. Adriel, your guidance implies nice leverage in the business, and I appreciate your comments on gross margin leverage. But more broadly, how are you thinking about the path to profitability in your current capital position here? Has anything changed just given what's going on in the world?

> [LARES:] Thanks, Brad. And I mean, generally, we still -- *we felt good about our path to profitability sort of pre-COVID. I think we feel just as good about it, if not maybe a little bit more confident about it, just based on the fact that we are seeing stronger demand, which is reflected in our sort of annual top line revenue guidance*. And so from where we are from a cash position, where we are from a profitability position, *I would say that nothing's changed other than the many -- or the incrementally more confident just based on everything we're seeing at the time*.

59. In response to an analyst question about assumptions for 2Q20 guidance, Lares highlighted that they are "not seeing anything at least concerning from a sort of the Q2 perspective" and that their large enterprise customers "seem to be in good shape":

> [ANALYST] Great. And I'm also wondering if you could unpack maybe your assumptions in Q2 and for the rest of the year in terms of maybe contract repricings or customer nonpayments or things related to some of the customer segment feeling pressure. I know it's a small percentage, but are you baking in some assumptions for bad debt or contract repricings and things like that?

> \* \* \*

> [LARES]: Yeah. Thanks, Joshua, and thanks . . . for the question. *Yes. At least at this time we're not seeing anything yet. And to Joshua's point, the majority of the customers that we have on our platform are those innovators, are those sort of larger enterprise customers which makes up the bulk of our revenue. And so far, they seem to be in good shape*. There was a slight uptick in DSO but there wasn't anything concerning from a long-term basis, at least what we can see right now. *It is something that we continue to monitor on sort of a weekly basis, daily basis. But at this time, we're not seeing anything at least concerning from a sort of the Q2 perspective*.

60. During the 1Q20 earnings call, an analyst asked about whether any of Fastly's customers were "talking about changing minimum traffic commitments" for the Company's platform. In response Lares stated "we haven't seen anything major."

61. In response to an analyst question regarding network utilization, Bergman stated that Defendants "*have had significant growth in usage*."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                          - 19 -
4825-8326-7812.v1

62.     Defendants' statements, set forth in ¶¶52-61, *supra*, were materially misleading and omitted material information because at the time the statements were made, TikTok was Fastly's single largest customer, representing over 10% of Fastly's revenue and was continuing to be its largest customer in 2Q20, which Defendants failed to disclose.  ¶¶3-5, 9, 15-16, 32-36, 68, 73. TikTok was a major contributor to Fastly's revenue growth and its usage of Fastly's platform was rapidly increasing as TikTok's popularity was exploding.  ¶¶16, 68, 73, 114-117.  By the start of the Class Period the reports of TikTok's threat as a national security concern and bans of its use in the United States were frequent and well-publicized.  TikTok was under investigation by CFIUS over national security concerns, which meant that TikTok's U.S. operations could be shut down or the app could be forced to be sold to a Fastly competitor; TikTok had already been banned by many government departments, including the U.S. Army, Navy, Air Force, Marine Corps, Coast Guard, State Department, Department of Homeland Security and TSA; and had been banned in other countries as well such as by the Australian Defense.  ¶¶17-31, 118-120.  As such, TikTok posed a significant material risk to Fastly's revenues by the start of the Class Period and going forward, which Defendants failed to disclose.

**B.     Defendants' False and Misleading Statements Made in Fastly's 1Q20 Form 10-Q on May 8, 2020**

63.     On May 8, 2020, Fastly issued its Form 10-Q with the SEC, signed by Bixby and Lares, reporting the Company's financial and operating results for the quarter ended March 31, 2020.  The 1Q20 Form 10-Q outlined various "[r]isk [f]actors," including the risk that the Company "receive[s] a substantial portion of our revenues from a limited number of customers," and "[t]he loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues" and "our business would be harmed."  The 1Q20 Form 10-Q stated:

> Our future success is dependent on establishing and maintaining successful relationships with a diverse set of customers. ***We currently receive a substantial portion of our revenues from a limited number of customers.  For trailing 12 months ended March 31, 2020, our top ten customers accounted for approximately 31% of our revenue***.  It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future and, in some cases, the portion of our revenues attributable to individual customers may increase in the future. ***The loss of one or more key customers or a reduction in usage by any major customers would reduce***

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                                    - 20 -
4825-8326-7812.v1

*our revenues. If we fail to maintain existing customers or develop relationships with new customers, our business would be harmed.*

64. The 1Q20 Form 10-Q "[r]isk [f]actors" section further warned of potential generic risks related to the U.S. government prohibiting Fastly's customers from doing business with the Company. The 1Q20 Form 10-Q stated in part:

*If the U.S. government prohibits our current or potential customers from doing business with us, whether through policy, regulations or laws, we could face direct liability or our delivery of content by our platform may be blocked. For example, in the current environment of economic trade negotiations and tensions between the Chinese and U.S. governments, the U.S. government has expressed concerns about the ability of companies operating in China to do business in the U.S. or with U.S. companies. As a result, we could lose the ability to contract with current or potential customers, which could harm our business.*

65. Another risk factor outlined in Fastly's 1Q20 Form 10-Q was that "[u]sage of our platform accounts for substantially all of our revenue." The 1Q20 Form 10-Q stated in relevant part:

We expect that we will be substantially dependent on our edge cloud platform to generate revenue for the foreseeable future. As a result, our operating results could suffer due to:

• *any decline in demand for our edge cloud platform*;

\* \* \*

• the market for edge cloud computing services not continuing to grow, or growing more slowly than we expect;

\* \* \*

If the market for our edge cloud platform grows more slowly than anticipated or *if demand for our edge cloud platform does not grow as quickly as anticipated, whether as a result of* competition, pricing sensitivities, product obsolescence, technological change, unfavorable economic conditions, *uncertain geopolitical environment*, budgetary constraints of our customers, or other factors, *our business would be harmed*.

66. Lastly, the 1Q20 Form 10-Q identified as another risk factor, the risk that "[o]ur business depends on customers increasing their use of our platform, and any loss of customers or decline in their use of our platform could harm our business." The 1Q20 Form 10-Q stated in relevant part:

*Our ability to grow and generate incremental revenue depends, in part, on our ability to maintain and grow our relationships with existing customers and to have them increase their usage of our platform. If our customers do not*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

- 21 -

*increase their use of our platform, our revenue may decline and our results of operations may be harmed*. Customers are charged based on the usage of our platform. Most of our customers do not have long-term contractual financial commitments to us, and therefore, most of our customers may reduce or cease their use of our products at any time without penalty or termination charges. *Customers may terminate or reduce their use of our platform for any number of reasons*.

In order for us to maintain or improve our results of operations, it is important that our customers use our platform in excess of their commitment levels, if any, and continue to use our platform on the same or more favorable terms. *Our ability to retain our customers and expand their usage could be impaired for a variety of reasons. For example, our customers may choose to use other providers*. Because our customers' minimum usage commitments for our platform are relatively low compared to their expected usage, it can be easy for certain customers to reallocate usage or switch from our platform to an alternative platform altogether. In addition, even if our customers expand their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time. *If any of these events were to occur, our business may be harmed*.

*Our usage and revenue may decline or fluctuate as a result of a number of factors*, including customer budget constraints, customer satisfaction, changes in our customers' underlying businesses, changes in the type and size of our customers, pricing changes, competitive conditions, the acquisition of our customers by other companies, and general economic conditions. In addition, our customers currently have no obligation to renew their commitments for our platform after the expiration of their contract term, and a majority of our current customer contracts are only one year in duration. *The loss of customers or reductions in their usage of our platform may each have a negative impact on our business, results of operations, and financial condition. If our customers reduce their usage of or do not continue to use our platform, our revenue and other results of operations will decline and our business will suffer*. In addition, existing customers may negotiate lower rates for their usage in exchange for an agreement to renew, expand their usage in the future, or adopt new products. As a result, these customers may not reduce their usage of our platform, but the revenue we derive from that usage will decrease. If our usage or revenue fall significantly below the expectations of the public market, securities analysts, or investors, our business would be harmed.

67. Fastly's 1Q20 Form 10-Q further outlined various "[f]actors [a]ffecting [o]ur [p]erformance," including "[e]xpanding within our [e]xisting [c]ustomer [b]ase." The 1Q20 Form 10-Q stated:

We emphasize retaining our customers and expanding their usage of our platform and adoption of our other products. Customers often begin with smaller deployments of our programmable edge platform and then expand their usage over time. In addition, our programmable edge platform includes a variety of other offerings, such as load balancing, shielding, web security, and WAF. As our customers mature, we assist them in expanding their use of our platform, including the use of additional offerings beyond edge cloud delivery. As enterprises grow and experience increased traffic, their needs evolve, leading them to find additional use cases for our platform and expand their usage accordingly. In addition, given that customer acquisition costs are incurred largely for acquiring and initial

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

- 22 -

onboarding, we gain operating leverage to the extent that existing customers expand their use of our platform and products.

> *Our ability to retain our customers and expand their usage could be impaired for a variety of reasons*, including a customer moving to another provider or reducing usage within the term of their contract to their minimum usage commitment. Even if our customers expand their usage of our platform, *we cannot guarantee that they will maintain those usage levels for any meaningful period of time or that they will renew their commitments*.

68. Fastly's 1Q20 Form 10-Q also touted the diversity of its customers and limited exposure risk in a provision titled "Concentrations of Credit Risk," noting that "[o]ne customer accounted for 10.5% of revenue" and that "[n]o customer accounted for more than 10% of revenue" in 1Q20. The 1Q20 Form 10-Q stated in relevant part:

> Concentrations of credit risk with respect to accounts receivable are primarily limited to certain customers to which we make substantial sales. *Our customer base consists of a large number of geographically dispersed customers diversified across several industries. To reduce risk, we routinely assess the financial strength of our customers. Based on such assessments, we believe that our accounts receivable credit risk exposure is limited. One customer accounted for 10.5% of revenue for the three months ended March 31, 2020, and 14.6% of the total accounts receivable balance as of March 31, 2020. No customer accounted for more than 10% of revenue for the three months ended March 31, 2019, or more than 10% of the total accounts receivable balance as of December 31, 2019*.

69. The 1Q20 Form 10-Q further noted that Fastly's "revenue has been driven primarily by a subset of customers" who are "critical to our long-term success." The 1Q20 Form 10-Q stated:

> *Historically our revenue has been driven primarily by a subset of customers who have leveraged our platform substantially from a usage standpoint*. These enterprise customers are defined as customers with revenue in excess of $100,000 over the previous 12-month period. *As of March 31, 2020, we had 297 enterprise customers which generated 88% of our revenue for the trailing 12 months ended March 31, 2020*. As of March 31, 2019, we had 243 enterprise customers which generated 85% of our revenue for the trailing 12 months ended March 31, 2019. *We believe the recruitment and cultivation of enterprise customers is critical to our long-term success*.

70. Defendants' statements, set forth in ¶¶63-69, *supra*, were materially misleading and omitted material information because at the time the statements were made, TikTok was Fastly's single largest customer, representing over 10% of Fastly's revenue and was continuing to be its largest customer in 2Q20, which Defendants failed to disclose. ¶¶3-5, 9, 15-16, 32-36, 68, 73. TikTok was a major contributor to Fastly's revenue growth and its usage of Fastly's platform was

rapidly increasing as TikTok's popularity was exploding. ¶¶16, 68, 73, 114-117. By the start of the Class Period, the reports of TikTok's threat as a national security concern and bans of its use in the United States were frequent and well-publicized. TikTok was under investigation by CFIUS over national security concerns, which meant that TikTok's U.S. operations could be shut down or the app could be forced to be sold to a Fastly competitor; TikTok had already been banned by many government departments, including the U.S. Army, Navy, Air Force, Marine Corps, Coast Guard, State Department, Department of Homeland Security and TSA; and had been banned in other countries as well such as by the Australian Defense. ¶¶17-31, 118-120. As such, TikTok posed a significant material risk to Fastly's revenues by the start of the Class Period and going forward, which Defendants failed to disclose.

### C. Defendants' False and Misleading Statements Made During an Investor Presentation on June 2, 2020

71. On June 2, 2020, Fastly held an investor presentation at the Bank of America Merrill Lynch Global Technology Conference. During the presentation, Bixby spoke to analysts about the growth drivers for Fastly's revenues, stating in part:

> [ANALYST:] Got it. So legacy -- you mentioned legacy CDN players, they have flat growth -- flattish growth. You're growing 30% a year. What is driving your growth versus the industry? And then can you discuss pricing trends, pricing pressure? I'm sure that legacy players are putting pricing pressure in the market.

> [BIXBY:] *Sure. So I think we are growing faster than 30%, we hope. If we look at what we've spoken about publicly and the change that we made to our guidance, and I think that growth is coming from 2 main areas. One is the market itself is growing. I mean we've got -- we have more content going online*. We have more use cases going online, the Internet, and I think it's very clear in the last few months is the lifeblood. It's bringing hope into homes all over the world, and people are changing their habits.

> \* \* \*

> [BIXBY:] *The market that we are in is a market of the enterprise and the very high-value video business, which should be live streaming and video-on-demand that actually feels like live. So when the Game of Thrones goes up, even though that's, in effect, a video-on-demand offering, everyone's watching at the same time, all eyes are on HBO, as an example. That's an example of the kind of thing that those companies are going to pay and think of as valuable*.

72. Defendants' statements, set forth in ¶71, *supra*, were materially misleading and omitted material information because at the time the statements were made TikTok was Fastly's

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH - 24 -
4825-8326-7812.v1

single largest customer, representing over 10% of Fastly's revenue and was continuing to be its largest customer in 2Q20, which Defendants failed to disclose. ¶¶3-5, 9, 15-16, 32-36, 68, 73. TikTok was a major contributor to Fastly's revenue growth and its usage of Fastly's platform was rapidly increasing as TikTok's popularity was exploding. ¶¶16, 68, 73, 114-117. By the start of the Class Period, the reports of TikTok's threat as a national security concern and bans of its use in the United States were frequent and well-publicized. TikTok was under investigation by CFIUS over national security concerns, which meant that TikTok's U.S. operations could be shut down or the app could be forced to be sold to a Fastly competitor; TikTok had already been banned by many government departments, including the U.S. Army, Navy, Air Force, Marine Corps, Coast Guard, State Department, Department of Homeland Security and TSA; and had been banned in other countries as well such as by the Australian Defense. ¶¶17-31, 118-120. As such, TikTok posed a significant material risk to Fastly's revenues by the start of the Class Period and going forward, which Defendants failed to disclose.

**D. Defendants' False and Misleading Statements Made During the 2Q20 Investor Call and in Fastly's Shareholder Letter on August 5, 2020**

73. On August 5, 2020, Fastly hosted an earnings conference call to discuss its 2Q20 results. During the earnings call, Bixby surprised and concerned investors by disclosing that TikTok was Fastly's "largest customer in the quarter" and had been for the entire first half of 2020. In response to this news, Fastly's share price fell to a closing price of $89.64 on August 6, 2020, $19.28 or 17.7%, off its previous day's closing price of $108.92.

74. While Defendants warned that the uncertainty surrounding TikTok's availability in the United States could have a negative impact on Fastly's earnings going forward, Bixby reassured investors they "are in a position to backfill the majority of [lost] traffic" in case of a TikTok ban:

> *ByteDance, the operator of TikTok, was our largest customer in the quarter. Any ban of the TikTok app by the U.S. would create uncertainty around our ability to support this customer. While we believe we are in a position to backfill the majority of this traffic in case they are no longer able to operate in the U.S., the loss of this customer's traffic would have an impact on our business.*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH — 25 —
4825-8326-7812.v1

75. Bixby also stated on the earnings call that Defendants "*are very confident because of our strategy on how we've looked at this side of traffic that there is a meaningful amount of traffic that we could pull on to the network in case something didn't move in the right direction at short notice, but that's not what we're seeing today*." Bixby also admitted that Fastly had been working with TikTok and told investors that Fastly's was monitoring TikTok's situation "closely."

76. During the earnings call, Lares gave investors the Company's 3Q20 and FY 2020 guidance:

> *For the third quarter, we expect revenue in the range of $73.5 million to $75.5 million. Non-GAAP operating income in the range of negative $1 million to positive $1 million. Non-GAAP net income per share in the range of negative $0.01 per share to positive $0.01 per share. For the full year 2020, we increased our revenue guidance range to $290 million to $300 million from $280 million to $290 million, non-GAAP operating loss range to minus $12 million to minus $2 million from minus $20 million to minus $10 million, non-GAAP net loss per share range to minus $0.06 to minus $0.01 from minus $0.15 to minus $0.08*.

77. On the earnings call, in response to an analyst question about the impact of the potential TikTok ban on guidance, Lares explained that Defendants assumed a "status quo" with respect to TikTok and did not make any changes in their 3Q20 or FY 2020 guidance assumptions:

> [ANALYST:] And then, Adriel, just following up on this line of thought. As you look at the back half guidance, have you assumed status quo with TikTok? Or have you made any changes in the assumptions?
>
> [LARES:] *Brad, yes, nothing at this time. I mean we're sort of assuming a little bit of a sort of a status quo at this moment. And again, as Joshua sort of mentioned, as you get to sort of the latter half of the year, also it gives us a lot more time to react. So that's sort of built into that*.

78. An analyst asked Defendants about the reasons the 3Q20 revenue guidance was flat compared to 2Q20. In response, Lares reiterated that although the Company grew at an "unprecedented pace" in 2Q20 and there is "just uncertainty, as you know, just with respect to one of our largest customers," 3Q20 still represents "relatively strong growth."

79. The 3Q20 guidance and FY 2020 guidance provided during the 2Q20 investor call was repeated from the shareholder letter that accompanied the Form 8-K signed by Lares and the Company that Fastly filed with the SEC on August 5, 2020 announcing its 2Q20 financial results.

80. Defendants' statements, set forth in ¶¶73-79, *supra*, were materially misleading and omitted material information because TikTok had already shifted traffic from Fastly's platform to

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

- 26 -

non-U.S. CDNs around the end of 2Q20 and accelerated its "DIY" CDN deployment in part because of the growing investigations and bans TikTok was facing in the United States. ¶¶5-6, 17-31, 38-39, 97-100, 102-104, 106-113. Additionally, Defendants either knew or were deliberately reckless in not knowing that there was a substantial risk that Fastly would not be able to quickly backfill any loss in usage and revenue from TikTok as they promised because the lost TikTok revenue to backfill would be very substantial given that Fastly relied on its largest customer for 13% of its revenue in 2Q20; the availability of customers at TikTok's scale was limited; and Fastly depended on only nine other large customers for another 20% of its revenue. ¶¶5-6, 13, 38, 83, 87-89, 97-102, 106. Also, by the beginning of 3Q20, some of Fastly's other enterprise customers were moving traffic to Fastly's competitors and slowing down their usage of Fastly's platform. ¶¶38, 105. Moreover, in the first half of 2020, TikTok's use of Fastly's platform had exploded due to the app's growing popularity which put constraints on Fastly's platform and caused Fastly to turn down business from other companies. These companies then went to Fastly's competitors and could not be used to "backfill" the loss of TikTok revenue. As a result, Defendants had no reasonable basis to expect and in fact, did not expect, Fastly to meet its 3Q20 and FY 2020 guidance. ¶76.

### E. Defendants' False and Misleading Statements Made During a CNBC Interview on August 6, 2020

81. On August 6, 2020, Bixby gave an interview on CNBC's Squawk on the Street to discuss Fastly's 2Q20 financial results and 3Q20 guidance and dispel any negative news surrounding TikTok. The interviewer asked Bixby how Fastly prepared for the upcoming potential September 15, 2020 ban on TikTok given the Company's dependence on the app. In response, Bixby again reassured investors that September 15th "is not a date that we are focused on" because Defendants "***feel very comfortable about our ability to backfill that revenue if indeed it does go away***."

82. Defendants' statement, set forth in ¶81, *supra*, was materially misleading and omitted material information because TikTok had already shifted traffic from Fastly's platform to non-U.S. CDNs around the end of 2Q20 and accelerated its "DIY" CDN deployment in part

because of the growing investigations and bans TikTok was facing in the United States. ¶¶5-6, 17-31, 38-39, 97-100, 102-104, 106-113. Additionally, Defendants either knew or were deliberately reckless in not knowing that there was a substantial risk that Fastly would not be able to quickly backfill any loss in usage and revenue from TikTok as they promised because the lost TikTok revenue to backfill would be very substantial given that Fastly relied on its largest customer for 13% of its revenue in 2Q20; the availability of customers at TikTok's scale was limited; and Fastly depended on only nine other large customers for another 20% of its revenue. ¶¶5-6, 13, 38, 83, 87-89, 97-102, 106. Also, by the beginning of 3Q20, some of Fastly's other enterprise customers were moving traffic to Fastly's competitors and slowing down their usage of Fastly's platform. ¶¶38, 105. Moreover, in the first half of 2020, TikTok's use of Fastly's platform had exploded due to the app's growing popularity which put constraints on Fastly's platform and caused Fastly to turn down business from other companies. These companies then went to Fastly's competitors and could not be used to "backfill" the loss of TikTok revenue. As a result, Defendants had no reasonable basis to expect and in fact, did not expect, Fastly to meet its 3Q20 and FY 2020 guidance. ¶76.

### F. Defendants' False and Misleading Statements Made in Fastly's 2Q20 Form 10-Q on August 7, 2020

83. On August 7, 2020, Fastly issued its Form 10-Q with the SEC, signed by defendants Bixby and Lares, reporting the Company's financial results for the quarter ended June 30, 2020. The 2Q20 Form 10-Q outlined various "[r]isk [f]actors," one of which was similar to the one in ¶63, *supra*, regarding the risk that the Company "receive[s] a substantial portion of our revenues from a limited number of customers, and the loss of, or a significant reduction in usage by, one or more of our major customers would result in lower revenues and could harm our business." The risk factor in the 2Q20 Form 10-Q contained new language stating that the August 6, 2020 Executive Order banning TikTok within 45 days if it is not sold by ByteDance and other worldwide bans "could have a negative impact on our business," that ByteDance/TikTok "may take actions to reduce dependence on our platform, which could harm our business":

> Our future success is dependent on establishing and maintaining successful relationships with a diverse set of customers. We currently receive a substantial

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 28 -

portion of our revenues from a limited number of customers. For trailing 12 months ended June 30, 2020, our top ten customers accounted for approximately 33% of our revenue. It is likely that we will continue to be dependent upon a limited number of customers for a significant portion of our revenues for the foreseeable future and, in some cases, the portion of our revenues attributable to individual customers may increase in the future. The loss of one or more key customers or a reduction in usage by any major customers would reduce our revenues. For example, we cannot be certain what actions the U.S. or another country's government may take with respect to certain of our customers that may adversely affect our ability to do business with our customers that operate in China, target China as a market or that have strong business ties to China. ByteDance, the operator of the TikTok application, operates in and has strong business ties to China and is our top customer, accounting for 13% and 12% of revenue for the three and six months ended June 30, 2020, respectively. On August 6, 2020, President Trump issued an executive order banning transactions with ByteDance, effective 45 days after the execution of the order. The TikTok application has also been the subject of a ban in other countries. While we are still assessing the impact of these bans, the ban of the TikTok application by the U.S. government, and any other governments, creates uncertainty around our ability to support ByteDance. ***The loss of this customer's traffic could have a negative impact on our business***. We are unable to predict the restrictions the U.S. or other governments may further impose or the eventual impact of those restrictions. ***Even in the absence of new restrictions or trade actions imposed by the U.S. or other governments, our customers that operate in China, target China as a market, or that have strong business ties to China, may take actions to reduce dependence on our platform, which could harm our business. If we fail to maintain existing customers or develop relationships with new customers, our business could be harmed***.

84. The 2Q20 Form 10-Q also contained a risk factor that was substantially similar to the one in ¶64, *supra*, regarding the potential generic risks related to the U.S. government prohibiting Fastly's customers from doing business with the Company, stating "[f]ailure to comply with U.S. and foreign governmental laws and regulations could harm our business." As in ¶64, the risk factor stated that Fastly "***could lose the ability to contract with current or potential customers, which could harm our business***."

85. The 2Q20 Form 10-Q also contained a risk factor that was identical to the one in ¶65, *supra*, regarding the risk that "[u]sage of our platform accounts for substantially all of our revenue." As in ¶65, the risk factor stated that Fastly's "***operating results could suffer due to***" "***any decline in demand for our edge cloud platform***" and that "***if demand for our edge cloud platform does not grow as quickly as anticipated, whether as a result of competition, . . ., uncertain geopolitical environment, . . . or other factors, our business would be harmed***."

86. The 2Q20 Form 10-Q also contained a risk factor that was identical to the one in ¶66, *supra*, regarding the risk that "[o]ur business depends on customers increasing their use of

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

our platform, and any loss of customers or decline in their use of our platform could harm our business." As in ¶66, the risk factor represented that "*[i]f our customers do not increase their use of our platform, our revenue may decline and our results of operations may be harmed,*" that "*[c]ustomers may terminate or reduce their use of our platform for any number of reasons*" and that "*our customers may choose to use other providers*" in which case "*our business may be harmed,*" that "*[t]he loss of customers or reductions in their usage of our platform may each have a negative impact on our business, results of operations, and financial condition*" and that "*[i]f our customers reduce their usage of or do not continue to use our platform, our revenue and other results of operations will decline and our business will suffer*."

87. The 2Q20 Form 10-Q contained a "[f]actors [a]ffecting our [p]erformance" that was substantially similar to the one in ¶67, *supra*, regarding "[e]xpanding within our [e]xisting [c]ustomer [b]ase." The risk factor in the 2Q20 Form 10-Q contained additional language noting that the impact of the August 6, 2020 Executive Order and TikTok bans in other countries "creates uncertainty around our ability to support ByteDance" and that the "loss of this customer's traffic could have a negative impact on our business":

> We emphasize retaining our customers and expanding their usage of our platform and adoption of our other products. Customers often begin with smaller deployments of our programmable edge platform and then expand their usage over time. In addition, our programmable edge platform includes a variety of other offerings, such as load balancing, shielding, web security, and WAF. As our customers mature, we assist them in expanding their use of our platform, including the use of additional offerings beyond edge cloud delivery. As enterprises grow and experience increased traffic, their needs evolve, leading them to find additional use cases for our platform and expand their usage accordingly. In addition, given that customer acquisition costs are incurred largely for acquiring and initial onboarding, we gain operating leverage to the extent that existing customers expand their use of our platform and products.

> *Our ability to retain our customers and expand their usage could be impaired for a variety of reasons, including a customer moving to another provider or reducing usage within the term of their contract to their minimum usage commitment. Even if our customers expand their usage of our platform, we cannot guarantee that they will maintain those usage levels for any meaningful period of time or that they will renew their commitments*.

> *We also cannot be certain what actions the U.S. or another country's government may take with respect to certain of our customers that may adversely affect our ability to do business with our customers that operate in China, target China as a market or that have strong business ties to China. ByteDance, the operator of the TikTok application, operates in and has strong business ties to*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 30 -

*China and is our top customer, accounting for 13% and 12% of revenue for the three and six months ended June 30, 2020, respectively. On August 6, 2020, President Trump issued an executive order banning transactions with ByteDance, effective 45 days after the execution of the order. The TikTok application has also been the subject of a ban in other countries. While we are still assessing the impact of these bans, the ban of the TikTok application by the U.S. government, and any other governments, creates uncertainty around our ability to support ByteDance. The loss of this customer's traffic could have a negative impact on our business*.

88. The 2Q20 Form 10-Q also contained a provision similar to the one in ¶68, *supra*, regarding "[c]oncentrations of [c]redit [r]isk." The 2Q20 Form 10-Q stated that "[o]ne customer [*i.e.*, ByteDance/TikTok] accounted for 13% and 12% of revenue for the three and six months ended June 30, 2020":

*Concentrations of credit risk with respect to accounts receivable are primarily limited to certain customers to which we make substantial sales. Our customer base consists of a large number of geographically dispersed customers diversified across several industries. To reduce risk, we routinely assess the financial strength of our customers. Based on such assessments, we believe that our accounts receivable credit risk exposure is limited*.

*One customer accounted for 13% and 12% of revenue for the three and six months ended June 30, 2020, and 20% of the total accounts receivable balance as of June 30, 2020*. No customer accounted for more than 10% of revenue for the three and six months ended June 30, 2019, or more than 10% of the total accounts receivable balance as of December 31, 2019.

89. The 2Q20 Form 10-Q also contained a provision similar to the one in ¶69, *supra*, noting that Fastly's "revenue has been driven primarily by a subset of customers" who are "critical to our long-term success." The 1Q20 Form 10-Q stated:

*Historically our revenue has been driven primarily by a subset of customers who have leveraged our platform substantially from a usage standpoint*. These enterprise customers are defined as customers with revenue in excess of $100,000 over the previous 12-month period. *As of June 30, 2020, we had 304 enterprise customers which generated 88% of our revenue for the trailing 12 months ended June 30, 2020*. As of June 30, 2019, we had 262 enterprise customers which generated 86% of our revenue for the trailing 12 months ended June 30, 2019. *We believe the recruitment and cultivation of enterprise customers is critical to our long-term success*.

90. Defendants' statements, set forth in ¶¶83-89, *supra*, were materially misleading and omitted material information because TikTok had already shifted traffic from Fastly's platform to non-U.S. CDNs around the end of 2Q20 and accelerated its "DIY" CDN deployment in part because of the growing investigations and bans TikTok was facing in the United States. ¶¶5-6,

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 31 -

17-31, 38-39, 97-100, 102-104, 106-113. Additionally, Defendants either knew or were deliberately reckless in not knowing that there was a substantial risk that Fastly would not be able to quickly backfill any loss in usage and revenue from TikTok as they promised because the lost TikTok revenue to backfill would be very substantial given that Fastly relied on its largest customer for 13% of its revenue in 2Q20; the availability of customers at TikTok's scale was limited; and Fastly depended on only nine other large customers for another 20% of its revenue. ¶¶5-6, 13, 38, 83, 87-89, 97-102, 106. Also, by the beginning of 3Q20, some of Fastly's other enterprise customers were moving traffic to Fastly's competitors and slowing down their usage of Fastly's platform. ¶¶38, 105. Moreover, in the first half of 2020, TikTok's use of Fastly's platform had exploded due to the app's growing popularity which put constraints on Fastly's platform and caused Fastly to turn down business from other companies. These companies then went to Fastly's competitors and could not be used to "backfill" the loss of TikTok revenue.

### G. Defendants' False and Misleading Statements Made During the August 11 and 12, 2020 Roadshows

91. On August 11, 2020, Fastly held an investor presentation at the Oppenheimer Technology, Internet & Communications Conference. In response to an analyst question asking for more color on 3Q20 guidance, Lares touted the fact that they "were seeing still really strong growth rates" through 3Q20 and that they "continue to be excited about what we're seeing in the demand funnel."

92. During the investor presentation, when asked for updates or color on the situation with TikTok, Bixby reassured investors that they "are in a position of strength" and that they see "opportunities to either . . . backfill that traffic because we have a lot of customers that have pent-up demand that were willing to provide content of this type of traffic to" and "great relationships with a lot of the majors that would be in the running for something of this asset of this size."

93. On August 12, 2020, Fastly held an investor presentation at the KeyBanc Capital Markets Future of Technology Series conference. During the presentation, Defendants were asked about their assumptions for the second half of the year guidance, specifically with regard to

TikTok. In response, Lares stated that the "guidance is assuming TikTok is the same as what we've seen so far going into earnings and then – that it doesn't change much."

94. When asked about Fastly's ability to backfill any lost TikTok revenue, Bixby reassured investors that "*we definitely have these relationships that we're able to pull off*," which "*gave us confidence* and definitely influenced how we looked at the numbers."

95. During the August 12, 2020 presentation, Defendants were also asked about the risks of managing large accounts and their impact on revenue volatility. In response, Lares reassured investors that working with TikTok has "been net positive for us."

96. Defendants' statements, set forth in ¶¶91-95, *supra*, were materially misleading and omitted material facts because TikTok had already shifted traffic from Fastly's platform to non-U.S. CDNs around the end of 2Q20 and accelerated its "DIY" CDN deployment in part because of the growing investigations and bans TikTok was facing in the United States. ¶¶5-6, 17-31, 38-39, 97-100, 102-104, 106-113. Additionally, Defendants either knew or were deliberately reckless in not knowing that there was a substantial risk that Fastly would not be able to quickly backfill any loss in usage and revenue from TikTok as they promised because the lost TikTok revenue to backfill would be very substantial given that Fastly relied on its largest customer for 13% of its revenue in 2Q20; the availability of customers at TikTok's scale was limited; and Fastly depended on only nine other large customers for another 20% of its revenue. ¶¶5-6, 13, 38, 83, 87-89, 97-102, 106. Also, by the beginning of 3Q20, some of Fastly's other enterprise customers were moving traffic to Fastly's competitors and slowing down their usage of Fastly's platform. ¶¶38, 105. Moreover, in the first half of 2020, TikTok's use of Fastly's platform had exploded due to the app's growing popularity which put constraints on Fastly's platform and caused Fastly to turn down business from other companies. These companies then went to Fastly's competitors and could not be used to "backfill" the loss of TikTok revenue. As a result, Defendants had no reasonable basis to expect and in fact, did not expect, Fastly to meet its 3Q20 and FY 2020 guidance. ¶76.

**H.    The October 14, 2020 Disclosures**

97.    After market close on October 14, 2020, Fastly filed a Form 8-K with the SEC, signed by Lares, attaching as an exhibit an October 14, 2020 press release, announcing preliminary revenue results for the third quarter ended September 30, 2020.  The press release indicated that it was issued "in fulfillment of [Fastly's] obligations to promptly file a resale registration statement on Form S-3 in connection with its successful acquisition of Signal Sciences on October 1, 2020."

98.    In the press release, Defendants announced that "Fastly now expects third quarter 2020 total revenue of $70.0 to $71.0 million, compared to its previous guidance of $73.5 to $75.5 million."   Defendants also announced that "[a]ll previously issued third quarter and full-year guidance that Fastly disclosed in its second quarter shareholder letter and related call on August 5 should not be relied upon" as a reflection of the following "customer-specific factors":

- Due to the impacts of the uncertain geopolitical environment, usage of Fastly's platform by its previously disclosed largest customer did not meet expectations, resulting in a corresponding significant reduction in revenue from this customer.

- During the latter part of the third quarter, a few customers had lower usage than Fastly had estimated.

99.    On this news, Fastly's stock price dropped $33.48 per share or 27.2%, from $123.18 per share at market close on October 14, 2020, to $89.70 per share at market close on October 15, 2020.

100.    Analysts were quick to comment on the "disappointing" 3Q20 preliminary results and withdrawal of the FY20 guidance.  They questioned Defendants' failure to account for a potential loss of TikTok revenue and their assurances that they would be able to easily backfill any lost revenue.

101.    On October 14, 2020, Piper Sandler issued an analyst report, which noted that Defendants' statements that they could backfill any issues with TikTok "create credibility issues":

The miss was primarily caused by the geopolitical impact on TikTok, and lower usage at larger customers than anticipated.  *Fastly management believed they could backfill any issues with TikTok, which proved to be incorrect and will likely create credibility issues.  Top 10 customers account for ~33% of revenue, meaning a slowdown at a few of these can have a material impact*.  The latter

issue is already raising questions about losing share of these key customers to competitors.

102. On October 15, 2020, Credit Suisse issued an analyst report, noting that according to information it obtained in one-on-one meetings with Defendants, ByteDance diversified its number of vendors. The Credit Suisse analyst's checks confirmed that ByteDance "redistributed traffic across a number of CDNs." The analyst report further called into question Fastly's statements on the 2Q20 earnings call that it would be able to backfill any lost traffic "at short notice" given that "the universe of customers at TikTok's scale is limited":

> ***Why Did TikTok's Usage Decline? Our conversations suggest that ByteDance changed their infrastructure to diversify the number of vendors they rely on significantly. This, according to our checks, is the result of ongoing geopolitical issues and the desire to diversify its dependence on any single provider. While not completely off Fastly's platform, our checks suggest the company redistributed traffic across a number of CDNs, including everything from small regional providers to ISPs***. Lastly, this is a fluid situation with the ability to redistribute traffic in near real-time.

> ***Ability to Backfill Capacity?*** On its last earnings call, Fastly mentioned it believed they would be able to backfill any lost traffic as it relates to TikTok relatively quickly. While that may be the case, ***our checks suggest the universe of customers at TikTok's scale is limited, and includes the likes of the largest of OTT properties***.

103. On October 15, 2020, William Blair issued an analyst report, stating that "[i]n our view, the company should have been aware of the impact from an India ban, which happened in late June, and the Pakistan ban happened after the quarter closed."

104. On October 22, 2020, Piper Sandler issued an analyst report, reacting with surprise at the fact that the "TikTok [r]isk [was] [n]ot [f]ully [r]eflected" as Fastly rapidly moved its traffic to other non-U.S. CDNs and accelerated its own CDN deployment:

> ***TikTok Risk Not Fully Reflected***: While bulls cling to temporary "compression" and non-geopolitical issues for the pre-announced Q3 miss, ***our research affirms geopolitical tension caused TikTok to move traffic to other CDNs, and more importantly, accelerate their "DIY" CDN deployment*** that puts estimates and the stock at greater risk (even at these lower levels in the last week). ***Numerous TikTok employees and an announced partnership point to this rapid build-out***, something we saw negatively play out for Akamai last decade at a lesser magnitude. There are multiple scenarios in place, including Fastly being used in conjunction with a DIY-CDN in 2021, but in our view estimates do not appropriately reflect a permanent slowdown for this +12% customer today.

\*    \*    \*

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 35 -

While we are unable to determine who may have temporarily received TikTok traffic within Q3 rather than Fastly, some of the possibilities include: Alibaba, Agora.io, China Mobile, Medianova, or Variti. Given the US-China relationship issues, *it is likely TikTok moved its delivery over to non-US firms to mitigate any "supply chain" geopolitical risk*.

105. The October 22, 2020 Piper Sadler report noted that customer concentration was a "major risk" for Fastly and that a decline in usage from other large customers resulted in Fastly not being able to backfill the loss in usage from TikTok. Specifically, the Piper Sandler analyst attributed the loss in other customers' usage to Amazon and Amazon's gaming subsidiary, Twitch.tv, "a top 50-internet traffic generator," which had a slowdown in viewing beginning in 3Q20:

**Other Customer Issues**: Fastly was unable to backfill TikTok issues because of other customers also slowing down. *Customer concentration is a major risk for Fastly, as the top 10 are ~33% of revenue*. Given the typical push to Akamai ahead of Prime Day and the holidays, a likely pushback to CloudFront as traffic normalized Q/Q and the company's investments, lower Prime Day Fastly traffic trends, and a slowdown in Twitch viewing, we believe Amazon was one of the main customers slowing down.

\* \* \*

**Other Large Customers, Especially Amazon**: *Other large customers were also an issue in Q3, as it resulted in Fastly not being able to "backfill" for TikTok*. While it is possible it is a few of them like Pinterest, the NY Times, or Wayfair, the dynamics at Amazon (AMZN, covered by Champion) would suggest Fastly lost traffic share at this recently landed customer (1Q20) for a variety of reasons. For example, Amazon likely shifted some of its website traffic back to CloudFront and/or to Akamai ahead of Prime Day and the holiday season.

\* \* \*

Given the pandemic, Amazon moved Prime Day to October 13-14th, while Target (a Fastly customer) and other major retailers moved their sale day to the same week. In monitoring Fastly's traffic as we normally do, *we found that traffic trends were actually below the Q3 and first half of October average traffic*, suggesting Fastly wasn't getting as much traffic related to Prime Day. We believe the trends support Akamai or Amazon CloudFront gaining share of Amazon.com-related traffic.

## VI. POST-CLASS PERIOD REVELATIONS

106. Following the October 14, 2020 press release in which it pre-announced the 3Q20 revenue guidance miss and withdrew FY 2020 guidance, on October 15, 2020, Fastly issued a Form S-3 Registration Statement, signed by Bixby and Lares to satisfy certain registration obligations in connection with its October 1, 2020 acquisition of Signal Sciences. In the Form S-

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
- 36 -
4825-8326-7812.v1

3, Defendants reiterated that they lowered the 3Q20 revenue guidance and withdrew all other guidance, all due to a reduction in usage and revenue from TikTok and lower usage from a few other customers.

107. After market close on October 28, 2020, Fastly filed a Form 8-K with the SEC, signed by Lares, attaching a shareholder letter, announcing its 3Q20 financial results. In the shareholder letter, the Company and Lares announced $71 million in total revenues, ($4 million) in non-GAAP operating losses, and ($0.04) in non-GAAP net loss per share; all below the original guidance estimates. Additionally, the Company and Lares stated that Fastly's Net Retention Rate for 3Q20 compressed to "122%, compared to 138% in Q2 2020."

108. In the shareholder letter, the Company and Lares also reduced revenue guidance for FY 2020 to $288.2-$292.2 million from $290-$300 million.

109. On November 6, 2020, Fastly issued its Form 10-Q with the SEC, signed by Bixby and Lares, reporting the Company's financial and operating results for the quarter ended September 30, 2020. In the 3Q20 Form 10-Q, Defendants disclosed that TikTok "accounted for 11% of revenue for the nine months ended September 30, 2020" and "less than 10% of revenue for the three months ended September 30, 2020," which represented "a significant reduction in revenue from this customer."

110. Following Defendants' 3Q20 earnings announcement, analysts again highlighted that the disappointing results were caused by TikTok moving some of its traffic away from Fastly. As a Raymond James analyst noted in his report on October 29, 2020, the drop off in TikTok revenue was due to "ByteDance/TikTok mov[ing] some of its traffic to regional CDNs and internal capacity in response to the potential ban on U.S. partners working with ByteDance."

111. On October 29, 2020, FBN Securities issued an analyst report that noted that "[s]ince TikTok accounted for 10.8% of revenue in the first 9 months of the year, it accounted for about $6M in revenue in FQ3, down from $9.7M in FQ2," which "implies that FSLY's revenue ex-TikTok was basically flat Q/Q at $65M."

112. On October 29, 2020, a Craig-Hallum analyst report stated that "TikTok moved overseas traffic to overseas providers as quickly as possible." As a result, the Craig-Hallum analyst

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH - 37 -
4825-8326-7812.v1

noted that "Q3 revenue fell short of the original $74.5M guidance mid-point by $3.9M (and possibly ~$7M if typical upside was expected at time of guide), coming in at $70.6M" and that of the revenue miss, "it was likely $2-4M from TikTok."

113. On February 10, 2021, a *Seeking Alpha* article titled "An Update On TikTok's DIY CDN Strategy And The Impact On Third-Party CDNs" revealed that TikTok had moved traffic away from Fastly as early as the end of 2Q20:

> Around the end of Q2 2020, TikTok changed their approach to delivering videos and other content and moved to a model that relied on what looked to be almost two dozen different providers globally, large and small. When the change[] happened, you could see this from public trace routes in various countries. This change was driven by politics due to the Trump Executive Order and was not driven by any kind of performance or capacity problems with the CDNs they were using. Fastly (NYSE:FSLY) and Akamai (NASDAQ:AKAM) were two CDNs that had a large volume of TikTok's delivery traffic in various regions of the world and at different volumes. For example, we know Akamai was doing a lot of delivery for TikTok in India, where the application has since been banned by the government.

## VII. ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER

### A. Defendants Knew that as Fastly's Largest Customer, TikTok Was of Central Importance to Fastly's Operations

114. The importance of TikTok's revenue to Fastly's financial results, and the magnitude of its growth, support an inference of scienter. The Individual Defendants, as senior executive officers of Fastly, were privy to non-public information concerning Fastly's customers (and their contribution to Fastly's revenues), finances, financial conditions and present and future business prospects including in connection with TikTok. Defendants' public statements evidence that, during the Class Period, Defendants knew the importance of TikTok's business to Fastly and the importance of retaining that business as Fastly was becoming increasingly dependent on TikTok revenue before and during the Class Period. As revealed in Fastly's August 7, 2020 2Q20 Form 10-Q filed with the SEC, TikTok accounted for 13% of Fastly revenue for the three months leading up to June 30, 2020 and 12% of revenues for the first six months of 2020, making TikTok Fastly's single largest customer by the end of 1Q20 (March 31, 2020). *See* ¶¶87-88, *supra*. In Fastly's FY 2019 Form 10-K filed with the SEC, the Company stated that "[n]o customer accounted for more than 10% of revenue for the year[] ended December 31, 2019." Thus, the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 38 -

percentage of total revenues generated by TikTok increased from less than 10% in 2019 to 13% in 2Q20, representing a 30% increase from December 31, 2019 through the second quarter ending on June 30, 2020. As a Piper Sandler analyst reported on October 22, 2020, "TikTok was a material contributor to the growth of Fastly in 1H20, likely representing ~25-30% of growth."

## B.  Defendants Monitored TikTok's Business and Revenue Contribution

115.  Defendants' monitoring of TikTok's business before and during the Class Period further supports an inference of scienter. Before and during the Class Period, Fastly's categorized its larger customers as "enterprise" customers; those customers whose revenue contribution exceeded $100,000 over the previous 12-month period, included TikTok. According to Fastly's 2Q20 Form 10-Q filed with the SEC, the Company's enterprise customers generated 88% of the Company's revenue. The Company had roughly 300 enterprise customers, out of roughly 1,900 total customers. In its SEC filings during the Class Period, Fastly separately broke out the amount of revenues it received from enterprise customers versus non-enterprise customers in its quarterly SEC filings during the Class Period and reported the average enterprise customer spend and enterprise revenue as a percentage of total revenue.

116.  Defendants closely monitored Fastly's enterprise customers, including TikTok, because they represented the Company's primary revenue driver and were critical to Fastly's future business operations. Fastly's SEC filings during the Class Period stated, "the recruitment and cultivation of enterprise customers is critical to our long-term success." Fastly's 2Q20 shareholder letter stated that enterprise customers "continue to be our primary revenue driver," that the Company "focus[es] on partnering with large companies that have the capability and available budget to increase engagement on our platform" and "highly value[s] these customers because they tend to have the quickest ramp in usage and the highest demand for ancillary products and features, as well as the ability to provide us with a certain degree of visibility and stability relative to other market segments in uncertain times."

117.  Moreover, during Fastly's 2Q20 earnings call on August 5, 2020, Bixby confirmed Fastly had been monitoring TikTok's contributions to Fastly revenues. An analyst from Stifel, Nicolaus & Company asked for "a sense of what percent of the traffic is U.S. versus rest of the

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

- 39 -

world," to which Bixby responded that "[TikTok] represents just about 12% of revenue, trailing 6 months ending June 30" and that "[l]ess than 50% of that is in the U.S." Bixby also confirmed that "[w]e *continue* to monitor the [TikTok] situation closely" and "we have looked at this risk."

### C. The U.S. Government's Investigation and Banning of TikTok Was Publicly Reported on, Before and During the Class Period

118. Media reports published before and during the Class Period concerning the U.S. Government's investigation and banning of TikTok due to concerns that it posed a national security threat, further support and inference of scienter.

119. As discussed in §II(B)-(C), by November 1, 2019, media outlets were reporting that CFIUS had initiated an investigation into TikTok as a national security threat. And in late 2019 through the early months of 2020, several news outlets had reported that multiple branches of the U.S. government banned employees from using TikTok. Given the national headlines generated by all these developments, Defendants would have been alerted to growing threats to TikTok's business and, in turn, to Fastly's TikTok-derived revenues.

120. The threats to TikTok in the United States became even more overt during the Class Period. In July 2020 alone, Secretary of State Mike Pompeo announced that the U.S. was looking at banning TikTok; both the Republican National Committee and Democratic National Committee issued warnings to staff about using TikTok; U.S. Presidential candidate Joe Biden's campaign told staff to remove TikTok from their work and personal devices due to security concerns; and many news outlets were reporting on the likelihood of the Trump administration outright banning TikTok. On July 31, 2020, then-President Trump indeed announced that he was planning to very quickly ban TikTok entirely from the United States; and on August 6, 2020, President Trump issued an executive order banning TikTok, effective 45 days after the execution of the order, if ByteDance did not sell TikTok before then.

### D. Fastly Had Strong Motive to Conceal the Unsustainable Nature of TikTok's Business Because It Was Attempting to Secure Desperately-Needed Operating Cash Through a Public Stock Offering

121. On May 18, 2020, Fastly announced a public offering of 6 million shares of Class A stock, from which Fastly expected to raise approximately $226.7 million, with the option for

underwriters to purchase an additional 900,000 Class A shares bringing the potential total to approximately $260.8 million.

122. On May 20, 2020, Fastly announced the pricing the publicly-available shares of Class A common stock at a price of $41.50 per share.

123. This cash was extremely important to Fastly, because the Company had been operating at a loss. Fastly's reported revenue for the 2019 fiscal year was just over $200 million, while its operating expenses were over $158 million and its net loss was $51.6 million. For the first quarter of 2020, the quarter immediately preceding the announced secondary offering, Fastly incurred a net loss of an additional $12 million. Having continuously operated at a loss in the time leading up to and during the Class Period, Fastly was desperate to secure sources of cash.

124. Fastly's ability to continue operating was dependent upon raising additional capital. Indeed, Fastly explained in its 1Q20 Form 10-Q that "[o]ur ability to timely raise capital in the future may be limited, or may be unavailable on acceptable terms, if at all, and *our failure to raise capital when needed could harm our business*." Fastly's 1Q20 Form 10-Q further noted that "[w]e cannot be certain when or if our operations will generate sufficient cash to fully fund our ongoing operations or the growth of our business" and "[w]e intend to continue to make investments to support our business and may *require* additional funds."

125. The need to raise additional capital was particularly acute given that, at the time, Fastly's largest customer, TikTok, was under worldwide regulatory scrutiny and at risk of being banned in multiple major markets, including the United States. *See* ¶¶17-31, *supra*. Thus, Defendants recognized that Fastly's financial situation was potentially inadequate to fund Fastly's business plan and that in order to meet optimistic projections, additional funding needed to be raised.

126. Defendants had strong motive to inflate or maintain inflation in Fastly's stock by misrepresenting and obscuring the nature of Fastly's reliance on TikTok, given that the amount of proceeds from the offering was directly tied to Fastly's stock price at the time of the offering. As Fastly's May 18, 2020 Form S-1 explained: "Each $1.00 increase (decrease) in the assumed public offering price of $39.50 per share would increase (decrease) the net proceeds to us from this

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                      - 41 -
4825-8326-7812.v1

offering by approximately $5.8 million . . . ." Thus, had Defendants been truthful about Fastly's unsustainable reliance on TikTok business prior to the offering, the cash-strapped Company would have potentially lost tens of millions in potential future financing from the stock offering.

### E. Fastly Had a Motive to Conceal Its Reliance on TikTok in Order to Use Its Stock as a Currency to Fund Its Acquisition of Signal Sciences

127. Fastly was looking to acquire a large company, Signal Sciences, a move that would mask the effects of reduced business from TikTok. On August 27, 2020, just weeks after the 2Q20 earnings announcement and the TikTok ban announcement, Fastly announced that it had entered into a definitive agreement to acquire Signal Sciences, a web application security company, for approximately $775 million in cash and stock. The acquisition was completed on October 1, 2020.

128. Defendants had strong motive to conceal that by 2Q20 TikTok was already shifting traffic off the Fastly platform, which was impacting revenues and that Fastly lacked the ability to backfill any loss in TikTok revenue, as doing so would inflate the Company's stock price leading up to the Signal Sciences acquisition. The size of the acquisition required Fastly to issue $575 million in common stock, giving Fastly a motive to maintain its stock price at artificially-inflated levels to execute the transaction.

### F. Insider Trades Further Support Scienter

129. During the Class Period, Bixby and Lares, as well as other Fastly insiders, sold Fastly shares at artificially-inflated prices.

130. In the 161 days between May 6, 2020 and October 14, 2020, Bixby sold 276,030 shares of his personally-held shares of Fastly stock, about 34% of his total holdings in Fastly, for proceeds of $18,140,479. In the 161 days immediately preceding the Class Period, by contrast, Bixby sold just 110,000 shares for approximately $2.3 million. Thus, Bixby sold about *2.5 times* as many shares during the Class Period than in his prior trading for roughly *784%* more money.

131. During this same period, Lares sold 57,682 shares of his personally-held shares of Fastly stock, almost 9% of his total Fastly holdings, for proceeds of $3,983,103. In the 161 days immediately preceding the Class Period, by contrast, Lares sold just 25,000 shares for $536,730.

Thus, Lares sold about *2.3 times* as many shares during the Class Period than in his prior trading for roughly *742%* more money.

132. Other insiders also sold shares at artificially-inflated prices and at greater rates than in the corresponding amount of time before the Class Period. Artur Bergman, Fastly's "Chief Architect and Executive Chairperson" and the Company's founder and former CEO, sold over 1.8 million shares for proceeds of approximately $143 million during the Class Period. These sales represented over 20% of Bergman's total Fastly stock holdings. Bergman sold *3.5 times* as much Fastly stock during the 161-day Class Period as he had during the preceding 161 days, for approximately *1,200%* more proceeds than his pre-Class Period trades. In addition, during the Class Period, Sunil Dhaliwal, a Director, sold 430,500 Fastly Shares for $39,163,894; Wolfgang Maasberg, Executive Vice President of Global Sales, sold 353,802 shares of Fastly stock, representing over 50% of his total holdings, for approximately $11.7 million; David Hornik, a Director and Beneficial Owner, sold 175,000 shares for $16,692,600; Paul Luongo, Fastly's General Counsel sold 48,949 shares for $3,852,079; and Kelly Wright, a Director, sold 39,000 shares for $2,392,711.

133. In sum, while Defendants were inflating Fastly's share prices by concealing that TikTok was Fastly's single largest customer by 1Q20, and the attenuated revenue impact that posed, and that by the end of 2Q 2020 TikTok was reducing its usage of Fastly's platform, Fastly insiders sold about *3.2 million* shares for proceeds of *$238,615,593*, an enormous increase compared to the roughly 1.4 million shares they sold for just $30.2 million in the preceding 161 days before the Class Period. All of these insiders, as high-level executives or directors at Fastly, would have been privy to the undisclosed information about TikTok during the Class Period. The insiders' abnormally large stock sales support a strong inference of scienter.

## VIII.  LOSS CAUSATION AND ECONOMIC LOSS

134. During the Class Period, Defendants materially misled the investing public through the misrepresentations and omissions alleged above (*see* ¶¶51-96, *supra*), which caused the publicly-traded price of Fastly common stock to be artificially inflated during the Class Period. Defendants' conduct operated as a fraud or deceit on Class Period purchasers of Fastly common

stock because it concealed that: 1) TikTok had become Fastly's single largest customer in 1Q20 and as such posed a major risk to Fastly's revenues; and 2) by 2Q20, TikTok had already started moving traffic off of Fastly's platform to other non-U.S. providers and Defendants had no reasonable basis to believe that Fastly would be able to replace the lost traffic "at short notice."

135.   When the relevant truth began to emerge, the price of Fastly's common stock declined immediately as the artificial inflation was removed from the market price of the stock, causing substantial damage to Lead Plaintiff and the Class.

136.   As set forth above in ¶¶5, 35-36, 73-74, 117, on August 5, 2020 Defendants surprised investors by disclosing that TikTok had been Fastly's largest customer for the first six months of 2020, representing "just about 12%" of Fastly's revenue.  As a result of this disclosure, the price of Fastly's common stock dropped 17.7%, from a close of $108.92 on August 5, 2020 to a close of $89.64 on August 6, 2020.  While Fastly's stock price dropped over 17%, the S&P 500 and the S&P Technology Index (the two comparative indexes identified in Fastly's FY 2019 Form 10-K), rose 0.6% and 1.5%, respectively.  The new Company-specific material information released on that day was directly related to the false or misleading statements previously made by Defendants.  However, Defendants continued their scheme and limited Fastly's stock price decline and Fastly's stock price remained inflated because Defendants continued to conceal the full impact of their fraudulent scheme from investors.

137.   Analysts and news outlets attributed the price decline to Fastly's revelation that TikTok was its largest customer and the risk that posed to Fastly's revenues going forward.  For example:

(a)   On August 5, 2020, Piper Sandler issued an analyst report stating that "shares are down [after hours] given a number of factors," including "the 12% exposure to TikTok in the face of a ban and expectation within guide of back-filling this potential loss."  The analyst report further noted that "TikTok is a larger percentage of revenue than we would have estimated, with management believing they could get more traffic at other existing customers to make up for a potential ban."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                          - 44 -
4825-8326-7812.v1

(b)     On August 5, 2020, *MarketWatch* published an article entitled "Fastly stock drops as strong earnings overshadowed by TikTok reliance." The article stated that "[Fastly's] shares dropped in the extended session Wednesday after the cloud-based online content services company identified video-sharing platform TikTok as its largest customer following an earnings beat."

(c)     On August 6, 2020, *Business Insider* published an article entitled "High-flyer Fastly plunges 21% despite earnings beat after CEO reveals TikTok is its largest customer (FSLY)." The article noted that "[t]he revelation that Fastly's single largest customer is TikTok could also be weighing down shares."

138.    In conjunction with Defendants' August 5, 2020 disclosure, Fastly's common stock price continued to drop on August 7, 2020, following the announcement on August 6, 2020 that President Trump had issued the August 6, 2020 Executive Order prohibiting "any transaction" by any U.S. person with ByteDance or its subsidiaries by September 20, 2020. Given the disclosure made by Defendants on August 5, 2020 that TikTok had been Fastly's single largest customer for the first six months of 2020, investors reacted to this news, causing an 11.5% decline in Fastly's common stock price on August 7, 2020. From the initial disclosure that TikTok was Fastly's single largest customer on August 5, 2020 to August 7, 2020, Fastly's stock price fell 27.2%. In comparison, the S&P 500 Index and the S&P Technology Index rose 0.7% and decreased -0.1% respectively, over the same period.

139.    Analysts and news outlets noted the news of an executive order banning TikTok in the U.S. based on the fact that Fastly had just disclosed that TikTok was Fastly's largest customer. For example:

(a)     On August 7, 2020, *The Motley Fool* published an article entitled "Why Fastly Stock Fell Again on Friday." The article stated that "[s]hares of content delivery network (CDN) operator Fastly (NYSE:FSLY) fell as much as 10.7% on Friday morning, following an 18% drop on Thursday" as a "result of the Trump administration threatening to shut down social video service TikTok, which is Fastly's largest customer." The article further noted that "Fastly investors are taking these executive orders like a slap in the face, because TikTok is the company's

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                    - 45 -

largest customer" "according to management comments from Fastly's second-quarter earnings call."

(b)    On August 7, 2020, *Barron's* published an article entitled "Fastly Stock Continues to Dive on Concerns About Its Ties to TikTok." The article stated that "Fastly stock continue to suffer collateral damage from the Trump administration's crackdown on TikTok" as President Donald Trump "last night followed up with an executive order that would bar U.S. companies from doing business with TikTok and its parent ByteDance."

140.    As set forth above in ¶¶6, 41, 97-98, on October 14, 2020, after market close, Fastly filed a Form 8-K with the SEC, signed by Lares, attaching as an exhibit an October 14, 2020 press release, announcing preliminary revenue results for the third quarter ended September 30, 2020. Defendants again surprised investors by lowering Fastly's third quarter 2020 total revenue guidance from $73.5 to $75.5 million to $70.0 to $71.0 million and withdrew all previously-issued third quarter and full-year guidance, due in substantial part to TikTok "not meet[ing] expectations" and "a corresponding significant reduction in revenue from this customer" as a result of the "impacts of the uncertain geopolitical environment." As a result of this news, the price of Fastly's common stock plummeted 27.2%, from a close of $123.18 per share on October 14, 2020, to a close of $89.70 per share on October 15, 2020, on a volume of close to 58 million shares, the highest trading volume day since Fastly became a public company in May 2019. While Fastly's stock price dropped over 17%, the S&P 500 and the S&P Technology Index, decreased 0.2% and 0.4%, respectively.

141.    Analysts and media reports attributed that drop to the reduction and withdrawal of the 3Q20 and FY 20 guidance caused by the loss of TikTok business and Fastly's inability to backfill that lost revenue. For example:

(a)    On October 14, 2020, *Dow Jones Institutional News* published an article entitled "TikTok Supplier Fastly Cuts Expectations, Cites Weakness at Video App." The article stated that "Fastly Inc. lost more than a quarter of its market value late Wednesday after the internet content deliverer lowered its revenue guidance because of reduced use from its largest customer, the video-sharing app TikTok."

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH                                                                                          - 46 -
4825-8326-7812.v1

(b)     Also on October 14, 2020, *Barron's* published an article entitled "Fastly Stock Just Lost a Quarter of Its Value – and It's Probably TikTok's Fault." The article stated that "Fastly shares were in free fall in late trading Wednesday after the content delivery and edge computing company reduced its guidance for the third quarter, apparently tied to weaker-than-expected traffic volume from the social video service TikTok."

(c)     On October 14, 2020, Piper Sandler issued an analyst report, which stated that "[t]he miss was primarily caused by the geopolitical impact on TikTok, and lower usage at larger customers than anticipated." The report also noted that Defendants' statements that they could backfill any issues with TikTok "create credibility issues" as "[t]op 10 customers account for ~33% of revenue, meaning a slowdown at a few of these can have a material impact" and that the "issue is already raising questions about losing share of these key customers to competitors."

(d)     On October 15, 2020, Credit Suisse issued an analyst report, noting that according to information it obtained in one-on-one meetings with Defendants, "ByteDance changed their infrastructure to diversify the number of vendors they rely on significantly" as a "result of ongoing geopolitical issues and the desire to diversify its dependence on any single provider." The Credit Suisse analyst's checks confirmed that ByteDance "redistributed traffic across a number of CDNs, including everything from small regional providers to ISPs." The analyst report further called into question Fastly's statements on the 2Q20 earnings call that it would be able to backfill any lost traffic "at short notice" given that its "checks suggest the universe of customers at TikTok's scale is limited, and includes the likes of the largest of OTT properties."

(e)     On October 15, 2020, William Blair issued an analyst report, stating that "[i]n our view, the company should have been aware of the impact from an India ban, which happened in late June, and the Pakistan ban happened after the quarter closed."

(f)     On October 22, 2020, Piper Sandler issued an analyst report, reacting with surprise at the fact that the "TikTok [r]isk [was] [n]ot [f]ully [r]eflected" as its "research affirms geopolitical tension caused TikTok to move traffic to other CDNs, and more importantly,

accelerate their 'DIY' CDN deployment that puts estimates and the stock at greater risk (even at these lower levels in the last week)."

## IX.  THE PSLRA SAFE HARBOR DOES NOT APPLY

142.  The Private Securities Litigation Reform Act of 1995 ("PSLRA") "Safe Harbor" warnings that accompanied Defendants' forward-looking statements issued during the Class Period were ineffective to shield Defendants from liability for their false and misleading statements and omissions of material fact.

143.  To the extent that the false and misleading statements related to existing facts or conditions, the Safe Harbor does not apply.  To the extent that the false and misleading statements are forward looking, Defendants are still liable.  Defendants knew at the time they spoke or failed to speak fully that each of their forward-looking false and misleading statements were false and misleading.  Defendants' false and misleading forward-looking statements were authorized or approved by an executive officer or director of Fastly, who knew that the forward-looking statements were false.  The forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  And the "Safe Harbor" warnings were inadequate, boilerplate and were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## X.  ADDITIONAL CONTROL PERSON ALLEGATIONS

144.  As alleged herein, each of the Individual Defendants acted as control persons of Fastly and the other Individual Defendants within the meaning of §20(a) of the Exchange Act as alleged herein.

145.  By virtue of their high-level positions, participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by Fastly and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS - 4:20-cv-06024-PJH
4825-8326-7812.v1

- 48 -

146. The Individual Defendants participated in conference calls with investors and analysts and interviews with media, and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after the statements were issued, and had the ability to prevent the issuance of statements or cause the statements to be corrected.

147. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had and exercised the power to control or influence the actions giving rise to the securities violations alleged herein.

148. Each of the Individual Defendants had consistent and constant access to information about the usage and revenue generated by TikTok.

149. As set forth above, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions. By virtue of their positions as controlling persons, the Individual Defendants are liable under §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly-traded common stock during the Class Period.

## XI. LEAD PLAINTIFF AND THE CLASS ARE ENTITLED TO A PRESUMPTION OF RELIANCE

150. Lead Plaintiff and the Class are entitled to a presumption of reliance under the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), fraud-on-the-market doctrine because, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) The Company's stock traded in an efficient market;

(d) Defendants' misrepresentations and omissions would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)     Lead Plaintiff and other members of the Class purchased Fastly common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

151.    The market for Fastly common stock was open, well developed and efficient at all relevant times for the following reasons, among others:

(a)     Fastly common stock met the requirements for quotation and/or listing, and was quoted and/or listed and actively traded and/or quoted on the NYSE, a highly efficient marketplace;

(b)     According to the Company's 2019 Form 10-K, the Company had almost 95.9 million shares of common stock outstanding as of February 28, 2020, demonstrating an active and broad market for Fastly common stock;

(c)     As a regulated issuer, Fastly filed periodic public reports with the SEC;

(d)     Fastly regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e)     Fastly was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

152.    As a result of the foregoing, the market for Fastly common stock promptly digested current information regarding Fastly from all publically available sources and reflected such information in Fastly's stock price.  Under these circumstances, all purchasers of Fastly common stock during the Class Period suffered similar injury through their purchase of Fastly common stock at artificially inflated prices and a presumption of reliance applies.

153. A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiff's claims are based on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding TikTok, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material omissions set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

154. Lead Plaintiff incorporates ¶¶1-153 by reference.

155. During the Class Period, Fastly and the Individual Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156. Fastly and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Fastly common stock during the Class Period.

157. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially-inflated prices for Fastly common stock. Lead Plaintiff and the Class would not have purchased Fastly common stock at the prices they paid, or

at all, if they had been aware that the market price had been artificially and falsely inflated by Fastly's and the Individual Defendants' misleading statements.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against Defendants Bixby and Lares

158.    Lead Plaintiff incorporates ¶¶1-157 by reference.

159.    Bixby and Lares acted as controlling persons of Fastly within the meaning of §20(a) of the Exchange Act as alleged herein.  Specifically, by virtue of their high-level positions, and their ability to control and direct the Company's decision making and day-to-day operations, the Individual Defendants had the power and ability to control and influence – and, in fact, did control and influence, directly or indirectly – the wrongful conduct alleged herein, including, without limitation, the content and dissemination of the false or misleading material misstatements and omissions set forth *supra*.  Each of the Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by Lead Plaintiff to be false or misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected or updated.

160.    As set forth above, Fastly and the Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Bixby and Lares are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly-traded common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Lead Plaintiff and the members of the Class damages, including interest;

C. Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable or injunctive, or other relief, as the Court may deem just and proper.

**JURY TRIAL DEMAND**

Lead Plaintiff hereby demands a trial by jury on all triable claims.

DATED: April 12, 2021

ROBBINS GELLER RUDMAN
  & DOWD LLP
LAURIE L. LARGENT
CAROLINE M. ROBERT
ALEXI H. PFEFFER-GILLETT


      s/ Laurie L. Largent
LAURIE L. LARGENT

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
llargent@rgrdlaw.com
crobert@rgrdlaw.com
agillett@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

Lead Counsel for Lead Plaintiff

CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -
4:20-cv-06024-PJH
4825-8326-7812.v1

- 53 -

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

ANDREW R. ZENOFF ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint filed and adopts its allegations. Plaintiff has authorized the filing of a motion for appointment as lead plaintiff.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5. Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Wasa Medical Holdings v. Sorrento Therapeutics, Inc.*, No. 3:20-cv-00966 (S.D. Cal.)
*McDermid v. Inovio Pharmaceuticals, Inc.,* No. 2:20-cv-01402 (E.D. Pa.)

6. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ April 9 day of April, 2021.

DocuSigned by:

*Andrew R. Zenoff*
EE82C6790A5C484...

ANDREW R. ZENOFF

FASTLY

DocuSign Envelope ID: 1D1F085E-C09E-4BCA-8525-05427F67DAA4

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/12/2020 | 3,000 | $35.22 |
| 05/12/2020 | 4,000 | $35.54 |
| 05/12/2020 | 1,900 | $36.40 |
| 05/12/2020 | 301 | $36.41 |
| 05/12/2020 | 1 | $36.39 |
| 05/12/2020 | 7,798 | $36.43 |
| 05/12/2020 | 4,250 | $36.36 |
| 05/12/2020 | 655 | $36.36 |
| 05/12/2020 | 95 | $36.36 |
| 05/12/2020 | 4,800 | $37.50 |
| 05/12/2020 | 200 | $37.46 |
| 05/12/2020 | 5,000 | $37.49 |
| 05/12/2020 | 300 | $38.08 |
| 05/12/2020 | 100 | $38.03 |
| 05/12/2020 | 100 | $38.04 |
| 05/12/2020 | 4,900 | $38.05 |
| 05/12/2020 | 500 | $38.05 |
| 05/12/2020 | 200 | $38.03 |
| 05/12/2020 | 200 | $38.00 |
| 05/12/2020 | 200 | $38.12 |
| 05/12/2020 | 100 | $38.07 |
| 05/12/2020 | 100 | $38.06 |
| 05/12/2020 | 1,200 | $38.04 |
| 05/12/2020 | 7,100 | $38.13 |
| 05/12/2020 | 5,000 | $37.77 |
| 05/12/2020 | 3,000 | $36.93 |
| 05/12/2020 | 7,000 | $37.73 |
| 05/13/2020 | 1,300 | $38.42 |
| 05/13/2020 | 300 | $38.50 |
| 05/13/2020 | 100 | $38.45 |
| 05/13/2020 | 700 | $38.82 |
| 05/13/2020 | 500 | $38.81 |
| 05/13/2020 | 98 | $38.90 |
| 05/13/2020 | 502 | $38.89 |
| 05/13/2020 | 175 | $38.92 |
| 05/13/2020 | 1,055 | $38.94 |
| 05/13/2020 | 200 | $38.93 |
| 05/13/2020 | 115 | $38.95 |
| 05/13/2020 | 625 | $38.96 |
| 05/13/2020 | 730 | $38.98 |
| 05/13/2020 | 800 | $38.97 |
| 05/13/2020 | 1,000 | $38.87 |
| 05/13/2020 | 1,600 | $39.00 |
| 05/13/2020 | 200 | $38.99 |
| 05/14/2020 | 6,000 | $36.68 |

DocuSign Envelope ID: 1D1F085E-C09E-4BCA-8525-05437F67DAA4

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/14/2020 | 6,000 | $36.75 |
| 05/14/2020 | 6,000 | $36.78 |
| 05/15/2020 | 3,000 | $38.18 |
| 05/15/2020 | 4,000 | $38.55 |
| 05/15/2020 | 1,000 | $38.46 |
| 05/15/2020 | 464 | $37.59 |
| 05/15/2020 | 2,536 | $37.58 |
| 05/18/2020 | 590 | $41.60 |
| 05/18/2020 | 910 | $41.48 |
| 05/18/2020 | 92 | $42.01 |
| 05/18/2020 | 100 | $42.24 |
| 05/18/2020 | 808 | $42.24 |
| 05/18/2020 | 205 | $40.99 |
| 05/18/2020 | 193 | $40.90 |
| 05/18/2020 | 990 | $41.00 |
| 05/18/2020 | 1,612 | $40.95 |
| 06/18/2020 | 1,600 | $63.11 |
| 06/18/2020 | 400 | $63.15 |
| 06/18/2020 | 1,000 | $62.87 |
| 06/19/2020 | 190 | $64.19 |
| 06/19/2020 | 1,037 | $64.20 |
| 06/19/2020 | 273 | $64.25 |
| 06/19/2020 | 276 | $63.25 |
| 06/19/2020 | 600 | $63.26 |
| 06/19/2020 | 24 | $63.28 |
| 06/19/2020 | 100 | $63.27 |
| 06/19/2020 | 500 | $63.38 |
| 06/19/2020 | 1,500 | $63.39 |
| 06/19/2020 | 1,000 | $63.66 |
| 06/22/2020 | 200 | $70.96 |
| 06/22/2020 | 221 | $70.97 |
| 06/22/2020 | 4,779 | $70.98 |
| 06/26/2020 | 100 | $86.81 |
| 06/26/2020 | 400 | $86.84 |
| 06/26/2020 | 500 | $86.84 |
| 06/26/2020 | 1,000 | $86.89 |
| 06/26/2020 | 500 | $87.22 |
| 06/26/2020 | 500 | $85.88 |
| 06/26/2020 | 300 | $83.91 |
| 06/26/2020 | 175 | $83.92 |
| 06/26/2020 | 25 | $83.96 |
| 06/26/2020 | 200 | $83.79 |
| 06/26/2020 | 800 | $83.80 |
| 06/29/2020 | 500 | $88.20 |
| 06/29/2020 | 500 | $88.37 |
| 06/29/2020 | 1,000 | $82.75 |
| 06/29/2020 | 500 | $80.27 |
| 07/21/2020 | 100 | $84.42 |
| 07/21/2020 | 300 | $83.73 |
| 07/21/2020 | 100 | $84.18 |
| 07/24/2020 | 200 | $77.38 |
| 07/24/2020 | 100 | $77.70 |

DocuSign Envelope ID: 1D1F085F-C09E-4BCA-8525-05427F67DAA4

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 07/30/2020 | 181 | $91.09 |
| 07/30/2020 | 100 | $91.05 |
| 07/30/2020 | 19 | $91.09 |
| 07/30/2020 | 200 | $92.11 |
| 08/04/2020 | 1,000 | $114.60 |
| 08/04/2020 | 20 | $114.00 |
| 08/04/2020 | 7 | $113.86 |
| 08/04/2020 | 473 | $114.00 |
| 08/04/2020 | 500 | $114.40 |
| 08/04/2020 | 10 | $114.25 |
| 08/04/2020 | 100 | $114.26 |
| 08/04/2020 | 8 | $114.11 |
| 08/04/2020 | 100 | $114.32 |
| 08/04/2020 | 50 | $114.20 |
| 08/04/2020 | 232 | $114.35 |
| 08/05/2020 | 3 | $101.00 |
| 08/05/2020 | 12 | $101.02 |
| 08/05/2020 | 10 | $100.91 |
| 08/05/2020 | 975 | $101.15 |
| 08/05/2020 | 1,000 | $102.00 |
| 08/05/2020 | 3,000 | $113.02 |
| 08/05/2020 | 1,000 | $110.25 |
| 08/05/2020 | 1,000 | $111.05 |
| 08/06/2020 | 115 | $89.16 |
| 08/06/2020 | 455 | $89.18 |
| 08/06/2020 | 1,000 | $89.15 |
| 08/06/2020 | 430 | $89.15 |
| 08/31/2020 | 300 | $90.89 |
| 08/31/2020 | 500 | $88.16 |
| 08/31/2020 | 300 | $92.83 |
| 09/10/2020 | 500 | $82.90 |
| 09/11/2020 | 1,000 | $81.29 |
| 09/11/2020 | 1,000 | $75.92 |
| 09/11/2020 | 300 | $76.50 |
| 09/11/2020 | 250 | $77.50 |
| 09/11/2020 | 2 | $77.51 |
| 09/11/2020 | 248 | $77.55 |
| 09/11/2020 | 1,000 | $82.70 |
| 09/11/2020 | 800 | $75.97 |
| 09/11/2020 | 1,000 | $82.33 |
| 09/11/2020 | 1,000 | $81.30 |
| 09/14/2020 | 500 | $81.79 |
| 09/14/2020 | 200 | $81.90 |
| 09/15/2020 | 500 | $83.08 |
| 09/15/2020 | 500 | $82.41 |
| 09/16/2020 | 2,028 | $82.83 |
| 09/16/2020 | 1,400 | $82.87 |
| 09/16/2020 | 10 | $82.77 |
| 09/16/2020 | 562 | $82.78 |
| 09/17/2020 | 3,000 | $81.50 |
| 09/17/2020 | 2,000 | $81.45 |
| 09/18/2020 | 100 | $80.97 |

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 09/18/2020 | 250 | $80.99 |
| 09/18/2020 | 100 | $80.98 |
| 09/18/2020 | 550 | $81.00 |
| 09/18/2020 | 1,000 | $80.99 |
| 09/18/2020 | 2,000 | $82.19 |
| 09/18/2020 | 600 | $82.77 |
| 09/18/2020 | 2,600 | $80.87 |
| 09/18/2020 | 400 | $80.73 |
| 09/18/2020 | 200 | $81.71 |
| 09/18/2020 | 100 | $81.69 |
| 09/18/2020 | 100 | $81.70 |
| 09/18/2020 | 200 | $81.72 |
| 09/18/2020 | 400 | $81.73 |
| 09/18/2020 | 2,000 | $80.30 |
| 09/18/2020 | 2,000 | $80.70 |
| 09/24/2020 | 3,000 | $88.38 |
| 09/24/2020 | 4,000 | $88.77 |
| 09/24/2020 | 2,000 | $87.02 |
| 09/24/2020 | 218 | $88.89 |
| 09/24/2020 | 2,000 | $88.76 |
| 10/07/2020 | 598 | $115.20 |
| 10/07/2020 | 2,402 | $115.21 |
| 10/07/2020 | 1,000 | $106.14 |
| 10/08/2020 | 1,000 | $122.18 |
| 10/08/2020 | 3,500 | $120.30 |
| 10/08/2020 | 400 | $115.46 |
| 10/13/2020 | 4,000 | $128.79 |
| 10/14/2020 | 3,000 | $126.76 |
| 10/14/2020 | 1,000 | $127.76 |
| 10/14/2020 | 1,000 | $128.41 |
| 10/14/2020 | 3,000 | $123.99 |
| 10/14/2020 | 2,000 | $125.50 |
| 10/14/2020 | 2,000 | $126.50 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 05/12/2020 | 50 | $38.29 |
| 05/12/2020 | 4,900 | $38.27 |
| 05/12/2020 | 50 | $38.28 |
| 05/12/2020 | 5,000 | $38.32 |
| 05/12/2020 | 300 | $38.38 |
| 05/12/2020 | 3,900 | $38.37 |
| 05/12/2020 | 800 | $37.37 |
| 05/12/2020 | 5,000 | $38.41 |
| 05/12/2020 | 100 | $35.92 |
| 05/12/2020 | 400 | $35.85 |
| 05/12/2020 | 100 | $35.84 |
| 05/12/2020 | 100 | $35.86 |
| 05/12/2020 | 800 | $35.83 |
| 05/12/2020 | 300 | $35.82 |
| 05/12/2020 | 5,100 | $35.75 |

DocuSign Envelope ID: 1D1F085E-C09E-4BCA-8525-05427567DAA4

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 05/12/2020 | 100 | $35.80 |
| 05/12/2020 | 1,100 | $36.62 |
| 05/12/2020 | 100 | $36.61 |
| 05/12/2020 | 4,400 | $36.61 |
| 05/12/2020 | 305 | $36.56 |
| 05/12/2020 | 1,008 | $36.55 |
| 05/12/2020 | 1,005 | $36.54 |
| 05/12/2020 | 312 | $36.51 |
| 05/12/2020 | 1,398 | $36.50 |
| 05/12/2020 | 872 | $36.52 |
| 05/12/2020 | 4,000 | $36.52 |
| 05/12/2020 | 500 | $36.53 |
| 05/12/2020 | 1,000 | $37.55 |
| 05/12/2020 | 2,400 | $37.53 |
| 05/12/2020 | 521 | $37.52 |
| 05/12/2020 | 400 | $37.51 |
| 05/12/2020 | 100 | $37.57 |
| 05/12/2020 | 100 | $37.54 |
| 05/12/2020 | 100 | $37.43 |
| 05/12/2020 | 100 | $37.45 |
| 05/12/2020 | 100 | $37.46 |
| 05/12/2020 | 772 | $37.50 |
| 05/12/2020 | 200 | $37.47 |
| 05/12/2020 | 600 | $37.46 |
| 05/12/2020 | 700 | $37.45 |
| 05/12/2020 | 2,907 | $37.44 |
| 05/12/2020 | 7,000 | $38.55 |
| 05/12/2020 | 3,000 | $37.35 |
| 05/13/2020 | 1,400 | $36.58 |
| 05/13/2020 | 200 | $36.63 |
| 05/13/2020 | 302 | $36.65 |
| 05/13/2020 | 300 | $36.62 |
| 05/13/2020 | 2,425 | $36.61 |
| 05/13/2020 | 303 | $36.66 |
| 05/13/2020 | 963 | $36.60 |
| 05/13/2020 | 2,486 | $36.57 |
| 05/13/2020 | 300 | $36.59 |
| 05/13/2020 | 300 | $36.74 |
| 05/13/2020 | 300 | $36.73 |
| 05/13/2020 | 500 | $36.71 |
| 05/13/2020 | 121 | $36.70 |
| 05/13/2020 | 100 | $36.69 |
| 05/13/2020 | 100 | $36.49 |
| 05/13/2020 | 300 | $36.45 |
| 05/13/2020 | 100 | $36.46 |
| 05/13/2020 | 3,500 | $36.33 |
| 05/13/2020 | 200 | $36.37 |
| 05/13/2020 | 200 | $36.38 |
| 05/13/2020 | 100 | $36.39 |
| 05/13/2020 | 500 | $36.36 |
| 05/14/2020 | 300 | $36.85 |
| 05/14/2020 | 9,700 | $36.83 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 05/14/2020 | 1,100 | $37.12 |
| 05/14/2020 | 1,700 | $37.11 |
| 05/14/2020 | 200 | $37.12 |
| 05/15/2020 | 4,000 | $38.20 |
| 05/15/2020 | 4,000 | $38.84 |
| 05/15/2020 | 557 | $38.70 |
| 05/15/2020 | 1 | $38.28 |
| 05/15/2020 | 2,442 | $38.28 |
| 05/15/2020 | 300 | $39.01 |
| 05/15/2020 | 869 | $39.00 |
| 05/15/2020 | 1,831 | $38.85 |
| 05/18/2020 | 2,500 | $41.69 |
| 06/19/2020 | 4,000 | $62.72 |
| 06/19/2020 | 300 | $63.21 |
| 06/19/2020 | 2,152 | $63.20 |
| 06/19/2020 | 2,048 | $63.23 |
| 06/24/2020 | 5,200 | $69.86 |
| 06/26/2020 | 1,500 | $84.29 |
| 07/06/2020 | 175 | $82.57 |
| 07/06/2020 | 100 | $82.55 |
| 07/06/2020 | 201 | $85.56 |
| 07/06/2020 | 200 | $82.58 |
| 07/06/2020 | 721 | $82.52 |
| 07/06/2020 | 703 | $82.53 |
| 07/06/2020 | 400 | $82.49 |
| 07/06/2020 | 500 | $82.31 |
| 07/06/2020 | 750 | $82.28 |
| 07/07/2020 | 1,750 | $87.39 |
| 08/04/2020 | 1,300 | $112.05 |
| 08/05/2020 | 2,725 | $110.45 |
| 08/05/2020 | 100 | $110.42 |
| 08/05/2020 | 175 | $110.41 |
| 08/05/2020 | 175 | $109.81 |
| 08/05/2020 | 1,325 | $109.80 |
| 08/06/2020 | 1,000 | $87.93 |
| 08/06/2020 | 1,000 | $87.74 |
| 08/07/2020 | 19 | $86.50 |
| 08/07/2020 | 7 | $86.40 |
| 08/07/2020 | 1,000 | $86.18 |
| 08/07/2020 | 1,020 | $86.25 |
| 08/07/2020 | 874 | $86.40 |
| 08/07/2020 | 98 | $86.26 |
| 08/07/2020 | 1 | $86.27 |
| 08/07/2020 | 50 | $86.21 |
| 08/07/2020 | 334 | $86.20 |
| 08/07/2020 | 2 | $86.24 |
| 08/07/2020 | 980 | $86.50 |
| 08/07/2020 | 20 | $86.51 |
| 08/07/2020 | 595 | $86.80 |
| 09/10/2020 | 10 | $84.35 |
| 09/10/2020 | 500 | $84.32 |
| 09/10/2020 | 5 | $84.40 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 09/10/2020 | 585 | $84.32 |
| 09/10/2020 | 500 | $82.58 |
| 09/11/2020 | 900 | $80.72 |
| 09/11/2020 | 100 | $80.78 |
| 09/11/2020 | 100 | $81.26 |
| 09/11/2020 | 700 | $81.25 |
| 09/11/2020 | 200 | $81.25 |
| 09/11/2020 | 100 | $82.31 |
| 09/11/2020 | 285 | $82.30 |
| 09/11/2020 | 100 | $82.42 |
| 09/11/2020 | 200 | $82.40 |
| 09/11/2020 | 100 | $82.45 |
| 09/11/2020 | 100 | $82.38 |
| 09/11/2020 | 115 | $82.32 |
| 09/11/2020 | 1,000 | $81.18 |
| 09/11/2020 | 30 | $75.70 |
| 09/11/2020 | 470 | $75.68 |
| 09/11/2020 | 300 | $75.61 |
| 09/16/2020 | 3,500 | $81.83 |
| 09/16/2020 | 1,000 | $82.25 |
| 09/16/2020 | 57 | $82.24 |
| 09/16/2020 | 25 | $82.21 |
| 09/16/2020 | 341 | $82.20 |
| 09/17/2020 | 145 | $79.00 |
| 09/17/2020 | 690 | $79.50 |
| 09/17/2020 | 3 | $79.25 |
| 09/17/2020 | 20 | $78.87 |
| 09/17/2020 | 60 | $78.88 |
| 09/17/2020 | 920 | $78.85 |
| 09/17/2020 | 520 | $78.75 |
| 09/17/2020 | 105 | $78.80 |
| 09/17/2020 | 100 | $78.76 |
| 09/17/2020 | 14 | $78.78 |
| 09/17/2020 | 3,000 | $81.23 |
| 09/17/2020 | 980 | $78.78 |
| 09/17/2020 | 20 | $78.80 |
| 09/17/2020 | 1,000 | $79.10 |
| 09/18/2020 | 2,000 | $80.70 |
| 09/18/2020 | 2,600 | $80.36 |
| 09/18/2020 | 400 | $81.60 |
| 09/18/2020 | 200 | $80.79 |
| 09/18/2020 | 800 | $80.77 |
| 09/18/2020 | 500 | $80.77 |
| 09/18/2020 | 500 | $80.78 |
| 09/18/2020 | 600 | $80.46 |
| 09/18/2020 | 1,000 | $81.48 |
| 09/18/2020 | 2,000 | $79.53 |
| 09/18/2020 | 2,000 | $80.35 |
| 09/23/2020 | 63 | $86.99 |
| 09/23/2020 | 117 | $86.92 |
| 09/23/2020 | 38 | $86.75 |
| 09/24/2020 | 700 | $88.69 |

DocuSign Envelope ID: 1D1F085E-C09E-4BCA-8525-05423F67DAA4

| Date<br>Sold | Amount of<br>Shares Sold | Price |
|---|---|---|
| 09/24/2020 | 2,300 | $88.69 |
| 09/24/2020 | 4,000 | $88.15 |
| 09/24/2020 | 1,799 | $87.45 |
| 09/24/2020 | 1 | $87.38 |
| 09/24/2020 | 200 | $87.37 |
| 09/24/2020 | 2,000 | $88.10 |
| 10/07/2020 | 5 | $113.74 |
| 10/07/2020 | 200 | $113.64 |
| 10/07/2020 | 395 | $113.59 |
| 10/07/2020 | 100 | $113.64 |
| 10/07/2020 | 100 | $113.62 |
| 10/07/2020 | 100 | $113.65 |
| 10/07/2020 | 100 | $113.66 |
| 10/08/2020 | 4,000 | $118.31 |
| 10/13/2020 | 980 | $128.55 |
| 10/13/2020 | 20 | $128.60 |
| 10/13/2020 | 2 | $129.51 |
| 10/13/2020 | 1,531 | $129.49 |
| 10/13/2020 | 530 | $129.41 |
| 10/13/2020 | 6 | $129.40 |
| 10/13/2020 | 542 | $129.46 |
| 10/13/2020 | 1,286 | $129.50 |
| 10/13/2020 | 3 | $129.52 |
| 10/14/2020 | 2,900 | $126.21 |
| 10/14/2020 | 100 | $126.14 |
| 10/14/2020 | 5,000 | $127.85 |
| 10/14/2020 | 3,000 | $122.32 |
| 10/14/2020 | 300 | $125.17 |
| 10/14/2020 | 500 | $125.16 |
| 10/14/2020 | 209 | $125.15 |
| 10/14/2020 | 991 | $125.10 |
| 10/14/2020 | 300 | $126.07 |
| 10/14/2020 | 675 | $126.01 |
| 10/14/2020 | 300 | $126.06 |
| 10/14/2020 | 620 | $126.06 |
| 10/14/2020 | 5 | $126.14 |
| 10/14/2020 | 100 | $126.08 |

Prices listed are rounded to two decimal places.

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on April 12, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Laurie L. Largent
LAURIE L. LARGENT

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: llargent@rgrdlaw.com

4825-8326-7812.v1

# Mailing Information for a Case 4:20-cv-06024-PJH In re FASTLY, INC. SECURITIES LITIGATION

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com,MAlbert@ecf.courtdrive.com,e_file_SD@rgrdlaw.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **Brett Hom De Jarnette**
  bdejarnette@cooley.com,galancr@cooley.com

- **Lubna Faruqi**
  lfaruqi@faruqilaw.com,ecf@faruqilaw.com

- **Janelle Marie Fernandes**
  jfernandes@cooley.com,emadrigal@cooley.com

- **Melissa Ann Fortunato**
  fortunato@bespc.com,ecf@bespc.com

- **Richard W. Gonnello**
  rgonnello@faruqilaw.com,ecf@faruqilaw.com,dbehnke@faruqilaw.com

- **Benjamin Heikali**
  Bheikali@faruqilaw.com,ealdo@faruqilaw.com,rglezakos@faruqilaw.com,ecf@faruqilaw.com,tpeter@faruqilaw.com

- **J Alexander Hood , II**
  ahood@pomlaw.com,tcrockett@pomlaw.com,abarbosa@pomlaw.com

- **Laurie L. Largent**
  llargent@rgrdlaw.com,e_file_sd@rgrdlaw.com,mkuwashima@rgrdlaw.com

- **Katherine M. Lenahan**
  klenahan@faruqilaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,tcrockett@pomlaw.com,disaacson@pomlaw.com,abarbosa@pomlaw.com,lpvega@pomlaw.com

- **Danielle Suzanne Myers**
  dmyers@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,tcrockett@pomla

- **Marion Curry Passmore**
  passmore@bespc.com,ecf@bespc.com

- **Alexi Harry Pfeffer-Gillett**
  agillett@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Caroline Maryse Robert**
  crobert@rgrdlaw.com,E_File_SD@rgrdlaw.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Jessica Valenzuela Santamaria**
  jsantamaria@cooley.com,galancr@cooley.com

- **Nina M. Varindani**
  nvarindani@faruqilaw.com

- **Shawn A. Williams**
  shawnw@rgrdlaw.com,ShawnW@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)