1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE ENOVIX CORP. SECURITIES LITIGATION

Case No. 23-cv-00071-SI

**ORDER GRANTING MOTION TO DISMISS**

Re: Dkt. No. 89

Now before the Court is defendants' motion to dismiss the consolidated complaint. Dkt. No. 89. Pursuant to Civil Local Rule 7-1(b), the Court found this matter appropriate for resolution without oral argument and vacated the hearing that was set for December 8, 2023. Dkt. No. 96. For the reasons set forth below, the Court GRANTS the motion to dismiss, with leave to amend.

## INTRODUCTION

This securities fraud class action is brought by lead plaintiffs Gary Kung; Discovery Global Opportunity Master Fund Ltd.; and Discovery Nymeria Master Fund, Ltd.; and by named plaintiffs Robert G. Lee and Traci Selke (collectively, "plaintiffs"). Plaintiffs sue on behalf of themselves and a putative class of all persons and entities that purchased the publicly traded common stock of Enovix Corporation ("Enovix") or Rodgers Silicon Valley Acquisition Corporation ("RSVAC") between June 24, 2021, and January 3, 2023, both dates inclusive ("Class Period"). Dkt. No. 84 ("Consolidated Complaint" or "CC") ¶ 1. Defendants are: Enovix, Harrold Rust, Steffen Pietzke, Cameron Dales, Thurman J. Rodgers, Emmanuel T. Hernandez, Lisan Hung, Steven J. Gomo, John D. McCranie, Joseph I. Malchow, Betsy Atkins, Pegah Ebrahimi, Gregory Reichow (collectively, "defendants"). *Id.* ¶¶ 41-55.

According to plaintiffs, "Enovix is an early-stage technology company that purports to design, develop, and manufacture a new type of lithium-ion ('Li-ion') battery that is smaller and stronger than conventional Li-ion batteries." *Id.* ¶ 2.  Enovix claims that its batteries last longer and are five years ahead of current industry production. *Id.* ¶ 76.  The events at issue in this case occurred as Enovix was "evolv[ing] from a company focused predominantly on R&D to a company capable of volume production and commercialization." *Id.* ¶ 4.  The consolidated complaint alleges that Enovix misled its investors when, in an "ambitious" attempt to set up its U.S.-based "Fab-1" production facility before the company went public, it decided to forego critical testing of its manufacturing equipment. *Id.* ¶¶ 7-13.  Specifically, plaintiffs allege that Enovix waived "factory acceptance testing" ("FAT") before the equipment left the vendor's factory and failed to conduct "site acceptance testing" ("SAT") once the equipment was installed at Fab-1.  According to plaintiffs, this led to the foreseeable consequence of equipment failures and Enovix's inability to meet the output and revenue targets it had announced.  Plaintiffs argue that disclosures made on November 1, 2022, and January 3, 2023, caused the share price to fall, harming investors.  Plaintiffs say that on November 7, 2022, defendant Thurman Rodgers issued a statement admitting that the company waived the FAT and SAT.

Defendants move to dismiss the consolidated complaint.  Defendants argue, *inter alia*, that the consolidated complaint "alleges no facts supporting its conclusion that Enovix conducted no testing at all[;]" that plaintiffs mischaracterize Rodgers's November 7, 2022 statement as an admission; and that plaintiffs fail to plead that any defendant acted with the requisite scienter.  Dkt. No. 89 ("Mot.") at 2-3.  Defendants also argue that plaintiffs have not pled loss causation for the January 3, 2023 stock drop.  *Id.* at 3.

## BACKGROUND

### I.        Lead-up to the Merger

Based in Fremont, California, Enovix has been developing its Li-ion battery technology since 2007.  CC ¶ 77.  In 2012, Enovix began to "work on the manufacturing approach[.]"  By 2017, the company "could produce small quantities of Li-ion batteries to provide to potential customers

as samples, but not at commercially viable levels." *Id.*

In February 2021, Enovix announced its plans to go public. *Id.* ¶ 5. Rather than going public through a traditional initial public offering, Enovix underwent what is known as a "de-SPAC merger," merging with Rodgers Silicon Valley Acquisition Corp. *Id.* RSVAC was "a public special purpose acquisition company known as a 'SPAC' or 'blank check' company . . . whose lone stated purpose is to acquire a private company."[1] *Id.* At the same time, "Enovix set an 'ambitious goal' to both develop its own U.S.-based manufacturing line and to begin delivering products to customers (generating the Company's first product revenue) by the second quarter of 2022." *Id.* ¶ 7. "Specifically, Enovix projected that it would manufacture one battery every two seconds, which would require four manufacturing lines capable of producing 550 units per hour ('UPH')." *Id.* At the time it made this forecast, Enovix had no product revenue to date. *Id.* ¶ 78.

On February 22, 2021, Enovix released an investor presentation. *Id.* ¶ 98. According to the consolidated complaint, the presentation discussed Enovix's "first commercial battery fabrication line, Fab-1, and explained that the manufacturing specifications for that line would be to manufacture one '3D battery every 2.0 seconds' and to run lines that could produce 500 units per hour . . . ." *Id.* ¶ 99. The presentation also stated that the manufacturing equipment that would be used to produce the batteries "was already at the FAT stage." *Id.* ¶ 100. "The presentation explained that during the FAT, 'Equipment must perform to specification at the vendor's factory before shipment to Enovix and must pass another test after installation at the Enovix site.'" *Id.* The presentation "identified the planned date ranges for the FAT and SAT for each manufacturing function (electrode fabrication, assembly, packaging, and testing). The FATs for all of the manufacturing functions were indicated to have started before the presentation." *Id.* ¶ 102. Given this schedule, first revenue for Fab-1 was expected in Q2 2022. *Id.* First revenue for the company's second fabrication line, "Fab-2," was expected in Q2 2023. *Id.*

---

[1] RSVAC was founded in September 2020. CC ¶ 65. Defendant Rodgers served as its Chairman and CEO. *Id.* ¶ 68. RSVAC completed its initial public offering on December 4, 2020. *Id.* ¶ 67.

## II.      Factory Acceptance Testing (FAT) and Site Acceptance Testing (SAT)

According to the consolidated complaint, the FAT and SAT are "two key quality control tests[.]"  *Id.* ¶ 85.  "The FAT is performed offsite at the equipment vendor's factory to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications.  The new manufacturing equipment is set up at the vendor's factory and then tested by the vendor's engineers in accordance with a detailed plan agreed upon by the purchaser and the equipment vendor."  *Id.* ¶ 86.  "The SAT is the next critical quality control procedure[,]" and takes place once the manufacturing equipment has been installed on site at the customer's facility.  *Id.* ¶ 90.  "To conduct the SAT, the equipment vendor sends representatives—typically the same engineers who designed the system and conducted the FAT—to install the equipment, configure it, conduct tests, and verify that the equipment operates correctly."  *Id.* ¶ 91.

## III.      Waiver of FAT and SAT; Merger

In April 2021, supply chain disruptions related to the COVID-19 pandemic created the potential for a three-month delay in delivery of the Fab-1 manufacturing equipment.  *Id.* ¶ 15.  According to the consolidated complaint, "[t]o show that the Company was capably executing its plan and progressing toward real revenues, Defendants wanted to tell public investors *before* the proposed Merger that the Fab-1 manufacturing equipment was already installed at its Fremont facility."  *Id.* ¶ 14.  The company thus decided to spend "$1.4 million chartering a Ukrainian Antonov An-124, one of the largest cargo planes on the planet, to avoid shipping delays and fly the Fab-1 equipment to California."  *Id.* ¶ 15.

On July 14, 2021, RSVAC's shareholders approved the merger at a special shareholder meeting, pursuant to a Proxy Statement filed with the Securities and Exchange Commission ("SEC") and disseminated to investors.  *Id.* ¶¶ 6, 72.

Plaintiffs allege that the decision to speed up delivery of the equipment ahead of the merger "involved a serious trade-off that was never disclosed to investors.  In order to avoid the potential delay, Enovix decided to waive the FAT.  Accordingly, the equipment was loaded on a cargo plane and shipped from China to California without first making sure it met Enovix's specifications at the

4

vendor's factory." *Id.* ¶ 16; *see also id.* ¶ 94 (alleging defendants Rodgers and Rust intentionally waived the FAT and SAT). The consolidated complaint alleges that once the equipment arrived in Fremont, "Enovix did not conduct the SAT. The engineers from Enovix's China-based vendors were not allowed to travel to the U.S. (due to the pandemic). Accordingly, they did not install or configure the equipment, nor did they test it at the Fremont site to ensure that it could meet Enovix's specifications." *Id.* ¶ 17. Instead, Enovix had its own employees and local contractors install and configure "the complex, custom-made, brand new manufacturing equipment[.]" *Id.*

The consolidated complaint alleges that "as a result of skipping the FAT and SAT, Enovix's new Fab-1 manufacturing equipment encountered myriad problems, disruptions, and delays in beginning and ramping up production." *Id.* ¶ 18. Fab-1 did not come "remotely close" to producing batteries at the rates projected, and the company "never came remotely close to meeting its projected revenue timeline." *Id.*

## IV.    Alleged Misstatements

Plaintiffs allege that between February 22, 2021, and March 25, 2022, defendants made thirteen false or misleading statements regarding the qualification of its manufacturing equipment and the decision to skip the FAT and SAT. Dkt. No. 91 ("Opp'n") at 11 (citing CC ¶¶ 100, 102, 105, 107, 110, 112, 114, 116, 118, 120, 123, 125, 127).

For instance, on June 24, 2021, the start of the Class Period, the company issued a Proxy Statement and Prospectus ahead of the proposed merger between RSVAC and Enovix. *Id.* ¶ 95. That same day, the company filed the Proxy Statement with the SEC on Form 424B3. *Id.* The Proxy Statement stated, "Fab-1 is Enovix's current production factory, for which Enovix started procuring equipment in 2020. ***All critical equipment for fabrication has arrived and is currently assembled. Enovix expects Fab-1 to be fully operational by the end of 2021 and to begin production by Q1 2022, with first production revenue in Q2 2022.***" *Id.* ¶ 105.[2] Plaintiffs allege "[t]he highlighted statements were misleading because Defendants failed to disclose that Enovix

---

[2] Unless otherwise noted, bold and italicized highlighting of statements is taken directly as it appears in the consolidated complaint.

United States District Court
Northern District of California

waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever." *Id.* ¶ 106.  Plaintiffs also argue that the risk disclosures in the company's SEC filings were inadequate and misleading for the same reasons, failing to disclose that the company did not conduct the FAT or SAT.  *Id.* ¶ 108.

On August 10, 2021, Enovix issued a "Letter to Our Shareholders" in which it stated,

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification.  ***The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements.  This follows factory acceptance testing already performed at the vendor's facility before taking delivery.*** …

*Id.* ¶ 110.

That same day, defendant Rust stated on a Q2 2021 Earnings Call,

> As many of you saw during our showcase last month, we are on track to start production at Fab-1 in the first quarter of 2022, resulting in product revenue in the second quarter of 2022.  ***Last quarter, we were able to navigate the global supply chain constraints and receive all key equipment for our first production line.  This required heroic efforts, including a critical decision to charter Antonov An-124, one of the world's largest cargo planes, to fly over 60 tons of manufacturing equipment from Asia to San Francisco.  We managed industry-wide supply chain issues and installed and started qualifying our equipment in the midst of a global pandemic.***

*Id.* ¶ 112 (emphasis in CC).  In response to a question regarding whether Enovix's equipment was performing in terms of capacity expectations, Rust responded, "Yes, I think we're pleased overall in terms of the equipment and its ability to do its intended function. … ***We have a pretty rigorous set of both factory and site acceptance things we have to go through and I would say there's no red flags there.*** …" *Id.* ¶ 114.

Plaintiffs allege that the August 2021 statements were false and misleading because the tests that Enovix and Rust represented had or were taking place had in fact been waived.

United States District Court
Northern District of California

The last of the alleged false or misleading statements occurred on March 25, 2022, with the filing of Enovix's 2021 Form 10-K.  *See* CC ¶¶ 123, 125, 127.  In the Form 10-K, Enovix stated, "After proving out our manufacturing capability at Fab-1 and leveraging our learning to improve our manufacturing processes, our plan is to expand capacity across multiple facilities and focus on localized production in proximity to our customers."  *Id.* ¶ 123.  Enovix also repeated the risk disclosures that plaintiffs allege were already inadequate.  *See id.* ¶ 125.  The 2021 10-K also stated,

> Currently, we are building out our Fab-1 at our headquarters in Fremont, California. We have commenced deliveries of qualification cells from Fab-1. ***Challenges associated with building out Fab-1 include extended shipping times, supply chain constraints and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions imposed on certain countries in Asia.*** Fab-1 features a first-of-its-kind line for battery production. As a result, every day we solve problems needed to improve yield and output. Simultaneously, this work is providing valuable learning, improving our processes and equipment for future lines.

*Id.* ¶ 127.  Plaintiffs allege all of these statements were false or misleading because they failed to disclose the waiver of the FAT and SAT.

## V.    Risks Materialize

The consolidated complaint alleges, "In the second half of 2022, Enovix began to gradually reveal that the risks concealed by Defendants' failure to disclose that they had bypassed the FAT and SAT were materializing."  *Id.* ¶ 130.  Problems with the Fab-1 manufacturing equipment delayed the goal of recognizing material product revenue by Q2 2022 and also pushed back the development of the second lines and of the next generation manufacturing equipment.  *Id.*

In August 2022, Enovix announced that it met its goal of recognizing its first product revenue by Q2 2022, with $5.1 million in revenue in that quarter.  *Id.* ¶ 131.  Plaintiffs allege, however, that "barely any of that revenue came from delivering products to customers" but instead was "service revenue" attributable to another cause.  *Id.* ¶ 131.  Plaintiffs further allege that "[a]t the same time, Defendants vaguely acknowledged that they would need to 'increase our manufacturing yield metrics.'"  *Id.* ¶ 132.  The company would need to take down the Fab-1 line for portions of Q3 2022 in order to "prioritize Fab-1 improvements," with the goal of positioning the company "for the start

of [its] production ramp to close the year." *Id.*

The consolidated complaint alleges, "In reality, as Defendant Rodgers would reveal a few months later, Fab-1 did not simply need to be 'improved.' It was never able to perform as necessary and needed to be completely abandoned." *Id.* ¶ 133. According to Former Employee 6 ("FE6"), for instance, by June 2022 the machinery in the area of Fab-1 where FE6 worked was producing less than 10% of the expected rate. *Id.* ¶ 134.

**VI.    Admissions/Disclosures**

On November 1, 2022, after the close of trading, Enovix released a "Letter to Our Shareholders," reporting that Enovix realized $8,000 in revenue for Q3 2022. *Id.* ¶ 136. The letter stated that Enovix "would be 'dialing back' its work on improving the 'Gen1' lines at Fab-1 in favor of shifting its focus to its future 'Gen2' lines because the supposed 'improvements' to Fab-1 were not having the desired results on output. Consequently, Enovix 'anticipate[d] achieving lower overall output from Fab-1 in 2023.'" *Id.* ¶¶ 23, 137. The letter stated that the total production run rate for 2023 would be under one million battery cells, which, according to plaintiffs, was "less than 10% of the production it said would result from producing a battery every two seconds[.]" *Id.* ¶ 138.

On this news, Enovix's share price fell 41%, from a close of $17.99 per share on November 1 to $10.53 per share by the close of trading on November 2, 2022, on unusually high trading volume. *Id.* ¶¶ 24, 143. Plaintiffs allege that "[t]his news partially revealed the risk that was concealed by Defendants' failure to disclose the truth about Fab-1 being rushed into production without the requisite testing—that the manufacturing equipment would not perform to specifications and the Company simply would not be able to produce batteries at commercial levels." *Id.* ¶ 24.

On November 7, 2022, Enovix announced that defendant Rodgers, previously Chairman of the Board, would become Executive Chairman of Enovix. *Id.* ¶¶ 45, 145. That day, Rodgers released a statement, stating, "We have poorly communicated on the status of Fab-1." *Id.* ¶ 145. Rodgers explained that the decision to charter a plane to fly the manufacturing equipment from China "***violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers***

United States District Court
Northern District of California

***fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment.  But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.*** *Id.*

Rodgers went on to state,

> ***The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.***

*Id.*  Plaintiffs do not allege any drop in the share price following Rodgers's statements on November 7, 2022.

On November 10, 2022, Enovix announced it would bring in Ajay Marathe as Chief Operating Officer ("COO").  *Id.* ¶ 151.  On December 29, 2022, Enovix announced defendant Rust would "retire" from his role as President and CEO and as a member of the Board of Directors.  *Id.* ¶ 152.

On January 3, 2023, after the close of trading, defendant Rodgers hosted a special presentation to shareholders.  *Id.* ¶ 153.  Plaintiffs allege that information revealed on this call "indicates that the end of Rust's tenure at Enovix was more akin to a termination than a 'retirement,' as the timing of the discussions about replacing Rust as CEO coincided with the production issues with Fab-1 coming to a head in late 2022."  *Id.*  Addressing concerns about the "lack of clear and transparent investor communications" concerning Fab-1, Rodgers stated, "I think they were reasonably misled."  *Id.* ¶ 154.  Regarding the first production line at Fab-1, Rodgers explained that the line "is nonfunctional for [sic] automation point of view.  That means its rated capacity of 550UPH [Units Per Hour] is really more like 100, and obviously, that wreaks havoc with output and promises."  *Id.* ¶ 155.  Rodgers went on to state that the second production line was only half built. *Id.* ¶ 156.  Rodgers explained that "we didn't want to commit to the second half of the Line 2, until Line 1 worked."  *Id.*  Rodgers went on to provide more detail about the output issues at Fab-1.  For instance, regarding one piece of equipment that was rated to 550UPH, Rodgers stated, "[W]e don't think that machine if we worked on it forever would be over 200[.]"  *Id.* ¶ 157.  Rodgers stated that

Fab-1 was "doing less than 10% of what it should be doing."  *Id.*

On the January 3, 2023 call, Rodgers also announced further delays to the Gen2 manufacturing lines, which the consolidated complaint states "could be traced back to the problems with Fab-1 and its 'Gen1' production lines[.]"  *Id.* ¶ 158.  Rodgers stated the buildout of the Gen2 lines would be delayed by several months.  *Id.* ¶ 159.  Therefore, according to plaintiffs, the revenues from Gen2 lines that investors had been told to expect in early 2024 were no longer possible.  *Id.*

During the same presentation, an analyst asked about Rodgers's November 7, 2022 statement concerning the company's violation of its Equipment Procurement Review with respect to the Fab-1 equipment.  *Id.* ¶ 160.  In response, Marathe, Enovix's new COO, stated:

> So this time instead of just saying, okay let's give you the PO and hope for the best and let them give us a machine, which kind of works and we will see it or not. This time, we are building proofs of concepts, which means smaller machines that represent the heads, . . . which are actually working in action, and we have seen those. You see the videos of those. Our engineers are over there many, many times. And many of them actually. I'm going there personally also this month where I'll be visiting these guys and establishing relationships with the CEOs myself.

*Id.*

The following day, Enovix's share price dropped 41%, from a close of $12.12 per share on January 3 to a close of $7.15 on January 4, 2023, on unusually high trading volume.  *Id.* ¶ 164. Plaintiffs allege that "[t]his significant decline was due, at least in part, because the disclosure of new information revealed the full scope of the materialized risks concealed by Defendants' omissions of the facts that the Company skipped the FAT and SAT—that Fab-1's inability to function would cause later and planned additional manufacturing processes to falter, further hampering Company growth."  *Id.* ¶ 165.

## VII.  Litigation

On January 6, 2023, plaintiff Maurice Twitchell filed suit against Enovix Corporation and four individual defendants, on behalf of a putative class of investors who purchased or otherwise acquired Enovix or RSVAC common stock between February 22, 2021, through January 3, 2023.

United States District Court
Northern District of California

1   Dkt. No. 1 at 2.

2       On April 28, 2023, following competing motions, the Court appointed the Discovery Funds

3   and Gary Kung as Co-Lead Plaintiffs and appointed Rolnick Kramer Sadighi LLP and The Rosen

4   Law Firm, P.A., as Co-Lead Counsel, and Sawyer & Labar LLP as Liaison Counsel.[3]  Dkt. No. 68.

5   On July 7, 2023, Co-Lead Plaintiffs filed the Consolidated Class Action Complaint, which, among

6   other things, amends the Class Period to June 24, 2021, through January 3, 2023, inclusive.  *See*

7   Dkt. No. 84.

8       Plaintiffs bring this securities fraud claim pursuant to Sections 10(b) and 20(a) of the

9   Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder

10  by the SEC.  Defendants now move to dismiss for failure to state a claim under Federal Rules of

11  Civil Procedure 9(b) and 12(b)(6).

12

13  **LEGAL STANDARDS**

14  **I.     Motion to Dismiss**

15      To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), "a

16  complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

17  plausible on its face." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting

18  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In reviewing a Rule 12(b)(6) motion, a district court

19  must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of

20  the plaintiff.  *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).  However, a district court

21  is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

22  fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

23      As a general rule, the Court may not consider any materials beyond the pleadings when

24  ruling on a Rule 12(b)(6) motion.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

25  However, the Private Securities Litigation Reform Act ("PSLRA") permits courts considering a

26  motion to dismiss governed by the PSLRA to consider "documents incorporated into the complaint

27

28  _____
    [3] The Discovery Funds are comprised of Discovery Global Opportunity Master Fund Ltd.
    and Discovery Nymeria Master Fund, Ltd.

United States District Court
Northern District of California

by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Securities fraud class actions must also "meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the . . . [PSLRA]." *See id.* at 313-14. Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA further requires that allegations based on false or misleading statements must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "each act or omission." *Id.* § 78u-4(b)(2)(A).

If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## II.     Exchange Act Claims

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

To establish falsity under the first element, the misrepresentation or omission must either "directly contradict what the defendant knew at that time" (i.e., be false) or "omit[ ] material information" (i.e., be misleading). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09

(9th Cir. 2018*)*.  Not all omissions are actionable.  *Id.* at 1009.  "Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b–5(b)).  For a statement or omission to be misleading, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted).  "To fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted).

The "required state of mind" for scienter covers "'intent to deceive, manipulate, or defraud,' [and] also 'deliberate recklessness.'"  *Schueneman v. Arena Pharms.*, 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted).  To determine whether scienter has been adequately pled, the Court must determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."  *Tellabs*, 551 U.S. at 310.  Plaintiffs who "seek to hold individuals and a company liable on a securities fraud theory" must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

The Supreme Court's decisions in *Tellabs*, 551 U.S. at 315-18, and *Matrixx Initiatives*, 563 U.S. at 37-49, dictate that courts not co-mingle the inquiries of falsity and scienter.  *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.* ("*Glazer II*"), 63 F.4th 747, 766 (9th Cir. 2023).  "[T]his means that we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.'  Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility."  *Id.*

**DISCUSSION**

**I.      Section 10(b)**

For the reasons stated below, the Court concludes the consolidated complaint suffers from a lack of particularity, especially with regard to the timing of events.  As such, the allegations neither create a reasonable inference that the statements were false or misleading at the time they were made, nor do they give rise to a strong inference of scienter.

**A.      False or Misleading Statements**

"In the securities fraud context, statements and omissions are actionably false or misleading if they 'directly contradict what the defendant knew at that time,' . . . or 'create an impression of a state of affairs that differs in a material way from the one that actually exists[.]'"  *In re Facebook, Inc., Sec. Litig.*, 87 F.4th 934, 948 (9th Cir. 2023) (citations omitted).

Plaintiffs challenge as false or misleading thirteen statements made between February 22, 2021, and March 25, 2022.  *See* Opp'n at 11 (citing CC ¶¶ 100, 102, 105, 107, 110, 112, 114, 116, 118, 120, 123, 125, 127).   The challenged statements can be sorted into three categories: (1) affirmative statements that the FAT or SAT had occurred or was occurring; (2) statements that did not affirmatively disclose that Enovix had waived the FAT and SAT, which plaintiffs argue was a material omission; and (3) risk disclosures, which plaintiffs argue should have included the specific information that defendants had waived the FAT and SAT.

**1.      Affirmative Statements that Reference the FAT and SAT**

Plaintiffs' case is at its strongest where they point to affirmative statements that the FAT and SAT had already occurred or were occurring, in light of plaintiffs' allegation that Enovix ultimately waived both tests in order to speed up delivery of the manufacturing equipment.  *See* CC ¶¶ 100, 102, 110, 116.  Plaintiffs allege, for instance, that on August 10, 2021, defendants stated in a letter to shareholders, "With the equipment for Line 1 installed, our factory is now undergoing qualification. ***The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements.  This follows factory acceptance testing***

14

*already performed at the vendor's facility before taking delivery.*"  *Id.* ¶ 110.  Plaintiffs allege these statements were false and misleading because Enovix waived the FAT and SAT, and thus it was false to say the FAT was "already performed" or that the equipment was "now undergoing" a qualification process that included the SAT.  *Id.* ¶ 111.

The problem is that this theory requires either: (1) accepting as true the allegation that Enovix completely waived the FAT and SAT; or (2) reading the challenged statements as stating something they do not, i.e., that Enovix was sending its engineers to the factory in China as part of the FAT and that the vendor's engineers would travel from China to California as part of the SAT.  As to the first, the allegations that Enovix waived the FAT and SAT completely are conclusory at best.  The complaint alleges that "the Fab-1 equipment . . . was not tested at all" and that "in truth the tests [the FAT and SAT] were not conducted at all."  *See* CC ¶¶ 101, 115; *see also id.* ¶ 117 ("In truth, the FAT and SAT were not conducted at all").  In their opposition brief, plaintiffs back off of these allegations, incorrectly representing that the complaint does <u>not</u> assert that Enovix "conducted no testing at all."  *Compare* Opp'n at 2, 13, 14 *with* CC ¶ 101.

If plaintiffs do not assert that Enovix conducted no testing at all, then plaintiffs' theory depends entirely on defendant Rodgers's November 7, 2022 statement, which plaintiffs label an "admission."  Plaintiffs state that on this date Rodgers "finally came clean about what happened, and the source of the problems with Fab-1's inability to meet its production specifications."  CC ¶ 19.  But as defendants note, the only "admission" Rodgers made with regard to the FAT is that Enovix waived the milestones whereby a team of Enovix engineers would fly to China to personally observe the manufacturing equipment up and running, and that the vendor's engineers would come in person to Enovix.

As quoted in the complaint, on November 7, 2022, Rodgers issued a statement that read:

> [W]e lowered our 2023 revenue projection in a confusing manner that erroneously implied that there were bigger problems with our technology.  Our revenue projections were lowered because our Fab-1 manufacturing ramp was delayed in our first year of production. This is an unacceptable execution problem which I will discuss.

United States District Court
Northern District of California

> However, as I look back on the decisions the company made, I would make the same calls again. For example, when Harrold Rust called me and said that Enovix Fab-1 would be delayed by at least three months due to the COVID-related shipping malaise unless we spent $1.4 million to charter the world's largest airplane, a Ukrainian AN-124, to fly over 55 tons of Fab-1 equipment to Silicon Valley in one shot, I said, "Brilliant, do it." ***Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.***
>
> ***The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.***

*Id.* ¶ 145.

In none of the challenged statements did defendants create the impression that Enovix engineers would go to China or that the vendor's engineers would travel to Enovix as part of quality testing. *See, e.g.*, *id.* ¶ 116 (statement by defendant Rust in September 2021 that "[w]e're in the middle of qualifying, which means basically testing out of each piece of equipment, making sure it's operating as optimum operating point, making sure we understand where the process windows are."). Nor do any of the statements say anything about "equipment procurement review." Thus, what Rodgers said on November 7, 2022, does not show that statements regarding the FAT or SAT were false or misleading when made. *See, e.g., id.* ¶¶ 100, 102, 110, 116.

In other words, as defendants explain, plaintiffs' theory "is based on speculation that Rodgers' references to 'FAT' and 'SAT,' as defined in an 'equipment procurement review' protocol, held the ***same exact*** meaning as general references to factory and site acceptance testing a year earlier." *See* Dkt. No. 94 ("Reply") at 1. The Ninth Circuit confronted a similar situation in *Wochos v. Tesla*, 985 F.3d 1180 (9th Cir. 2021). There, the plaintiffs challenged a statement by defendant Tesla that it had "started the installation of Model 3 manufacturing equipment." *Id.* at 1193. Under the plaintiffs' theory, the statement would have been false if it asserted Tesla had "begun installation

of *automated* equipment in the first quarter[.]" *Id.* The Ninth Circuit affirmed the dismissal of the fraud claim, explaining that the plaintiffs had "overlook[ed] the heightened pleading requirements imposed by the PSLRA. Where, as here, a plaintiff claims that the words used in a statement have some special or nuanced meaning that differs from what the literal words suggest, the plaintiff must plead facts that will support this crucial premise in order to satisfy the PSLRA's requirement that a private securities plaintiff adequately plead 'the *reason or reasons* why [a] statement is misleading.'" *Id.* (citing 15 U.S.C. § 78u-4(b)(1)). Here, by not connecting the dots between Rodgers's "admission" and the challenged statements regarding the FAT and SAT, plaintiffs have failed to plead adequately the reason the statements are misleading.

In opposition, plaintiffs argue that "it would not have been 'unreasonable' for an investor to understand that the FAT required Enovix staff to travel to China, or that the SAT required the Chinese vendors' engineers to visit the Fab-1 facility." Opp'n at 14-15. But this is not the standard. The question is whether the complaint plausibly alleges, with particularity, that defendants: made statements that directly contradicted what they knew to be true at the time; or created an impression of a state of affairs that differed in a material way from what actually existed. *See Facebook*, 87 F.4th at 948. Plaintiffs point to no statements by Enovix affirmatively stating their engineers would travel to China or vice versa. Nor do plaintiffs point to statements that create the impression this travel would occur. Given that the complaint itself explains that travel could not take place due to COVID-19 restrictions, *see, e.g.*, CC ¶ 17, the Court declines to read a travel requirement in to the general references to the FAT and SAT in the challenged statements. *See Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (citation omitted).

In sum, the only thing Rodgers admitted to was failing to send Enovix engineers to the vendor in China and not bringing the vendor's engineers to California in the midst of a global pandemic. Plaintiffs failed to plead with particularity that the FAT and SAT were waived entirely, nor have they identified any statements that stated or implied that Enovix would send its engineers to China or bring the vendor's engineers to California. By failing to connect these dots, plaintiffs

have not adequately pled that Enovix made false or misleading statements when it stated that the FAT or SAT was or had been conducted.[4] [5]

## 2.    Material Omissions

Plaintiffs also assert an omissions theory, arguing that it was misleading for defendants to issue certain statements without also disclosing that the FAT and SAT had been waived.  These include statements such as:

- In the June 24, 2021 Proxy Statement:

    "Fab-1 is Enovix's current production factory, for which Enovix started procuring equipment in 2020. ***All critical equipment for fabrication has arrived and is currently assembled. Enovix expects Fab-1 to be fully operational by the end of 2021 and to begin production by Q1 2022, with first production revenue in Q2 2022.***" CC ¶ 105.

- In an August 10, 2021 earnings call:

    "As many of you saw during our showcase last month, we are on track to start production at Fab-1 in the first quarter of 2022, resulting in product revenue in the second quarter of 2022. ***Last quarter, we were able to navigate the global supply chain constraints and receive all key equipment for our first production line. This required heroic efforts, including a critical decision to charter Antonov An-124, one of the world's largest cargo planes, to fly over 60 tons of manufacturing equipment from Asia to San Francisco. We managed industry-wide supply chain issues and installed and started qualifying our equipment in the midst of a global pandemic.***" *Id.* ¶ 112.

- In the same August 10, 2021 earnings call:

---

[4] Defendants also argue that the claim fails on its face because the price of Enovix stock actually *increased* the day after Rodgers issued his November 7, 2022 statement.  *See* Mot. at 10, 17.  Defendants ask the Court to take judicial notice of the stock price.  Dkt. No. 89-21, Ex. 20; Dkt. No. 90 at 8.  Although the price of Enovix stock may be a proper subject of judicial notice under Federal Rule of Evidence 201, the Court leaves this matter for another day, given that the pleadings are currently deficient on their face.

[5] The Court's conclusion today covers the February 2021 statements that plaintiffs allege were false and misleading.  Accordingly, the Court does not address the parties' alternative argument regarding whether the February 2021 statements were properly incorporated by reference into the June 2021 Proxy Statement.

United States District Court
Northern District of California

"Q: … as you look at the latest capacity test, how is your proprietary equipment sort of stacking up against your expectations on capacity? Better or worse? Any detail around that would be great.

A: Yes, I think we're pleased overall in terms of the equipment and its ability to do its intended function. … *We have a pretty rigorous set of both factory and site acceptance things we have to go through and I would say there's no red flags there.* …" *Id.* ¶ 114.

- In a March 3, 2022 letter to shareholders:

"We made significant progress in 2021 by equipping our first factory, allowing us to start commercial production and remain on track for our first product revenue by Q2 2022." *Id.* ¶ 120.

- On March 25, 2022, in the Form 10-K:

"After proving out our manufacturing capability at Fab-1 and leveraging our learning to improve our manufacturing processes, our plan is to expand capacity across multiple facilities and focus on localized production in proximity to our customers." *Id.* ¶ 123.

*See also* CC ¶ 118 (stating that Enovix overcame "*obstacles such as extended shipping times and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia*"), ¶ 127 ("*Challenges associated with building out Fab-1 include extended shipping times, supply chain constraints and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions imposed on certain countries in Asia.*").  Plaintiffs allege each of these statements were false or misleading for failing to disclose the material information that Enovix had waived the FAT and SAT.

The Court finds that the above statements are not actionable under the PSLRA, for several reasons.  First, plaintiffs' theory requires that Enovix waived the FAT and SAT entirely.  This is insufficiently alleged in the consolidated complaint, as already explained above.

Additionally, for an omission to be actionable under the PSLRA, the complaint "must specify the reason or reasons why the statements made by [the company] were misleading." *Brody*, 280 F.3d at 1006 (citing 15 U.S.C. § 78u-4(b)(1)).  The Ninth Circuit has considered and rejected whether Rule 10b-5 of the PSLRA contains "a free standing completeness requirement." *See id.*  In *Brody*, for instance, the Ninth Circuit affirmed the dismissal of a complaint challenging two press releases that announced the company's plans to buy back stock from investors but that did not disclose the company had offers from potential acquirers at a higher share price than what they were

offering.  The plaintiffs did not allege that the press releases were untrue.  Rather, the plaintiffs argued the information regarding the potential merger should have been included.  In rejecting this argument, the *Brody* court explained that "[i]f the press release had affirmatively intimated that no merger was imminent, it may well have been misleading." *Id.*  Where the actual press release "neither stated nor implied anything regarding a merger[,]" plaintiffs had failed to state an omissions theory under the PSLRA. *Id.*

Likewise here, plaintiffs essentially argue for a completeness rule.  They have not provided reasons why the challenged "omissions" were misleading.  Instead, they essentially argue that every reference to installation of equipment, supply chain constraints, and vendor support should have included the additional details that Enovix waived the FAT and SAT in order to address these challenges.  This is not what the PSLRA requires.  And as already explained above, the challenged statements "neither stated nor implied anything regarding" sending Enovix engineers to China or having the vendor's engineers travel to California—which is the only thing that Rodgers ultimately admitted did not occur. *See Brody*, 208 F.3d at 1006; CC ¶ 145.

### 3.    Risk Disclosures

Lastly, several of the challenged statements fall under the umbrella of risk disclosures.  Specifically, plaintiffs challenge risk disclosure statements contained in Enovix's Proxy Statement (dated June 24, 2021) and 2021 Form 10-K (dated March 25, 2022). *See* CC ¶¶ 107, 125.  As quoted in the complaint, these statements read:

> ***We rely on a new and complex manufacturing process for our operations: achieving production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***
>
> Although we have developed our Li-ion battery technology, we rely heavily on a new and complex manufacturing process for the production of our lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes. This will require us to bring up a first-of-its-kind automated production line to produce our batteries. ***It may take longer than expected to install, qualify and release this line and require modifications to the equipment to achieve our goals for throughput and yield. The work required to develop this process and integrate equipment into the production of our lithium-ion battery cells is time intensive and requires us to work closely with developers and***

> ***equipment providers to ensure that it works properly for our unique***
> ***battery technology. This integration work will involve a significant***
> ***degree of uncertainty and risk and may result in the delay in the***
> ***scaling up of production or result in additional cost to our battery***
> ***cells.***

*Id.* ¶ 125; *see also id.* ¶ 107 (substantially the same).  Plaintiffs allege that the highlighted statements were misleading, and the risk disclosure inadequate, "because Defendants failed to disclose that Enovix waived the FAT and failed to conduct the SAT on its Fab-1 manufacturing equipment, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever."  *Id.* ¶¶ 108, 126.  Plaintiffs go on to say, "[I]t was misleading to say that Enovix was required to work closely with developers and equipment providers to ensure that the equipment and process work properly, when Enovix bypassed the very procedural safeguards alluded to in that statement – the FAT and SAT."  *Id.*

The Court finds these statements are not actionable under the facts as alleged.  Again, for the reasons explained above, plaintiffs have not adequately alleged that the risk disclosures contained material misstatements or omissions.  The risk disclosures do not state or imply that Enovix engineers would travel to the vendor's factory in China or that the vendor's engineers would travel to Enovix.

Second, there is a timing problem.  The equipment testing only matters because, without it, there is a heightened risk the equipment will not function as needed.  *See* CC ¶¶ 87, 92-93.  This is the risk that plaintiffs allege defendants concealed, i.e., "the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever."  *See id.* ¶¶ 108, 126.  Yet the complaint never specifies *when* these risks materialized.

The alleged misstatements were made between February 22, 2021, and March 25, 2022.  The complaint does not allege that the cracks began to show until, at the earliest, the second half of 2022.  *See id.* ¶ 130 ("In the second half of 2022, Enovix began to gradually reveal that the risks concealed by Defendants' failure to disclose that they had bypassed the FAT and SAT were materializing.").  The complaint goes on to state that in August 2022 "Defendants vaguely acknowledged that they would need to 'increase our manufacturing yield metrics.'"  *Id.* ¶¶ 131-132.  On November 1, 2022, Enovix's Letter to Our Shareholders reported only $8,000 in revenue for the third quarter, although

the letter did "not yet fully disclos[e] the nature and extent of its manufacturing problems . . . ." *Id.* ¶ 136.  The complaint also states that FE6 confirmed that "by June 2022 the machinery in the area of Fab-1 in which FE6 worked was producing less than 10% of the expected production rate."[6] *Id.* ¶ 134.

Nowhere does the complaint allege that the risks warned of were beginning to materialize as of March 25, 2022, the latest date of the various challenged statements.  Thus, even taking as true plaintiffs' allegations that the manufacturing problems were materializing in the second half of 2022, and that defendants knew of these problems, this would not have rendered any prior risk disclosures false.

The Ninth Circuit has recently explained that falsity allegations are "sufficient to survive a motion to dismiss when the complaint plausibly allege[s] that a company's SEC filings warned that risks 'could' occur when, in fact, those risks had already materialized." *Facebook,* 87 F.4th at 948-49 (citing *In re Alphabet*, 1 F.4th at 702-05).  But here, plaintiffs have not alleged *when* the risks materialized.  Plaintiffs attempt to fit the *Facebook* ruling to the facts of this case by arguing that "[e]ven if delays and impairments at Fab-1 had not yet materialized when the statements were made, the risks of those problems had." *See* Opp'n at 16 n.7 (citing *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 859-60 (9th Cir. 2023), *amended by* 87 F.4th 934 (9th Cir. 2023)).  This  argument is contorted at best.  The risks Enovix warned of, as alleged in the complaint, are the same risks that would be mitigated by performing a FAT and SAT.  The complaint is silent as to when those risks actually materialized, thereby precluding the Court from finding that the risk disclosures were false or misleading *when made*.

For all these reasons, the Court finds plaintiffs have failed adequately to allege a false or misleading statement that is actionable under the PSLRA.  The Court will therefore GRANT defendants' motion to dismiss the consolidated complaint.  Because appropriate amendment could cure the deficiencies identified in this Order, and because this is the first consolidated complaint

---

[6] FE6 worked for Enovix from June 2022 to December 2022, as a Controls Engineer.  CC ¶ 63.  The complaint does not specify in which "area" of Fab-1 FE6 worked, nor does it say how large a percentage of Enovix's total manufacturing that area was responsible for.

plaintiffs filed, plaintiffs shall have the opportunity to amend.

**B.     Scienter**

The Court further finds the consolidated complaint should be dismissed on the additional grounds that it fails to plead the element of scienter.  "'Scienter' as used in the federal securities laws means the intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors. . . .  Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud."  *Glazer II*, 63 F.4th at 765 (citations and internal quotation marks omitted).  Courts in the Ninth Circuit analyze scienter using a "dual inquiry": first, the court "determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter."  *Id.* at 766 (citing *Zucco*, 552 F.3d at 992).

Plaintiffs' scienter theory depends entirely on an admission that the complaint does not actually allege defendants made.  Plaintiffs' brief quotes selectively from the complaint to argue that "Rodgers admitted that he and Rust made the decision to waive the 'key milestone[s]' of the FAT and SAT for the Fab-1 equipment, which 'violated our sacred Equipment Procurement Review (EPR) specification.'  ¶ 145."  *See* Opp'n at 19.  Paragraph 145 of the complaint, however, shows that Rodgers admitted only to waiving the milestones that involved sending Enovix engineers to the vendor's factory in China and having the vendor's engineers travel to Enovix to install the manufacturing equipment.  *See* CC ¶ 145.  Thus, plaintiffs' basic theory for scienter, that defendants knew they had waived the FAT and SAT completely at the time they made the alleged misstatements, has no basis in the complaint itself.

Additionally, the consolidated complaint does not state with specificity what defendants knew *and when*.  The allegations that Enovix waived the FAT and SAT tell only half of the story: plaintiff's case depends on the theory that, "*as a result of skipping the FAT and SAT*, Enovix's new Fab-1 manufacturing equipment encountered myriad problems, disruptions, and delays in beginning and ramping up production."  *See* CC ¶ 18 (emphasis added).  In other words, skipping the FAT and

United States District Court
Northern District of California

SAT only mattered because of the accompanying risk that the equipment wouldn't function. Plaintiffs argue that "Enovix began to gradually reveal that the risks" of bypassing the FAT and SAT were materializing "[i]n the second half of 2022," *see id.* ¶ 130, but all of the alleged misstatements occurred in March 2022 or earlier. This is insufficient to show that any individual defendant knew any of the challenged statements were false or misleading when made.

Even reading the consolidated complaint holistically, the allegations do not add up to a strong inference that any defendant acted with scienter. None of the Former Employee witnesses report any direct knowledge of what the individual defendants knew regarding any specifics of problems with the equipment or with manufacturing delays. The Former Employees generally allege that defendant Rust was "deeply involved" and "closely engaged" in daily operations. *See* CC ¶¶ 179-180. FE6 reports that the production numbers for Fab-1 were readily available at any given time through automated reports, but the complaint does not allege what those production numbers showed on any given date. *See id.* ¶ 135. As defendants note in their reply brief, none of the Former Employees claim to have interacted with the individual defendants; only one alleges having attended meetings with Rust and Dales; and none state that the FAT or SAT were discussed at any meetings. *See* Reply at 11 n.6; *see also* CC ¶¶ 179-180. Plaintiffs argue that scienter may be inferred based on motive, because Enovix needed the equipment to be installed quickly in 2021 in order for the merger to close and because defendant Rodgers had a significant financial incentive for the merger to close due to his 5.75 million RSVAC Founder Shares (worth up to $80 million). Opp'n at 20; CC ¶¶ 171-172. But the complaint makes no particularized allegations that the merger was otherwise in jeopardy, and "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements" the Court must apply here. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). Nor is the Court persuaded by the allegation that defendant Dales sold 15% of his stock during the Class Period in less than three months, *see* CC ¶ 173, as nothing in the complaint indicates that such sales were "unusual" or "suspicious." *See In re Silicon Graphics In., Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *superseded by statute on other grounds*. The Ninth Circuit has described an executive selling 87% of holdings as "suspicious" and selling 43.6% and 75.3% as "somewhat suspicious." *See In re Quality Sys., Inc.,*

*Sec. Litig.*, 865 F.3d 1130, 1146 (citing *Silicon Graphics*, 183 F.3d at 987). Such sales may "reinforce" a showing of scienter as to a particular individual. *See id.* Here, there is nothing to "reinforce," as the scienter allegations amount to little, as already explained. Even reading all the allegations together, including the reports by Former Employees, the motive to close the merger, and the alleged stock sales, the complaint falls short of creating a strong inference of scienter.

As with the allegations regarding false or misleading statements, the scienter allegations suffer from the basic underlying problem that the complaint fails to connect the dots to show that any defendant said one thing while knowing (or being deliberately reckless about not knowing) that the reality at that time differed in a material way. In sum, the complaint is so devoid of allegations regarding what defendants knew and when that there can be little inference, let alone a strong one, that defendants "acted with the required state of mind" for "each act or omission." *See* 15 U.S.C. § 78u-4(b)(2)(A).

### C.     Remaining Issues

#### 1.     Loss Causation

Defendants also argue that plaintiffs have not established loss causation following the alleged January 3, 2023 disclosure, arguing that plaintiffs "fail to explain how the 2023 disclosures about Fab-2 'corrected' challenged statements focused solely on Fab-1." Mot. at 25. Having found that the consolidated complaint does not adequately plead falsity or scienter, the Court need not reach defendants' remaining argument regarding loss causation.

#### 2.     Highlighted Statements

Defendants also argue that the consolidated complaint does not sufficiently identify which statements plaintiffs allege are false or misleading. The complaint makes use of block quotes, with bold and italicized highlighting throughout. However, the complaint does not consistently use highlighting or state that the highlighted statements in the block quotes are the precise statements being challenged. *Compare, e.g.*, CC ¶ 106 (stating that "[t]he highlighted statements were misleading because . . .") *with* ¶ 119 (stating that "[t]hese statements were misleading because . . .").

In amending the complaint, plaintiffs shall clearly identify which statements in the block quotes are the challenged statements.

### 3.      Requests for Incorporation-by-Reference and Judicial Notice

Defendants attach twenty exhibits, totaling more than 300 pages, arguing that the Court should consider them either under the "incorporation-by-reference" doctrine or because they are subject to judicial notice.  Plaintiffs filed a response to defendants' request, arguing that some of the exhibits are not properly before the Court at this stage.  Dkt. No. 92.  With their opposition brief, plaintiffs also attach four exhibits, totaling more than 250 pages, which they describe as "copies of public documents for the Court's convenience."  Dkt. No. 91-1, Baker Decl. ¶ 2.  Because the Court has found the consolidated complaint deficient on its face for the reasons stated above, the Court has not and does not at this time need to consider the numerous documents defendants attach.  In general, the Court discourages the "[t]he overuse and improper application of judicial notice and the incorporation-by-reference doctrine" and advises the parties to be judicious with regard to any future requests in connection with motions to dismiss.  *See Khoja*, 899 F.3d at 998.

### 4.      Section 20(a)

Given that plaintiffs have failed to state a claim under Section 10(b), they have failed to state a claim under Section 20.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS the motion to dismiss the consolidated complaint, with leave to amend.  Any amended consolidated complaint shall be filed **by February 16, 2024.**

**IT IS SO ORDERED**.

Dated: January 30, 2024

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California