Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | No: 3:23-cv-0071-SI<br><br>CLASS ACTION<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE: Hon. Susan Illston, U.S.D.J.<br>DATE: July 19, 2024<br>TIME: 10:00 a.m.<br>CTRM: Videoconference Only |

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT ..................................................................................1

II.    STATEMENT OF FACTS .......................................................................................2

    A.    Enovix and its Brand-New Battery Technology..........................................2

    B.    Enovix Procured Manufacturing Equipment that Never Came Close to Meeting Specifications or Passing Required Acceptance Tests ............................3

    C.    Defendants Secretly Waived the FAT Requirements as Fab-1 Issues Persisted ......................................................................................4

    D.    Defendants Misled Investors as They Hid the Repeated Failings of Fab-1.............5

    E.    The Company's Stock Price Plummeted as the Truth About the Fab-1 Equipment Came to Light...............................................................5

III.   ARGUMENT..........................................................................................6

    A.    The SAC Adequately Alleges Falsity as to Each Challenged Statement ................7

        1.    The SAC Adequately Alleges that Defendants Misrepresented and Failed to Disclose Material Facts About the Fab-1 Equipment...................8

        2.    Statements 1a and 1b Were False and Misleading....................................10

            a.    Statement 1a Was Incorporated Into the Proxy Statement ............11

            b.    Statement 1b Was Misleading in the Context of Statement 1a.......................................................12

        3.    Defendants Made False and Misleading Statements About Testing the Fab-1 Equipment (Statements 4, 6, and 7).........................................12

        4.    Defendants Made False and Misleading Statements About Overcoming Challenges with the Fab-1 Equipment (Statements 5, 8, 9, and 11) .......................................................14

        5.    Statement 2 Was Misleading and Not Protected Under the Safe Harbor by Inadequate and Misleading Risk Disclosures (Statements 3 and 10) .......................................................16

        6.    Statement 12 Was Misleading ...............................................17

    B.    The Complaint Alleges a Cogent and Compelling Inference of Scienter..............18

        1.    Rust and Rodgers Actually Knew or Recklessly Disregarded that Their Statements Would Mislead Investors...............................................19

        2.    Defendants Had Strong Economic Motivation to Mislead Investors ........22

    C.    The SAC Alleges Loss Causation as to the January and October 2023 Events.......................................................23

    D.    The Complaint Adequately Alleges a Section 20(a) Claim..................................25

IV.    CONCLUSION..........................................................................25

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aramic LLC v. Revance Therapeutics, Inc.*,
  2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) .......................................................................20, 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..............................................................................................................7

*Azar v. Yelp, Inc.*,
  2018 WL 6182756 (N.D. Cal. Nov. 27, 2018) .........................................................................21

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ..........................................................................................18, 19

*Buttonwood Tree Value Partners, LP v. Sweeney*,
  2012 WL 13026910 (C.D. Cal. Dec. 10, 2012) .......................................................................23

*Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) .................................................................................23

*Eminence Cap., LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ..............................................................................................25

*Espy v. J2 Glob., Inc.*,
  99 F.4th 527 (9th Cir. 2024) .................................................................................................20

*Fadia v. FireEye, Inc.*,
  2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) .........................................................................10

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ...........................................................................................passim

*Grigsby v. BofI Holding, Inc.*,
  979 F.3d 1198 (9th Cir. 2020) ..............................................................................................24

*Hsu v. Puma Biotech., Inc.*,
  2018 WL 4945703 (C.D. Cal. Oct. 5, 2018)............................................................................13

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 n.12 (N.D. Cal. Nov. 4, 2020) ...................................................................23

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ...............................................................................................18

*In re Facebook, Inc. Sec. Litig.*,
  84 F.4th 844 (9th Cir. 2023) .................................................................................................17

*In re Fibrogen, Inc. Sec. Litig.*,
2022 WL 2793032 (N.D. Cal. July 15, 2022).................................................................21, 22

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ....................................................................................7

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005)........................................................................19

*In re Juniper Networks, Inc. Sec. Litig.*,
542 F. Supp. 2d 1037 (N.D. Cal. 2008) ....................................................................25

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
78 F. Supp. 3d 1215 (N.D. Cal. 2015) .....................................................................25

*In re Portal Software, Inc. Sec. Litig.*,
2005 WL 1910923 (N.D. Cal. Aug. 10, 2005) ..........................................................22

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ....................................................................................9

*In re WageWorks, Inc., Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) .............................................................23

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022) .................................................................................17

*Kampe v. Volta Inc.*,
2024 WL 308262 (N.D. Cal. Jan. 26, 2024) ..............................................................12

*Maiman v. Talbott*,
2010 WL 11421950 (C.D. Cal. Aug. 9, 2010)............................................................23

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)......................................................................................................7

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ......................................................................................7

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ......................................................................22

*Nguyen v. Radient Pharms. Corp.*,
2011 WL 13141630 (C.D. Cal. Oct. 26, 2011)...........................................................22

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ....................................................................................23

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
   774 F.3d 598 (9th Cir. 2014) ...............................................................................................18

*Rabkin v. Lion Biotechnologies, Inc.*,
   2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ........................................................................25

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) .............................................................................................7, 16

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008) ..........................................................................................21, 22

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ............................................................................................7, 13

*Special Situations Fund III QP, L.P. v. Brar*,
   2015 WL 1393539 (N.D. Cal. Mar. 26, 2015)......................................................................24

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ............................................................................................6, 7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)..........................................................................................................passim

*TSC Indus., Inc. v. Northway, Inc.*,
   426 U.S. 438 (1976)...............................................................................................................11

*Vernazza v. S.E.C.*,
   327 F.3d 851 (9th Cir. 2003) .................................................................................................18

*Weston Fam. P'ship LLLP v. Twitter, Inc.*,
   29 F.4th 611 (9th Cir. 2022) ............................................................................................15, 17

*Wochos v. Tesla, Inc.*,
   985 F.3d 1180 (9th Cir. 2021) ...............................................................................................14

*WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) ...............................................................................................22

*Zhou v. Faraday Future Intelligent Elec. Inc.*,
   No. 221CV09914CASJCX, 2022 WL 13800633 (C.D. Cal. Oct. 20, 2022) .....................12, 13

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...................................................................................................9

**Statutes**

15 U.S.C. § 78t(a) ...........................................................................................................................25

15 U.S.C. § 78u-5(c) .......................................................................................................................16

Plaintiffs submit this memorandum of points and authorities in opposition to Defendants' motion to dismiss the Second Amended Class Action Complaint (Dkt. No. 102, "SAC").[1]

## I.    PRELIMINARY STATEMENT

The SAC alleges a particularized and compelling set of facts underpinning Plaintiffs' claims that Defendants committed securities fraud. Now providing ground-level detail to the events described in Plaintiffs' prior complaint, the SAC adds significant new allegations from key former employees of Enovix Corporation ("Enovix"), showing with specificity how Defendants failed for years to disclose that Enovix's new manufacturing equipment at its sole production facility, "Fab-1," never came close to achieving the level of capacity (550 units per hour) that Enovix told investors was needed to support commercial production.

As the SAC alleges, not only did Defendants personally waive critical equipment testing requirements, they concealed the fact that—for six months before the waiver, and for more than two years after—the equipment persistently *failed* those tests despite continuous, but fruitless, improvement efforts. Defendants made numerous false and misleading statements and omissions about the status of the Fab-1 equipment throughout the Class Period, concealing the truth about Fab-1's shortcomings from investors until they could no longer hide the delays and failures.

When Defendants finally revealed that Fab-1 was unable to produce at even a fraction of the required rate, that it would not be able to support commercial production on Defendants' projected revenue timeline, or ever, and that investors "were reasonably misled" by Defendants' prior statements about Fab-1, Enovix's share price fell precipitously, harming investors.

The SAC adequately alleges each element of Plaintiffs' securities fraud claims. The SAC alleges detailed facts, corroborated by nine different former employees, showing that each of Defendants' statements were false or misleading when made. The SAC also alleges particularized facts supporting a strong inference that Defendants knew, or were reckless in disregarding, material facts contradicting what they were telling investors about the status and progress of Fab-1. Finally, the SAC alleges a direct causal relationship between each of the events that partially

---

[1] References to "Def. Br." are to Defendants' motion to dismiss the SAC (Dkt. No. 105). Citations to "¶" are to paragraphs in the SAC.

revealed the truth behind Defendants' statements and the immediately ensuing decreases in stock price, which harmed Plaintiffs and the putative class of investors.

The SAC adds significant, particularized allegations that directly address the Court's concerns with Plaintiffs' previous complaint. The SAC alleges clear and compelling allegations of securities fraud, and thus the Court should deny Defendants' motion to dismiss in its entirety.

## II.    STATEMENT OF FACTS

### A.    Enovix and its Brand-New Battery Technology

In late 2020, Enovix was an early-stage technology company based in Fremont, California. ¶64. Using new silicon anode technology, Enovix designed a new type of lithium-ion ("Li-ion") battery that it said was smaller and stronger than conventional Li-ion batteries. ¶73.

In early 2021, Enovix had no product revenue and was hemorrhaging money, losing tens of millions of dollars each quarter and accumulating a deficit of over $200 million. ¶76. Enovix had never manufactured its batteries at commercial scale (*i.e.*, at rates and amounts necessary to fill customer orders). ¶¶78-79. In order to generate revenues, Enovix needed to design and install custom manufacturing equipment that could produce the new batteries in the amounts and at the speeds necessary to meet customers' needs. ¶¶80-82. In particular, before a customer would buy Enovix's new batteries, the batteries had to be "qualified," meaning Enovix had to show not only that it could manufacture the battery in a manner that was compatible with the customer's product, but that it could produce large enough volumes of quality batteries to meet the customer's requirements for reliably meeting the customer's own mass production needs. ¶¶82-84.

In February 2021, Enovix announced plans to become a public company. ¶64. Rather than a traditional (and more strictly regulated) initial public offering, Enovix went public by merging with Rodgers Silicon Valley Acquisition Corp. ("RSVAC"), a public special purpose acquisition company known as a "SPAC" or "blank check" company (the "Merger"). The Merger preserved Enovix's ability to continue as a going concern by providing more than $400 million in sorely needed cash as Enovix attempted to manufacture its newly-designed batteries. ¶71.

When the Merger was announced, Enovix said it expected to develop its own U.S.-based manufacturing line and begin delivering products to customers (generating its first commercial

product revenues) by the second quarter of 2022. ¶77. To meet that goal, Enovix told investors it would need to achieve its production specifications of one battery every two seconds, which would, in turn, require four manufacturing lines capable of producing 550 units per hour ("UPH"). *Id.*

### B.    Enovix Procured Manufacturing Equipment that Never Came Close to Meeting Specifications or Passing Required Acceptance Tests

Enovix started procuring custom manufacturing equipment for its first production factory, Fab-1, in early 2020. ¶95. Enovix contracted with vendors to design and produce the custom Fab-1 manufacturing equipment. ¶95. The development and production of a large portion of the equipment was outsourced to Shenzhen Yinghe Technology Co. Ltd. ("Yinghe"), in China. ¶97.

To govern the procurement of equipment from Yinghe, Enovix had an Equipment Procurement Review ("EPR"), a document that authorizes funding to purchase equipment from a vendor. ¶¶98-99. The EPR lays out a set of parameters that must be met to complete the purchase, including requirements that the equipment pass critical quality tests before Enovix accepted delivery: the Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT"). ¶99.

The FAT had specific criteria, based on a checklist provided by Enovix, to ensure equipment met Enovix's performance and quality specifications. ¶101. The primary parameters the equipment had to meet to pass the FAT were capacity—how many units the equipment could fabricate in a certain time (*i.e.*, UPH)—and quality, including industry standard measures of production efficiency. ¶¶101-03. Per Enovix's EPR, the FAT also required that Enovix's engineers fly to China to personally observe the equipment running at full speed during the FAT to confirm that the equipment was operating correctly and meeting Enovix's specifications. ¶¶107-09. Due to Covid-19 travel restrictions in late 2020 and early 2021, Enovix's engineers were never permitted to travel to China to participate in the FAT. ¶¶109, 111.[2]

The first FAT for the Yinghe-made Fab-1 equipment took place in November and December 2020, with three or four iterations of testing spaced two to four weeks apart. ¶100. The

---

[2] Defendants' factual assertion that the FAT "was conducted remotely" is neither contained in nor reasonably implied by any allegation of the SAC. *Cf.* Def. Br. at 6. Defendants cite no support for that assertion.

equipment failed the FAT, as the equipment never got close to meeting Enovix's capacity specifications, among other problems. ¶¶100, 104. After the initial failed FAT, Yinghe continued working on the equipment and kept testing for months, to no avail. ¶104. Those continued efforts and repeated testing extended through the final FAT that Yinghe conducted in April 2021, which the equipment failed yet again. *Id.* The equipment never passed the FAT. ¶110.

**C.    Defendants Secretly Waived the FAT Requirements as Fab-1 Issues Persisted**

By April 2021, Defendants Rodgers and Rust had learned that shipment of the Fab-1 equipment from China "would be delayed by at least three months" due to global shipping delays. ¶¶105, 107. The Merger was scheduled to close in just three months and, without it, Enovix's ability to continue as a going concern was in jeopardy. ¶67. If Defendants had told investors the truth—that the new equipment repeatedly failed the FAT and that Enovix's engineers had not even been able to travel to China to personally observe the FAT, as required under Enovix's EPR, it would imperil the impending Merger and the $400 million in desperately needed operating capital. ¶201. Instead, Rodgers and Rust decided to take a "massive shortcut": they waived the requirement that the equipment pass the FAT before Enovix accepted delivery, and they air-lifted the equipment to Fremont. ¶¶105, 206. They hoped to "catch up later," after installing the equipment. ¶107.

Flying the Fab-1 equipment to California allowed Defendants to tell investors that the new manufacturing equipment was being installed at Fab-1 prior to the Merger vote, but of course it did not fix the equipment. Moreover, Enovix's engineers installed the equipment at Fab-1 without the assistance of Yinghe's engineers. ¶112. The SAT required Yinghe's engineers to travel to the United States to help install and test the equipment—after it *passed* the FAT—to confirm that it was still able to meet Enovix's specifications after being disassembled, transported, and reassembled at Enovix's facilities. ¶¶91-92, 112. Enovix's engineers struggled for months trying to improve the capacity of the Fab-1 equipment, but their efforts failed. ¶¶113-20. Eventually, Enovix paid for Yinghe's engineers to travel to California and help but they fared no better, even after many months of working on the equipment alongside Enovix's engineers. ¶¶112-24.

By June 2022, the equipment was producing 30-40 UPH, ***less than 10%*** of the required production rate. ¶122. By December 2022, the Company had only managed to increase production

- 4 -

to about 100 UPH, still less than 20% of Enovix's 550 UPH specifications. *Id.* Fab-1 simply never came remotely close to achieving the production capacity needed to support commercial revenues.

### D.    Defendants Misled Investors as They Hid the Repeated Failings of Fab-1

While it was evident within Enovix that the Fab-1 equipment could not perform according to Enovix's specifications, Defendants told investors a completely different story by repeatedly misrepresenting and misleadingly omitting critical facts about Fab-1, including, for example:

- Defendants assured investors that the Fab-1 equipment "must perform to specification at the vendor's factory before shipment to Enovix," and emphasized the timely arrival and assembly of the equipment at Fremont. ¶¶129, 131.

- Defendants told investors that the Fab-1 equipment was undergoing the SAT "to *confirm* the … equipment was meeting performance requirements" after the FAT was "already performed at the vendor's facility before taking delivery." ¶138.

- Rust touted to investors the "heroic efforts" Enovix undertook to receive the Fab-1 equipment, including the "critical decision" to fly it over from China. ¶140.

- When an analyst asked about the "latest capacity test" for Fab-1, Rust responded that "[w]e ***have a pretty rigorous set of both factory and site acceptance*** [tests] we have to go through and ***I would say there's no red flags there***." ¶142.

- Defendants bragged that Enovix had "overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up." ¶146.

- Defendants told investors that Enovix had "made significant progress in 2021 by equipping our first factory, ***allowing us to start commercial production*** and remain on track for our first product revenue by Q2 2022." ¶148.

### E.    The Company's Stock Price Plummeted as the Truth About the Fab-1 Equipment Came to Light

Defendants' false and misleading statements about Fab-1 concealed from investors that Fab-1 was not even coming close to meeting its production capacity requirements, preventing the Company from achieving commercial production of its batteries. The truth finally began to come to light on November 1, 2022, when Enovix revealed that it would be "dialing back" its work on improving the production lines at Fab-1 because the "improvements" to Fab-1 that they had vaguely alluded to previously were not having the desired results. ¶161. As a result, Enovix "anticipate[d] achieving lower overall output from Fab-1 in 2023." *Id.* In fact, Enovix revealed that it anticipated producing fewer than one million batteries in 2023—only a small fraction of the

quantity it would produce if the equipment were capable of running multiple lines at 550 UPH. ¶162. This news shocked the market, and Enovix's share price fell 41% as a result. ¶165.

A few days later, Enovix announced that Rodgers would assume the role of Executive Chairman. ¶168. In a public statement, Rodgers admitted that "[w]e have poorly communicated on the status of Fab-1" and revealed for the first time that he and Rust had waived the FAT (but without disclosing the repeated failed tests before and after the waiver). *Id.* Rodgers misleadingly assured investors that "Fab-1 is going to work and ship a lot of batteries to our customers," giving investors the false impression that the production delays were merely transitory. ¶¶169-70.

On January 3, 2023, Rodgers gave a special presentation for investors. ¶175. Rodgers directly addressed the Company's "lack of clear and transparent investor communications" concerning Fab-1, "that led some of our investors to say we're outright dishonest with them." *Id.* Rodgers conceded that "***I think they were reasonably misled.***" *Id.* Rodgers also revealed that, as to the first production line at Fab-1, "its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." ¶176. Rodgers explained that Fab-1 was able to produce only one battery every 72 seconds, and that "we don't think that machine if we worked on it forever would be over 200 [UPH]." ¶¶177-78. Rodgers conceded that Fab-1 was "doing less than 10% of what it should be doing." ¶178. On this news, Enovix's share price dropped another 41%. ¶185.

Finally, on October 3, 2023, Enovix announced it was abandoning commercial production operations at Fab-1 altogether, laying off 185 workers and writing off $36 million of Fab-1 manufacturing equipment. ¶189. After years of failed testing and attempted improvements, Enovix was forced to finally admit that it had completely failed to achieve commercial production capabilities at Fab-1. On this news, Enovix's share price fell 13%. ¶190.

## III.    ARGUMENT

A motion to dismiss under Rule 12(b)(6) tests only whether the factual allegations in the complaint "plausibly suggest an entitlement to relief." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th

- 6 -

Cir. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).[3] While a securities fraud complaint is subject to the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a court considering a motion to dismiss must assess the complaint "in its entirety," accepting all well-pled factual allegations as true and construing those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If there are competing, plausible explanations advanced by both defendants and plaintiffs, the complaint survives a motion to dismiss. *Starr*, 652 F.3d at 1216.

A motion to dismiss a complaint for violation of § 10(b) and Rule 10b-5 will be denied so long as the plaintiff alleges: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).[4]

### A.    The SAC Adequately Alleges Falsity as to Each Challenged Statement

Statements and omissions of material fact are actionable if they are either false or misleading. *Matrixx*, 563 U.S. at 37. Falsity can be shown by pointing to a statement that "directly contradict[s] what the defendant knew at that time." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023). "A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Even literally true statements may mislead, due to their context and manner of presentation. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Once a company chooses "to tout positive information to the market, [it is] bound to do so in a manner that wouldn't mislead investors, including [by] disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016).

---

[3] Internal citations and quotations are omitted unless otherwise indicated.

[4] Defendants concede that Plaintiffs have adequately alleged the connection, reliance, and economic loss elements of the claim.

"Falsity is subject [only] to … the reasonable inference standard of plausibility." *Forescout*, 63 F.4th at 766 ("we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.'"). Here, the SAC alleges particularized facts plausibly demonstrating that Defendants concealed from investors material facts about the fatal shortcomings of Fab-1 through a dozen false and misleading statements.

### 1.    The SAC Adequately Alleges that Defendants Misrepresented and Failed to Disclose Material Facts About the Fab-1 Equipment

The central theory of the SAC is that Defendants concealed the fact that the Fab-1 equipment was never able to produce batteries fast enough to support commercial production. In fact, it never came close. That is why the equipment failed the FAT. That is why Defendants had to waive the FAT. That is why Enovix delayed, and eventually abandoned altogether, the commercial production and revenue prospects for Fab-1.

In order for Enovix to generate revenues, the Fab-1 equipment had to produce a lot of quality batteries at high speeds to qualify the equipment for Enovix's customers. ¶¶80-84. Specifically, the Fab-1 equipment needed to produce usable batteries at a rate of 550 UPH. ¶77. That was the specification Enovix cited in February 2021, *id.*, and that was the specification Rodgers cited in January 2023. ¶¶176-78. The number of units that the Fab-1 equipment could produce per hour (UPH) was the "primary parameter" for the FAT and SAT. ¶103. The equipment failed test after test; throughout the two years of futile improvement efforts, it was never able to produce more than a fraction of the UPH necessary to support commercial production. ¶122. As a result, investors "were reasonably misled" by Defendants' statements about Fab-1. ¶175.

Defendants argue that Plaintiffs fail to allege with sufficient particularity that the Fab-1 equipment did not pass the FAT. To the contrary, the SAC alleges that FE2 personally "oversaw the entire [procurement] process" for the Fab-1 equipment made by Yinghe, including "conducting the FAT," ¶51, and FE2 reported that "the [Fab-1] equipment did not pass the FAT, as the production yield that the equipment was able to muster was very low and never got close to

meeting Enovix's capacity specifications." ¶100.[5] The SAC alleges that the specific tests involved in the FAT were based on a checklist provided by Enovix, which included the specifications for output within a specific time (*i.e.*, UPH). ¶101. It is reasonable to infer from the allegations of the SAC that the UPH specifications for the FAT were the same as those Enovix cited to investors through the relevant period: 550 UPH. ¶¶77, 176-78.

FE2 reported from firsthand experience that "the equipment did not pass the FAT," providing details of how and when iterations of the FAT were performed, that "yield" and "capacity" specifications were not met, and that the equipment "never passed the FAT," despite repeated testing through April 2021. ¶¶100, 101, 104. The SAC clearly alleges that FE2 was "in a position to be personally knowledgeable of the information alleged." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1137–39 (9th Cir. 2017) (finding confidential witnesses were reliable when they reported firsthand knowledge). Defendants' argument that FE2's "conclusion" that the equipment did not pass the FAT is unsupported and "conclusory" is nonsensical. *Cf.* Def. Br. at 13. FE2 did not merely "conclude" from indirect sources that the Fab-1 equipment did not pass the FAT; rather FE2 directly oversaw the entire process, including the FAT, and reported firsthand knowledge that the equipment failed the FAT.

The SAC's allegations from former employees corroborate that the Fab-1 equipment fell woefully short of the production specification of 550 UPH at all relevant times. For example:

- FE9: "it was common knowledge we weren't meeting the output requirements and quality requirements." ¶117.

- FE3: in October 2021, the Fab-1 line "was not producing," and by November 2022, the progress on improving its "capacity" (not its "yield," as Defendants misstate, Def. Br. at 19) was "not substantial enough" to meet Enovix's needs. ¶120.

- FE7: by late 2021, Fab-1 "was definitely not fully operational." ¶121.

- FE6: by June 2022, the Fab-1 equipment from Yinghe was producing only 30-40 batteries per hour (or 5-7% of 550 UPH), and by December 2022 those numbers

[5] "'Yield' refers to the number of batteries that meet [design] specifications out of the total number of batteries produced." ¶56. Capacity means "how many units the equipment could produce per hour (*i.e.*, UPH)," and it was the "primary parameter for the FAT and SAT for the Fab-1 equipment." ¶103.

had increased only to approximately 100 batteries per hour (18% of 550 UPH), which was a "far cry" from Enovix's specifications. ¶122.

- FE4: the Fab-1 production line "was just never really capable of doing the [production] numbers that [Enovix] initially advertised," and Enovix was unable to meet the high-volume production stage requirements for any of its potential customers with Fab-1, as it was "unable to produce the required quantities." ¶123.

- FE9: "the specs in place for the EPR were never met," as the Fab-1 equipment was never able to produce more than about 100 UPH. ¶124.

These consistent allegations, from different former employees at different times, strongly corroborate Plaintiffs' allegations that the Fab-1 equipment consistently failed to achieve Enovix's production capacity specifications. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at \*5 (N.D. Cal. Nov. 14, 2016) ("the corroborative nature of the other facts alleged ... [including] the coherence and plausibility of the allegations, the number of sources, the reliability of sources, and similar indicia" support the reliability of confidential witness allegations).

Finally, Defendants repeatedly cite to the disclosure that "Enovix has not achieved every specification for the products it plans to produce in its first year of production" and that "Enovix will need to make improvements in packaging technology *to achieve its energy density roadmap*," but those statements are plainly not exculpatory when read in context, which Defendants conveniently omit. *E.g.*, Def. Br. at 14 (omitting italicized language). Those statements appeared in a risk disclosure titled, "Enovix will need to improve its energy density, which requires Enovix to implement higher energy density materials for both cathodes and anodes, which it may not be able to do." *See, e.g.*, Dkt. No. 105-3. The statements referred to Enovix's need for *more efficient battery technology*, not a need to *manufacture its batteries faster*, which was hidden from investors.

### 2.    Statements 1a and 1b Were False and Misleading

Prior to the start of the class period, Defendants issued an investor presentation explaining that during the FAT for the Fab-1 equipment, "[e]quipment *must* perform to specification at the vendor's factory before shipment to Enovix." ¶129 (emphasis added) (**Statement 1a**).[6] Pursuant to that statement, if the equipment had shipped to Enovix, it must have performed to specifications.

---

[6] Statement 1a also corroborates Plaintiffs' allegations that, prior to April 2021, Enovix's EPR required that the Fab-1 equipment pass the FAT before being shipped to Fremont. ¶¶7, 87, 99.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

When Statement 1a was incorporated by reference into the Proxy Statement in June 2021, it was false and misleading because Enovix had already waived that very requirement and shipped the Fab-1 equipment even though it never performed to specification at Yinghe's factory. ¶130.

### a.    Statement 1a Was Incorporated Into the Proxy Statement

The Proxy Statement explicitly invokes and repeatedly relies upon RSVAC's prior SEC filings to disclose material information to investors. Those filings are not superfluous; they are indispensably incorporated into the Proxy Statement, and their statements are actionable.

Not only does the Proxy Statement explicitly direct investors to "read RSVAC's SEC filings" in order to "find more information" regarding the proposed transaction, ¶125, but the Proxy Statement also explicitly invokes RSVAC's prior SEC filings to qualify numerous representations made in the Proxy Statement. The Proxy Statement *necessitates* reading RSVAC's prior SEC filings because "[t]he representations and warranties of RSVAC" in the Proxy Statement are expressly "*qualified* by information included in RSVAC's public filings, filed or submitted to the SEC on or prior to the date of the Merger Agreement." Proxy Statement at 113.[7] That the statements in the Proxy are "qualified" by the information contained in RSVAC's other public filings makes clear that its representations are limited or incomplete in some way—and investors can fully understand those representations—*only* by going to the incorporated SEC filings. Indeed, the Merger Agreement (which Defendants concede is part of the Proxy Statement) repeatedly invokes RSVAC's prior SEC filings ("Parent SEC Documents"), including the February 2021 Presentation filed with the SEC (¶126), to provide further information about its terms and to expressly qualify RSVAC's representations.[8] The "total mix" of information available to a reasonable investor necessarily includes both sources of information. *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Thus, by the

---

[7] Defendants provide a link to the entire Proxy Statement in their declaration in support of their motion to dismiss. Dkt. No. 105-1 ¶4. Defendants concede that the Proxy Statement is properly subject to judicial notice and incorporated by reference into the SAC. *See* Dkt. No. 106.

[8] *See, e.g.,* Proxy Statement at A-27 ("Other than as set forth in the Parent SEC Documents…"); *id* at A-31 ("Except as disclosed in the Parent SEC Documents…"); *id.* at A-32 ("…subject to the qualifications and limitations set forth in … the Parent SEC Documents…").

Proxy Statement's own terms, its disclosures regarding the Merger expressly incorporate RSVAC's prior SEC filings, including the February 2021 Presentation.[9]

### b.    Statement 1b Was Misleading in the Context of Statement 1a

Regardless of incorporation, Statement 1a also provided important context for the statement in the Proxy Statement that "[a]ll critical equipment for fabrication has arrived." ¶131. (**Statement 1b**). Statement 1b therefore gave investors the false impression that since the Fab-1 equipment had been delivered, it must have performed to specification during the FAT, which Enovix had previously said was a prerequisite for delivery. ¶132. Defendants read the word "must" out of Statement 1a in arguing that it referred merely to "plans" or a "goal" to meet the specifications, Def. Br. at 15, rather than an express requirement per its plain language.

### 3.    Defendants Made False and Misleading Statements About Testing the Fab-1 Equipment (Statements 4, 6, and 7)

In August 2021, Defendants told investors that the Fab-1 equipment was "now undergoing" qualification, the "first step" of which was performing the SAT "to confirm the individual pieces of equipment are meeting performance requirements," following the FAT "already performed at the vendor's facility before taking delivery." ¶138 (**Statement 4**). Statement 4 was false and misleading because Enovix was not "confirming" that the Fab-1 equipment was meeting performance requirements; it had repeatedly *failed* to meet those requirements during the FAT. ¶139. A reasonable investor would have understood Statement 4 to mean that the Fab-1 equipment was "meeting performance requirements" currently and/or at some point in the past. In truth the equipment never came close to meeting performance requirements. Statement 4 also gave investors the false impression that the equipment had passed the FAT before Enovix took delivery, which

---

[9] The cases cited by Defendants do not hold otherwise. In *Kampe v. Volta Inc.*, 2024 WL 308262, at *27 (N.D. Cal. Jan. 26, 2024), the document at issue was only "mentioned" in the proxy statement, not invoked or relied upon to provide additional relevant material or to qualify or limit the statements made. *Zhou v. Faraday Future Intelligent Elec. Inc.*, No. 221CV09914CASJCX, 2022 WL 13800633, at *14 (C.D. Cal. Oct. 20, 2022), supports Plaintiffs' position, not Defendants'. In *Zhou*, the court contrasts a situation where incorporation is not proper—where proxy materials make only a *generalized* reference to extrinsic "business and financial information"—from cases like this one: where the proxy materials *specifically* reference and rely on prior "information filed with the SEC," like the February 2021 Presentation. *Id.*

Enovix had previously explained "must" happen. There would be nothing to "confirm" at the SAT without an implication that Fab-1 passed the FAT.

In response to an analyst's question about the "latest capacity test" for Fab-1, Rust boasted that "[w]e have a pretty rigorous set of both factory and site acceptance things we have to go through and *I would say there's no red flags there*." ¶142 (**Statement 6**). Statement 6 was false and misleading because the FAT and SAT were replete with red flags: the Fab-1 equipment had repeatedly failed the FAT; Enovix's engineers were not able to personally observe the FAT (as required under Enovix's EPR); Rust himself had waived the FAT requirement; and the equipment was still only achieving a small fraction of the required production capacity. ¶143.

Allegations that a statement "differs dramatically" from the true facts are sufficient to allege falsity. *See Zhou*, 2022 WL 13800633, at *6. So too are statements that "directly contradict[] what defendant[s] knew at the time." *Forescout Techs.*, 63 F.4th at 764; *see also Hsu v. Puma Biotech., Inc.*, 2018 WL 4945703, at *8 (C.D. Cal. Oct. 5, 2018) (holding that where a defendant "chose to make statements directly inconsistent with the information he did have," a "triable issue of fact" exists). The facts about the repeated testing failures and fruitless improvement efforts for the Fab-1 equipment were known to Rust, *see infra* §III(B), and were fundamentally inconsistent with Rust's statements that there were "no red flags" with the FAT or SAT.

Similarly, in September 2021, Rust told investors that Enovix was "in the middle of qualifying [the Fab-1 equipment], which means basically testing out of each piece of equipment," which Rust stated was "going on quite well." ¶144 (**Statement 7**). At this time, after months of failed tests and fruitless improvement efforts, the qualifying and testing process was objectively not going "quite well." ¶145. It is misleading for a company to "tout positive information to the market" but fail to "disclos[e] adverse information that cuts against the positive information." *Arena Pharms.*, 840 F.3d at 705-06. Rust touted the fact that Enovix had progressed to the point of "qualifying" and "testing" the Fab-1 equipment—*i.e.*, ensuring that it could meet customers' capacity requirements—but he misleadingly omitted that the equipment had repeatedly failed those tests and consistently failed to achieve anywhere near the production capacity Enovix needed for commercial production, which was the entire point of "qualifying."

- 13 -

This case is unlike *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1193 (9th Cir. 2021), where the challenged statement concerned the generalized, subjective "progress" that Tesla was making on its battery production. In contrast, Statements 4 and 6 address historical, objectively verifiable facts: whether the equipment had ever met performance requirements and whether any "red flags" arose during the testing process. Statement 7, likewise, does not concern the extent of progress being made; it concerns the misleading omission of material facts, including nearly a year of fruitless efforts. Defendants raise a straw-man argument in asserting that Enovix did not "imply that it had reached all equipment goals or experienced no issues," Def. Br. at 18, but that is simply not what the challenged statements say or why Plaintiffs claim they were false or misleading.

### 4. Defendants Made False and Misleading Statements About Overcoming Challenges with the Fab-1 Equipment (Statements 5, 8, 9, and 11)

Defendants also made various statements boasting to investors about the challenges they had supposedly "overcome" in developing the Fab-1 equipment for commercial production.

First, in August 2021, Rust touted to investors the "heroic efforts" Enovix undertook to receive the Fab-1 equipment, including the "critical decision" to fly the equipment over from China. ¶140 (**Statement 5**). Statement 5 was misleading because Rust failed to disclose that this "critical decision" actually entailed waiving the FAT requirement after six months of failed tests. ¶141. Similarly, in March 2022, Defendants bragged to investors that Enovix had "overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up." ¶146 (**Statement 8**). Statement 8 was misleading because Defendants failed to disclose that: (1) they had purportedly "overcome" extended shipping times only by waiving the FAT requirement; and (2) in any event, they had not actually "overcome" those obstacles because, with or without Yinghe's engineers, the Fab-1 equipment still had never come close to achieving the required production rates. ¶147.

Then, in March 2022, Defendants boasted that Enovix had "made significant progress in 2021 by equipping our first factory [Fab-1], allowing us to start commercial production and remain on track for our first product revenue by Q2 2022." ¶148 (**Statement 9**). Statement 9 was false and

misleading because Defendants failed to disclose that the equipment had never come close to meeting Enovix's required specifications for commercial production. ¶149. Therefore, it was false, or at least misleading, to say that Enovix was able "to start commercial production" in March 2022 when—even as late as June 2022, after three more months of attempted improvements—the Fab-1 equipment was still only able to muster 30-40 batteries per hour (5-7% of the 550 UPH that Enovix required for commercial production). ¶122.[10] Separately, even if it were literally true that Enovix was "on track" to produce some number of batteries and generate some nominal amount of product revenue by Q2 2022, Statement 9 gave investors the false impression that Enovix's purported accomplishment of starting "commercial production" meant that it was "on track" to generate *commercial*-scale revenues in Q2 2022. ¶149. In truth, Fab-1 was nowhere near achieving commercial production capabilities in March 2022, and thus it was not, in any objective sense, "on track" to recognize commercial-scale production revenue in the quarter opening mere weeks later. ¶149. Rather than implying that "I'm in the middle of it but I'm not there yet," *c.f. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611, 620 n.3 (9th Cir. 2022), Statement 9 told investors "this car is ready to race," when it couldn't get out of the garage.

In Enovix's annual report for 2021, under the heading of "Key Trends, Opportunities and Uncertainties," Defendants again described generic "[c]hallenges associated with building out Fab-1" that Enovix had faced, such as "extended shipping times" and "intermittent vendor support during equipment bring-up." ¶153 (**Statement 11**). Statement 11 was misleading because it grossly underplayed and misleadingly omitted the ongoing challenges that Enovix still faced with "building out Fab-1." ¶154. Just three weeks earlier, Enovix told investors (in Statement 8) that it had already "overcome" the very same "challenges" referenced in Statement 11. ¶146. A reasonable investor would thus interpret Statement 11 to mean that the only material "challenges" facing Enovix at that time with building out Fab-1 were the few issues named, which Enovix had recently claimed were "overcome." Defendants failed to disclose the real challenges facing Enovix

---

[10] Defendants' contorted argument that Statement 9, which says Enovix's progress in 2021 "allow[ed] us to start commercial production," does not literally say that "Enovix had commercial-scale production capabilities," Def. Br. at 20, raises a distinction without a difference.

at that time—the repeated failure of the Fab-1 equipment to achieve even a small fraction of the required production capacity—giving "reasonable investor[s] the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese*, 643 F.3d at 691.

### 5. Statement 2 Was Misleading and Not Protected Under the Safe Harbor by Inadequate and Misleading Risk Disclosures (Statements 3 and 10)

Defendants also made a false and misleading statement in the Proxy Statement about Enovix's projected timeline for commercial production and revenue. Defendants stated that, "Enovix expects Fab-1 to be fully operational by the end of 2021." ¶133 (**Statement 2**). Statement 2 was misleading because "fully operational" implied that Fab-1 would be ready for commercial scale production by the end of 2021, when in truth Defendants had no reasonable basis for that expectation because they knew the equipment had repeatedly failed the FAT and failed to achieve anything close to Enovix's required UPH specifications for commercial production. Statement 2 was not protected by the PSLRA's safe harbor provision because it was not "accompanied by meaningful cautionary statements" and was made with Defendants' knowledge of facts rendering the statement misleading. 15 U.S.C. § 78u-5(c); *see also infra* §III(B).

Moreover, the purported risk disclosures that Defendants point to as "meaningful cautionary statements" were themselves misleading and actionable statements. The Proxy Statement and Enovix's 2021 annual report told investors that it "*may* take longer than expected to install, qualify, and release this [Fab-1 production] line and require modifications to the equipment to achieve its goals for through put and yield," and that general "uncertainty and risk" in integrating new production equipment "*may* result in the delay in the scaling up of production," but they failed to tell investors that these risks had already begun to materialize due to Enovix's repeated and continuing failures to get the Fab-1 equipment up to speed. ¶¶135-36 (**Statement 3**); ¶¶151-52 (**Statement 10**). By the time these statements were made, in June 2021 and March 2022, respectively, the continuing efforts to improve the production capacity of the Fab-1 equipment had shown an utter lack of material progress. ¶122. As FE4 summed up, the Fab-1 production line "was just never really capable of doing the [production] numbers that [Enovix] initially advertised," and Enovix was unable to meet the high-volume production stage requirements for its

customers with Fab-1. ¶123. Thus, unlike in *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1256–57 (10th Cir. 2022), Plaintiffs have adequately alleged that the risks had materialized because Enovix "was so far behind … that it was virtually certain to cause harm to the business."[11]

Disclosures that warn of risks that "could" or "may" occur are misleading when the issuer knows that those risks have materialized. *In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 859 (9th Cir. 2023). It was misleading for Defendants to say that it "may" take longer to qualify Fab-1, and that "delay in the scaling up of production" "may result" from generic "uncertainty and risk" because Defendants knew that the specific risks had already materialized: the repeated failures of the Fab-1 equipment to achieve a fraction of Enovix's required specifications for production capacity after continuous (but fruitless) improvement efforts and repeated testing.

### 6.    Statement 12 Was Misleading

On November 7, 2022, following his assumption of the role of Executive Chairman of Enovix, Rodgers misleadingly assured investors that, despite the recently revealed production delay, "Fab-1 is going to work and ship a lot of batteries to our customers – period." ¶169 (**Statement 12**). Statement 12 gave investors the false impression that the reported "delay and projected underperformance of Fab-1" were merely transitory hiccups, despite Rodgers having no legitimate basis for this assertion because he knew the equipment had not even achieved 20% of its production capacity requirements at that time. ¶170.[12] He admitted just two months later that "we don't think that machine if we worked on it forever would be over 200 [UPH]," ¶178, precisely the conclusion FE6 drew from the same circumstances during the same time frame. ¶122. Nothing in the SAC suggests that this was a new conclusion Rodgers arrived at from new information gleaned during that time period. Statement 12 was also not accompanied by adequate and

---

[11] Likewise, this case is unlike *Weston*, 29 F.4th at 622, where the plaintiffs alleged that "software bugs in the legacy MAP program delayed the new version of MAP," but failed to allege facts showing any delays to the new MAP program had already materialized. Here, with no commercial production capabilities, nor a reasonable basis to believe such capabilities could timely (if ever) be achieved given the persistent abject failures, it is reasonable to infer that qualifying the Fab-1 equipment and scaling up production were already substantially delayed when Statements 3 and 10 were made.

[12] Defendants misread the SAC in asserting that "Plaintiffs claim that Rodgers failed to disclose that the equipment was 'producing less than 10% of the expected production rate.'" Def. Br. at 20.

meaningful cautionary language and is thus not sheltered from liability by the "safe harbor" provision of the PSLRA. Statement 12 is not puffery because a reasonable investor would interpret "Fab-1 is going to work and ship a lot of batteries to our customers" as referring to its objectively verifiable ability to achieve commercial production capacity, *i.e.*, 550 UPH. *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements … that are capable of objective verification are not 'puffery' and can constitute material misrepresentations.").

### B.    The Complaint Alleges a Cogent and Compelling Inference of Scienter

Plaintiffs allege that Rust, Rodgers, and Enovix repeatedly misled investors in their statements about Fab-1. When each of those statements were made, Rust, Rodgers (and therefore Enovix) knew or recklessly disregarded that Fab-1 was not performing anywhere near Enovix's specifications for commercial production and had been failing acceptance testing for months or years.[13] Rust and Rodgers were intimately involved with and aware of Fab-1's problems at the same time as they were painting a much rosier picture for investors.

At the pleading stage, Plaintiffs do not have to prove scienter but instead simply "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive" or, at minimum, "with deliberate recklessness as to the possibility of misleading investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (quoting PSLRA); *see also Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003) (section 10(b) claims "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud"). Scienter may be established either (1) upon "any one of the plaintiff's allegations" that is "alone sufficient to give rise to a strong inference of scienter," or (2) upon "a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Forescout Techs.*, 63 F.4th at 765; *see also Tellabs*, 551 U.S. at 322-23 ("The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."). Moreover, the inference of knowing or reckless fraud "need not be irrefutable, *i.e.*, of the smoking-gun genre," and it need only be at least *equally* as likely as any non-culpable explanation of the alleged conduct.

---

[13] Rodgers and Rust's scienter is imputed to Enovix. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

*Tellabs*, 551 U.S. at 314 and 324. Here, the SAC alleges a strong inference of scienter as to Defendants Rust, Rodgers, and Enovix.

**1.  Rust and Rodgers Actually Knew or Recklessly Disregarded that Their Statements Would Mislead Investors**

The SAC alleges that Rust and Rodgers knew facts contradicting their statements at the time those statements were made, supporting a strong inference that they acted with at least "deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter.").

*First*, Rodgers and Rust personally waived the requirement that the Fab-1 equipment pass the FAT before Enovix took delivery. ¶¶105-09. This happened only after Fab-1 repeatedly failed the FAT over a span of six months. ¶¶100-04. During that span, FE2 provided daily updates on the status of the Fab-1 equipment. ¶51. These facts support a cogent and compelling inference that Rust and Rodgers knew, or recklessly disregarded, that the Fab-1 equipment had repeatedly failed the FAT over the prior six months when they personally waived the FAT requirement.

*Second*, Rodgers and Rust made a multitude of statements regarding the testing and production capabilities of Fab-1, supporting a strong inference that they were aware of the basic facts pertinent to the important matter they were discussing. *See, e.g.*, ¶¶129, 131, 133, 135, 138, 140, 142, 144, 146, 148, 151, 153, 169, 196.

*Third*, the SAC alleges Rust was aware that the Fab-1 equipment from Yinghe was not performing, and never had performed, to Enovix's specifications and "was not happy" with the lack of progress. ¶118. Several former employees confirm that "Rust was closely engaged with the process of trying to get the Fab-1 lines producing at the level they needed" (¶118), including through his attendance at daily "metrics meetings" to "discuss the struggling operations of the Fab-1 production lines" (¶114-16). "[T]he daily meetings always included reports about Fab-1 production numbers, comparing goals against actual results from the prior day, and discussions about ongoing efforts to get the Fab-1 equipment performing up to specification." ¶115 ("written

status reports were distributed during the daily meetings that detailed the production problems Fab-1 was facing"). Enovix's former employees explained that "anyone who attended" the daily meetings would have known that Fab-1 was not performing to specifications, "everyone was concerned," and "it was common knowledge" that Fab-1 was not meeting "the output requirements." ¶117. FE6 explained that production numbers for Fab-1, including "UPH rates" were readily available at any time from automated reports that "everyone" at Enovix had access to. ¶119.

These daily meetings and freely available reports would have showed Rust and Rodgers that Fab-1 was still "not producing" by October 2021. ¶120. By June 2022, Fab-1 was still producing only 5-7% of the 550 UPH capacity needed for commercial production. ¶122. By December 2022, that number had inched up to only 18%. *Id.* Taken collectively, these facts are sufficient to support a reasonable and strong inference that Rodgers, Rust, and Enovix knew or recklessly disregarded that their statements to investors were false and misleading. Defendants' non-culpable inference that "Defendants acted in good faith" and "disclosed the challenges they faced," Def. Br. at 24, is certainly no *more* compelling of an inference, and does not undermine the SAC's allegations supporting a strong inference of scienter. *See Tellabs*, 551 U.S. at 314.

The two cases on which Defendants primarily rely do not support Defendants' position. *See* Def. Br. at 22. *Espy v. J2 Glob., Inc.*, 99 F.4th 527, 533 (9th Cir. 2024), involved a defendant umbrella company that had acquired 186 portfolio businesses. The *Espy* complaint was based upon omissions of granular information regarding the portfolio businesses, and the Ninth Circuit held that the plaintiffs insufficiently pleaded scienter because there were no allegations that "individual defendants actually knew the underlying data of each of their [portfolio] acquisitions with the requisite accuracy to report detailed financials." *Id.* at 538. Here, in contrast, Enovix's primary business challenge was the successful manufacture of newly-designed batteries, and Defendants were intimately involved in overseeing that operation on a daily basis.

*Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *14 (N.D. Cal. Apr. 2, 2024) addressed problems with production that were apparent only "in hindsight." In that case, the plaintiffs did "not allege[] facts showing that Defendants believed that the manufacturing issues

could not be resolved quickly." *Id.* Instead, the pleadings showed that production delays associated with an unexpected FDA rejection were due to the "[d]efendants' misreading of what the FDA required," not a fundamental inability to produce a viable product. *Id.* Indeed, by the time the FDA rejected the company's approval request, the company was already "in the process of qualifying a new" production process and "had already successfully produced drug substance lots with the new [process]," and "the FDA approved the [company's renewed request] the following year." *Id.*

In contrast, here, the Defendants themselves waived the FAT requirements. The equipment was installed without Yinghe's engineers, was "not producing" even four months later and, despite constant struggles to improve output, the equipment never achieved more than a small fraction of the capacity it needed for commercial production. Enovix's equipment never performed even remotely close to specification, and there was never any objective reason to believe it would. Whereas *Revance* addressed a classic "two steps forward, one step back" scenario, Enovix here took no steps forward (except when Defendants took a "massive shortcut"), and nothing about the two years of failed tests and fruitless improvement efforts suggested that they ever would.

The "core operations" doctrine further bolsters Plaintiffs' scienter allegations. *See S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). That doctrine "allows a court to impute" scienter when "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *In re Fibrogen, Inc. Sec. Litig.*, 2022 WL 2793032, at *29-31 (N.D. Cal. July 15, 2022) (applying core operations theory where concealed issues concerned the defendants' "flagship product"). Here, it would be absurd to suggest that Rodgers and Rust were unaware of the Fab-1 testing "red flags"—or that testing was not actually "going on quite well"—given that they personally waived the FAT after Fab-1 repeatedly failed to pass. Enovix's Li-ion batteries were more than even a "flagship" product; they were Enovix's *only* product, made in a single factory (Fab-1), in the same facility as the Company's executive offices, and the timely success of Fab-1's commercial production capabilities was critical to the Company's viability. ¶216. Fab-1's progress toward commercial production capacity was "such a central component of [the Company's] operations that Defendants can be presumed to have knowledge of the problems with [it]." *Azar v. Yelp, Inc.*, 2018 WL 6182756, at *20 (N.D.

Cal. Nov. 27, 2018); *see also Fibrogen*, 2022 WL 2793032, at *30-31. These core operations allegations also support a strong inference of scienter on a holistic basis because they are "made in conjunction with detailed and specific allegations about management's exposure to factual information." *S. Ferry*, 542 F.3d at 785.

### 2.    Defendants Had Strong Economic Motivation to Mislead Investors

Defendants had strong financial incentives to deceive investors about Enovix's ability to manufacture its new batteries at commercial scale. *See Tellabs*, 551 U.S. at 325 (economic motive to mislead investors "may weigh heavily in favor of a scienter inference"). Enovix desperately needed the Merger to go through in order to continue its operations. Prior to the Merger, Enovix had no revenues, "an accumulated deficit of $223.4 million," and achieving commercial production at Fab-1 was its only avenue to generate meaningful sales from its only product. ¶72. The Proxy Statement explained that while "substantial doubt [exists] about Enovix's ability to continue as a going concern … the successful completion of the [Merger] will eliminate this doubt and enable Enovix to continue as a going concern." *Id*. Portraying the successful progress of Fab-1 towards commercial production, despite overwhelming evidence to the contrary, was critical to gaining shareholder support for the Merger, which Enovix needed to survive. Telling investors the truth—that the Fab-1 equipment had failed the FAT despite six months of testing and improvement efforts—would have jeopardized the consummation of the Merger. Courts have found that similar facts support a common-sense inference of scienter. *See e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 (N.D. Cal. 2020) (motive to raise capital due to "substantial doubt about [the company's] ability to continue as a going concern" supported scienter).[14]

Consummating the Merger also allowed Rodgers to monetize his privately-owned shares for up to $80 million. ¶¶62, 202. And Rodgers was also the trustee for a trust that loaned $15 million to Enovix, which Enovix may not have been able to repay if the Merger did not close.

---

[14] *See also WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1052 (9th Cir. 2011) (allegation that company "needed continued infusion of investment capital" supported finding of scienter); *Nguyen v. Radient Pharms. Corp.*, 2011 WL 13141630, at *6 (C.D. Cal. Oct. 26, 2011) (allegations that a company's "ability to continue operating was dependent upon raising additional capital" supported finding of scienter); *In re Portal Software, Inc. Sec. Litig.*, 2005 WL 1910923, at *12 (N.D. Cal. Aug. 10, 2005) (similar).

¶¶204-05. Defendants argue this inference of scienter at the time of the misrepresentations is undercut by *post hoc* evidence that Rodgers did not ultimately sell his shares (and in fact purchased more shares) before the price crashed.[15] Def. Br. at 24. Defendants posit that, "[i]f Rodgers intended to mislead investors to close the merger and profit from his [shares], then one would expect him to have sold shares … following the close of the transaction." *Id.* However, the Ninth Circuit has made clear that "[s]cienter can be established even if the officers who made the misleading statements did not sell stock during the class period." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003). It is not uncommon for a defendant to hold or purchase stock while falsely touting the Company's prospects hoping for even greater increases in price, and thus such actions do not negate scienter. *Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 n.2 (N.D. Cal. 2012) ("[C]ourts have refused to hold that stock purchases were inconsistent with fraud where the defendants could have believed they could have continued to hide the fraud"); *Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 13026910, at *2 (C.D. Cal. Dec. 10, 2012) (rejecting the argument "that a strong inference of scienter is negated by" defendants' stock purchases).[16]

## C.    The SAC Alleges Loss Causation as to the January and October 2023 Events

Plaintiffs sufficiently plead a causal link between Defendants' misrepresentations and omissions regarding the status and production capabilities of Fab-1 and the drops in share price that resulted in Plaintiffs' economic losses. This is a "low bar" at the pleading stage. *In re WageWorks, Inc., Sec. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020). Plaintiffs need

[15] The simple fact of a subsequent stock purchase—without context—does not negate a strong inference of scienter. *See, e.g.*, *Maiman v. Talbott*, 2010 WL 11421950, at *7 (C.D. Cal. Aug. 9, 2010) ("Defendants have not provided sufficient context of the stock purchases reflected in the Form 4s. Thus, … such purchases would not negate the strong inference of scienter.").

[16] Rodgers "may have thought that there was a chance"—albeit a much slimmer chance than was portrayed to investors—that Fab-1 would still be able to achieve commercial production capacity such that "the benefits of concealment might exceed the costs." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Id. See also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *13 n.12 (N.D. Cal. Nov. 4, 2020) (defendants "may have hoped that the situation in China would improve, a hope that does not justify misleading investors").

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI

allege only a "plausible" inference that the "revelation of fraudulent activity, rather than changing market conditions or other unrelated factors, proximately caused the decline in defendant's stock price." *Grigsby v. BofI Holding, Inc.*, 979 F.3d 1198, 1204–06 (9th Cir. 2020).

Plaintiffs allege three events that each partially revealed the truth concealed by Defendants' false and misleading statements: (1) the Company's letter to its Shareholders on November 1, 2022, ¶¶160-66; (2) Rodgers' presentation to shareholders on January 3, 2023, ¶¶175-87; and (3) the Company's announcement on October 3, 2023 that it was abandoning commercial production operations at Fab-1, ¶¶189-92. Each event precipitated an immediate drop in Enovix's share price. ¶¶165, 185, 190. Defendants do not challenge that Plaintiffs sufficiently plead loss causation as to the first event. That alone suffices to deny Defendants' motion as to loss causation.

Defendants' challenges to the January 2023 and October 2023 events also lack merit. *First*, Plaintiffs plainly allege that the stock price drop following the January 2023 presentation "was caused … by the disclosure of new information revealing to a larger extent the scope of the materialized risks concealed by Defendants' misrepresentations and omissions: that … the Fab-1 equipment … was still 'doing less than 10% of what it should be doing.'" ¶186; *see also* ¶175 (Rodgers addressed the "lack of clear and transparent investor communications" concerning Fab-1 and conceded that investors "***were reasonably misled***"); ¶176 (Rodgers provided "information on the first production line at Fab-1 and its disappointing output."). Thus, the SAC alleges that the January 2023 disclosures revealed new information about Fab-1, they were not simply "about Fab-2," as Defendants baselessly contend. *Cf.* Def. Br. at 25. Plaintiffs sufficiently alleged a causal connection between the challenged statements and their loss in January 2023.

*Second*, Plaintiffs allege that the October 2023 drop in share price "was caused … by the revelation that Enovix had completely given up on Fab-1's ability to achieve commercial production capacity." Plaintiffs allege that Defendants' false and misleading statements and omissions concealed the risk that Fab-1 would not achieve commercial production capacity, which risk materialized when production at Fab-1 was abandoned, and the market's recognition of that true level of exposure "played some part in diminishing the market value of [Plaintiffs'] securit[ies]." *Special Situations Fund III QP, L.P. v. Brar*, 2015 WL 1393539, at *9 (N.D. Cal.

Mar. 26, 2015). That shows a "connection" between the concealed risk and the losses incurred upon materialization and revelation of that risk, *cf.* Def. Br. at 25, and is sufficient to allege loss causation as to the October 2023 event.

### D.    The Complaint Adequately Alleges a Section 20(a) Claim

To state a claim under Section 20(a), Plaintiffs must allege (1) a primary violation of the Exchange Act, and (2) that the individual defendants controlled the entity liable for the primary violation. 15 U.S.C. § 78t(a); *In re Juniper Networks, Inc. Sec. Litig.*, 542 F. Supp. 2d 1037, 1053–54 (N.D. Cal. 2008). The SAC states a claim for a primary violation by Enovix, and thus also alleges Section 20(a) claims against the Individual Defendants.  *Forescout Techs.*, 63 F.4th at 781.

Plaintiffs also adequately allege the Individual Defendants' control. "Whether a defendant is a control person is an intensely factual question, and a plaintiff will survive a motion to dismiss on allegations that individual defendants, by virtue of their position, could and did control and influence the company." *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *19 (N.D. Cal. Feb. 15, 2018). Here, the Individual Defendants were senior officers and directors of Enovix or RSVAC who directly participated in the management of Enovix and RSVAC and signed or made the statements alleged herein. ¶¶37-48, 65, 126, 137, 146, 150, 241-44. This is more than sufficient to satisfy Plaintiffs' light burden to allege control. *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1228 (N.D. Cal. 2015) (Illston, J.) ("allegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status.").

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss. If the Court grants any part of the motion, Plaintiffs respectfully request leave to amend. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to replead is routinely granted in securities cases).

Dated: June 11, 2024                    Respectfully submitted,

                                           **THE ROSEN LAW FIRM, P.A.**

                                           By: */s/Laurence M. Rosen*
Laurence M. Rosen (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Email: pkim@rosenlegal.com
            jbaker@rosenlegal.com

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick
Marc B. Kramer (*pro hac vice*)
Nicole Castiglione (*pro hac vice* forthcoming)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
ncastiglione@rksllp.com

*Co-Lead Counsel for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS; 3:23-CV-71-SI