# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RETAIL WHOLESALE DEPARTMENT STORE UNION LOCAL 338 RETIREMENT FUND, et al., | Case No. 22-cv-04893-PCP |
| Plaintiffs, | **ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |
| v. | Re: Dkt. No. 69 |
| STITCH FIX, INC., et al., | |
| Defendants. | |

Court-appointed lead plaintiffs (four pension and benefit funds) bring this class action securities lawsuit against Stitch Fix, Inc., Stitch Fix's former CEO Elizabeth Spaulding, and Stitch Fix's founder Katrina Lake. Defendants Stitch Fix, Spaulding, and Lake now move to dismiss the lawsuit under Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants defendants' motion to dismiss with leave to amend.

**BACKGROUND**

Stitch Fix is a clothing company whose core product is "Fix," a box of five trial items curated by the company's stylists that is mailed to customers. Customers purchase the items they decide to keep and return the rest, paying a fixed styling fee as well. In August 2021, Stitch Fix publicly launched a second business line called "Direct Buy," which allows customers to shop directly on the company's website for specific products. Plaintiffs allege that Stitch Fix's former executives Spaulding and Lake made material misstatements and omissions about this new business line to the public. In particular, plaintiffs allege that the executives told investors that Direct Buy would be additive and complementary to Fix but knew from internal test results that Direct Buy would cannibalize the Fix business. Plaintiffs allege, for example, that various former

data science employees ran internal tests in March 2021 that purportedly showed that Direct Buy would be cannibalistic. According to plaintiffs, Spaulding knew of these results through weekly standing meetings.

Below is a timeline of purportedly false and misleading statements that plaintiffs allege defendants made about Direct Buy during the class period from December 2020 to June 2022.[1]

- December 7, 2020: On an earnings call, Lake told investors regarding Direct Buy (which was still in its pilot stages and not yet broadly launched to the public) and Fix that "what we're seeing is that the two experiences are really additive" and "the kind of combination of those two things will allow us to address many more types of clients." Dkt. No. 52, at 13. Spaulding reiterated that Direct Buy was "highly additive" to Fix and that "there's a real complementarity" between the two products. *Id.* Lake also said that "[D]irect [B]uy certainly has been a significant contributor" to revenue generation and "we're running A/B tests all the time." *Id.* at 14. The stock price rose thereafter.

- February 10, 2021: Lake said to a Goldman Sachs analyst that "we've seen clear incrementality with [D]irect [B]uy. We can see that through our numbers and cohort performance." *Id.*

- March 8, 2021: Defendants allegedly delayed the launch of Direct Buy because of timeline and logistical constraints but made no mention of the company's internal tests showing that Direct Buy was cannibalizing Fix. *Id.* at 18. A shareholder letter stated that Direct Buy "complement[ed] our core Fix form factor." *Id.* On an earnings call, Spaulding assured investors that Direct Buy was "additive" to Fix and highlighted the "incrementality" of the two programs notwithstanding an analyst's question about potential cannibalization. *Id.*

- June 7, 2021: Lake stated that "[t]he success in incrementality that Direct Buy has demonstrated to date gives us high conviction that our personalized shopping experience will significantly broaden the appeal and reach of Stitch Fix." *Id.* at 20. Analysts responded positively to these assurances.

- June 10, 2021: In response to a question about whether Direct Buy was cannibalizing Fix in its pilot stages, Spaulding replied, "We originally did the most pur[e]st sense of that as kind of an A/B test of hold out … And we loved what we saw at that point. It was highly, highly incremental. And we see all of those signs continuing." *Id.* at 21. She further noted, "[W]e've noticed that each new cohort of Fix clients are engaging faster with [D]irect [B]uy and it's expanding their spend with us." *Id.*

- September 21, 2021: In response to a question about cannibalization during an investor call, Spaulding again said that "the knowledge that we have of like the new cohorts of clients is the real strength and incrementality of these two offerings really being quite complementary." *Id.* at 24. She added, "I think we see solid growth in both sides of the business in the coming year." *Id.*

---

[1] The following facts are drawn from the complaint. In considering a Rule 12(b)(6) motion contending that a complaint fails to state a claim, the Court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the non-moving party. *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029 (9th Cir. 2009).

United States District Court
Northern District of California

- December 7, 2021: Spaulding acknowledged for the first time that because of Direct Buy the company "may experience short-term impacts of cannibalization." *Id.* at 25. This caused a 24% stock price decline. Nonetheless, she stated that Stitch Fix saw its "clients leveraging both Fixes and Freestyle, demonstrating the complementarity of our growth offering." *Id.* at 25–26. (In September 2021, Stitch Fix had rebranded "Direct Buy" as "Freestyle." Dkt. No. 52, at 7.) She also stated, "we feel really good about the additive nature of Fixes together with Freestyle for clients in our ecosystem." *Id.* at 26.

- March 8, 2022: Spaulding noted in an earnings call that "in our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience. It is important to note that stitchfix.com is the primary landing page for customers interested in ordering a Fix. Therefore, in leading clients to the Freestyle experience first, we inadvertently created friction for those seeking a Fix." *Id.* She also stated that "conversion of new visitors for Fix and Freestyle is not where we want it to be." *Id.* This caused a 6% stock price decline. Spaulding nonetheless assured investors that there was "incrementality provided by Freestyle to our existing client base." *Id.* at 27. CFO Dan Jedda stated, "When Fix customers do engage in Freestyle, we do see both their Fix and their Freestyle go up, and so that's just really back to the point of how the two really work in tandem together from an overall client experience standpoint." *Id.*

- June 9, 2022: Spaulding signed off on a Form 10-Q which described a decline in active clients "driven by client conversion challenges and lower site traffic." *Id.* at 28. Spaulding explained that to address the cannibalization problem, the company "began directing all stitchfix.com traffic to a simplified Fix first onboarding path [before] their Freestyle shop is unlocked." *Id.* This caused a 10% stock price decline. Analysts responded by noting that Freestyle was not the "bull case" or "unlock once perceived by the market." *Id.* at 29. This caused a further 19% stock price decline.

Plaintiffs allege that when this information was revealed to investors, Stitch Fix's market value declined by over $6 billion (approximately 90%). They bring this lawsuit on behalf of all persons who purchased Stitch Fix common stock between December 8, 2020 and June 9, 2022. Plaintiffs allege: (1) a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 against Stitch Fix, Spaulding, and Lake; and (2) a violation of Section 20(a) of the Exchange Act against Spaulding and Lake. They request class certification, damages, costs, and fees.

Defendants now move to dismiss the lawsuit under Rule 12(b)(6), arguing that plaintiffs have failed to sufficiently allege that the statements made by Spaulding and Lake were false or misleading or that the defendants possessed the scienter required by the Private Securities Litigation Reform Act (PSLRA).

## LEGAL STANDARDS

A Section 10(b) violation requires "a material misrepresentation or omission of fact, scienter, a connection with the purchase or sale of a security, transaction and loss causation, and economic loss." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). "A securities fraud

United States District Court
Northern District of California

3

complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites of Federal Rule of Civil Procedure 9(b) and the PSLRA." *In re VeriFone Holdings, Inc. Securities Litigation*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

For plaintiffs in securities fraud class actions, the PSLRA creates additional "formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). In particular, "[t]he PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter." *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). To properly allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, [specify] the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … [state] with particularity all facts on which that belief is formed." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990–91 (9th Cir. 2009). To adequately plead scienter the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* at 991.

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the Supreme Court held that a "strong inference" of scienter exists "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 551 U.S. 308, 324 (2007). In the Ninth Circuit, a court must conduct a dual inquiry in assessing whether this standard is met: "[F]irst, it determines whether any one of the plaintiff's allegations is alone sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747, 766 (9th Cir. 2023). The strong inference standard applies only to the element of scienter, not to falsity. *Id.* ("Falsity is subject to a particularity requirement and the reasonable inference standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is

4

subject to a particularity requirement and a strong inference standard of plausibility.").

## ANALYSIS

### I.     Plaintiffs' Complaint Fails To State a Valid Claim Under Section 10(b).

#### A.  Plaintiffs Have Not Adequately Pleaded Falsity.

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). The purportedly false or misleading statement must "directly contradict what the defendant knew at the time." *Weston Family Partnership LLLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022).

Defendants' primary argument is that plaintiffs fail to plead the falsity of Spaulding and Lake's public statements adequately because the identified statements addressed the complementarity of Fix and Direct Buy for *existing* Fix clients, while the negative internal tests identified by plaintiffs measured the effects of Direct Buy on *prospective* Stitch Fix consumers. Defendants contend that plaintiffs' generalized allegations about "cannibalization" fail to distinguish between these two potential effects of Direct Buy, even though the truth or falsity of the statements at issue depends upon which form of cannibalization was being addressed.

In support of their contention that the statements at issue all dealt with the effect of Direct Buy on existing Fix customers, defendants note that Direct Buy was available only to existing Fix clients between June 2019 and April 2021 and did not become available to new Stitch Fix customers until August 2021.[2] Accordingly, as Stitch Fix notes, the purportedly misleading statements from before August 2021 identified by plaintiffs necessarily addressed only the effect of Direct Buy on existing clients.

---

[2] On a Rule 12(b)(6) motion, materials outside the complaint can be considered only if they are incorporated by reference therein or otherwise judicially noticeable. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A [district] court may … consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."). Here, defendants' evidence about Stitch Fix's rollout of Direct Buy and the corresponding public statements by the company's executives are judicially noticeable because this evidence is publicly available and undisputed. *See* Fed. R. Evid. 201 (permitting judicial notice of "a fact that is not subject to reasonable dispute" because it is "generally known.").

5

When reporting data about Direct Buy's impact on existing clients in June 2019, for example, Lake cautioned that "a small portion of [Direct Buy] will be cannibalistic," but that it is "broadly really incremental to our company and our services because it's really allowing people another touch point to engage with Stitch Fix." Dkt. No. 69, at 10. In December 2019, Lake similarly emphasized that the goal of Direct Buy was to increase client spending, not attract prospective clients: "In terms of new clients, it's actually currently not oriented towards helping new clients. This is really about increasing revenue per client." *Id.* Lake reiterated that "there is a small amount of cannibalization" but that "clients who are engaging with us in [D]irect [B]uy, they're spending more, they're more engaged and . . . overall for the business, it is incremental." *Id.* at 10–11. In February 2020, Stitch Fix likewise reported that Fix clients with early access to Direct Buy spent more money with Stitch Fix overall than those without such access. When Direct Buy became available to all Fix clients in September 2020, the company similarly reported that "access to [D]irect [B]uy actually increases the total amount that [Fix clients] spend with Fixes" though some clients spent "more in [D]irect [B]uy and less in [F]ixes." *Id.* at 11. In March 2021, Spaulding again explained "the incrementality that we've observed *with active Fix clients* as they participate in both … is actually an additive experience." *Id.* at 12 (emphasis added). Indeed, in August 2021, when Stitch Fix rebranded Direct Buy to Freestyle and launched it to the public and Spaulding became CEO, Stitch Fix's revenue per client was the highest ever. *Id.* at 13.

In context, it is clear that Spaulding and Lake's public statements concerned Direct Buy's impact on the spending of existing Fix clients. Statements discussing the complementarity of Fix and Direct Buy were made almost entirely before Direct Buy was ever available to prospective rather than existing customers. In this window, Spaulding and Lake's statements about Direct Buy and its "A/B testing" could only be interpreted by a reasonable investor as referring to Direct Buy's impact on current Fix clients. Indeed, Lake explicitly stated in December 2019 that Direct Buy is "currently not oriented towards helping new clients [but] about increasing revenue per client." Dkt. No. 69, at 10. And Spaulding said in June 2021 that "[o]ur clients that engage in both [Fix and Direct Buy] are spending more with us." *Id.* at 22. She also noted that "Fix clients are engaging faster with [D]irect [B]uy and it's expanding their spend with us." Dkt. No. 52, at 21.

6

In contending that these statements were false or misleading, the plaintiffs rely upon alleged internal testing from at least March 2021 showing "cannibalization." But as they acknowledge, these internal tests were conducted "to understand whether Direct Buy would attract new clients" and were even titled the "New Fix Customer Test." Dkt. No. 52, at 15; Dkt. No. 69, at 20. While these tests may have shown that the introduction of Direct Buy would reduce the growth of Fix customers, such results are not inconsistent with Spaulding and Lake's statements about the impact of Direct Buy on increasing revenue from current Fix customers.

The executives' statements following the public launch of Direct Buy in August 2021 further bolster this conclusion. In December 2021, Spaulding revealed that the company "may experience short-term impacts of cannibalization" because of Direct Buy's immediate availability to new customers. Dkt. No. 52, at 25. She also expressly noted after Direct Buy's full launch, "We do know that in this new phase of onboarding we're in, we have a lot to learn of helping consumers find the right fit over the coming quarters so that they can engage in the full Stitch Fix ecosystem." Dkt. No. 69, at 23. And she admitted in March 2022 that "in our efforts to launch and promote Freestyle, we chose to direct visitors coming to stitchfix.com towards the Freestyle experience. [The] conversion of *new visitors* for Fix and Freestyle is not where we want it to be." Dkt. No. 52, at 26 (emphasis added). But Stitch Fix clarified that when "Fix customers do engage in Freestyle, we do see both their Fix and their Freestyle go up." *Id.* at 27. Accordingly, even if plaintiffs' allegations about the negative results from the internal tests about new customer growth are accepted as true, they do not contradict the statements made by Spaulding and Lake about Direct Buy's effect on revenue from existing clients.

A separate problem with plaintiffs' allegations is that they fail to provide sufficient details about the purported internal tests. Under Rule 9(b), plaintiffs must plead "with particularity all facts on which" their belief that defendants made false or misleading statements is formed. *Zucco*, 552 F.3d at 990–91. Here, plaintiffs fail to specify the "who, what, when, where, and how" of the alleged fraud because they do not describe who the tests tested, what the tests entailed (e.g., what its parameters were), or how the results were quantified. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Rather, plaintiffs allege only in conclusory terms that the New Fix

Customer Test "revealed that Direct Buy was going to negatively impact customer acquisition" and showed "that Direct Buy was cannibalizing Fix." Dkt. No. 52, at 6. Plaintiffs further allege that "multiple internal tests were done … to understand whether Direct Buy would attract new clients, and those test results were very bad." *Id.* at 15. And plaintiffs generically allege that "the Data Science team would use their framework and methodology around multi-variant testing to model out what completion looked like through the onboarding function." *Id.*

These general allegations do not satisfy Rule 9(b). Without further details on the specifics of the internal tests, the Court cannot ascertain whether the executives' statements were misleading or if they made material omissions when speaking to their shareholders.

For both of these reasons, plaintiffs have failed to adequately plead falsity. The Court will therefore grant defendants' motion to dismiss the Section 10(b) claim on this ground.

### B. Plaintiffs Have Not Adequately Pleaded Scienter.

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman v. Arena Pharms.*, Inc., 840 F.3d 698, 705 (9th Cir. 2016). "The PSLRA's 'strong inference' requirement has teeth. It is an 'exacting' pleading obligation that 'present[s] no small hurdle for the securities fraud plaintiff.'" *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (citations omitted). To establish a strong inference of deliberate recklessness, the plaintiff must plead "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Zucco*, 552 F.3d at 991. In determining whether each defendant had the requisite scienter, courts "must consider plausible, nonculpable explanations" for defendants' conduct, and determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323.

Plaintiffs allege that defendants were aware of Direct Buy's negative impacts on Stitch Fix but nonetheless failed to timely inform shareholders of this. They rely on four basic claims to allege scienter.

8

First, they allege that the executives received contemporaneous information from company reports and presentations at weekly meetings that showed the negative results of internal cannibalization testing. Plaintiffs cite discussions with three former employees (FEs) to allege that the individual defendants were aware of the New Fix Customer Test results, which apparently showed that users of Stitch Fix were now being "funneled to Direct Buy" but ultimately would not make any purchase. Dkt. No. 52, at 15. For example, one FE purportedly confirmed that "Spaulding saw the results of all the tests" through slide decks presented at weekly meetings focused on Direct Buy. *Id.* And another FE allegedly "confirmed that cannibalization was a big topic of conversation at Stitch Fix" and that "it was clear internally that the initial [Direct Buy] beta test was a failure." *Id.* at 17. Finally, a third FE alleged that "there were routine meetings happening between data scientists and executive leadership, including Defendant Spaulding, regarding the performance of Freestyle." *Id.*

Second, plaintiffs allege that "Stitch Fix tracked live data showing that Direct Buy was cannibalizing Fix, and the Executive Defendants received this real-time information reflecting cannibalization in weekly reports" and that "the Executive Defendants had access to the relevant data showing that Direct Buy was cannibalizing Fix through the Company's internal Looker system." *Id.* at 44–45.

Third, plaintiffs contend that Lake's stock sales of $78 million (12.7% of her holdings) between the March 8, 2021 and December 7, 2021 earnings calls create a strong inference of scienter.

Fourth, plaintiffs allege that Spaulding "stood to receive substantial performance-based compensation that created a strong financial incentive for her to grow Freestyle regardless of whether it was cannibalizing the Fix business." *Id.* at 48 (noting that 20% of Spaulding's annual cash bonus was determined by growing Freestyle during the 2022 fiscal year, 40% was determined by Stitch Fix's net revenue, and 40% was determined by active client count).

Plaintiffs' allegations, even taken holistically, fail to meet the PSLRA's "strong inference" standard to establish scienter. *Tellabs*, 551 U.S. at 323. The fact that the executives might have known of the New Fix Customer Test results, which are otherwise not pleaded with particularity

9

under Rule 9(b), does not mean that defendants made unreasonable omissions in their public statements to shareholders. *Zucco*, 552 F.3d at 991. As discussed above, the internal tests appear to have related to Direct Buy's impact on prospective clients, not existing Fix clients.

As to the live data showing Direct Buy's cannibalization of Fix to which Spaulding and Lake purportedly had access, access to such data alone is insufficient to establish scienter for purposes of the PSLRA. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) ("[P]laintiffs merely assert in conclusory terms that the defendants had access to internal data demonstrating a decline in sales of [product]. Plaintiffs do not identify any internal reports of 'sales data,' much less plead, in any detail, the contents of any such report or the purported data."). As in *Lipton*, the plaintiffs fail to identify specific reports of the internal data that defendants received or the specific contents of such reports.

Defendant Lake's sale of 12.7% of her holdings also does not establish scienter because she sold more shares in the 18-month period before the class period, undermining any inference of scienter. *See In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989) ("Large sales of stock before the class period are inconsistent with plaintiffs' theory that defendants attempted to drive up the price of Apple stock during the class period."); *see also Leventhal v. Chegg*, 2024 WL 924484, at *8 n.3 (N.D. Cal. Mar. 4, 2024).

Finally, plaintiffs' argument about the purported financial incentives encouraging Spaulding to prioritize Freestyle misses the mark. As defendants noted, Spaulding's new compensation package went into effect in October 2021, *after* the challenged statements were made and after Freestyle was launched to the public. Dkt. No. 69, at 31. Moreover, as plaintiffs concede, Spaulding's compensation was more strongly tied to Stitch Fix's net revenue and client count than to Freestyle's success. If plaintiffs are correct that Freestyle cannibalized Fix and reduced Stitch Fix's new client count (and potentially net revenue), prioritizing Freestyle at the expense of Stitch Fix's overall financial success would have been contrary to Spaulding's own financial interests. *Id.* at 32.

For these reasons, plaintiffs have failed to plead facts creating a strong inference of scienter. The Court therefore dismisses plaintiffs' Section 10(b) claim on this ground as well.

10

## II. Plaintiffs' Section 20(a) Claim Also Fails.

Plaintiffs' Section 20(a) claim is premised on an underlying violation of Section 10(b). Accordingly, their Section 20(a) claim falls with their claim under Section 10(b). *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (requiring "a primary violation of underlying securities laws, such as Section 10(b) or Rule 10b-5" to establish a cause of action under Section 20(a)).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiffs' complaint is granted. Dismissal is with leave to amend. If they so choose, plaintiffs must file an amended complaint within 21 days of this Order.

**IT IS SO ORDERED.**

Dated: July 16, 2024

P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

11