1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    MAURICE L. TWITCHELL, et al.,              Case No. 23-cv-00071-SI
8                    Plaintiffs,
9          v.                                   ORDER GRANTING IN PART AND
                                                DENYING IN PART MOTION TO
10   ENOVIX CORPORATION, et al.,                DISMISS SAC
11                   Defendants.                 Re: Dkt. No. 105
12

13        Now before the Court is defendants' motion to dismiss the Second Amended Class Action

14   Complaint.  Pursuant to Civil Local Rule 7-1(b), the Court found this matter appropriate for

15   resolution without oral argument and vacated the hearing set for July 19, 2024.  For the reasons set

16   forth below, the Court GRANTS IN PART and DENIES IN PART the motion to dismiss.

17

18                                    **BACKGROUND**

19   **I.    Factual Background**

20        This proposed securities fraud class action is brought against Enovix Corporation

21   ("Enovix"); co-founder and former CEO Harrold Rust; Executive Chairman Thurman J. Rodgers;

22   and other individual officers.  The factual background of this lawsuit is described more fully in the

23   Court's Prior Order granting the motion to dismiss the consolidated complaint.  Dkt. No. 97 ("Prior

24   Order").

25        To re-state, "Enovix is an early-stage technology company that purports to make a new type

26   of lithium-ion ('Li-ion') battery that is smaller and stronger than conventional Li-ion batteries."

27   Dkt. No. 102 ("SAC") ¶ 2.  Based in Fremont, California, Enovix has been developing its technology

28   since 2007.  *Id.* ¶ 75.  In 2012, Enovix began "work on the manufacturing approach[.]"  *Id.*  Between

2012 and 2017, the company "could produce small quantities of Li-ion batteries to provide to potential customers as samples, but not at commercially viable levels." *Id.*

In February 2021, Enovix announced its plans to go public. *Id.* ¶ 3. Rather than going public through a traditional initial public offering, Enovix underwent what is known as a "de-SPAC merger," merging with Rodgers Silicon Valley Acquisition Corp. ("RSVAC").[1] *Id.* ¶¶ 3, 64. RSVAC was "a public special purpose acquisition company known as a 'SPAC' or 'blank check' company . . . whose lone stated purpose is to acquire a private company." *Id.* ¶ 59. At the same time, "Enovix set an 'ambitious goal' to both develop its own U.S.-based manufacturing line and to begin delivering products to customers (generating the Company's first product revenue) by the second quarter of 2022." *Id.* ¶ 77. "Specifically, Enovix estimated it would manufacture one battery every two seconds, which would require four manufacturing lines capable of producing 550 UPH [units per hour]." *Id.* At the time it made this forecast, Enovix had no product revenue to date. *Id.* ¶ 76.

In early 2020, Enovix started the process of procuring custom manufacturing equipment for its first production factory, "Fab-1," to be located in Fremont. *Id.* ¶ 5. Enovix outsourced the development and production of a large portion of the Fab-1 equipment to Shenzhen Yinghe Technology Co. Ltd. ("Yinghe") in China. *Id.* Enovix had an "Equipment Procurement Review" in place to govern the procurement of the equipment from Yinghe. *Id.* ¶ 6. This document included "requirements that the equipment pass critical quality tests before Enovix accepted delivery[,] including that the equipment had to pass a "Factory Acceptance Test." *Id.* ¶¶ 6-7.

According to the SAC, "two key quality control tests" are known as the "Factory Acceptance Test" ("FAT") and "Site Acceptance Test" ("SAT"). *Id.* ¶ 85. "The FAT is performed offsite at the equipment vendor's factory to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications. To conduct the FAT, the new manufacturing equipment is set up at the vendor's factory and tested in accordance with a detailed plan agreed upon by the purchaser and the equipment vendor." *Id.* ¶ 86. "The SAT is the next critical quality control

---

[1] Defendant Rodgers was RSVAC's CEO. SAC ¶ 11.

procedure[,]" and takes place once the manufacturing equipment has been installed on site at the customer's facility. *Id.* ¶¶ 91-92. "To conduct the SAT, the equipment vendor sends representatives—typically the same engineers who designed the system and conducted the FAT— to install the equipment, configure it, conduct tests, and verify that the equipment operates correctly." *Id.* ¶ 92. The SAC alleges, "Due to Covid-19-related travel restrictions in late 2020 and early 2021, Enovix's engineers were never permitted to travel to China to participate in the FAT." *Id.* ¶ 8.

"[A]round November and December 2020, with 3 or 4 iterations of testing spaced half a month to a month apart[,]" the first FAT for the Yinghe-made Fab-1 equipment took place. *Id.* ¶ 9. The equipment failed the FAT. *Id.* Yinghe continued working on the equipment and kept testing for months, to no avail. *Id.* ¶ 10. Yinghe conducted the final FAT in April 2021, and "the equipment failed yet again." *Id.*

According to the SAC, "That is when Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment pass the FAT and had it airlifted to Fremont." *Id.* ¶ 105. "In April 2021, Rust called Rodgers and proposed to fly the Yinghe equipment from China to Fremont to avoid a potential three-month delay due to global shipping backlogs[.]" *Id.* Rodgers approved the plan. *Id.* They "planned to 'catch up later' with continued improvement efforts and testing after installing the equipment in Fremont. They spent $1.4 million to prematurely fly over the equipment so they could tell investors that the Fab-1 equipment had arrived and was installed as the critical Merger [with RSVAC] was awaiting shareholder approval." *Id.* ¶ 11.

On June 24, 2021, the Company issued a "Proxy Statement and Prospectus" (hereinafter referred to as "Proxy Statement") soliciting shareholder approval of the merger. *Id.* ¶ 65. The Company filed the Proxy Statement with the Securities and Exchange Commission ("SEC") on Form 424B3 the same day. *Id.* On July 14, 2021, the merger closed. *Id.* ¶ 69.

In the meantime, once the Yinghe equipment came to Fremont in late April 2021, Enovix's engineers installed the equipment at Fab-1 without the assistance of Yinghe's engineers. *Id.* ¶¶ 12, 106. Plaintiffs allege that "Enovix's engineers struggled for months to get the Fab-1 equipment operating at full capacity, but their efforts failed. Eventually the Company agreed to pay for

Yinghe's engineers to travel to California and help work on and test the equipment. They fared no better." *Id.* ¶ 13. According to Former Employee 2, Yinghe's staff stayed in the United States for almost a year, from fall 2021 until September 2022. *Id.* ¶ 112. Even with a year of combined efforts, the equipment still never passed the SAT. *Id.* ¶ 124.

The SAC alleges, "In the second half of 2022, Enovix began to gradually reveal that the continued setbacks to the Fab-1 manufacturing equipment not only delayed the Company's goal of recognizing material product revenue by Q2 2022, but also pushed back the development of Enovix's next generation of manufacturing equipment, which had been expected to build upon the original Fab-1 line's success." *Id.* ¶ 156. By June 2022, the Fab-1 equipment was producing less than 10% of the expected production rate. *Id.* ¶ 14. By December 2022, the production had increased to about 100 UPH, or less than 20% of the expected rate. *Id.* ¶¶ 14, 170.

Plaintiffs argue that disclosures made on November 1, 2022; January 3, 2023; and October 3, 2023, caused the share price to fall, harming investors.

On November 1, 2022, after the close of trading, Enovix released a "Letter to Our Shareholders," reporting that Enovix realized just $8,000 in revenue for Q3 2022. *Id.* ¶ 160. The letter stated that Enovix "would be 'dialing back' its work on improving the 'Gen1' lines at Fab-1 in favor of shifting its focus to its future 'Gen2' lines . . . because the supposed 'improvements' to Fab-1 that they had vaguely alluded to previously were not having the desired results. Consequently, Enovix 'anticipate[d] achieving lower overall output from Fab-1 in 2023.'" *Id.* ¶ 17. The letter stated that the total production run rate for 2023 would be under one million battery cells, which, according to plaintiffs, was "less than 10% of the production it said would result from producing a battery every two seconds[.]" *Id.* ¶ 162.

On this news, Enovix's share price fell 41%, from a close of $17.99 per share on November 1 to $10.53 per share by the close of trading on November 2, 2022, on unusually high trading volume. *Id.* ¶ 165. Plaintiffs allege that "the November 1, 2022 letter did not fully reveal to the market the extent of the undisclosed risks: the Company's continuing failure to achieve anywhere close to commercial production capacity and quality with its long-touted Fab-1 equipment." *Id.* ¶ 167.

On November 7, 2022, Enovix announced that defendant Rodgers, previously Chairman of the Board, would become Executive Chairman of Enovix. *Id.* ¶¶ 39, 168. That day, Rodgers released a statement, stating, "We have poorly communicated on the status of Fab-1." *Id.* ¶ 168. Rodgers explained that the decision to charter the world's largest airplane to fly the manufacturing equipment from China "violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later." *Id.*

Rodgers went on to state,

> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.

*Id.* Plaintiffs do not allege any drop in the share price following the November 7, 2022 statements.

On November 10, 2022, Enovix announced it would bring in Ajay Marathe as Chief Operating Officer. *Id.* ¶ 173. On December 29, 2022, Enovix announced defendant Rust would "retire" from his role as President and CEO and as a member of the Board of Directors. *Id.* ¶ 174. Enovix replaced Rust that same day. *Id.*

On January 3, 2023, after the close of trading, defendant Rodgers hosted a special presentation to shareholders. *Id.* ¶ 175. Plaintiffs allege that information revealed on this call "indicates that the end of Rust's tenure at Enovix was more akin to a termination than a 'retirement,' as the timing of the discussions about replacing Rust as CEO coincided with the production issues with Fab-1 coming to a head in late 2022." *Id.* ¶ 215. Addressing concerns about the "lack of clear and transparent investor communications" concerning Fab-1, Rodgers stated, "I think they were reasonably misled." *Id.* ¶ 20. Regarding the first production line at Fab-1, Rodgers explained that the line "is nonfunctional for automation point of view. That means its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." *Id.* Rodgers

went on to state that the second production line was only half built. *Id.* ¶ 177. Rodgers explained that "we didn't want to commit to the second half of the Line 2, until Line 1 worked." *Id.* Rodgers went on to provide more detail about the output issues at Fab-1. For instance, regarding one piece of equipment that was rated to 550UPH, Rodgers stated, "[W]e don't think that machine if we worked on it forever would be over 200[.]" *Id.* ¶ 178. Rodgers stated that Fab-1 was "doing less than 10% of what it should be doing." *Id.*

On the January 3, 2023 call, Rodgers also announced further delays to the Gen2 manufacturing lines, which the complaint states "could be traced back to the problems with Fab-1 and its 'Gen1' production lines[.]" *Id.* ¶ 179. Rodgers stated the buildout of the Gen2 lines would be delayed by several months, to the end of 2023 or beginning of 2024. *Id.* ¶ 180. Therefore, according to plaintiffs, the revenues from Gen2 lines that investors had been told to expect in early 2024 were no longer possible. *Id.* The following day, Enovix's share price dropped 41%, from a close of $12.12 per share on January 3 to a close of $7.15 on January 4, 2023, on unusually high trading volume. *Id.* ¶ 185.

On October 3, 2023, Enovix announced that it was abandoning commercial production operations at Fab-1 altogether, laying off 185 workers and writing off the value of $36 million of Fab-1 equipment. *Id.* ¶¶ 189, 191. Enovix described this as "a strategic realignment of Fab1 in Fremont designed to refocus the facility from a manufacturing hub to its 'Center for Innovation,' focused on new product development. This move is supportive of the Company's strategy to locate high-volume manufacturing in Asia near customers and suppliers while locating technology development in both Silicon Valley and Asia." *Id.* ¶ 189. Enovix's share price fell 13%, from a close of $11.81 per share on October 2 to a close of $10.30 on October 3, 2023, on unusually high trading volume. *Id.* ¶ 190.

## II. Procedural Background

On January 6, 2023, plaintiff Maurice Twitchell filed suit on behalf of a putative class of investors who purchased or otherwise acquired Enovix or RSVAC common stock from February 22, 2021, through January 3, 2023. Dkt. No. 1 at 2. Following appointment of co-lead plaintiffs

1   and plaintiff counsel, Dkt. No. 68, plaintiffs filed the Consolidated Class Action Complaint,

2   amending the Class Period to June 24, 2021, through January 3, 2023.  Dkt. No. 84 ("CC").

3   Defendants moved to dismiss.  Dkt. No. 89.

4         On January 30, 2024, the Court issued an Order granting the motion to dismiss, with leave

5   to amend.  Dkt. No. 97.  The Court found the consolidated complaint "suffer[ed] from a lack of

6   particularity, especially with regard to the timing of events.  As such, the allegations neither

7   create[d] a reasonable inference that the statements were false or misleading at the time they were

8   made, nor [did] they give rise to a strong inference of scienter."  *Id.* at 14.

9         Plaintiffs filed the SAC on March 19, 2024.  Dkt. No. 102.  The SAC brings claims on behalf

10  of a class defined as "all persons and entities that purchased the publicly traded common stock of

11  Enovix or RSVAC between June 24, 2021 and October 2, 2023, both dates inclusive[.]"  *Id.* ¶ 1.

12  Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of

13  1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder by the SEC.

14        Defendants again move to dismiss for failure to state a claim under Federal Rules of Civil

15  Procedure 9(b) and 12(b)(6).  They argue: that the SAC still fails to adequately plead that any

16  defendant made a false or misleading statement, in that plaintiffs fail to provide a consistent

17  definition of, or particularized facts showing, what "specifications" the equipment allegedly did not

18  meet; that the SAC does not plead falsity, as none of the challenged statements created the

19  impression that all equipment had met performance goals; that the SAC does not raise a strong

20  inference that any defendant acted with fraudulent intent; and that plaintiffs fail to plead loss

21  causation for the January 3 and October 3, 2023 stock drops.  Dkt. No. 105 ("Mot.") at 2-3.  Plaintiffs

22  oppose, and defendants have filed a reply brief.  Dkt. Nos. 109 ("Opp'n"), 111 ("Reply").  The Court

23  has also reviewed the statement of recent decision defendants filed on July 17, 2024.  Dkt. No. 115.

24  This matter is now ripe for review.

## LEGAL STANDARDS

**I.      Motion to Dismiss**

28        To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), "a

7

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in the complaint, and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009). However, a district court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

As a general rule, the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6) motion. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, the Private Securities Litigation Reform Act ("PSLRA") permits courts considering a motion to dismiss governed by the PSLRA to consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

Securities fraud class actions must also "meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the . . . [PSLRA]." *See id.* at 313-14. Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA further requires that allegations based on false or misleading statements must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for "each act or omission." *Id.* § 78u-4(b)(2)(A).

If the Court dismisses a complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## II.       Exchange Act Claims

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

To establish falsity under the first element, the misrepresentation or omission must either "directly contradict what the defendant knew at that time" (i.e., be false) or "omit[ ] material information" (i.e., be misleading). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018*)*. Not all omissions are actionable. *Id.* at 1009. "Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b–5(b)). For a statement or omission to be misleading, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp*., 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). "To fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted).

The "required state of mind" for scienter covers "'intent to deceive, manipulate, or defraud,' [and] also 'deliberate recklessness.'" *Schueneman v. Arena Pharms.*, 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted). To determine whether scienter has been adequately pled, the Court must determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 310. Plaintiffs who "seek to hold individuals and a company liable on a securities fraud theory" must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 607 (9th Cir. 2014).

The Supreme Court's decisions in *Tellabs*, 551 U.S. at 315-18, and *Matrixx Initiatives*, 563 U.S. at 37-49, dictate that courts not co-mingle the inquiries of falsity and scienter. *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.* ("*Glazer II*"), 63 F.4th 747, 766 (9th Cir. 2023). "[T]his means that we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.' Falsity is subject to a particularity requirement and the *reasonable inference* standard of plausibility set out in *Twombly* and *Iqbal*, and scienter is subject to a particularity requirement and a *strong inference* standard of plausibility." *Id.*

## DISCUSSION

### I.      Section 10(b)

#### A.      False or Misleading Statements

The SAC alleges that between February 22, 2021, and November 7, 2022, defendants made twelve false or misleading statements regarding the testing and qualification of its manufacturing equipment. Some of these statements are ones plaintiffs challenged with the prior complaint, while some are newly highlighted statements.

##### 1.      Failure of the FAT

Previously, the Court found that plaintiffs had failed to identify any actionable misstatement supported by particularized allegations as required by the PSLRA. The prior complaint rested on the assertion that Enovix waived the FAT and SAT altogether and conducted no testing of the equipment at all. *See* Prior Order at 15 (citing CC ¶¶ 101, 115, 117).

In the current iteration, plaintiffs modify their theory, no longer asserting that testing was waived altogether but instead asserting that extensive testing took place—in China and in Fremont—over a period of many months, but that the equipment never passed the tests either at the FAT stage or at the SAT stage. This is a very different set of allegations, which plaintiffs now support with particularized facts.

For instance, the SAC now includes information from Former Employee 2 ("FE2"), a Project Manager for Enovix from September 2020 to early 2024, who worked for Enovix in China

"overseeing the process through which Enovix outsourced the manufacturing of Fab-1 equipment to Yinghe" and who "oversaw the entire process from producing the equipment to conducting the FAT." SAC ¶ 51. FE2 reports that the first FAT took place around November and/or December 2020, with 3 or 4 iterations of testing spaced half a month to a month apart. *Id.* ¶ 100. FE2 describes that "the FAT tests were based on a checklist provided by Enovix, with specifications including output requirements within a specified time, Overall Equipment Effectiveness ('OEE'), and the frequency of the system crashing or similar stoppages." *Id.* ¶ 101. According to FE2, the equipment did not pass the FAT, with the production yield never getting close to meeting Enovix's capacity specifications. *Id.* ¶ 100. The Yinghe equipment failed to complete all checklist items for the FAT. *Id.* ¶ 104. FE2 explained that "Yinghe continued working on the equipment and kept testing for months but the equipment never passed the FAT requirements." *Id.* The repeated testing extended through the final FAT, which the equipment again failed, in April 2021. *Id.*

At that point, according to the SAC, "Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment pass the FAT and had it airlifted to Fremont." *Id.* ¶ 105. The equipment arrived in San Francisco in late April 2021. *Id.* ¶ 106. Rodgers later stated that the decision to airlift the equipment from China at that time involved "waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment." *Id.* ¶ 107.

The Court previously found that Rodgers's statement did not amount to an admission that the FAT had been waived altogether but that Rodgers admitted only to "failing to send Enovix engineers to the vendor in China and not bringing the vendor's engineers to California in the midst of a global pandemic." Prior Order at 17. Nevertheless, under the new allegations of the SAC, the Court finds plaintiffs have now alleged with particularity that Enovix brought the Fab-1 equipment to California without it ever having passed the FAT. Because the FAT by definition is to be conducted *at the vendor's factory*, SAC ¶ 86, by the time the equipment arrived in California in late April 2021, there was no way for the equipment to pass the FAT at that point.

Accordingly, the Court finds that statements made after April 2021 that implied the Fab-1

United States District Court
Northern District of California

equipment had passed the FAT were false or misleading.  These are:

- **Statement 4** (August 10, 2021 "Letter to Our Shareholders"):

  In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …

  With the equipment for Line 1 installed, our factory is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery. …

SAC ¶ 138.[2]  The Court agrees with plaintiffs that, if the equipment never passed the FAT, it was false and misleading for Enovix to state that the site acceptance test would "confirm" the equipment was meeting performance requirements and to state that the FAT was "already performed" without revealing that the equipment had failed the FAT.

- **Statement 6** (Defendant Rust, on August 10, 2021 earnings call):

  We have a pretty rigorous set of both factory and site acceptance things we have to go through and I would say there's no red flags there.

*Id.* ¶ 142.  The Court agrees with plaintiffs that, if the equipment never passed the FAT, it was false and misleading for Rust to state that there were "no red flags."

- **Statement 7** (Defendant Rust, on September 9, 2021, at the Cowen 14th Annual Global Transportation & Sustainable Mobility Conference):

  We're in the middle of qualifying, which means basically testing out of each piece of equipment, making sure it's operating as optimum operating point, making sure we understand where the process windows are. That's going on quite well.

*Id.* ¶ 144.  The Court agrees with plaintiffs that, if the equipment failed multiple rounds of the FAT through April 2021 and ultimately never passed the FAT, it was false and misleading for Rust to state in September that the testing out of each piece of equipment was "going on quite well."

In sum, the SAC sufficiently alleges false or misleading statements as to Statements 4, 6, and 7.

---

[2] Throughout the SAC and this Order, the underlined statements are those that plaintiffs allege were false or misleading.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.  Omissions Theory

Plaintiffs also identify a number of statements that they do not allege were false but that they say wrongly omitted mention of the testing failures.  These include the following:

- **Statement 5** (Defendant Rust, on August 10, 2021 earnings call):

  …[l]ast quarter, we were able to navigate the global supply chain constraints and receive all key equipment for our first production line. This required heroic efforts, including a critical decision to charter Antonov An-124, one of the world's largest cargo planes, to fly over 60 tons of manufacturing equipment from Asia to San Francisco.

SAC ¶ 140.

- **Statement 8** (March 3, 2022 Q4 "Letter to Our Shareholders"):

  We have commenced deliveries from Fab-1 to our lead customers. Getting to this point was not easy. We have overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia.

*Id.* ¶ 146.

- **Statement 11** (March 25, 2022 Form 10-K):

  Challenges associated with building out Fab-1 include extended shipping times, supply chain constraints and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions imposed on certain countries in Asia.

*Id.* ¶ 153.

As the Court previously explained, however, not every reference to the installation of equipment, supply chain constraints, and vendor support is actionable solely because it did not include the additional details regarding waiver (or, as now alleged, failure) of the FAT.  For reasons explained in the Prior Order, the Court finds that statements that "neither stated nor implied anything" regarding the performance of the Fab-1 equipment or success of the FAT fail to state an omissions theory under the PSLRA.  *See* Prior Order at 19-20.

To the extent the challenged statements in the SAC rely on allegations that the equipment never passed the SAT, the Court finds these allegations continue to suffer from the same timing problems that stymied the prior complaint.  In contrast to the amended allegations regarding the FAT, which now clearly state that the equipment never passed the FAT as of late April 2021, the SAC is silent as to when the SAT should have been completed and when Enovix knew that the

equipment did not and would never pass the SAT.  The complaint alleges that Enovix engineers installed the equipment in Fremont themselves but struggled and failed for months to get the equipment operating at full capacity.  SAC ¶¶ 12-13.  Engineers from Yinghe then traveled to Fremont sometime around the fall of 2021 and stayed for almost a year, until September 2022.  *Id.* ¶ 112.  At the very least, these allegations show that as of September 2022 Envoix and Yinghe were still trying to work on meeting SAT requirements.  This would not make the above statements (Statements 5, 8, and 11) from August 2021 and March 2022 false or misleading at the time they were made, to the extent plaintiffs argue those statements are misleading due to failure of the SAT.

### 3.    February 2021 Investor Presentation

To the extent that plaintiffs point to a statement contained in Enovix's February 2021 investor presentation, this statement is not actionable.  On February 22, 2021, Enovix released an investor presentation in connection with the announcement of its plans to go public via a merger with RSVAC.  SAC ¶ 126.  RSVAC filed the presentation as Exhibit 99.2 to a Current Report filed with the SEC on Form 8-K that same day.  *Id.*  The presentation contained a statement that, at the FAT stage, "Equipment must perform to specification at the vendor's factory before shipment to Enovix and must pass another test after installation at the Enovix site."  *Id.* ¶ 129 ("Statement 1a").  Although this statement issued before the start of the class period, plaintiffs argue that the February 2021 presentation was incorporated by reference into the June 24, 2021 Proxy Statement.  Plaintiffs argue the earlier statement is therefore actionable because as of June 2021 the company knew that the equipment had failed the FAT.  *See id.* ¶¶ 125-126; Opp'n at 11-12.

Defendants attach to their motion copies of the June 2021 Proxy Statement and copies of the February 2021 investor presentation.  Dkt. No. 105, Simmons Decl., Ex. 1 & 2.  Plaintiffs do not challenge the authenticity of these documents and do not object to the Court's considering them at this stage, subject to a few caveats.  Dkt. No. 110 at 5.[3]  The Court finds it is proper to consider the

---

[3] To accommodate plaintiffs' objections, the Court has referred to the Proxy Statement linked to in plaintiffs' papers, Dkt. No. 110 at 5 n.3, rather than to the "truncated" version defendants submitted.  The Court has disregarded any highlighting of the documents that defendants added.

United States District Court
Northern District of California

June 2021 Proxy Statement and February 2021 investor presentation, both of which plaintiffs reference extensively throughout the SAC.  *See Khoja*, 899 F.3d at 998, 1002 (citations omitted).

Under the facts presented here, the Court finds no misstatement actionable under the PSLRA. The challenged statement is contained in a small footnote at slide 41 of a presentation containing more than 60 slides.  *See* Dkt. No. 105-2.  The Proxy Statement does not reference the footnote or incorporate the presentation specifically.  Rather, the Proxy Statement generally instructs readers that they can find more information by reading RSVAC's SEC filings on the SEC website.[4]  The Court agrees with defendants that this simply is not enough for liability to attach to a statement contained in a footnote of a presentation given four months before the start of the class period, even if that presentation was filed with the SEC.  *See Kampe v. Volta Inc.*, No. 22-cv-2055-JST, 2024 WL 308262, at *27 (N.D. Cal. Jan. 26, 2024) (finding that a pre-merger investor presentation was not "impliedly" incorporated by reference into a Registration Statement, even where the Registration Statement mentioned the presentation several times).

The Court therefore finds Statement 1a contained in the February 2021 presentation not actionable.  Statement 1b, which plaintiffs allege "was misleading when read in conjunction with, or in the context of, Statement 1a," *see* SAC ¶ 132, is likewise not actionable.[5]

### 4.    Risk Disclosures

Plaintiffs challenge the risk disclosures contained in the June 24, 2021 Proxy Statement and in the March 25, 2022 Form 10-K.  SAC ¶¶ 135, 151 (Statements 3 and 10).  These disclosures stated:

> ***Enovix relies on a new and complex manufacturing process for its operations: achieving production involves a significant degree of***

---

[4] The Proxy Statement contains a section titled, "WHERE YOU CAN FIND MORE INFORMATION" and which states, in part: "We file reports, proxy statements and other information with the SEC as required by the Exchange Act.  You can read RSVAC's SEC filings, including this proxy statement prospectus, over the Internet at the SEC's website at http://www.sec.gov."  *See* Proxy Statement at 257, https://www.sec.gov/Archives/edgar/data/-1828318/000110465921085122/tm217682-15_424b3.htm#tWYCFec.gov [https://perma.cc/KYJ3-HUVH].

[5] Statement 1b comes from the June 24, 2021 Proxy Statement: "[a]ll critical equipment for fabrication has arrived and is currently assembled."  SAC ¶ 131.

United States District Court
Northern District of California

*risk and uncertainty in terms of operational performance and costs.*

> Although Enovix has developed its Li-ion battery technology, Enovix relies heavily on a new and complex manufacturing process for the production of its lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes. This will require Enovix to bring up a first-of-its-kind automated production line to produce its batteries. <u>It may take longer than expected to install, qualify and release this line and require modifications to the equipment to achieve its goals for through put and yield.</u> The work required to develop this process and integrate equipment into the production of Enovix's lithium-ion battery cells is time intensive and requires Enovix to work closely with developers and equipment providers to ensure that it works properly for Enovix's unique battery technology. <u>This integration work will involve a significant degree of uncertainty and risk and may result in the delay in the scaling up of production or result in additional cost to Enovix's battery cells.</u>

*Id.* ¶ 135; *see also id.* ¶ 151 (same).  Plaintiffs allege the risk disclosures were misleading because they did not disclose that the equipment "never performed close to the required capacity or quality specifications" and that the risk warned of was not merely hypothetical but had already begun to materialize when the statements were made.  *Id.* ¶¶ 136, 152.

The Court finds claims based on these risk disclosures not actionable, largely for the same reasons stated in the Prior Order.  *See* Prior Order at 21-22.  The SAC does not cure the timing problems previously identified, in that the SAC lacks particulars to show that "the risks warned of were beginning to materialize as of March 25, 2022, the latest date of the various challenged statements."  *See id.* at 22.  If qualification and testing of the equipment was still ongoing until September 2022, as the SAC alleges, *see* SAC ¶ 112, then without further facts plaintiffs have not shown that risk disclosures in June 2021 and March 2022 were false when made or that the risks warned of had begun to materialize at that point.  The Court dismisses claims based on Statements 3 and 10.

### 5.    Forward-Looking Statements

Plaintiffs challenge several projections regarding Enovix's expected production and revenue.  These are:

- **Statement 2** (June 24, 2021 Proxy Statement):

    Enovix expects Fab-1 to be fully operational by the end of 2021 and

United States District Court
Northern District of California

to begin production by Q1 2022, with first production revenue in Q2 2022.

SAC ¶ 133.

- **Statement 9** (March 3, 2022 "Letter to Our Shareholders"):

  We made significant progress in 2021 by equipping our first factory, allowing us to start commercial production and remain on track for our first product revenue by Q2 2022.

*Id.* ¶ 148.

- **Statement 12** (Defendant Rodgers, in November 7, 2022 press release):

  We have poorly communicated on the status of Fab-1. I have heard from many investors that the delay and projected underperformance of Fab-1 must be the result of some catastrophic technology problem. <u>For the record: Fab-1 is going to work and ship a lot of batteries to our customers – period.</u> I will personally be in all Fab-1 reviews, because Fab-1 is not only critical to the Company, but also to our customers, some of whom are designing products right now that could not exist without Enovix battery performance.

*Id.* ¶ 169.

Defendant argues that all three of these statements are forward-looking statements protected by the safe harbor provisions of the PSLRA. Mot. at 15-16, 19-21. The Court agrees. Thus, even assuming that plaintiffs have adequately alleged that Statements 2, 9, and 12 were false or misleading when made, the statements are not actionable under the PSLRA.

As the Ninth Circuit has explained, "[e]ven when a plaintiff has adequately pleaded all six elements of a Section 10(b) claim, the defendant may be protected under the PSLRA's 'safe harbor' provision for forward-looking statements." *Glazer II*, 63 F.4th at 767. The provision includes "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." *Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(B)). Liability under the federal securities laws will not attach to a forward-looking statement where the statement: "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward looking statement" or "the plaintiff fails to prove that the statement 'was made with actual knowledge that the statement was false or misleading.'" *Id.* (quoting 15 U.S.C. § 78u-5(c)(1)). "In other words, 'a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that

1   it is false or misleading.'" *Id.* (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th

2   Cir. 2017)).

3          In *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021), the Ninth Circuit affirmed the

4   district court's finding that Tesla's statements that it was "on track" to meet a year-end goal were

5   forward-looking statements protected by the PSLRA's safe harbor.  Tesla's goal of producing 5,000

6   vehicles per week was "unquestionably a 'forward-looking statement[.]'" *Id.* at 1192.  The Ninth

7   Circuit clarified that "'statement[s] of the assumptions underlying or relating' to a declared objective

8   are also deemed to be forward-looking statements." *Id.* (quoting 15 U.S.C. § 78u-5(i)(1)(D)).  The

9   *Wochos* court therefore rejected "Plaintiffs' theory that Tesla's year-end goal rested on scheduling

10  assumptions that Tesla knew it was unlikely to meet[,]" explaining, "Any such schedule about how

11  future production would play out on the way toward the announced goal is simply a set of the

12  'assumptions' about future events on which that goal is based." *Id.*  In contrast, "a concrete factual

13  assertion about a specific present or past circumstance goes *beyond* the assertion of a future goal"

14  and may not be protected by the safe harbor provisions.  *Id.*

15         Here, Statements 2, 9, and 12 are protected by the safe harbor.  None of these statements is

16  "a concrete factual assertion about a specific present or past circumstance." *See id.*  Statement 2

17  asserts the projected future goal (here, beginning production by Q1 2022, with first production

18  revenue in Q2 2022), much like Tesla's goal of producing 5,000 vehicles per week, which the

19  appellate court found was "unquestionably" forward-looking.  *See id.* at 1192; SAC ¶ 133.  The

20  Proxy Statement containing Statement 2 was accompanied by a "Cautionary Note Regarding

21  Forward-Looking Statements."  Proxy Statement at 68-69.  Statement 9 said that Enovix was "on

22  track" to meet the goal, much like the "on track" statements the Ninth Circuit found were essentially

23  extensions of the underlying forward-looking goal.  *See Wochos*, 985 F.3d at 1192; SAC ¶ 148.

24  Moreover, plaintiffs have alleged no facts to show that as of March 3, 2022, when Statement 9

25  issued, any of the individual defendants had "actual knowledge . . . that the statement was false or

26  misleading." *See* 15 U.S.C. § 78u-5(c)(1)(B)(ii).  Rather, according to the SAC, Enovix and Yinghe

27  engineers were still testing out and trying to qualify the equipment in Fremont until at least

28

September 2022.  *See* SAC ¶ 112.[6]

Statement 12 is also forward-looking.  Rodgers's statement in November 2022 that "Fab-1 is going to work and ship a lot of batteries to our customers – period" does not go "*beyond* the assertion of a future goal."  *See Wochos*, 985 F.3d at 1192; SAC ¶ 169.  Moreover, the SAC contains no allegations to show that Rodgers made the statement "with actual knowledge that the statement was false or misleading."  *See* 15 U.S.C. § 78u-5(c)(1)(B)(i).  Rather, the SAC alleges that in August 2022 defendants announced plans to make "improvements" to Fab-1, but that they still expected Fab-1 would be "the workhorse of our output next year[.]"  SAC ¶ 158.  On November 1, 2022, a letter to shareholders "cryptically disclosed that the 'improvements' that Enovix had partially shut down Fab-1 to implement had been 'slower-than-expected[.]'"  *Id.* ¶¶ 160-161. And nearly a year after Statement 12 issued, Enovix announced it was abandoning commercial production operations at Fab-1 altogether.  *See id.* ¶ 189.  None of this shows Rodgers's knowledge on November 7, 2022 that Fab-1 would not in fact "work and ship a lot of batteries to our customers[.]"  *See id.* ¶ 169.

In sum, the Court finds Statements 2, 9, and 12 not actionable under the PSLRA's safe harbor for forward-looking statements.

### B.    Scienter

Defendants also move to dismiss the SAC for lack of scienter.  "'Scienter' as used in the federal securities laws means the intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors. . . .   Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud."  *Glazer II*, 63 F.4th at 765 (citations and internal quotation marks omitted).  Courts in the Ninth Circuit analyze scienter using a "dual inquiry": first, the court "determines whether any one of the plaintiff's allegations is alone sufficient

---

[6] To the extent plaintiffs challenge Statement 9 for its use of the phrase "significant progress in 2021," the Court agrees with defendants that such a characterization is unactionable puffery.  *See City of Royal Oak Retirement Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1063 (N.D. Cal. 2012) ("vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements") (citing *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008)) (internal quotation marks omitted).

United States District Court
Northern District of California

to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, it conducts a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Id.* at 766 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009)).

Because the Court has found only Statements 4, 6, and 7 are potentially actionable, the Court will analyze the allegations of scienter only as related to these statements. To summarize the above, taking the allegations of the SAC as true, each of these statements is false or misleading for misrepresenting or implying that the Fab-1 equipment had passed the FAT when, as of late April 2021, the equipment left the factory in China without ever having passed. In an August 10, 2021 shareholder letter, Enovix stated that the equipment was installed in Fremont and that the SAT would "**confirm** the individual pieces of equipment are meeting performance requirements[,]" following "factory acceptance testing already performed at the vendor's facility . . . ." SAC ¶ 110 (emphasis added). On an earnings call that same day, defendant Rust represented that there were "no red flags" in the "factory and site acceptance things" the equipment had to go through. *Id.* ¶ 142. At a conference on September 9, 2021, defendant Rust stated that the qualifying and testing out of each piece of equipment was "going on quite well." *Id.* ¶ 144.

The Court previously found scienter lacking because plaintiffs' theory in the consolidated complaint depended "entirely on an admission that the complaint does not actually allege defendants made." Prior Order at 23. The consolidated complaint alleged that Enovix waived the FAT and SAT completely, but Rodgers admitted only to waiving the milestones that involved sending Enovix engineers to the vendor's factory in China and having the vendor's engineers travel to Enovix to install the manufacturing equipment. *Id.* Now, plaintiffs allege that Enovix conducted extensive testing at the FAT and SAT stage, but that the equipment was never able to meet the standards for either test.

In light of the amended allegations, the Court finds plaintiffs have sufficiently pleaded scienter regarding the failure of the FAT. The SAC adds a number of allegations, largely supported by FE2, who oversaw the equipment outsourcing in China and who "conducted daily teleconferences with Enovix to provide updates on the assembly and tuning progress of battery

20

packaging and formation production lines at Yinghe's facility[.]" SAC ¶ 51.  FE2 explains what the FAT entailed and describes the equipment's repeated failure to meet specification, from November and/or December 2020 through April 2021.  *Id.* ¶¶ 100-102, 104.  The SAC alleges that, in April 2021, the equipment failed the final FAT.  *Id.* ¶ 104.  The SAC goes on:

> That is when Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment pass the FAT and had it airlifted to Fremont.  In April 2021, Rust called Rodgers and proposed to fly the Yinghe equipment from China to Fremont to avoid a potential three-month delay due to global shipping backlogs, spending $1.4 million to charter the world's largest airplane to do so. Rodgers approved the plan.
> . . .
> In other words, in order to fly the equipment from Yinghe's factory in China to Enovix's Fab-1 facility in Fremont, Rust and Rodgers decided to waive the requirement in Enovix's EPR [Equipment Procurement Review] that the Yinghe equipment—which had repeatedly failed the FAT over the preceding six months—pass the FAT in China before Enovix approved delivery of the equipment.
> . . .
> Even if the EPR hadn't required Enovix's engineers to physically visit the Yinghe factory and personally observe the testing of the Fab-1 equipment, it required that the equipment run "at full speed before [Enovix] approved shipment."  Rust and Rodgers waived that EPR requirement too, as the equipment was never able to operate at full speed per Enovix's specifications, with or without Enovix's team on site in China. The Fab-1 equipment never passed the FAT at all before Enovix took delivery.

*Id.* ¶¶ 105, 108, 110.

The Court finds these allegations are sufficient to give rise to a strong inference of scienter.  At the time that Rust and Rodgers made the call to spend $1.4 million to charter a cargo plane to bring the Fab-1 equipment to Fremont and avoid three months of shipping delays, the equipment had been repeatedly failing to pass quality tests for approximately four or five months.  When read in conjunction with the new allegations provided by FE2, the Court finds the SAC sufficiently alleges that Rust and Rodgers either knew or were deliberately reckless with regard to not knowing that they the equipment had failed the FAT.  Whether or not the Fab-1 equipment was performing to specification at the factory was information of such importance "that it would be absurd to suggest that top management was unaware of [it]."  *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008), 527 F.3d at 989 (citation and internal quotation marks omitted).  Moreover, the allegation that Rust and Rodgers decided to waive passage of the FAT is "at least as compelling as

United States District Court
Northern District of California

1    any opposing inference" that the executives did not know the status of the equipment before deciding

2    to spend $1.4 million to rush shipment of the equipment to Fremont. *See Tellabs*, 551 U.S. at 324.

3        The Court finds the element of scienter adequately alleged, as to Statements 4, 6, and 7.

4

5       **C.**     **Loss Causation**

6        Lastly, defendants argue that "[p]laintiffs fail to plead that the January 2023 or October 2023

7    stock drops 'w[ere] proximately caused by a revelation of fraudulent activity rather than by changing

8    market conditions, changing investor expectations, or other unrelated facts.'" Mot. at 25 (quoting

9    *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 770 (N.D. Cal. 2020)).

10       "[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the

11    deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the

12    plaintiff." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1025 (9th Cir. 2005) (citing *Dura Pharm., Inc. v.*

13    *Broudo*, 544 U.S. 336, 346 (2005)), *abrogated on other grounds by Matrixx Initiatives, Inc. v.*

14    *Siracusano*, 563 U.S. 27 (2011). "A plaintiff is not required to show that a misrepresentation was

15    the *sole* reason for the investment's decline in value in order to establish loss causation. . . . As long

16    as the misrepresentation is one substantial cause of the investment's decline in value, other

17    contributing forces will not bar recovery under the loss causation requirement but will play a role in

18    determining recoverable damages." *Id.* (quoting *Robbins v. Kroger Props., Inc.*, 116 F.3d 1441,

19    1447 n.5 (11th Cir. 1997)) (internal quotation marks and brackets omitted). As the Ninth Circuit

20    has recently reiterated:

21          In the end, "loss causation is simply a variant of proximate cause,
          [and] the ultimate issue is whether the defendant's misstatement, as

22          opposed to some other fact, foreseeably caused the plaintiff's loss."
          . . . "[P]laintiffs need only show a 'causal connection' between the

23          fraud and the loss," and they can do so "even when the alleged fraud
          is not necessarily revealed prior to the economic loss."

24    *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1183 (9th Cir. 2024) (citations omitted).

25       The SAC alleges that the "concealed facts gradually came to light through a series of partial

26    disclosures beginning in late 2022," alleging disclosures caused Enovix's share price to fall on

27

28

                                             22

*United States District Court*
*Northern District of California*

November 1, 2022; January 3, 2023; and October 3, 2023.  SAC ¶¶ 155, 160-190.  Defendants do not challenge the November 1, 2022 disclosure on loss causation grounds.

As to the January 3, 2023 disclosures, defendants confusingly argue that the disclosures were only about Fab-2 and thus could not have "corrected" any previous misstatements about Fab-1.  *See* Mot. at 25 ("Plaintiffs fail to explain how the January 2023 disclosures about Fab-2 'corrected' challenged statements focused solely on Fab-1.").  Not so.  The SAC alleges that on January 3, 2023, defendant Rodgers "directly acknowledged the Company's 'lack of clear and transparent investor communications' concerning Fab-1 'that led some of our investors to say we're outright dishonest with them.'"  SAC ¶ 175.  Rodgers described Fab-1's "Line 1," the first manufacturing line at the Fremont facility, as "nonfunctional for automation point of view.  That means its rated capacity of 550 UPH [units per hour] is really more like 100."  *Id.* ¶ 176.  Rodgers confirmed that "[b]y my math, Fab-1 is doing less than 10% of what it should be doing."  *Id.* ¶ 178.  On October 3, 2023, Enovix announced it was abandoning commercial production at Fab-1 altogether, laying off 185 workers and writing off $36 million of Fab-1 equipment.  *Id.* ¶¶ 189, 191.

Plaintiffs' theory of the case is that Enovix's decision to rush the Yinghe manufacturing equipment to Fremont before it passed the FAT was the first step in a chain of events that led to the equipment's continued failure to perform and the company's ultimate decision in October 2023 to abandon manufacturing efforts at Fab-1.  These allegations are sufficient to plead the element of loss causation as to the January 3 and October 3, 2023 stock drops.  Even if defendants argue there were other reasons for Enovix to decide to "realign" the Fab-1 facility and move high-volume manufacturing to Asia, for purposes of the pleading stage, plaintiffs have sufficiently alleged a "causal connection between the fraud and the loss[.]"  *See In re Genius Brands*, 97 F.4th at 1183.

## II.     Section 20(a)

A claim under Section 20(a), which provides for control person liability, "must demonstrate: (1) a primary violation of federal securities laws and (2) that the defendant exercised actual power or control over the primary violator."  *See Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (internal quotation marks and citation omitted).  A control person claim under Section 20(a)

requires a predicate primary violation.  *Id.*

Where the Court has found that plaintiffs have sufficiently stated a Section 10(b) claim (i.e., with regard to Statements 4, 6, and 7), the Court also finds that plaintiffs have stated a claim under Section 20(a).  For the remainder of the claims, where the Court has found no Section 10(b) violation is sufficiently alleged, the Court likewise finds plaintiffs have failed to state a claim under Section 20(a).

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART and DENIES IN PART the motion to dismiss the SAC.  The Court will not grant plaintiffs further leave to amend at this time.  Plaintiffs' claims shall move forward based on Statements 4, 6, and 7.

The Court sets a case management conference **for August 23, 2024, at 2:30 p.m.** over Zoom videoconference.  A joint case management statement is due by **August 16, 2024.**

**IT IS SO ORDERED**.

Dated:  July 23, 2024

_____
SUSAN ILLSTON
United States District Judge