COOLEY LLP
SHANNON M. EAGAN (212830)
(seagan@cooley.com)
BRETT H. DE JARNETTE (292919)
(bdejarnette@cooley.com)
AMIE L. SIMMONS (336356)
(asimmons@cooley.com)
3175 Hanover Street
Palo Alto, California 94304-1130
Telephone:     +1 650 843 5000
Facsimile:     +1 650 849 7400

SARAH M. LIGHTDALE (*pro hac vice*)
(slightdale@cooley.com)
55 Hudson Yards
New York, New York 10001
Telephone:     +1 212 479 6000
Facsimile:     +1 212 479 6275

Attorneys for Defendants
*Enovix Corporation, Harrold Rust, Steffen Pietzke,*
*Thurman J. Rodgers, Emmanuel T. Hernandez, John*
*D. McCranie, Betsy Atkins, and Gregory Reichow*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Civil Action No. 23-cv-00071-SI<br><br>CLASS ACTION<br><br>**DEFENDANTS' ANSWER TO PLAINTIFFS' SECOND AMENDED COMPLAINT** |

Defendants Enovix Corporation ("Enovix") and Individual Defendants Harrold Rust ("Rust"), Steffen Pietzke ("Pietzke"), Thurman J. Rodgers ("Rodgers"), Emmanuel T. Hernandez ("Hernandez"), John D. McCranie ("McCranie"), Besty Atkins ("Atkins"), and Gregory Reichow ("Reichow") (the "Individual Defendants," and collectively with Enovix, "Defendants"), by and through their counsel, hereby answer Plaintiffs' Second Amended Class Action Complaint (the "Complaint"). To the extent that the paragraphs in the Complaint are grouped under headings and subheadings (which are also listed in the Complaint's Table of Contents), Defendants respond generally that the headings and subheadings do not constitute factual averments and thus no response is required. To the extent that a response is deemed necessary, Defendants deny any and all allegations in each and every heading and subheading in the Complaint.

Except as explicitly admitted herein, Defendants deny each and every allegation in the Complaint, including, without limitation, any and all allegations in the unnumbered paragraphs on page 2 of the Complaint, headings, subheadings, footnotes, the prayer for relief, and the jury trial demand.

The Court's Order dated July 23, 2024 (the "Order") granted in part and denied in part Defendants' motion to dismiss the Complaint. Specifically, the Order dismissed nine challenged statements between February 22, 2021 and November 7, 2022. As a result, many allegations in the Complaint relate to claims that the Court dismissed. (Dkt. 116.) In addition, the Court's Stipulated Order dismissed four Defendants from the case: Lisan Hung, Steven J. Gomo, Joseph I. Malchow, and Pegah Ebrahimi ("Stipulated Order"). (Dkt. 120.) As a result, some allegations in the Complaint also relate to defendants who the Court dismissed. Defendants are not obligated to answer those allegations. *See, e.g., American Fam. Ins. Co. v. Almassud*, 522 F.Supp.3d 1263, 1278 (N.D. Ga. 2021); *Peper v. Dep't of Agric.*, 2008 WL 1744578, at *2 (D. Colo. Apr. 11, 2008); *see also Davanzia, S.L. v. Laserscope, Inc.*, 2007 WL 3460721, at *2 (N.D. Cal. Nov. 14, 2007) (noting that defendant was "not required to respond to dismissed claims and allegations").

Defendants further answer the numbered paragraphs of the Complaint in line as follows.

## **NATURE OF THE ACTION**

1.    Plaintiffs bring this action as a federal securities class action pursuant to Federal

COOLEY LLP
ATTORNEYS AT LAW

1

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

Rule of Civil Procedure 23(a) and (b)(3), on behalf of a Class defined as all persons and entities that purchased the publicly traded common stock of Enovix or RSVAC between June 24, 2021 and October 2, 2023, both dates inclusive ("Class Period").[1] Plaintiffs bring claims individually and on behalf of the Class pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

**Response:** To the extent a response is required, Defendants admit that Plaintiffs purport to bring this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) for that alleged class period, but that portions of that alleged class period from June 24, 2021 to August 10, 2021 were dismissed from the case pursuant to the Order, and therefore, no response is required. Defendants further admit that Plaintiffs purport to bring claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5, but Defendants deny that Plaintiffs have met the requirements necessary to do so. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 1 of the Complaint.

2.    Enovix is an early-stage technology company that purports to make a new type of lithium-ion ("Li-ion") battery that is smaller and stronger than conventional Li-ion batteries. Enovix planned to sell its batteries to other companies that could incorporate the batteries into their consumer electronics and other products. However, simply developing advanced battery technology does not generate revenues on its own. Enovix also had to develop the capabilities to manufacture its new batteries at a large enough scale to satisfy the needs of its customers.

**Response:** In response to Paragraph 2 of the Complaint, Defendants admit that Enovix makes a new type of lithium-ion battery. Defendants further admit that Enovix has plans to sell batteries to other companies. Defendants further admit that Enovix disclosed in its June 24, 2021 proxy statement (the "Proxy Statement") that "Enovix has not commenced commercial manufacturing of its batteries, and thus, no product revenue has been generated to date." Defendants further admit that Enovix disclosed, among other things in its Risk Factors in the Proxy

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a controlling or majority ownership interest at any time.

Statement, and in its Form 10-Q for Q2 2021, that "[a]lthough Enovix has developed its Li-ion battery technology, Enovix relies heavily on a new and complex manufacturing process for the production of its lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes" and "Enovix currently does not have a manufacturing facility to produce its lithium-ion battery cell in sufficient quantities to meet expected demand, and if we cannot successfully locate and bring an additional facility online, our business will be negatively impacted and could fail."  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 2 of the Complaint.

3.    In February 2021, Enovix announced its plans to become a public company. Rather than going public through a traditional (and more strictly regulated) initial public offering ("IPO"), Enovix merged with RSVAC, a public special purpose acquisition company known as a "SPAC" or "blank check" company (the "Merger").

**Response:** In response to Paragraph 3 of the Complaint, Defendants admit that in February 2021, Enovix announced its plan to become a public company through a business combination with Rodgers Silicon Valley Acquisition Corp. ("RSVAC"), a special purpose acquisition company ("SPAC").  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 3 of the Complaint.

4.    When the Merger was announced, Enovix set an "ambitious goal" to both develop its own U.S.-based manufacturing line and to begin delivering products to customers (generating the Company's first product revenues) by the second quarter of 2022. To meet its projected revenues, Enovix estimated it would need to manufacture one battery every two seconds, which would require four manufacturing lines capable of producing 550 units per hour ("UPH").

**Response:** In response to the first sentence of Paragraph 4, Defendants admit that the Complaint quotes and/or purports to summarize or characterize a statement made by Rust on Enovix's Q2 2022 Earnings Call on August 22, 2022; however, the quoted statement has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript.  In response to the second sentence of Paragraph 4, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize a footnote in Enovix's

February 22, 2021 Investor Presentation (the "February 2021 Investor Presentation"); however, the quoted statement has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete presentation filed with the SEC. Defendants admit that Slide 37 of Enovix's February 2021 Investor Presentation states, "Fab-1 Will Make a 3D Battery Every 2.0 Seconds" and footnote 1 on that slide states "4 lines running 900 Wh/l cell batteries @ 80% OEE on 550 uph lines." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 4 of the Complaint.

5.     Enovix started the process of procuring custom manufacturing equipment for its first production factory, "Fab-1," in early 2020. Fab-1 was located in Fremont, California. To procure the Fab-1 equipment, Enovix contracted with vendors who helped design and produce  custom manufacturing equipment. The development and production of a large portion of the Fab-1 equipment was outsourced to Shenzhen Yinghe Technology Co. Ltd. ("Yinghe"), in China.

**Response:** In response to Paragraph 5 of the Complaint, Defendants admit that in 2020, Enovix procured equipment for its first production factory, Fab-1, which is located in Fremont, California.  Defendants further admit that Enovix contracted with vendors for the design and production of custom manufacturing equipment.  Defendants further admit that Enovix contracted with Shenzhen Yinghe Technology Co. Ltd. ("Yinghe"), a vendor located in China, for some of the equipment used in the Fab-1 production line.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 5 of the Complaint.

6.     To govern the procurement of equipment from Yinghe, Enovix had an Equipment Procurement Review ("EPR") in place. An EPR is a document that authorizes funding to purchase equipment from a vendor. The EPR lays out a set of parameters that must be met to complete the purchase agreement, including requirements that the equipment pass critical quality tests before Enovix accepted delivery.

**Response**:  In response to Paragraph 6 of the Complaint, Defendants admit that Enovix had an Equipment Procurement Review (EPR) process to authorize the equipment procurement process from vendors that included certain criteria for equipment testing.  Except as expressly admitted

herein, Defendants deny each and every allegation in Paragraph 6 of the Complaint.

7.    Specifically, the Fab-1 equipment Enovix arranged to purchase from Yinghe had to pass the Factory Acceptance Test ("FAT"). The FAT had specific criteria, based on a checklist provided by Enovix, with certain performance and quality specifications that the equipment had to meet in order to pass the FAT. The primary parameters the equipment had to meet under the FAT were capacity – how many units the equipment could fabricate in a certain time (*i.e.*, UPH) – and quality, including industry standard measures of production efficiency that measure how often good units are produced at the maximum speed without interruption.

**Response:** In response to Paragraph 7 of the Complaint, Defendants admit that the Fab-1 equipment Enovix would purchase from Yinghe would undergo factory acceptance testing. Defendants further admit that factory acceptance testing included specific criteria and a checklist provided by Enovix.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 7 of the Complaint.

8.    Per Enovix's EPR, the FAT also required that Enovix's engineers fly to China to personally observe the equipment running at full speed during the FAT, to confirm that the equipment was operating as intended. Due to Covid-19-related travel restrictions in late 2020 and early 2021, Enovix's engineers were never permitted to travel to China to participate in the FAT.

**Response:** In response to Paragraph 8 of the Complaint, Enovix admits that factory acceptance tests were to be performed by Enovix engineers at the vendor's site, which in the case of Yinghe, was at Yinghe's facilities in China.  Enovix admits that there were COVID-19-related travel restrictions to China in 2020 and 2021.  Enovix denies the allegation that none of its engineers participated in factory acceptance testing.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 8 of the Complaint.

9.    The first FAT for the Yinghe-made Fab-1 equipment took place around November and December 2020, with 3 or 4 iterations of testing spaced half a month to a month apart. The equipment failed the FAT. In fact, the production yield that the equipment was able to muster was very low and never got close to meeting Enovix's capacity specifications.

**Response:** In response to Paragraph 9 of the Complaint, Defendants admit that factory

acceptance testing for the Yinghe equipment began in Q4 2020. Defendants deny that the equipment failed factory acceptance testing. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 9 of the Complaint.

10. After the initial failed FAT, Yinghe continued working on the equipment and kept testing for months, but to no avail. The Fab-1 equipment never passed the FAT requirements. Those continued efforts and repeated testing extended through the final FAT that Yinghe conducted in April 2021, which the equipment failed yet again.

**Response:** In response to Paragraph 10 of the Complaint, Defendants admit that Yinghe worked on the Yinghe equipment for a period of months, during which testing took place. Except as expressly admitted herein, Defendants deny the remaining allegations in Paragraph 10 of the Complaint.

11. That is when Defendants Harrold Rust, Enovix's co-founder and Chief Executive Officer ("CEO"), and Thurman J. Rodgers, RSVAC's CEO and Chairman and post-Merger Enovix's Chairman, secretly decided to waive the requirement that the equipment – which had repeatedly *failed* the FAT over the prior six months – *pass* the FAT *before* Enovix accepted delivery, and had it flown to Fremont anyway. They planned to "catch up later" with continued improvement efforts and testing after installing the equipment in Fremont. They spent $1.4 million to prematurely fly over the equipment so they could tell investors that the Fab-1 equipment had arrived and was installed as the critical Merger was awaiting shareholder approval.

**Response:** Paragraph 11 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants deny that Defendants Rust and Rodgers waived factory acceptance testing for the Yinghe equipment. Defendants further deny that the Yinghe equipment failed factory acceptance testing. Defendants admit that Enovix chartered a cargo plane to fly some of the Yinghe equipment to San Francisco International Airport to avoid delays caused by global supply chain constraints. Defendants further admit that Enovix disclosed in the Proxy Statement that "[t]he spread of COVID-19 has also impacted Enovix's potential customers and suppliers by disrupting the manufacturing, delivery and overall supply chain of battery and device

manufacturers. As a result, the effects of the COVID-19 pandemic could impact the availability of materials and resources necessary to install, bring-up and supply materials to Enovix's first production line." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 11 of the Complaint.

12.    Of course, the problems with the Fab-1 equipment did not magically resolve upon transporting it to California. First, Enovix's own engineers installed the equipment at Fab-1 without the assistance of Yinghe's engineers, violating another requirement of the EPR called the Site Acceptance Test ("SAT"). The SAT required Yinghe's engineers to travel to the United States and help install and test the equipment, to *confirm* that it was still able to meet Enovix's specifications after *passing* the FAT (which the equipment never did), and being disassembled, transported, and reassembled at Enovix's facilities.

**Response:** In response to Paragraph 12 of the Complaint, Defendants admit that Enovix and others installed the Yinghe equipment at Enovix's Fremont location. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 12 of the Complaint.

13.    Enovix's engineers struggled for months to get the Fab-1 equipment operating at full capacity, but their efforts failed. Eventually the Company agreed to pay for Yinghe's engineers to travel to California and help work on and test the equipment. They fared no better. Enovix worked on the equipment for months and months, but it simply never came close to reaching Enovix's capacity and quality specifications.

**Response:** In response to Paragraph 13 of the Complaint, Defendants admit that certain Yinghe engineers traveled to Enovix's Fremont facility. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 13 of the Complaint.

14.    By June 2022, the equipment was producing *less than 10%* of the expected production rate. By December 2022, the Company managed to increase production to about 100 UPH, still a far cry from the 550 UPH that formed the basis for Enovix's revenue projections. As a result, Fab-1 never came remotely close to producing batteries at the rates and volumes necessary to support commercial sales, rendering the Company's projected revenue timeline a mere fantasy.

**Response:** In response to Paragraph 14 of the Complaint, Defendants admit that during the

alleged class period, Fab-1 was producing batteries at a rate of less than 550 UPH. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 14 of the Complaint.

15.    Meanwhile, the Company's investors were kept in the dark. Defendants repeatedly made false and misleading statements that omitted the material facts about the Fab-1 equipment's repeated failures, failed tests, and waived EPR requirements.

**Response:** Defendants deny each and every allegation in Paragraph 15 of the Complaint.

16.    For example, Defendants told investors that the Fab-1 equipment "must perform to specification at the vendor's factory before shipment to Enovix" and touted the arrival and installation of the equipment at Fremont, while omitting that Rust and Rodgers had waived that very requirement and, in fact, the equipment had repeatedly failed to perform to anywhere near specification. Defendant Rust boasted that, with respect to the Fab-1 equipment, "[w]e have a pretty rigorous set of both factory and site acceptance things we have to go through and *I would say there's no red flags there*."

**Response:** The first sentence of Paragraph 16 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that the first sentence of Paragraph 16 quotes and/or purports to summarize and/or characterize portions of a footnote in Enovix's February 2021 Investor Presentation; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete presentation. Defendants further admit that the second sentence of Paragraph 16 quotes and/or purports to summarize or characterize a portion of a statement by Rust on Enovix's Q2 2021 Earnings Call on August 10, 2021; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript. Defendants deny that Rust and Rodgers waived factory acceptance testing. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 16 of the Complaint.

17.    The truth finally began to come to light on November 1, 2022, when Enovix revealed that it had realized just *eight thousand dollars* in revenue in the third quarter of 2022. Moreover,

it revealed that it would be "dialing back" its work on improving the "Gen1" lines at Fab-1 in favor of shifting its focus to its future "Gen2" lines (to be installed at future planned production facilities) because the "improvements" to Fab-1 that they had vaguely alluded to previously were not having the desired results. Consequently, Enovix "anticipate[d] achieving lower overall output from Fab-1 in 2023." In fact, Enovix revealed that it anticipated producing fewer than one million batteries in 2023—only a small fraction of the quantity it would produce if it were in fact manufacturing one battery every two seconds and running multiple lines at 550 UPH, as originally projected,

**Response:** In response to Paragraph 17 of the Complaint, Defendants admit that on November 1, 2022 in a Letter to Our Shareholders filed as an attachment to Form 8-K, Enovix disclosed eight thousand dollars in third quarter total revenue. Defendants further admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's Letter to Our Shareholders filed with the SEC on November 1, 2022; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete letter. Defendants further admit that Enovix disclosed, "We expect Fab‑1 improvement activities to extend into 2023, but at a slower rate given the decision to redirect resources to Gen2. Given this, we expect to exit 2023 at a run rate of under one million battery cells produced." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 17 of the Complaint.

18.    This news shocked the market, as Enovix's share price fell $7.46, a 41% decline.

**Response:** In response to Paragraph 18 of the Complaint, Defendants admit that on November 1, 2022, Enovix's stock price closed at $17.99 per share and on November 2, 2022, it closed at $10.53, a $7.46 decrease or 41% decline. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 18 of the Complaint.

19.    A few days later, Enovix announced that Rodgers would assume the role of Executive Chairman. In a public statement, Rodgers admitted that "[w]e have poorly communicated on the status of Fab-1" and partially revealed that he and Rust had waived the FAT (without disclosing the repeated failed tests before and after the waived FAT). Despite the production delay,

Rodgers misleadingly assured investors that "Fab-1 is going to work and ship a lot of batteries to our customers."

**Response:** In response to Paragraph 19 of the Complaint, Defendants admit that Enovix disclosed in a November 7, 2022 press release that Rodgers was appointed Executive Chairman. Defendants further admit that the Complaint quotes and/or purports to summarize or characterize portions of Enovix's press release issued on November 7, 2022; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete press release. The last sentence of Paragraph 19 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 17-19. Except as expressly admitted herein, and to the extent a response is required, Defendants deny each and every allegation in Paragraph 19 of the Complaint.

20. On January 3, 2023, Rodgers gave a special presentation for investors. During the presentation, Rodgers directly addressed the Company's "lack of clear and transparent investor communications" concerning Fab-1, "that led some of our investors to say we're outright dishonest with them." Rodgers conceded that "*I think they were reasonably misled.*"

**Response:** In response to Paragraph 20 of the Complaint, Defendants admit that Rodgers gave a Special Presentation to investors on January 3, 2023. Defendants further admit that the Complaint quotes and/or purports to summarize or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 20 of the Complaint.

21. Rodgers also revealed that the first production line at Fab-1 "is nonfunctional for automation point of view. That means its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." Rodgers explained that Fab-1 was only able to produce one battery every 72 seconds, and that "we don't think that machine if we worked on it forever would be over 200." Due to the problems with the manufacturing equipment at Enovix's Fab-1 facility, Rodgers conceded that Fab-1 was "doing less than 10% of what it should be doing."

**Response:** In response to Paragraph 21, Defendants admit that the Complaint quotes and/or purports to summarize or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 21 of the Complaint.

22.     On this news, Enovix's share price dropped another 41%, falling $4.97 per share.

**Response:** In response to Paragraph 22, Defendants admit that on January 3, 2023, Enovix's stock price closed at $12.12 per share and on January 4, 2023, it closed at $7.15, a $4.97 or 41% decrease. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 22 of the Complaint.

23.     Finally, on October 3, 2023, Enovix announced that it was abandoning commercial production operations at Fab-1 altogether, laying off 185 workers and writing off $36 million of Fab-1 manufacturing equipment. Not only were the "improvements" to the Fab-1 equipment moving slower than expected, and the equipment running at a fraction of its intended capacity, but after years of failed testing and attempted improvements, the Company was finally forced to admit it had completely failed to achieve the long-touted commercial capabilities of its production lines at Fab-1.

**Response:** In response to Paragraph 23 of the Complaint, Defendants admit that on October 3, 2023, Enovix announced in a press release that it "initiated a strategic realignment of Fab1 in Fremont designed to refocus the facility from a manufacturing hub to its 'Center for Innovation,' focused on new product development" which would support "the Company's strategy to locate high-volume manufacturing in Asia near customers and suppliers while locating technology development in both Silicon Valley and Asia." Defendants further admit that the press release announced that this shift in Fab 1's focus would "result in a reduction of the workforce in Fremont that had been dedicated to supporting 24/7 manufacturing by approximately 185 personnel, including over 125 contractors." Defendants further admit that the press release also announced that Enovix would "recognize accelerated depreciation expenses of approximately $36 million for Gen1 equipment between the fourth quarter of 2023 and the first quarter of 2024." Except as

expressly admitted herein, Defendants deny each and every allegation in Paragraph 23 of the Complaint.

24.    On this news, Enovix's share price fell 13%, or $1.51 per share.

**Response:** In response to Paragraph 24, Defendants admit that on October 2, 2023, Enovix's stock price closed at $11.86 per share and on October 3, 2023, it closed at $10.30, a 13% or $1.51 per share decrease.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 24 of the Complaint.

25.    As a result of Defendants' violations of the securities laws, Plaintiffs and the Class suffered significant damages, losing a significant portion of the value of their investments.

**Response:** Defendants deny each and every allegation in Paragraph 25 of the Complaint.

## JURISDICTION AND VENUE

26.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**Response:** In response to Paragraph 26 of the Complaint, Defendants admit that Plaintiffs purport to bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, but Defendants deny that Plaintiffs have met the requirements necessary to do so.

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**Response:** In response to Paragraph 27 of the Complaint, Defendants admit that 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, provide for jurisdiction over this action.

28.    This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

**Response:** Paragraph 28 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants are not challenging personal jurisdiction.

29.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section

COOLEY LLP
ATTORNEYS AT LAW

27 of the Exchange Act (15 U.S.C. § 78aa(c)) because the alleged false and misleading public filings and statements were made in or issued from this District and the Company's headquarters are located in this District.

**Response:** Paragraph 29 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants are not challenging venue.

30.    In connection with the acts, transactions, and conduct alleged in this complaint, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, the Internet, and the facilities of a national securities exchange.

**Response:** Paragraph 30 of the Complaint contains Plaintiffs' legal argument and does not require a response; to the extent a response is required, Defendants deny each and every allegation therein.

## PARTIES

31.    Lead Plaintiff Gary Kung ("Kung"), as set forth in his certification on file with the Court (Dkt. No. 17-3) and incorporated by reference herein, purchased Enovix common stock at artificially inflated prices during the Class Period and was damaged thereby.

**Response:** In response to Paragraph 31 of the Complaint, Defendants admit that the Court appointed Gary Kung as a Lead Plaintiff in this action and that Kung's certification filed with the Court on March 7, 2023 purports to list transactions in Enovix securities between November 3, 2021 and November 11, 2022.  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 31 of the Complaint.

32.    Lead Plaintiff Discovery Global Opportunity Master Fund Ltd. ("Discovery Global"), as set forth in its certification on file with the Court (Dkt. No. 7-2) and incorporated by reference herein, purchased Enovix common stock at artificially inflated prices during the Class Period and was damaged thereby.

**Response:** In response to Paragraph 32 of the Complaint, Defendants admit that the Court appointed Discovery Global Opportunity Master Fund Ltd. ("Discovery Global") as a Lead Plaintiff in this action and that Discovery Global's certification filed with the Court on March 7,

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

2023 purports to list transactions in Enovix securities between May 19, 2022 and December 14, 2022.  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 32 of the Complaint.

33.     Lead Plaintiff Discovery Nymeria Master Fund, Ltd. ("Discovery Nymeria"), as set forth in its certification on file with the Court (Dkt. No. 7-2) and incorporated by reference herein, purchased Enovix common stock at artificially inflated prices during the Class Period and was damaged thereby.

**Response:** In response to Paragraph 33 of the Complaint, Defendants admit that the Court appointed Discovery Nymeria Master Fund, Ltd. ("Discovery Nymeria") as a Lead Plaintiff in this action and that Discovery Nymeria's certification filed with the Court on March 7, 2023 purports to list transactions in Enovix securities between May 19, 2022 and December 14, 2022.  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 33 of the Complaint.

34.     Named Plaintiff Robert G. Lee, as set forth in his certification on file with the Court (Dkt. No. 84-1) and incorporated by reference herein, purchased the Company's common stock at artificially inflated prices during the Class Period and was damaged thereby.

**Response:** In response to Paragraph 34 of the Complaint, Defendants admit that Robert G. Lee ("Lee") filed a certification with the Court on July 7, 2023 that purports to list transactions in Enovix securities between November 29, 2021 and January 11, 2023.  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 34 of the Complaint.

35.     Named Plaintiff Traci Selke, as set forth in her certification on file with the Court (Dkt. No. 84-2) and incorporated by reference herein, purchased the Company's common stock  at artificially inflated prices during the Class Period and was damaged thereby.

**Response:** Defendants admit that Traci Selke ("Selke") filed a certification with the Court on July 7, 2023 that purports to list transactions in Enovix securities on October 15, 2021, November 15, 2021, and December 1, 2021.  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 35 of the Complaint.

36.     Defendant Enovix is a Delaware corporation with principal executive offices

located in Fremont, California. The Company's common stock trades on NASDAQ under the ticker symbol "ENVX."

**Response:** Defendants admit Paragraph 36 of the Complaint.

37.    Defendant Harrold Rust co-founded Enovix in November 2006 and served as the Company's CEO and President from the Company's founding until December 29, 2022. Rust also served as Chairman of Enovix's board of directors prior to the Merger and as a member of Enovix's board of directors following the Merger.

**Response:** Defendants admit Paragraph 37 of the Complaint.

38.    Defendant Steffen Pietzke has served as Enovix's Chief Financial Officer ("CFO") since joining the Company in April 2021.

**Response:** Defendants admit Paragraph 38 of the Complaint.

39.    Defendant Thurman J. Rodgers has served on Enovix's board of directors since 2012. He also served as the CEO and Chairman of the Board of RSVAC from its creation in September 2020 through the Merger. Rodgers was named as the incoming Chairman of the Board of Enovix in the Proxy Statement. On November 7, 2022, Rodgers was appointed as Executive Chairman of Enovix. Rodgers held 21.4 million shares of Enovix stock as of November 7, 2022.

**Response:** Defendants admit Paragraph 39 of the Complaint.

40.    Defendant Emmanuel T. Hernandez served as RSVAC's CFO and a member of RSVAC's board of directors at all relevant times prior to the Merger. Hernandez was also named as an incoming director of Enovix, and the chairman of its audit committee, in the Proxy Statement.

**Response:** Defendants admit Paragraph 40 of the Complaint.

41.    Defendant Lisan Hung served as RSVAC's Corporate Secretary and a member of RSVAC's board of directors and its audit committee since December 1, 2020, and at all relevant times prior to the Merger.

**Response:** Paragraph 41 contains allegations regarding a defendant who was dismissed pursuant to the Stipulated Order, to which no response is required. *See supra* at 1, n.1; Stipulated Order.  To the extent a response is required, Defendants admit that Lisan Hung was Corporate

Secretary for RSVAC, and a member of RSVAC's board of directors and its audit committee from December 1, 2020 until the Merger.

42. Defendant Steven J. Gomo served as a member of RSVAC's board of directors and its audit committee chairman since December 1, 2020, and at all relevant times prior to the Merger.

**Response:** Paragraph 42 contains allegations regarding a defendant who was dismissed pursuant to the Stipulated Order, to which no response is required. *See supra* at 1, n.1; Stipulated Order. To the extent a response is required, Defendants admit that Steven G. Gomo was a member of RSVAC's board of directors and its audit committee chairman from December 1, 2020 until the Merger.

43. Defendant John D. McCranie served as a member of RSVAC's board of directors since December 1, 2020, and at all relevant times prior to the Merger. McCranie was also named as an incoming director of Enovix, and a member of its audit committee, in the Proxy Statement.

**Response:** Defendants admit Paragraph 43 of the Complaint.

44. Defendant Joseph I. Malchow served as a member of RSVAC's board of directors and its audit committee since December 1, 2020, and at all relevant times prior to the Merger.

**Response:** Paragraph 44 contains allegations regarding a defendant who was dismissed pursuant to the Stipulated Order, to which no response is required. *See supra* at 1, n.1; Stipulated Order. To the extent a response is required, Defendants admit that Joseph I. Malchow was a member of RSVAC's board of directors and its audit committee from December 1, 2020 until the Merger.

45. Defendant Betsy Atkins served as a member of Enovix's board of directors since January 2021 and was named as an incoming director of Enovix in the Proxy Statement.

**Response:** Defendants admit Paragraph 45 of the Complaint.

46. Defendant Pegah Ebrahimi served as a member of Enovix's board of directors since November 8, 2021.

**Response:** Paragraph 46 contains allegations regarding a defendant who was dismissed pursuant to the Stipulated Order, to which no response is required. *See supra* at 1, n.1; Stipulated

Order. To the extent a response is required, Defendants admit that Pegah Ebrahimi has been a member of Enovix's board of directors since November 8, 2021.

47. Defendant Gregory Reichow served as a member of Enovix's board of directors since November 2020. Reichow was also a member of RSVAC's Technical Advisory Board prior to the Merger. Reichow was named as an incoming director of Enovix in the Proxy Statement.

**Response:** Defendants admit Paragraph 47 of the Complaint.

48. Defendants Rust, Pietzke, Rodgers, Hernandez, Hung, Gomo, McCranie, Malchow, Atkins, Ebrahimi, and Reichow are collectively referred to herein as the "Individual Defendants."

**Response:** Paragraph 48 contains allegations regarding defendants who were dismissed pursuant to the Stipulated Order, to which no response is required. *See supra* at 1, n.1; Stipulated Order. To the extent Paragraph 48 relates to allegations regarding defendants who were not dismissed pursuant to the Stipulated Order, Defendants admit Paragraph 48 of the Complaint.

### CONFIDENTIAL WITNESSES

49. Plaintiffs' investigators spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 49 of the Complaint.

50. Former Employee 1 ("FE1") worked as a Production Manager for Enovix from October 2020 to December 2021. FE1 worked at Enovix's facility in Fremont, California, and reported to Dan Kistner, Enovix's Director of Manufacturing Operations. FE1 was in charge of the pilot line that assembled prototypes of Enovix's Li-ion batteries.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 50 of the Complaint.

51. Former Employee 2 ("FE2") worked as a Project Manager for Enovix from September 2020 to early 2024. FE2 worked for Enovix in China, overseeing the process through which Enovix outsourced the manufacturing of Fab-1 equipment to Yinghe. FE2 oversaw the entire process from producing the equipment to conducting the FAT. FE2 conducted daily teleconferences

with Enovix to provide updates on the assembly and tuning progress of battery packaging and formation production lines at Yinghe's facility, located in the Huizhou, Guangdong province of China. FE2's responsibilities also included summarizing technical issues, facilitating communications between Chinese (Yinghe) and American (Enovix) engineers, and ensuring the timely delivery of machinery.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 51 of the Complaint.

52.     Former Employee 3 ("FE3") worked as a Senior Director of Operations for Enovix from October 2021 to November 2022. FE3 worked at Enovix's facility in Fremont, California, and reported to Boris Bastien, Enovix's Vice President of Operations. According to FE3, FE3 and Bastien were brought in by Enovix specifically to bring the Company's Fab-1 line to the mass production level it was designed for, at a full commercial manufacturing volume.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 52 of the Complaint.

53.     Former Employee 4 ("FE4") worked as a Senior Program Manager – New Product Introduction for Enovix from August 2021 to September 2022. FE4 worked at Enovix's facility in Fremont, California, and reported to Florence Chen, Enovix's Senior Director – New Product Introduction. FE4 served as the liaison between Enovix and prospective customers during the qualification process for battery products. FE4 communicated with prospective customers about their custom battery products and applications.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 53 of the Complaint.

54.     Former Employee 5 ("FE5") worked as a Senior Principal Equipment Engineer for Enovix from September 2020 to March 2021. FE5 previously worked for Enovix as a Principal Equipment Engineer from April 2019 to September 2020. FE5 worked at Enovix's facility in Fremont, California. FE5 was involved as a manufacturing equipment engineer with Enovix's Fab-1 line.

COOLEY LLP
ATTORNEYS AT LAW

18

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 54 of the Complaint.

55.     Former Employee 6 ("FE6") worked as a Controls Engineer for Enovix from June 2022 to December 2022. FE6 worked at Enovix's facility in Fremont, California. FE6 worked on improving output for manufacturing equipment at Enovix's Fab-1 facility. FE6's responsibilities also included supporting process engineers who were working on improving the percentage of batteries made by the Fab-1 equipment that successfully met the Company's design specifications.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 55 of the Complaint.

56.     Former Employee 7 ("FE7") worked as a Manufacturing Manager for Enovix from October 2020 to December 2021. FE7 worked at Enovix's facility in Fremont, California, and reported to Shane Kistner, Enovix's Operations Manager (and the son of Dan Kistner, Enovix's Director of Manufacturing Operations). FE7 was originally hired to work on Fab-1 production lines, and then transitioned to work on improving the "yield" of the Company's pilot line. "Yield" refers to the number of batteries that meet specifications out of the total number of batteries produced. FE7's responsibilities also involved relaying information gleaned from working on the pilot line to other employees working on Fab-1 to support their efforts to increase the yield on Fab-1. FE7 regularly communicated with engineers working to improve the yield of Fab-1 production lines.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 56 of the Complaint.

57.     Former Employee 8 ("FE8") worked as a Senior Director – Equipment Engineering for Enovix from October 2018 to August 2021. FE8 worked at Enovix's facility in Fremont, California, and reported to Neal Sarswat, the Company's Director of Engineering, who reported directly to Rust. FE8's responsibilities at Enovix involved sourcing the manufacturing equipment for, and working on the construction of, the Company's Fab-1 facility in Fremont, and overseeing the remodeling of the Fremont facility in preparation for installing the Fab-1 production line.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 57 of the Complaint.

58. Former Employee 9 ("FE9") worked as a Senior Logistics Manager for Enovix from October 2021 to December 2023. FE9 worked at Enovix's facility in Fremont, California, and reported to Tae Chang, the Company's Senior Director of Procurement. FE9's responsibilities at Enovix included the management of shipping and receiving logistics for the Company's Fremont facility, which included manufacturing equipment.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 58 of the Complaint.

## COMPANY BACKGROUND
### RSVAC and the De-SPAC Merger with Enovix

59. RSVAC was a public special purpose acquisition company, also known as a "SPAC" or "blank check" company. A SPAC is a public shell corporation whose lone stated purpose is to acquire a private company. RSVAC was formed in September 2020, per its initial registration statement, "for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities."

**Response:** In response to Paragraph 59 of the Complaint, Defendants admit that RSVAC was formed as a blank check company for the "purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses or entities," as disclosed in RSVAC's Form S-1 filed with the SEC on November 12, 2020. Defendants further admit that as disclosed in RSVAC's November 2020 S-1, RSVAC was incorporated in Delaware in September 2020. Defendants further admit that Paragraph 59 quotes and/or purports to summarize or characterize portions of RSVAC's Form S-1 filed with the SEC on November 12, 2020; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete SEC filing. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 59 of the Complaint.

60.    RSVAC's initial registration statement stated that "given the experience of our management team, our acquisition and value creation strategy will be to identify, acquire, and build a Silicon Valley-based technology company with applications in the energy or industrial sectors."

**Response:** In response to Paragraph 60 of the Complaint, Defendants admit that the Complaint appears to quote and/or summarize or characterize portions of RSVAC's initial Form S-1 registration statement filed with the SEC on November 12, 2020; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete SEC filing.  Defendants further admit that RSVAC's initial Form S-1 disclosed that "[w]e have not selected any business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. While we will not be limited to a particular industry or geographic region, given the experience of our management team, our acquisition and value creation strategy will be to identify, acquire, and build a Silicon Valley-based technology company with applications in the energy or industrial sectors."  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 60 of the Complaint.

61.    RSVAC completed its IPO of 23 million "Units" at $10.00 each on December 4, 2020. Each Unit consisted of one share of RSVAC common stock and one half of a redeemable warrant. One full warrant entitled the holder to purchase one share of RSVAC's common stock for $11.50. Prior to the Merger, RSVAC's common stock, Units, and warrants traded on NASDAQ under ticker symbols RSVA, RSVAU, and RSVAW, respectively.  RSVAC's IPO generated gross proceeds of $230 million, which was placed into a trust account for the purpose of redeeming shares or, in the event of a successful business combination, contributing capital to the acquired operating company.

**Response:** Defendants admit the first four sentences of Paragraph 61 of the Complaint.  In response to the last sentence of Paragraph 61, Defendants admit that $230 million in proceeds of RSVAC's IPO were placed into a trust account.  Defendants further admit that Paragraph 61 appears to characterize and/or summarize RSVAC's Form 8-K filed with the SEC on December 7, 2020; however, the portions referenced are taken out of context and incomplete, and Defendants

respectfully refer the Court to the complete SEC filing.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 61 of the Complaint.

62.    As RSVAC's Chairman and CEO, Rodgers had a significant financial incentive to find a target company, acquire it, and maintain the company's stock price after the transaction. On September 24, 2020, RSVAC issued 5,750,000 shares of common stock (the "Founder Shares") to an entity controlled by Rodgers (Rodgers Capital LLC), for an aggregate purchase price of $25,000. Rodgers agreed not to sell the shares until the earlier to occur of: (A) one year after the completion of a "Business Combination" (such as the Merger) or (B) subsequent to a Business Combination, if the last reported sale price of the company's common stock equaled or exceeded $14.00 per share for any 20 trading days within any 30-trading day period commencing at least 150 days after the Business Combination. At $14 per share, Rodgers stood to gain $80 million upon selling those shares.

**Response**: Paragraph 62 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 24. To the extent a response is required, Defendants admit that on September 24, 2020, the Company issued an aggregate of 5,750,000 shares of Class B common stock (the "Founder Shares") to the RSVAC Sponsor, Rodgers Capital LLC, for an aggregate purchase price of $25,000 in cash. Defendants further admit that the Proxy Statement disclosed that "The Sponsor has agreed, subject to limited exceptions, not to transfer, assign or sell any of the Founder Shares until the earlier to occur of: (A) one year after the completion of a Business Combination or (B) subsequent to a Business Combination, (x) if the last reported sale price of the Company's common stock equals or exceeds $14.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after a Business Combination, or (y) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property." Defendants further admit that the Proxy Statement disclosed that "The balance of the units in the Sponsor are held by the Rodgers Massey Revocable Living

Trust, of which Mr. Rodgers is trustee, and are convertible into 4,020,000 Founders Shares, which have an aggregate market value of approximately $80,400,000 based on the RSVAC Common Stock Closing Price and 4,200,000 Placement Warrants, which have an aggregate market value of approximately $34,482,000 based on the RSVAC Warrant Closing Price.  These interests may influence RSVAC's directors in making their recommendation that you vote in favor of the approval of the Business Combination."  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 62 of the Complaint.

63.    By December 2020, RSVAC had identified Enovix as one of ten potential acquisition candidates. RSVAC's board concluded that Enovix met most of their criteria and presented the best probability for a business combination. According to the Proxy Statement (defined below), the RSVAC Board conducted numerous due diligence sessions with Enovix senior management and staff members between December 16, 2020 and February 11, 2021, including weekly meetings to report and review progress on due diligence efforts. Per the Proxy Statement, before reaching its decision, "the RSVAC Board of Directors discussed the material results of its due diligence activities with respect to Enovix, which included extensive meetings and calls and detailed review of: … factory configuration, capacity utilization models, throughput of the factory, the level of automation, yields, manpower plans and detailed cost models…."

**Response:** Paragraph 63 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 24. To the extent a response is required, Defendants admit that Paragraph 63 appears to characterize and/or summarize portions of the Proxy Statement; however, the portions it references are taken out of context, are incomplete, and Defendants respectfully refer the Court to the complete SEC filing.

Defendants further admit that the Proxy Statement disclosed the process for selecting Enovix as a target in a section titled "Background of the Business Combination."  Specifically, the Proxy Statement disclosed that in an initial board meeting on December 2, 2020, "the Board narrowed its list of candidates to the top ten potential targets. The top ten list included Enovix, which was proposed by Mr. Rodgers. The Board was aware that Mr. Rodgers was a member of the

board of directors of Enovix and also had investments in Enovix." Defendants further admit that the Proxy Statement disclosed that "on December 16, 2020, RSVAC held a Board meeting to discuss overall progress in assessing potential initial business combination candidates" and that "having further vetted the top nine potential targets, the Board members ranked their top targets, with Enovix being the company with the highest potential based on Enovix meeting most of RSVAC's criteria…" Defendants further admit that the Proxy Statement disclosed that the RSVAC Board disclosed numerous due diligence sessions between RSVAC's board and Enovix management between December 16, 2020 and February 11, 2021. Defendants further admit that the Proxy Statement disclosed that the "RSVAC Board (excluding Mr. Rodgers) discussed the material results of its due diligence activities with respect to Enovix, which included extensive meetings and calls and detailed review of" at least 16 different factors, including "factory configuration, capacity utilization models, throughput of the factory, the level of automation, yields, manpower plans and detailed cost models…." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 63 of the Complaint.

64. On February 22, 2021, RSVAC and Enovix entered into a merger agreement in what is known as a "de-SPAC" transaction. The press release announcing the Merger explained that the de-SPAC was expected to close in the second quarter of 2021.

**Response:** Paragraph 64 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 24. To the extent a response is required, Defendants admit Paragraph 64 of the Complaint.

65. On June 24, 2021, the Company issued a Proxy Statement and Prospectus (a single document bearing both titles) soliciting shareholder approval of the Merger between RSVAC and Enovix, as well as other proposals related to the Merger ("Proxy Statement"). The Company also filed the Proxy Statement with the SEC on Form 424B3 on the same date. The Proxy Statement was incorporated into and formed part of a Registration Statement filed by RSVAC with the SEC on Form S-4. The Registration Statement was filed on March 8, 2021, and declared effective, after a series of amendments, on June 24, 2021. The Registration Statement was signed by Defendants Rodgers, Hernandez, Gomo, McCranie, Hung, and Malchow.

COOLEY LLP
ATTORNEYS AT LAW

24

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

**Response:** Paragraph 65 of the Complaint contains allegations regarding claims and defendants that were dismissed pursuant to the Order and Stipulated Order, to which no response is required. *See supra* at 1, n.1; Order at 24; Stipulated Order. To the extent a response is required, Defendants admit Paragraph 65 of the Complaint.

66. The Proxy Statement stated that "the disinterested members of the board of directors of RSVAC [i.e., excluding Rodgers] have unanimously approved and adopted the Merger Agreement and the transactions contemplated therein and unanimously recommends that RSVAC stockholders vote 'FOR' adoption and approval of the Business Combination Proposal, 'FOR' the Nasdaq Proposal, 'FOR' the Directors Proposal, 'FOR' the Charter Amendment Proposal, 'FOR' the Advisory Proposals and 'FOR' the Incentive Plan Proposals presented to RSVAC stockholders in this proxy statement/prospectus, and 'FOR' the Adjournment Proposal, if presented."

**Response:** Paragraph 66 of the Complaint contains allegations regarding claims and defendants that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 24. To the extent a response is required, Defendants admit Paragraph 66 of the Complaint.

67. After receiving the Proxy Statement, RSVAC's stockholders approved the de-SPAC Merger with Enovix at a special meeting held on July 12, 2021.

**Response:** In response to Paragraph 67 of the Complaint, Defendants admit that the Agreement and Plan of Merger, dated February 22, 2021, by and among RSVAC, Merger Sub and Legacy Enovix (the "Merger Agreement"), was approved at a special meeting of the stockholders of RSVAC held on July 12, 2021, as disclosed in a Form 8-K filed with the SEC on July 14, 2021. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 67 of the Complaint.

68. The Merger was effected by the merger of an RSVAC subsidiary with and into pre-Merger Enovix, with Enovix surviving the combination as a wholly owned subsidiary of RSVAC. Following the consummation of the Merger, RSVAC changed its name to Enovix Corporation and pre-Merger Enovix changed its name to Enovix Operations Inc. Each outstanding share of pre-Merger Enovix common stock was converted into the right to receive a number of shares of the

Company's common stock at a conversion ratio set forth in the merger agreement, and all outstanding warrants and options to purchase pre-Merger (private) Enovix common stock were converted into warrants and options to purchase a number of shares of post-Merger (public) Enovix common stock, as set forth in the merger agreement.

**Response:** Defendants admit the first two sentences of Paragraph 68. Defendants further admit that at the effective time of the Merger, each share of Legacy Enovix Common Stock issued and outstanding immediately prior to the Effective Time (after conversion of the outstanding Legacy Enovix preferred stock, and excluding any dissenting shares), was canceled and converted into the right to receive a number of shares of the Company's common stock, par value $0.0001 per share ("**Common Stock**") equal to (x) (1) $1.05 billion, *divided by* (2) the aggregate fully diluted number of Legacy Enovix securities (the "**Per Share Amount**"), *divided by* (y) $10.00 (such quotient, the "**Exchange Ratio**"). Defendants further admit that as a result of the Merger, each warrant to purchase Legacy Enovix Common Stock that was outstanding immediately prior to the Effective Time, whether vested or unvested, was converted into a warrant to purchase a number of shares of Common Stock (such warrant, an "**Exchanged Warrant**") equal to the product (rounded down to the nearest whole number) of (x) the number of shares of Legacy Enovix Common Stock subject to such Legacy Enovix warrant immediately prior to the Effective Time and (y) the Exchange Ratio, at an exercise price per share (rounded up to the nearest whole cent) equal to (1) the exercise price per share of such Legacy Enovix warrant immediately prior to the Effective Time, divided by (2) the Exchange Ratio. Defendants admit that Paragraph 68 of the Complaint appears to summarize portions of the Merger Agreement and/or Enovix's Form 8-K filed on July 14, 2021; however, the portions it references are taken out of context, are incomplete, and Defendants respectfully refer the Court to the complete Merger Agreement and SEC filing. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 68 of the Complaint.

69.    Prior to, and but for, the consummation of the Merger, RSVAC's shareholders were entitled to redeem their shares for a pro rata portion of the trust account funds, which was approximately $10 per share at the time of the Merger. The Merger closed on July 14, 2021, with the Company's stock trading at slightly over $20 per share.

**Response:** In response to Paragraph 69 of the Complaint, Defendants admit that as disclosed in the Proxy Statement, RSVAC provided its public stockholders "with the opportunity to redeem, upon the Closing, shares of its Common Stock then held by them for cash equal to their pro rata share of the aggregate amount on deposit (as of two business days prior to the Closing) in the trust account (the 'Trust Account') that holds the proceeds (including interest not previously released to RSVAC to pay its taxes) of RSVAC's initial public offering (the 'RSVAC IPO'). For illustrative purposes, based on funds in the Trust Account of approximately $230 million on June 11, 2021, the estimated per share redemption price would have been approximately $10.00. Public stockholders may elect to redeem their shares even if they vote for the Business Combination Proposal." Defendants admit the second sentence of Paragraph 69. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 69 of the Complaint.

70. Concurrent with the Merger agreement, RSVAC also entered into a Private Investment in Public Equity ("PIPE") financing agreement, whereby RSVAC agreed to issue and sell, in a private placement to close immediately prior to the closing of the Merger, 12.5 million shares of RSVAC common stock for $14.00 per share, for a total of $175 million.

**Response:** In response to Paragraph 70 of the Complaint, Defendants admit that, as disclosed in the Proxy Statement, "RSVAC entered into subscription agreements dated as of February 22, 2021, with the PIPE Financing investors, pursuant to which, among other things, RSVAC agreed to issue and sell, in a private placement to close immediately prior to the Closing, an aggregate of 12,500,000 shares of RSVAC common stock for $14.00 per share for a total of $175,000,000." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 70 of the Complaint.

71. Accordingly, between the SPAC holdings (which would be contributed to the post-Merger Company) and PIPE financing, the de-SPAC Merger with RSVAC presented Enovix with an influx of $405 million in cash that it desperately needed to finance Enovix's ongoing operations and the build-out of its manufacturing capabilities.

**Response:** In response to Paragraph 71 of the Complaint, Defendants admit that the transaction between RSVAC and Enovix provided Enovix with approximately $405.2 million of

COOLEY LLP
ATTORNEYS AT LAW

27

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

gross proceeds.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 71 of the Complaint.

72.    As the Proxy Statement explained:

> Enovix has incurred losses since inception and has an accumulated deficit of $223.4 million. These conditions raise substantial doubt about Enovix's ability to continue as a going concern. The ability to continue as a going concern is dependent upon generating profitable operations in the future and/or obtaining the necessary financing to meet Enovix's obligations and repay its liabilities arising from normal business operations when they become due. Enovix believes that the successful completion of the Business Combination will eliminate this doubt and enable Enovix to continue as a going concern.

**Response:** In response to Paragraph 72 of the Complaint, Defendants admit that the Complaint quotes and/or purports to summarize or characterize the Proxy Statement; however, the quoted statement has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete SEC filing.  Defendants further admit that the next sentence of the Proxy Statement states, "[h]owever, there can be no assurance that Enovix will be successful in its plans described elsewhere in this proxy statement/prospectus or in attracting future debt or equity financings or strategic and collaborative ventures with third parties on acceptable terms, or if at all. The consolidated financial statements do not include adjustments that might result from the outcome of this uncertainty."  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 72 of the Complaint.

**Enovix Had to Manufacture Batteries at Commercial Levels to Generate Revenues**

73.    Enovix is an early-stage technology company that develops and manufactures a new type of Li-ion battery that is purportedly smaller and stronger than existing Li-ion batteries. It does so by using silicon anodes and a proprietary 3D stacking architecture that Enovix claims increases energy density and helps the batteries maintain a high cycle life.

**Response:** In response to Paragraph 73 of the Complaint, Defendants admit that Enovix is a technology company that has developed and manufactured a new type of lithium-ion (Li-ion) battery.  Defendants further admit that Enovix's batteries use silicon anodes and a proprietary 3D

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

cell architecture to increase energy density.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 73 of the Complaint.

74.    Enovix claims that its new Li-ion battery lasts longer than conventional Li-ion batteries and is five years ahead of current industry production.[2]  Specifically, by designing a Li-ion battery that deploys a silicon anode, and constructing the battery using 3D battery cell architecture, Enovix claimed to be able to manufacture Li-ion batteries with 27%-110% higher energy density as measured by battery power (in watts) and battery size (in volume). In essence, Enovix claimed it could make a smaller, stronger Li-ion battery.

**Response:** In response to Paragraph 74 of the Complaint, Defendants admit Enovix batteries with silicon anodes and Enovix's 3D battery cell architecture have higher energy density than conventional lithium-ion batteries.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 74 of the Complaint.

75.    Enovix started developing its technology in early 2007 at a small facility in Fremont, California. In 2012, Enovix moved to a larger facility in Fremont and began work on the manufacturing approach and plans for its products. Between 2012 and 2017, Enovix procured and installed pilot production equipment that could produce small quantities of Li-ion batteries to provide to potential customers as samples, but not at commercially viable levels.

**Response:** Defendants admit the first and second sentences of Paragraph 75.  Defendants further admit that between 2007 and 2011, Enovix developed the core processes and architecture of its battery technology.  Defendants further admit that between 2012 and 2017, Enovix procured and installed pilot production equipment.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 75 of the Complaint.

76.    According to the Proxy Statement, at the time of the Merger Enovix was "a development stage company that has no product revenue to date and has incurred a net loss of $39.7 million for the year ended December 31, 2020 and $16.2 million for the period ended March 31,

---

[2] According to the Proxy Statement, based on "a 30-year Li-ion battery industry trajectory of modest (4.36%) annual Li-ion battery energy density improvements… and Enovix's estimated greater energy density of at least 27%, it would require five years for the industry to reach energy densities equivalent to Enovix's current batteries."

2021. As of March 31, 2021, [Enovix] had an accumulated deficit of $223.4 million." Enovix needed outside financing to fund its continued operations, and it needed to build and scale up its manufacturing capabilities in order to generate sustainable revenues from selling its batteries.

**Response:** In response to Paragraph 76 of the Complaint, Defendants admit that at the time of the Merger, Enovix was a development stage company that had no product revenue to date and had incurred a net loss of $39.7 million for the year ended December 31, 2020 and $16.2 million for the period ended March 31, 2021. Defendants further admit that as of March 31, 2021, Enovix had an accumulated deficit of $223.4 million. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 76 of the Complaint.

77.    When the Merger was announced, Enovix set an "ambitious goal" to both develop its own U.S.-based manufacturing line and to begin delivering products to customers (generating the Company's first product revenue) by the second quarter of 2022. In February 2021, Enovix told investors the rate of manufacturing output that would be necessary to meet its projected revenues. Specifically, Enovix estimated it would manufacture one battery every two seconds, which would require four manufacturing lines capable of producing 550 UPH.

**Response:** In response to the first sentence of Paragraph 77, Defendants admit that the Complaint quotes and/or purports to summarize or characterize a statement made by Rust on Enovix's Q2 2022 Earnings Call on August 22, 2022; however, the quoted statement has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript. In response to the second sentence of Paragraph 77, Defendants admit that the Complaint quotes and/or purports to summarize or characterize a footnote in Enovix's February 2021 Investor Presentation. Defendants admit that Slide 37 of Enovix's February 2021 Investor Presentation states, "Fab-1 Will Make a 3D Battery Every 2.0 Seconds" and footnote 1 on that slide states "4 lines running 900 Wh/l cell batteries @ 80% OEE on 550 uph lines." Defendants respectfully refer the court to the complete presentation. Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 77 of the Complaint.

78.    Enovix's CEO, Defendant Rust, stressed the importance of manufacturing when the Company went public. In a July 14, 2021 press release, Rust stated that Enovix was "focused on

producing the first advanced silicon-anode lithium-ion battery for mass market applications from our U.S. manufacturing facility." Defendant Rodgers added: "We believe that Enovix will be the first to deliver at scale due to its proprietary 3D cell architecture, world-class team and automated manufacturing. With five design wins with major technology leaders, Enovix is years ahead of other battery companies. Even better, it has a plan to maintain that lead."

**Response:** In response to Paragraph 78 of the Complaint, Defendants admit that the Complaint quotes and/or purports to summarize or characterize statements made by Rust and Rodgers in Enovix's July 14, 2021 press release; however, the quoted statements have been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete press release.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 78 of the Complaint.

79.    Although Enovix had previously produced and delivered sample batteries using its pilot production line, the pilot line produced only 20 batteries per day—nowhere near the amount needed to support commercial sales operations. Building a commercial-scale production facility was therefore critical to producing batteries at a commercially viable level and meeting revenue projections.

**Response:** In response to Paragraph 79 of the Complaint, Defendants admit that Enovix's pilot line was not intended for commercial-scale production.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 79 of the Complaint.

80.    Enovix planned to sell its new battery to Original Equipment Manufacturers ("OEMs"), who would incorporate the battery into consumer electronics such as smart watches, virtual reality headsets, laptop computers, mobile phones and electric vehicles. To realize these sales and monetize its proprietary technology, Enovix had to be able to reliably manufacture its new batteries at a large enough scale to satisfy the needs of its customers. To borrow the Company's own words, it hoped to "evolve from a company focused predominantly on R&D to a company capable of volume production and commercialization."

**Response:** In response to the first sentence of Paragraph 80, Defendants admit that Enovix planned to sell its batteries to companies that could incorporate the batteries into their consumer

electronics and other products.  In response to the second sentence of Paragraph 80, Defendants admit that Enovix disclosed in its Risk Factors in the Form 10-Q for Q2 2021, that "[w]e currently do not have a manufacturing facility to produce our lithium-ion battery cell in sufficient quantities to meet expected demand, and if we cannot successfully locate and bring an additional facility online, our business will be negatively impacted and could fail."  Defendants further admit that the third sentence of Paragraph 80 Complaint quotes and/or purports to summarize or characterize a statement in Enovix's August 10, 2021 Letter to Our Shareholders; however, the quoted statement has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter.  Except as expressly admitted here, Defendants deny each and every allegation in Paragraph 80 of the Complaint.

81.    In order to sell its new Li-ion batteries, Enovix had to have them "qualified" by the OEMs. Through the qualification process, OEMs would try the newly designed batteries in their own consumer products to ensure that they functioned as intended. If the batteries functioned as represented, OEMs would design their consumer products to incorporate the new Li-ion batteries. However, before designing their consumer products for compatibility with the new batteries, OEMs needed assurance that Enovix could manufacture quality batteries in the quantities needed to satisfy their own production needs. If Enovix could demonstrate its ability to do so, OEMs would place purchase orders commensurate with large-scale consumer product manufacturing.

**Response:** In response to Paragraph 81 of the Complaint, Defendants admit that Enovix and customers participate in a qualification process, which typically involves providing samples to customers.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 81 of the Complaint.

82.    For example, if a manufacturer of smart watches wanted to incorporate Enovix's new batteries into its watches, it might re-design its watches to be compatible with the new battery. Before undertaking that investment it would need assurance that Enovix could reliably manufacture enough batteries in time to meet the watchmaker's own production needs. Thus, if the smart watch manufacturer intended to make one million smart watches with Enovix's new batteries, it would need to know that Enovix could reliably and timely supply one million commercial-grade batteries.

Otherwise, the smart watch manufacturer would not invest in redesigning its watches to work with the new batteries.

**Response:** Defendants deny each and every allegation in Paragraph 82 of the Complaint.

83.    Before an OEM would "qualify" Enovix's new Li-ion battery, Enovix had to provide them with batteries manufactured on the same production line that would be used to fill the order— not the pilot line. Enovix also had to demonstrate that the same manufacturing facility it would use to fill the order was able to produce a sufficient number of batteries to timely fill a customer's purchase order. Thus, Enovix needed to have a functioning manufacturing line meeting mass production specifications before it could begin generating revenue from product sales and meeting its financial projections.

**Response:** Defendants deny each and every allegation in Paragraph 83 of the Complaint.

84.    FE4 confirmed that the qualification process involved a number of steps. One early step was to prove to the customer that the Fab-1 line could manufacture a batch of batteries to meet that customer's unique design specifications. The next step involved ramping up manufacturing to prove that Enovix could produce large quantities of the battery that also met the customer's specifications. For example, in this high-volume qualification step, a customer would ask Enovix to produce 10,000 or 20,000 batteries by a certain date that the customer would then test themselves to ensure the products met the customer's specifications.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 84 of the Complaint.

### The Factory Acceptance Test and Site Acceptance Test Were Critical Steps in Procuring New Manufacturing Equipment

85.    Manufacturing a new product—like a newly designed battery—that has never before been manufactured is a complex process because it requires custom-designed manufacturing equipment. Such custom equipment, designed and produced by engineers at equipment vendors, has countless opportunities for "bugs" and other errors. To reduce those errors, companies purchasing newly designed manufacturing equipment have equipment procurement protocols (i.e., an EPR) that include two key quality control tests: the FAT and SAT. These tests are designed to

COOLEY LLP
ATTORNEYS AT LAW

33

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

ensure that the new manufacturing equipment meets performance requirements, and to mitigate the significant risks that the equipment will not perform as needed.

**Response:** The allegations in Paragraph 85 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 85 of the Complaint.

86.    The FAT is performed offsite at the equipment vendor's factory to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications. To conduct the FAT, the new manufacturing equipment is set up at the vendor's factory and tested in accordance with a detailed plan agreed upon by the purchaser and the equipment vendor.

**Response:** The allegations in Paragraph 86 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 86 of the Complaint.

87.    FE9 confirmed that with a typical FAT, the customers sends its engineers to the vendor's factory to assist with the testing and ensure that the manufacturing equipment meets the agreed-upon specifications for the FAT. This is so the vendor's engineers can share firsthand with the customer's engineers all relevant information about the equipment and how it works. According to FE9, if the equipment fails to meet the FAT specifications set out in the contract, it is not shipped to the customer.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 87 of the Complaint.

88.    The ultimate objective of the FAT is to ensure that the equipment can operate at the speeds and quality necessary to meet the customer's manufacturing needs. In the event that the FAT reveals manufacturing deficiencies, they can be corrected faster and much more easily and cheaply at the vendor's facilities. Once the equipment is shipped out and installed in the buyer's factory, it becomes much more time-consuming, costly, and difficult to fix problems with the equipment. Conducting the FAT greatly reduces the risk that manufacturing equipment will not produce as designed and paves the way for on-site troubleshooting before the equipment is transported and installed at the customer's facility.

COOLEY LLP
ATTORNEYS AT LAW

34

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

**Response:** The allegations in Paragraph 88 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 88 of the Complaint.

89. The first step in conducting the FAT is a written plan detailing all of the customer's specifications and what level of equipment performance is needed to meet the customer's expectations. The parties agree on an inspection plan and a set of procedures. Manufacturing data is recorded by the equipment vendor to verify that it meets the customer's specifications, and the data are shared with the customer for review.

**Response:** The allegations in Paragraph 89 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 89 of the Complaint.

90. FE5 and FE9 confirmed that the specific parameters to be used in the FAT are set at the time the purchase agreement is negotiated between the equipment purchaser and the vendor. According to FE5, the criteria for what will be tested during the FAT and SAT are typically agreed upon about one year prior to when the tests are conducted. While changes can be made to the criteria, that would have to be negotiated between the purchaser and vendor. The FAT is performed once the equipment has been built and assembled by the vendor to show that the machinery is performing to specifications of the purchase contract.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 90 of the Complaint.

91. The SAT is the next critical quality control procedure. It provides an opportunity to confirm that the performance experienced during the FAT can be replicated after the equipment is installed and configured at the customer's site. Typically, the working conditions at the equipment vendor's facility are not the same as the working conditions at the customer's facility. The SAT requires the equipment to run through an actual production at the customer's facility.

**Response:** The allegations in Paragraph 91 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 91 of the Complaint.

92.    To conduct the SAT, the equipment vendor sends representatives—typically the same engineers who designed the system and conducted the FAT—to install the equipment, configure it, conduct tests, and verify that the equipment operates correctly. The SAT ensures that the equipment is installed correctly and is properly integrated with the customer's supporting systems, like computer networks, and makes sure the equipment is still able to perform up to the customer's specifications. If production or quality problems are detected at the SAT, after the equipment passed the FAT, the equipment vendor has the responsibility to resolve it.

**Response:** The allegations in Paragraph 92 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 92 of the Complaint.

93.    FE5 explained that in the manufacturing industry, conducting the FAT and SAT on new equipment is "all risk mitigation." FE5 confirmed that with respect to the FAT, "you want to test [new manufacturing equipment] at the factory because it's cheaper to fix it at the factory than at your site," and for the SAT, testing the equipment to ensure it is working properly upon delivery, "is easier to do before the integrators (suppliers) go home." As FE5 explained, "if you skip the tests (FAT and SAT), you're not mitigating the risks."

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 93 of the Complaint.

94.    The FAT and SAT were of particular importance for Enovix's Fab-1 equipment because Enovix planned to sell its batteries to OEMs. Before an OEM would even enter into a sales contract with Enovix, the Company had to demonstrate through the qualification process that it could manufacture batteries to the OEM's specifications, at a high volume. This high-volume production was required to be done on the actual line that would be used to fill the OEM's order, not a pilot line. And before Enovix's production line could be up and running—especially at the high volume necessary to complete the qualification process— it had to pass the FAT and SAT. Thus, successful completion of the FAT and SAT were key milestone events for Enovix in its path to generating revenue from product sales and meeting its financial projections.

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

**Response:** In response to Paragraph 94 of the Complaint, Defendants admit that factory and site acceptance testing were important for Enovix's Fab-1 equipment.  Defendants further admit that Enovix planned to engage in a qualification process with customers, which involved shipping samples from the Fab-1 production line for qualification.  Defendants admit that factory and site acceptance testing were milestones in Enovix's equipment procurement process for Fab-1.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 94 of the Complaint.

## THE COMPANY'S FAB-1 EQUIPMENT PERSISTENTLY FAILED TO MEET SPECIFICATIONS

95.    Per the Proxy Statement, Enovix started procuring equipment for its first production factory, Fab-1, in 2020. To procure the manufacturing equipment needed to outfit its Fab-1 facility, Enovix contracted with vendors who helped design and produce custom manufacturing equipment.

**Response:** Defendants admit the first sentence of Paragraph 95.  Defendants further admit that Enovix contracted with vendors to procure manufacturing equipment for Fab-1.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 95 of the Complaint.

96.    The Fab-1 production lines comprised of four "areas" where different parts of the battery manufacturing process would take place: Electrode Fabrication, Assembly, Packaging, and Testing and Formation. Each of the areas were critical to complete the manufacturing process, such that all of the production areas must be running at full speed in order for Fab-1 to produce quality batteries at the specified rates.

**Response:** In response to Paragraph 96 of the Complaint, Defendants admit that Fab-1 had the following manufacturing zones: Electrode Fabrication, Assembly, Packaging, and Test and Formation.  Defendants further admit that each zone was important to the manufacturing process.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 96 of the Complaint.

97.    According to both FE9 and FE2, the production of a large portion of the Fab-1 equipment, the critical areas of the production lines used for battery Assembly and Packaging, were

outsourced to Yinghe. Yinghe is located in Huizhou, in the Guangdong province of China.

**Response:** In response to Paragraph 97 of the Complaint, Defendants admit that Yinghe is located in the Guangdong province in China. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 97 of the Complaint.

98.     FE9 reported that Enovix had an EPR in place with Yinghe long before the equipment was delivered from Yinghe to Envoix. Based on FE9's general familiarity with EPRs in the industry, FE9 concluded that FE9's supervisor, Enovix's Senior Director of Procurement Tae Chang, likely drafted the EPR for the Yinghe equipment and that "the entire C-suite" at Enovix would have been involved in approving it.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 98 of the Complaint.

99.     As FE9 explained, an EPR is a document that authorizes funding to purchase equipment from a vendor. The EPR lays out a set of parameters that must be met to complete the purchase agreement, including requirements that the equipment pass the FAT and SAT. If the equipment is unable to pass the FAT, the equipment is not shipped to the customer's site for the SAT, as the purpose of the SAT is primarily to prove that the equipment—having passed the FAT—could continue to perform to specification after being disassembled, shipped to the customer's facility, and reassembled.

**Response:** The allegations contained in Paragraph 99 of the Complaint refer to EPR documents generally and do not specify what EPR is at issue; therefore, Defendants lack sufficient information to admit or deny the allegations in Paragraph 99 of the Complaint.

100.     FE2 reported that Enovix placed an equipment production order with Yinghe at the beginning of 2020. The equipment was originally scheduled to undergo the FAT at the beginning of September 2020. After some delays caused in part by the Covid-19 pandemic, the first FAT took place around November and/or December 2020, with 3 or 4 iterations of testing spaced half a month to a month apart. FE2 explained that the equipment did not pass the FAT, as the production yield that the equipment was able to muster was very low and never got close to meeting Enovix's capacity specifications.

**Response:** In response to Paragraph 100 of the Complaint, Defendants admit that factory acceptance testing for the Yinghe equipment started in Q4 2020. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 100 of the Complaint.

101. According to FE2, the FAT tests were based on a checklist provided by Enovix, with specifications including output requirements within a specified time, Overall Equipment Effectiveness ("OEE"), and the frequency of the system crashing or similar stoppages.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 101 of the Complaint.

102. OEE is an industry standard measurement for production efficiency, identifying the percentage of manufacturing time that is truly productive. OEE is calculated as the product of three measurable factors: Availability, Performance and Quality. An OEE of 100% means that only good parts are produced (100% quality), at the maximum speed (100% performance), and without interruption (100% availability). OEE is universally accepted as a significant key performance indicator (or "KPI") for all manufacturers. Measuring OEE is a manufacturing best practice that provides insight on how to systematically improve the manufacturing process.

**Response:** The allegations contained in Paragraph 102 of the Complaint are not specific to any one company or testing process; therefore, Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 102 of the Complaint.

103. FE9 explained that the primary parameter for the FAT and SAT for the Fab-1 equipment was capacity – how many units the equipment could produce per hour (i.e., UPH).

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 103 of the Complaint.

104. According to FE2, the Yinghe equipment failed to complete all checklist items for the FAT. FE2 also noted that the equipment was designed to manufacture two distinct product specifications, but it failed to effectively meet either specification, individually or simultaneously. As FE2 explained, after the initial failed FAT, Yinghe continued working on the equipment and kept testing for months but the equipment never passed the FAT requirements. Those continued efforts and repeated testing extended through the final FAT that Yinghe conducted in April 2021,

when the equipment failed the FAT yet again.

**Response:** Defendants deny that the manufacturing equipment failed factory acceptance testing. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 104 of the Complaint.

### Rust and Rodgers Secretly Waived the FAT Requirements

105. That is when Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment pass the FAT and had it airlifted to Fremont. In April 2021, Rust called Rodgers and proposed to fly the Yinghe equipment from China to Fremont to avoid a potential three-month delay due to global shipping backlogs, spending $1.4 million to charter the world's largest airplane to do so. Rodgers approved the plan.

**Response:** Paragraph 105 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that Enovix chartered a cargo plane to fly equipment to San Francisco International Airport to avoid delays caused by global supply chain constraints. Defendants further admit that Enovix disclosed in the Proxy Statement that "[t]he spread of COVID-19 has also impacted Enovix's potential customers and suppliers by disrupting the manufacturing, delivery and overall supply chain of battery and device manufacturers. As a result, the effects of the COVID-19 pandemic could impact the availability of materials and resources necessary to install, bring-up and supply materials to Enovix's first production line." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 105 of the Complaint.

106. A September 2021 article published on FreightWaves, a transportation industry publication, described the airlift operation authorized by Defendants Rodgers and Rust: "[a]fter undergoing extensive testing at factories in Asia, the equipment was partially disassembled and carefully packed into 60 shipping crates before being loaded on the An-124, which delivered it to San Francisco International Airport on a Sunday in late April."[3]

---

[3] Kulisch, Eric, "Lithium battery maker airlifts assembly line to leapfrog port congestion," *FreightWaves, available at* https://www.freightwaves.com/news/lithium-battery-maker-airlifts-assembly-line-to-leapfrog-port-congestion.

**Response:** In response to Paragraph 106, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of an article published by FreightWaves on September 28, 2021; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete article. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 106 of the Complaint.

107. As Rodgers later admitted (in November 2022):

> Our decision [to airlift the Fab-1 equipment from China] violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.
>
> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors.

**Response:** In response to Paragraph 107 of the Complaint, Defendants admit that the Complaint quotes and/or purports to summarize or characterize portions of Enovix's press release issued on November 7, 2022; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete press release. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 107 of the Complaint.

108. In other words, in order to fly the equipment from Yinghe's factory in China to Enovix's Fab-1 facility in Fremont, Rust and Rodgers decided to waive the requirement in Enovix's EPR that the Yinghe equipment—which had repeatedly failed the FAT over the preceding six months—pass the FAT in China before Enovix approved delivery of the equipment.

**Response:** Defendants deny each and every allegation in Paragraph 108 of the Complaint.

109. In Rodgers' own words, under Enovix's EPR for the Yinghe equipment, the FAT "required that a team of Enovix engineers fly to multiple Chinese factories [including Yinghe's],

and personally observe each piece of Fab-1 equipment running at full speed." At all relevant times, Enovix's engineers were not permitted to travel to China to personally observe any testing of the Fab- 1 equipment at Yinghe's factory, so Rust and Rodgers knew that the FAT was never even performed in the manner required by Enovix's own EPR.

**Response:** In response to Paragraph 109, Defendants admit that the Complaint quotes and/or purports to summarize or characterize portions of Enovix's press release issued on November 7, 2022; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete press release. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 109 of the Complaint.

110.    Even if the EPR hadn't required Enovix's engineers to physically visit the Yinghe factory and personally observe the testing of the Fab-1 equipment, it required that the equipment run "at full speed before [Enovix] approved shipment." Rust and Rodgers waived that EPR requirement too, as the equipment was never able to operate at full speed per Enovix's specifications, with or without Enovix's team on site in China. The Fab-1 equipment never passed the FAT at all before Enovix took delivery.

**Response:** Defendants deny each and every allegation in Paragraph 110 of the Complaint.

111.    FE8 confirmed that, prior to April 2021, no one from Enovix was permitted to travel to China, nor did they, to help conduct the FAT. While FE9 did not start at Enovix until a few months later, FE9 also learned during his time at Enovix that Covid-19 travel restrictions had prevented Enovix employees from traveling to China to help conduct the FAT. According to FE9, "if we had been able to do the FAT, we would have found out these [production performance problems] sooner. But we didn't, so we didn't stumble across them until later, and we had to try to bring them up to specification" at Fremont.

**Response:** In response to Paragraph 111 of the Complaint, Defendants deny the allegation that no one from Enovix was permitted to travel to China. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 111 of the Complaint.

**After Delivery, the Fab-1 Equipment Still Never**

**Performed Close to Enovix's Specifications**

112.    FE2 noted that Yinghe eventually sent its engineers to Enovix's Fremont facility to provide SAT services, as outlined in the companies' contract, but required financial assistance from Enovix to do so. According to FE2, negotiations over those expenses delayed Yinghe's engineers from traveling to the United States for SAT services for several months, until fall 2021, when Enovix finally agreed to cover all travel and accommodation expenses for over 20 Yinghe employees coming to the United States from China. FE8 confirmed that when FE8 left Enovix in August 2021, no one from Yinghe had travelled to the United States yet to help conduct the SAT after the equipment was installed in Fremont by Enovix's own personnel. FE2 recalled that Yinghe's staff stayed in the United States for almost a year, until September 2022.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 112 of the Complaint.

113.    FE4 corroborated that in August 2021, the Company was still attempting to use in-house employees or independent contractors to complete the work of attempting to fully qualify the Fab-1 manufacturing equipment, struggling for months to get its manufacturing equipment to work as it was supposed to. At that point, FE4 explained that "we didn't have the right people working on those machines to get it to where it needed to be in the time it needed to be done."

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 113 of the Complaint.

114.    During this time, roughly 20-30 members of Enovix's management and senior leadership met at 9:00am every weekday to discuss the struggling operations of the Fab-1 production lines. FE9 usually attended these daily meetings and reported that Defendant Rust attended the meetings about 80% of the time, along with Enovix's CFO Steffen Pietzke on occasion. During the daily meetings, Enovix's senior engineering and operations managers updated Defendant Rust and other members of management about the status of the Fab-1 lines.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 114 of the Complaint.

115. FE3 explained that written status reports were distributed during the daily meetings that detailed the production problems Fab-1 was facing, and that the attendees discussed: "where the bottle neck is, what the problem is, what's going on that day," as well as "projections for output" for the day and upcoming time periods. FE9 likewise explained that the daily meetings always included reports about Fab-1 production numbers, comparing goals against actual results from the prior day, and discussions about ongoing efforts to get the Fab-1 equipment performing up to specification.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 115 of the Complaint.

116. FE7 also sometimes attended these daily meetings, at which the Company's management received reports about, and discussed, how many batteries the Fab-1 line produced in certain areas, how much material was used, and the throughput levels of each manufacturing area. FE7 described the daily meetings as "metrics meetings" about Fab-1's production output.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 116 of the Complaint.

117. According to FE7, anyone who attended the daily meetings would have known that Fab-1 was struggling to produce a reasonable yield of quality batteries. FE9 confirmed that anyone who attended the meetings was aware that the Fab-1 equipment was not performing to specifications, noting that "everyone was concerned" and that "it was common knowledge we weren't meeting the output requirements and quality requirements."

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 117 of the Complaint.

118. Based on FE9's experience at these meetings, FE9 stated that Defendant Rust was aware that the Fab-1 equipment from Yinghe was not performing, and never had performed, to Enovix's specifications, noting specifically that "he [Rust] was not happy" with the equipment problems. FE3 corroborated that Rust was closely engaged with the process of trying to get the Fab- 1 lines producing at the level they needed.

COOLEY LLP
ATTORNEYS AT LAW

44

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 118 of the Complaint.

119.    FE6 reported that production numbers for Fab-1, such as the UPH rates, were readily available at any given time because the Fab-1 machinery automatically generated those numbers in automated reports. According to FE6, Enovix had a "whole data pipeline set up to look at the number of batteries made and quality of the batteries. There were several dashboards that showed all that information." FE6 explained that "everyone" at Enovix had access to these production reports.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 119 of the Complaint.

120.    FE3 reported that they and their direct supervisor were brought in by Enovix to bring the Fab-1 line to a full commercial manufacturing volume because when FE3 joined Enovix in October 2021, the Fab-1 line "was not producing." By the time FE3 left Enovix in November 2022, the Fab-1 line was still not producing at levels the company needed. As FE3 described it, "there was progress" to improve the manufacturing capacity of Fab-1 during FE3's time with Enovix, but it was "not substantial enough to meet the needs of what was proposed" by Enovix.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 120 of the Complaint.

121.    FE7 recalled that every area of Fab-1, not just the lines from Yinghe, had problems. "They had trouble in all the areas," noted FE7, particularly the Electrode Fabrication, Assembly, and Packaging areas, which were all failing to produce batteries that met specifications and passed quality tests. FE7 explained that by late 2021, the Fab-1 production line was producing very few batteries that met quality specifications. According to FE7, the yields for Fab-1 were "almost zero" as "they barely had anything coming out [of the Fab-1 production lines] that was good." For example, the Fab- 1 production lines would run 1,000 batteries through the line, but none of them would pass quality tests; "they would have so much rejected... all the time." FE7 recalled that Enovix went through a lot of leadership and personnel changes to try to find people who could address the problems and increase the yield for Fab-1. When FE7 left Enovix at the end of 2021,

"it [Fab-1] was definitely not fully operational," and while yields had improved somewhat, "it was still bad" when FE7 left.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 121 of the Complaint.

122.    As FE6 reported, by June 2022 the machinery in the area of Fab-1 in which FE6 worked—the Assembly area, with the equipment that came from Yinghe—was producing less than 10% of the expected production rate. While the equipment in the Assembly area was expected, per Enovix's original specifications, to produce 550 batteries per hour, by June 2022 it was still producing only 30-40 batteries per hour (or 5-7% of 550 UPH). According to FE6, by December 2022 Enovix had increased production numbers in FE6's area of Fab-1 to approximately 100 batteries per hour (18% of 550 UPH), but this was still a "far cry" from the original specifications. In FE6's estimation, having worked to improve the production capacity of Fab-1 for several months in the last half of 2022, the Fab-1 manufacturing equipment was never going to be capable of producing more than 200 UPH (36% of 550 UPH) even if all of the attempted improvements were successful.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 122 of the Complaint.

123.    FE4 explained that the Fab-1 production line "was just never really capable of doing the [production] numbers that they [Enovix] initially advertised," and that it became obvious to everyone that the equipment was not going to work or produce as intended. FE4 also reported that Enovix was unable to meet the high-volume production stage requirements for any of its potential customers with Fab-1, as they were "unable to produce the required quantities."

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 123 of the Complaint.

124.    According to FE9 and FE2, after a year of combined efforts between Enovix and Yinghe engineers in Fremont, the equipment still never met the SAT requirements, as it was never able to produce to Enovix's specifications. FE9 described the equipment Enovix procured from Yinghe as "a piece of junk," and stated that "obviously, the specs in place for the EPR were never

met." According to FE9, the equipment was never able to produce more than about 100 UPH—far below Enovix's requirements.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 124 of the Complaint.

## DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS AND OMISSIONS ABOUT THE COMPANY'S FAB-1 MANUFACTURING EQUIPMENT

125. The Proxy Statement referred investors to the Company's prior SEC filings, among other things, under the heading, "WHERE YOU CAN FIND MORE INFORMATION." Specifically, the Proxy Statement told investors that "[w]e file reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read RSVAC's SEC filings, including this proxy statement/prospectus, over the Internet at the SEC's website at http://www.sec.gov." Accordingly, the Proxy Statement incorporated by reference all of RSVAC's SEC filings predating the Proxy Statement.

**Response:** Paragraph 125 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's Proxy Statement; however the quoted portions are taken out of context, are incomplete, and Defendants respectfully refer the Court to the complete Proxy Statement. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 125 of the Complaint.

126. On February 22, 2021, Enovix released an investor presentation in connection with the announcement of its plans to go public via the Merger with RSVAC. The presentation was filed by RSVAC as Exhibit 99.2 to a Current Report filed with the SEC on Form 8-K on February 22, 2021. Defendant Hernandez signed the 8-K. Defendants Rust and Rodgers signed the presentation.

**Response:** Paragraph 126 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that Enovix publicly filed an investor presentation with the SEC on February 22, 2021 that would be used by RSVAC in making

presentations to existing stockholders of RSVAC and other persons with respect to the Merger. Defendants further admit the second, third, and fourth sentences of Paragraph 126. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 126 of the Complaint.

127. In the February 22, 2021 investor presentation, Enovix discussed its first commercial battery fabrication line, Fab-1, and explained that the manufacturing specifications for that line would be to manufacture one "3D battery every 2.0 seconds" and to run lines that could produce 500 units per hour ("500 UPH lines."). The investor presentation stated that "Fab-1 [is] being equipped now," and told investors that to ensure that the equipment being manufactured could produce Li-ion batteries at these speeds, the equipment would be subjected to a FAT and SAT.

**Response:** Paragraph 127 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's February 2021 Investor Presentation; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete presentation. Defendants further admit that Slide 37 of Enovix's February 2021 Investor Presentation states "Fab-1 Will Make a 3D Battery Every 2.0 Seconds" and footnote 1 on that slide states "4 lines running 900 Wh/l cell batteries @ 80% OEE on 550 uph lines." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 127 of the Complaint.

128. The February 22, 2021 investor presentation stated that the newly designed manufacturing equipment was already at the FAT stage. Indeed, the presentation included a slide expressly stating that the "Fab-1 Equipment" was "At Vendor Factory Acceptance Test (FAT)."

**Response:** Paragraph 128 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's February 2021 Investor

Presentation; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete presentation. Defendants further admit that slide 41 of the February 2021 Investor Presentation is titled "Fab-1 Equipment" and states "At Vendor Factory Acceptance Test (FAT)." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 128 of the Complaint.

129. Statement 1a: The February 22, 2021 investor presentation explained that during the FAT, "Equipment must perform to specification at the vendor's factory before shipment to Enovix and must pass another test after installation at the Enovix site."

**Response:** Paragraph 129 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's February 2021 Investor Presentation; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete presentation.

130. Statement 1a, when incorporated by reference into the June 2021 Proxy Statement, was false and misleading because Defendants failed to disclose that in April 2021, Enovix had waived the requirement that the Fab-1 manufacturing equipment made by Yinghe successfully pass the FAT, taking delivery of the equipment despite the fact that it never performed to specification at Yinghe's factory even after several months of testing.

**Response:** Paragraph 130 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants deny each and every allegation in Paragraph 130 of the Complaint.

131. Statement 1b: The Proxy Statement stated that "[a]ll critical equipment for fabrication has arrived and is currently assembled."

**Response:** Paragraph 131 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants admit that the Complaint quotes and/or

purports to summarize and/or characterize portions of Enovix's February 2021 Investor Presentation; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete presentation.

132.    Statement 1b was misleading when read in conjunction with, or in the context of, Statement 1a, because it gave investors the false impression that the Fab-1 equipment, having been delivered to and assembled in Fremont, must have performed to specification at the vendor's factory before that time. In truth, the equipment never performed to specification at Yinghe's factory and Defendants had actually waived the requirement that it do so before taking delivery.

**Response:** Paragraph 132 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 14-15. To the extent a response is required, Defendants deny each and every allegation in Paragraph 132 of the Complaint.

133.    Statement 2: The Proxy Statement stated that, "Enovix expects Fab-1 to be fully operational by the end of 2021 and to begin production by Q1 2022, with first production revenue in Q2 2022."

**Response:** Paragraph 133 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 16-18. To the extent a response is required, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's Proxy Statement; however, the quoted portion is taken out of context and is incomplete, and Defendants respectfully refer the Court to the complete Proxy Statement.

134.    Statement 2 was false misleading because it implied Fab-1 would be ready for commercial scale production by the end of 2021, but Defendants failed to disclose that the Fab-1 equipment made by Yinghe never performed to specification after several months of testing in China or after continuing efforts to improve the equipment once assembled in Fremont, concealing the material risk that the Fab-1 equipment would not perform to the Company's specifications on the timeline Defendants provided, if ever. Accordingly, Defendants had no reasonable basis to say they expected Fab-1 to be "fully operational" in 2021, to begin production by Q1 2022, or to achieve

first production revenue in Q2 2022.

**Response:** Paragraph 134 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 16-18. To the extent a response is required, Defendants deny each and every allegation in Paragraph 134 of the Complaint.

135. Statement 3: The Proxy Statement contained the following purported risk disclosure, which was inadequate and misleading:

> ***Enovix relies on a new and complex manufacturing process for its operations: achieving production involves a significant degree of risk and uncertainty in terms of operational performance and costs***
>
> Although Enovix has developed its Li-ion battery technology, Enovix relies heavily on a new and complex manufacturing process for the production of its lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes. This will require Enovix to bring up a first-of-its-kind automated production line to produce its batteries. It may take longer than expected to install, qualify and release this line and require modifications to the equipment to achieve its goals for through put and yield. The work required to develop this process and integrate equipment into the production of Enovix's lithium-ion battery cells is time intensive and requires Enovix to work closely with developers and equipment providers to ensure that it works properly for Enovix's unique battery technology. <u>This integration work will involve a significant degree of uncertainty and risk and may result in the delay in the scaling up of production or result in additional cost to Enovix's battery cells.</u>

**Response:** Paragraph 135 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 15-16. To the extent a response is required, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's Proxy Statement; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete Proxy Statement. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 135 of the Complaint.

136. The underlined sentences in Statement 3 were misleading, and the purported risk disclosure was inadequate, because Defendants failed to disclose that the Fab-1 equipment made by Yinghe never performed to specification after several months of testing in China or after

continuing efforts to improve the equipment once assembled in Fremont. The material risk that the Fab-1 equipment "may" not perform to the Company's specifications on the timeline Defendants provided, if ever, was not merely hypothetical but had already begun to materialize at the time Statement 3 was made. This generic warning of vague "uncertainty and risk" that "may" result in delaying the scaling up of production was woefully insufficient to apprise investors of the specific risks that had already begun to materialize: the repeated failures of the Fab-1 equipment to even approach Enovix's required specifications for production capacity in testing that began at Yinghe's facility in November 2020 and continued through the time of the Proxy Statement.

**Response:** Paragraph 136 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 15-16. To the extent a response is required, Defendants deny each and every allegation in Paragraph 136 of the Complaint.

137.    On August 10, 2021, Enovix issued its first "Letter to Our Shareholders," detailing its activities and financial results for the second quarter of 2021. The letter was attached as an exhibit to a current report filed on Form 8-K with the SEC. Defendants Rust and Pietzke signed the letter, and Pietzke signed the 8-K.

**Response:** Defendants admit Paragraph 137 of the Complaint.

138.    **Statement 4:** The August 10, 2021 "Letter to Our Shareholders" stated that:

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery. …

**Response:** In response to Paragraph 138, Defendants admit that the Complaint quotes and/or purports to summarize or characterize a portion of Enovix's August 10, 2021 Letter to Our Shareholders; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter.

139.    The underlined sentences in Statement 4 were false and misleading because

Defendants failed to disclose that the Fab-1 equipment made by Yinghe never performed to specification after several months of factory acceptance testing in China. Thus, it was false and misleading to say that a site acceptance test (SAT) would "confirm" that the equipment was "meeting performance requirements" because the equipment had never met those requirements in the first place during the FAT. It was also misleading to tout that the FAT was "already performed at the vendor's facility before taking delivery" while omitting that the equipment had repeatedly failed the FAT and that Defendants had actually waived the requirement for it to pass the FAT before taking delivery.

**Response:** Defendants deny each and every allegation in Paragraph 139 of the Complaint.

140.    Statement 5: On August 10, 2021, during an earnings call discussing Enovix's quarterly results for the second quarter of 2021, Defendant Rust said "[l]ast quarter, we were able to navigate the global supply chain constraints and receive all key equipment for our first production line. This required heroic efforts, including a critical decision to charter Antonov An-124, one of the world's largest cargo planes, to fly over 60 tons of manufacturing equipment from Asia to San Francisco."

**Response:**   In response to Paragraph 140, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize a portion of a statement by Rust on Enovix's Q2 2021 Earnings Call on August 10, 2021; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 140 of the Complaint.

141.    Statement 5 was misleading because Defendants touted to investors the Company's "heroic efforts" to "receive all key equipment" while omitting the material facts that the "critical decision" to fly the equipment over from China actually required that Enovix waive the requirement for the equipment to pass the FAT before taking delivery, when the equipment had never performed to specification after several months of repeatedly failed FAT attempts.

**Response:** Defendants deny each and every allegation in Paragraph 141 of the Complaint.

142.    Statement 6: During the same earnings call, Rust responded to a question from an

analyst from Colliers Securities about the Company's "latest capacity test" for Fab-1 stating: "We have a pretty rigorous set of both factory and site acceptance things we have to go through and I would say there's no red flags there."

**Response:** In response to Paragraph 142, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize a portion of an exchange between Rust and an analyst on Enovix's Q2 2021 Earnings Call on August 10, 2021; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 142 of the Complaint.

143. Statement 6 was false and misleading for multiple reasons. First, Statement 6 was misleading because Rust touted the "rigorous" FAT and SAT process for the Fab-1 equipment but failed to disclose the material fact that the Fab-1 equipment made by Yinghe repeatedly failed the FAT. Second, Statement 6 was false because Rust claimed that the Fab-1 equipment "ha[d] to go through" the FAT and SAT, but Rust and Rodgers had actually waived the requirement that the Fab- 1 equipment successfully complete the FAT before it was shipped to Enovix, so it was not true that the equipment "had to go through" the FAT and SAT. Third, Rust's assurance that "there's no red flags" with the FAT and SAT was false and misleading because he failed to disclose a plethora of major red flags that arose in connection with the FAT and SAT: (1) that the Fab-1 equipment had repeatedly failed the FAT over a period of six months; (2) that Enovix waived the requirement that the FAT be successfully completed before shipping the equipment to Fremont; and (3) that the equipment still never got close to performing to Enovix's required specifications after additional months of work and testing (to that point without Yinghe's engineers, as required per the SAT) at Enovix's facilities. Thus, Rust had no reasonable basis to assert that there were "no red flags" with the FAT and SAT for the Fab-1 equipment.

**Response:** Defendants deny each and every allegation in Paragraph 143 of the Complaint.

144. Statement 7: On September 9, 2021, at the Cowen 14th Annual Global Transportation & Sustainable Mobility Conference, Defendant Rust made the following statement regarding the Company's equipment for its Fab-1 production lines:

COOLEY LLP
ATTORNEYS AT LAW

54

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

> We're in the middle of qualifying, which means basically testing out of each piece of equipment, making sure it's operating as optimum operating point, making sure we understand where the process windows are. That's going on quite well.

**Response:** In response to Paragraph 144, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize a portion of a statement by Rust at the Cowen 14th Annual Global Transportation & Sustainable Mobility Conference on September 10, 2021; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript.

145.    Statement 7 was false and misleading because Rust touted that the testing of "each piece of equipment" for the production lines at Fab-1 was "going on quite well," but he failed to disclose that Fab-1 equipment had repeatedly failed the FAT over a period of six months and the equipment never got close to performing to Enovix's required specifications after additional months of work and testing at Enovix's facility. The qualifying and testing process for the Fab-1 equipment was not going "quite well." Far from it.

**Response:** Defendants deny each and every allegation in Paragraph 145 of the Complaint.

146.    Statement 8: On March 3, 2022, Enovix released its Q4 2021 Letter to Our Shareholders. In that letter, signed by Defendants Rust and Pietzke, Defendants stated:

> We have commenced deliveries from Fab-1 to our lead customers. Getting to this point was not easy. We have overcome obstacles such as extended shipping times and intermittent vendor support during equipment bring-up resulting from COVID travel restrictions to/from Asia.

**Response:** Paragraph 146 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 13-14.  To the extent a response is required, Defendants admit that Enovix released a Q4 2021 Letter to Our Shareholders on March 3, 2022.  In response to the second sentence of Paragraph 146, Defendants admit that the Complaint quotes a portion of Enovix's Q4 2021 Letter to Our Shareholders that Defendants Rust and Pietzke signed; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter.

147.     The underlined portion of Statement 8 was misleading because Defendants touted to investors that the Company had "overcome obstacles such as extended shipping times and intermittent vendor support" while omitting the material facts that: (1) the way they "overcame" the obstacle of extended shipping times was by waiving the requirement that the equipment pass the FAT (which it had repeatedly failed over the prior six months) before taking delivery so they could fly the equipment to Fremont and install it before the de-SPAC Merger vote; and (2) they had not "overcome" the obstacle of "intermittent vendor support" because, with and without the Yinghe engineers, the Fab-1 equipment never performed close to specification after almost another full year (from the equipment arriving in April 2021 through March 2022) of efforts to improve the equipment, and it continued to fail testing at Enovix's facility.

**Response:** Paragraph 147 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 13-14.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 147 of the Complaint.

148.     Statement 9: The Q4 2021 Letter to Our Shareholders also stated that "[w]e made significant progress in 2021 by equipping our first factory, allowing us to start commercial production and remain on track for our first product revenue by Q2 2022."

**Response:** Paragraph 148 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 17-18.  To the extent a response is required, Defendants admit that the Complaint quotes a portion of Enovix's Q4 2021 Letter to Our Shareholders; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter.

149.     Statement 9 was false and misleading because Defendants failed to disclose that the Fab-1 equipment had repeatedly failed the FAT and SAT, never coming close to meeting the Company's required specifications for commercial production capacity despite continuous efforts over the course of more than a year to get the equipment up to speed. Thus, even if it were literally true that Enovix could produce some number of batteries and generate some *de minimus* amount of

product revenue by Q2 2022, Statement 9 provided investors with the false impression that Enovix had *commercial-scale* production capabilities and would be able to begin generating *commercial-scale* revenues, when in truth Fab-1 was nowhere near having commercial production capabilities and was not "on track" to recognize commercial-scale production revenue on the stated timeline.

**Response:** Paragraph 149 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 17-18. To the extent a response is required, Defendants deny each and every allegation in Paragraph 149 of the Complaint.

150. On March 25, 2022, Enovix filed its annual report for 2021 on Form 10-K with the SEC ("2021 10-K"). Defendants Rust, Pietzke, Rodgers, Atkins, Hernandez, Ebrahimi, McCranie, and Reichow signed the 2021 10-K.

**Response:** Paragraph 150 of the Complaint contains allegations regarding defendants and claims that were dismissed pursuant to the Stipulated Order, to which no response is required. *See supra* at 1, n.1; Stipulated Order; Order at 15-16. To the extent a response is required, Defendants admit Paragraph 150 of the Complaint.

151. **Statement 10:** The 2021 10-K contained the following purported risk disclosure, which was inadequate and misleading:

> ***We rely on a new and complex manufacturing process for our operations: achieving production involves a significant degree of risk and uncertainty in terms of operational performance and costs.***
>
> Although we have developed our Li-ion battery technology, we rely heavily on a new and complex manufacturing process for the production of our lithium-ion battery cells, all of which has not yet been developed or qualified to operate at large-scale manufacturing volumes. This will require us to bring up a first-of-its-kind automated production line to produce our batteries. It may take longer than expected to install, qualify and release this line and require modifications to the equipment to achieve our goals for throughput and yield. The work required to develop this process and integrate equipment into the production of our lithium-ion battery cells is time intensive and requires us to work closely with developers and equipment providers to ensure that it works properly for our unique battery technology. This integration work will involve a significant degree of uncertainty and risk and may result in the delay in the scaling up of production or result in additional cost to our battery cells.

COOLEY LLP
ATTORNEYS AT LAW

**ANSWER TO AMENDED COMPLAINT**
**CASE NO. 23-CV-00071-SI**

**Response:** Paragraph 151 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 15-16.  To the extent a response is required, Defendants admit that the 2021 Form 10-K contained risk disclosures, including the one quoted in Paragraph 151; however the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete SEC filing.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 151 of the Complaint.

152.   The underlined sentences in Statement 10 were misleading, and the purported risk disclosure was inadequate, because Defendants failed to disclose that the Fab-1 equipment made by Yinghe never performed close to the required capacity or quality specifications after several months of testing in China or after continuing efforts to improve the equipment once it was assembled in Fremont. The material risk that the Fab-1 equipment "may" not perform to the Company's specifications on the timeline Defendants provided, if ever, was not merely hypothetical but had already begun to materialize at the time Statement 10 was made. This generic warning of vague "uncertainty and risk" that "may" result in delaying the scaling up of production was woefully insufficient to apprise investors of the specific risks that had already begun to materialize: the repeated failures of the Fab-1 equipment to even approach Enovix's required specifications for production capacity and quality after continuous improvement efforts and repeated testing that began at Yinghe's facility in November 2020 and continued through the time of the 2021 10-K.

**Response:** Paragraph 152 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 15-16.  Further, Paragraph 152 asserts legal conclusions to which no response is required.  To the extent a response is required, Defendants deny each and every allegation therein.

153.   **Statement 11:** The 2021 10-K also stated, under the heading of "Key Trends, Opportunities and Uncertainties":

> Challenges associated with building out Fab-1 include extended shipping times, supply chain constraints and intermittent vendor

COOLEY LLP
ATTORNEYS AT LAW

support during equipment bring-up resulting from COVID travel restrictions imposed on certain countries in Asia.

**Response:** Paragraph 153 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 13-14. To the extent a response is required, Defendants admit that the Complaint quotes a portion of Enovix's 2021 Form 10-K; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete SEC filing.

154. Statement 11 was misleading because Defendants chose to tell investors about some of the "challenges" associated with building out Fab-1, but failed to disclose in any real sense the severe, already-materialized challenges that had truly hamstrung the build-out of Fab-1: that the Fab-1 equipment made by Yinghe never performed close to the required capacity or quality specifications after several months of testing in China or after continuing efforts to improve the equipment once it was assembled in Fremont. Thus, even if literally true, Statement 11 was misleading because it concealed the already-materialized risks imperiling the build-out of the Fab-1 production lines.

**Response:** Paragraph 154 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 13-14. To the extent a response is required, Defendants deny each and every allegation in Paragraph 154 of the Complaint.

## PLAINTIFFS AND THE CLASS WERE DAMAGED
## WHEN THE CONCEALED RISKS CAME TO LIGHT

155. Defendants' false and misleading statements and omissions about Fab-1, as identified above, concealed the material facts that Fab-1 was repeatedly failing to meet its production capacity and quality specifications, preventing the Company from recognizing its first meaningful revenue from the commercial production and sale of its batteries. Those concealed facts gradually came to light through a series of partial disclosures beginning in late 2022, revealing substantial delays in production and projected revenue timelines, the shortcomings of the Fab-1 equipment, and ultimately resulting in the Company abandoning Fab-1 as a commercial production

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

facility. As the concealed risks materialized and the truth came to light, the revelations caused Enovix's share price to fall precipitously, harming Plaintiffs and the Class.

**Response:** Defendants deny each and every allegation in Paragraph 155 of the Complaint.

156.    In the second half of 2022, Enovix began to gradually reveal that the continued setbacks to the Fab-1 manufacturing equipment not only delayed the Company's goal of recognizing material product revenue by Q2 2022, but also pushed back the development of Enovix's next generation of manufacturing equipment, which had been expected to build upon the original Fab-1 line's success.

**Response:** Defendants deny each and every allegation in Paragraph 156 of the Complaint.

157.    In August 2022, Enovix announced that it had met its stated goal of recognizing its first product revenue by Q2 2022, as the Company had brought in $5.1 million in revenue in the quarter. However, barely any of that revenue came from delivering products to customers. $5 million of the $5.1 million (98%) was actually attributable to completing the initial phases of a product development program with a single customer and was classified as "service revenue," as opposed to sales revenue.

**Response:** Defendants admit that in its August 2022 Q2 2022 Letter to Our Shareholders, Enovix "reported its first revenue, consisting of approximately $5.1 million of service revenue and a small contribution from commercial battery cells." Defendants further admit Enovix disclosed that service revenue for Q2 2022 "included $5.0 million from a single customer based on the shipment of commercial cells from Fab-1 and Enovix's completion of various milestones of a product development program that included the design, development, and shipment of custom validation cells." Defendants further admit that Enovix disclosed, among other things, in its Proxy Statement that "Enovix generates revenue from payments received from its customers based on executed engineering revenue contracts (the "Service Revenue") for the development of silicon-anode lithium-ion battery technology." Defendants further admit that in February 2021 Enovix announced a goal of receiving first product revenue from Fab-1 in Fremont in Q2 2022 and met that goal. Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of a quote from Enovix's Q2 2022 Letter to Our Shareholders; however, the

quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 157 of the Complaint.

158.    At the same time, Defendants vaguely acknowledged that they would need to "increase our manufacturing yield metrics." Accordingly, to "prioritize Fab-1 improvements in the third quarter" of 2022, Defendants announced that they would be "taking the line down for portions of the quarter to improve individual process modules and install planned battery conveyance." Defendants stated that their "goal" was to "do the needed work in Q3 to position us for the start of our production ramp to close the year." Defendant Rust told investors that Fab-1 would be "the workhorse of our output next year" and to expect the revenue "ramp" to begin in Q4 2022, after the "improvements" had been made to Fab-1.

**Response:** In response to Paragraph 158, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of a quote from Enovix's Q2 2022 Earnings Call and/or Letter to Our Shareholders; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 158 of the Complaint.

159.    Rather than revealing the truth about the Company's failure to get anywhere near its capacity and quality requirements for commercial production despite nearly two years of continued efforts and failed tests by Yinghe and Enovix engineers, these statements merely alluded to vague "improvements" being performed on the Fab-1 line, which would be interrupted only for "portions of the quarter" and slightly delay the projected revenue ramp to later that same year.

**Response:** Defendants deny each and every allegation in Paragraph 159 of the Complaint.

160.    On November 1, 2022, after the close of trading, Enovix released its Letter to Our Shareholders for Q3 2022. The letter reported that Enovix's revenues for the third quarter were just *eight thousand dollars*. The letter explained that the revenue came from "a modest number of batteries shipped to customers for qualification programs and pre-production and end-product builds." Enovix was not, in fact, manufacturing or delivering batteries on a commercial scale, but

rather "[t]he majority of batteries shipped during the quarter were samples that did not generate revenue."

**Response:** Defendants admit that after market close on November 1, 2022 in a Letter to Our Shareholders filed as an attachment to Form 8-K, Enovix disclosed eight thousand dollars in third quarter total revenue. Defendants further admit that the Complaint quotes and/or purports to summarize and/or characterize portions of a quote from Enovix's November 1, 2022 Letter to Our Shareholders for Q3 2022; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 160 of the Complaint.

161. Although not yet fully disclosing the nature and extent of its manufacturing problems, the letter cryptically disclosed that the "improvements" that Enovix had partially shut down Fab-1 to implement had been "slower-than-expected," and that the Company was now engaged in a major strategic shift: prioritizing the development of its next generation manufacturing lines, to be installed in future planned production facilities, over maximizing the output from the existing production lines at Fab-1:

> As we highlighted in last quarter's Shareholder Letter, we made a conscious decision to focus on manufacturing improvements over shipments in Fab-1 during the third quarter. … Given the wide gap in expected performance between our Gen1 and Gen2 and the slower-than- expected improvements on our Gen1 manufacturing equipment, we have now concluded that the incremental effort necessary to drive higher throughput on Gen1 technology is better spent on the critical yield and productivity learning necessary for a strong launch of our Gen2 Autoline. ***As a result, we are dialing back Gen1 throughput enhancement activities and anticipate achieving lower overall output from Fab-1 in 2023 in favor of focusing on the Gen2 Autoline, which is the engine for our future scaling.***

**Response:** In response to Paragraph 161, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of a quote from Enovix's November 1, 2022 Letter to Our Shareholders for Q3 2022; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 161

of the Complaint.

162.    The November 1, 2022 letter further stated that the total production run rate for 2023 would be under one million battery cells—less than 10% of the production that would result from producing a battery every two seconds as originally specified:

> In the third quarter, we worked to optimize our first production line ("Line 1") in Fab-1 for higher yield and throughput, bring up our second production line in Fab-1 ("Line 2"), and complete our learnings for Gen2. ***We expect Fab-1 improvement activities to extend into 2023, but at a slower rate given the decision to redirect resources to Gen2. Given this, we expect to exit 2023 at a run rate of under one million battery cells produced from the Gen1 equipment at Fab-1.***

**Response:** Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of a quote from Enovix's November 1, 2022 Letter to Our Shareholders for Q3 2022; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 162 of the Complaint.

163.    The news that there would be dramatically lower output from Fab-1 in 2023 and that the Company would "redirect resources" to Gen2 lines suddenly and dramatically changed the perceived timeline for Enovix to commercialize its batteries and achieve revenue. As Enovix's Chief Commercial Officer ("CCO") Cameron Dales explained during the Cowen Global Transportation & Sustainable Mobility Conference, producing batteries for OEMs was a multi-stage process that involved substantial testing: "there's a multiyear process of just qualifying the technology to make sure that the technology really works." While Enovix had cleared some of these hurdles with the batteries produced on its Gen1 lines at Fab-1, giving up on the Gen1 lines in favor of trying with new and untested Gen2 lines meant starting the qualification timeline over anew.

**Response:** In response to Paragraph 163, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of a quote from the November 1, 2022 Letter to Our Shareholders and a statement by Dales in the Cowen Global Transportation & Sustainable Mobility Conference on September 8, 2022; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to

the complete letter and transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 163 of the Complaint.

164.    The November 1, 2022 letter also told investors: "We expect that certain customers may require up to several months to qualify the Gen2 line before accepting product that is manufactured on that line." Enovix did not expect to even receive the new manufacturing equipment for its Gen2 lines until the second half of 2023.

**Response:** In response to Paragraph 164, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Enovix's November 1, 2022 Letter to Our Shareholders; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 164 of the Complaint.

165.    On this news, Enovix's share price fell 41%, from a close of $17.99 per share on November 1, 2022 to $10.53 per share by the close of trading on November 2, 2022, on unusually high trading volume.

**Response:** In response to Paragraph 165 of the Complaint, Defendants admit that on November 1, 2022, Enovix's stock price closed at $17.99 per share and on November 2, 2022, it closed at $10.53, a 41% decrease. Defendants further admit that on November 2, 2022, the trading volume was 28,099,600, as reflected on Yahoo! Finance. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 165 of the Complaint.

166.    On November 2, 2022, a post on the popular investing website Motley Fool entitled "Why Enovix Stock Plunged Today," explained that investors "weren't expecting an announcement the company will put more effort into Gen2 technology over improving Gen1 technology. This likely means that revenue scaling will take longer than expected." The post went on to explain that "management said that Gen2 production is expected to start in late 2023 at best. This means the company will need to survive on the $349 million in cash on the balance sheet until then, which may be a stretch. The company has used over $91 million in cash in the first three quarters of the year and will spend more on installing capacity next year."

**Response:** In response to Paragraph 166, Defendants admit that the Complaint quotes

and/or purports to summarize and/or characterize portions of an article published by the Motley Fool on November 2, 2022; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete article. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 166 of the Complaint.

167.   However, the November 1, 2022 letter did not fully reveal to the market the extent of the undisclosed risks: the Company's continuing failure to achieve anywhere close to commercial production capacity and quality with its long-touted Fab-1 equipment. Defendants also continued to make misleading statements concerning the status of Fab-1.

**Response:** Defendants deny each and every allegation in Paragraph 167 of the Complaint.

168.   On the morning of November 7, 2022, Enovix announced in a press release that Defendant Rodgers would take on a new, more directly involved role as the Company's Executive Chairman. In a statement released that day, Rodgers admitted to investors that "***We have poorly communicated on the status of Fab-1***," explaining:

> [W]e lowered our 2023 revenue projection in a confusing manner that erroneously implied that there were bigger problems with our technology. Our revenue projections were lowered because our Fab-1 manufacturing ramp was delayed in our first year of production. This is an unacceptable execution problem which I will discuss.

> However, as I look back on the decisions the company made, I would make the same calls again. For example, when Harrold Rust called me and said that Enovix Fab-1 would be delayed by at least three months due to the COVID-related shipping malaise unless we spent $1.4 million to charter the world's largest airplane, a Ukrainian AN-124, to fly over 55 tons of Fab-1 equipment to Silicon Valley in one shot, I said, 'Brilliant, do it.' Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later.

> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.

**Response:** Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize Enovix's November 7, 2022 press release; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete press release. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 168 of the Complaint.

169. Rodgers went on to address the perceived "problem[] concerning shareholders" of "the delay and projected underperformance of Fab-1," and in doing so made an additional misleading statement:

> **Statement 12:** We have poorly communicated on the status of Fab-1. I have heard from many investors that the delay and projected underperformance of Fab-1 must be the result of some catastrophic technology problem. <u>For the record: Fab-1 is going to work and ship a lot of batteries to our customers – period</u>. I will personally be in all Fab-1 reviews, because Fab-1 is not only critical to the Company, but also to our customers, some of whom are designing products right now that could not exist without Enovix battery performance.

**Response:** Paragraph 169 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 17-18. To the extent a response is required, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize Enovix's November 7, 2022 press release; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete press release. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 169 of the Complaint.

170. The underlined portion of Statement 12 was misleading because it provided the false impression that the "delay and projected underperformance of Fab-1" were merely transitory hiccups that Enovix would quickly and easily resolve on its way to commercial-scale production. The persistent failures of the preceding two years had demonstrated otherwise. According to Rodgers, the Fab-1 production line was not doomed to fail but had simply experienced a delayed "manufacturing ramp … during [Enovix's] first year of production." In truth, as Rodgers knew by November 2022, after two years of continuous efforts from Yinghe and Enovix trying to test, fix, and improve the Fab- 1 equipment, it never got remotely close to the capacity and quality

specifications necessary to support commercial production. As Rodgers knew, by June 2022 the Fab-1 equipment was producing less than 10% of the expected production rate of 550 UPH, and even by December 2022, it had not even cracked 20% of the required capacity, thus there was no legitimate basis for his unequivocal assertion that "Fab-1 is going to…ship a lot of batteries to our customers." Statement 12 was not accompanied by adequate and meaningful cautionary language and is thus not sheltered from liability by the "safe harbor" provision of the Private Securities Litigation Reform Act of 1995.

**Response:** Paragraph 170 of the Complaint contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 17-18. The last sentence of Paragraph 170 is Plaintiffs' legal argument and does not require a response. To the extent a response is required, Defendants deny each and every allegation in Paragraph 170 of the Complaint.

171. With the FAT and SAT long since in Enovix's rearview mirror (to the limited extent the market was apprised of the circumstances surrounding those tests), the market was focused on the Company's path forward and the "improvement activities" being performed on Fab-1's production equipment. Rodgers' explanation about the FAT and SAT, coupled with his mea culpa that Enovix's lowered revenue projection for 2023 had been done in a "confusing manner that erroneously implied that there were bigger problems with [Enovix's] technology," also misled investors to believe that the issues delaying the Fab-1 production line would soon be resolved.

**Response:** Defendants lack sufficient information to admit or deny the first sentence of Paragraph 171. Defendants admit that Paragraph 171 quotes and/or purports to summarize and/or characterize Enovix's November 7, 2022 press release; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete press release. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 171 of the Complaint.

172. Following Rodgers' statement, Enovix's stock price increased $1.11 per share over the previous trading day, as the market digested the various information provided therein, including Rodgers' new role as Executive Chairman, the purported reasons for the Fab-1 production delays,

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

and Rodgers' assertion that "Fab-1 is going to… ship a lot of batteries to our customers."

**Response:** Paragraph 172 contains allegations regarding claims that were dismissed pursuant to the Order to which no response is required. *See supra* at 1, n.1; Order at 17-18. To the extent a response is required, Defendants admit that on November 4, 2022, Enovix's stock price closed at $10.74, and on November 7, 2022, the stock price closed at $11.85, a $1.11 per share increase. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 172 of the Complaint.

173. On November 10, 2022, Enovix announced that it was bringing in Ajay Marathe, a Company outsider, as Chief Operating Officer ("COO").

**Response:** Defendants admit that on November 10, 2022, Enovix announced the appointment of Ajay Marathe as Chief Operating Officer in a press release and Form 8-K filed with the SEC. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 173 of the Complaint.

174. On December 29, 2022, Enovix announced that Defendant Rust would "retire" as President and CEO of the Company and as a member of the Company's board of directors. Enovix replaced Rust that same day.

**Response:** Defendants admit that on December 29, 2022, Enovix announced in a press release and Form 8-K filed with the SEC that "on December 23, 2022, Harrold Rust determined that he would retire as President and Chief Executive Officer and as a member of the Board of Directors, effective as of the date of his successor's appointment to each such position. Following the date of his successor's appointment as President and Chief Executive Officer, Mr. Rust will continue to provide services to the Company for a brief transition period." Defendants respectfully refer the court to the complete press release and SEC filing. Except as expressly admitted, Defendants deny each and every allegation in Paragraph 174 of the Complaint.

175. On January 3, 2023, after the close of trading, Defendant Rodgers hosted a "special presentation to shareholders" via conference call. During his presentation, Rodgers again directly acknowledged the Company's "lack of clear and transparent investor communications" concerning Fab-1 "that led some of our investors to say we're outright dishonest with them." Rodgers conceded

that "*I think they were reasonably misled.*"

**Response:** Defendants admit the first sentence of Paragraph 175. Defendants further admit that the Complaint quotes and/or purports to summarize or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 175 of the Complaint.

176.    Rodgers also provided more information on the first production line at Fab-1 and its disappointing output:

> Line 1 is the one we brought in the airplane, it's a Fremont wearables line, meaning make small batteries, uses the same heads, but it's nonfunctional for automation point of view. That means its rated capacity of 550 UPH is really more like 100. Obviously that wreaks havoc with output and promises.

**Response:** In response to Paragraph 176, Defendants admit that the Complaint quotes and/or purports to summarize or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 176 of the Complaint.

177.    Line 2, meanwhile, was incomplete according to Rodgers. "It's only a partial line. We only built half the line," he told investors on the January 3, 2023 call, "we didn't want to commit to the second half of the Line 2, until Line 1 worked." Rodgers went on:

> If we run [the second line] at high OEE and high UPH, it then goes to 22.5 seconds when we lost the automation and the UPH dropped from 550 to 100. And it then went to 72 seconds when the OEE dropped because of the lack of automation and the need to do manual stuff in the yield problem. So what we started out is the battery every 2 seconds, ended up battery every 72 seconds, a battery 1 minute roughly. That's been the problem and it's got multiple causes.

**Response:** In response to Paragraph 177, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of the January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are

incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 177 of the Complaint.

178. According to Rodgers, the equipment was "rated at 550" UPH, but Rodgers admitted that "we don't think that machine if we worked on it forever would be over 200 [UPH]," thus corroborating FE6's estimate. Due to the problems with the manufacturing equipment at Enovix's Fab-1 facility, Rodgers also confirmed (as FE6 reported) that "[b]y my math, Fab-1 is doing less than 10% of what it should be doing."

**Response:** Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of the January 3, 2023 Special Presentation; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 178 of the Complaint.

179. During the same presentation, Rodgers also announced further delays to the Gen2 manufacturing lines, which could be traced back to the problems with Fab-1 and its "Gen1" production lines:

> Gen2 equipment owners will prove to the board, in bold, that they've embedded all the learning from Gen1. So, Gen1 is not working the way we wanted to… And Gen2 can't have any of those problems and you have to prove to the board that.
>
> \*   \*   \*
>
> Gen2 is going to work and Gen1 doesn't.

**Response:** In response to Paragraph 179, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 179 of the Complaint.

180. Rodgers acknowledged that the buildout of the Gen2 lines would be delayed by

several months, to the end of 2023 or beginning of 2024. The revenues from the Gen2 lines that investors had previously been told to expect in early 2024 were therefore no longer possible.

**Response:** In response to Paragraph 180, Defendants admit that the Complaint purports to summarize and/or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the summarized portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 180 of the Complaint.

181. During the same presentation, an analyst from B. Riley Securities asked specifically about Defendant Rodgers' statement from November 7, 2022, concerning the Company's violations of its EPR with respect to the Fab-1 equipment. In response, the Company's new COO, Marathe, explained that:

> So this time instead of just saying, okay let's give you the PO and hope for the best and let them give us a machine, which kind of works and we will see it or not. This time, we are building proofs of concepts, which means smaller machines that represent the heads, as T.J. mentioned, which are actually working in action, and we have seen those. You see the videos of those. Our engineers are over there many, many times. And many of them actually. I'm going there personally also this month where I'll be visiting these guys and establishing relationships with the CEOs myself.

**Response:** In response to Paragraph 181, Defendants admit that the Complaint quotes and/or purports to summarize or characterize portion of an exchange between Marathe and an analyst in the January 3, 2023 Special Presentation; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 181 of the Complaint.

182. In other words, waiving the requirement for the Fab-1 equipment to pass the FAT contributed materially to the major delays and inability of Fab-1 to achieve the Company's production goals. Instead of "hop[ing] for the best" by letting the equipment vendors "give us a machine," which Enovix may not see in advance (as the Company did by waiving the FAT after months of repeated testing failures), going forward the Company's engineers would be going to the equipment vendors' facilities in person to see the next generation of equipment and ensuring that it

passes the FAT before it is shipped and installed in the Company's facility, which would help avoid the problems that plagued Fab-1.

**Response:** Defendants deny each and every allegation in Paragraph 182 of the Complaint.

183.    During the same presentation, Marathe confirmed the critical importance of passing the FAT, explaining that the Company's confidence in its production lines "becomes at the very high point when we finish doing the factory acceptance test. When we're actually at the vendor, the machine is working, is running. It's running both the sprint UPH. It's running the uptime, it's running those types of things improved, actually seeing it. That's when typically the confidence is high and you start triggering the long lead time items."

**Response:** In response to Paragraph 183, Defendants admit that the Complaint quotes and/or purports to quote and/or summarize or characterize a portion of a statement by Marathe in the January 3, 2023 Special Presentation responding to an analyst question regarding the Gen2 line; however, the quoted portion has been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 183 of the Complaint.

184.    In other words, successful completion of the FAT provides a company with the confidence necessary to support significant investments of time and money into the equipment installation and qualification process. When Enovix waived the requirement that its Fab-1 manufacturing equipment pass the FAT, it lacked the necessary confidence to make these major investments and foreseeably ran into serious delays and operating problems when attempting to ramp up the Fab-1 equipment for commercial scale production. Accordingly, waiving successful completion of the FAT after months of failed tests was a material fact that Defendants failed to disclose to investors until November 2022.

**Response:** Paragraph 184 of the Complaint contains Plaintiffs' legal argument to which no response is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 184 of the Complaint.

185.    In response to the news disclosed in the January 2023 special presentation, Enovix's share price dropped 41%, from a close of $12.12 per share on January 3, 2023 to a close of $7.15

on January 4, 2023, on unusually high trading volume.

**Response:** In response to Paragraph 185 of the Complaint, Defendants admit that on January 3, 2023, Enovix's stock price closed at $12.12 per share and on January 4, 2023, it closed at $7.15, a 41% decline. Defendants further admit that on January 4, 2023, the trading volume was 37,943,100, as reflected on Yahoo! Finance. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 185 of the Complaint.

186.    This decline was caused, at least in part, by the disclosure of new information revealing to a larger extent the scope of the materialized risks concealed by Defendants' misrepresentations and omissions: that not only were the "improvements" to the Fab-1 production lines moving slower than expected as announced in November 2022, but that more than a year and half after the Fab-1 equipment was delivered to Fremont it was still "doing less than 10% of what it should be doing." These admissions were a complete shock to the market, as Rodgers had assured investors only two months prior that "Fab-1 is going to work and ship a lot of batteries to [Enovix's] customers – period."

**Response:** Paragraph 186 of the Complaint contains Plaintiffs' legal argument to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

187.    Moreover, Rodgers' admission that investors had been misled revealed material negative facts in and of itself. Reasonable investors purchase a company's stock or pay a certain price because they believe that the company's management is honest and forthright. Thus, Rodgers' admission that Enovix's investors were "reasonably misled" by Defendants' prior statements negatively impacted the value of the Company and the price of its shares.

**Response:** Paragraph 187 of the Complaint contains Plaintiffs' legal argument to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

188.    However, the January 3, 2023 presentation also did not fully reveal to the market the extent of the undisclosed risks, which continued to materialize.

**Response:** Paragraph 188 of the Complaint contains Plaintiffs' legal argument to which no

response is required; to the extent a response is required, Defendants deny each and every allegation therein.

189.    On October 3, 2023, Enovix announced that it was abandoning commercial production operations at Fab-1 altogether, laying off 185 workers and writing off the value of all the equipment purchased.

> Enovix … announced that it has initiated a strategic realignment of Fab1 in Fremont designed to refocus the facility from a manufacturing hub to its "Center for Innovation," focused on new product development. This move is supportive of the Company's strategy to locate high-volume manufacturing in Asia near customers and suppliers while locating technology development in both Silicon Valley and Asia.

> Shifting Fab1's focus will result in a reduction of the workforce in Fremont that had been dedicated to supporting 24/7 manufacturing by approximately 185 personnel, including over 125 contractors.

> *    *    *

> Associated with the Fab1 strategic realignment, Enovix … expects to recognize accelerated depreciation expenses of approximately $36 million for Gen1 equipment between the fourth quarter of 2023 and the first quarter of 2024.

**Response:** In response to Paragraph 189 of the Complaint, Defendants admit that on October 3, 2023, Enovix announced in a press release that it "initiated a strategic realignment of Fab1 in Fremont designed to refocus the facility from a manufacturing hub to its 'Center for Innovation,' focused on new product development" which would support "the Company's strategy to locate high-volume manufacturing in Asia near customers and suppliers while locating technology development in both Silicon Valley and Asia." The press release announced that this shift in Fab 1's focus would "result in a reduction of the workforce in Fremont that had been dedicated to supporting 24/7 manufacturing by approximately 185 personnel, including over 125 contractors." Defendants admit that the press release also announced that Enovix would "recognize accelerated depreciation expenses of approximately $36 million for Gen1 equipment between the fourth quarter of 2023 and the first quarter of 2024." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 189 of the Complaint.

190.    In response to this news, Enovix's share price fell 13%, from a close of $11.81 per

share on October 2, 2023 to a close of $10.30 on October 3, 2023, on unusually high trading volume.

**Response:** In response to Paragraph 190, Defendants admit that on October 2, 2023, Enovix's stock price closed at $11.81 per share and on October 3, 2023, it closed at $10.30, a 13% decline. Defendants further admit that on October 3, 2023, the trading volume was 17,314,000, as reflected on Yahoo! Finance. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 190 of the Complaint.

191.    This decline was caused at least in part by the revelation that Enovix had completely given up on Fab-1's ability to achieve commercial production capacity. After years of failed testing and attempted improvements, the Company was finally forced to pull the plug on the long-touted revenue-generating, commercial production prospects of its production lines at Fab-1. As a result, the Company had to write off $36 million of Fab-1 equipment and lay off 185 people at its Fremont facility.

**Response:** Defendants deny each and every allegation in Paragraph 191 of the Complaint.

192.    FE9 explained that, when the decision was made to abandon Fab-1 as a commercial production facility, the Company had determined that Fab-1 production line would never be able to meet its capacity requirements and the quality level that customers were demanding.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 192 of the Complaint.

### ADDITIONAL ALLEGATIONS SHOWING DEFENDANTS'
### FALSE AND MISLEADING STATEMENTS WERE MADE WITH SCIENTER

193.    Plaintiffs allege that each of the false and misleading statements and omissions identified above was made with Defendants' knowledge or severely reckless disregard for the falsity of those statements.

**Response:** Paragraph 193 of the Complaint contains Plaintiffs' legal argument to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

194.    Enovix is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the

wrongful acts complained of herein were carried out within the scope of their employment. Accordingly, the scienter of the Individual Defendants and other employees and agents of the Company is imputed to Enovix. This is particularly true with respect to Defendants Rust and Rodgers, senior officers and/or directors of Enovix who were sufficiently senior in the organization that it is proper to impute their scienter to Enovix.

**Response:** Paragraph 194 of the Complaint asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

195.     Several material adverse facts underlying the false or misleading nature of Defendants' statements were already known to, or recklessly disregarded by, Defendants at the time the statements were made, supporting a strong inference that Defendants acted knowingly or with severe recklessness in making those statements. This inference of scienter is cogent and at least as compelling as any opposing inference that one could draw from the facts alleged herein.

**Response:** Paragraph 195 of the Complaint contains Plaintiffs' legal argument to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

196.     For example, Defendants Rodgers and Rust made numerous statements regarding the FAT and SAT processes for the Fab-1 equipment, demonstrating their familiarity with the subject matter they spoke about. *See supra* ¶¶129, 131, 133, 135, 138, 140, 142, 144, 146, 148, 151, 153, and 169.

**Response:** Defendants admit that Defendants Rodgers and Rust made certain statements relating to factory and site acceptance testing during the alleged class period. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 196 of the Complaint.

197.     Based on Rust's and Rodger's direct involvement in the decision to waive successful completion of the FAT, as well as, among other things, Rust's specific statements about "factory acceptance testing already performed at the vendor's facility before taking delivery" and that "there's no red flags" in the FAT, it is reasonable to infer that Rust and Rodgers knew, or were severely reckless in not knowing, that the Fab-1 equipment from Yinghe had failed to perform to specification and repeatedly failed the FAT before Rust and Rodgers decided to waive the

requirement that the equipment pass the FAT before being shipped to Enovix. Rodgers' detailed statements explaining the operative capacity of Fab-1, running at a fraction of its required UPH, also support a strong inference that he knew, or was severely reckless in not knowing, that the Fab-1 equipment from Yinghe never got close to meeting Enovix's specifications for commercial production.

**Response:** In response to Paragraph 197, Defendants admit that the Complaint quotes and/or purports to quote and/or summarize or characterize portions of Enovix's August 10, 2021 Letter to Our Shareholders and Q2 2021 Earnings Call; however, the quoted portions have been modified, taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete letter and transcript.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 197 of the Complaint.

198.    A cogent and compelling inference of scienter is also appropriate because Defendants were incentivized to deliver their Fab-1 equipment before the Merger closed, and so it could close. By the time Defendants announced the Merger on February 22, 2021, the Yinghe equipment for the Fab-1 production line had repeatedly failed the FAT and was nowhere close to meeting Enovix's capacity specifications in the EPR. With the announced timeline for the closing of the de-SPAC rapidly approaching, Defendants Rust and Rodgers decided to waive the "sacred" FAT requirement in Enovix's EPR and fly the Fab-1 equipment to Fremont in April 2021.

**Response:** Paragraph 198 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation in Paragraph 198 of the Complaint.

199.    At the same time, Defendants knew (or should have known) that Enovix desperately needed the Merger to go through in order to continue its operations, further buttressing the strong inference that Defendants were motivated to close the Merger. According to the Proxy Statement:

> Enovix has incurred losses since inception and has an accumulated deficit of $223.4 million. These conditions raise substantial doubt about Enovix's ability to continue as a going concern. The ability to continue as a going concern is dependent upon generating profitable operations in the future and/or obtaining the necessary financing to meet Enovix's obligations and repay its liabilities arising from normal business operations when they become due. Enovix believes

that the successful completion of the Business Combination will eliminate this doubt and enable Enovix to continue as a going concern.

**Response:** In response to Paragraph 199, Defendants admit that the Complaint quotes and/or purports to quote and/or summarize or characterize portions of Enovix's Proxy Statement; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete Proxy Statement. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 199 of the Complaint.

200. Defendants thus had reason not to inform the market of the shortcuts they took to ensure the closing of the Merger—that they had cut corners on the Company's EPR procedures— as well as concealing the repeated failures of the critical Fab-1 equipment to pass the FAT or to get anywhere near the Company's capacity and quality specifications for commercial production. Concealing those material facts from RSVAC shareholders helped ensure that they would approve the Merger proposal and that Enovix would gain access to over $400 million in outside financing to fund its operations, which were not yet generating any revenues.

**Response:** Defendants deny each and every allegation in Paragraph 200 of the Complaint.

201. Indeed, had Defendants come clean about the difficulties the Fab-1 equipment had encountered during the FAT, the repeated failed FATs, the fact that Enovix's engineers were never able to travel to China to conduct the FAT as required pursuant to Enovix's "sacred" EPR, the fact that Rust and Rodgers had waived the requirement that the equipment pass the FAT, and how those material facts severely jeopardized the Company's projected timeline for achieving commercial scale production and revenues, RSVAC's shareholders would have voted against the Merger and/or redeemed their shares. Without the imminent infusion of cash from the Merger, Enovix—which had been bleeding cash and was nowhere close to having the Fab-1 production line up and running— would be unable to continue as a going concern. Simply put, Enovix was a house of cards that could only remain standing if the Merger was approved.

**Response:** Defendants deny each and every allegation in Paragraph 201 of the Complaint.

202. Rodgers also had a significant personal financial incentive to conceal the material adverse facts in hopes of securing approval of the Merger. This is because he held 5.75 million

RSVAC Founder Shares that could only monetize—for up to $80 million—after RSVAC completed a "Business Combination" like the Merger.

**Response:** In response to Paragraph 202 of the Complaint, Defendants admit that on September 24, 2020, the Company issued an aggregate of 5,750,000 shares of Class B common stock (the "Founder Shares") to the RSVAC Sponsor, Rodgers Capital LLC, for an aggregate purchase price of $25,000 in cash. Defendants further admit that the Proxy Statement disclosed that "The Sponsor has agreed, subject to limited exceptions, not to transfer, assign or sell any of the Founder Shares until the earlier to occur of: (A) one year after the completion of a Business Combination or (B) subsequent to a Business Combination, (x) if the last reported sale price of the Company's common stock equals or exceeds $14.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after a Business Combination, or (y) the date on which the Company completes a liquidation, merger, capital stock exchange, reorganization or other similar transaction that results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property." Defendants further admit that the Proxy Statement disclosed that "The balance of the units in the Sponsor are held by the Rodgers Massey Revocable Living Trust, of which Mr. Rodgers is trustee, and are convertible into 4,020,000 Founders Shares, which have an aggregate market value of approximately $80,400,000 based on the RSVAC Common Stock Closing Price and 4,200,000 Placement Warrants, which have an aggregate market value of approximately $34,482,000 based on the RSVAC Warrant Closing Price. These interests may influence RSVAC's directors in making their recommendation that you vote in favor of the approval of the Business Combination." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 202 of the Complaint.

203. Moreover, at the time of the Merger, Defendant Rodgers was a member of the board of directors of Enovix, and owned, through a trust, approximately 11.3% of all then-outstanding Enovix common stock, which was not publicly traded until the Merger. Securing approval of the Merger allowed Rodgers to monetize his large holdings of Enovix stock.

**Response:** In response to the first sentence of Paragraph 203, Defendants admit that Rodgers was a member of the board of directors of Enovix and owned approximately 11.3% of all issued and outstanding Enovix common stock as of Enovix's Proxy Statement. Defendants further admit that the Complaint appears to characterize Enovix's Proxy Statement filed with the SEC on June 24, 2021; however the portions referenced are taken out of context and are incomplete, and Defendants respectfully refer the Court to the complete proxy statement. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 203 of the Complaint.

204.    In May 2021, Enovix issued a $15 million bridge note to a trust for which Defendant Rodgers was the trustee. The proceeds from the Bridge Note were intended to provide working capital funds to help support Enovix's operations. The Company intended to repay the bridge note upon the closing of the Merger. According to the Proxy Statement, "if the Merger did not close by October 25, 2021, Enovix may not have sufficient funds to repay the loan and will need to pursue a forbearance arrangement with the lender or some other arrangement to meet its obligations under the Bridge Note.

**Response:** In response to Paragraph 204 of the Complaint, Defendants admit that in May 2021, Enovix issued a secured promissory note in the principal amount of $15,000,000 to the Rodgers Massey Revocable Living Trust dtd 4/4/11 (the "Bridge Note") of which Mr. Rodgers is trustee. Defendants further admit that in the Proxy Statement, Enovix stated: "the proceeds from the Bridge Note were intended to provide working capital funds to help support the operations of Enovix. Defendants further admit that the Bridge Note had a maturity date of the earlier of (i) October 25, 2021 and (ii) the closing of the Business Combination. Upon the closing of the Business Combination, Enovix intended to repay the principal amount and any accrued and unpaid interest under the Bridge Note with funds from the PIPE Financing and the Trust Account. If the Business Combination does not close by October 25, 2021, Enovix may not have sufficient funds to repay the loan and will need to pursue a forbearance arrangement with the lender or some other arrangement to meet its obligations under the Bridge Note." Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 204 of the Complaint.

205.    Thus, Defendant Rodgers was particularly incentivized to obtain approval of the

Merger. If it did not close—which would have been a very real threat had Defendants disclosed that they had waived the requirement that the Fab-1 equipment pass the FAT despite months of repeated failures to meet specifications—Rodgers risked adverse and negative consequences to a trust for which he served as trustee. Rodgers was thus put in a difficult situation: either make sure the Merger closed or risk violating his fiduciary duties to this trust.

**Response:** Defendants deny each and every allegation in Paragraph 205 of the Complaint.

206.    In the September 2021 FreightWaves article, Enovix's CCO, Dales, was quoted as describing the decision to fly the Fab-1 equipment from China to California ahead of the Merger as a "massive shortcut" for setting up the Fab-1 factory.  In the interview, Dales explained that "[w]e were faced with a choice: Accept a three-month delay and delay the startup of our factory … or try to find some creative way around the backlog." As Dales described, the airlift operation "involved premium pricing relative to other modes of transportation, but from an ROI perspective it was kind of a no-brainer for us. ***The time was just so valuable.***"

**Response:** In response to Paragraph 206, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of an article published by FreightWaves on September 28, 2021; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete article.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 206 of the Complaint.

207.    Dales' statements underscore the fact that the decision to fly out the Fab-1 equipment ahead of the Merger was made for the purpose of having the equipment shipped and installed ahead of the Merger, which allowed Defendants to tout their new manufacturing capabilities to investors and ensure that RSVAC shareholders approved the Merger.

**Response:** Defendants deny each and every allegation in Paragraph 207 of the Complaint.

208.    Rust's and Rodgers' involvement in the day-to-day operations of the Company's Fremont factory further supports an inference of scienter, particularly as to Defendant Rust. FE1 described Rust as being "deeply involved" in the operations at the Company's Fremont facility, noting that Rust was at the facility every day and that Rust regularly went out onto the factory floor

and talked with employees. FE3 also reported seeing Rust on the Fremont factory floor "more than once a day, beginning and end. He was in tune with things. He was in communication."

**Response:** Defendants deny the first sentence of Paragraph 208 of the Complaint. Defendants lack sufficient information to admit or deny the remaining allegations in Paragraph 208 of the Complaint.

209.     FE3 recalled that Rust attended daily engineering and operations meetings at Fremont, during which time senior engineering and operations managers updated Rust and others on the status of the Fab-1 line. According to FE9, roughly 20-30 members of Enovix's management and senior leadership held meetings at 9:00am every weekday at the Company's Fremont facility to report on operations of the Fab-1 production lines. FE9 usually attended the meetings and reported that Defendant Rust attended the meetings about 80% of the time, and Enovix's CFO, Defendant Pietzke, sometimes attended the meetings too. FE1 also attended the 9:00am operations meetings, and recalled that Rust always attended the meetings.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 209 of the Complaint.

210.     FE3 noted that the status reports shared at those meetings included reports about the production problems Fab-1 was facing, and the discussion topics centered on: "where the bottle neck is, what the problem is, what's going on that day," as well as "projections for output" for the day and upcoming time periods. FE9 said these meetings always included reports about Fab-1 production numbers, comparing goals against actual results from the prior day, and discussions about ongoing efforts to get the Fab-1 equipment performing up to specification. FE7 also sometimes attended these daily meetings, at which the Company's management received reports about, and discussed, how many batteries the Fab-1 line produced in certain areas, how much material was used, and the throughput levels of each manufacturing area. FE7 described the daily meetings as "metrics meetings" about Fab-1's production output.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 210 of the Complaint.

211.     According to FE7, anyone who attended the meetings would have known that Fab-

COOLEY LLP
ATTORNEYS AT LAW

82

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

1 was struggling to produce a reasonable yield of quality batteries. FE9 confirmed that anyone who attended the meetings was aware that the Fab-1 equipment was not performing to specification, noting that "everyone was concerned" and that "it was common knowledge we weren't meeting the output requirements and quality requirements."

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 211 of the Complaint.

212.    Based on FE9's experience at these meetings, FE9 stated that Defendant Rust was aware that the Fab-1 equipment from Yinghe was not performing, and never had performed, to Enovix's specifications, noting specifically that "he [Rust] was not happy" with the equipment problems. FE3 corroborated that Rust was closely engaged with the process of trying to get the Fab- 1 lines producing at the level they needed.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 212 of the Complaint.

213.    FE9 reported that Ashok Lahiri, Enovix's co-founder and Chief Technology Officer, oversaw the testing of equipment at Enovix's Fremont facility. FE1 reported that Neal Sarswat, Enovix's Director of Engineering from May 2017 to September 2022, oversaw the Fab-1 production line and Fab-1 operation and reported directly to Rust.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 213 of the Complaint.

214.    FE6 reported that production numbers for Fab-1, such as the UPH rates, were readily available at any given time because the Fab-1 machinery automatically generated those numbers in automated reports. According to FE6, Enovix had a "whole data pipeline set up to look at the number of batteries made and quality of the batteries. There were several dashboards that showed all that information." FE6 explained that "everyone" at Enovix had access to these production reports.

**Response:** Defendants lack sufficient information to admit or deny the allegations in Paragraph 214 of the Complaint.

215.    During his January 2023 special presentation, Rodgers revealed that the Company's

board had considered changing the Company's CEO as early as August 5, 2022, discussed a mechanism for changing the Company's CEO on October 3, 2022, commenced the formal launch of the Company's CEO search on November 4, 2022, and confirmed the decision to hire Rust's replacement on December 24, 2022. According to Rodgers' presentation, Defendant Rust was fully informed of each of these steps. This indicates that the end of Rust's tenure at Enovix was more akin to a termination than a "retirement," as the timing of the discussions about replacing Rust as CEO coincided with the production issues with Fab-1 coming to a head in late 2022.

**Response:** In response to Paragraph 215, Defendants admit that the Complaint quotes and/or purports to summarize and/or characterize portions of Rodgers' January 3, 2023 Special Presentation; however, the summarized portions are taken out of context, and are incomplete, and Defendants respectfully refer the Court to the complete transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 215 of the Complaint.

216.    Finally, another relevant factor that creates a strong inference of scienter is the core operations inference, insofar as it would be absurd for Enovix's senior management to be unaware that the Company waived the requirement that the Fab-1 equipment pass the FAT after months of repeated failures to even come close to meeting production specifications, and continued to fail to get anywhere close to meeting specifications during more than a year of subsequent improvement efforts and testing, and that, as a result, there was a material risk that Company's Fab-1 facility would fail to achieve commercial production capabilities. During the Class Period, Enovix made one product – Li- ion batteries – out of a single factory in Fremont: Fab-1. That factory and the Company's executive offices shared the same facility.

**Response:** Paragraph 216 contains Plaintiffs' legal argument, to which no response is required; to the extent a response is required, Defendants deny each and allegation in Paragraph 216 of the Complaint.

217.    Moreover, it was critical to the Company's development for the Fab-1 manufacturing line to produce as stated and "ramp up" to a commercial level necessary to sustain the growth purportedly demanded by Enovix's customers. Consequently, any problem with the manufacturing output and performance of Fab-1 represented a serious warning that Enovix itself

COOLEY LLP
ATTORNEYS AT LAW

84

**ANSWER TO AMENDED COMPLAINT**
**CASE NO. 23-CV-00071-SI**

may not be able to survive.

**Response:** In response to Paragraph 217, Defendants admit that the Complaint quotes and/or purports to quote and/or summarize or characterize portions of Enovix's August 10, 2021 Letter to Our Shareholders; however, the quoted portion has been modified, taken out of context, and is incomplete, and Defendants respectfully refer the Court to the complete letter and transcript. Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 217 of the Complaint.

## CLASS ACTION ALLEGATIONS

218.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class.

**Response:** In response to Paragraph 218 of the Complaint, Defendants deny that this action can be maintained as a class action under Federal Rules of Civil Procedures 23(a) and 23(b)(3).

219.    Throughout the Class Period, shares of the Company's common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of shares of the Company's common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Enovix or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**Response:** In response to Paragraph 219 of the Complaint, Defendants admit that throughout the alleged class period, Enovix shares were publicly traded on the NASDAQ. Paragraph 219 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 219 of the Complaint.

220.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

COOLEY LLP
ATTORNEYS AT LAW

85

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

**Response:** Paragraph 220 of the Complaint asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

221. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

**Response:** Paragraph 221 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

222. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether, during the Class Period, Defendants made false or misleading statements of material fact to the investing public, or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(c) whether the Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(d) whether Defendants acted negligently, knowingly, or recklessly in issuing, or causing the Company to issue, false and misleading SEC filings and public statements during the Class Period;

(e) whether the price of the Company's common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

**Response:** Paragraph 222 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

223. Plaintiffs will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made

COOLEY LLP
ATTORNEYS AT LAW

86

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

public statements of material fact that were false, misleading, or were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the false and misleading statements and omissions of material fact, the Company's common stock traded at artificially inflated prices during the Class Period; (c) Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock relying on the integrity of the market price of the Company's common stock and market information relating to the Company, and have been damaged thereby.

**Response:** Paragraph 223 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

224. During the Class Period, the artificial inflation of the Company's common stock was caused by Defendants' material misrepresentations and omissions as described above, causing the damages sustained by Plaintiffs and the other members of the Class. Defendants' material misrepresentations and omissions created an unrealistically positive assessment of the Company and its business, operations, and prospects, causing the price of the Company's common stock to be artificially inflated at all relevant times, including when Plaintiffs and other members of the Class purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed, that disclosure negatively affected the value of the Company's common stock, dissipating the artificial inflation and damaging Plaintiffs and other members of the Class.

**Response:** Paragraph 224 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

225. The market for the Company's common stock was an efficient market at all times during the Class Period for the following reasons, among others:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) As a regulated issuer, the Company filed periodic public reports with the SEC;

(c) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of Current Reports in their SEC filings;

(d) The Company's shares were liquid and traded with moderate to heavy volume during the Class Period. On average, approximately 11.2 million shares of the Company's common stock, or roughly 11.1% of Enovix's total shares outstanding, were traded weekly during the Class Period, permitting a very strong presumption that its shares traded on an efficient market;

(e) During the Class Period, the Company's common stock met the requirements for listing, and were listed and traded on the NASDAQ, a highly efficient and automated market;

(f) The Company was covered by multiple securities analysts employed by brokerage firms who wrote reports about the Company, which were distributed to customers, made publicly available, and entered the public marketplace;

(g) The misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(h) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's securities prices during the Class Period.

**Response:** Paragraph 225 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

226. Based on the foregoing, the market for the Company's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the Company's common stock shares. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and thus are entitled to a presumption of reliance.

**Response:** Paragraph 226 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

227. Alternatively, Plaintiffs and the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants'

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

**Response:** Paragraph 227 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

228.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**Response:** Paragraph 228 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

229.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

**Response:** Paragraph 229 asserts legal conclusions to which no response is required; to the extent a response is required, Defendants deny each and every allegation therein.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5

**(Against Defendants Enovix, Rust, and Rodgers)**

230.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**Response:** In response to Paragraph 230 of the Complaint, Defendants incorporate by reference and re-allege their answers to each and every allegation set forth above as if fully set forth herein.

231.   This Count is asserted against Defendants Enovix, Rust, and Rodgers (the "10(b)

COOLEY LLP
ATTORNEYS AT LAW

89

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

Defendants") and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b- 5 promulgated thereunder by the SEC.

**Response:** In response to Paragraph 231 of the Complaint, Defendants admit that Plaintiffs purport to bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, but Defendants deny that Plaintiffs have met the requirements necessary to do so.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 231 of the Complaint.

232.    During the Class Period, the 10(b) Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they, individually and in concert, directly or indirectly, disseminated or approved the false and/or misleading statements specified above, which they knew or recklessly disregarded were false and/or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

**Response:** Defendants deny each and every allegation in Paragraph 232 of the Complaint.

233.    The 10(b) Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's common stock during the Class Period.

**Response:** Defendants deny each and every allegation in Paragraph 233 of the Complaint.

234.    The 10(b) Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of

COOLEY LLP
ATTORNEYS AT LAW

90

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

**Response:** Defendants deny each and every allegation in Paragraph 234 of the Complaint.

235.    Defendants Rust and Rodgers, the senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and Class.

**Response:** Defendants deny each and every allegation in Paragraph 235 of the Complaint.

236.    As a result of the foregoing, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and members of the Class relied on the statements described above and/or the integrity of the market price of the Company's common stock during the Class Period in purchasing the Company's common stock at prices that were artificially inflated as a result of the 10(b) Defendants' false and misleading statements and omissions.

**Response:** Defendants deny each and every allegation in Paragraph 236 of the Complaint.

237.    Had Plaintiffs and members of the Class been aware that the market price of the Company's common stock had been artificially inflated by the 10(b) Defendants' false and misleading statements and by the material adverse information which they did not disclose, they would not have purchased the Company's common stock at the artificially inflated prices that they did, or at all.

**Response:** Defendants deny each and every allegation in Paragraph 237 of the Complaint.

238.    As a result of the wrongful conduct alleged herein, Plaintiffs and members of the Class have suffered damages in an amount to be established at trial.

**Response:** Defendants deny each and every allegation in Paragraph 238 of the Complaint.

239.    By reason of the foregoing, Enovix, Rust, and Rodgers have violated Section 10(b)

of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and members of the Class for substantial damages which they suffered in connection with their purchases of the Company's common stock during the Class Period.

**Response:** Defendants deny each and every allegation in Paragraph 239 of the Complaint.

## COUNT II

### Violations of Section 20(a) of the Exchange Act

### (Against the Individual Defendants)

240.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

**Response:** In response to Paragraph 240 of the Complaint, Defendants incorporate by reference and re-allege their answers to each and every allegation set forth above as if fully set forth herein.

241.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non- public information regarding the Company's business practices.

**Response:** In response to Paragraph 241 of the Complaint, Defendants admit that during the alleged class period, Defendants Rust, Pietzke, and Rodgers participated in the operation and management of the Company, and conducted and participated in the conduct of the Company's business affairs.  Except as expressly admitted herein, Defendants deny each and every allegation in Paragraph 241 of the Complaint.

242.    As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

**Response:** In response to Paragraph 242 of the Complaint, Defendants admit that the Individual Defendants were officers and directors of a publicly owned company with certain fiduciary duties and other legal obligations.  Except as expressly admitted, Defendants deny each

and every allegation in Paragraph 242 of the Complaint.

243.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's common stock.

**Response**: Defendants deny each and every allegation in Paragraph 243 of the Complaint.

244.    The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

**Response**: Defendants deny each and every allegation in Paragraph 244 of the Complaint.

245.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**Response**: Defendants deny each and every allegation in Paragraph 245 of the Complaint.

## PRAYER FOR RELIEF

The section entitled "Prayer for Relief" is Plaintiff's statement of requested relief, to which no response is required; to the extent a response is required, Defendants deny the allegations therein, including but not limited to denying that Plaintiff is entitled to judgment and that Plaintiff is entitled to any relief whatsoever.

## JURY DEMAND

Plaintiff demands a trial by jury. The paragraph in the section entitled "Jury Demand" is Plaintiff's demand for a jury trial, to which no response is required.

## AFFIRMATIVE DEFENSES

With respect to separate affirmative defenses to the causes of action in the Complaint, Defendants allege as follows:

**FIRST AFFIRMATIVE DEFENSE**

**(Failure to State a Cause of Action)**

1.    The Complaint, and each and every cause of action alleged therein, fails to state facts sufficient to constitute a cause of action against Defendants upon which the requested relief may be granted.

**SECOND AFFIRMATIVE DEFENSE**

**(Justification)**

2.    The Complaint, and each and every cause of action alleged therein, is barred because Defendants were justified in doing any and/or all of the acts alleged in the Complaint.

**THIRD AFFIRMATIVE DEFENSE**

**(Conduct of Third Parties)**

3.    If it should be determined that Plaintiffs have been damaged, then Defendants are informed and believe, and based thereon allege, that said damage was proximately caused by the conduct of others for which Defendants were not and are not responsible.

**FOURTH AFFIRMATIVE DEFENSE**

**(Good Faith Projections)**

4.    The Complaint, and each and every cause of action alleged therein, is barred to the extent Plaintiffs' allegations are based on alleged projections, forecasts, or predictions of future events or results.  Such projections, forecasts or predictions were not false when made, were made in good faith, and had a reasonable basis when made.

**FIFTH AFFIRMATIVE DEFENSE**

**(Good Faith Basis)**

5.    The Complaint, and each and every cause of action alleged therein, is barred because Defendants' alleged misstatements were made in good faith and with genuine belief and had a reasonable and factual historical basis.

**SIXTH AFFIRMATIVE DEFENSE**

**(Standing)**

6.    The Complaint, and each and every cause of action alleged therein, is barred by

Plaintiffs' lack of standing pursuant to Federal Rule of Civil Procedure 23.1.

## SEVENTH AFFIRMATIVE DEFENSE

### (Estoppel)

7.    The Complaint, and each and every cause of action alleged therein, is barred by the doctrine of estoppel.

## EIGHTH AFFIRMATIVE DEFENSE

### (Waiver)

8.    The Complaint, and each and every cause of action alleged therein, is barred by the doctrine of waiver.

## NINTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

9.    The Complaint, and each and every cause of action alleged therein, is barred because Plaintiffs have failed, and continue to fail, to act reasonably to mitigate the damages alleged in the Complaint.

## TENTH AFFIRMATIVE DEFENSE

### (No Proximate Cause)

10.    The Complaint, and each and every cause of action alleged therein, is barred because the alleged statements or acts by Defendants were not the proximate cause of any loss suffered by Plaintiffs.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Privilege)

11.    The Complaint, and each and every cause of action alleged therein, is barred because Defendants' acts were privileged.

## TWELFTH AFFIRMATIVE DEFENSE

### (15 U.S.C. § 78u-4(e))

12.    If it should be determined that Plaintiffs have been damaged, then the damages that Plaintiff seeks are limited by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(e).

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Truth)

13.     The Complaint, and each and every cause of action alleged therein, is barred by virtue of the truth of Defendants' assertions.

## FOURTEENTH AFFIRMATIVE DEFENSE

### (Assumption of Risk)

14.     The Complaint, and each and every cause of action alleged therein, is barred because Plaintiffs were expressly advised in statements made to them, including in documents and otherwise, regarding the material facts concerning his investment.  Plaintiffs therefore assumed the risk of any loss and are estopped from recovering any relief.

## FIFTEENTH AFFIRMATIVE DEFENSE

### (Available Information)

15.     The Complaint, and each and every cause of action alleged therein, is barred because the allegedly misleading statements, if any, were rebutted by contrary information (including both public and non-public information) received by or that was otherwise available to Defendants.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Loss Causation)

16.     The Complaint, and each and every cause of action alleged therein, is barred because the damages that Plaintiffs seek were not caused by any statement, omission, or other action by any Defendant, and therefore Plaintiffs cannot establish loss causation.

## SEVENTEETH AFFIRMATIVE DEFENSE

### (Scienter)

17.     The Complaint, and each and every cause of action alleged therein, is barred because Defendants did not have scienter with respect to any allegedly untrue statement of material fact, omission of material fact, misleading statement, or other challenged statement with respect to which the liability of Defendants is asserted.

COOLEY LLP
ATTORNEYS AT LAW

96

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Failure to Plead a Material Misrepresentation or Omission)

18.    Plaintiffs' claims are barred, in whole or in part, because Defendants did not make any material misrepresentations or omissions.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Class Action)

19.    The Complaint, and each and every cause of action alleged therein, is barred because this action is not maintainable as a class action pursuant to Federal Rule of Civil Procedure 23.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Section 20(a) Lack of Primary Liability)

20.    As to the Defendants against whom control person liability is alleged pursuant to Section 20(a) of the Securities Exchange Act of 1934, such liability is barred because Plaintiffs cannot establish the primary liability necessary to assert a control person liability claim.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Section 20(a) Failure to Control)

21.    As to the Defendants against whom control person liability is alleged pursuant to Section 20(a) of the Securities Exchange Act of 1934, such liability is barred because Defendants did not directly or indirectly control Enovix or any other individual that Plaintiffs allege is a primary violator.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Forward-Looking Statements)

22.    The Complaint, and each and every cause of action alleged therein, is barred to the extent Plaintiffs allegations are based on alleged projections, forecasts, or predictions of future events or results, because such projections, forecasts, or predictions were identified as forward-looking statements and accompanied by meaningful cautionary language, including in Defendants' public filings with the SEC and as referenced or incorporated during investor conference calls, that identified factors that could cause actual results to differ materially from those in the forward-looking statements; were immaterial; or were not made with actual knowledge that the statements

were false or misleading when made.  All such statements fall within the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995, as codified at 15 U.S.C. § 78u-5(c).

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Lack of Reliance/Price Impact)

23.     Plaintiffs cannot recover for the claims alleged in the Complaint because the allegedly actionable misrepresentations or omissions did not affect Enovix's stock price, thus severing the link between the alleged misstatements or omissions and the price received (or paid) by the putative class of plaintiffs and rebutting the presumption of reliance under *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

24.     Defendants expressly reserve the right to amend or supplement their Answer, defenses, and all other pleadings as permitted by law.  Defendants further reserve the right to assert any and all additional defenses under any applicable law in the event that discovery indicates such defenses would be appropriate, and to assert any crossclaims, counterclaims, and/or third-party claims.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray that this Court enter judgment as follows:

1.  That Plaintiff takes nothing by their Complaint;

2.  For costs, attorneys' fees, and expert witness fees;

3.  For judgment in favor of Defendants; and

4.  For such other and further relief as this Court deems just and proper.

## JURY DEMAND

Defendants demand a trial by jury.

COOLEY LLP
ATTORNEYS AT LAW

ANSWER TO AMENDED COMPLAINT
CASE NO. 23-CV-00071-SI

Dated:  September 23, 2024

COOLEY LLP

By: */s/ Shannon M. Eagan*
    Shannon M. Eagan

Attorneys for Defendants
*Enovix Corporation, Harrold Rust, Steffen Pietzke, Thurman J. Rodgers, Emmanuel T. Hernandez, John D. McCranie, Betsy Atkins, and Gregory Reichow*

COOLEY LLP
ATTORNEYS AT LAW

99

**ANSWER TO AMENDED COMPLAINT**
**CASE NO. 23-CV-00071-SI**