Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | No: 3:23-cv-0071-SI <br><br> <u>CLASS ACTION</u> <br><br> **PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS** <br><br> JUDGE: Hon. Susan Illston, U.S.D.J. <br> DATE: September 5, 2025 <br> TIME: 10:00 a.m. <br> CTRM: Videoconference Only |

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ...................................................................................1

II.     STATEMENT OF FACTS ........................................................................................2

        A.      Enovix Developed Brand-New Battery Technology .........................................2

        B.      Enovix Procured Manufacturing Equipment that Never Came Close to
                Meeting Specifications or Passing Required Acceptance Tests..........................2

        C.      Defendants Secretly Waived the FAT Requirements .......................................3

        D.      Defendants Misled Investors as They Hid the True Status of Fab-1 ..................4

        E.      The Company's Stock Price Plummeted as the Truth About the Fab-1
                Equipment Came to Light ...........................................................................5

III.    RELEVANT PROCEDURAL HISTORY ..............................................................6

IV.     ARGUMENT.............................................................................................................7

        A.      The Court Should Deny Defendants' Attempt to Re-litigate Decided
                Issues.......................................................................................................7

        B.      Defendants' Arguments Fail on the Merits....................................................11

                1.      The SAC Adequately Alleges the Falsity of Both Challenged
                        Statements.............................................................................12

                        a.      Statement 6 Was Materially Misleading ...............................13

                        b.      Statement 7 Was Materially Misleading and Not Puffery ..........16

                2.      The SAC Adequately Alleges Statements 6 and 7 Were Made With
                        Scienter ................................................................................19

V.      CONCLUSION.........................................................................................................22

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

# TABLE OF AUTHORITIES

**Cases**

*ADYB Engineered For Life, Inc. v. Edan Admin. Servs. Ltd.*,
2022 WL 912127 (S.D.N.Y. Mar. 28, 2022) ...............................................................................10

*Antero Res. Corp. v. C & R Downhole Drilling, Inc.*,
2019 WL 13193860 (N.D. Tex. Sept. 13, 2019)..........................................................................10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................................................11

*Aviles v. S&P Glob., Inc.*,
2020 WL 1689405 (S.D.N.Y. Apr. 6, 2020)..................................................................................8

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)......................................................................................................................12

*Baum v. Harman Int'l Indus., Inc.*,
575 F. Supp. 3d 289 (D. Conn. 2021)............................................................................................8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................................................20, 21

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ........................................................................................................19

*Cardenas v. Cnty. of Ventura*,
2025 WL 1415331 (C.D. Cal. Apr. 11, 2025) ................................................................................9

*Eminence Cap., LLC v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ......................................................................................................14

*Estep v. City of Somerset, Ky.*,
2011 WL 845847 (E.D. Ky. Mar. 8, 2011)....................................................................................8

*Fecht v. Price Co.*,
70 F.3d 1078 (9th Cir. 1995) ........................................................................................................19

*Geffon v. Micrion Corp.*,
249 F.3d 29 (1st Cir. 2001)...........................................................................................................22

*Gen Digital, Inc. v. Sycomp*,
2025 WL 895212 (N.D. Cal. Mar. 24, 2025)..................................................................................8

*Ginsburg v. InBev NV/SA*,
623 F.3d 1229 (8th Cir. 2010) ......................................................................................................11

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ...............................................................................................12, 20

*Grajales v. Puerto Rico Ports Auth.*,
    682 F.3d 40 (1st Cir. 2012) .........................................................................................................11

*Hsu v. Puma Biotech., Inc.*,
    2018 WL 4945703 (C.D. Cal. Oct. 5, 2018)................................................................................12

*Hutton v. XPO Logistics Freight Inc.*,
    2025 WL 264208 (D. Ariz. Jan. 22, 2025) .................................................................................10

*In re Alphabet, Inc. Sec. Litig.*,
    1 F.4th 687 (9th Cir. 2021) .........................................................................................................12

*In re Bayer AG Sec. Litig.*,
    2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004).............................................................................16

*In re ChinaCast Educ. Corp. Sec. Litig.*,
    809 F.3d 471 (9th Cir. 2015) ......................................................................................................21

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ....................................................................................................11

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005).........................................................................................21

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) .....................................................................................................19

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ........................................................................................16

*Jones v. Town of Quartzsite*,
    2014 WL 12617038 (D. Ariz. Feb. 24, 2014)................................................................................9

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ......................................................................................................15

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)........................................................................................................................12

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ...........................................................................................12, 13, 14

*Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ......................................................................................................18

*Pampena v. Musk*,
    2024 WL 3678002 (N.D. Cal. Aug. 5, 2024) ......................................................................8, 9, 11

*Perez v. Oak Grove Cinemas, Inc.*,
   2014 WL 1796674 (D. Or. May 5, 2014) ...................................................................10

*Reese v. BP Expl. (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) .....................................................................................12

*S.E.C. v. Hemp, Inc.*,
   2018 WL 1220566 (D. Nev. Mar. 8, 2018) ...............................................................10

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) .....................................................................................18

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) .............................................................................11, 13

*Strigliabotti v. Franklin Res., Inc.*,
   398 F. Supp. 2d 1094 (N.D. Cal. 2005) ......................................................................9

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*,
   83 F.4th 514 (6th Cir. 2023) ......................................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)........................................................................................11, 20, 21

*Vernazza v. S.E.C.*,
   327 F.3d 851 (9th Cir. 2003) .....................................................................................20

*Warshaw v. Xoma Corp.*,
   74 F.3d 955 (9th Cir. 1996) .......................................................................................19

*Zhou v. Faraday Future Intelligent Elec. Inc.*,
   2022 WL 13800633 (C.D. Cal. Oct. 20, 2022).........................................................12

**Statutes**

15 U.S.C. § 78u-4(b)(3)(B)...................................................................................................6

**Rules**

Fed. R. Civ. P. 12(b)(6)......................................................................................................11

Fed. R. Civ. P. 12(c) ..........................................................................................................11

**Other Authorities**

5C Charles Alan Wright & Arthur R. Miller, Federal Practice and
   Procedure § 1367 (3d ed. 2017).............................................................................9, 10

5C Charles Alan Wright & Arthur R. Miller, Federal Practice and
   Procedure § 1368 (3d ed. 2017)................................................................................11

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

Lead Plaintiffs Discovery Global Opportunity Master Fund Ltd., Discovery Nymeria Master Fund, Ltd., and Gary Kung, and named Plaintiffs Robert G. Lee and Traci Selke (collectively, "Plaintiffs") submit this memorandum in opposition to the motion for partial judgment on the pleadings (Dkt. No. 175, "MJOP") filed by Defendants Enovix Corporation ("Enovix" or the "Company"), Harrold Rust, Steffen Pietzke, Thurman J. Rodgers, Emmanuel T. Hernandez, John D. McCranie, Betsy Atkins, and Gregory Reichow (collectively, "Defendants").

## I.    PRELIMINARY STATEMENT

Defendants' second bite at the apple fares no better than their first. The Court already found the two statements in Plaintiffs' Second Amended Complaint (Dkt. No. 102, "SAC") that Defendants now challenge (again) were actionable when it denied in relevant part Defendants' motion to dismiss the SAC over one year ago. Dkt. No. 116 ("SAC Order"). The Court's decision came after Defendants had presented the same documents and context that form the basis for Defendants' MJOP. Notwithstanding Defendants' rhetoric and their attempts to cast aspersions on Plaintiffs while throwing Defendants' former counsel under the bus, at its core, Defendants' MJOP simply rehashes the same losing arguments that the Court already considered and rejected. The MJOP appears to be Defendants' latest tactical effort to stall the case nearly one year into discovery. The Court should exercise its discretion to refuse to consider the substance of Defendant's tactical MJOP under these circumstances.

Nonetheless, to the extent the Court considers Defendants' renewed pleading challenges on their merits, the Court should deny the MJOP in its entirety because the challenged statements are still materially misleading for largely the same reasons the Court found in denying Defendants' prior motion to dismiss the same allegations. Statement 6 was materially misleading when viewed in full context. Statement 7 was materially misleading for the same reasons the Court found in the SAC Order, and is not puffery. Defendants' scienter arguments are implausible and no more compelling than the culpable inference Plaintiffs allege. Thus, even if Defendants' motion had been more timely, and even if their arguments and extrinsic documents were now presented to the Court for the first time—they are not—the MJOP still fails because the SAC sufficiently alleges that Statements 6 and 7 were materially misleading and made with scienter.

## II.    STATEMENT OF FACTS

### A.    Enovix Developed Brand-New Battery Technology

In late 2020, Enovix was an early-stage technology company based in Fremont, California. ¶64.[1] Using new silicon anode technology, Enovix designed a new type of lithium-ion ("Li-ion") battery that it said was smaller and stronger than conventional Li-ion batteries. ¶73.

In early 2021, Enovix had no product revenue and was hemorrhaging money. ¶76. Enovix had never manufactured its batteries at commercial scale (*i.e.*, at rates and amounts necessary to fill customer orders). ¶¶78-79. In order to generate revenues, Enovix needed to design and install custom manufacturing equipment that could produce the new batteries to meet its customers needs. ¶¶80-82. Before a customer would buy Enovix's new batteries, Enovix had to show that it could produce large enough volumes of quality batteries fast enough to meet the customer's requirements for reliably meeting the customer's own mass production needs. ¶¶82-84.

Enovix told investors it expected to develop its own U.S.-based manufacturing line and begin delivering products to customers (generating its first commercial product revenues) by the second quarter of 2022. ¶77. To meet that goal, Enovix told investors it would need to achieve its production specifications of one battery every two seconds, which would, in turn, require four manufacturing lines capable of producing 550 units per hour ("UPH"). *Id.*

### B.    Enovix Procured Manufacturing Equipment that Never Came Close to Meeting Specifications or Passing Required Acceptance Tests

Enovix started procuring custom manufacturing equipment for its first production line at its manufacturing facility, Fab-1, in early 2020. ¶95. Enovix contracted with vendors to design and produce the custom Fab-1 production equipment. ¶95. The development and production of a large portion of the production line equipment was outsourced to Shenzhen Yinghe Technology Co. Ltd. ("Yinghe"), in China. ¶97.

To govern the procurement of equipment from Yinghe, Enovix had an Equipment Procurement Review ("EPR"), a document that authorizes funding to purchase equipment from a

---

[1] Citations to "¶__" are to the paragraphs of the SAC. Emphasis is added and internal quotations and citations are omitted unless otherwise indicated.

vendor. ¶¶98-99. The EPR lays out a set of parameters that must be met to complete the purchase, including requirements that the equipment pass critical quality tests before Enovix accepted delivery: the Factory Acceptance Test ("FAT") and Site Acceptance Test ("SAT"). ¶99.

The FAT had specific criteria, based on a checklist provided by Enovix, to ensure equipment met Enovix's performance and quality specifications. ¶101. The primary parameters the equipment had to meet to pass the FAT were capacity—how many units the equipment could fabricate in a certain time (*i.e.*, UPH)—and quality, including industry standard measures of production efficiency. ¶¶101-03.

The first FAT for the Yinghe-made Fab-1 equipment took place in November and December 2020, with three or four iterations of testing spaced two to four weeks apart. ¶100. The equipment never passed the FAT, as the equipment never got close to meeting Enovix's capacity specifications, among other problems. ¶¶100, 104. Yinghe continued working on the equipment and kept testing for months, to no avail. ¶104. Those continued efforts and repeated testing extended through the final FAT that Yinghe conducted in April 2021, but the equipment still did not pass the FAT. *Id.* It never did. ¶110.

**C.      Defendants Secretly Waived the FAT Requirements**

By April 2021, Defendants Rodgers and Rust had learned that shipment of the Fab-1 equipment from China "would be delayed by at least three months" due to global shipping delays. ¶¶105, 107. The Company was going public in just three months and, without the Fab-1 equipment in place, Enovix's ability to continue as a going concern was in jeopardy. ¶67. If Defendants had told investors the truth—that the new equipment never passed the FAT and that Enovix's engineers had not even been able to travel to China to personally observe the FAT, as required under Enovix's EPR, it would imperil the impending de-SPAC transaction and the $400 million influx of desperately needed operating capital that Enovix was set to receive. ¶201. Instead, Rodgers and Rust decided to take a "massive shortcut": they waived the requirement that the equipment pass the FAT before Enovix accepted delivery, and they air-lifted the equipment to Fremont. ¶¶105, 206. They hoped to "catch up later," after installing the equipment. ¶107.

Flying the Fab-1 equipment to California allowed Defendants to tell investors that the new manufacturing equipment was being installed at Fab-1, but of course it did not fix the equipment. The SAT required Yinghe's engineers to travel to Fremont to help install and test the equipment to "confirm" that it was still able to meet Enovix's specifications after being disassembled, transported, and reassembled at Enovix's facilities. ¶¶91-92, 112. Enovix's engineers struggled for months trying to improve the capacity of the Fab-1 equipment, but their efforts failed. ¶¶112-24. By June 2022, the equipment was producing 30-40 UPH, less than 10% of the required production rate. ¶122. By December 2022, the Company had only managed to increase production to about 100 UPH, still less than 20% of Enovix's 550 UPH specifications. *Id.* Fab-1 simply never came close to achieving the production capacity needed to support commercial revenues.

**D.    Defendants Misled Investors as They Hid the True Status of Fab-1**

While Defendants knew, or recklessly disregarded, that the Yinghe equipment never passed the FAT and that the Fab-1 production line could not meet Enovix's specifications, Defendants told investors a completely different story.

**Statement 4 (¶138):** On August 10, 2021, in a "Letter to Our Shareholders" filed with the SEC, Defendants told investors that:

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery. …

**Statement 6 (¶142 and Dkt. No. 175-5 (full call transcript)):** On August 10, 2021, in response to an analyst's question about the "latest capacity test" for Enovix's "proprietary equipment" for its Fab-1 production line, following up on Rust's comments about the Fab-1 production line's ability to achieve "volume production," Rust responded that "[w]e ***have a pretty rigorous set of both factory and site acceptance*** [tests] we have to go through and ***I would say***

*there's no red flags there*. We're pretty excited about the tools being able to deliver to the intended specs. ..."

**Statement 7 (¶144):** On September 9, 2021, at an investor conference, Rust again explained that Enovix was "in the middle of qualifying, which means basically testing out of each piece of equipment.... That's going on quite well."

**E.     The Company's Stock Price Plummeted as the Truth About the Fab-1 Equipment Came to Light**

The truth finally began to come to light on November 1, 2022, when Enovix revealed that it would be "dialing back" its work on improving the production lines at Fab-1. ¶161. As a result, Enovix "anticipate[d] achieving lower overall output from Fab-1 in 2023." *Id*. This news shocked the market, and Enovix's share price fell 41% as a result. ¶165.

A few days later, Enovix announced that Rodgers would assume the role of Executive Chairman. ¶168. In a public statement, Rodgers admitted that "[w]e have poorly communicated on the status of Fab-1" and revealed for the first time that he and Rust had waived the FAT (but without disclosing the repeated failed tests before and after the waiver). *Id.*

On January 3, 2023, Rodgers gave a special presentation for investors. ¶175. Rodgers directly addressed the Company's "lack of clear and transparent investor communications" concerning Fab-1, "that led some of our investors to say we're outright dishonest with them." *Id.* Rodgers conceded that "***I think they were reasonably misled.***" *Id.* Rodgers also revealed that, as to the first production line at Fab-1, "its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." ¶176. Rodgers explained that "we don't think that machine if we worked on it forever would be over 200 [UPH]," and that Fab-1 was "doing less than 10% of what it should be doing." ¶¶177-78. On this news, Enovix's share price dropped another 41%. ¶185.

Finally, on October 3, 2023, Enovix announced it was abandoning commercial production operations at Fab-1 altogether, laying off 185 workers and writing off $36 million of Fab-1 manufacturing equipment. ¶189. Enovix had completely failed to achieve commercial production capabilities at Fab-1. On this news, Enovix's share price fell 13%. ¶190.

## III.    RELEVANT PROCEDURAL HISTORY

Defendants previously submitted to the Court the full August 10, 2021 Shareholder Letter in connection with Defendants' first round of pleading challenges. Dkt. No. 89-10. Defendants submitted to the Court the full August 10, 2021 Earnings Call Transcript in connection with Defendants' motion to dismiss the SAC. Dkt. No. 105-4. On both occasions, the Court acknowledged receipt and review of Defendants' submissions but did not conduct a formal judicial notice analysis. Dkt. No. 97 at 8, 26; SAC Order at 14-15. In their instant motion, Defendants argue that these previously-submitted documents provide context that renders Statements 6 and 7 not false or misleading. MJOP at 2; *see also* Dkt. No. 176 (Defendants' Request for Judicial Notice ("RJN")) at 1 n.1 (acknowledging that these documents were already submitted in connection with Defendants' prior pleading challenges). Defendants also concede that the Court explicitly considered both the June 2021 Proxy Statement and February 2021 investor presentation in its SAC Order. RJN at 1 (citing SAC Order at 14-15).[2]

On July 23, 2024, over one year ago, the Court granted in part and denied in part Defendants' motion to dismiss the SAC. *See* SAC Order. Defendants' motion challenged the SAC on the grounds of falsity, scienter, and loss causation. *See id.* The Court denied Defendants' motion with respect to Statements 4, 6, and 7, finding that the SAC adequately alleged that those statements were materially false or misleading and made with scienter, and that the SAC adequately alleged loss causation. *Id.* at 11-12, 20-23. With respect to falsity, the Court held that those three statements were "false or misleading" because they "implied the Fab-1 equipment had passed the FAT" when, in fact, "the equipment never passed the FAT." *Id.* at 11-12.

Upon this decision, the automatic discovery stay imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(3)(B), was lifted and the parties began discovery. The parties have been diligently litigating discovery and other issues over the

---

[2] To the extent Defendants previously submitted only excerpts from Enovix's Proxy Statement, the Court explained that it considered the entire document. SAC Order at 14 n.3.

course of the past year. The parties have been negotiating complex and extensive document discovery and have already substantially completed document production.

Per the Court's orders adopting the parties' negotiated case schedule (Dkt. Nos. 125 and 159), Plaintiffs also timely moved for class certification on May 23, 2025. Dkt. No. 162. Upon filing their MJOP one month later, Defendants took the position that the PSLRA automatically stayed the entire case, including any further discovery and further briefing on Plaintiffs' motion for class certification. *See* Dkt. No. 178. The Court determined that the PSLRA stay did not apply and that discovery will continue unabated while the MJOP is litigated (Dkt. No. 182), but suspended further briefing and hearing on Plaintiffs' motion for class certification pending resolution of Defendants' MJOP (Dkt. Nos. 179 and 181).

## IV.    ARGUMENT

### A.    The Court Should Deny Defendants' Attempt to Re-litigate Decided Issues

Defendants' MJOP impermissibly seeks to re-litigate decided pleadings issues a year into discovery. Thus, the MJOP is improper on its face and the Court need not address its substance.

First, the Court already considered Defendants' challenges to the sufficiency of the SAC with respect to Statements 4, 6 and 7, holding that the SAC "sufficiently alleges false or misleading statements as to Statements 4, 6, and 7," and "find[ing] the element of scienter adequately alleged, as to Statements 4, 6, and 7."  SAC Order at 12, 22. There is no good reason to give Defendants another bite at the apple where the Court has already determined that these allegations of the SAC were sufficiently pleaded. Indeed, some of Defendants' MJOP arguments were *explicitly* considered and decided by the Court; for example, the Court already determined that Statement 7's update about progress on the SAT was misleading because it necessarily implied that the FAT was complete. *Id*. at 11-12; *see also infra* §IV(B)(1)(b). Other arguments in the MJOP were *implicitly* considered and rejected, including that Statement 7 was inactionable puffery. *See* Dkt. No. 105 (Defendants' motion to dismiss the SAC) at 18-20 (making puffery challenges to other alleged statements regarding testing progress). Moreover, Defendants admit that each of their arguments *could have been* raised in their prior motions to dismiss (MJOP at 1); it appears they simply chose to keep some arguments in their back pocket. Defendants' rehashing of arguments

which were made and considered, or which could have been made in their motion to dismiss, warrants denial of their MJOP. *See Estep v. City of Somerset, Ky.*, 2011 WL 845847, at *2 (E.D. Ky. Mar. 8, 2011) ("If the defendant's 12(c) motion simply reiterates the same arguments that he made in his 12(b)(6) motion, the court should deny it out of hand. If the defendant raises new arguments in his 12(c) motion that he could (and should) have raised in his 12(b)(6) motion, the court should usually deny the 12(c) motion.").

The Court should also deny the MJOP because the Court's prior decision denying Defendants' motion to dismiss Statements 6 and 7—particularly with respect to the MJOP's challenges that were explicitly or implicitly before the Court on the motion to dismiss—is law of the case and bars re-litigation of those issues. *See Gen Digital, Inc. v. Sycomp*, 2025 WL 895212, at *2 (N.D. Cal. Mar. 24, 2025) ("[A] Rule 12(c) motion for judgment on the pleadings that raises issues already decided on a prior Rule 12(b)(6) motion to dismiss is subject to the 'law of the case' doctrine."); *Pampena v. Musk*, 2024 WL 3678002, at *3 (N.D. Cal. Aug. 5, 2024) (denying motion for judgment on the pleadings premised on purportedly countervailing statements of which "the Court was fully aware" when it denied the motion to dismiss notwithstanding a lack of "full briefing" on the particular argument). Defendants already argued in their motion to dismiss the SAC that Statements 6 and 7 were not misleading in the context that they were made. *See* Dkt. No. 105 at 17-18. Defendants' MJOP "that challenges the sufficiency of a complaint on the same ground as [that] already-denied Rule 12(b)(6) motion to dismiss should meet an identical fate." *Aviles v. S&P Glob., Inc.*, 2020 WL 1689405, at *3 (S.D.N.Y. Apr. 6, 2020).

To disturb the Court's SAC Order, Defendants must clear the high bar for reconsideration. *See Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 293 (D. Conn. 2021) ("Insofar as the motion [for judgment on the pleadings] relies on arguments previously considered and rejected, it constitutes, in substance, a motion for reconsideration and will be treated as such."). Defendants make no attempt to do so; indeed, they admit that their new counsel is simply taking another swing where their prior counsel missed. MJOP at 1. However, "[t]he fact that defense counsel believes that the previous motion to dismiss was erroneously decided, and erroneously presented by [their] co-counsel, is not a persuasive reason for the Court to exercise its discretion to revisit" the

sufficiency of Plaintiffs' allegations. *Strigliabotti v. Franklin Res., Inc.*, 398 F. Supp. 2d 1094, 1098 (N.D. Cal. 2005).

Defendants also concede that the extrinsic documents on which their renewed arguments rest were already presented to the Court in connection with Defendants' prior motions to dismiss.[3] RJN at 1 and n.1. Defendants are now simply highlighting different portions of those documents to make essentially the same arguments that Statements 6 and 7 are not misleading their full context. "Defendants' instant challenge to plaintiffs' claims is essentially the same, but with a different emphasis." *Strigliabotti*, 398 F. Supp. 2d at 1098. Accordingly, Defendants' attempt to re-litigate these issues should be denied on its face.

*Second*, the Court should deny the MJOP because its apparent purpose and effect is to delay these proceedings. *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2017) ("The determination whether the motion is a legitimate one or simply has been interposed to delay the trial is within the sound discretion of the judge."). Defendants filed their MJOP *fifteen months* after the SAC and *eleven months* after the SAC Order. There is no dispute that the arguments in Defendants' MJOP have been available to them since the SAC was filed. Given Defendants' position that the very filing of the MJOP triggered an automatic stay of the entire case—a dubious claim that the Court rightfully rejected (Dkt. No. 182)—the obvious inference is that Defendants timed the MJOP filing to inflict strategic delay. *See Jones v. Town of Quartzsite*, 2014 WL 12617038, at *2 (D. Ariz. Feb. 24, 2014) ("The excessive delay and timing of the motion suggests Defendants strategically waited to file the motion."); *see also* Dkt. Nos. 166 and 180 (outlining Defendants' multiple attempts to delay key proceedings in this case). Indeed, Defendants' tactic successfully obtained indefinite delay of Plaintiffs' pending motion for class certification. *See* Dkt. No. 179 (suspending further briefing on class certification pending resolution of the MJOP). In these circumstances, the Court should decline to entertain the MJOP. *See Cardenas v. Cnty. of Ventura*, 2025 WL 1415331, at *4 (C.D. Cal. Apr. 11, 2025) (finding

---

[3] That the court previously declined to take formal judicial notice of some of these documents—because doing so was not essential to the Court's prior rulings—does not change the fact that the Court had the opportunity to consider them. *See Pampena*, 2024 WL 3678002, at *3.

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

MJOP "untimely" where "the pleadings had been closed for more than three months"); *Hutton v. XPO Logistics Freight Inc.*, 2025 WL 264208, at *3 (D. Ariz. Jan. 22, 2025) (finding MJOP filed "[m]ore than a year" after the defendants' answer was "extremely late"); *S.E.C. v. Hemp, Inc.*, 2018 WL 1220566, at *2 (D. Nev. Mar. 8, 2018) (declining to consider motion filed "almost an entire year after [the defendants] answered the complaint" because it would "cause[] undue and unnecessary delay"); *ADYB Engineered For Life, Inc. v. Edan Admin. Servs. Ltd.*, 2022 WL 912127, at *9 (S.D.N.Y. Mar. 28, 2022) (collecting cases).

The Court should also deny the MJOP because, contrary to Defendants' vague and unsupported assertions, it will do nothing to streamline this case. A motion for judgment on the pleadings is "an auxiliary or supplementary procedural device to determine the sufficiency of the case before proceeding any further and investing additional resources in it." Wright & Miller § 1367. Here, discovery is already well underway, and it will continue in substantially the same scope even if Defendants were to prevail on the MJOP. The two statements Defendants challenge (again) concern the same factual issues as the statement Defendants do not contest. Even if the MJOP were granted, it would not change the class period that Plaintiffs seek to certify. Indeed, discovery conducted thus far has already confirmed Plaintiffs' core allegations: that Defendants misleadingly implied to investors that the Yinghe equipment passed the FAT when they knew it had not. Accordingly, there is no practical purpose to further testing of the pleadings under the plausibility standard. *See Perez v. Oak Grove Cinemas, Inc.*, 2014 WL 1796674, at *4 (D. Or. May 5, 2014) (collecting cases).

The ongoing development of the factual record also underscores why the Court should not entertain Defendants' belated MJOP at all. Considering the MJOP on its merits will encourage further serial pleading challenges—followed by pleading amendments if necessary—in cat-and-mouse fashion, wasting the parties' (and the Court's) resources on needless motion practice on issues that will be presented on a full record at the summary judgment stage anyway. *See* Dkt. No. 183 (resolving discovery dispute, noting "[t]he Court is more concerned with getting to the truth of the substance of this lawsuit"). At this juncture, judicial economy is better served by reserving Defendants' challenges for the summary judgment stage. *Antero Res. Corp. v. C & R Downhole*

*Drilling, Inc.*, 2019 WL 13193860, at *2 (N.D. Tex. Sept. 13, 2019) ("Where a court recognizes that an application of the plausibility standard would not screen out claims and that the filing of a motion for summary judgment by the party seeking dismissal is certain, such a consideration can serve an important role in streamlining litigation by declining to consider the merits of a motion to dismiss following discovery."); *see also Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) ("once the parties have invested substantial resources in discovery, a district court should hesitate to entertain a Rule 12(c) motion that asserts a complaint's failure to satisfy the plausibility standard."); *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1233 n.3 (8th Cir. 2010) (indicating concern over a district court entertaining a Rule 12(c) motion to apply the plausibility standard after an extensive factual record had already been developed).

For these reasons, the Court should deny or refuse to consider the MJOP at the outset.

**B.      Defendants' Arguments Fail on the Merits**

To the extent the Court considers the merits of Defendants' MJOP—notwithstanding its improper and delayed attempt to re-litigate the SAC Order—it should still deny the motion.

In ruling on a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the Court applies the same standard as ruling on a motion to dismiss pursuant to Rule 12(b)(6). *See Pampena*, 2024 WL 3678002, at *2; Wright & Miller § 1368. A motion to dismiss under Rule 12(b)(6) tests only whether the factual allegations in the complaint "plausibly suggest an entitlement to relief." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). While a securities fraud complaint is subject to the heightened pleading requirements of Rule 9(b) and the PSLRA, a court considering a motion to dismiss must assess the complaint "in its entirety," accepting all well-pled factual allegations as true and construing those allegations in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). If there are competing, plausible explanations advanced by both defendants and plaintiffs, the complaint survives a motion to dismiss. *Starr*, 652 F.3d at 1216.

A motion to dismiss a complaint for violation of § 10(b) and Rule 10b-5 will be denied so long as the plaintiff alleges: "(1) a material misrepresentation or omission by the defendant

["falsity"]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). In their MJOP, Defendants contest only the elements of falsity and scienter, and only with respect to two of the misleading statements alleged in the SAC: Statements 6 and 7.

### 1. The SAC Adequately Alleges the Falsity of Both Challenged Statements

Statements and omissions of material fact are actionable if they are either false or misleading. *Matrixx*, 563 U.S. at 37. "A statement or omission is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 691 (9th Cir. 2011). Even literally true statements may mislead, due to their context and manner of presentation. *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). "Falsity is subject [only] to … the reasonable inference standard of plausibility." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) ("we do not impute the strong inference standard of scienter to the element of falsity; we do not require a 'strong inference of fraud.'").

Allegations that a statement "differs dramatically" from the true facts are sufficient to allege falsity. *See Zhou v. Faraday Future Intelligent Elec. Inc.*, 2022 WL 13800633, at *6 (C.D. Cal. Oct. 20, 2022). So too are statements that "directly contradict[] what defendant[s] knew at the time." *Forescout Techs.*, 63 F.4th at 764; *see also Hsu v. Puma Biotech., Inc.*, 2018 WL 4945703, at *8 (C.D. Cal. Oct. 5, 2018) (holding that where a defendant "chose to make statements directly inconsistent with the information he did have," a "triable issue of fact" exists). A misleading statement or omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investors as having significantly altered the 'total mix' of information made available." *Miller*, 519 F.3d at 889 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). Materiality is an intensely fact-specific inquiry, and dismissal is appropriate only where a lack of materiality "is so obvious that reasonable minds could not differ." *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021).

Here, the SAC alleges particularized facts plausibly demonstrating that Statements 6 and 7 were materially misleading when made.

### a.    Statement 6 Was Materially Misleading

The context that Defendants point to regarding Statement 6 does not change the fact that it was materially misleading. Defendants focus on the narrowest possible interpretation of Statement 6 and argue that it was literally true. At this stage, however, competing interpretations of Statement 6 must be resolved in Plaintiffs' favor. *See Starr*, 652 F.3d at 1216. Moreover, even crediting Defendants' interpretation of Statement 6, the law is clear that the literal truth of a statement is not the end of the inquiry; a literally true statement may still be materially misleading in the context in which it was made. *Miller*, 519 F.3d at 886. Indeed, the full context of Statement 6 confirms that it was materially misleading for several reasons.

First, the Court should not put blinders on and accept Defendants' argument that Rust's statement was literally true if limited only to the testing of "proprietary equipment." Defendants' MJOP suggests that the phrase "proprietary equipment" was a defined term that referred only to specific machine parts or specific segments of the Fab-1 production line. That is not the case. To the contrary, the August 10, 2021 Shareholder Letter (which Rust was discussing on the August 10, 2021 call) describes how the Fab-1 production line "includes a combination" of various "propriety" and "standard" equipment, and that "[t]his equipment incorporates our proprietary ... processes." Dkt. No. 175-4. Thus, Enovix used the term "proprietary" to refer both to certain equipment *and* to larger processes incorporated into the combination of proprietary and standard equipment. When viewing the entirety of the colloquy between the analyst and Rust (*see* Dkt. No. 175-5 at 6-7), it is clear that the discussion concerns the "production" capabilities of the Fab-1 production line—*i.e.*, the efficacy of Enovix's propriety *processes*—not just the isolated performance of any specific "proprietary" piece or segment of the production line. Rust and the analyst are discussing full "volume production," "production that's fully automated," and the ability of the Fab-1 production line to "deliver to the intended specs," which they each specifically distinguish from "stuff in R&D [that] is a bit more manual in nature." *Id.* The distinction is important because for full, automated production Enovix needed the *entire* production line to work.

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

¶96 ("Each of the areas [of the Fab-1 production line] were critical to complete the manufacturing process, such that all of the production areas must be running at full speed in order for Fab-1 to produce quality batteries at the specified rates").

Moreover, even interpreting the analyst's initial inquiry as focusing only on the proprietary *components* of the production line, to the complete exclusion of the "standard" components integral to Enovix's manufacturing processes (a farfetched and needlessly narrow interpretation), the larger context of the analyst's back-and-forth discussion with Rust shows that his real concern is that there are "no red flags" with *any* of the equipment that might impede "volume production" that is "fully automated." Indeed, Defendants concede that the "standard" components comprised **70%** of the production line. MJOP at 12. It would not be possible to "deliver to the intended [capacity] specs," as Rust indicated, if a major part of the production line never passed the required FAT and, as Plaintiffs alleged, "never got close to meeting Enovix's capacity specifications." ¶100.

The relevant information Rust was conveying to investors in Statement 6 was the existence of "red flags" concerning the ability of the Fab-1 production line to make whole batteries (not just parts of them) at commercially viable quality and scale. He did not specifically distinguish any variance in the testing and performance of each and every component, giving the misleading impression that there were "no red flags" with the ability of the production line, as a whole, to "deliver to the intended specs." If a trapeze artist asks if the bar is safe, and her partner tells her there are "no red flags" with the bar even though he knows the rope is frayed, that is materially misleading even if the bar itself is perfectly intact. Likewise, the Yinghe equipment's inability to pass the required FAT was a massive "red flag." Rust's omission of that critical fact rendered Statement 6 materially misleading because it "would have been viewed by the reasonable investors as having significantly altered the 'total mix' of information made available." *Miller*, 519 F.3d at 889.[4]

---

[4] To the extent the Court finds that Rust's statements were misleading for reasons incorporated into, but not explicitly alleged in, the SAC, Plaintiffs are willing to amend their complaint to reflect the full statements, although they do not believe doing so is necessary at this stage. *See Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (leave to replead is routinely granted in securities cases).

Second, contrary to Defendants' assertions it is not at all clear from the SAC and incorporated documents that the Yinghe equipment comprised only "standard" or non-proprietary equipment. Not one of the documents Defendants point to conclusively establishes that purported fact, and Defendants are not entitled to have disputed interpretations and inferences drawn in their favor at the pleading stage. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998–99 (9th Cir. 2018) (warning that "[i]f defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief.").[5]

Based on the allegations of the SAC and the context of Statement 6, a reasonable investor may have understood Rust to mean, or imply, that there were "no red flags" with the testing of the Yinghe Fab-1 equipment. Defendants' argument to the contrary relies on a string of several inferences and interpretations which neither prove Defendants' interpretation nor preclude Plaintiffs'. The August 10, 2021 Shareholder Letter does not say that the "proprietary equipment" came *exclusively* from U.S.-based factory vendors. It also does not say that "standard battery industry production equipment" did not include any proprietary elements. It says only that the Fab-1 production line "includes a **combination** of Enovix-designed proprietary equipment from tier one U.S.-based factory automation vendors as well as standard battery industry production equipment. This equipment **incorporates** our proprietary ... processes." The SAC's allegations that Enovix flew over "manufacturing equipment" from Yinghe to Fab-1 does not specify that the equipment was "proprietary," "standard," or a combination of the two. The Yinghe equipment may have included mostly "standard" or "conventional" battery manufacturing equipment that was modified to conform to Enovix's proprietary equipment, designs, or other requirements. Indeed, even assuming that the equipment procured from Yinghe was *mostly* "standard," it is nonetheless

---

[5] While Plaintiffs do not dispute that judicial notice of the documents Defendants submit is proper for the purpose of establishing what was said in those documents, the Court may not take judicial notice of the *truth* of their contents. *Khoja*, 899 F.3d at 1001 (judicial notice is improper "when the substance of the [document] is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes.").

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

entirely plausible that the equipment must still have incorporated various "proprietary" battery design elements in order to integrate it with other components comprising Fab-1's "propriety" battery manufacturing processes. Defendants' unfounded suggestion that the Yinghe equipment was essentially "off the rack" cannot overcome the SAC's well-pleaded allegations that Enovix contracted Yinghe to provide *custom* equipment in order to implement the Company's *proprietary* battery manufacturing processes. *See* ¶95 ("Enovix contracted with vendors who helped design and produce custom manufacturing equipment."). How exactly "standard" and "proprietary" components were combined to do so is a fact-intensive inquiry that Defendants cannot establish as a matter of law at this stage.

Therefore, the Court cannot accept Defendants' invitation to conclude as a matter of law that Rust was clearly ***not*** referring to the testing of the Yinghe equipment in Statement 6, particularly at the pleading stage, where Plaintiffs are entitled to have all fair inferences drawn in their favor. Plaintiffs' countervailing interpretation of Statement 6 is plausible, which is sufficient for the pleading stage. The appropriate time to resolve these competing interpretations is at summary judgment, after testing the relevant facts in discovery. "Where terms [in an alleged misstatement] are reasonably susceptible to different interpretations, it's appropriate to resolve that issue with evidence at a later stage." *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 656 (S.D. Tex. 2021) (denying motion to dismiss claims where the court found it "conceivable here that investors could have understood" alleged statement in line with the plaintiffs' interpretation); *In re Bayer AG Sec. Litig.*, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) ("While other interpretations may be plausible, plaintiffs are entitled to all reasonable inferences at the pleading stage.").

### b.    Statement 7 Was Materially Misleading and Not Puffery

Statement 7 was materially misleading for the same reasons that the Court found—and Defendants do not contest—that Statement 4 was misleading. Namely, Statement 7 "implied the Fab-1 equipment had passed the FAT" when, in fact, it "never passed the FAT." SAC Order at 11-12.  Indeed, Hence, "it was false and misleading for Rust to state in September [2021] that the testing out of each piece of equipment was 'going on quite well.'" *Id.* at 12.

As the Court observed, the same context that made Statement 4 misleading is also what made Statement 7 misleading: namely, Enovix's explanation of how the SAT would be conducted only *after* the equipment passed the FAT. It is Defendants, not Plaintiffs, who are ignoring or obscuring the relevant context here. Defendants specifically told investors in the February 22, 2021 investor presentation that "*[e]quipment must perform to specification at the vendor's factory [during the FAT] before shipment to Enovix.*" ¶129. As Enovix explained in Statement 4 (issued one month before Statement 7): (1) the SAT was the "first step" in qualifying; and (2) the SAT purportedly served to "confirm," after installation in Fremont, the results of the FAT that was "already performed at the vendor's facility before taking delivery." ¶138 ("With the equipment for Line 1 installed, our factory is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery."); *see also* ¶87 ("if the equipment fails to meet the FAT specifications set out in the contract, it is not shipped to the customer"); ¶91 ("[the SAT] provides an opportunity to confirm that the performance experienced during the FAT can be replicated after the equipment is installed and configured at the customer's site").

Just as Statement 4 was misleading because the SAT could not "confirm" the FAT when the equipment had never passed the FAT in the first place, Statement 7 was misleading because qualifying and post-installation testing (*i.e.*, the SAT) could not be "going on quite well" when the SAT (the "first step" in qualifying) could not "confirm" the equipment was still meeting performance requirements after the FAT, which, as Defendants knew but never disclosed, the equipment had not passed. Thus Statement 7 was misleading because it reiterated the false implication, first made in Statement 4, that the Fab-1 equipment had passed the FAT. *See* SAC Order at 12 (finding the SAC sufficiently alleges falsity as to Statement 7, because if the Fab-1 equipment "never passed the FAT, it was false and misleading for Rust to state in September [Statement 7] that the testing our of each piece of equipment was 'going on quite well.'"). It is misleading for a company to "tout positive information to the market," such as the fact that the Fab-1 equipment was undergoing the qualifying and SAT process, but fail to "disclos[e] adverse

- 17 -

information that cuts against the positive information," such as the fact that the equipment never passed the FAT. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016).

Unlike the context provided in Statement 4, the sentences immediately surrounding Statement 7 that Defendants assert were misleadingly omitted do not materially add to or change the context or meaning of the statement. There is no dispute, and indeed the SAC itself plainly alleges, that the qualifying process and SAT occur after installation. *See, e.g.*, ¶¶91-92 (describing SAT), ¶94 ("to complete the qualification process [Enovix's production line] had to pass the FAT and SAT."); ¶¶112-13 (describing SAT and qualification process after installation), ¶138. The context that *does* matter is that Defendants told investors that installation only occurs after passing the FAT.

Defendants' argument that Statement 7 was inactionable puffery also does not hold water. The central misleading aspect of Rust's statement was not his subjective assessment of whether the SAT was going "well" versus "poorly." The misleading information he conveyed to investors was the implied fact—based on Defendants' prior explanations of the FAT, SAT, and qualification processes—that "*the Fab-1 equipment had passed the FAT.*" SAC Order at 11. In other words, Statement 7 was misleading because omitting the material fact that the equipment had not passed the FAT gave investors the false impression that the ongoing qualifying and SAT process aimed to "confirm" that the Fab-1 equipment was still meeting performance requirements after it had passed the FAT. The false implication is that the FAT was passed prior to installation, which is a fact capable of objective verification and therefore not puffery. *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 606 (9th Cir. 2014) ("Statements … that are capable of objective verification are not 'puffery' and can constitute material misrepresentations.").

Even if the misleading aspect of Rust's statement was the progress of testing more generally (beyond the specific and false implication that the equipment passed the FAT), Statement 7 was still not puffery. While it is generally true that vague or optimistic statements are not actionable, courts in the Ninth Circuit routinely find that "even 'general statements of optimism, when taken in context, may form the basis for a securities fraud claim' when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly."

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

*In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017) (quoting *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996)). That is precisely what happened here, where Statement 7 falsely implied that the equipment had passed concrete testing benchmarks (the FAT) that had been previously communicated to investors when Defendants knew it had not. Similarly, in *Warshaw*, 74 F.3d at 959, statements reassuring investors that "everything [was] going fine" with FDA approval when the company knew FDA approval would never come was materially misleading. Likewise, a statement that the company "anticipates a continuation of its accelerated expansion schedule" when the expansion had already failed was materially misleading. *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). Statement 7 "affirmatively created an impression of a state of affairs that differed in a material way from the one that actually existed," and thus it was materially misleading. *Quality Sys.*, 865 F.3d at 1144 (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)).

Finally, Statement 7 was also misleading to the extent the ongoing SAT and qualifying efforts themselves were demonstrably and objectively not "going on quite well," as alleged in the SAC. ¶145. The Yinghe Fab-1 equipment never passed the FAT and never got close to meeting performance requirements or passing the SAT after nearly 2 years of attempted improvements. *See* ¶110-24. The equipment was only producing less than 10% of the required production rate by June 2022 despite continuous improvement efforts, nearly a year after Statement 7 was made, and by December 2022 it still hadn't cracked 20%. ¶122. The only plausible inference to draw from these allegations is that when Statement 7 was made in September 2021, the equipment was still producing at no more than 10% capacity after failing to pass the FAT. By no reasonable measure could it be said in light of those facts that SAT or qualifying was "going on quite well" at the time Statement 7 was made.

### 2. The SAC Adequately Alleges Statements 6 and 7 Were Made With Scienter

At the pleading stage, Plaintiffs do not have to prove scienter but instead simply "'state with particularity facts giving rise to a strong inference' that defendants acted with the intent to deceive" or, at minimum, "with deliberate recklessness as to the possibility of misleading

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

investors." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) (quoting PSLRA); *see also Vernazza v. S.E.C.*, 327 F.3d 851, 860 (9th Cir. 2003) (section 10(b) claims "may be supported by knowing or reckless conduct, without a showing of willful intent to defraud"). Scienter may be established either (1) upon "any one of the plaintiff's allegations" that is "alone sufficient to give rise to a strong inference of scienter," or (2) upon "a 'holistic' review to determine whether the allegations combine to give rise to a strong inference of scienter." *Forescout Techs.*, 63 F.4th at 765; *see also Tellabs*, 551 U.S. at 322-23 ("The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter."). Moreover, the inference of knowing or reckless fraud "need not be irrefutable, *i.e.*, of the smoking-gun genre," and it need only be at least *equally* as likely as any non-culpable explanation of the alleged conduct. *Tellabs*, 551 U.S. at 314 and 324.

Defendants' scienter arguments are entirely derivative of their arguments concerning falsity. Hence, just as the Court should once again find that Statements 6 and 7 were materially misleading, it should also find again—as it did in the SAC Order—that the SAC adequately alleges a strong inference that those statements were made with scienter.

In denying Defendants' motion to dismiss as to Statements 4, 6, and 7, the Court found that the SAC's allegations, particularly that the Yinghe equipment never passed the FAT and that Rodgers and Rust secretly waived that requirement, sufficiently supported a strong inference that Defendants knew or recklessly disregarded that they the equipment had never passed the FAT and thus that Statements 4, 6, and 7 were misleading. SAC Order at 20. The Court also found that "[w]hether or not the Fab-1 equipment was performing to specification at the factory was information of such importance "that it would be absurd to suggest that top management was unaware of it." *Id.* (quoting *Berson*, 527 F.3d at 987 and 989). Finally, the Court found that "the allegation that Rust and Rodgers decided to waive passage of the FAT is 'at least as compelling as any opposing inference' that the executives did not know the status of the equipment before deciding to spend $1.4 million to rush shipment of the equipment to Fremont." *Id.* at 20-21 (quoting *Tellabs*, 551 U.S. at 324). These same allegations are still sufficient to support a strong inference that Statements 6 and 7 were made with scienter.

Defendants do not contest that the SAC adequately alleges Rust knew, or recklessly disregarded, that the Yinghe equipment never passed the FAT and was not performing to Enovix's production specifications before he and Rodgers secretly waived that requirement.[6] Instead, Defendants resort to arguing that Rust may have subjectively believed that his statements were literally true. MJOP at 16-17. This purported non-culpable inference is neither plausible nor *more* compelling than the inference that Rust knowingly or recklessly misled investors by omitting critical facts. *See Tellabs*, 551 U.S. at 314.

As explained above, it was misleading for Rust to say that there were "no red flags" with respect to the testing of Enovix's proprietary production line equipment when he knew or recklessly disregarded that the Yinghe equipment—which either incorporated or was combined with proprietary equipment in the production line—never passed the FAT. Likewise, it was misleading for Rust to say that post-installation qualifying, including the SAT, were "going on quite well" when he knew or recklessly disregarded that the Yinghe equipment never passed the FAT and thus the SAT could not possibly "confirm" the FAT.[7] That Rust knew facts contradicting his statements supports a strong inference that he acted with at least "deliberate recklessness as to the possibility of misleading investors." *Berson*, 527 F.3d at 987; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("[T]hat the defendants published statements when they knew facts suggesting the statements were inaccurate … is classic evidence of scienter.").

Defendants' cited authorities provide no support for their arguments. This case is unlike *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 526, 533

---

[6] Defendants do not contest that Rust's scienter is imputed to Enovix. *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).

[7] Contrary to Defendants' assertion, MJP at 17, the SAC also alleges ample facts showing that Rust knew, or recklessly disregarded, that post-FAT testing (the SAT) and qualification were not "going on quite well," even putting aside the fact that they could not possibly "confirm" the FAT that Rust knew was never passed in the first place. *See* Dkt. No. 109 at 19-20 (Plaintiffs' opposition to Defendants' motion to dismiss the SAC, detailing allegations that "Rust was aware that the Fab-1 equipment from Yinghe was not performing, and never had performed, to Enovix's specifications"); ¶¶112-24.

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

(6th Cir. 2023), where the relevant analyst question and answer concerned general nationwide pricing trends, which were not rendered misleading in light of price increases in Mobile, Alabama, which were not plausibly alleged to have impacted national pricing trends. Here, in contrast, Rust knew or recklessly disregarded that the Fab-1 production line could not possibly "deliver to the intended [capacity] specs" if a major component of the line (the Yinghe equipment) was not up to snuff. Thus, Statement 6 was made with knowledge or reckless disregard for its misleading nature. In *Geffon v. Micrion Corp.*, 249 F.3d 29, 37 (1st Cir. 2001), the court was assessing a motion for summary judgment where it found the *evidence*, not just pleadings, suggested only that one company officer may have had a different interpretation of certain terminology than was used in the company's statements, which was insufficient to support scienter. Here, while discovery will eventually bear out to what extent Yinghe's equipment comprised or incorporated "proprietary equipment" and/or was combined with and necessary to the performance of, other "proprietary equipment" in the Fab-1 production line, on a motion directed at the pleadings the Court is not assessing the sufficiency of Plaintiffs' *evidence*. The question is only whether Plaintiffs have sufficiently *alleged*, drawing all fair inferences in Plaintiffs' favor, that Rust knew or recklessly disregarded material facts underlying the misleading nature of his statements. The SAC adequately alleges a strong inference that Rust made Statements 6 and 7 with scienter.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for partial judgment on the pleadings.

Dated: July 28, 2025                          Respectfully submitted,

                                              **THE ROSEN LAW FIRM, P.A.**

                                              By: */s/Joshua Baker*
                                              Laurence M. Rosen (SBN 219683)
                                              355 S. Grand Avenue, Suite 2450
                                              Los Angeles, CA 90071
                                              Telephone: (213) 785-2610
                                              Email: lrosen@rosenlegal.com

PLAINTIFFS' OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS; 3:23-CV-71-SI

Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Email:  pkim@rosenlegal.com
       jbaker@rosenlegal.com

**ROLNICK KRAMER SADIGHI LLP**
Lawrence M. Rolnick
Marc B. Kramer (*pro hac vice*)
Nicole Castiglione (*pro hac vice*)
Shane Kunselman (*pro hac vice*)
1 Pennsylvania Plaza, Suite 3401
New York, New York 10119
Telephone: (212) 597-2800
lrolnick@rksllp.com
mkramer@rksllp.com
ncastiglione@rksllp.com
skunselman@rksllp.com

*Co-Lead Counsel for Plaintiffs*