UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | Case No. 23-cv-00071-SI<br><br>**ORDER GRANTING MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. No. 175 |

Now before the Court is defendants' motion for partial judgment on the pleadings. Dkt. No. 175. Pursuant to Civil Local Rule 7-1(b), the Court finds this matter suitable for resolution without oral argument and VACATES the hearing set for October 17, 2025. For the reasons set forth below, the Court GRANTS the motion.

**BACKGROUND**

**I.   Factual Background**

The factual background of this case is stated more fully in the Court's prior orders on the motions to dismiss. *See* Dkt. Nos. 97, 116. To re-state, "Enovix is an early-stage technology company that purports to make a new type of lithium-ion ('Li-ion') battery that is smaller and stronger than conventional Li-ion batteries." Dkt. No. 102 ("SAC") ¶ 2. Based in Fremont, California, Enovix has been developing its technology since 2007. *Id.* ¶ 75. In 2012, Enovix began "work on the manufacturing approach[.]" *Id.* Between 2012 and 2017, the company "could produce small quantities of Li-ion batteries to provide to potential customers as samples, but not at commercially viable levels." *Id.*

In early 2020, Enovix started the process of procuring custom manufacturing equipment for

its first production factory, "Fab-1," to be located in Fremont. *Id.* ¶ 5. Enovix outsourced the development and production of a large portion of the Fab-1 equipment to Shenzhen Yinghe Technology Co. Ltd. ("Yinghe") in China. *Id.* Enovix had an "Equipment Procurement Review" in place to govern the procurement of the equipment from Yinghe. *Id.* ¶ 6. This document included "requirements that the equipment pass critical quality tests before Enovix accepted delivery[,]" including that the equipment had to pass a "Factory Acceptance Test." *Id.* ¶¶ 6-7.

According to the SAC, "two key quality control tests" are known as the "Factory Acceptance Test" ("FAT") and "Site Acceptance Test" ("SAT"). *Id.* ¶ 85. "The FAT is performed offsite at the equipment vendor's factory to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications. To conduct the FAT, the new manufacturing equipment is set up at the vendor's factory and tested in accordance with a detailed plan agreed upon by the purchaser and the equipment vendor." *Id.* ¶ 86. "The SAT is the next critical quality control procedure[,]" and takes place once the manufacturing equipment has been installed on site at the customer's facility. *Id.* ¶¶ 91-92. "To conduct the SAT, the equipment vendor sends representatives—typically the same engineers who designed the system and conducted the FAT—to install the equipment, configure it, conduct tests, and verify that the equipment operates correctly." *Id.* ¶ 92.

"[A]round November and December 2020, with 3 or 4 iterations of testing spaced half a month to a month apart[,]" the first FAT for the Yinghe-made Fab-1 equipment took place. *Id.* ¶ 9. The equipment failed the FAT. *Id.* Yinghe continued working on the equipment and kept testing for months, to no avail. *Id.* ¶ 10. Yinghe conducted the final FAT in April 2021, and "the equipment failed yet again." *Id.* The SAC alleges, "Due to Covid-19-related travel restrictions in late 2020 and early 2021, Enovix's engineers were never permitted to travel to China to participate in the FAT." *Id.* ¶ 8.

Meanwhile, in February 2021, Enovix announced its plans to go public by merging with Rodgers Silicon Valley Acquisition Corp. ("RSVAC"), "a public special purpose acquisition company known as a 'SPAC' or 'blank check' company . . . whose lone stated purpose is to acquire a private company." *Id.* ¶¶ 3, 59, 64.

According to the SAC, in April 2021 "Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment pass the FAT and had it airlifted to Fremont." *Id.* ¶ 105. ". . . Rust called Rodgers and proposed to fly the Yinghe equipment from China to Fremont to avoid a potential three-month delay due to global shipping backlogs[.]" *Id.* Rodgers approved the plan. *Id.* They "planned to 'catch up later' with continued improvement efforts and testing after installing the equipment in Fremont. They spent $1.4 million to prematurely fly over the equipment so they could tell investors that the Fab-1 equipment had arrived and was installed as the critical Merger [with RSVAC] was awaiting shareholder approval." *Id.* ¶ 11.

On June 24, 2021, the Company issued a "Proxy Statement and Prospectus," soliciting shareholder approval of Enovix's merger with Rodgers Silicon Valley Acquisition Corp. *Id.* ¶ 65. The Company filed the Proxy Statement with the Securities and Exchange Commission ("SEC") on Form 424B3 the same day. *Id.* On July 14, 2021, the merger closed. *Id.* ¶ 69.

In the meantime, once the Yinghe equipment came to Fremont in late April 2021, Enovix's engineers installed the equipment at Fab-1 without the assistance of Yinghe's engineers. *Id.* ¶¶ 12, 106. Plaintiffs allege that "Enovix's engineers struggled for months to get the Fab-1 equipment operating at full capacity, but their efforts failed. Eventually the Company agreed to pay for Yinghe's engineers to travel to California and help work on and test the equipment. They fared no better." *Id.* ¶ 13. According to Former Employee 2, Yinghe's staff stayed in the United States for almost a year, from fall 2021 until September 2022. *Id.* ¶ 112. Even with a year of combined efforts, the equipment still never passed the SAT. *Id.* ¶ 124.

The SAC alleges, "In the second half of 2022, Enovix began to gradually reveal that the continued setbacks to the Fab-1 manufacturing equipment not only delayed the Company's goal of recognizing material product revenue by Q2 2022, but also pushed back the development of Enovix's next generation of manufacturing equipment, which had been expected to build upon the original Fab-1 line's success." *Id.* ¶ 156. By June 2022, the Fab-1 equipment was producing less than 10% of the expected production rate. *Id.* ¶ 14. By December 2022, the production had increased to about 100 UPH, or less than 20% of the expected rate. *Id.* ¶¶ 14, 170.

Plaintiffs argue that disclosures made on November 1, 2022; January 3, 2023; and October

3

3, 2023, caused the share price to fall, harming investors.

On November 7, 2022, Enovix announced that defendant Rodgers, previously Chairman of the Board, would become Executive Chairman of Enovix. *Id.* ¶¶ 39, 168. That day, Rodgers released a statement, stating, "We have poorly communicated on the status of Fab-1." *Id.* ¶ 168. Rodgers explained that the decision to charter the world's largest airplane to fly the manufacturing equipment from China "violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later." *Id.*

Rodgers went on to state,

> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.

*Id*. On November 10, 2022, Enovix announced it would bring in Ajay Marathe as Chief Operating Officer. *Id.* ¶ 173. On December 29, 2022, Enovix announced defendant Rust would "retire" from his role as President and CEO and as a member of the Board of Directors. *Id.* ¶ 174. Enovix replaced Rust that same day. *Id.*

On January 3, 2023, after the close of trading, defendant Rodgers hosted a special presentation for shareholders. *Id.* ¶ 175. Addressing concerns about the "lack of clear and transparent investor communications" concerning Fab-1, Rodgers stated, "I think they were reasonably misled." *Id.* ¶ 20. Regarding the first production line at Fab-1, Rodgers explained that the line "is nonfunctional for automation point of view. That means its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." *Id*. Rodgers went on to state that the second production line was only half built. *Id.* ¶ 177. Rodgers explained that "we didn't want to commit to the second half of the Line 2, until Line 1 worked." *Id.* Rodgers went on to provide more detail about the output issues at Fab-1. For instance, regarding one piece

4

1    of equipment that was rated to 550UPH, Rodgers stated, "[W]e don't think that machine if we
2    worked on it forever would be over 200[.]" *Id.* ¶ 178. Rodgers stated that Fab-1 was "doing less
3    than 10% of what it should be doing." *Id.*

4    On the January 3, 2023 call, Rodgers also announced further delays to the Gen2
5    manufacturing lines, which the complaint states "could be traced back to the problems with Fab-1
6    and its 'Gen1' production lines[.]" *Id.* ¶ 179. Rodgers stated the buildout of the Gen2 lines would
7    be delayed by several months, to the end of 2023 or beginning of 2024. *Id.* ¶ 180.

8    On October 3, 2023, Enovix announced that it was abandoning commercial production
9    operations at Fab-1 altogether, laying off 185 workers and writing off the value of $36 million of
10   Fab-1 equipment. *Id.* ¶¶ 189, 191.

## II.   Procedural Background

On January 6, 2023, plaintiff Maurice Twitchell filed suit on behalf of a putative class of investors who purchased or otherwise acquired Enovix or RSVAC common stock from February 22, 2021, through January 3, 2023. Dkt. No. 1 at 2. Following appointment of co-lead plaintiffs and plaintiff counsel, Dkt. No. 68, plaintiffs filed the Consolidated Class Action Complaint, amending the Class Period to June 24, 2021, through January 3, 2023. Dkt. No. 84 ("CC"). Defendants moved to dismiss. Dkt. No. 89.

On January 30, 2024, the Court issued an Order granting the motion to dismiss, with leave to amend. Dkt. No. 97. The Court found the consolidated complaint "suffer[ed] from a lack of particularity, especially with regard to the timing of events. As such, the allegations neither create[d] a reasonable inference that the statements were false or misleading at the time they were made, nor [did] they give rise to a strong inference of scienter." *Id.* at 14.

On March 19, 2024, plaintiffs filed the SAC, which is now the operative complaint. Dkt. No. 102. Plaintiffs bring this action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder by the Securities and Exchange Commission.

Defendants again moved to dismiss. On July 23, 2024, the Court issued an order granting

in part and denying in part the motion to dismiss. Dkt. No. 116.  The Court allowed the claims in the SAC to proceed with regard to Statements 4, 6, and 7, finding plaintiffs had adequately alleged the elements of a Section 10(b) claim as to these statements.  The order stated, in relevant part:

> …under the new allegations of the SAC, the Court finds plaintiffs have now alleged with particularity that Enovix brought the Fab-1 equipment to California without it ever having passed the FAT. Because the FAT by definition is to be conducted *at the vendor's factory*, SAC ¶ 86, by the time the equipment arrived in California in late April 2021, there was no way for the equipment to pass the FAT at that point.
>
> Accordingly, the Court finds that statements made after April 2021 that implied the Fab-1 equipment had passed the FAT were false or misleading.  These are:
>
> - **Statement 4** (August 10, 2021 "Letter to Our Shareholders"):
>
>   In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
>   With the equipment for Line 1 installed, our factory is now undergoing qualification. <u>The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery.</u> …
>
> SAC ¶ 138.[]  The Court agrees with plaintiffs that, if the equipment never passed the FAT, it was false and misleading for Enovix to state that the site acceptance test would "confirm" the equipment was meeting performance requirements and to state that the FAT was "already performed" without revealing that the equipment had failed the FAT.
>
> - **Statement 6** (Defendant Rust, on August 10, 2021 earnings call):
>
>   We have a pretty rigorous set of both factory and site acceptance things we have to go through and I would say there's no red flags there.
>
> *Id.* ¶ 142. The Court agrees with plaintiffs that, if the equipment never passed the FAT, it was false and misleading for Rust to state that there were "no red flags."
>
> - **Statement 7** (Defendant Rust, on September 9, 2021, at the Cowen 14th Annual Global Transportation & Sustainable Mobility Conference):
>
>   We're in the middle of qualifying, which means basically testing out of each piece of equipment, making sure it's operating as optimum operating point, making sure we

6

> understand where the process windows are. That's going on quite well.
>
> *Id.* ¶ 144. The Court agrees with plaintiffs that, if the equipment failed multiple rounds of the FAT through April 2021 and ultimately never passed the FAT, it was false and misleading for Rust to state in September that the testing out of each piece of equipment was "going on quite well."
>
> In sum, the SAC sufficiently alleges false or misleading statements as to Statements 4, 6, and 7.

*Id.* at 11-12. The Court found plaintiffs had failed to sufficiently plead the necessary elements for the remaining alleged nine misstatements.

Discovery proceeded in this case, and defendants had a change in counsel. Plaintiffs filed a motion for class certification, for which briefing was suspended after defendants filed the present motion for partial judgment on the pleadings.[1] Defendants move for partial judgment on the pleadings as to Statements 6 and 7, pursuant to Federal Rule of Civil Procedure 12(c).

**LEGAL STANDARDS**

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move to dismiss a suit "[a]fter the pleadings are closed . . . but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is "functionally identical" to a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989). The court must accept "all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party." *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (citing *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004)). "A judgment on the pleadings is properly granted when, taking all the allegations in the pleadings as true, [a] party is entitled to judgment as a matter of law." *Lyon v. Chase Nat'l Bank, USA, N.A.*, 656 F.3d 877, 883 (9th Cir. 2011) (quoting *Dunlap v. Credit Protection Ass'n, L.P.*, 419 F.3d 1011, 1012 n.1 (9th Cir. 2005)).

Securities fraud class actions must also "meet the higher, exacting pleading standards of

---

[1] Following their filing of the motion for partial judgment on the pleadings, defendants took the position that discovery should be automatically stayed under the PSLRA. Dkt. No. 178. The Court then issued an order confirming that discovery remained open pending resolution of the motion. Dkt. No. 182.

7

1   Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA).”
2   *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 604 (9th Cir. 2014) (citing *Tellabs,*
3   *Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007)). Rule 9(b) requires a party
4   alleging fraud or mistake to "state with particularity the circumstances constituting fraud or
5   mistake." Fed. R. Civ. P. 9(b). The PSLRA further requires that allegations based on false or
6   misleading statements must also "specify each statement alleged to have been misleading, the reason
7   or reasons why the statement is misleading, and, if an allegation regarding the statement or omission
8   is made on information and belief, the complaint shall state with particularity all facts on which that
9   belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). Additionally, the complaint must "state with
10  particularity facts giving rise to a strong inference that the defendant acted with the required state
11  of mind" for "each act or omission." *Id.* § 78u-4(b)(2)(A).

### DISCUSSION

14  Defendants argue that plaintiffs omitted critical context from Statements 6 and 7 in the SAC
15  that would show these statements are neither material misrepresentations by the defendants nor that
16  defendants had the requisite scienter. Plaintiffs oppose on multiple grounds, including that
17  defendants improperly seek to relitigate issues already decided and that could have been raised in
18  their motion to dismiss. Plaintiffs stand by their allegations in the SAC and contend that the Court
19  correctly found Statements 6 and 7 actionable and that, construing the allegations in plaintiffs' favor
20  at this stage, the claims should proceed.

21  The Court first addresses the threshold argument that the present motion improperly seeks a
22  second bite at the apple. Although it is true that defendants could have presented this argument in
23  their prior motion to dismiss, the Court will consider the motion, in light of the change in counsel
24  and because the present motion provides context omitted from plaintiffs' allegations. "The authority
25  of a district judge to reconsider a previous ruling in the same litigation . . . is governed by the doctrine
26  of the law of the case, which authorizes such reconsideration if there is a compelling reason . . . ."
27  *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006) (citations omitted).
28  Having reviewed the motion and exhibits, the Court finds compelling reason to revisit Statements 6

1   and 7, in the interest of ensuring the claims have met the high bar of Rule 9(b) and the PSLRA.

2   The Court now turns to the alleged misstatements themselves. To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Weston Family P'ship LLP v. Twitter, Inc.*, 29 F.4th 611, 619 (9th Cir. 2022) (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

9   To establish falsity under the first element, the misrepresentation or omission must either "directly contradict what the defendant knew at that time" (i.e., be false) or "omit[ ] material information" (i.e., be misleading). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018). Not all omissions are actionable. *Id.* at 1009. "Disclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). For a statement or omission to be misleading, it must "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted). "To fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (internal quotation marks omitted).

### I.     Statement 6

Defendants argue that Statement 6 is not false or misleading because it does not address the Yinghe equipment. They argue that "Plaintiffs **omitted both** the analyst's question and nearly all of the context from Mr. Rust's response . . . which facially concerned only the testing of Fab-1's "***proprietary equipment***[.]" Dkt. No. 175 ("Mot.") at 6. Defendants include the following chart,

United States District Court
Northern District of California

for context:

| **Statement 6 (as alleged), ¶ 142** | **Aug. 10, 2021 Enovix Earnings Call Transcript (full text)** |
|---|---|
| During the same earnings call, Rust responded to a question from an analyst from Colliers Securities about the Company's "latest capacity test" for Fab-1 stating: | ***Derek Soderberg*, Analyst, Colliers Securities LLC:** Got it. So, it sounds like you guys haven't been able to do sort of a full dry run of production yet, but I guess, you've probably been testing you know the individual steps on the production line I guess as you look at the latest capacity test, how is *your proprietary equipment* sort of stacking up against your expectations on capacity. You know better or worse any detail around that would be great. |
| | **Mr. Rust:** Yeah, I think we're pleased overall in terms of the equipment and its ability to do its intended function. You know we actually started working on the equipment probably two years ago in some ways. And so, there's been a lot of work that's gone do with a lot of proof of concept work some pilot tools that we did. So, we had pretty high confidence going in. And I think in general the tools that perform to specifications you know[.] |
| "We have a pretty rigorous set of both factory and site acceptance things we have to go through and *I would say there's no red flags there.*" | [W]e have a pretty rigorous set of both factory and site acceptance things we have to go through. And you know *I would say there's no red flags there.* |
| | We're pretty excited about the tools being able to deliver to the intended specs. And you know it's a real significant improvement from as you mentioned you know stuff in R&D is a bit more manual in nature. And I think the level of quality of the parts we're going to make is going to be quite high out of this new line. So, we're pretty excited about it. |

Mot. at 7 (highlighting and emphases in motion). Defendants argue that other documents (namely the August 10, 2021 Enovix Letter to Shareholders issued shortly before the earnings call) defines "proprietary equipment" in such a way as to exclude the Yinghe equipment. *See* Mot. at 6 (citing Dkt. No. 175-4, Kapur Decl., Ex. C) at 3/11. Plaintiffs argue that "Defendants focus on the

10

narrowest possible interpretation of Statement 6" and the full context of the colloquy shows "the discussion concerns the 'production' capabilities of the Fab-1 production line—*i.e.*, the efficacy of Enovix's propriety [sic] *processes*—not just the isolated performance of any specific "proprietary piece or segment of the production line." Dkt. No. 184 ("Opp'n") at 13.[2]

The Court agrees with defendants that, when taken in context, Statement 6 is not a misstatement actionable under the PSLRA. What has become clearer with the full context is that not every reference to "equipment" by defendants was a reference to the Yinghe equipment. Defendants note that the SAC alleges that "the production of a large portion of the Fab-1 equipment, the critical areas of the production lines used for battery Assembly and Packaging, were outsourced to Yinghe." *See* SAC ¶ 97. But other parts of the manufacturing equipment were not from Yinghe. In its June 24, 2021 Proxy Statement, Enovix explained, "The Enovix team has developed an innovative low-cost approach that uses the conventional Li-ion battery cell manufacturing equipment on approximately 70% of the manufacturing process, while using Enovix's own proprietary tools on the approximately 30% of the processes focused on laser patterning and stacking of electrodes." Kapur Decl., Ex. B at 200/482. The August 10, 2021 Letter to Our Shareholders also distinguished between Enovix's "proprietary" manufacturing equipment and the other manufacturing equipment, stating:

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. This line includes a combination of Enovix-designed proprietary equipment from tier one

---

[2] The Court will consider the exhibits to the Kapur Declaration, Dkt. No. 175-1, under the incorporation by reference doctrine. These are: the February 22, 2021 Investor Presentation; Enovix's June 24, 2021 Form 424B3; the August 10, 2021 Letter to Our Shareholders; a transcript of the August 10, 2021 Enovix earnings call; and a transcript of defendant Rust's remarks at the September 8-10, 2021 TD Cowen Global Transportation and Sustainable Mobility Conference.
  The PSLRA permits courts considering a motion to dismiss governed by the PSLRA to consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs,* 551 U.S. at 322. The "incorporation-by-reference doctrine is a judicially created doctrine that treats certain documents as though they are part of the complaint itself." *Khoja*, 899 F.3d at 1002. A document may be incorporated into a complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).
  The Court finds it is appropriate to consider the Kapur declaration exhibits, as the SAC quotes extensively from all of these materials, and plaintiffs challenge various statements within these documents as false or misleading. It is appropriate for the Court to consider the full context in which these statements were made.

11

> U.S.-based factory automation vendors as well as standard battery industry production equipment. This equipment incorporates our proprietary laser patterning, stacking, and constraining processes that uniquely manage the expansion of a 100% active silicon anode, replacing the traditional winding processes found in conventional Li-ion cell manufacturing.

Kapur Decl., Ex. C at 3/11.[3]

The context of the August 10, 2021 colloquy shows that Statement 6 was a response to a question about how Enovix's "proprietary equipment" was meeting expectations. Kapur Decl., Ex. D at 6. Elsewhere, including in a letter to shareholders released earlier that day, Enovix defined "proprietary equipment" as equipment "from tier one U.S.-based factory automation vendors" which necessarily would have excluded equipment coming from Yinghe, based in China. *See* Kapur Decl., Ex. C at 3/11. The SAC lacks any allegations about the functionality of the equipment coming from U.S.-based vendors, and thus there are no allegations indicting that it was misleading for Rust to respond to a question about "proprietary equipment" by saying "there's no red flags there." *See* Kapur Decl., Ex. D at 6. Rust's response to a question about the proprietary equipment did not "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists." *See Brody*, 280 F.3d at 1006 (citing *McCormick v. The Fund Am. Cos.*, 26 F. 3d 869, 880 (9th Cir. 1994)). Plaintiffs take the position that, because Rust and the analyst were discussing automation of the production line during the call, Rust should have disclosed the problems with the FAT and the Yinghe equipment because automated production required "the *entire* production line to work." Opp'n at 13-14. The Court has reviewed the entire colloquy and disagrees with plaintiffs. The Court previously rejected plaintiffs' line of argument in ruling on the first motion to dismiss, where "plaintiffs essentially argue for a completeness rule." *See* Dkt. No. 97 at 20. As previously explained, the Ninth Circuit has considered and rejected whether Rule 10b-5 of the PSLRA contains "a free standing completeness requirement." *See Brody*, 280 F.3d at 1006. Rust was asked a question about "proprietary equipment"—which Enovix's papers indicate did not include Yinghe equipment—and answered it. For the same reasons stated in its prior orders, Dkt.

---

[3] Although the SAC quotes from this portion of the shareholder letter, it omits the sentence beginning, "This line includes a combination of Enovix-designed proprietary equipment from tier one U.S.-based factory automation vendors . . . ." *See* SAC ¶ 138.

12

1    No. 97 at 19-20, Dkt. No. 116 at 13, the Court finds Rust was not required to additionally disclose

2    that the Yinghe equipment failed the FAT when discussing the proprietary equipment. The Court

3    will grant defendants' motion for judgment on the pleadings as to Statement 6.

### II.     Statement 7

Defendants likewise move for judgment on the pleadings as to Statement 7, arguing that—when taken in context—the statement was not about the FAT. Statement 7 was made by defendant Rust in September 2021 at the Cowen 14th Annual Global Transportation & Sustainable Mobility Conference. At the conference, Rust stated (with the portion quoted in the SAC in bold):

> … we started ordering equipment for this factory in Fremont. We've got a roughly 50,000 square foot building here, where we're putting on our first production lines. That equipment has been all installed for the last several months, the last pieces came in. **We're in the middle of qualifying, which means basically testing out of each piece of equipment, making sure it's operating at its optimum operating point,[4] making sure we understand where the process windows are. That's going on quite well.** We expect that work will take us into the fourth quarter to finish that work.

Kapur Decl., Ex. E at 5 (emphasis added). Defendants argue that the alleged misstatement—that the "qualifying" was "going on quite well"—was not false or misleading because it did not refer to the FAT.

The Court agrees that, when read in context, the statement was not about the FAT. Defendants point out that the context indicates that qualification begins *after* the equipment was installed in Fremont. This is contrasted with the FAT, which by definition would have been conducted *at the vendor's factory*. *See* SAC ¶ 86. Additional context in the SAC supports this reading. In the August 10, 2021 Letter to Our Shareholders, Enovix stated, "In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont." *See* SAC ¶ 138; *see also* Kapur Decl., Ex. at 3/11. The letter goes on: "With the equipment for Line 1 installed, our factory is now undergoing qualification. The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance

---

[4] The SAC quotes this portion as: ". . . making sure it's operating *as* optimum operating point . . . ." *See* SAC ¶ 144 (emphasis added).

13

requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery." SAC ¶ 138; Kapur Decl., Ex. at 3/11. Other allegations in the SAC indicate that "qualification" involved "Original Equipment Manufacturers" using Enovix's batteries "in their own consumer products to ensure that they functioned as intended." SAC ¶¶ 80-81. Thus, even as described in the SAC itself, the "qualification" process did not include factory acceptance testing specifically. Plaintiffs appear to concede as much, stating in their papers that "the SAT was the 'first step' in qualifying[.]" *See* Opp'n at 17. Nevertheless, they argue that "Statement 7 was misleading because it reiterated the false implication, first made in Statement 4, that the Fab-1 equipment had passed the FAT." *Id.* From plaintiffs' perspective, any reference to "qualification," which began with the SAT, should have included the *additional* disclosure that the equipment failed the FAT. For the same reasons stated above and in the Court's prior orders, Dkt. No. 97 at 19-20, the Court rejects this position. Rule 10b-5 prohibits "*only* misleading and untrue statements, not statements that are incomplete." *See Brody*, 280 F.3d at 1006. Rust's statements in September 2021 that the qualification was "going on quite well" was not misleading for failing to affirmatively state that the equipment had, prior to late April 2021, failed the FAT.[5]

## CONCLUSION

For the reasons stated above, the Court GRANTS defendants' motion for partial judgment on the pleadings; plaintiffs' claims based on Statements 6 and 7 are dismissed from the case with prejudice, leaving only the alleged misstatements in Statement 4.

The case management conference remains on calendar for October 17, 2025. In their joint case management statement, the parties shall address resuming the briefing schedule on plaintiffs' pending motion for class certification. Given how long the class certification motion has been

///

///

---

[5] Because the Court finds that plaintiffs have failed to sufficiently plead falsity as to Statements 6 and 7, the Court does not address defendants' alternative argument that plaintiffs have also failed to adequately plead scienter.

pending, the Court is not inclined to approve a lengthy briefing schedule.

**IT IS SO ORDERED**.

Dated: October 7, 2025

*(signature)*

SUSAN ILLSTON
United States District Judge