QUINN EMANUEL URQUHART & SULLIVAN, LLP
Emily C. Kapur (Cal. Bar No. 306724)
emilykapur@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Tel: (650) 801-5000
Fax: (650) 801-5100

Andrew J. Rossman (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
Courtney C. Whang (*pro hac vice*)
Brenna D. Nelinson (*pro hac vice*)
Sasha Boutilier (*pro hac vice*)
W. Jackson Vallar (Cal. Bar No. 341861)
295 5th Avenue
New York, NY 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
andrewrossman@quinnemanuel.com
jessebernstein@quinnemanuel.com
courtneywhang@quinnemanuel.com
brennanelinson@quinnemanuel.com
sashaboutilier@quinnemanuel.com
jackvallar@quinnemanuel.com

*Attorneys for Defendants*
*Enovix Corporation, Harrold Rust, Steffen Pietzke,*
*Thurman J. Rodgers, Emmanuel T. Hernandez, John D.*
*McCranie, Betsy Atkins, and Gregory Reichow*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION<br><br>This document relates to: all actions. | Case No. 23-cv-00071-SI<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO LEAD PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES AND CLASS COUNSEL**<br><br>Judge: Hon. Susan Illston<br><br>Hearing Date: January 23, 2026<br><br>Hearing Time: 10:00 AM<br><br>Courtroom 1, 17th Floor |

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND ......................................................................................................3

PROCEDURAL HISTORY .........................................................................................................9

LEGAL STANDARD .................................................................................................................10

ARGUMENT ..............................................................................................................................10

I.    PLAINTIFFS ARE NOT ENTITLED TO THE *BASIC* PRESUMPTION. ....................11

    A.    The Alleged Misstatement Had No Front-End Price Impact. .................................12

    B.    The Alleged Misstatement Had No Back-End Price Impact. ..................................13

        1.    None Of The Three Disclosures Match Plaintiffs' Theory Of Falsity And Therefore None Are "Corrective." .................................................13

        2.    Following The November 7, 2022 Press Release, Neither The January Nor October 2023 Disclosure Revealed New Or Value-Relevant Information. .................................................................................15

            (a)    Plaintiffs Concede That The November 7 Press Release Disclosed The Relevant Truth About The Yinghe Equipment. .....................................................................................15

            (b)    The January and October 2023 Disclosures Did Not Provide Any New, Value-Relevant Information Under Any Theory of Falsity. .................................................................................16

    C.    Plaintiffs Fail To Show An Efficient Market Before January 11, 2022. .................18

II.    PLAINTIFFS HAVE NOT PROPOSED A DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASS-WIDE DAMAGES. ........................................20

III.    PLAINTIFFS ARE ATYPICAL AND INADEQUATE CLASS REPRESENTATIVES. ...............................................................................................23

    A.    Plaintiffs Are Not Adequate Class Representatives. ..............................................23

    B.    The Funds Are Not Typical Of The Class. .............................................................25

CONCLUSION ...........................................................................................................................25

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013) ............................................................................................... 11, 23

*Angley v. UTi Worldwide Inc.*,
311 F. Supp. 3d 1117 (C.D. Cal. 2018) ............................................................................ 11

*Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*,
77 F.4th 74 (2d Cir. 2023) ............................................................................... 12, 13, 14

*Averza v. Super Micro Computer, Inc.*,
788 F. Supp. 3d 1060 (N.D. Cal. 2025) ................................................................................ 23

*Bailey v. Rite Aid Corp.*,
338 F.R.D. 390 (N.D. Cal. 2021) ..................................................................................... 10

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ....................................................................................... 2, 11, 12, 16

*Brokop v. Farmland Partners Inc.*,
2021 WL 4913970 (D. Colo. Sep. 30, 2021) ................................................................. 18, 20

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.*,
141 F.R.D. 144 (N.D. Cal. 1991) .................................................................................... 23

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ..................................................................................... 19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................... 3, 10, 20, 22

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ...................................................................................................... 11

*Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) ...................................................................................... 20

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
594 U.S. 113 (2021) ................................................................................. 2, 11, 12, 14, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ........................................................................... 10, 11, 12, 25

*IBEW Loc. 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ........................................................................................... 13

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

*In re Fed. Home Loan Mortg. Corp.*,
281 F.R.D. 174 (S.D.N.Y. 2012) .......................................................................................... 19

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ......................................................... 13, 15, 18

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ........................................................................ 12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ......................................................... 13, 14, 17

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................................................... 12

*In re Peregrine Sys., Inc. Sec. Litig.*,
2002 WL 32769239 (S.D. Cal. Oct. 11, 2002) ..................................................................... 25

*In re PolyMedica Corp. Sec. Litig.*,
453 F. Supp. 2d 260 (D. Mass. 2006) .............................................................................. 19, 20

*In re Qualcomm Inc. Sec. Litig.*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ...................................................................... 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) ............................................................................................. 20

*In re Safety-Kleen Corp. Bondholders Litig.*,
2004 WL 3115870 (D.S.C. Nov. 1, 2004) ........................................................................... 19

*In re Vaxart, Inc. Sec. Litig.*,
738 F. Supp. 3d 1259 (N.D. Cal. 2024) ..................................................................... 15, 18, 22

*In re Waste Mgmt. Sec. Litig.*,
775 F. Supp. 3d 742 (S.D.N.Y. 2025) .................................................................................. 19

*Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing & Sec., LLC*,
616 F. Supp. 2d 461 (S.D.N.Y. 2009) .................................................................................. 24

*Jaeger v. Zillow Group, Inc.*,
2025 WL 2741642 (9th Cir. Sep. 26, 2025) ......................................................................... 14

*Jaroslawicz v. M&T Bank Corp.*,
2024 WL 2975766 (D. Del. June 13, 2024) ......................................................................... 21

*Kalodner v. Michaels Stores, Inc.*,
172 F.R.D. 200 (N.D. Tex. 1997) ........................................................................................ 25

*Kottaras v. Whole Foods Mkt., Inc.*,
281 F.R.D. 16 (D.D.C. 2012) ............................................................................................... 21

Case No. 23-cv-00071-SI
DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................................... 19

*Loritz v. Exide Tech.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015) ................................................................... 22

*Ma v. Twitter*,
2024 WL 4859090 (N.D. Cal. Nov. 20, 2024) .................................................................. 24

*Malriat v. QuantumScape Corp.*,
2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ................................................................. 19

*Pardi v. Tricida, Inc.*,
2024 WL 4336627 (N.D. Cal. Sep. 27, 2024) ....................................................... 13, 14, 17

*Perlmutter v. Intuitive Surgical, Inc.*,
2011 WL 566814 (N.D. Cal. Feb. 15, 2011) ..................................................................... 23

*Petrie v. Elec. Game Card, Inc.*,
308 F.R.D. 336 (C.D. Cal. 2015) ...................................................................................... 19

*Rolex Emps. Ret. Tr. v. Mentor Graphics Corp.*,
136 F.R.D. 658 (D. Or. 1991) ........................................................................................... 24

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ................................................................................................ 19

*White v. E-Loan, Inc.*,
2006 WL 2411420 (N.D. Cal. Aug. 18, 2006) .................................................................. 23

**<u>Federal Rules</u>**

Fed. R. Civ. P. 23(a)(3) .............................................................................................................. 23

Fed. R. Civ. P. 23(a)(4) .............................................................................................................. 23

Fed. R. Civ. P. 23(b)(3) .............................................................................................................. 11

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Enovix Corporation ("Enovix"), Harrold Rust, Steffen Pietzke, Thurman J. Rodgers, Emmanuel T. Hernandez, John D. McCranie, Betsy Atkins, and Gregory Reichow (collectively, "Defendants") respectfully submit the following memorandum of points and authorities in opposition to Lead Plaintiffs' Amended Motion for Class Certification and Appointment of Class Representatives and Class Counsel (Dkt. 201, the "Motion").

## STATEMENT OF THE ISSUES PURSUANT TO L.R. 7-4(a)(3)

Whether to certify the proposed class pursuant to Rule 23 for the period August 10, 2021 to October 2, 2023 (the "Class Period"), where the sole remaining alleged misstatement had no price impact, the market was not efficient for a portion of the Class Period, individual damages issues predominate, and no Lead Plaintiff is a typical and adequate class representative.

## PRELIMINARY STATEMENT

Now that almost all of Plaintiffs' originally identified "misstatements" have been dismissed, their remaining theory is quite narrow. In August 2021, Enovix stated that the "Factory Acceptance Test" ("FAT") had been conducted on manufacturing equipment for its Fab-1 factory, and that subsequent testing would seek to confirm that the equipment met performance requirements (the "Alleged Misstatement"). Plaintiffs claim this statement violated securities laws because it did not also note that one specific portion of the equipment produced by one Chinese vendor (Shenzhen Yinghe Technology Co. ("Yinghe")) for one of four zones of one line of the Fab-1 factory had failed FAT.

That narrow theory cannot support class certification because it is far too disconnected from the three statements Plaintiffs identify as corrective disclosures. Those statements, made on November 1, 2022, January 3, 2023, and October 3, 2023, said ***nothing*** about Yinghe, its equipment, or Plaintiffs' theory of falsity. Instead, they discussed Enovix's shifting focus toward a new factory, Fab-2, general problems with overall Fab-1 production, and the ultimate repurposing of Fab-1 as a technology development center instead of a commercial manufacturing factory. Unsurprisingly, these revelations about Enovix's shifting approach affected stock prices for reasons that have nothing to do with a purported correction of a prior purported omission about Yinghe equipment. Another

statement, made on November 7, 2022, *did* address FAT of the Yinghe equipment—but Plaintiffs ignore that statement, because Enovix's stock price went *up* after it was released, not down.

Plaintiffs' Motion should thus be denied for the same reason that the Court previously rendered judgment against two misstatements under Rule 12(c). The Court's observation that "not every reference to 'equipment' by [D]efendants was a reference to the Yinghe equipment" is equally true with respect to the alleged corrective disclosures as it was with respect to the two now-eliminated alleged misstatements. Dkt. 193 ("12(c) Order") at 11. Just as the Court held that not all statements about Fab-1 equipment could be rendered misleading under Plaintiffs' narrow, Yinghe-equipment-specific theory of falsity, not all statements about Fab-1 equipment can correct the narrow, Yinghe-equipment-specific fact that Plaintiffs claim Enovix omitted. The statements Plaintiffs highlight did not correct the purported misimpression, and the sole statement that disclosed that Enovix had waived FAT of the problematic Yinghe equipment did not cause a stock decrease.

There is thus a mismatch between Plaintiffs' narrow theory of falsity and the broad information conveyed by the alleged corrective disclosures, which did not even mention Yinghe equipment. To the extent those disclosures drove stock prices, it was for different reasons, and that mismatch is fatal to Plaintiff's Motion because it rebuts the *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), "fraud on the market" presumption of reliance and therefore individual issues of reliance predominate. The *Basic* presumption is rebutted because the Alleged Misstatement did not impact Enovix's stock price. The Alleged Misstatement had no "front-end" impact: it did not cause a statistically significant increase in Enovix's stock price. And the Court cannot infer a "back-end" price impact from stock drops following the three purported corrective disclosures because they *did not even mention the Yinghe equipment*. Indeed, two of them were made long after Enovix's November 7, 2022 disclosure that it had waived FAT of the Yinghe equipment and after a series of disclosures regarding Fab-1 throughput and yield problems, after which further information about FAT of the Yinghe equipment was irrelevant. Unrelated and duplicative disclosures thereafter cannot demonstrate the price impact of an alleged misstatement they do not correct. And absent price impact, "*Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.* ("*Goldman I*"), 594 U.S. 113, 119 (2021).

Furthermore, the *Basic* presumption is not available for the first five months of the Class Period—prior to January 11, 2022—as Plaintiffs have not carried their burden to establish market efficiency during a period when share lockups impeded rapid incorporation of news into Enovix's stock price.

The Motion should also be denied for the independent reason that individual issues predominate over class-wide issues because Plaintiffs will never advance an appropriate class-wide damages methodology. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). No math can solve the disconnect between Plaintiffs' theory of what should have been disclosed—a supposed increased risk that one zone of one line of Fab-1 might not ultimately achieve its performance requirements—and their actual alleged corrective disclosures—which allegedly reveal the materialization of a different risk, that Fab-1 overall might not perform as intended. Plaintiffs' expert concedes he has no idea how to disentangle these issues. His only proposal for how to construct a damages model turns on either finding an imagined needle-in-a-haystack document in Defendants' production that Plaintiffs offer no reason to believe exists or relying on a hypothetical additional expert whom Plaintiffs have not proffered, and whose hypothetical methodology has not been disclosed.

Plaintiffs' failure to meet Rule 23's predominance requirement is all the more apparent considering that this is their second bite at the apple. The Court ordered Plaintiffs to craft a new motion "limited to the things that are now in the case." Dkt. 199 at 3:22-25. But Plaintiffs still ask this Court to certify the same Class Period based on the same mismatched theory. This fails.

Finally, Plaintiffs are each inadequate and atypical representatives under Rule 23 given their conflicts with the class, their failure to understand and execute their responsibilities, and the unique defenses to which they will be subject.

Plaintiffs' Motion should be denied.

## **FACTUAL BACKGROUND**

Enovix is an early-stage technology company pursuing large-scale commercial production of its cutting-edge lithium-ion batteries. ¶¶ 5, 73–76.[1] Enovix invested years and substantial resources in developing its proprietary technology for these batteries and then, in 2020, began procuring

---

[1] Citations to "¶ __" are to the Second Amended Complaint, Dkt. 102. All emphasis is added and quotations omitted unless otherwise noted.

equipment for its first manufacturing line, "Line 1," for its first production factory in Fremont, California, "Fab-1," based on its first manufacturing line design, "Gen-1." ¶¶ 5, 75–76.

Line 1 of Enovix's Fab-1 factory consisted of four zones where different parts of the battery manufacturing process took place. ¶ 96; Ex. 2 (Dkt. 175-2) at 40.[2] Enovix procured equipment for each of the four zones from different vendors in different countries:[3]

| Zone | Manufacturing Process | Vendor | Country |
|---|---|---|---|
| 1 | Electrode Fabrication | SYSCO; Delta ModTech | Taiwan; USA |
| 2 | Battery Assembly | DW Fritz | USA |
| 3 | Battery Packaging | Yinghe | China |
| 4 | Formation & Testing | Top Power | China |

Approximately 70% of Line 1 contained industry standard equipment, while 30% contained equipment incorporating Enovix's proprietary technology. 12(c) Order at 11. Specifically, Zone 2 equipment sourced from DW Fritz assembled the batteries using Enovix's proprietary technology for laser patterning and stacking whereas Zone 3 equipment sourced from Yinghe was standard battery packaging equipment. Ex. 3 (Dkt. 175-3) at 53–55; *see also* 12(c) Order at 11-12 (discussing the difference between U.S.-sourced proprietary equipment and Chinese-sourced conventional equipment).

Enovix's multi-step Line-1 Equipment Procurement Review process ("EPR") governed its procurement of equipment from vendors. ¶ 6. One of the steps was FAT, which was undertaken around the world at each vendor's factory for each individual piece of equipment prior to shipment to Enovix's Fab-1 factory. ¶¶ 7, 86. The purpose of FAT, as an early, vendor-site equipment test, was "to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications" while still at the vendor's facility. ¶ 86. After equipment from the different vendors arrived at Fab-1, Enovix undertook a separate testing process of its own, called qualification. The first step of Enovix's Fremont testing was Site Acceptance Testing ("SAT"). Ex.

---

[2] Defendants submit herewith the Declaration of Emily Kapur In Support Of Defendants' Opposition To Plaintiffs' Amended Motion For Class Certification, attached to which are the documents referenced as exhibits herein. Exhibits 2-4 were previously incorporated by reference by this Court (Dkt. 193 at 11 n.2) and are re-submitted here only for the Court's convenience.

[3] *See* Ex. 5 (Enovix_0097795) at slides 6-12.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

4 (Dkt. 175-4) at 8. As with FAT, SAT tested "individual pieces of equipment," and was part of a qualification process designed to ensure, first, that the components of manufacturing equipment worked on site and, second, that the components worked when they were integrated together to comprise the entire Fab-1 manufacturing line. *Id.* Yet more testing then ensued to ensure that the whole line not only worked but produced batteries fast enough and at high enough quality to make the endeavor commercially viable. Ex. 2 (Dkt. 175-2) at 49. Thereafter, further testing with customers would ensure the batteries met their specific requirements. *Id.* Thus, by design, FAT at the vendors' facilities in early 2021 was the first step in a multi-year testing and qualification process, with numerous additional tests and production runs to follow before commercial viability could be determined.

In late 2020 and early 2021, FAT was conducted around the world at the facilities for the applicable equipment, Sysco, Delta ModTech, DW Fritz, Yinghe, and TopPower. *Id.* Enovix engineers were unable to observe FAT at Yinghe due to COVID-19 travel restrictions. ¶ 8. Thereafter, vendors shipped the machinery to Enovix's Fab-1 factory. In April of 2021, Enovix shipped pieces of equipment for Zone 3 from Yinghe to Fremont. *See* ¶¶ 105-06. As the components of Fab-1 arrived in mid-2021, Enovix began installation and transitioned into the next phase of its EPR process: conducting SAT. ¶ 138; Ex. 4 (Dkt. 175-4) at 8.

On August 10, 2021, Enovix issued a "Letter to Our Shareholders" providing updates about the Fab-1 factory and containing the Alleged Misstatement. ¶ 137.

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. This line includes a combination of Enovix-designed proprietary equipment from tier one U.S.-based factory automation vendors as well as standard battery industry production equipment. This equipment incorporates our proprietary laser patterning, stacking, and constraining processes that uniquely manage the expansion of a 100% active silicon anode, replacing the traditional winding processes found in conventional Li-ion cell manufacturing.

> With the equipment for Line 1 installed, our factory is now undergoing qualification. ***The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery.***

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

Ex. 4 (Dkt. 175-4) at 8 (emphasized text referred to herein as the "Alleged Misstatement"). No analyst commented on the disclosure concerning FAT. Ex. 1 (James Rep.) ¶ 40. Analysts instead focused on "the complex and novel manufacturing process" Enovix was implementing in its Fab-1 facility, including the "remaining challenge[s]" involved with "manufacturing at scale." *Id*. ¶ 38.

Throughout 2022, Enovix continued to update investors on the difficulties Enovix was facing in achieving the overall Fab-1 throughputs and yields it needed to quickly produce large numbers of high-quality batteries. *See id.* ¶¶ 40-41.

- In May, Enovix disclosed that it "ha[d] experienced challenges associated with building out Fab-1 including technical issues negatively impacting yield and volume production." Ex. 6 (2022 Q1 10Q) at 16. As Ian Lieberman, then a portfolio manager for Plaintiffs Discovery Global Opportunity Master Fund Ltd. and Discovery Nymeria Master Fund, Ltd. (together, "Funds") testified, this disclosure and the corresponding Q1 2022 Shareholder Letter provided "granular" and "very specific" disclosures regarding the company's problems. Ex. 18 (Lieberman Tr.) at 137:10-138:14.
- In June, Enovix disclosed that "improvement on yields and throughput . . . [was] going to be a task that [it would be] working on all of [2022] and to some part of [2023]." Ex. 7 (June 22, 2022 JPM Tr.) at 10.
- In August, Enovix disclosed that it was "prioritizing manufacturing improvements over shipments," which would require "taking portions of [its] first production line down to install planned automated conveyance and implementing throughput and reliability enhancements for multiple process modules." Ex. 8 (2022 Q2 Letter to Shareholders) at 3. Plaintiffs understood this to mean that "whatever they were working on in Q2 wasn't getting them where they wanted to get" so Enovix had to take down Fab-1 "in order to fix certain manufacturing steps." Ex. 18 (Lieberman Tr.) at 159:4-160:6.
- Throughout 2022, analysts commented on Enovix's disclosures regarding its manufacturing difficulties, including in the context of "resetting . . . 2023-2025 estimates lower" and "slip[ping] out the company's product revenue a quarter and reduc[ing] the rate of increase." Ex. 1 (James Rep.) ¶ 42.

On November 1, 2022, Enovix announced $8,000 in revenue for Q3 2022 and published a Letter to Shareholders that Plaintiffs allege served as the first corrective disclosure. ¶¶ 160–61. Although the Company had improved its Fab-1 manufacturing equipment, it decided that resources were "better spent on the critical yield and productivity learning necessary for a strong launch of [its] Gen2 Autoline." ¶ 161. Enovix announced that it was "dialing back Gen1 throughput enhancement activities" at Fab-1 and "anticipate[d] achieving lower overall output from Fab-1 in 2023 in favor of focusing on the Gen2 Autoline, which is the engine for [Enovix's] future scaling." ¶ 161. Specifically, Enovix disclosed that it "expect[ed] Fab-1 improvement activities to extend into 2023, but at a slower rate given the decision to redirect resources to Gen2," an updated manufacturing

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

process to be rolled out at a new Fab-2 factory facility, and that it "expect[ed] to exit 2023 at a run rate of under one million battery cells produced from the Gen1 equipment at Fab-1." ¶ 162; *see also* Ex. 9 (2022 Q3 Shareholder Letter). Enovix offered no disclosure about FAT, or Yinghe, or Zone 3. Enovix's share price fell by $7.46 the next day. ¶ 165.

Analysts tied Enovix's stock drop to the delayed ramp up in major revenue recognition associated with "dialing back" Fab-1 and "redirect[ing] resources" to Fab-2. Ex. 1 (James Rep.) ¶ 48. Plaintiffs similarly understood that as of November 1, 2022, Enovix implemented a "████████████" to go "████████," "██████████████████████████" on account of "█████████████████████████████████████████████████" relative to Fab-2 such that "██████████████████████████████████" Fab-2. Ex. 10 (DIS*18045). Plaintiffs also recognized that while Fab-1 was initially expected to provide "███████████████" and no longer would, Enovix "████████████████████████████████." Ex. 11 (DIS*27722). As such, Plaintiffs believed that the "██████████████████████████████████████████████████████████████" which "████████████████████████████." Ex. 10 (DIS*18045). Plaintiffs continued purchasing Enovix stock following this disclosure. Dkt. 203-1; Dkt. 207-1; Dkt. 7-2.

Six days later, on November 7, 2022, Enovix issued a press release disclosing that FAT of the Yinghe equipment had been waived (the "November 7 Press Release"). ¶ 168; *see* Ex. 12 (Nov. 7 Press Release). In the November 7 Press Release, T.J. Rodgers, Executive Chairman, addressed Enovix's decision "to charter the world's largest airplane, a Ukrainian AN-124, to fly over 55 tons of Fab-1 equipment to Silicon Valley in one shot" from Yinghe and in particular that the "decision violated [Enovix's] sacred Equipment Procurement Review (EPR) specification by ***waiving a key milestone called Factory Acceptance Test (FAT)***, which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment." *Id.* Rodgers further disclosed that this decision was associated with "equipment problems." *Id.* This was the truth Plaintiffs allege: each Plaintiff has submitted a sworn declaration testifying that the Alleged Misstatement was false because, "[i]n truth, a large part of the equipment had not passed the requisite tests at the vendor's facility, which were actually waived[.]" Dkt. 201-7 at ¶ 9; Dkt. 201-8 at ¶ 8; Dkt. 201-9 at ¶ 8; *see also* Dkt. 201-6 at

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

¶ 11.  At their deposition, Plaintiffs conceded that ███████████████████████ ███  *See* Ex. 14 (Lee Tr.) at 80:8-24 (following the November 7, 2022 Press Release, "█████ ████████████" that Enovix waived the FAT for the Yinghe Fab-1 equipment); *see also* Ex. 15 (Selke Tr.) at 96:10-17; Ex. 16 (Fruchter Tr.) at 166:5-12; Ex. 17 (Kung Tr.) at 190:20-191:7.  Enovix's stock price increased $1.11 on November 7.  ¶ 172.

On January 3, 2023, Rodgers reiterated what Enovix had disclosed previously, announcing that "Fab-1 was still not performing at commercially viable capacity and was unlikely to achieve that goal"—Plaintiffs' alleged second corrective disclosure.  Mot. 7.  He also addressed projected delays to Fab-2, ¶¶ 179–80, with the "major redesign[s]" between Fab-1 and Fab-2 relating to Zone 2 (Assembly) equipment, a zone whose equipment was not supplied by Yinghe, Ex. 13 (Jan. 3 Pres.) at slides 39-40.  Enovix's stock price fell the next day from $12.12 to $7.15.  ¶ 185.  Analysts attributed the decline to the delay in the Fab-2 timeline.  Ex. 1 (James Rep.) ¶¶ 99–100.

On October 3, 2023, Enovix made the third alleged corrective disclosure, announcing a reduction in force and "strategic realignment of Fab-1 in Fremont . . . to refocus the facility from a manufacturing hub to its 'Center for Innovation,'" which supported the Company's "strategy to locate high-volume manufacturing in Asia near customers and suppliers while locating technology development in Silicon Valley and Asia."  ¶ 189.  Analysts reacted favorably to Enovix's strategic realignment and noted that the Company had achieved its goals for Fab-1.  Ex. 1 (James Rep.) ¶ 115.  Enovix's stock dropped that day from $11.81 to $10.30, ¶ 190, which analysts reported stemmed from changes in Enovix's production guidance for the year, Ex. 1 (James Rep.) ¶¶ 110, 115.

During the Class Period, Plaintiffs engaged in a varied array of transactions in Enovix stock:

| Plaintiff | First Trade | Last Trade | Purchases (#) | Sales (#) | Enovix Shares at 10/2/23 |
|---|---|---|---|---|---|
| Funds | 5/19/2022 | 12/14/2022 | 93 | 63 | 0 |
| Kung | 11/02/2021 | 4/12/2023 | 229 | 135 | 710 |
| Lee | 11/29/2021 | 5/16/2023 | 5 | 2 | 0 |
| Selke | 10/15/2021 | 12/01/2021 | 3 | 0 | 117 |

Dkts. 7-2, 84-2, 203-1, 207-1.  Mr. Lee **profited $8,006** from his Enovix transactions.  Ex. 14 (Lee Tr.) at 136:12–138:5.  Plaintiffs continued to purchase Enovix stock following each alleged corrective disclosure.  Dkts. 7-2, 203-1, 207-1.

**PROCEDURAL HISTORY**

This case was initially filed on January 6, 2023. Dkt. 1. On July 7, 2023, Plaintiffs filed the First Amended Complaint alleging that 13 statements "falsely represented to investors that the new manufacturing equipment for Fab-1 would be, or was already, subjected to both a FAT and SAT" when "[i]n truth," Enovix had entirely failed, as to all of Fab-1, "to conduct these important equipment procurement protocols in a misguided effort to hasten delivery of the Fab-1 equipment." Dkt. 84 ¶¶ 11, 13. In January 2024, the Court dismissed that complaint, finding that "the allegations that Enovix waived the FAT and SAT completely are conclusory at best." Dkt. 97 at 15.

On March 19, 2024, Plaintiffs filed the Second Amended Complaint (the "Complaint"), which targeted 12 statements, Dkt. 102, and presented a "very different set of allegations" regarding falsity. Dkt. 116 at 10. Gone were Plaintiffs' broad assertions that Enovix had abandoned "important equipment procurement protocols," Dkt. 84 ¶ 13, for all of Fab-1 and in their place were narrow allegations that equipment from one vendor for Line 1 of Fab-1, Yinghe, had "failed multiple rounds of the FAT through April 2021 and ultimately never passed the FAT," Dkt. 116 at 12. On July 23, 2024, this Court dismissed all but three alleged misstatements. *Id.* at 24.

Plaintiffs moved for class certification on May 23, 2025 based on the three remaining statements. Dkt. 162. Defendants moved for partial judgment on the pleadings on June 23, 2025 to dismiss two of the three remaining alleged misstatements, Dkt. 175, which the Court granted on October 7, 2025. 12(c) Order. Recognizing that Defendants' "motion provide[d] context omitted from plaintiffs' allegations," *id.* at 8, the Court held that "[w]hat has become clearer with the full context is that not every reference to 'equipment' by defendants was a reference to the Yinghe equipment," *id.* at 11, and further that, "when taken in context," neither Statement 6 nor 7 concerned the Yinghe equipment nor the FAT, *id.* at 11–13. The Court dismissed both statements with prejudice. *Id.* at 14. The Alleged Misstatement is now the only alleged misstatement remaining in this case.

Acknowledging that Plaintiffs needed a new argument for class certification following its decision on the Rule 12(c) motion, the Court ordered Plaintiffs to "refile" their motion for class certification "limited to the things that are now in the case." Dkt. 199 at 3:22-25. But Plaintiffs' Amended Motion barely changed. It remains premised on the misrepresentation of facts that this

Court corrected in its 12(c) Order: that the Fab-1 factory as a whole is equivalent to specific equipment supplied by one vendor for one zone of the first line of Fab-1. Plaintiffs assert in both motions that Defendants "waived the requirement that the equipment pass the FAT before Enovix accepted delivery," that "[t]hrough late 2020 and early 2021, the Fab-1 equipment was repeatedly tested but never passed the FAT," and that "Defendants misled investors about the fact that the Fab-1 manufacturing equipment had never passed the FAT," Mot. 5; Dkt. 162 at 5 (same), even though all Plaintiffs plausibly allege is that FAT failed for the Yinghe equipment, 12(c) Order at 12. Plaintiffs go on to assert that Defendants' broad statements on November 1, 2022, January 3, 2023, and October 3, 2023 "corrected" the Alleged Misstatement by revealing problems with the **overall Fab-1 equipment**. Mot. 5-6, 7; Dkt. 162 at 5-6 (same). Plaintiffs' Amended Motion still misrepresents overall Fab-1 "equipment" as if it were all "Yinghe equipment." It was not. 12(c) Order at 12.

## LEGAL STANDARD

A "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Thus, "a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Id.* A plaintiff bears the burden of "prov[ing]—not simply plead[ing]—that [its] proposed class satisfies each requirement of Rule 23": numerosity, typicality, commonality, and adequacy, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"), as well as the predominance and superiority requirements of Rule 23(b)(3)—all by a preponderance of the evidence. *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 396–97 (N.D. Cal. 2021). The court "must resolve all factual and legal disputes relevant to class certification, even if doing so overlaps with the merits." *Id.* at 396. Contrary to Plaintiffs' portrayal of class certification as a foregone conclusion, certification "is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of [Rule 23]" are met. *Comcast*, 569 U.S. at 33. Plaintiffs have not met their burden.

## ARGUMENT

Plaintiffs' Motion should be denied for three independent reasons. *First*, Plaintiffs are not entitled to the *Basic* presumption of reliance and thus cannot satisfy the predominance element of Rule 23(b): none of the corrective disclosures—which Plaintiffs must rely upon to demonstrate price

impact—match the alleged truth and the second and third corrective disclosures provided no new value-relevant information regarding the alleged truth. Plaintiffs are further not entitled to the *Basic* presumption for the Class Period prior to January 11, 2022 because they have not met their burden to establish market efficiency. Indeed, their own expert admitted he did not attempt to do so. *Second*, Plaintiffs cannot satisfy the predominance requirement because they have not proposed a viable, class-wide damages methodology consistent with their theory of liability. *Third*, Plaintiffs are inadequate and atypical.

## I.    PLAINTIFFS ARE NOT ENTITLED TO THE *BASIC* PRESUMPTION.

It is Plaintiffs' burden to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013) (citing Fed. R. Civ. P. 23(b)(3)); *see also* Mot. 2. Predominance turns on the required elements of the relevant cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 809 (2011). To establish predominance here, Plaintiffs must establish that they can prove the reliance element of their Section 10(b) claim through class-wide evidence. *Amgen*, 568 U.S. at 462-63. "If every plaintiff had to prove direct reliance on the defendant's misrepresentation, individual issues then would . . . overwhelm[] the common ones, making certification under Rule 23(b)(3) inappropriate." *Halliburton II*, 573 U.S. at 268.

Plaintiffs thus attempt to invoke the fraud-on-the-market presumption from *Basic v. Levinson*, Mot. 16, under which purchasers in an efficient market can rely on a stock's market price because "most publicly available information is reflected" in the price, including "any public material misrepresentations," 485 U.S. at 247. "The fundamental premise of the fraud-on-the-market theory underlying *Basic*'s presumption is that an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Goldman I*, 594 U.S. at 118. "The plaintiff has the burden of proving the prerequisites," including "market efficiency," prior to class certification. *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1120 (C.D. Cal. 2018).

Defendants can rebut the *Basic* presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," *Basic*, 485 U.S. at 248, including by demonstrating that there

was neither front- nor back-end price impact sufficient to support an inference of inflation, *Goldman I*, 594 U.S. at 117.  If the alleged misstatements did not impact the stock price, "the basis for finding that the fraud had been transmitted through market price would be gone," *id.*, and there is no basis to presume the plaintiff relied on the alleged misrepresentations, *Halliburton II*, 573 U.S. at 283.  At the class certification stage, a defendant can show a lack of price impact "by a preponderance of the evidence." *Goldman I*, 594 U.S. at 126.  Courts must "assess all the evidence of price impact—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Id.*  "[C]ourts should be open to all probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Id.* at 122.

Defendants herein demonstrate a lack of "front-end" price impact, i.e., that there was no stock reaction in response to the Alleged Misrepresentation.  *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011).  Defendants also demonstrate a lack of "back-end" price impact, i.e., that the decline in Enovix's stock price following the alleged corrective disclosures is not indicative of front-end inflation.  *Goldman I*, 594 U.S. at 123.  The fraud-on-the-market presumption is rebutted, individual reliance issues predominate, and class certification must be denied.

### A.     The Alleged Misstatement Had No Front-End Price Impact.

When a stock price does not move in a statistically significant manner in response to an alleged misstatement, defendants "sever[] the link" on the front end between an alleged misstatement and price impact.  *Moody's*, 274 F.R.D. at 493.  If an alleged misstatement "had no price impact, it cannot be presumed that the [later corrective disclosures] revealed a latent price impact," and the fraud-on-the-market theory must be rejected.  *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017) (denying certification where there was no statistically significant price increase on the date of the alleged misstatement).  Here, the Alleged Misstatement did not increase Enovix's stock price.  Ex. 1 (James Rep.) ¶ 36.  Not a single analyst covering Enovix's August 10, 2021 shareholder letter mentioned FAT.  Ex. 1 (James Rep.) ¶ 40; *see Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.* ("*Goldman II*"), 77 F.4th 74, 104 (2d Cir. 2023) ("[M]arket commentary can provide insight into the kind of the information investors would rely upon in making investment decisions.").  Because there is no price impact where "[t]he allegedly 'inflated price' was established by . . . non-

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

fraudulent" information, there is no front-end price impact. *IBEW Loc. 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 783 (8th Cir. 2016).

### B.    The Alleged Misstatement Had No Back-End Price Impact.

Plaintiffs will claim the inflation maintenance theory excuses the lack of front-end price impact, and that *Basic* can still establish predominance. However, "courts must undertake a mismatch inquiry in price-maintenance cases to determine 'whether there is a basis to infer that the back-end price equals front-end inflation.'" *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024) (quoting *Goldman II*, 77 F.4th at 99 n.11). Importantly, "[a]voiding a 'mismatch' 'requires a closer fit (even if not precise) between the front-and back-end statements than courts have required when analyzing the loss causation element of securities fraud.'" *Pardi v. Tricida, Inc.*, 2024 WL 4336627, at *8 (N.D. Cal. Sep. 27, 2024) (quoting *Kirkland*, 2024 WL 1342800, at *6). Courts have set forth a three-part framework for analyzing whether a mismatch under *Goldman* exists: "A finding of back-end price impact requires proof that the information disclosed . . . was (i) ***corrective*** of one or more prior false statements or omissions, (ii) ***new*** (unknown to the market prior to [the corrective disclosure date]), and (iii) ***value relevant*** (*i.e.*, caused at least some of the stock price decline)." *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024); *see also Pardi*, 2024 WL 4336627, at *7 (applying the same framework). None of Plaintiffs' alleged "corrective disclosures" were "corrective," and neither the January nor October 2023 disclosures provided new, value-relevant information connected to Plaintiffs' theory.

### 1.    None Of The Three Disclosures Match Plaintiffs' Theory Of Falsity And Therefore None Are "Corrective."

"[R]evelations that are not 'corrective' cannot form the basis for a corrective disclosure." *FibroGen*, 2024 WL 1064665, at *12. Thus, a back-end disclosure must "expressly and specifically negat[e] the alleged false statement" or "directly render[] [it] false." *Goldman II*, 77 F.4th at 98. The "back-end disclosure['s] corrective effect upon the affirmative misrepresentations [should be] obvious." *Id.* A "substantive mismatch" between the alleged truth and corrective disclosure rebuts the presumption of reliance because the "inference that the back-end price drop equals front-end inflation starts to break down" if the alleged truth and corrective disclosure do not "stand on equal

footing." *Id.* at 102; *accord Kirkland*, 2024 WL 1342800, at *11. The analysis involves "a good dose of common sense." *Goldman I*, 594 U.S. at 122.[4]

Plaintiffs contend that the Alleged Misstatement was false because it concealed the alleged truth that (1) "Defendants had actually waived the requirement for [the Yinghe equipment] to *pass* the FAT before taking delivery," ¶ 139 (emphasis in original), and (2) the Yinghe equipment "had repeatedly *failed* the FAT" due to problems with the Yinghe equipment, ¶ 139 (emphasis in original). Specifically, Plaintiffs allege FAT revealed that "the Fab-1 equipment made by Yinghe never performed close to the required capacity ["throughput"] or quality ["yield"] specifications after several months of testing in China." ¶ 152. The relevant question is therefore "what would have happened" with Enovix's stock on August 10, 2021 "if [Defendants] had spoken truthfully"? *Goldman II*, 77 F.4th at 97.

None of Plaintiffs' alleged corrective disclosures answers that question. Not one of Plaintiffs' alleged corrective disclosures "substantive[ly] []match[es]," *Kirkland*, 2024 WL 1342800 at *11, Plaintiffs' alleged truth in an "obvious" manner so as to answer "what would have happened" if Defendants had disclosed the alleged truth in August 2021, *Goldman II*, 77 4th at 98. No corrective disclosure mentions *anything at all* about the Yinghe equipment, let alone states that FAT was waived for the Yinghe equipment, or that the Yinghe equipment had problems. This is not the "closer fit" required. *Pardi*, 2024 WL 4336627, at *8.

Instead, as detailed *supra*, pp. 7-8, all three corrective disclosures relate to the status of Fab-1 overall by giving updates on the "shortcomings of the Fab-1 equipment," Enovix's transition from Fab-1 to Fab-2, and its ultimate decision to "abandon[] Fab-1 as a commercial production facility," ¶ 155. But the broad point that Fab-1 had problems is not the truth that Plaintiffs allege. 12(c) Order at 11-12. If that were the truth that Defendants should have disclosed, then Defendants did so by

---

[4] The Ninth Circuit's recent "no[n]" "precedent[ial]" "disposition" in *Jaeger v. Zillow Group, Inc.*, 2025 WL 2741642, *1 n.* (9th Cir. Sep. 26, 2025), does not change the analysis. There, the Ninth Circuit concluded that the district court's factual finding—that the defendant's evidence of no-price-impact had "failed to rebut the *Basic* presumption by a preponderance of the evidence"—"was not illogical, implausible, or without support in the record." *Id.* at *2. By comparison, the evidence here, for the reasons below, firmly establishes there is no price impact and *Zillow* only affirms that it is proper for the district court to consider such evidence. *Id.*

May 18, 2022, Ex. 6 (2022 Q1 10Q) at 16, notably before the Funds bought Enovix stock on May 19, Dkt. 7-2. For the same reason that not all broad statements about Fab-1 equipment are rendered misleading under Plaintiffs' narrow theory of falsity, 12(c) Order at 11–14, not all broad statements about Fab-1 equipment are "corrective" of the remaining Alleged Misstatement. Because none of Plaintiffs' corrective disclosures matches Plaintiffs' alleged truth, none are "corrective," the *Basic* presumption is rebutted, and individual reliance issues predominate.

2.     Following The November 7, 2022 Press Release, Neither The January Nor October 2023 Disclosure Revealed New Or Value-Relevant Information.

The January and October 2023 alleged corrective disclosures have independent mismatch failures because they did not offer new, value-relevant information relating to Plaintiffs' alleged truth. In an efficient market—which Defendants do not dispute (for purposes of this Motion) existed at the time of the corrective disclosures—only "new" and "value relevant" material information impacts a company's stock price. *FibroGen*, 2024 WL 1064665, at *12; *see also In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12-13 (S.D. Cal. Mar. 20, 2023) (no price impact where "the corrective disclosures did not actually contain new information correcting the alleged misrepresentations"). The January 3, 2023 and October 3, 2023 disclosures fail this test because, *first*, November 7, 2022 is the *only* date when Enovix disclosed information specific to the Yinghe equipment and *second*, problems relating to yields and throughputs at Fab-1 broadly were disclosed and their implications for production recognized well before November 7, 2022. Thus, independent of the fact that no alleged corrective disclosure is actually "corrective," there cannot be "[a] finding of 'back-end' price impact" for the January and October 2023 dates. *Qualcomm*, 2023 WL 2583306, at *12-13; *see also In re Vaxart, Inc. Sec. Litig.*, 738 F. Supp. 3d 1259, 1267 (N.D. Cal. 2024) (denying certification where plaintiffs failed to analyze whether alleged corrective disclosures provided new information).

(a)     Plaintiffs Concede That The November 7 Press Release Disclosed The Relevant Truth About The Yinghe Equipment.

Plaintiffs have identified only one disclosure Enovix made about the Yinghe equipment at all, and certainly only one disclosure about FAT at Yinghe: the November 7, 2022 Press Release. Plaintiffs avoid calling this disclosure "corrective" because the price of Enovix stock increased $1.11 that day. ¶ 172. On November 7, 2022, Enovix disclosed that it had "waiv[ed]" the requirement that

the Yinghe equipment pass FAT prior to being shipped. ¶ 168. Enovix's Executive Chairman T.J. Rodgers detailed that the decision to fly over the Yinghe equipment "violated our sacred Equipment Procurement Review (EPR) specification by **waiving a key milestone called Factory Acceptance Test (FAT)**, which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment." ¶ 168. Rodgers continued, "those factories stopped receiving guests due to COVID, and we decided to *waive the FAT milestone* and catch up later." *Id*. Rodgers further described "equipment problems" and "unforced execution errors." ¶ 168. Rodgers noted that "[w]e are still paying for the months we gained and then gave back due to equipment problems." ¶ 168.

Plaintiffs concede in a series of matching declarations that the November 7 Press Release revealed the "truth" that they allege Defendants withheld. Dkts. 201-6, 201-7, 201-8, 201-9. In those declarations, each Plaintiff attests that the "truth" that needed to be revealed was that FAT was "actually waived so that Enovix could ship the equipment from China to California before" Enovix went public. Dkt. 201-6, ¶ 11; Dkt. 201-7, ¶ 9; Dkt. 201-8, ¶ 8; Dkt. 201-9, ¶ 8. Plaintiffs likewise testified that following the November 7, 2022 Press Release, "███████████████████████" regarding the waiver of FAT and problems with the Yinghe Fab-1 equipment. Ex. 14 (Lee. Tr.) at 80:8-24; *see also id.* at 81:9-20 ("███████████████████████████████████████████████████████████"); Ex. 16 (Fruchter Tr.) at 166:5-12 ("██████████████████████████████████████████████████████████████████████████"). When the disclosure that Plaintiffs characterize as the "truth" causes a price increase, the inference that later, more attenuated disclosures revealed latent inflation "completely collapses," the *Basic* presumption of reliance is rebutted, and individual reliance issues predominate. *Goldman I*, 594 U.S. at 119.

> (b)  The January and October 2023 Disclosures Did Not Provide Any New, Value-Relevant Information Under Any Theory of Falsity.

Plaintiffs' alleged truth relates only to narrow issues with the Yinghe equipment and not to broader issues with Fab-1 as a whole. *See* 12(c) Order at 11. And beyond the contents of the November 7, 2022 Press Release itself, Plaintiffs have alleged no causal connection between broad

problems at Fab-1 in 2022 and 2023 and problems with the Yinghe equipment specifically. Plaintiffs have not, for instance, shown that problems Fab-1 experienced with throughput and yield were connected to the standard Yinghe packaging equipment rather than, for example, the development of Zone 2, the manufacturing component that incorporated Enovix's proprietary technology. This is insufficient to support class certification. "Avoiding a 'mismatch' 'requires a closer fit (even if not precise) between the front-and back-end statements than courts have required when analyzing the loss causation element of securities fraud.'" *Pardi*, 2024 WL 4336627, at *8 (quoting *Kirkland*, 2024 WL 1342800 at *6). But even assuming Plaintiffs adequately alleged that yield and throughput problems with the Yinghe equipment caused yield and throughput problems at Fab-1 as a whole, no new, value-relevant information underlying that version of the alleged truth was revealed following November 7, 2022. By that date, the alleged truth had been fully disclosed, and any implications for risk assessment that the alleged truth might have had in August 2021 were already irrelevant.

As detailed above, in May and June 2022, Enovix told investors repeatedly in ██████████ ████████████████████████████████████████████████. Ex. 18 (Lieberman Tr.) at 137:10–138:14. Investors understood in August 2022 that what Enovix was ████████ ████████████████████████████████████████████████████████████ ████████████████ Ex. 18 (Lieberman Tr.) at 159:4–160:6. On November 1, 2022, Enovix informed investors additional work was needed to improve the levels of throughput and yield for Fab-1 equipment, but given "slower-than-expected improvements," it would re-direct resources toward "critical yield and productivity learning" for Gen2. Ex. 9 (2022 Q3 Shareholder Letter) at 2. And on November 7, 2022, as detailed *supra*, Section I.B.2.a, Enovix disclosed information about FAT at Yinghe. Analysts reacted to the May through November 2022 disclosures by resetting revenue estimates lower. Ex. 1 (James Rep.) ¶¶ 84-89. Accordingly, by November 7, 2022, investors were aware "Fab-1 was experiencing challenges, including that the levels of throughput and yield of some modules of the Fab-1 equipment needed to be improved." Ex. 1 (James Rep.) ¶ 79.

The concrete information Enovix disclosed regarding Fab-1's actual performance between May and November 2022 superseded any information Enovix could have disclosed in August 2021. Implications for Enovix's risk profile that investors might have deduced from disclosure of the

alleged truth about the Yinghe equipment in August 2021—specifically, any greater risk Enovix might not hit certain ramp-up and revenue targets—would not have been new information by November 7, 2022, because by then Enovix had revealed that Fab-1 had problems, and specifically problems relating to throughput and yield.  Likewise, any assessment of the risk as of August 10, 2021, that problems with the Yinghe equipment might later impact Enovix's revenue and production ramp was stale by November 7, 2022, because earlier revenue and production targets were no longer expected to be met and therefore those risks had materialized (regardless of whether the materialization had anything to do with the Yinghe equipment).  Any further information relating to such allegedly concealed risks therefore would already be irrelevant by November 7, 2022.  Ex. 1 (James Rep.) ¶¶ 81-91.

As the alleged truth (i) had already been disclosed and (ii) had become value irrelevant by November 7, 2022, declines in Enovix's stock price on January 3, 2023 and October 3, 2023 were caused exclusively by information other than the alleged truth.  *See* Ex. 1 (James Rep.) ¶¶ 92-118 (detailing the causes of price declines on those days).  Thus, they cannot serve as "corrective disclosures." *Fibrogen*, 2024 WL 1064665, at *12; *see also Vaxart*, 738 F. Supp. 3d at 1267.  The *Basic* presumption is rebutted for these later two disclosure dates, leaving individual issues predominant after November 1, 2022.

### C.    Plaintiffs Fail To Show An Efficient Market Before January 11, 2022.

Plaintiffs seek to certify a Class Period beginning August 10, 2021, weeks after Enovix went public through a de-SPAC transaction on July 15, 2021.  But from July 15, 2021 through January 10, 2022 (the "Lock-Up Period"), over 65% of Enovix's outstanding shares were locked up and unavailable for trading.  Ex. 19 (S-1) at 87, 105.  During this period, the market for Enovix stock was thin, with minimal analyst coverage, wide bid-ask spreads, and limited tradeable float.  Plaintiffs' expert Dr. Tabak offers no opinion on the effect of the Lock-Up Period on market efficiency during the proposed Class Period, including on August 10, 2021, when the Alleged Misstatement was made. *See* Dkt. 201-2 ("Tabak Rep.") ¶¶ 12–63.  Even if Plaintiffs meet their burden of proving efficiency for later periods, which Defendants do not contest on this Motion, the Lock-Up Period must be excluded from any certified class. *E.g.*, *Brokop v. Farmland Partners Inc.*, 2021 WL 4913970, at *4

(D. Colo. Sept. 30, 2021) (class certification improper for period where efficiency was not shown); *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp. 2d 260, 278-79 (D. Mass. 2006) (similar).

An event study producing "evidence of a cause-and-effect relationship between unexpected news and market price"—the fifth *Cammer* factor—is "the *sine qua non* of efficiency." *In re Fed. Home Loan Mortg. Corp.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012). Yet, the event study proffered by Plaintiffs' expert Dr. Tabak does not demonstrate any statistically significant relationship between news and price movement during the Lock-Up Period, Ex. 1 (James Rep.) ¶¶ 148-50, thus flunking what is "considered the most important *Cammer* factor . . . because it assesses 'the essence of an efficient market and the foundation for the fraud on the market theory,'" *Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017) (quoting *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989)).

Such evidence of cause-and-effect is all the "more critical"—and its absence indicative of inefficiency—where, as here, the other *Cammer/Krogman* factors are not "compelling in showing an efficient market." *Waggoner*, 875 F.3d at 98. As detailed in the James Report (¶¶ 140-47), other factors underscore Dr. Tabak's failure to show cause-and-effect—the very "foundation for the fraud-on-the-market theory"—during the Lock-Up Period, *Waggoner*, 875 F.3d at 98. The contrast between the Lock-Up Period and the balance of the Class Period is stark. Ex. 20 (Tabak Tr.) at 72:24-73:3, 76:7-79:21; Ex. 1 (James Rep.) ¶¶ 140-47. As shown below, multiple factors affirmatively weigh against efficiency during the Lock-Up Period, and others provide no support for efficiency.[5] Ex. 1 (James Rep.) ¶¶ 140-47.

| Factor | Lock-Up Period | Later Class Period |
|---|---|---|
| **Float**[6] | 27% | Over 70% |
| **Analyst Coverage** | 2 analysts (mean and median) | 7 (mean); 8 (median) |

---

[5] *Malriat v. QuantumScape Corp.*, 2022 WL 17974629, at *13 (N.D. Cal. Dec. 19, 2022) (66% float weighed against efficiency); *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (54% float weighed against efficiency and 5.6% bid-ask spread "suggests market inefficiency"); *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015) (coverage by only one analyst "weigh[ed] against" market efficiency); *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870, at *7 (D.S.C. Nov. 1, 2004) (coverage by "only two or three" analysts "does not support a finding of market efficiency").

[6] Defined as "number of shares available for trading" "not held by insiders" as percentage of shares outstanding. *In re Waste Mgmt. Sec. Litig.*, 775 F. Supp. 3d 742, 754, 758 (S.D.N.Y. 2025).

| | | |
|---|---|---|
| **Bid-Ask Spread** | 4.09%: day after Alleged Misstatement<br>2.90%: first two months of public trading<br>2.35%: first month after Alleged Misstatement<br>1.31%: over whole Lock-Up Period. | 0.80% |
| **Market Makers & Arbitrageurs** | 3.66% borrowing fee (daily average)<br>0.14% fails-to-deliver (% shares outstanding) | 0.70% borrowing fee<br>0.03% fails-to-deliver |

Given the multitude of indicia weighing against efficiency, the mere fact that Enovix was traded frequently (Factor 1) on the Nasdaq (Factor 6) and had a substantial market capitalization (Factor 7) is insufficient to satisfy Plaintiffs' burden of proving efficiency during the Lock-Up Period. Courts deny certification as to portions of the class period in such circumstances. *See, e.g.*, *Brokop*, 2021 WL 4913970, at \*4; *In re PolyMedica*, 453 F. Supp. 2d at 278-79. Therefore, any class period, if certified, should not begin before January 11, 2022.

## II. PLAINTIFFS HAVE NOT PROPOSED A DAMAGES METHODOLOGY THAT CAN RELIABLY CALCULATE CLASS-WIDE DAMAGES.

The proposed class should be rejected for the additional, independent reason that Plaintiffs fail to "establish[] that damages are capable of measurement on a classwide basis," and therefore fail to show predominance. *Comcast*, 569 U.S. at 34. Following *Comcast*, "[i]t is now indisputably the role of the district court to scrutinize the evidence" of a plaintiff's proposed damages methodology "before granting certification, even when doing so 'requires inquiry into the merits of the claim.'" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013). Although damages "[c]alculations need not be exact" at the certification stage, "courts must conduct a rigorous analysis to determine whether" a plaintiff's damages case is consistent with its liability case. *Comcast*, 569 U.S. at 35. Plaintiffs must offer more than their expert's unelaborated "say-so" that a viable model of class-wide damages exists. *Ft. Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014). Plaintiffs fail to do so.

Dr. Tabak's "say so" on damages amounts to five paragraphs. *See* Tabak Rep. ¶¶ 64–67. *First*, he proposes a standard event study methodology employing price drops observed on alleged corrective disclosure dates. Tabak Rep. ¶ 67; Ex. 1 (James Rep.) ¶¶ 122-24. But he has a particular problem with the necessary linkage here: whereas the truth Plaintiffs allege Enovix should have revealed in August 2021 related to results of FAT at Yinghe, the alleged corrective disclosures relate

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

to Fab-1 as a whole failing to perform years later. *See supra* Section I.B. Dr. Tabak concedes that Enovix's stock price would have declined when Enovix announced Fab-1 was not operating as intended, regardless of whether Enovix had earlier disclosed the results of FAT at Yinghe. Tabak Rep. ¶ 68; Ex. 1 (James Rep.) ¶¶ 121-25 & n. 240. Consequently, Dr. Tabak concedes he will need some other input into his damages model to be able to parse what portion (if any) of the price declines observed on the corrective disclosure dates related to Enovix's alleged failure to disclose results of FAT at Yinghe back in August 2021. Tabak Rep. ¶ 68.

Defendants pressed Dr. Tabak to explain how he would obtain this requisite missing input. Dr. Tabak did not know. Ex. 20 (Tabak Tr.) at 120:12-23. He speculated that there could be a document among Defendants' papers that attributes a hypothetical X% of the failure of Fab-1 to the specific engineering issues observed during the FAT of the Yinghe equipment. *Id*. Yet, despite Defendants' production of over 300,000 pages of documents, neither Plaintiffs nor Dr. Tabak have identified any such document. Dr. Tabak then suggested that even absent such a document, he could still execute his model so long as Plaintiffs supplied him with another expert who could opine that X% of the failure of Fab-1 as a whole to perform as expected was attributable to the specific engineering issues observed during the FAT of the Yinghe equipment, perhaps a "battery manufacturing expert." *Id*. at 119:8–120:11. But Plaintiffs have not proffered such an expert or any credible methodology to generate such an opinion.

Dr. Tabak takes a similar approach to addressing any confounding information, saying that he will do so with "relevant analytical tools," Tabak Rep. ¶ 68—essentially that he will cross that bridge when he comes to it. Again, that is not enough. *See, e.g.*, *Jaroslawicz v. M&T Bank Corp.*, 2024 WL 2975766, at *8 (D. Del. June 13, 2024) (expert's methodology insufficient where "Plaintiffs have not proposed any mechanism for incorporating intervening or confounding factors into their proposed damages calculations"); *Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 25-26 (D.D.C. 2012) (expert's proposed methodology was too vague because it failed to account for "[confounding] factors that may have affected price"). Neither is his contradictory testimony that he "would need whatever type of production or manufacturing expert to handle at least a portion of" disaggregating the impact of confounding information. Ex. 20 (Tabak Tr.) at 120:5-11. Dr. Tabak's failure to

account for confounding information is particularly problematic given Defendants' superseding disclosures concerning the status of Fab-1 throughout early 2022. *See supra* Section I.B; *see also Vaxart*, 738 F. Supp. 3d at 1267 (Plaintiffs must show "how their expert would discern the waning effect of the fraud on the stock price as the level of artificial inflation gradually dissipated . . . to show that damages can be measured on a class-wide basis.").

*Second*, Dr. Tabak offers no methodology other than an event study to identify the varying level of inflation in Enovix stock over time. Ex. 1 (James Rep.) ¶¶ 126-33. Nor is there any viable methodology, given that Enovix made a series of disclosures prior to and following the Alleged Misstatement related to its ability to meet production targets that would have been incorporated into Enovix's stock price. Ex. 1 (James Rep.) ¶¶ 134-39. As detailed above, under Plaintiffs' own theory, copious information relating to the putative risk that problems observed at Yinghe would materialize into broader problems at Fab-1 or reductions in corporate targets was made available to the market throughout the period from May 2022 to November 7, 2022 and through Plaintiffs' proposed class period. *See supra* Section I.B.2.b. Dr. Tabak has not explained any methodology to identify, for each day in the Class Period, any pieces of information regarding the alleged truth that were not yet publicly available as of that day and has provided no reason for Defendants or this Court to conclude he can. Ex. 1 (James Rep.) ¶ 132; *see, e.g.*, *Vaxart*, 738 F. Supp. 3d at 1267 ("[P]laintiffs have offered no guidance on how their expert would discern the waning effect of the fraud on the stock price as the level of artificial inflation gradually dissipated . . . [a]nd so they have failed to show that damages can be measured on a class-wide basis."); *Loritz v. Exide Tech.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015) (denying class certification where expert "discusse[d] general techniques for computing damages in securities fraud cases" but failed to connect them "to the facts of th[e] case").

For these reasons, Dr. Tabak's proffered methodology for calculating damages for the proposed class is insufficient to support a finding of predominance. *Comcast*, 569 U.S. at 34–35 (plaintiffs failed to satisfy predominance requirement for class certification where damages model did not "establish that damages [were] susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"). Absent such a showing, "[q]uestions of individual damage calculations [will] inevitably overwhelm questions common to the class." *Id.*

## III.   PLAINTIFFS ARE ATYPICAL AND INADEQUATE CLASS REPRESENTATIVES.

In addition to predominance, Plaintiffs must also satisfy the Rule 23(a)(3) requirement that the "claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), and the Rule 23(a)(4) requirement that Plaintiffs will "fairly and adequately protect the interests of the class," *Amgen*, 568 U.S. at 459.  Plaintiffs are neither adequate nor typical.

### A.   Plaintiffs Are Not Adequate Class Representatives.

Under Rule 23(a)(4), "a [class] representative is adequate if (1) it and its counsel do not have any conflicts of interest with the rest of the class and (2) [it] will vigorously prosecute the action on behalf of the class." *Averza v. Super Micro Computer, Inc.*, 788 F. Supp. 3d 1060, 1072 (N.D. Cal. 2025).  "[A] party who is not familiar with basic elements of its claim is not considered to be an adequate representative for the class because there is no sense that there is an actual party behind counsel's prosecution of the action." *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 153 (N.D. Cal. 1991).  Moreover, "[s]ome courts have also examined the personal integrity of class representatives, and some have found that a class representative would be inadequate based on such concerns." *White v. E-Loan, Inc.*, 2006 WL 2411420, at *3 (N.D. Cal. Aug. 18, 2006) (Illston, J.).  None of the Plaintiffs meet this standard.

*First*, Plaintiffs have myriad conflicts that render them inadequate.  To start, Mr. Lee earned a profit of over $8,000 on his Enovix investment, Dkt. 203-1, Ex. 14 (Lee Tr.) at 136:12-138:5, rendering him inadequate. *See Perlmutter v. Intuitive Surgical, Inc.*, 2011 WL 566814, at *12 n.17 (N.D. Cal. Feb. 15, 2011) ("Marcus' status as a net seller and a net gainer during the Class Period undermines his contention that he would be a typical and adequate class representative.").  Mr. Lee has also acknowledged that his ███████████████████████████████ ████████████. Ex. 14 (Lee Tr.) at 33:11-17.  This, too, renders him inadequate. *White*, 2006 WL 2411420, at *3 (observing that conduct that "was much more recent" and "was much more related to his role as class representative[]" was more probative of a dispositive lack of credibility).

As to the other Plaintiffs, the Funds exited their entire Enovix position in December 2022.  They are therefore incentivized to show that any price inflation was at its highest in advance of November 2022 and dissipated by December 2022—interests "antithetical" to those of the class in

the event the Court were to certify the entire Class Period. *See Ma v. Twitter*, 2024 WL 4859090, at *4 (N.D. Cal. Nov. 20, 2024). Similarly, Ms. Selke's only transactions occurred during the Lock-Up Period. *See supra* Section I.C; Dkt. 84-2. If certification is denied as to the Lock-Up Period due to Plaintiffs' failure to prove market efficiency, Ms. Selke would not even be a member of the Class.

*Second*, Plaintiffs have expressed disdain for their roles in this action. The Funds' 30(b)(6) representative testified he "█████████████████████████." Ex. 16 (Fruchter Tr.) at 175:3-11. Mr. Kung testified he "████████" agreeing to serve as a Lead Plaintiff and was told that "████████ ████████," noting that his counsel was a good ████████ Ex. 17 (Kung Tr.) at 223:4-19. He would not have agreed ████████████████████. *Id*. at 223:20-23.

*Finally*, Plaintiffs cannot vigorously prosecute this action as they do not understand and have not executed their duties as class representatives. The Funds' corporate representative ████████ ████████████████████████████████████████████ ████████████. Ex. 16 (Fruchter Tr.) at 175:3-9, 176:19-177:8. Mr. Lee did not ████████ ████████████████████████████████ Ex. 14 (Lee Tr.) at 21:4-22:22. Meanwhile, Mr. Kung acknowledged that, like Mr. Lee, ████████████████████████ ████████████, Ex. 17 (Kung Tr.) at 249:6-24 ("████████████████"), and that the amended PSLRA certification that he submitted in this case contains ████████████ ████████████████████████████████████████, *id*. at 119:4-9.[7] Mr. Kung ████████████████████████████████████ ████████████████████████████████ *Id*. at 196:19-22. But a lead plaintiff must "check the otherwise unfettered discretion of counsel in prosecuting the suit" and "provide his personal knowledge of the facts underlying the complaint," *Rolex Emps. Ret. Tr. v. Mentor Graphics Corp*., 136 F.R.D. 658, 666 (D. Or. 1991), so as to avoid "the vice of lawyer-driven litigation" that the PSLRA was "intended to curtail," *Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing & Sec., LLC*, 616 F. Supp. 2d 461, 463 (S.D.N.Y. 2009). Plaintiffs have not done so.

---

[7] Blind trust in their attorneys at Rosen also led Mr. Lee and Mr. Kung ████████████ ████████████. *See* Ex. 14 (Lee Tr.) at 53:11-54:22; Ex. 17 (Kung Tr.) at 258:9-17.

**B.      The Funds Are Not Typical Of The Class.**

Finally, the Funds, with the largest putative loss among Plaintiffs, are not typical. "A plaintiff who relies on non-public information is subject to a unique defense"—rendering him or her atypical. *Kalodner v. Michaels Stores, Inc.*, 172 F.R.D. 200, 209 (N.D. Tex. 1997). In purchasing Enovix stock, the Funds heavily relied ██████████████████████████████████████████████████████████████████████████████████████████, *see* Exs. 22 (DIS*21822), 23 (DIS*19286), 24 (DIS*19037), 25 (DIS*21095), 26 (DIS*26880). Moreover, in selling their entire Enovix position in December 2022, the Funds relied upon conversations ██████████████████████████████████████████████████████████████████████████████████████████, Ex. 21 (DIS*25426) at -32—information which Mr. Lieberman ████████████████████████, Ex. 18 (Lieberman Tr.) at 309:6-19.

The Funds' private conversations superseded any reliance on the alleged fraud. The fraud-on-the-market presumption does not apply to a plaintiff who "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Halliburton II*, 573 U.S. at 269. Mr. Lieberman could not name any "████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. 18 (Lieberman Tr.) at 280:3-13. The Funds' access to non-public information will require them to show individual reliance and subject them to unique defenses that will "loom[] too large for the court to determine [they would be] able to adequately represent the interests of the remaining class members." *In re Peregrine Sys., Inc. Sec. Litig.*, 2002 WL 32769239, at *6-7 (S.D. Cal. Oct. 11, 2002).

## CONCLUSION

Defendants respectfully request that the Court deny Plaintiffs' Amended Motion for Class Certification or, in the alternative, order that the Class Period begin after January 10, 2022 and end prior to November 7, 2022.

DEFENDANTS' OPPOSITION TO PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION

Dated:  December 12, 2025

By: */s/ Emily C. Kapur*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Emily C. Kapur (Cal. Bar No. 306724)
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone: +1 650 801 5000
Facsimile: +1 650 801 5100
Email: emilykapur@quinnemanuel.com

Andrew J. Rossman (*pro hac vice*)
Jesse Bernstein (*pro hac vice*)
Courtney C. Whang (*pro hac vice*)
Brenna D. Nelinson (*pro hac vice*)
Sasha Boutilier (*pro hac vice*)
W. Jackson Vallar (Cal. Bar No. 341861)
295 5th Avenue
New York, NY 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
andrewrossman@quinnemanuel.com
jessebernstein@quinnemanuel.com
courtneywhang@quinnemanuel.com
brennanelinson@quinnemanuel.com
sashaboutilier@quinnemanuel.com
jackvallar@quinnemanuel.com

*Attorneys for Defendants*
*Enovix Corporation, Harrold Rust, Steffen Pietzke, Thurman J. Rodgers, Emmanuel T. Hernandez, John D. McCranie, Betsy Atkins, and Gregory Reichow*