# EXHIBIT 20

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
- - - - - - - - - - - - - - - - - -x
IN RE: ENOVIX CORPORATION

SECURITIES LITIGATION                    Case No.

This Document Relates to                 3:23-cv-00071-SI

All Actions:
- - - - - - - - - - - - - - - - - -x

VIDEO-RECORDED DEPOSITION OF DAVID I. TABAK, Ph.D.

Taken remotely

Tuesday, November 25, 2025

Reported by:
Jeffrey Benz, CRR, RMR
Job No. J13823864



Okay.

Q.   Do you see that on December 17, 2021, Piper Sandler initiated coverage of Enovix?

A.   December -- I see it says, Enovix initiated it overweight by Piper Sandler.

Q.   That is, over four months after the alleged misstatement, correct?

A.   Correct.

Q.   So at the time of the alleged misrepresentation, Piper Sandler does not appear to have been covering Enovix, true?

A.   That appears to be the case, yes.

Q.   If we go to the next page and you look at August 5, 2022.

A.   August 5, 2022, okay.

Q.   You see that it says, Enovix initiated it overweight by J.P. Morgan?

A.   I do see that.

Q.   And so that would be approximately a year after the alleged misstatement, right?

A.   August 22 is, indeed, about a year after August 2021, yes.

Q.   So as of the time of the alleged misrepresentation, J.P. Morgan was not an analyst covering Enovix.  Correct?

A.    It appears not to be.

Q.    Okay.  If we turn to the next page, do you see on January 11, 2023, Enovix initiated at buy, by Canaccord Genuity?

A.    I do see that.

Q.    And that's about 18 months after the alleged misstatement, true?

A.    Or 17 months.

Q.    Whether 17 or 18 months, it's certainly over a year after the alleged misrepresentation, correct?

A.    Correct.

Q.    So it appears that Canaccord Genuity also was not covering Enovix at the time of the alleged misrepresentation.  True?

A.    That appears to be the case.

Q.    Okay.  We can actually -- I missed one.  If we go to page 1 of Exhibit 2A, August 17, 2021.

A.    Yes.

Q.    Enovix initiated at outperformed by Oppenheimer.

Do you see that?

A.    I do.

Q.    And that is also after the alleged



misrepresentation.

A.    About a week, yeah.  About a week after, yes.

Q.    Okay.

And now, if we turn to Tab 29, we'll mark as Exhibit 4.

(Equity research report from Cantor Fitzgerald, dated September 28, 2022, initiating coverage of Enovix, was marked Tabak Exhibit 4 for identification, as of this date.)

Q.    Do you see this is an equity research report from Cantor Fitzgerald, dated September 28, 2022, initiating coverage of Enovix?

A.    I do see that.

Q.    So, Cantor Fitzgerald also did not initiate coverage of Enovix until after the alleged misstatement, correct?

A.    It appears that way, yes.

Q.    In fact, it's over a year after the alleged misstatement, correct?

A.    Correct.

Q.    So none of the prominent investment houses that you listed in Footnote 18 of your



report appear to have been covering Enovix at the time of the alleged misstatement.  True?

A.    It appears that way.

Q.    Are you aware of which analysts were covering Enovix at the time of the alleged misstatement?

A.    Not offhand.

Q.    Did you specifically, when preparing your report, look at which analysts were observing -- which analysts were covering Enovix at the time of the alleged misstatement?

A.    I looked at the list, so I probably would have seen that, but I did not look specifically to make that determination.

Q.    Did you -- withdrawn.

I -- I assume, then, that you did not look specifically to determine whether the analyst coverage at the time of the alleged misrepresentation was of sufficient quality to support a finding of market efficiency.

MR. BODNAR:  Object to form.

Q.    In the class period.

A.    I did not perform that review.

Q.    And you didn't look at the specific analyst reports that were released at or around



the time of the alleged misrepresentation.
Correct?

A.    Also correct.

Q.    So what is your basis to assert that the second counter factor supports a finding of market efficiency as of the time of the alleged misrepresentation?

MR. BODNAR:  Object to form.

A.    Well, first of all, my opinion was over the class period generally, not over any particular date.

Q.    Sorry, you said "first of all," so I -- I don't know if there is something further, I didn't want to interrupt you.

A.    Fair -- fair enough.

No, I think that's my answer to the question.  Thank you, uh-huh.

Q.    Okay.

So then, you are not offering the opinion, then, that the analyst coverage, as of the time of the alleged misstatement, supports a finding of market efficiency as of the beginning of the class period, true?

MR. BODNAR:  Object to form.

A.    Well, I was not asked to address that



particular question, so at least as of my opening report, I don't have an opinion one way or the other on that.

Q.   You would agree that if -- withdrawn.

Turn to paragraph 54 of your report.

On page 25.

A.   Okay.

Q.   You offer the opinion that, Enovix's bid-ask spread averaged .9 percent of the same day's closing price over the class period, with a median of .57 percent.

Do you see that?

A.   I do.

Q.   And you note that this figure indicates that, on average, it would be profitable in expectation for investors to trade in Enovix stocks if they felt it was mispriced by as little as .9 percent.  True?

A.   True.

Q.   And you believe that such a level of a bid-ask spread supports a finding of market efficiency, correct?

A.   Yes.

Q.   And in -- in general, the lower the bid-ask spread, the more supportive it is of

market efficiency, correct?

A.   Correct.

Q.   And the higher the bid-ask spread, the less supportive it is of market efficiency. True?

A.   True.

Q.   So let's look at Exhibit 9 in your report.

Between August 11, 2021, and September 23, 2021, there is not a single day where the bid-ask spread was less than 1. Correct?

A.   One -- you have to give it some units, but 1 percent of the closing price, correct.

Q.   So for that entire period, the bid-ask spread was higher than the average over the class period, correct?

A.   For the closing, for the bid -- for the final bid-ask spread each day, that is true. We don't have the intraday bid-ask spread data.

Q.   Is the bid-ask spread of .9 that you mentioned in your -- in paragraph 54 of your report, is that the intraday, or is that the closing spread?

A.   It is the average of what we'll call



the closing spreads.

Q.    Okay.   So looking at the numbers on Exhibit 9, the last column, "Spread as a Percent of Closing Price," that would be an apples-to-apples comparison to the average that you observed and included in paragraph 54 of your report, correct?

MR. BODNAR:   Object to form.

A.    That is correct.

Q.    And so every single day for a little more than the first month of the class period, the spread as a percent of closing price was higher than the average over the class period, correct?

A.    That is correct.

Q.    And as of the date of the alleged misrepresentation, the bid-ask spread is over 4 percent, right?

A.    As of the first trading day following the alleged misrepresentation, which I believe was on August 10, so as of August 11, the closing bid-ask spread as a percent of the closing price was 4.09 percent.

Q.    Have you ever offered an opinion in another case where you opined that a bid-ask



spread above 3 percent was indicative of an efficient market?

A.    I don't recall.  I don't recall my testimony cases and -- cases and opinions on that.

Q.    And what does a bid-ask spread above 3 percent mean in terms of the incentives to trade?

MR. BODNAR:  Object to form.

A.    Well, it depends if one winds up actually paying the full bid-ask spread, that means a round-trip transaction would cost about 3 percent.  If people trade as described within the quotes, it would mean that it's less than 3 percent.

Q.    In your report, do you recall you wrote that the .9 percent figure indicates that on average it would be profitable in expectation for investors to trade in Enovix stock if they felt it was mispriced by as little as .9 percent?

A.    Yes.

Q.    So here, when it's over 3 percent, that figure would indicate that on average it would be profitable in expectation for investors



to trade in Enovix stock if they felt it was mispriced by as little as 3 percent, right?

MR. BODNAR:  Object to form.

A.    3 percent and potentially a smaller figure.

Q.    The period of August 11 through September 23, 2021, is less indicative of an efficient market than the evidence over the entirety of the class period, correct?

MR. BODNAR:  Object to form.

A.    I'm sorry, Mr. Bernstein, are you suggesting that the only thing we look at is the bid-ask spread for this question?  Or are you actually asking about all evidence from all of the Cammer-Krogman tests?

Q.    Sure.  Let's start with the bid-ask spread.  The evidence of market efficiency from the bid-ask spread, Factor 8, is stronger for the class period as a whole than it is for the August 2021 through September 2021 period, true?

A.    That is true.

Q.    And if the bid-ask spread was averaging 3 percent, you would be less confident in concluding that Factor 8 supported market efficiency, true?



MR. BODNAR:  Object to form.

A.   First let me check which is -- that this is Factor 8.

Let's -- I would think about it more, I think that's a fair assessment, but I might still decide that it supported market efficiency.  I just haven't done that thought experiment.

Q.   You might conclude it does, you might conclude it doesn't, true?

A.   Well, without having done that thought experiment, I really can't tell you the answer other than say, yes, I could come up potentially with either answer.

Q.   And as we noted with respect to Factor 2, you didn't do a specific analysis to determine whether the bid-ask spreads that you're looking at, at the early part of the class period, let's say August 11 through September 23, 2021, are supportive of an efficient market, true?

A.   That is correct, I did not do a specific analysis of that date range.

Q.   And you're not offering an opinion that that specific date range -- withdrawn.



You're not offering an opinion that the market for Enovix stock was efficient during that particular time period?

MR. BODNAR:  Object to form.

A.   I'm -- correct, I'm offering an opinion over the class period as a whole and not any specific sub-period.

Q.   Including the specific sub-period where the alleged misrepresentation occurred, correct?

MR. BODNAR:  Object to form.

A.   There are multiple sub-periods where the alleged misrepresentation occurred.

Q.   Are you offering the opinion that on the day of the alleged misrepresentation, Enovix's stock traded in an efficient market?

MR. BODNAR:  Object to form.

A.   The answer is that my assignment was to look at the efficiency over the class period, so I haven't picked out any particular day, whether it's that day or any other day, to offer a specific opinion focused solely on one particular day.

Q.   So just to be clear, the answer to my question is that you are not offering the



must go in one direction, certainly not at least without really thinking this through and understanding the way that the production works.

Q.   And as far as understanding how the production works, I assume you don't have an understanding; is that fair?

MR. BODNAR:  Objection to form.

A.   I only have the most basic understanding from the complaint.  I'm not going to hold myself out as an expert on the production here.

Q.   So you don't have an understanding of the four different zones that work independently in FAB-1, right?

A.   I saw that blank, but I don't recall it, and I don't have any real understanding of it beyond a simple reading of the complaint.

Q.   So assuming that the market understood that the zones are independent, if one of the zones that doesn't have equipment from Yinghe has issues that render the production -- render the -- render FAB-1 inoperable, that hypothetical would result in artificial inflation dissipating and not as a result of the



alleged fraud, true?

MR. BODNAR:  Object to form.

A.  Put it this way, I'll say at least there is a -- that is one scenario -- I'm not going to say it's necessarily the scenario because I don't understand all the manufacturing but, yes, that is a scenario that is possible.

Q.  Okay.  And if on a -- withdrawn.

If the -- if FAB-1 is unable to reach its production targets both for reasons related to the not passing of FAT but also for reasons completely independent of the non-passing of FAT, you would need to conduct an analysis that would allow you to isolate the amount of decline that was due to the FAT-related cause of the failure and the non-FAT-related cause of the failure, true?

MR. BODNAR:  Object to form.

A.  First of all, are you assuming that that information about FAB-1 comes out simultaneously?

Q.  Correct.

A.  Yes, if there are two reasons for, whether you want to call the -- the decline or inability of FAB-1 to reach expectations, if one



is allegation related and one is not allegation related, then you want -- for purposes of damages, you want to figure out how much of the effect comes from each of those two.

Q.    And do you propose any method to do that in your report?

MR. BODNAR:  Object to form.

A.    No, because, again, that's something where you would need whatever type of production or manufacturing expert to handle at least a portion of that.

Q.    So you would -- you would need a production or manufacturing expert to quantify for you how much of the failure was due to the FAT-related issues and how much was related to non-FAT-related issues?

MR. BODNAR:  Object to form.

A.    I mean, yes, that is one way. Obviously, again, if there are internal documents that say production should be, you know, at 550 units per hour but it's down this much for Reason 1 and this much for Reason 2, I may be able to rely on such documents.

Q.    Do you agree that the alleged corrective disclosures in this case could not



have been disclosed at the beginning of the class period?

MR. BODNAR:  Object to form.

A.    Well, let's see.  So the first one if you were talking about only earning $8,000 in a quarter from the batteries, obviously you couldn't disclose that particular amount.  But I do not know whether based on the failure to pass the FAT someone would have projected there would be minimal production.  So obviously the very specific number, no.  That overall figure, that's November 1, I -- I'm not going to say at this point.

If we go to January 3 and production of a hundred units per hour, rather than 550 on the first line, again, I don't think you could have said it would definitely be there, but I do not know what one could have projected based on the information available as of the time of the alleged misrepresentation.

And then moving on to October 3 and basically saying they are going to convert FAB-1 from basically mass production to, let's call it, you know, research and development, again, that is a question of -- you -- I don't know if



they would know the specifics.  But I don't know whether one would say, Look, given the issues that -- the FAT, here is what one should have reasonably projected.

So obviously the very specific things, no, but I don't think I can give you an answer as to whether something generically similar to that could have been disclosed.

Q.   And do you -- just so I understand, do you view the $8,000 in revenue as corrective?

MR. BODNAR:  Object to form.

A.   Well, put it this way, that is alleged in the complaint to represent, you know, the effects of not being able to have FAB-1, that is part of it, as well as the statement there that they are going to kind of start moving away from FAB-1 and focus more or FAB-2.

So I would want to think about it more but it's definitely alleged in the complaint as part of the corrective disclosure.

Q.   Then moving away from FAB 1, in -- in November '22, the company couldn't have disclosed that at the beginning of the class period, right?

MR. BODNAR:  Object to form.



A C K N O W L E D G E M E N T


        I, DAVID I. TABAK, Ph.D., hereby certify, I

have read the transcript of my testimony taken

under oath in my deposition of November 25, 2025;

that the transcript is a true, complete and

correct record of what was asked, answered and

said during this deposition, and that the answers

on the record as given by me are true and correct.



_____
DAVID I. TABAK, Ph.D.

Subscribed and sworn to

before me on this _____ day

of _____, 2025



_____
            NOTARY PUBLIC



C E R T I F I C A T E


STATE OF NEW YORK      )
                       )   Ss.:
COUNTY OF NEW YORK     )


       I JEFFREY BENZ, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public within and for the State of New York, do hereby certify:

       That the witness whose examination is hereinbefore set forth was duly sworn by me and that this transcript of such examination is a true record of the testimony given by such witness.

       I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

       IN WITNESS WHEREOF, I have hereunto set my hand this 1st of December, 2025.



_____

JEFFREY BENZ, CRR, RMR

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com