# EXHIBIT 1

THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE THE ENOVIX CORPORATION SECURITIES LITIGATION | Case No: 3:23-cv-00071-SI |

# EXPERT REPLY REPORT OF DAVID I. TABAK, PH.D.

## I.     SCOPE OF ANALYSIS AND SUMMARY OF FINDINGS

1.   This report concerns a securities action brought "on behalf of a Class defined as all persons and entities that purchased the publicly traded common stock of Enovix or RSVAC between June 24, 2021 and October 2, 2023, both dates inclusive ('Class Period')."[1]  I understand that the Order Granting In Part and Denying In Part Motion to Dismiss SAC dated July 23, 2024 ("MTD Order") limited the actionable challenged statements to Statements 4 and 6 on August 10, 2021 and Statement 7 on September 9, 2021, as identified in the SAC.[2]  I also understand that the Order Granting Motion for Partial Judgment on the Pleadings dated October 7, 2025 ("MJOP Order"), further limited the actionable challenged statements to only Statement 4.[3]  As Statement 4 was made after the close of the market on August 10, 2021, I treat the Class Period, as that term is used in this report, as running from August 11, 2021 through October 2, 2023.  I understand that this is the same Class Period that Plaintiffs are seeking to certify in their

---

[1] Second Amended Class Action Complaint dated March 19, 2024 ("Complaint" or "SAC"), p. 2. Closing footnote omitted.

[2] MTD Order, p. 12.

[3] MJOP Order, p. 14.

amended motion for class certification.  On November 13, 2025, I submitted an amended report on class certification ("Tabak Report").  On December 12, 2025, Defendants submitted an expert report from Christopher James ("James Report") responding to the Tabak Report.

2.  Counsel for Plaintiffs in this matter have asked me to respond to the James Report.  As discussed below, I find that:

     a.  The James Report's conclusions regarding price impact are incorrect because, among other reasons, they (1) ignore that a disclosure of post-FAT "challenges" that were being addressed does not reveal the existence of pre-FAT failures, (2) ignore that a disclosure of some problems does not mean that additional problems would not have worsened the market's perception, and (3) with respect to back-end price impact, disregard how Plaintiffs and the Court have described Plaintiffs' allegations.

     b.  The James Report's conclusions regarding the ability to calculate damages on a class-wide basis misrepresent my opinion and the James Report primarily argues that Plaintiffs have not yet obtained an opinion from a technical or subject-matter expert in advance of the merits phase of this case.

     c.  The James Report's conclusions regarding market efficiency focus only on certain metrics to assess market efficiency, ignoring the other metrics that do not support its conclusions.  The James Report also argues only that for a certain period of time, Enovix's stock may have had less evidence in favor of efficiency, but generally does not even argue that there is evidence of inefficiency, much less provide an opinion that Enovix's stock did not trade in an efficient market over the period it examines.

## II.    QUALIFICATIONS AND REMUNERATION

3.   My qualifications are as stated in the Tabak Report.  Updates to my curriculum vitae since the Tabak Report are included in this report as Exhibit 1.

4.   As noted in the Tabak Report, NERA is being compensated on a non-contingent basis for out-of-pocket costs and at our usual rates for time.  My current billing rate is $1,325 per hour.  I have been assisted by a number of individuals at NERA working at my direction who are billing at their standard rates.

## III.    MATERIALS CONSIDERED

5.   Materials considered for the purposes of this report beyond those already considered for purposes of the Tabak Report are listed in Exhibit 2.

## IV.    THE JAMES REPORT'S ANALYSIS OF PRICE IMPACT IS FATALLY FLAWED

### A.    The James Report's Claim that the "Alleged Truth" Was Fully Known to the Market by November 7, 2022 Is Not Supported

6.   The James Report states:[4]

> I understand that Plaintiffs allege the following allegedly concealed truth ("Alleged Truth") should have been disclosed at the beginning of the Putative Class Period in order to make the Alleged Misstatement not misleading:
>
> i.   Enovix had waived the requirement that the Gen1 equipment purchased from Chinese vendor Shenzen Yinghe Technology Co. Ltd. ("Yinghe" and the "Yinghe Equipment") pass the Factory Acceptance Test ("FAT") before it was shipped to Fab-1 ("Statement A"); and
>
> ii.  Prior to the waiver, Enovix had identified problems with the equipment, as a result of which it had not passed the

---

[4] James Report, ¶10a. Closing footnote omitted.

FAT—specifically, equipment capacity (throughputs) and quality (yields) were not meeting desired specifications during the FAT ("Statement B").

7.    The James Report does not provide any citation for this understanding.  I offer no opinion on any legal significance of the James Report's decision to create its own categorization of the "Alleged Truth," which it refers to as Statements A and B.  Nevertheless, solely for purposes of my response to the James Report, I follow the James Report's characterization of the "Alleged Truth."

8.    The James Report does not dispute that there was price impact with respect to the November 1 alleged corrective disclosure.  Instead, its price-impact opinion is limited to the following: (1) "By November 7, 2022, the information comprising the Alleged Truth was publicly available and, in an efficient market, such information would have been fully incorporated into the price of Enovix's stock" and "In an efficient market, the Enovix stock price declines on January 4, 2023 and on October 3, 2023, following the release of allegedly corrective information, were not caused by revelation of any new information underlying the Alleged Truth[.]"[5]

9.    The James Report reports that on November 7, 2022, an Enovix press release stated, "Our decision violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later."[6]

---

[5] Headers to James Report Sections VI.A and VI.B. Capitalization altered.

[6] James Report, ¶69, quoting from Enovix's November 7, 2022 press release. Closing footnote and emphasis added by the James Report removed.

10. I agree with the James Report that the November 7, 2022 press release stated that the company "decided to waive the FAT milestone" and that this corrects what the James Report has termed as "Statement A."

11. With respect to "Statement B," the James Report begins its argument by stating, "From the beginning of the Putative Class Period and through November 7, 2022, Enovix provided information to the market about the challenges it was facing with respect to Fab-1—including information regarding efforts to improve the throughputs and yields of the Gen1 equipment installed at Fab-1. Therefore, it informed the market that Fab-1 equipment was not meeting the levels of throughput and yield required in order to scale up production."[7]  However, the James Report's conclusion here does not follow from its predicate.  For example, a company can be facing challenges and be successfully overcoming them.  Similarly, if a student said that they were facing challenges in a class and making efforts to improve their understanding of the material, that would not be the equivalent of them saying that they had failed an exam.  Put simply, facing challenges and working hard to improve is not the same thing as failing a test.

12. Notably, in ¶75, the James Report lists statements in support of its claim that "Enovix regularly informed investors about issues it experienced in improving throughputs and yields[,]" but it does not include a May 11, 2022 statement that it previously quoted as stating, "With production underway, our focus in Fab-1 is on increasing volumes and yields. The large majority of the process steps that make up Fab-1 operate today at very high yields. **A small number are yielding below 95%, and we have a documented plan to drive these to their targeted yields. Delivering to plan is a journey of many incremental improvements that our operations team undertakes daily.**"[8]  This omitted statement's description ("a small number") and its quantitative

---

[7] James Report, ¶73.

[8] James Report ¶41, quoting Q1 2022 "Letter to Our Shareholders," May 11, 2022. Emphasis added in the James Report.  See also footnote 78 of the James Report, quoting two other instances of Enovix discussing that a "small number are yielding below 95%[.]"

figure ("below 95%") provided the market with important context around the quotes that ¶75 of the James Report provides such as "In August 2022, Enovix explained that throughputs and yields still needed to be improved. Specifically, the Company stated that its 'challenge now [was] improving [its] manufacturing output' and that Enovix 'need[ed] to increase [its] manufacturing yield metrics' but '[t]here [would be] no easy path when bringing up a first-of-a-kind manufacturing line. It [would be] a relentless effort of continuous improvement.'"[9] Even if the market interpreted the August 2022 statement to mean that there were challenges (and putting aside that those challenges were being met by "a relentless effort of continuous improvement"), the earlier statement would have suggested that the true challenges were limited to "a small number" of issues resulting in yields that could accurately be described as "below 95%[.]" The James Report makes no attempt to explain how the August 2022 statement, or any of the other statements that it cites, would have informed the market about what the Court described as one of the particularized facts that led it to sustain allegations in the SAC: "According to FE2, the equipment did not pass the FAT, with the production yield never getting close to meeting Enovix's capacity specifications. *Id.* ¶ 100."[10] Nor does the James Report attempt to reconcile its claim that the market was told about material issues with Fab-1 with the statement that "a small number" of issues where yields were described as merely "below 95%" with "a documented plan to drive these to their targeted yields[.]"

13. To be clear, ***not one*** of the quotes in ¶75 of the James Report indicates that the equipment in Yinghe failed the FAT. Indeed, many of those quotes were quite positive, such as "every day [it] solve[d] problems needed to improve yield and output."[11] That quote sounds very different from saying that the equipment in Yinghe failed the FAT and that those problems were not solved. That quote is perfectly consistent with the

---

[9] James Report, ¶75. Internal and closing footnotes omitted. Alterations in the James Report.

[10] MTD Order, p 11, quoting and citing to the SAC.

[11] James Report, ¶75. Closing footnote omitted. Alterations in the James Report.

equipment passing the FAT and then Enovix working to improve yield and output further.  Again, Enovix said that "a small number are yielding below 95%[,]" which sounds like, at most, a borderline problem.

14. The James Report asks the reader to assume that essentially any discussion of challenges that are being addressed is the equivalent of failing the FAT.  Of course, had the equipment in Yinghe passed the FAT, Enovix still may have characterized its work to improve yields further as something that it did "every day [to] solve[] problems needed to improve yield and output."[12]

15. Notably, the James Report summarized what information was publicly available by November 7, 2022, and its summary *does not include failing the FAT*:[13]

> Thus, by November 7, 2022, Statement B of the Alleged Truth was publicly available information because it was publicly available information that (i) Fab-1 was experiencing challenges, including that the levels of throughput and yield of some modules of the Fab-1 equipment needed to be improved; and (ii) parts of the Fab-1 equipment that had come from China had problems that had not been resolved by the time the equipment was shipped.

16. Furthermore, there is no clear support in the preceding paragraphs of the James Report for the second part of this conclusion: that the market learned that "(ii) parts of the Fab-1 equipment that had come from China had problems that had not been resolved by the time the equipment was shipped."  The James Report argues:[14]

> Thus, in the November 7, 2022 Press Release, Mr. Rodgers explained that the Fab-1 equipment that was transported from China had problems that had not been resolved at the time the equipment was shipped to Fremont—"we decided to waive the FAT milestone and catch up later…. The catch up would have occurred at the [SAT] milestone.… We are still paying for the months we gained and then gave back due to equipment problems." After this press release, Cowen analysts, in a report

---

[12] James Report, ¶75. Closing footnote omitted.

[13] James Report, ¶79.

[14] James Report, ¶78. Internal and closing footnotes omitted.

released on the same day, stated that Enovix "explained [that] the company's Equipment Procurement Review (EPR) process and COVID related impacts … led to delays in Fab-1."

17. But the quote that the James Report uses for Mr. Rodgers, beginning "we decided to waive the FAT milestone and catch up later[,]" leaves out the introductory clause, with a more complete quote for this portion of the statement reading, "But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later."  Thus, Mr. Rodgers' statement did not blame the failure or inability of the equipment to meet specifications for waiving the FAT, but blamed travel restrictions for Enovix not being able to send engineers to observe the equipment functioning, a necessary component of the FAT.

18. The James Report also quotes Cowen talking about Enovix's Equipment Procurement Review Process or EPR, but leaves out the very next sentence (after a header), which reads, "Despite early shipment delays and limitations to test equipment last year, Mr. Rodgers reiterated Fab-1 remains critical to ENVX and customers as cells delivered next year will help qualify new products *given EPR issues are not representative of any technology concerns*."[15]  Yet, the James Report argues that the market understood that "parts of the Fab-1 equipment that had come from China had problems that had not been resolved by the time the equipment was shipped."[16]

19. Even if "technology" is read narrowly to refer just to Enovix's proprietary battery technology and not Enovix's battery-production capabilities, the James Report's conclusion is belied by a Piper Sandler Report on November 10, 2022 that addressed the question "Describe ENVX's current production facility, as well as how/if it will differ from new facilities" by stating, "The company's existing facility in California, referred to as 'Fab 1', contains manufacturing equipment that was designed by a small team of engineers. … The equipment was pieced together on a shoestring budget using a third-

---

[15] "3Q Post Mortem Continues; TJ Named Executive Chair," *Cowen*, November 7, 2022. Emphasis added.

[16] James Report, ¶79.

party vendor."[17]  While calling out the "shoestring budget" for development, Piper Sandler notably does not mention that "parts of the Fab-1 equipment that had come from China had problems that had not been resolved by the time the equipment was shipped"[18] or that such problems still existed with the Fab-1 production equipment.

20. In addition, the MTD Order states, "The Court previously found that … Rodgers admitted only to 'failing to send Enovix engineers to the vendor in China and not bringing the vendor's engineers to California in the midst of a global pandemic.' Prior Order at 17."[19]  I offer no legal opinion, but note that it appears that Cowen and I share the same interpretation of Mr. Rodgers' November 7, 2022 statement as that expressed in the MTD Order and the prior order on the motion to dismiss for the prior complaint.  The James Report does not explain the basis for its contrary view or how that contrary view is applicable given this statement in the MTD Order.

21. Furthermore, even if the market had perceived that there were still steps that should have been completed in China, by saying that a "catch up **would have occurred** at the Site Acceptance Test (SAT) milestone,"[20] Enovix suggested that dealing with any such steps were merely a matter of timing rather than an issue with potentially unresolvable "problems."  The phrase "catch up would have occurred" implies that on net there would have been no overall loss (i.e., Enovix would have caught up on any lost time from waiving the FAT), and that instead any difficulties that jeopardized Fab-1's timeline occurred *after* the waiver of the FAT.  This would mean that rather than the equipment being known to not work at all by failing the FAT, the market may have perceived any problem to simply concern the way that potentially functional equipment was re-installed in Fremont, California.  Thus, even if the market learned of issues with the Yinghe

---

[17] "Our Answers to Frequently-Asked Investor Questions," *Piper Sandler*, November 10, 2022.

[18] James Report, ¶79.

[19] MTD Order, p. 11.

[20] Enovix Press Release, November 7, 2022. Emphasis added.

equipment, because it did not learn that at least some of those issues occurred in Yinghe's facilities and not after the equipment was shipped to Fremont, the market would likely have underestimated the seriousness of those problems.

22. In summary, the James Report's conclusions that the full "Alleged Truth" was publicly available by November 7, 2022 depends on the market interpreting that the equipment in Yinghe had failed the FAT (or at least that there were problems similar in nature to that failure) based on statements that Enovix was surmounting challenges, that only a small number of process steps were yielding less than 95%, and that the FAT was waived but that a "catch up would have occurred" after pandemic-related delays, and despite the very analyst report that the James Report quotes for support of its conclusions quoting Mr. Rodgers as stating that the Equipment Procurement Review "issues are not representative of any technology concerns."

#### B. The James Report's Claim that the "Implications" of the Alleged Truth Regarding Enovix's Revenue and Production Ramp-Up Were Superseded by November 7, 2022 Ignores that Greater Degrees of Risk Can Lead to Less Trust in Management Projections

23. The James Report next argues that the "implications" of the "Alleged Truth" were superseded by later disclosures of Fab-1 throughputs and yields and downward revisions in revenue guidance.[21] It states its conclusion early in that section, claiming, "Thus, as an economic matter, a disclosure of the Alleged Truth at the time of the Alleged Misstatement combined with a reiteration of financial targets would have, at most, informed investors of two things. First, there was a greater risk that Enovix might not be able to achieve its outstanding financial targets due to throughputs and yields not meeting desired specifications. Second, this incremental risk neither (a) prevented management from indicating that it expected to exit 2025 with over a billion dollars in annualized

---

[21] James Report, Section VI.A.4.

revenue, nor (b) caused management to withdraw any financial targets. However, by November 7, 2022, that same risk had already materialized."[22]

24. I agree with the James Report that a disclosure of the "Alleged Truth" would have led the market to recognize greater risks to Enovix's future financial results. However, that does not mean that the two are one and the same. The James Report gives no reason to try to address the actual allegations (i.e., that Enovix failed to disclose that the equipment in Yinghe failed the FAT) with a different question (whether the market recognized greater risks to Enovix's financial results). Even if there is some relationship between the two, that does not make them interchangeable, making this an improper exercise for the purposes of examining price impact.

25. Even putting aside the switch of topic areas, the relevant financial risk would not be limited to a binary "risk that Enovix might not be able to achieve its outstanding financial targets due to throughputs and yields not meeting desired specifications."[23] The market would also care about the degree to which Enovix might miss (or exceed) its financial targets.

26. The second part of the conclusion, that this risk did not cause Enovix to expect to exit 2025 (more than two years after the end of the Class Period) with less than a billion dollars in annual revenue or to withdraw any financial targets, has several flaws. First, as just stated, the market does not simply care about the yes/no outcome of meeting financial targets. It also cares about the amount by which a target may be exceeded or missed. The James Report does nothing to address that point.

27. Second, the James Report is effectively making the argument that as long as a company does not withdraw guidance, no other information should matter to the market, or, at a minimum, no other information that might affect earnings during the period for

---

[22] James Report, ¶¶83-84.

[23] James Report, ¶83.

which guidance has been given should matter to the market.  The James Report provides no basis for this assumption.

28. Third, the James Report states that "[b]y November 7, 2022, the median (mean) analyst estimates of Enovix's FY 2023, FY 2024, and FY 2025 revenues represented reductions of 95.5% (94.8%), 92.1% (87.0%), and 76.7% (67.1%) relative to the Company's revenue targets disclosed in its Merger Investor Presentation, respectively. Thus, by November 7, 2022, the risk that Enovix might not be able to achieve the financial targets it had outstanding at the start of the Putative Class Period had already materialized."[24]  But this ignores the possibility that if Enovix had stated that the equipment in Yinghe had failed the FAT, there would have been even larger reductions in analysts' revenue estimates.  If the problems were greater (e.g., the equipment repeatedly failed the FAT as opposed to the FAT was simply waived because of travel restrictions due to COVID), one would generally expect to see larger reductions in revenue estimates.

29. To examine this, I extended the James Report's analysis and show that by October 3, 2023, the median (mean) analyst estimates of Enovix's FY 2023, FY 2024, and FY 2025 revenues represented reductions of 99.6% (99.5%), 96.1% (96.0%), and 79.3% (79.9%) relative to the Company's revenue targets disclosed in its Merger Investor Presentation, respectively.[25]  See Exhibit 3.  Each of these six figures is less than the corresponding figure that the James Report presents for November 7, 2022.  Thus, the James Report's argument that analysts had already lowered their estimates by November 7, 2022 is meaningless, as it is clear that they could have, and did, lower their estimates further when presented with additional negative news.  The James Report does not even attempt to demonstrate that the figures for November 7, 2022 fully reflect the "Alleged

---

[24] James Report, ¶84. Internal footnote omitted.

[25] Because I have a different data source than Dr. James does, the dates shown in Exhibit 3 are not the same as those in the James Report.  Nevertheless, we can still see that the data in the two exhibits are closely matched.  The figures reported in the text for median (mean) analyst estimates are as of September 14, 2023.

Truth," and thus presents no reason to believe that those figures demonstrate market knowledge of the "Alleged Truth."

30. As long as Enovix maintained plans to continue large-scale production on Fab-1, analysts would be expected to continue to incorporate corresponding levels of revenue for Fab-1. And if analysts perceived risks to Fab-1, the magnitude of their downward adjustments to expected Fab-1 revenue would reflect the magnitude of the perceived risks. Thus, until Enovix admitted that revenues from Fab-1 would be permanently reduced to relatively immaterial amounts, if the market was misled about the true risk to Fab-1 (i.e., that the FAT was repeatedly failed rather than just waived), analysts and the market would overestimate the potential future revenues and profitability of Fab-1.

### C. The James Report's Claim that the Stock-Price Declines on January 4, 2023 and on October 3, 2023 Were Not Caused by the Revelation of Any New Information Underlying the "Alleged Truth" Are Incorrect

31. The James Report argues that the stock-price declines on January 4, 2023 and October 3, 2023 could not be caused by the revelation of any new information regarding the "Alleged Truth" because it believes that it has argued that all the information regarding the "Alleged Truth" was already known to the market.[26] However, as shown above, that is not true. Thus, the entire predicate for this analysis is false.

32. The James Report then argues that "Enovix stock price declines after November 7, 2022 are *consistent* with factors other than new, value-relevant information underlying the Alleged Truth having impacted the price of Enovix stock."[27] By "consistent[,]", the James Report merely means that there is information at the time of the corrective disclosures that it regards as negative and unrelated to the allegations in this matter. The James Report does not quantify that additional information or show that it accounts for all, or even any known part, of the stock-price declines.

---

[26] James Report, ¶92.

[27] James Report, ¶92. Emphasis added.

33. In addition, the James Report argues that following the January 3, 2023 news, "certain analysts stat[ed] that the stock price decline on January 4, 2023 may have been caused by the additional delay in timeline for Fab-2."[28]  However, in the Tabak Report, I quoted the MTD Order as stating, "Plaintiffs' theory of the case is that Enovix's decision to rush the Yinghe manufacturing equipment to Fremont before it passed the FAT was the first step in a chain of events that led to the equipment's continued failure to perform and the company's ultimate decision in October 2023 to abandon manufacturing efforts at Fab-1."[29]  I included a footnote to this sentence on analyst commentary "supporting how negative information about Gen1 could affect market views of Gen2."[30]  Thus, it would not have been necessary for Dr. James to even read through the Complaint or the MTD Order to see that his claimed news unrelated to the allegations has been pled to relate to the allegations in this matter.

34. The James Report does not reference my points here or the underlying sections of the Complaint or the MTD Order.  While I do not provide a legal opinion, I do not see how the James Report's arguments regarding the January 3, 2023 alleged corrective disclosure are consistent with Plaintiffs' theory of the case as pled in the Complaint and reaffirmed as Plaintiffs' theory of the case in the MTD Order.  Moreover, the James Report does not address the discussion in the SAC that the January 3, 2023 disclosure revealed that Fab-1 output was only around 100 units per hour.[31]

---

[28] James Report, ¶93.  See also ¶99. ("Analyst commentary following the January 3, 2023 Special Presentation is consistent with factors other than new, value-relevant information underlying the Alleged Truth causing the stock price decline following this alleged corrective disclosure. Those factors include additional delays in the production ramp-up for Gen2 lines. Thus, analyst commentary is consistent with the January 4, 2023 Enovix price decline not providing evidence of price impact from the Alleged Misstatement after November 7, 2022.")

[29] Tabak Report, ¶67. Closing footnote omitted.

[30] Tabak Report, fn 56.

[31] See, for example, SAC ¶¶176-178.

35. With regard to the October 3, 2023 alleged corrective disclosure, the James Report states, "Analyst commentary following the October 3, 2023 Press Release is consistent with factors other than new, value-relevant information underlying the Alleged Truth causing the stock price decline following this alleged corrective disclosure. Those factors include the announcement that Enovix would not meet its production guidance due to a shift in strategy. Thus, analyst commentary is consistent with the October 3, 2023 Enovix price decline not providing evidence of price impact from the Alleged Misstatement after November 7, 2022. Securities analysts generally reacted favorably to Enovix's strategic realignment[.]"[32]

36. It appears that the James Report is suggesting that "[s]ecurities analysts generally react[ing] favorably to Enovix's strategic realignment" is "consistent with the October 3, 2023 Enovix price decline not providing evidence of price impact from the Alleged Misstatement after November 7, 2022." However, if the analysts were "generally react[ing] favorably" to Enovix's strategic realignment, that would not explain the negative stock-price decline following the October 3, 2023 alleged corrective disclosure. If anything, that would suggest that there was even more negative news disclosed on October 3, 2023 than one would infer from the negative stock-price movement, as the positive reaction to the strategic realignment limited some of the downward pressure on Enovix's stock price from the negative news.

37. The James Report provides no explanation for the decline in Enovix's stock price following the October 3, 2023 alleged corrective disclosure other than Enovix missing its production guidance. Here, the James Report leads us into a contradiction. Enovix's stock-price *decline* is said to be due to the miss in production guidance, which in turn is due to a *favorably received* strategic realignment. The James Report has not explained why Enovix's stock price fell after the October 3, 2023 alleged corrective disclosure. And, given that the James Report pins that stock-price decline on the miss in production guidance and Plaintiffs allege that the lowered production was due to issues with Fab-1

---

[32] James Report, ¶¶114-115.

that date back to the time of the FAT failures, the James Report has, in fact, provided evidence in favor of price impact for this alleged corrective disclosure.

## V.    THE JAMES REPORT'S ARGUMENTS CONCERNING A CLASS-WIDE METHODOLOGY TO MEASURE DAMAGES ASKS FOR CALCULATIONS THAT WOULD BE PERFORMED AT THE MERITS STAGE OF THIS MATTER AND MISREPRESENTS MY OPINION

38. The James Report's arguments about the applicability of a class-wide damages methodology can be broken down into a few categories.

39. *First*, the James Report argues that I have not yet shown how to disaggregate potential confounding information.  For example, the James Report states:[33]

> Dr. Tabak further states that he can "apply relevant analytical tools (including but not limited to cash-flow analyses and content analysis)" to remove from the residual stock price movements following the alleged corrective disclosures the effect of "any economically important confounding news." Dr. Tabak defines confounding information as information that is "unrelated to the remaining allegations." Dr. Tabak singles out information about Fab-2 revenues and earnings as potential confounding information and explains that "should it be necessary to examine the effects of Fab-1 revenues and earnings from those of Fab-2, the difference in the dates when each was expected to contribute financially will make such an examination feasible through the use of changes in analyst forecasts." I note that Dr. Tabak does not provide a full methodology to assess damages as he asserts that "further discovery should aid in some of the exact parametrizations of the damages calculations." At his deposition, Dr. Tabak acknowledged that beyond his reference to using an event study, he does not "have a more detailed discussion" of how to analyze inflation across different periods during the Putative Class Period.

40. Notably, my identification of potential confounding information (i.e., revenues and earnings from Fab-2) goes beyond what is typically done in the class-certification

---

[33] James Report, ¶124. Internal and closing footnotes omitted.

stage in securities class actions.  The James Report then appears to fault me for "not provid[ing] a full methodology to assess damages as [I] assert[] that 'further discovery should aid in some of the exact parameterizations of the damages calculations.'"  The James Report does not state its basis for requiring a "full methodology" to assess damages.  Nor does it state how a "full methodology" would differ from actually calculating damages, which I understand is to be done at the merits stage of this litigation as opposed to the class-certification stage.  The James Report also does not dispute my statement that "further discovery should aid in some of the exact parameterizations of the damages calculations."

41. In short, this argument in the James Report does not claim that I present less information on a damages methodology than is typical at the class-certification stage, does not dispute that information from discovery may help complete the damages analysis, and does not even explain what else I could provide at this stage that would be something short of a complete damages analysis.

42. *Second*, the James Report argues that "Dr. Tabak testified that he may need the assistance of a battery manufacturing expert to provide inputs to his damages methodology. However, he did not provide any details or analysis with respect to the feasibility of this approach, and I am not aware of any industry expert proffering an opinion in this matter such that it would be feasible to develop the parameterizations that Dr. Tabak states are necessary."[34]  Dr. James appears to be asking for an industry expert's opinion before discovery is complete in this matter.  I cannot speak to that other than to say that whatever opinion such an industry expert provides, should that be necessary, would affect damages in a class-wide manner.

43. An industry expert here would be no different from an accounting expert in a securities-fraud case involving accounting issues.  Each may be asked to analyze how much of a corrective disclosure is due to allegation-related information (here, the

---

[34] James Report, ¶125. Internal footnote omitted. Emphases added.

inadequacy of the Yinghe equipment; in an accounting case, whatever relates to the accounting allegations as opposed to timely disclosed information) as well as often to analyze what proper disclosures would have been at an earlier point in time and to assess their effects (here, issues with the Yinghe equipment when it failed the FAT; in an accounting case, whether prior accounting statements should have been presented differently, which may include an assessment of whether certain information was material enough to have warranted inclusion in prior accounting statements).

*44. Third*, the James Report argues that what was undisclosed was a concealed risk that resulted in an ultimate materialization of risk.[35]  To the extent that this argument is directed at legal issues, as materialization of risk is also a legal concept, I do not respond. To the extent that the James Report is arguing about the economics of this concept, it has already conceded that I understand this issue in the same way that it describes.[36]  Again, the James Report's concern is that I would rely on an industry expert to analyze the risks in Enovix's manufacturing.[37]  Of course, I would not opine on the technical details of Enovix's manufacturing myself, but for any relevant inputs to my analysis, I would rely on an industry expert and/or other material obtained in fact discovery.  The James Report is again merely arguing that Plaintiffs have not provided an industry expert before fact discovery is complete.

45. Next, the James Report states, "Moreover, Dr. Tabak appears to suggest that a technical expert could opine on the market's reaction to a technical disclosure."[38]  The

---

[35] See, for example, James Report, ¶128.

[36] James Report, ¶130.  In addition, when Dr. James made a similar argument against me in a previous case, the class was certified.  See *In re Teva Securities Litigation*, District of Connecticut, No.: 3:17-cv-00558 (SRU), ECF #508-4 (Dr. James' report), ¶80 ("Second, Dr. Tabak has not provided a methodology that can account for price declines attributable to the materialization of previously disclosed risks associated with each of Plaintiffs' theories of injury.").  The class was certified (ECF #736).

[37] James Report, ¶131.

[38] James Report, ¶132.

James Report's hedged claim that I "***appear[]*** to ***suggest***" that a technical expert could opine on the market's reaction has no citation.  To be clear, I never made any such suggestion.

46. At best, the James Report attempts to support this claim that I "appear[] to suggest" something that I never said by speculating, "Such an assessment may need to rely on an expertise that goes beyond technical battery manufacturing issues in order to assess how, upon the disclosure of the allegedly concealed truth, the market's consensus regarding the different parameters that are needed to estimate inflation would have changed (e.g., how the market would have updated its estimate of the probability that Enovix may not be able to scale up production at Fab-1)."[39]  This is, however, no different than what economic experts do all the time in securities-fraud cases: they take inputs from an industry or other expert (as well as from other discovery) and use those to opine on market reactions to a disclosure of those inputs.  That is exactly what I am proposing here.

47. Moreover, this argument in the James Report makes no sense in the context of an efficient market.  If an industry expert said that a full disclosure would have led knowledgeable, technologically savvy observers to recognize that Enovix had, say, only a 10% chance of being able to scale up production at Fab-1, an efficient market would have similarly reached the conclusion that there was only a 10% chance for Enovix being able to scale up production at Fab-1.  That is what it means for the market to incorporate ***all*** public information: had that information been made public, the market would have recognized it.  In fact, the James Report later concedes that "in an efficient market, the price of Enovix stock would have reflected, to a degree, the risk that Enovix would not be able to scale up production and meet its publicly disclosed production and financial targets."[40]  While there may be a battle of the industry experts, that has nothing to do with

---

[39] James Report, ¶132. Closing footnote omitted.

[40] James Report, ¶136.  I do not understand why the James Report includes the phrase "to a degree" here.

how the market would respond to whatever the finder of fact decides is the correct technological conclusion on any matter.

48. Finally, starting in ¶134, the James Report argues that I have not identified an alternative methodology to measure damages because of its claim that my "event study approach is incapable of reliably measuring inflation, if any, caused by the Alleged Misstatement[.]"  Because, as discussed above, I do not agree with the James Report's arguments regarding the ability of my event-study methodology to reliably measure inflation, I see no need to develop an "alternative" methodology that would be different from the event-study methodology used to measure inflation in nearly every securities-fraud class action that I have participated in, whether as an expert for plaintiffs or defendants, or that I have otherwise learned about.[41]

## VI.    THE JAMES REPORT'S ARGUMENTS CONCERNING MARKET EFFICIENCY DO NOT DEMONSTRATE MARKET INEFFICIENCY DURING THE "LOCK-UP PERIOD"

49. The James Report argues that because a number of Enovix shares were subject to lock-up restrictions from the start of the Class Period to January 11, 2022, that "*could have* hindered market efficiency prior to January 11, 2022."[42]  Dr. James continues, stating, "I find economic evidence consistent with *a potential difference in the degree of market efficiency* in the Lock-Up Period and the remainder of the Putative Class Period (i.e., the Post-Lock-Up Period), including that the cost of borrowing Enovix shares and several other metrics Dr. Tabak points to as support for his finding of market efficiency—

---

[41] The James Report does not identify a single securities class action where the event-study methodology was deemed incapable of calculating damages in a class-wide manner, much less explain why whatever issues may have existed in such a case are also present in the instant case.

[42] James Report, ¶140.

such as fails-to-deliver, bid-ask spreads, and analyst coverage—differed between the Lock-Up Period and the Post-Lock-Up Period."[43]

50. Notably, Dr. James does not opine that the market for Enovix's stock was inefficient during the Lock-Up Period. Instead, he finds that on some (i.e., the cost of borrowing and "several other") metrics, there is "evidence consistent with a potential difference in the degree of market efficiency"[44] in different periods. However, as the Supreme Court held, *Basic* "recognized that market efficiency is a matter of degree[.]"[45] Ultimately, the James Report is only arguing that there is, at best, evidence "consistent" with a "potential difference" in the degree of efficiency demonstrated, and then only for only some of the metrics I analyzed in the Tabak Report.[46]

51. Before turning to the various metrics where the James Report argues that there is "evidence consistent with a potential difference in the degree of market efficiency[,]" I list eight metrics in the Tabak Report where the James Report provides ***no claim*** of any evidence of a potential difference in the degree of market efficiency:

- Trading Volume / Turnover
- Market Makers
- Institutional Holdings and Changes in Institutional Holdings
- Changes in Short Interest
- S-3 Registration Eligibility
- Trading on a Major Securities Market
- Market Capitalization

---

[43] James Report, ¶140. Emphases added.

[44] James Report, ¶140.

[45] *Halliburton Co v. Erica P. John Fund, Inc.*, 573 US 258 (2011).

[46] Evidence "consistent" with a claim is weaker than evidence "supporting" a claim. For example, fingerprints of a suspect at a crime scene should generally provide at least some support for claim that that suspect committed the crime in question, while a complete lack of fingerprints at a crime scene would likely be consistent with anyone either committing or not committing that crime but would generally not be considered supportive of a particular individual committing the crime.

- Autocorrelation

52. The James Report's failure to address any of these eight metrics renders its conclusion suspect. For example, suppose that six metrics showed stronger evidence of efficiency during the Lock-Up Period and six metrics showed weaker evidence of efficiency during the Lock-Up Period. To focus on just one of these two sets, as the James Report does, would present an incomplete and biased picture from which to draw any conclusions.

53. Next, I address the six metrics where the James Report argues that there is a difference in the degree of support for market efficiency.

### A. Float

54. In footnote 264, the James Report states that the float as of August 11, 2021 should be 27% of the shares outstanding. The James Report does not claim that this number suggests either efficiency or inefficiency.

### B. Cost of Borrowing

55. The James Report looks at two separate measures related to short sellers, one of the two categories of arbitrageurs. It does not dispute my analysis of institutions, which represent the other category of arbitrageurs. It also does not dispute that the level of short interest changed over the Lock-Up Period. Instead, it first claims that "[i]n the Lock-Up Period, the average daily borrowing fee was 3.66% and higher than what the academic literature documents to be borrowing fees at the 90th percentile of the empirical distribution of borrowing fees[.]"[47]

56. However, what the single academic article that the James Report relies on for the 90th percentile figure does is calculate a percentile based on a sample of stocks in which "the stock must be optionable and there must be at least one put-call pair that satisfies the following criteria: … (iii) the sum of the call and put bid-ask spreads divided by the stock

---

[47] James Report, ¶143.

price is less than or equal to 5%[.]"[48]  Overall, there are four restrictions on at least one put-call pair, plus another five restrictions "for each option in a put-call pair[.]"[49]  As noted by the authors, of these nine restrictions, two are to filter out puts and calls "for which early exercise is important" and "[t]he other [seven] restrictions eliminate options with wide bid-ask spreads, low liquidity, or unreasonable prices."[50]

57. In other words, the academic paper's sample excludes stocks without options (which may suggest less interest in the company and also less information to stock traders) and then applies seven filters, or rules, to exclude stocks where the options show signs, such as wide bid-ask spreads or low liquidity, that are indicative of inefficiency in the options market.  Given that arbitrage between an options market and the market for the underlying stock promotes efficiency of both securities (by providing additional liquidity and price discovery), the sample used in this academic paper is not of all stocks, but likely already disproportionately excludes stocks that do not trade in an efficient market.

58. Evidence of this is seen in Enovix-James-0000262.tif, an image file in Dr. James back-up materials of a page from the academic article.  This page shows that at least half of the sample used were in the top 20% of firms listed on the New York Stock Exchange ("NYSE") sorted by market capitalization.  And the top 90% of firms in the sample

---

[48] Muravyev, Dmitriy, et al. 2022, "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance* 77 (3): 1787–1828, at p. 1801, a page corresponding to the file labeled Enovix-James0000261.tif in Dr. James' backup materials.

[49] Muravyev, Dmitriy, et al. 2022, "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance* 77 (3): 1787–1828, at p. 1801, a page corresponding to the file labeled Enovix-James0000261.tif in Dr. James' backup materials.

[50] Muravyev, Dmitriy, et al. 2022, "Is There a Risk Premium in the Stock Lending Market? Evidence from Equity Options," *The Journal of Finance* 77 (3): 1787–1828, at fn. 8 on p. 1801, a page corresponding to the file labeled Enovix-James0000261.tif in Dr. James' backup materials.

Case 3:23-cv-00071-SI    Document 214-2    Filed 01/16/26    Page 25 of 32

sorted by market capitalization were all in the top half of all NYSE-listed firms sorted by market capitalization.[51]  Thus, when the James Report compares Enovix's borrowing costs to those of the sample in the academic article, it is really comparing Enovix's borrowing costs to those of a set of companies with high market capitalizations that have options trading on them where the options satisfy certain conditions that are indicative of efficiency in the options market.  Thus, even if we accept the figures in the James Report on average borrowing fees for Enovix (which come from a different source than those in the academic article do), the comparison is being made to a sample of stocks that are disproportionately likely to trade in an efficient market.[52]

59. Moreover, even if we accept that comparison, being in the outer 20% of a sample (which is what is implied by having a cost of borrowing of at least the 90th percentile) would not be sufficient for statistical significance at the standard 5% level, which would require, by definition, being in the outer 5% of the sample, or the outer 2.5% on either end of the sample.  Thus, even ignoring all of the issues with the James Report's calculations, its results do not show a statistically significant difference between Enovix's cost of borrowing during the Lock-Up Period and that of the academic article's sample data.

### C.  Fails to Deliver

60. The second metric that the James Report looks at within the short category of arbitrageurs is fails to deliver.  The James Report states:[53]

---

[51] Given that the NYSE tends to attract large companies, that means that the top 90% of firms in the sample sorted by market capitalization are not just in the top 50% of all companies sorted by market capitalization, but in an even smaller subset of all firms sorted by market capitalization.

[52] At an extreme, if the sample were to contain only stocks that traded in an efficient market, then any result within that sample could not be used to argue for inefficiency. Similarly, if the sample is disproportionately likely to contain stocks that trade in an efficient market, any result within that sample cannot be used to argue that that result is indicative of anything relative to all stocks.

[53] James Report, ¶144. Internal footnotes omitted.

-24-

> Based on Dr. Tabak's reported daily fails-to-deliver, in the Lock-Up Period the average daily fails-to-deliver as a percentage of shares outstanding was 0.14%, compared to 0.03% in the Post-Lock-Up Period. Furthermore, Dr. Tabak claims that reaching the "fails-to-deliver condition for being a 'threshold security'" of at least 0.5% of shares outstanding generally indicates that "it may be difficult to engage in short sales of that security." Based on Dr. Tabak's "fails-to-deliver condition," his reported daily fails-to-deliver above 0.5% of shares outstanding occurred on 5.7% of the trading days in the Lock-Up Period, compared to 0.9% of trading days in the Post-Lock-Up Period.

61. The James Report does not claim that these differences indicate inefficiency during the Lock-Up Period.  At most, the James Report merely suggests that the differences it notes represent "evidence consistent with a potential difference in the degree of market efficiency[.]"[54]

### D.  Bid-Ask Spreads

62. With regard to bid-ask spreads, the James Report says merely, "Dr. Tabak claims that the median (mean) bid-ask spread as a percentage of closing price over the Putative Class Period was 0.57% (0.90%). However, Dr. Tabak fails to consider that the bid-ask spread was substantially higher in the Lock-Up Period. Based on Dr. Tabak's reported daily bid-ask spreads, in the Lock-Up Period average daily bid-ask spreads as a percentage of the closing price were 1.31%, compared to 0.80% in the Post-Lock-Up Period."[55]  While the James Report recognizes that the Tabak Report presented both the median and mean bid-ask spreads, the James Report fails to present the median figures of 0.89% for the Lock-Up Period and 0.47% for the Post-Lock-Up Period, both of which happen to be lower than the mean figures that it presents and thus may make the argument in favor of efficiency in the Lock-Up Period weaker.

63. Again, the James Report does not claim that the mean (or median) bid-ask spread during the Lock-Up Period is evidence of inefficiency.

---

[54] James Report, ¶140.

[55] James Report, ¶145. Internal and closing footnotes omitted.

### E. Analyst Coverage

64. Similarly, when discussing analyst coverage, the James Report states, "While Dr. Tabak notes 'a mean [and median] of six analysts issuing one or more quarterly earnings estimates each month' throughout the Putative Class Period, analyst coverage based on Dr. Tabak's measure was lower in the Lock-Up Period (mean and median of two analysts) than in the Post-Lock-Up Period (mean of seven analysts and median of eight analysts)."[56] Again, the James Report does not argue that this level of analyst coverage is indicative of an inefficient market.

65. More importantly, the James Report carefully limits its analysis to "analyst coverage based on Dr. Tabak's measure[.]"[57] My measure was limited to analysts who reported earnings estimates to I/B/E/S, one particular data vendor. However, there were (at least) two analysts who published additional earnings estimates during the Lock-Up Period that were not included in the I/B/E/S data. While the James Report's description ("analyst coverage based on Dr. Tabak's measure") is technically correct, it may be misleading since the James Report does not mention that my measure is conservative because it does not count all analyst reports. Furthermore, this important qualification in both the Tabak and James Reports appears to have been missed by Defendants, who misleadingly refer only to "Analyst Coverage" in a chart on page 19 of their Memorandum of Points and Authorities in Opposition to Lead Plaintiffs' Amended Motion for Class Certification and Appointment of Lead Plaintiffs and Class Counsel, dated December 12, 2025. Once one adds in reports by those two analysts with published earnings estimates that were not included in the I/B/E/S data, the mean and median analyst coverage figures for the Lock-Up Period move from two for each measure to 3.7 and 3.0, respectively.

66. Moreover, the *total* number of analysts that covered Enovix over the Lock-Up Period (i.e., not just the mean or median figure over each month) would be at least six, as

---

[56] James Report, ¶146. Internal and closing footnotes omitted.

[57] James Report, ¶146.

already reported in Exhibit 4 to the Tabak Report.  This would be the relevant figure if one were comparing analyst coverage for Enovix over the Lock-Up Period to class-certification decisions in other cases in which the total, rather than the average number, of analysts is discussed.

67. The James Report also does not note that there were no statistically significant changes in Enovix's share price when other analysts initiated coverage, indicating that the additional analyst coverage did not cause the market to come to a materially different view of the value of information that was already available to it.

### F.  Price Response to News

68. The final metric that the James Report considers is my analysis of price response to news, arguing that if limited to the Lock-Up Period, it does not show statistically significant results.[58]  However, if a single additional news day were associated with a statistically significant return, then five of the ten results would show statistical significance.  Such a result is not unusual given the small number of news days examined when the analysis is limited to the Lock-Up Period: a single news day can substantially change the results.  Thus, while the overall results are not in favor of demonstrating price response to news in this small sample, the results are also close to 50:50, meaning that negative results should not be given substantial weight.

### G.  Summary

69. Ultimately, the James Report concludes, that "these economic differences [i.e., the six metrics discussed above] suggest that the degree of market efficiency for Enovix stock *could* differ between the Lock-Up Period and the rest of the Putative Class Period."[59]  The James Report does not conclude that Enovix's stock traded in an inefficient market during the Lock-Up Period or even that the degree of market efficiency

---

[58] James Report, ¶¶148-149.

[59] James Report, ¶147. Emphasis added.

differed between the Lock-Up Period and the rest of the Class Period, much less than any such difference was meaningful.[60]

70. Moreover, as noted above, the James Report does not challenge eight of my analyses of market efficiency during the Lock-Up Period. And, as noted above, while "the degree of market efficiency could differ," the James Report provides no reason to believe that overall the market for Enovix's stock was not efficient during the Lock-Up Period. At most, the James Report argues that the evidence for efficiency may not be as strong during the Lock-Up Period for six of the fourteen metrics I analyzed in the Tabak Report. But I still find that the evidence as a whole points toward efficiency in the Lock-Up Period. Notably, Dr. James was unwilling to provide a contrary conclusion.

I reserve the right to modify or extend my opinion in light of any new information, including submissions by any experts for Defendants, that becomes available to me.

David I. Tabak
January 15, 2026

---

[60] Such a conclusion would also potentially be inconsistent with Dr. James' opinion in *In re Adams Golf, Inc. Securities Litigation*, in which Dr. James opined that "Adams Golf's stock traded in an efficient market" after (1) reviewing only the five *Cammer* factors, (2) and not considering four of the six factors he considers here (float, cost of borrowing, fails to deliver, and bid-ask spread), (4) concluding that for a fifth factor that he considers here, analyst coverage, "Adams Golf was followed by six analysts[,]" the same as the number of analysts who provided earnings estimates on Enovix reported by I/B/E/S in the Lock-Up Period, and (5) for the sixth factor he considers here (price response to news), not performing a statistical comparison of the percentage of news and non-news days with statistically significant returns, the analysis that he relies on for this factor in this matter. See Expert Report of Christopher M. James, *In Re Adams Golf, Inc. Securities Litigation*, 2006 WL 6048215 (2006), Section VI.



**David I. Tabak**
Senior Managing Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 2176
david.tabak@nera.com
www.nera.com.

# EXHIBIT 1
# DAVID I. TABAK
## SENIOR MANAGING DIRECTOR

## Expert Reports and Testimony Since the Tabak Report

Deposition Testimony before the United States District Court for the Northern District of California in *In re the Enovix Corporation Securities Litigation*, November 25, 2025.

Amended Expert Report of David I. Tabak, Ph.D. before the United States District Court for the Northern District of California in *In re the Enovix Corporation Securities Litigation*, November 13, 2025.

**Exhibit 2**

**Enovix Corporation**

**Materials Considered Beyond Those Considered in the Tabak Report**

*Case Law*

*In re Teva Securities Litigation, District of Connecticut,* No.: 3:17-cv-00558 (SRU), ECF #736.

*Halliburton Co v. Erica P. John Fund, Inc.*, 573 US 258 (2011).

*Expert Reports*

Amended Expert Report of David I. Tabak, Ph.D., dated November 13, 2025.

Expert Report of Professor Christopher James, Ph.D., dated December 12, 2025, and all backup materials.

Expert Report of Christopher M. James, *In Re Adams Golf, Inc. Securities Litigation*, 2006 WL 6048215 (2006), dated July 14, 2006.

Expert Report of Christopher M. James, Ph.D. *In re Teva Securities Litigation*, District of Connecticut, No.: 3:17-cv-00558 (SRU).

**Exhibit 3**
**Enovix Corporation**
**I/B/E/S Sales Consensus Estimates[1]**
**FY 2023 - FY 2025**

| Estimate Date | Consensus Sales Estimate for: | | | | | |
|---|---|---|---|---|---|---|
| | FY 23 | | FY 24 | | FY 25 | |
| | Median | Mean | Median | Mean | Median | Mean |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | ------- $ in millions ------- | | | | | |
| 7/15/2021 | $ 173 | $ 173 | $ 405 | $ 405 | $ 801 | $ 801 |
| 8/19/2021 | 170 | 159 | 400 | 394 | 800 | 769 |
| 9/16/2021 | 150 | 150 | 386 | 386 | 753 | 753 |
| 10/14/2021 | 150 | 150 | 386 | 386 | 753 | 753 |
| 11/18/2021 | 150 | 152 | 386 | 386 | 786 | 786 |
| 12/16/2021 | 150 | 152 | 385 | 386 | 790 | 787 |
| 1/20/2022 | 150 | 152 | 386 | 386 | 785 | 785 |
| 2/17/2022 | 150 | 150 | 386 | 386 | 785 | 785 |
| 3/17/2022 | 150 | 147 | 390 | 388 | 785 | 785 |
| 4/14/2022 | 141 | 142 | 385 | 384 | 779 | 781 |
| 5/19/2022 | 126 | 120 | 373 | 368 | 772 | 777 |
| 6/16/2022 | 100 | 95 | 373 | 368 | 772 | 777 |
| 7/14/2022 | 80 | 82 | 340 | 350 | 790 | 797 |
| 8/18/2022 | 23 | 23 | 181 | 223 | 427 | 592 |
| 9/15/2022 | 23 | 23 | 189 | 259 | 469 | 840 |
| 10/20/2022 | 23 | 23 | 181 | 225 | 489 | 735 |
| 11/17/2022 | 8 | 8 | 28 | 36 | 187 | 225 |
| 12/15/2022 | 8 | 8 | 29 | 36 | 191 | 225 |
| 1/19/2023 | 7 | 7 | 28 | 36 | 195 | 243 |
| 2/16/2023 | 6 | 6 | 26 | 33 | 190 | 243 |
| 3/16/2023 | 3 | 3 | 24 | 21 | 170 | 178 |
| 4/20/2023 | 3 | 3 | 25 | 21 | 170 | 180 |
| 5/18/2023 | 1 | 1 | 24 | 20 | 170 | 176 |
| 6/15/2023 | 1 | 1 | 22 | 19 | 170 | 176 |
| 7/20/2023 | 1 | 1 | 20 | 18 | 151 | 162 |
| 8/17/2023 | 1 | 1 | 16 | 16 | 166 | 161 |
| 9/14/2023 | 1 | 1 | 16 | 16 | 166 | 161 |
| 10/19/2023 | 1 | 1 | 16 | 18 | 166 | 163 |
| 11/16/2023 | 4 | 4 | 25 | 24 | 157 | 151 |
| 12/14/2023 | 4 | 4 | 25 | 24 | 157 | 151 |
| 1/18/2024 | 4 | 4 | 24 | 23 | 120 | 138 |
| 2/15/2024 | 4 | 4 | 24 | 23 | 120 | 138 |

**Notes and Sources:**
Data obtained from FactSet Research Systems Inc.
Horizontal lines represent corrective disclosures between the preceding and following dates.

[1] Sales estimates are obtained from Institutional Brokers' Estimate System ("I/B/E/S").