**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | Case No. 3:23-cv-00071-SI |

**EXPERT SUR-REPLY REPORT OF PROFESSOR CHRISTOPHER JAMES, PH.D.**

**February 13, 2026**

# Table of Contents

I.      Assignment ................................................................................................................ 1

II.     Summary of Opinions ............................................................................................... 1

III.    Opinion 1 – Dr. Tabak's Price Impact Analysis Relies on a More Severe Version of the
        Allegedly Concealed Truth ...................................................................................... 4

IV.     Opinion 2 – General Disclosures About Fab-1, Line 1 Throughput Are Not Specific
        Disclosures of Yinghe Equipment Throughput ...................................................... 7

V.      Opinion 3 – Dr. Tabak Fails to Refute that by November 7, 2022 It Was Publicly
        Available that Fab-1's Performance Was Severely Constrained ........................... 9

VI.     Opinion 4 – Dr. Tabak Has Failed to Identify Any New Information about the
        Performance of the Yinghe Equipment Disclosed after November 7, 2022 ..................... 12

## I.    Assignment

1.    I previously submitted an expert report dated December 12, 2025 (the "James Report") in this matter.[1]  I have since been asked by counsel to review and respond to certain opinions of Dr. Tabak, expressed in a report dated January 16, 2025 (the "Tabak Reply Report").  Specifically, I have been asked to address Dr. Tabak's rebuttal opinions in the Tabak Reply Report regarding my finding that economic evidence is consistent with the Alleged Misstatement having had no price impact after November 7, 2022.  To the extent I do not address every claim in the Tabak Reply Report, the lack of a specific response in this report to a claim in the Tabak Reply Report does not indicate my agreement with that claim.[2]

2.    In the James Report, I included my qualifications, curriculum vitae, list of prior testimony, and materials that I considered.  My updated list of prior testimony is in **Appendix A**. In evaluating the Tabak Reply Report, I have additionally reviewed certain documents.  A list of the additional materials that I have considered is provided in **Appendix B** to this report.

3.    I am being compensated for my work in connection with this report at a rate of $1,350 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation nor the compensation of Cornerstone Research staff who assisted me is affected by the outcome of this matter.

## II.    Summary of Opinions

4.    I have reached the following additional opinions on this matter, the bases for which are discussed in detail in the sections that follow.

5.    **First,** Dr. Tabak's rebuttal price impact analysis articulates and relies on a new, more severe version of the allegedly concealed truth than the Alleged Truth, whereby the Yinghe Equipment problems at the time of the FAT were such that the equipment was "known to not

---

[1] I incorporate into this report all opinions, statements, and definitions of terms from the James Report.
[2] In particular, I understand from counsel that Defendants have stipulated that their sur-reply will solely address issues of price impact.  As a result, I do not respond herein to the Tabak Reply Report regarding damages and market efficiency.

work at all."[3]  However, Dr. Tabak provides no citations to the record or to the Court's decisions to support his characterization of the allegedly concealed truth—namely, that at the time of the FAT the Yinghe Equipment was "known to not work at all"[4] and that "revenues from Fab-1 would be permanently reduced to relatively immaterial amounts."[5]

6.    **Second,** because Fab-1, Line 1 was a sequential production line, Fab-1's overall throughput (speed) necessarily reflected the throughput of Line 1's lowest-throughput zone.  When market participants learned information about the overall performance of Fab-1, Line 1, those participants learned about the performance of the worst performing zone within Fab-1, Line 1 (whichever of the four zones that was).  However, general information about Fab-1, Line 1 performance would not be sufficient to identify which zone was the bottleneck.

7.    **Third**, Dr. Tabak is unable to refute that, by November 7, 2022, it was publicly available that Fab-1's performance was severely constrained, as demonstrated by company statements indicating the same and analyst revenue forecasts.  By November 7, 2022, median analyst revenue estimates had been reduced by 95.5% for FY 2023, 92.1% for FY 2024, and 76.7% for FY 2025 relative to the Company's revenue targets at the start of the Putative Class Period.[6]  Thus, it was publicly available information that the worst-performing zone of Fab-1, Line 1 was performing poorly relative to Enovix's initial projections and the timeline of any ramp up was substantially delayed, with revenues expected to be driven in years to come by Fab-2 and other Fabs.  By November 7, 2022, additional information about the Yinghe Equipment's performance during the FAT could only have been new, negative, and value-relevant if it was so dire that it would have caused revenue forecasts to decrease even further (e.g., more than 95% for FY 2023).  For example, if hypothetically the company knew back in early 2021 that the Yinghe Equipment was effectively doomed to fail and unfixable, and Enovix was still hiding that from market participants in November 2022, that information may have been sufficiently dire to cause even further reductions to revenue forecasts.  However, Dr. Tabak has provided no support from the record or the Court's decisions for this ever having been the case.  If instead the FAT at Yinghe had identified that the Yinghe Equipment had some problems, but those were problems

---

[3] Expert Reply Report of David I. Tabak, Ph.D., January 16, 2026 ("Tabak Reply Report"), ¶ 21.
[4] Tabak Reply Report, ¶ 21.
[5] Tabak Reply Report, ¶ 30.
[6] Expert Report of Christopher James, Ph.D., December 12, 2025 ("James Report"), ¶ 84.

that Enovix reasonably believed it could resolve relatively quickly upon bringing the equipment to California—as is consistent with my understanding of the Alleged Truth, or with any version of the allegedly concealed truth that would have led to forecast revisions less than those that had occurred by November 7, 2022—then more information about such Yinghe Equipment performance issues at the time of the FAT would not have provided new, value-relevant information to market participants.  This is because of the extensive information that was publicly available and incorporated into the stock price regarding Fab-1, Line 1's worst-performing zone as of November 7, 2022.

8.      **Fourth,** in his Reply Report, Dr. Tabak has not identified any new information about Yinghe Equipment performance issues that was provided to market participants after November 7, 2022.  In particular, he offers no evidence from Enovix disclosures or analyst commentary that the alleged corrective disclosures on January 3, 2023 and October 3, 2023 revealed any new information about Zone 3 equipment performance (or its consequences).  Although Enovix did disclose information about Fab-1, Line 1's overall performance on January 3, 2023, that information simply reflected the performance of the worst-performing zone.  Enovix offered no suggestion on January 3, 2023 that Zone 3 was the bottleneck constraining Fab-1, Line 1's performance.  To the contrary, Enovix disclosed on January 3, 2023 that Zone 2 (not Zone 3) required "major redesign" for the Gen 2 equipment at Fab 2, while Zone 3 required only "no/small changes."[7]  Securities analysts attributed the stock price decline following this disclosure to delays in Gen2/Fab-2 relating to the redesign needs, not to new information about Zone 3.  On October 3, 2023, Enovix announced that Fab-1 had achieved its then-outstanding publicly stated goals, which securities analysts understood to mean that line-wide yields were above 60% and that the production guidance miss was due to a strategic pivot to prioritize custom cells.  Securities analysts discussed this as a strategic decision—not an admission that Fab-1, Line 1 was still underperforming.  Moreover, no securities analyst discussed new information regarding Zone 3 packaging equipment performance in any analyst reports I reviewed in the periods following these two disclosures.  This silence from securities analysts indicates that Enovix's disclosures did not convey to market participants that Zone 3 equipment was the bottleneck in allowing Fab-1 to ramp up production.  Dr. Tabak's failure to provide

---

[7] *See* James Report, ¶¶ 96–97; Enovix Corporation Special Presentation to Shareholders, January 3, 2023 ("January 3, 2023 Special Presentation"), pp. 39–40.

evidence that Zone 3 *was* the limiting zone at Fab-1 is consistent with this lack of securities analyst commentary.

### III.    Opinion 1 – Dr. Tabak's Price Impact Analysis Relies on a More Severe Version of the Allegedly Concealed Truth

9.    Dr. Tabak's rebuttal opinions regarding price impact articulate and rely on a new, more severe version of the allegedly concealed truth than the Alleged Truth that I considered in the James Report. But he provides no citations to the Second Amended Complaint, the factual record in this matter, or the Court's decisions to support his characterization of the allegedly concealed truth as being that the Yinghe Equipment was "known to not work at all"[8] at the time of the FAT and that, as a result of that, "revenues from Fab-1 would be permanently reduced to relatively immaterial amounts."[9]

10.    Contrary to Dr. Tabak's assertion that he "follow[s] the James Report's characterization of the 'Alleged Truth,'"[10] he makes numerous speculative statements regarding information that is not part of the Alleged Truth but would have been included in his version of the allegedly concealed truth. For example, Dr. Tabak's allegedly concealed truth appears to be that "the [Yinghe] equipment [was] known to *not work at all* by failing the FAT" and that the Yinghe Equipment had "*potentially unresolvable* 'problems.'"[11] His version of the allegedly concealed truth also includes that "until Enovix admitted that revenues from Fab-1 would be permanently reduced to relatively immaterial amounts, if the market was misled about the true risk to Fab-1 (i.e., that the FAT was repeatedly failed rather than just waived), analysts and the market would overestimate the potential future revenues and profitability of Fab-1."[12]

11.    These discussions in the Tabak Reply Report indicate that his view is that Enovix should have disclosed more severe information than that included in the Alleged Truth at the beginning of the Putative Class Period. Dr. Tabak suggests this information would have led market participants to infer that the throughput and yield issues associated with the Fab-1 equipment would not be resolved and that the financial targets provided by Enovix would not be met

---

[8] Tabak Reply Report, ¶ 21.
[9] Tabak Reply Report, ¶ 30.
[10] Tabak Reply Report, ¶ 7.
[11] Tabak Reply Report, ¶ 21 (emphasis added).
[12] Tabak Reply Report, ¶ 30.

because "revenues from Fab-1 would be permanently reduced to relatively immaterial amounts."[13]  However, Dr. Tabak fails to provide any citations to Enovix disclosures, analyst commentary, the Court's rulings in this matter to date, or any other type of support for this more severe version of the allegedly concealed truth.

12.     By contrast, as I discuss in the James Report, my understanding of the Alleged Truth is informed by a number of sources, including the Complaint, the MTD Order, Plaintiffs' Amended Class Certification Motion, and Plaintiffs' own statement in their declarations in support of the Amended Class Certification Motion.[14]  In particular, the Alleged Truth is consistent with Plaintiffs statement in their declaration in support of Plaintiffs' Amended Class Certification Motion that "[i]n truth, a large part of the equipment had not passed the requisite tests at the vendor's facility, which were actually waived so that Enovix could ship the equipment from China to California before the Company went public."[15]  I also discussed Plaintiffs' allegation in the Complaint that the Alleged Misstatement "concealed" the actual level of risk that Fab-1 would not perform consistently with projections provided by Defendants,[16] as well as the Court's statement in its MTD Order about the Alleged Misstatement that "if the [Yinghe] equipment never passed the FAT, it was false and misleading for Enovix to state that the site acceptance would 'confirm' the equipment was meeting performance requirements and to state that the FAT was 'already performed' without revealing that the equipment had failed the FAT."[17]  Rather than engage with this detailed discussion of the Alleged Truth in the James Report, Dr. Tabak instead simply excerpts a portion of the summary of opinions in the James Report and then asserts that the "James Report does not provide any citation for [its] understanding" of the Alleged Truth.[18]

13.     In making his alternative assumption with respect to the allegedly concealed truth, Dr. Tabak fails to explain how it would even be consistent with (a) Enovix's reiteration of its previously disclosed 2025 revenue goal at the time of the Alleged Misstatement, which I

---

[13] Tabak Reply Report, ¶ 30.
[14] *See* James Report, ¶¶ 13–18.
[15] James Report, ¶ 18; Declaration of Lead Plaintiff Gary Kung in Support of Plaintiffs' Motion for Class Certification, *In Re Enovix Corporation Securities Litigation*, November 14, 2025, ¶ 9.
[16] James Report, ¶ 15; Second Amended Class Action Complaint, *In Re Enovix Corporation Securities Litigation*, March 19, 2024 ("Complaint"), ¶ 155.
[17] James Report, ¶ 16; Order Granting in Part and Denying in Part Motion to Dismiss SAC, *Maurice L. Twitchell et al. v. Enovix Corporation et al.*, July 23, 2024 ("MTD Order"), p. 12.
[18] Tabak Reply Report, ¶¶ 6–7.

understand is not an alleged misstatement, and (b) the Court's dismissal of Statement 12 in the Complaint, which Plaintiffs asserted as misleading, because Plaintiffs had not shown "[Mr.] Rodgers's knowledge on November 7, 2022 that Fab-1 would not in fact 'work and ship a lot of batteries to [Enovix's] customers[.]'"[19]

14.    Specifically, on August 10, 2021, Enovix reiterated its previously disclosed revenue goal for 2025, stating that "[b]ased on the strength of [its] revenue funnel, [it saw] a favorable demand picture supporting [its] goal to exit 2025 with over $1 billion of annualized revenue."[20]  Thus, based on Dr. Tabak's assertion that Enovix should have disclosed that "revenues from Fab-1 would be permanently reduced to relatively immaterial amounts," he suggests that Enovix should have disclosed on the same day two contradicting statements—(a) the above statement Enovix made on August 10, 2021 reiterating its previously disclosed 2025 revenue goal, and (b) a statement informing market participants that the Company was going to dramatically miss this revenue goal because Fab-1 could only produce "relatively immaterial amounts."[21]  Dr. Tabak fails to reconcile this contradiction.

15.    In addition, Plaintiffs identify in the Complaint the following statements by Mr. Rodgers in the November 7, 2022 Press Release as "Statement 12" and allege that "[t]he underlined portion of Statement 12 was misleading":[22]

> **Statement 12:**  We have poorly communicated on the status of Fab-1. I have heard from many investors that the delay and projected underperformance of Fab-1 must be the result of some catastrophic technology problem.  <u>For the record: Fab-1 is going to work and ship a lot of batteries to our customers – period</u>.  I will personally be in all Fab-1 reviews, because Fab-1 is not only critical to the Company, but also to our customers, some of whom are designing products right now that could not exist without Enovix battery performance.[23]

16.    I understand that the Court in its MTD Order did not find Statement 12 to be an actionable misstatement, because Plaintiffs had not shown "[Mr.] Rodgers's knowledge on November 7, 2022 that Fab-1 would not in fact 'work and ship a lot of batteries to [Enovix's]

---

[19] MTD Order, p. 19.
[20] James Report, ¶ 82; Enovix Corporation, Form 8-K, Filed on August 10, 2021, EX-99.1, p. 4.
[21] Tabak Reply Report, ¶ 30.
[22] Complaint, ¶¶ 169–170.
[23] Complaint, ¶ 169 (emphasis in original).

customers[.]'"[24]  Dr. Tabak fails to reconcile how Enovix could have disclosed at the time of the Alleged Misstatement information that would have led market participants to think that Enovix's Fab-1 revenues were going to be reduced to "relatively immaterial amounts"[25] with the Court's statement that Mr. Rodgers did not know over a year later that the Fab-1 equipment would never be able to "ship a lot of batteries."[26]

## IV.    Opinion 2 – General Disclosures About Fab-1, Line 1 Throughput Are Not Specific Disclosures of Yinghe Equipment Throughput

17.    Because Line 1 at Fab-1 was a sequential production line comprising four zones, its overall throughput necessarily reflected the throughput of its worst performing zone.  Thus, when market participants learned new information about the throughput of Fab-1, Line 1 generally, they learned about the throughput of the worst performing zone of Fab-1, Line 1 (whichever of its four zones that was).  However, information about Fab-1, Line 1's overall throughput would not be sufficient to identify which zone was the bottleneck constraining the line's production throughput.

18.    Line 1 at Enovix's Fab-1 factory in Fremont, California was a production line that followed a sequence of manufacturing steps.  This information was publicly available during the Putative Class Period.  For instance, in a February 2021 investor presentation filed with the SEC, Harrold Rust (Enovix's then-President) walked through "roughly the manufacturing flow."[27]  He described discrete sequential stages: incoming materials are "loaded onto laser processing tools" in one area, "from that point onward...they go through stacking and constraining and packaging," and then "the batteries are put in trays" for testing before being "stored and aged" prior to shipment.[28]  Securities analysts covering Enovix were also aware of the sequential nature of the Company's manufacturing process.  For instance, a December 2, 2021, Craig Hallum securities

---

[24] MTD Order, p. 19.
[25] Tabak Reply Report, ¶ 30.
[26] MTD Order, p. 19.
[27] Enovix Corporation Rodgers SVAC Merger Presentation Transcript, February 22, 2021
[28] Enovix Corporation Rodgers SVAC Merger Presentation Transcript, February 22, 2021 ("Here's roughly the manufacturing flow.  … Incoming materials come into this room.  Those large rolls I mentioned are loaded onto laser processing tools here, and from that point onward the product is not touched by a human, they go through stacking and constraining and packaging.  Once that's done, the batteries are put in trays of 100 to 200 batteries, and they're put into a test area, where we do the charging and buffering, and then the batteries come back into this area, where they're stored and aged, prior to being put into boxes and shipped to customers.").

analyst report stated that "Li-ion battery manufacturing is broken into three stages: electro[de] fabrication, cell assembly, and battery packaging and formation," and provides a detailed description of Enovix's sequential manufacturing processes through each stage.[29]

19.    The economic significance of Enovix's production line, and indeed any other sequential production line, is that the overall throughput (the speed of the line, expressed in units per hour) of the entire line necessarily reflects the throughput of whichever zone is the worst performing—the "bottleneck."[30]  That is, the line can only produce as many batteries as its lowest throughput zone.[31]  Bottlenecks and their management in systems like assembly lines are commonly taught concepts in business school operations management classes.[32]  If, for example, in its regular operation Line 1 of Fab-1, Zone 1 could process 100 units per hour, Zone 2 could process 200 units per hour, Zone 3 could process 500 units per hour, and Zone 4 could process 300 units per hour, then Line 1 would only be able to produce 100 units per hour (the throughput of Zone 1, which is the lowest throughput zone across the four zones of Line 1).  In this example, Zone 1 is bottlenecking the throughput of Line 1.  As a result, increasing the throughput of any other zone—or even decreasing the throughput of other zones down to 100 units per hour—would not change Line 1's overall throughput.

---

[29] "Disrupting The Battery Market Stuck In Its Ways For 30 Years. A 30-110% Energy Density Improvement, And Growing Design Wins From Tier-1 Customers. Initiating Coverage With A BUY Rating And $50 Price Target," *Craig-Hallum*, December 2, 2021, pp. 17–19 ("Enovix can use industry standard manufacturing equipment for the ~70% of its manufacturing process that is the same as for standard li-ion batteries. This ~30% difference comes from three differences in the processes of the process that are essentially dropped into the typical li-ion battery manufacturing line. … Li-ion battery manufacturing is broken into three stages: electro[de] fabrication, cell assembly, and battery packaging and formation."). *See also, e.g.,* "Initiating ENVX at Outperform – 'Silicon is Awesome'," *Cowen*, January 4, 2022.

[30] Heizer, Jay, Barry Render, and Chuck Munson. 2017. *Operations Management: Sustainability and Supply Chain Management*, 12th ed., Pearson, ("Heizer et al. (2017)"), p. 314 ("**Capacity analysis** involves determining the throughput capacity of workstations in a system and ultimately the capacity of the entire system.  A key concept in capacity analysis is the role of a constraint or **bottleneck**. … A bottleneck has the lowest effective capacity of any operation in the system and thus limits the system's output.").

[31] Heizer et al. (2017), p. 315 ("To determine the bottleneck in a production system, simply identify the station with the slowest process time.  The **bottleneck time** is the process time of the slowest workstation (the one that takes the longest) in a production system.  For example, … [i]ndividual station process times are 2, 4, and 3 minutes [for stations A, B, and C] respectively.  The bottleneck time is 4 minutes.  This is because station B is the slowest station. Even if we were to speed up station A, the entire production process would not be faster.").

[32] *See, e.g.,* Heizer et al. (2017), p. 317 ("**Bottleneck Management**[.]  A crucial constraint in any system is the bottleneck, and managers must focus significant attention on it. … **STUDENT TIP**[:] There are always bottlenecks; a manager must identify and manage them.").  Economists use principles of Operations Management to model and analyze economic phenomena.  *See, e.g.*, Vickery, William S. 1969. "Congestion Theory and Transport Investment," *The American Economic Review* Vol. 59, No. 2: 251–260; Daniel, Joseph I. 1995. "Congestion Pricing and Capacity of Large Hub Airports: A Bottleneck Model with Stochastic Queues," *Econometrica*, Vol. 63, No. 2: 327–370; Acemoglu, Daron, David Autor, and Christina Patterson. 2024. "Bottlenecks: Sectoral Imbalances and the US Productivity Slowdown," *NBER Macroeconomics Annual*, Volume 38: 153–207.

20.     Because the throughput of Fab-1, Line 1 is equal to the throughput of the "bottleneck" zone of the line, a disclosure of changes in the line's throughput is uninformative as to which of the zones of the line is responsible for the reduction in throughput.  Continuing with the example above, a disclosure that Line 1's throughput is 50 units per hour rather than 100 units per hour cannot be used to infer that the throughput of Zone 1 of the line has decreased from 100 to 50 units per hour.  Such a disclosure would only inform market participants that the throughput is now bottlenecked by at least one zone that can process only 50 units per hour.  This might be due to the throughput of Zone 2 decreasing from 200 to 50 units per hour, and might be in spite of the throughput of Zone 1 increasing from 100 to 150 units per hour.  Thus, a mere disclosure of a reduction in Fab-1, Line 1's throughput is insufficient to determine which zone was the bottleneck causing that reduction.

**V.      Opinion 3 – Dr. Tabak Fails to Refute that by November 7, 2022 It Was Publicly Available that Fab-1's Performance Was Severely Constrained**

21.     Dr. Tabak attempts to minimize publicly available information regarding throughput and yield issues and their impact on Enovix's ability to ramp up production and revenue at Fab-1.[33] However, Dr. Tabak is unable to refute that, by November 7, 2022, it was publicly available that Fab-1's throughput and yield performance was severely constrained, as demonstrated by company statements indicating the same and analyst revenue forecasts.

22.     As discussed in the James Report,[34] as the Putative Class Period progressed, Enovix regularly informed investors about issues it experienced in improving throughputs and yields at Fab-1.  For example, in May 2022, Enovix stated that it "ha[d] experienced challenges associated with building out Fab-1 including technical issues negatively impacting yield and volume

---

[33] *See, e.g.*, Tabak Reply Report, ¶ 11 ("With respect to 'Statement B,' the James Report begins its argument by stating, 'From the beginning of the Putative Class Period and through November 7, 2022, Enovix provided information to the market about the challenges it was facing with respect to Fab-1—including information regarding efforts to improve the throughputs and yields of the Gen1 equipment installed at Fab-1.  Therefore, it informed the market that Fab-1 equipment was not meeting the levels of throughput and yield required in order to scale up production.'  However, the James Report's conclusion here does not follow from its predicate.  For example, a company can be facing challenges and be successfully overcoming them. Similarly, if a student said that they were facing challenges in a class and making efforts to improve their understanding of the material, that would not be the equivalent of them saying that they had failed an exam.  Put simply, facing challenges and working hard to improve is not the same thing as failing a test.").

[34] James Report, ¶¶ 75–78.

production."[35]  In August 2022, Enovix explained that throughputs and yields still needed to be improved and "[t]here [would be] no easy path when bringing up a first-of-a-kind manufacturing line.  It [would be] a relentless effort of continuous improvement."[36]  On November 1, 2022, Enovix informed market participants that additional work was needed to improve the levels of throughput and yield for Fab-1 equipment, but given "slower-than-expected improvements," it would re-direct its resources toward "critical yield and productivity learning" for Gen2.[37]  Specifically, Enovix stated in the Q3 2022 Letter to Our Shareholders:

> **Given** the wide gap in expected performance between our Gen1 and Gen2 and **the slower-than-expected improvements on our Gen1 manufacturing equipment**, we have now concluded that the incremental effort necessary to drive higher throughput on Gen1 technology is better spent on the critical yield and productivity learning necessary for a strong launch of our Gen2 Autoline.[38]

23.    Correspondingly, by November 7, 2022, median analyst revenue estimates had been reduced by 95.5% for FY 2023, 92.1% for FY 2024, and 76.7% for FY 2025 relative to the Company's revenue targets at the start of the Putative Class Period.[39]

24.    As explained above, because Fab-1, Line 1 was a sequential production line, as market participants learned new information about the performance of Fab-1, Line 1 generally, they learned about the performance of the worst performing zone of Fab-1, Line 1 (whichever of the four zones it may have been).  Thus, by November 7, 2022 it was publicly available information that the worst-performing zone or zones of Fab-1, Line 1 were generating poor throughputs and yields relative to those targeted by Enovix at the start of the Putative Class Period and the timeline of any ramp up was substantially delayed, with revenues expected to be driven in years to come by Fab-2 and potentially other Fabs.[40]

---

[35] James Report, ¶ 75; Enovix Corporation, Form 10-Q for the Quarterly Period Ended April 3, 2022, Filed on May 18, 2022, p. 16.

[36] James Report, ¶ 75; Enovix Corporation FQ2 2022 Earnings Call Transcript, August 10, 2022, 4:00 PM ET, p. 5.

[37] James Report, ¶ 76; Enovix Corporation, Form 8-K, Filed on November 1, 2022, EX-99.1 ("Q3 2022 Letter to Our Shareholders") , p. 1.

[38] James Report, ¶ 76; Q3 2022 Letter to Our Shareholders, p. 1 (emphasis added).

[39] James Report, ¶ 84.

[40] For example, a Cowen and Company securities analyst report on November 1, 2022 projected Fab-1 revenue in FY 2025 of $13.5 million ("3Q22 Recap: Attractive Gen-2 Economics; Slower Ramp Clears the Deck," *Cowen*, November 1, 2022, p. 8), which compares to projected Fab-1 revenue of $220 million in the Merger Investor

25.    Given all the information that was publicly available regarding the performance of Fab-1, Line 1 as of November 7, 2022, any additional information about the Yinghe Equipment's performance during the FAT could only have been new, negative, value-relevant information after November 7, 2022 if it was so dire that it would have caused revenue forecasts to decrease even further (e.g., more than 95% for FY 2023). A hypothetical example of information that might cause this is if Enovix knew at the start of the Putative Class Period that the Yinghe Equipment was effectively doomed to fail and unfixable and had hidden this from investors through November 7, 2022. However, Dr. Tabak has offered no support (e.g., from Enovix disclosures or analyst commentary) in the Tabak Reply Report or elsewhere for this ever having been the case.

26.    If instead the FAT at Yinghe had identified that the Yinghe Equipment had some problems, but those were problems that Enovix reasonably believed the Company could resolve relatively quickly upon bringing the Yinghe Equipment to California—as is consistent with my understanding of the Alleged Truth,[41] or even consistent with any version of the alleged truth that would have led to forecast revisions less than those that had occurred by November 7, 2022— then, as I explained in the James Report,[42] more information about such Yinghe Equipment performance issues at the time of the FAT would not have provided new, value relevant information to market participants given the extensive information that was publicly available and incorporated into the stock price regarding Fab-1's worst-performing zone as of November 7, 2022.

---

Presentation (Rodgers Silicon Valley Acquisition Corp., Form 8-K, Filed on February 22, 2021, EX-99.2, p. 51). That same securities analyst contributor projected that Fab-1 revenue in FY 2030 would be $14.3 million, compared to $1,748.7 million from Fab-2 and other Fabs ("3Q22 Recap: Attractive Gen-2 Economics; Slower Ramp Clears the Deck," *Cowen*, November 1, 2022, p. 8).

[41] As explained in the James Report, ¶¶ 82–83, "at the time of the Alleged Misstatement, Enovix stated that '[b]ased on the strength of [its] revenue funnel, [it saw] a favorable demand picture supporting [its] goal to exit 2025 with over $1 billion of annualized revenue.' Enovix had likewise disclosed an annualized run-rate revenue target of over $1 billion by the end of 2025 in February 2021. Thus, as an economic matter, a disclosure of the Alleged Truth at the time of the Alleged Misstatement combined with a reiteration of financial targets would have, at most, informed investors of two things. First, there was a greater risk that Enovix might not be able to achieve its outstanding financial targets due to throughputs and yields not meeting desired specifications. Second, this incremental risk neither (a) prevented management from indicating that it expected to exit 2025 with over a billion dollars in annualized revenue, nor (b) caused management to withdraw any financial targets."

[42] James Report, Section VI.A.4, explaining that the implications of the Alleged Truth regarding Enovix's revenue and production ramp-up were superseded, by November 7, 2022, by the disclosure of challenges with Fab-1 equipment throughputs and yields and downward revisions of revenue guidance.

27.     In fact, I understand the Court already held that Plaintiffs had not shown that Mr. Rodgers had knowledge on November 7, 2022 different from his stated knowledge that Fab-1 would "work and ship a lot of batteries to our customers," as stated in Statement 12.[43]  If Statement 12 was consistent with Fab-1, Line 1 (including the Yinghe Equipment) performance as of November 7, 2022, and Zone 3 equipment for Gen 2 required "no/small changes," particularly in the context of deep reductions in analyst forecasts by that date following months of disclosures of throughputs and yields challenges at Fab-1, any new information related to Yinghe Equipment problems observed at the FAT would not have been value relevant after November 7, 2022.  Under these assumptions, whatever the Yinghe Equipment problems were at the time of the FAT, they were not so dire as to be inconsistent with Mr. Rodgers' belief in November 2022 that Fab-1 would still work, and thus not so dire as to cause securities analysts to reduce revenue projections for 2023 by more than 95%.

## VI.     Opinion 4 – Dr. Tabak Has Failed to Identify Any New Information about the Performance of the Yinghe Equipment Disclosed after November 7, 2022

28.     In the Tabak Reply Report, Dr. Tabak has failed to identify any new information about the performance of the Yinghe Equipment that was revealed to market participants after November 7, 2022.  In particular, with respect to the alleged corrective disclosures on January 3, 2023 and October 3, 2023, he offers no evidence from Enovix disclosures or from securities analyst commentary that new negative information about the performance of the equipment in Zone 3 (which included the Yinghe Equipment), or the consequences of such performance, was disclosed on these days.[44]

29.     With respect to *January 3, 2023*, as explained in the James Report, Enovix provided information about the performance of the Fab-1 equipment and its Gen2 progress.[45]   With respect to Fab-1, for example, Enovix stated that this equipment would be unable to meet the Company's throughput target of 550 UPH and that Enovix did not anticipate that the Fab-1

---

[43] MTD Order, p. 19.
[44] Tabak Reply Report, ¶¶ 31–37.
[45] *See* James Report, Section VI.B.1.a).

equipment, even "if [the company] worked on it forever, would be over 200 [units per hour]."[46] As explained above in the discussion related to my Opinion 2, these statements only convey information about the performance of the worst-performing zone of Fab-1, Line 1 without revealing the specific zone that was performing poorly. Dr. Tabak ignores that Enovix did not state that the Yinghe Equipment was the bottleneck constraining Fab-1, Line 1's production throughput.

30.    Dr. Tabak also disregards my discussion in the James Report that Fab-1, Line 1 had different zones and that the Yinghe Equipment was only used in Zone 3.[47] Specifically, Dr. Tabak ignores that the January 3, 2023 Special Presentation highlighted issues in zones that did not include the Yinghe Equipment. As I discuss in the James Report, Enovix disclosed that it had identified several manufacturing steps in Zone 2 of Fab-1, Line 1 (a zone that I understand did not include any equipment procured from Yinghe[48]) that it characterized as "manual" and requiring "major redesign."[49] By comparison, Enovix noted that, for Fab-2, the contact points in the manufacturing line of Zone 3 (the zone I understand contained all of the Yinghe Equipment[50]) required "no/small changes" or "minor redesign" relative to those of Fab-1.[51]

31.    As set out in the James Report, some securities analysts mentioned that most of the planned changes between Fab-1 and Fab-2 would be made to equipment located in Zone 2,[52] and none of the securities analysts discussed new information about the Yinghe Equipment or the performance of the Zone 3 equipment.[53]

32.    Consistent with this discussion, I explain in the James Report that some securities analysts stated the additional delay in timeline for Fab-2—an unexpected negative

---

[46] James Report, ¶ 96; Enovix Corporation Special Call Transcript, January 3, 2023, 5:00 PM ET ("January 3, 2023 Special Presentation Transcript"), p. 12 ("The UPH was rated at 550 nameplate. We don't think that machine, if we worked on it forever, would be over 200."). *See also* January 3, 2023 Special Presentation, p. 38.

[47] James Report, ¶ 31.

[48] *See* James Report, footnote 50.

[49] *See* James Report, ¶ 96; January 3, 2023 Special Presentation, p. 39. Enovix also stated during the January 3, 2023 Special Presentation that "Line 1 is the one [Enovix] brought in the airplane … it's nonfunctional for automation point of view." *See* January 3, 2023 Special Presentation Transcript, p. 11. *See also* January 3, 2023 Special Presentation Transcript, pp. 12–13.

[50] *See* James Report, footnote 50.

[51] *See* James Report, ¶ 97; January 3, 2023 Special Presentation, p. 40.

[52] James Report, ¶ 104.

[53] James Report, ¶ 107.

development—was the cause of the stock price decline following the January 3, 2023 Special Presentation, rather than any new information about the Yinghe Equipment.[54]

33.     Dr. Tabak similarly fails to identify any new information about the performance of the Yinghe Equipment disclosed on *October 3, 2023*.  As explained in the James Report, on this day, Enovix issued a press release announcing a strategic realignment of Fab-1 and a reduction to the Company's production targets for Q3 2023.[55]  Enovix explained that it was shifting Fab-1 activities from a horizontal business strategy (building standardized batteries for hundreds of customers) to a vertical business strategy (building custom battery cells for a small number of large customers) because "it allow[ed] [Enovix] the most efficient path to scale."[56]  In this press release, Enovix also announced that Fab-1 had achieved its goals and would refocus from manufacturing to product development.[57]  For example, Enovix stated:

> Fab1 ha[d] fulfilled its intended purpose in 2023, which was to 1) drive overall yield on the Gen1 equipment and generate the learning necessary to launch with Fab2/Gen2 yields at a high level 2) build enough small cells to fulfill customer qualification demand and 3) build enough standard small cells to support customer product launches to bridge over to production in Malaysia.[58]

34.     As I discussed in the James Report, following the October 3, 2023 Press Release securities analysts noted that Enovix had achieved its manufacturing goals for Fab-1.[59]  For example, with respect to the Company's goal stated on January 3, 2023 to achieve yields of 60% in Q4 2023, a Canaccord Genuity securities analyst report stated "[y]ields above 60% have been achieved, and faster than expected."[60]  Similarly, a J.P. Morgan securities analyst report indicated that the "strategic realignment of…Fab-1…makes strategic sense given that Enovix has met its manufacturing improvement goals in terms of yields and output,"[61] and a TD Cowen securities

---

[54] James Report, ¶ 100.
[55] *See* James Report, Section VI.B.2.a).   The October 3, 2023 Press Release was published at 7:30 AM ET.  *See* Enovix Corporation Press Release, "Enovix Announces Strategic Realignment of Fab1 to Improve Operational Efficiency and Enhance Technology Development," *GlobeNewswire*, October 3, 2023.
[56] James Report, ¶ 112.
[57] James Report, ¶¶ 112–113.
[58] Enovix Corporation Press Release, "Enovix Announces Strategic Realignment of Fab1 to Improve Operational Efficiency and Enhance Technology Development," *GlobeNewswire*, October 3, 2023.
[59] James Report, ¶ 115.
[60] James Report, ¶ 115; "Making the Right, Albeit Unpopular, Decision," *Canaccord Genuity*, October 3, 2023.
[61] James Report, ¶ 115; "Strategic Shift at Fab-1 Aligns with Company Goals; Fab-2 Ramp Key to Unlock Long-Term Opportunity –Remain OW," *J.P. Morgan*, October 3, 2023.

analyst report stated "[t]urning Fab1 into an R&D facility had always been the plan and after ENVX completed its manufacturing goals, including enough inventory to support customer product launch of small cells and reaching 60% yield at the facility, the company decided to pull forward plans…."[62]  I also document in the James Report that securities analysts discussed Enovix missing its production guidance due to its change in strategy rather than due to issues with the performance of the Zone 3 equipment.[63]

35.    In sum, on both alleged corrective disclosures dates, securities analysts did not discuss any new information regarding the Yinghe Equipment's performance.  This lack of commentary from securities analysts is consistent with Enovix's disclosures not conveying to market participants that the Zone 3 Yinghe Equipment was the bottleneck in allowing Fab-1 to ramp up production.  Dr. Tabak's failure to provide evidence that Zone 3 *was* the limiting zone at Fab-1 is consistent with this lack of analyst commentary.

Executed this 13th day of February, 2026

_____

Christopher James, Ph.D.

---

[62] "Fab1 Strategic Realignment Announced; Not Surprising," *TD Cowen*, October 3, 2023.
[63] James Report, ¶ 115.

**APPENDIX A**

## Testimony of Christopher M. James in the Previous Four Years

*In re: Uniti Group Inc. Securities Litigation*, United States District Court Eastern District of Arkansas, Case No. 4:19-cv-00756-BSM, deposition, 2022.

*Deutsche Bank National Trust Company, as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC1 v. Morgan Stanley ABS Capital I Inc.* (Index No. 650291/2013) and *Deutsche Bank National Trust Company, as Trustee for the Morgan Stanley ABS Capital I Inc. Trust, Series 2007-NC3 v. Morgan Stanley ABS Capital I Inc.* (Index No. 651959/2013), Supreme Court of the State of New York, County of New York, deposition, 2022.

*United States of America ex rel. Gwen Thrower v. Academy Mortgage Corporation*, United States District Court Northern District of California, Case No. 16-cv-02120-EMC, deposition, 2022.

*Leslie J. Murphy and Vincent J. Martin, III, Individually and On Behalf of All Others Similarly Situated, v. Samuel M. Inman, III, John F. Smith, Bernard M. Goldsmith, William O. Grabe, Lawrence David Hansen, Andreas Mai, Jonathan Yaron, and Enrico Digirolamo*, State of Michigan, In the Circuit Court for the County of Oakland, Case No. 2017-159571-CB, deposition, 2024.

*Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited v. Newsmax Media, Inc.*, Supreme Court of the State of Delaware, Case No. N21C-11, deposition, 2024.

*IKB International, S.A. in Liquidation and IKB Deutsche Industriebank A.G. v. U.S. Bank N.A.*, Supreme Court of the State of New York, County of New York, Index No. 654442/2015, deposition, 2024.

*Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited v. Michael J. Lindell and My Pillow, Inc.*, United States District Court, District of Minnesota, Case No. 22-cv-00098-JMB-JFD, deposition, 2024.

*Otay Project LP, Oriole Management LLC, Tax Matters Partner v. Commissioner of Internal Revenue*, United States Tax Court, Docket No. 6819-20, trial testimony, 2024.

*National Credit Union Administration Board v. U.S. Bank National Association*, United States District Court Southern District of New York, Case No. 1:18-cv-11366-LSS, deposition, 2024.

*Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited v. Fox Corporation, Fox News Network, LLC, Debi Dobbs, as Administrator of the Estate of Lou Dobbs, deceased, Maria Bartiromo, Jeanine Pirro, and Sidney Powell*, Supreme Court of the State of New York, County of New York, Index No. 151136/2021, deposition, 2025.

*MLRN LLC v. U.S. Bank National Association*, Supreme Court of the State of New York, County of New York, Index No. 652712/2018, deposition, 2025.

**APPENDIX A**

*In re: Capital One 360 Savings Account Interest Rate Litigation*, United States District Court Eastern District of Virginia, Alexandria Division, Case No. 1:24-md-03111-DJN-WBP, deposition, 2025.

*In re: Teva Securities Litigation*, United States District Court for the District of Connecticut, Case No. 3:18-cv-01681 (SRU), 3:19-cv-00603 (SRU), deposition, 2025.

*In re: Enovix Corporation Securities Litigation*, United States District Court Northern District of California, Case No. 3:23-cv-00071-SI, deposition, 2026.

**APPENDIX B**

# List of Documents Considered

## Academic Articles

Acemoglu, Daron, David Autor, and Christina Patterson. 2024. "Bottlenecks: Sectoral Imbalances and the US Productivity Slowdown," *NBER Macroeconomics Annual*, Volume 38: 153–207

Daniel, Joseph I. 1995. "Congestion Pricing and Capacity of Large Hub Airports: A Bottleneck Model with Stochastic Queues," *Econometrica*, Vol. 63, No. 2: 327–370

Vickery, William S. 1969. "Congestion Theory and Transport Investment," *The American Economic Review* Vol. 59, No. 2: 251–260

## Books

Heizer, Jay, Barry Render, and Chuck Munson. 2017. *Operations Management: Sustainability and Supply Chain Management*, 12th ed., Pearson

## Expert Reports

Expert Reply Report of David I. Tabak, Ph.D., January 16, 2026, including all documents cited therein

Expert Report of Christopher James, Ph.D., December 12, 2025, including all documents cited therein and backup materials

Note:  In addition to the documents on this list, I considered all documents cited in my report to form my opinions.