**Pages 1 - 25**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Susan Illston, Judge

IN RE: ENOVIX CORPORATION          )
SECURITIES LITIGATION.             )
                                   )    **NO. 23-00071 SI**
                                   )
_____    )

San Francisco, California
Friday, March 13, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

            THE ROSEN LAW FIRM, P.A.
            101 Greenwood Avenue - Suite 440
            Jenkintown, Pennsylvania  19046
        BY: **JOSHUA E. BAKER, ATTORNEY AT LAW**

            ROLNICK KRAMER SADIGHI LLP
            Penn 1 - Suite 3401
            One Pennsylvania Plaza
            New York New York  10119
        BY: **SHANE KUNSELMAN, ATTORNEY AT LAW**

For Defendant:

            QUINN, EMANUEL, URQUHART & SULLIVAN LLP
            555 Twin Dolphin Dr. - 5th Floor
            Redwood Shores, California  94065
        BY: **EMILY C. KAPUR, ATTORNEY AT LAW**
            **OLIVIA MELLO, ATTORNEY AT LAW**

            QUINN, EMANUEL, URQUHART & SULLIVAN LLP
            295 5th Avenue
            New York, New York  10016
        BY: **W. JACKSON VALLAR, ATTORNEY AT LAW**

Reported By:    Marla F. Knox, CSR No. 14421, RMR, CRR
                United States Official Reporter

**Friday - March 13, 2026**                                    **10:17 a.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  All rise.  Court is now in session.  The Honorable Susan Illston presiding.

Now calling civil matter 23-CV-71, In Re: Enovix Corporation Securities.

Counsel, please state your appearances for the record starting with Plaintiffs.

MR. BAKER:  Good morning, Your Honor, Josh Baker with The Rosen Law Firm, co-lead Counsel for Plaintiffs.

THE COURT:  Good morning.

MS. KAPUR:  Good morning, Your Honor, Emily Kapur with Quinn Emanuel for Defendants, and with me are Jack Vallar and Olivia Mello, also with Quinn Emanuel for Defendants.

THE COURT:  Good morning.

THE CLERK:  I'm showing a Shane Kunselman who has his hand raised.  Does he --

MR. BAKER:  That is our co-Counsel.  There might be one or two others joining by Zoom.

THE CLERK:  Does he need to be promoted to the panel or are you going to be arguing?

MR. BAKER:  It should just be me speaking unless there is something unexpected that comes up.

THE COURT:  Okay.  This is Plaintiffs' motion for

class certification.  The case has been through a lot of iterations leading up to this day.  We are now at a position where there is one alleged statement number 4.

The Defendants argue that -- well, they argue that class certification should be denied for a whole bunch of reasons.  The one I'm focused on -- and the one I actually agree with -- is that the basic presumption of reliance falls away because there's a mismatch between number 4, which is the sole remaining misstatement in the case, and the alleged corrective disclosures.

So, that's kind of where I'm starting.  And so, that will -- the burden is on you to let me know why I'm wrong.  I recognize the burden is on them to demonstrate that, but it appears to me they have.

**MR. BAKER:**  Understood, Your Honor, and hopefully I can change your mind.

So, with that, I will dispense with the preamble and jump right in.  I think it is important to really clarify here what we are talking about with the price impact inquiry.

And what came up in *Goldman*, Your Honor, is familiar in general with the price in fact theory is that Defendants must prove there is a complete disconnect between the misrepresentation and the disclosure of the concealed truth such that none of those three significant price drops -- none of which are disputed that are significant -- are connected to

the misrepresentation.

So, what we think is happening here is Defendants have used this price impact analysis to import this full -- a full loss causation analysis, which is not appropriate at the class certification stage.

The relevant question here is whether or not Defendants have shown that there's absolutely no back-end price impact connected to the misrepresentation, not whether Plaintiffs had proven at class certification stage -- which Your Honor recognized it is not our burden to prove this particular thing -- whether we have proven loss causation for each individual corrective disclosure.

So, calling loss causation -- dressing it up as price impact doesn't mean you get to look at every corrective disclosure and analyze and disaggregate and go into all of that.

I now understand that the *Goldman* case and the cases interpreting *Goldman* have blurred this line, blurred this distinction a bit; but still the focus is on is there a connection between the misrepresentation and the truth that was concealed later.

Here, there is.  And I think it is pretty clear.  And, frankly, I don't think it is fairly disputed -- sorry -- I don't think it is really fully disputed at all that there is back-end price impact with respect to begin with the first

corrective disclosure in November 2022.

Defendants -- there is no full disclosure of the truth prior to that disclosure and if -- once we get beyond that, I will explain why there is also a connection with the January and October 2023 disclosures as well as connecting back to the misrepresentation.

So Defendants' arguments that there is no complete -- that there is a complete lack of price impact is that none of the disclosures exactly mirror or expressly correct the misrepresentation, but this is a materialization of the risk case where instead of having a literal corrective disclosure, the truth is revealed when the risk that the misrepresentation concealed from the market eventually materializes.

This is the same fact pattern at issue in *Zillow* where there was a misrepresentation about *Zillow*'s pricing model for buying homes.  And the disclosures that came out first just said, oh, we have a backlog of these houses or we overpaid for these houses.

It said nothing about the cause of that backlog and the overbuying.  It said that we have this.  Plaintiffs allege that that was connected and then there was a later disclosure that made a further connection, but the court -- both the district court and the Ninth Circuit in affirming that decision -- said that, no, this is enough.  This is a materialization of the risk that was concealed by lying about the algorithm.

And the fact pattern here is very similar. Here, what Plaintiffs allege is that Defendants misrepresented that the Yinghe equipment passed the FAT when, in fact, it was tested repeatedly and it did not pass that FAT because it did not meet these commercial production specifications.

That misrepresentation concealed the full extent of the risk that Fab-1 may not be able to achieve commercial production on the stated timeline, if ever. And we allege that that risk materialized in part on November 1, 2022, when Enovix announced it was dialing back its ongoing efforts to improve Fab-1 and that it expected a lower Fab-1 output delaying commercial sales revenue; and the stock fell 41 percent on that disclosure.

Defendants don't point to any full disclosure before that point nor can they. This was the materialization of the very risk that Plaintiffs alleged was concealed by the misrepresentation and the same theory and -- the same theory of the materialization that the Court recognized at the motion to dismiss stage.

And a comparison here to *Goldman* itself is particularly instructive; where in *Goldman* you had very broad and generic misrepresentations about integrity and honesty and putting clients' interests first, for example. Then there was a very specific disclosure about purported conflicts of interest for specific transactions. That wasn't enough to show price

impact.

And there is a similar fact pattern in *Kirkland* with very broad misrepresentations and very specific purported corrective disclosures.

Here, it is the exact opposite.  Misrepresentation was a specific source of this undisclosed risk; that failing the FAT led to a higher risk that Fab-1 may not achieve commercial production.

The corrective disclosures -- certainly the November 2022 one and the later ones as well -- to varying extents, those revealed that that very risk had materialized.  It was, therefore, connected to the misrepresentation.

And with respect to Defendants point to the November 7th disclosure -- November 7th, 2022, disclosure, where Defendant Rodgers revealed that the FAT was waived with respect to the Yinghe equipment, Defendants are now trying to argue that that was full disclosure of the truth; but that's not even close to what was actually revealed there.  And, in fact, that's exactly the opposite of what Defendants themselves took as their position -- their interpretation of those statements in both the first and second motions to dismiss and the interpretation that the Court found of those statements, which was that that statement in November 7th disclosed, oh, we just didn't send our engineers to China to observe the FAT.  It was a technical requirement that we waived.  It didn't say anything about the

ability of the equipment to pass the FAT.  It didn't say anything about problems with the equipment that might reveal a bigger risk to Fab-1 working in the end.

And the November -- on the same November 7th statement -- I forget offhand if it was an oral or a written statement -- Defendant Rodgers also was telling investors:  Don't worry -- quote, Fab-1 is going to work and ship a lot of batteries at the same time.  This isn't fully corrective disclosure.  He is saying, oh, no, this is nothing to worry about.  This is a minor hiccup.  That's not a full disclosure of the truth in any regards.

(Pause in proceedings.)

**MR. BAKER:**  Let's see.  In our papers, as Your Honor is familiar with, we lay out additional evidence showing that there were additional revelations or materializations of the concealed risk in January, in October 2023 including Rodgers' statement which did specifically attribute the failures of Fab-1 to the Yinghe equipment.

He said in the January 2023 disclosures, "The equipment we brought in the airplane," which, as we allege in the complaint, is referring to the equipment from Yinghe that Enovix had hired the Ukranian aircraft to fly over.  They had made a big press release about that.  That's clearly what he is referencing here.

He said, That equipment was unable to be automated as

planned and was still producing only 100 units per hour instead of the 550 as planned for commercial production.

Enovix's Chief Operating Officer also made statements during that presentation suggesting that the Yinghe equipment's failure to past the FAT contributed materially to the delays and inability of Fab-1 to achieve commercial production.

**THE COURT:**  Let me ask you this about the equipment: There are four zones or areas in the manufacturing process; electrode fabrication, assembly, packaging and testing.

The complaint alleges that the Yinghe equipment was for two zones, assembly and packaging.  The Defendants presented evidence from an internal slide deck showing that Yinghe supplied the equipment only for the packaging.  What is your view of that?

**MR. BAKER:**  Two things, Your Honor.  First, it is not entirely factually correct.  Defendants -- I'm not sure if this is fully reflected in the responses to the request for admission that Defendants submitted in connection with the sur-reply -- but they -- one of their requests for admission was admit that the Yinghe equipment was only zone 3 and not for anywhere else.  That's not true.  There is evidence in the record that shows otherwise, which we didn't submit on this motion but that's why we did not admit that request -- we did admit that --

**THE COURT:**  So, you are contending it is two?

MR. BAKER:  Well, we are saying there is evidence in the record that shows Yinghe supplied some equipment at least for some other zones as well.

But the more important thing here is what Defendants have done is flip this burden completely on its head.  It is not up to us to prove that the overall issues with Fab-1 -- its inability to achieve commercial production -- at least at this stage, it is not up to us to prove exactly how much of that was due to the Yinghe equipment.

There is evidence in both the allegations that I referred to just a minute ago and Defendant Rodgers' statement and the CEO -- I believe it is Marath or Marathe -- statements that are attributing this to it; and there is further evidence that we will be able to produce in the record.

Fact discovery is still ongoing.  Through expert discovery we will be able to submit that on loss causation at the appropriate time.

And what this doesn't show is that Defendants have conclusively established that the Yinghe equipment did not cause these problems for Fab-1.  They have to show that there is no connection between the disclosures that Fab-1 was struggling to achieve commercial production and misrepresentation that the Yinghe equipment wasn't able to meet commercial production.

We have shown that there is at least some evidence of a

connection, the amount -- when we are talking about the amount of that -- how much that contributed, maybe there were issues with other lines, maybe there weren't -- but there is no way what they have submitted conclusively establishes that there was no connection to the Yinghe equipment.  That's their burden to show.  They have to show that there was no connection, not that we have to establish how much of a connection there is for each disclosure.

**THE COURT:**  Well, the misrepresentation is limited to the fact that they didn't -- they didn't disclose that it failed the FAT back in China.

**MR. BAKER:**  That's what the misrepresentation is. But, as we allege -- and I was mentioning it earlier -- what that did is that concealed the extent of the risk that the Fab 1 equipment would not be able to perform to commercial specifications.  Because, as Your Honor mentioned, yeah, there's four lines -- and Defendants mention this in their sur-reply as well.  There is four parts of this line.

If one of them doesn't work, the whole thing can't work. Like, it can't reach 550 if one piece of it is lower.  We allege this piece was not meeting those specifications, and there is evidence and reason to support that and allegations; and it's up to them to show that there is no way that the failure of the Yinghe equipment, which concealed the risk that it may not work -- which, like I said, if this one part doesn't

work, the whole thing can't produce 550 if this piece is only producing a hundred.

So, it is up to them to prove that there was no -- that no relationship; that it had no causal evidence, that it was totally because of other things or that the full extent of the truth was revealed, which, as I mentioned -- discussed before, they have not done.

**THE COURT:** So, is it your theory of the case right now that the Fab-1 battery manufacturing line was not commercially viable because the Yinghe supply part of that line was unable to produce batteries at commercial scale?  That's your theory.

**MR. BAKER:** The theory -- it's a little more nuanced than that -- but it is that, yes, the Yinghe equipment, by concealing that it did not pass the FAT because it could not meet these specifications concealed the extent of the risk that Fab-1 as a whole would not be able to achieve those same specifications.

So, whether or not there was some risk or some amount of it disclosed before, there was a bigger risk that they concealed by saying, oh, yeah, the Yinghe equipment -- or by implying the Yinghe equipment had passed the FAT, by implying that, they are concealing the extent of the risk that the Fab-1 equipment may not be able to achieve commercial production.

And we don't need to show with certainty that they

absolutely knew that the Yinghe equipment wouldn't work.  What they knew was that it did not pass the test because it didn't meet specifications, and that created a significant increase in the material risk that Fab-1 as a whole could not meet those same specifications.

**THE COURT:**  Thank you.  What do you say to that?

**MS. KAPUR:**  So, there is a lot of questions about burden and who has to prove what at this stage; and I think those are really important questions.

So, our view is that Defendants' burden at this stage is to prove that there is -- to show Your Honor -- to bear the burden of proof, to show that there is a disconnect between the alleged truth that Plaintiffs bring before you at this stage of the case and the corrective disclosures.

But it is Plaintiffs' burden to bring an alleged truth to Your Honor at this stage after we have whittled the case all the way the down to one misstatement out of thirteen and a narrowed alleged truth, and the narrowed alleged truth is simply that this one zone of the equipment that was supplied by Yinghe -- and it was only one zone and I can get to that in a moment -- but this one zone of the equipment didn't meet all the specifications that were required of the testing back in China in 2021.

That's all that's in the case.  There isn't more in the case.  There isn't -- there aren't -- they say they have some

evidence that Yinghe was connected to multiple zones.  None of that is here before Your Honor.  And when we look at the complaint, when we look at their reply, when we look at how they try to connect all of this up, it doesn't connect together.

So, I heard Mr. Rosen [sic] say, Well, we do have allegations that actually it was Yinghe that was responsible for Fab-1 not performing.  That's not there.  The one paragraph in the complaint where they lay out in some detail we have -- you know, we have heard from FE6.  FE6 said, you know, the Yinghe equipment in particular was having trouble in June of 2022, in December of 2022.

What discovery has shown is that FE6 told Plaintiffs' investigators before they put this complaint before Your Honor that FE6 didn't know anything about at all about the Yinghe equipment.  He told Plaintiffs' investigators, "I worked only in zone 2.  The zone 2 equipment was only supplied by DWFritz in Oregon.  I don't know anything about Yinghe.  Yinghe was in zone 3.  I don't know anything about zone 3."

And they have now admitted that they didn't have any support for paragraph 122 in their complaint, and that's the detail.  And when they point in their reply -- when they try to explain, you know, why is it that the January disclosure has anything to do with the Yinghe equipment?  They say, Well, TJ Rodgers disclosed in January that the line was operating at a

hundred UPH, and it wasn't automated.  That disclosure was about the line but -- and in their reply they point to paragraph 178 of their complaint, which talks about FE6.  And they say, See, these numbers, they line-up; but FE6 was talking about zone 2.

We have put evidence in with my declarations showing that Yinghe only supplied equipment for zone 3 for the packaging equipment.  What TJ Rodgers disclosed in January was that the company was having some struggles with zone 2.  He said, zone 2, it needs major redesign -- and if -- I have got a copy of our slides if they are helpful to Your Honor.  What TJ said is zone 2 needs major redesign.  It is not automated.  It is operating manually, and that lines up with what they heard from FE6, which was, I'm working -- I was working in zone 2.  Zone 2 was having some troubles.

And so, the only evidence at this stage indicates that the bottleneck zone was not Yinghe.  There is certainly no evidence that the bottleneck zone was Yinghe.  Beyond Mr. Rosen -- sorry -- Mr. Baker's say so here this morning, there is no -- they haven't put anything before the Court; and it's their job to come in with a theory of alleged truth that is connected.  We have to show that their theory is disconnected, but they have to come in with the theory in a way that's admissible before this Court.

Your Honor has already narrowed this case all the way down

to this one misstatement, which really was just that the equipment wasn't necessarily all the way up to performance specifications back in early 2021 when they did this early stage testing on this one zone of the factory.

And there isn't enough here for them to say, Well, we have pled and we have shown that there's -- that ultimately it was Yinghe that was responsible for all of these issues with Fab-1.

So, that's the complete disconnect.  That's our first theory; that there is a --

THE COURT:  I mean, the Yinghe equipment was essential to the process; right?  If it didn't work, the whole process wouldn't work.

MS. KAPUR:  If the Yinghe equipment didn't work, the whole process wouldn't work.  We agree with that.  But there is no -- there aren't even allegations that are credible that have gotten the green light from Your Honor, and there is no showing that the Yinghe equipment was the reason that Fab-1 ultimately did not operate at commercial scale.  There is some showing that zone 2 was having issues, and it was the zone that Enovix was focused on.

So, this isn't like the *Zillow* case.  You know, in the *Zillow* case, defendants came out and they said, Look, this business failed.  We concede the reason the business failed is because our algorithm didn't work, and that was the case that the plaintiffs brought before the court.  And it was, Well, the

algorithm wasn't working.  The defendants, they didn't disclose the risk to the business if the algorithm didn't work.  They knew the algorithm wasn't working.  And ultimately, they came out and they admitted, you know, the business failed because the algorithm didn't work.  That's not what happened here.

And Enovix never said -- never did Enovix ever say, the reason Fab-1 didn't get to commercial scale is because the Yinghe equipment was having problems.

Instead, Enovix said, We are having a bunch of issues in zone 2.  That's where our proprietary laser technology is.  That's the technology that we worked on for years and years before we became a public company.  That's the technology that, you know, allows us to put the batteries into a stack and make these special super duper batteries that are this huge advance forward in battery technology.

And then it turned out -- you know, as happens with a Silicon Valley company trying to undertake a novel process, it turns out they had some struggles with figuring out how they were going to do manufacturing.  And that's what they said.  That's what they said to the market, not that this Yinghe equipment that was in the packaging zone that was standard battery equipment -- you know, yes, they said, We didn't require it to meet all of the specifications.  We thought that once we got it to Fremont and we could actually get our engineers on it, we were going to be able to get it fixed.

They never said it was that equipment that was at fault for what ultimately happened with Fab-1.  And as a result, there is just no connection with any of the misstatements at all.

We also have a separate set of independent arguments relating to the 2023 statements.  If that's helpful to Your Honor, I can go through that in brief.

THE COURT:  All right.

MS. KAPUR:  So, the 2023 statements have another issue.  The other issue -- and if I can, there's just one chart that I'd like to show you.  I will not go through the rest of these.

THE COURT:  You may.

MS. KAPUR:  There is -- this is not in our briefing and I do think it is helpful.

This relates to the second argument.  It is slide 17. This is a chart of data that was provided by Plaintiffs' expert to the Court.  And what this chart is analyst's projections of revenues for Enovix over time.  Enovix's revenues were going to be driven by the batteries that it produced from its factories. Initially it was working on Fab-1.  Then it was going to add Fab-2.

But to extent that analysts understood that Fab-1 was not going to operate at commercial levels, analysts would be reducing their revenue projections for Enovix for particularly

fiscal years '23 and '24.  So, this is Plaintiffs' own data. It is just in chart format so it is easier to see.

So, what we can see here is exactly what happened. Analysts understood -- Enovix projected -- Fab-1 was going to do great.  Fab-2 was going to come on line.  That was the hope. That was, you know, early '21.  As we go forward, that's still the expectation.

Once we get to May or 2022, Enovix starts to release information to the market.  They say, Fab-1 is not working as well as we'd hoped.  We are having to take pieces of it down. We are having to work on these through-puts and yields.  We are working hard but we are not there.

By the time we get to November 1st, 2022, Enovix says to the market, Fab-1 is not operating at commercial levels.  The through-puts and yields are not there, and we are not going to get it there.  We are going to shift our attention -- we are going to move all of our best engineers over to Fab-2.

And after that, analysts understood.  They understood that Fab-1 was not going to operate at commercial levels at that point.  Instead, Enovix changed its goals for Fab-1 at that stage.

Enovix said, We are not going to operate Fab-1 at commercial levels.  We are going to use Fab-2 for that. Instead, we have a couple of other goals for Fab-1 going forward.  What we want Fab-1 to do, we want Fab-1 to prove that

technology can actually work at relatively high yield.  It can produce enough quality batteries even if it can't go fast.  We want to show that we can get batteries off the line.  We can give them to customers so they can test them out and see if they work.  We want to show that we can produce some batteries for some important customer.

And that's exactly what Enovix then did in 2023.  Throughout 2023, they got Fab-1 to a point where it was producing at 60 percent yield.  That was their goal.  They got Fab-1 to the point where they were producing batteries for the U.S. Army, important batteries.  They sent out qualification samples.

And then in October -- which was the date I didn't even hear Mr. Baker try all that hard to defend the October date -- in October, Enovix says, We are shutting Fab-1 down.  We are going to change it to an R&D facility.  We are going to re-focus entirely on Fab-2.  But that was exactly what the market expected.

So, there's a quote in the slides from TD calling one of the analysts.  And they say, Oh, this is exactly what we expected.  This was always the plan once Enovix met its goals.  Other analysts said, Terrific, they got to 60 percent yield even faster than we expected them to.  So, that's what happened in October.

And, of course, analysts did not reduce their projected

revenues at all because they already understood that this was the plan for Fab-1. In January -- January, you know, it was an unusual disclosure. It was a fireside chat that the chairman of the board did with investors with a long slide deck with some pictures from Rocky, but what he disclosed was a lot of detail. And, you know, it was meant to convey the understanding to investors, I'm at the helm now. I'm going to make sure that we do everything we can to try to make these batteries as quickly as we can.

The information that he provided was consistent with the information that the market already understood from November, which was that Fab-1 wasn't going to operate at commercial scale.

So, for those reasons, the 2023 disclosures don't provide any new and value relevant information to the market really even about what Fab-1 is doing and certainly not about early stage testing of this one zone when that equipment was back in China in 2021. They just don't say anything about that.

I heard Mr. Baker say, Well, in January, he mentioned an airplane and there was some talk about, you know, how they were going to do testing in the future. None of that disclosed anything in particular about the Yinghe equipment.

I mean, when you read through the slides -- and we have provided them with my declaration so that Your Honor has them in full. When you read through the slides, Yinghe is not

mentioned anywhere.  The only mention of zone 3, which is the only place where the Yinghe equipment was, says we are doing almost nothing to change zone 3 for Fab-2.

Orally, Mr. Rodgers said, Making almost no changes to zone 3.  He said, zone 2 we have got issues.  We have to do major redesign work in zone 2.  We have to make that more automated.  That's holding us up in ordering our Fab-2 equipment.

So, that's the story with 2023.  I think between those two -- two separate price impact issues, the completeness match for all of the dates and the lack of any new value relevant information for the 2023 dates, that really takes care of everything that --

**THE COURT:**  Did the Yinghe equipment ever work?

**MS. KAPUR:**  Did it ever work?  I think -- well, it certainly got to the stage that it, along with the other zones, was able to support Fab-1 in getting to 60 percent yield.  So, that required all of the zones to work together to get to that stage.

I'm not sure if there is -- frankly, I don't know if I have seen evidence that specifically answers the question.  Sort of what was the maximum capacity that it got to?  I would have to come back to Your Honor with that evidence.  But we haven't seen anything indicating that the Yinghe equipment was the bottleneck for Fab-1 as opposed to zone 2.  And, you know,

if zone 2 is the bottleneck, it sort of doesn't really matter where the Yinghe equipment is.

**THE COURT:** Okay. Thank you. Mr. Baker.

**MR. BAKER:** I will try to briefly respond. I understand we are short on time.

**THE COURT:** Please.

**MR. BAKER:** So, just a few points. These arguments, the vast bulk of the arguments that you just heard are not for class certification. They don't have to do with price impact. These are disaggregating the effects of zone 2 versus zone 3. These are loss causation arguments for summary judgment.

All Plaintiffs -- Plaintiffs don't have to make a showing here. It is Defendants that have to show there can be no connection -- there is no connection between the two. We have shown there is.

As my colleague -- excuse me -- as Ms. Kapur had said earlier, there were some assertions that -- in the papers certainly that we had been changing our theory and that things were evolving; that we are somehow changing things around entirely. That's not true at all.

In our reply brief we quote the Court's own opinion from the motion to dismiss. The theory of the case is that Enovix's decision to rush the Yinghe manufacturing equipment to Fremont before it passed the FAT was the first step in a chain of events that led to the equipment's continued failure to perform

and the company's ultimate decision to abandon manufacturing in October of 2023.

This has been the same theory the whole time.  These are questions of how much of that is debatable to zone 2 versus zone 3.  We submit that we have shown a connection between them, and Defendants have not conclusively proven that the Yinghe equipment had nothing to do with these Fab-1s.

When we get to loss causation and summary judgment stage, then it will be our burden to show evidence showing how much of this is attributable to the Yinghe equipment but they have not shown that there is not connection whatsoever.

Very briefly with the point about the analyst estimates and this chart that they have put together, if you look at the actual data from that -- which Dr. Tabak explains in his reply report, which are paragraphs 28 and 29 -- he shows that, yes, the analyst estimates for revenue had decreased significantly after November '22, but then they also decreased even more by October 2023.  So, by that same metric, it shows that there was still new information about the ability of Fab-1 to produce commercial batteries and to produce sales.

So, that shows that even by the same metric, there was additional information that was revealed at that point.  And it also goes to the point of if it was all good and expected news on October 2023 when this was announced, why did the stock price fall 13 percent?  Because it wasn't all good news.  This

showed that Fab-1 was kaput from commercial production perspective and it was at -- whatever little hopes there might have still been were completely gone at that point.

And really the central theme of this is that there is this connection that was alleged that is attributed to Yinghe equipment from the same consistent theory we have alleged this entire time.

And at summary judgment, we'd be happy to submit the evidence showing how much exactly.  But if we are talking about how much is attributable, that is not what the price impact inquiry is.

**THE COURT:**  All right.  Thank you.  Thank you, both. The matter is submitted and I will get back to you.

**MS. KAPUR:**  Thank you, Your Honor.

**MR. BAKER:**  Thank you, Your Honor.

(Proceedings adjourned at 10:50 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    March 16, 2026




_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter