UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ENOVIX CORPORATION SECURITIES LITIGATION | Case No. 23-cv-00071-SI<br><br>**ORDER DENYING MOTION FOR CLASS CERTIFICATION**<br>Re: Dkt. No. 201 |

On March 13, 2026, the Court held a hearing on plaintiffs' motion for class certification. Plaintiffs seek to certify a class of investors "consisting of all persons and entities that purchased the publicly traded common stock of Enovix between August 11, 2021 and October 2, 2023, . . . and were damaged thereby[.]" Dkt. No. 201 at 1-2. For the reasons set forth below, the Court denies the motion.

**BACKGROUND**

**I.      Factual Background[1]**

According to the second amended complaint, "Enovix is an early-stage technology company that purports to make a new type of lithium-ion ('Li-ion') battery that is smaller and stronger than conventional Li-ion batteries." Dkt. No. 102 (SAC) ¶ 2. Based in Fremont, California, Enovix has been developing its technology since 2007. *Id.* ¶ 75. In 2012, Enovix began "work on the manufacturing approach[.]" *Id.* Between 2012 and 2017, the company "could produce small

---

[1] The Court has issued two rulings on motions to dismiss as well as a ruling on a motion for partial judgment on the pleadings. *See* Dkt. Nos. 97, 116, 193. In this Order, the Court recites only those facts relevant to the present motion.

United States District Court
Northern District of California

quantities of Li-ion batteries to provide to potential customers as samples, but not at commercially viable levels." *Id.*

In early 2020, Enovix started the process of procuring custom manufacturing equipment for its first production factory, "Fab-1," to be located in Fremont. *Id.* ¶ 5. Enovix outsourced "the development and production of a large portion of the Fab-1 equipment" to Shenzhen Yinghe Technology Co. Ltd. (Yinghe) in China. *Id.* Enovix had an "Equipment Procurement Review" in place to govern the procurement of the equipment from Yinghe. *Id.* ¶ 6. This document included "requirements that the equipment pass critical quality tests before Enovix accepted delivery[,]" including that the equipment had to pass a "Factory Acceptance Test." *Id.* ¶¶ 6-7.

According to the SAC, "two key quality control tests" are known as the "Factory Acceptance Test" (FAT) and "Site Acceptance Test" (SAT). *Id.* ¶ 85. "The FAT is performed offsite at the equipment vendor's factory to make sure that the equipment is designed properly, functions correctly, and meets the customer's specifications. To conduct the FAT, the new manufacturing equipment is set up at the vendor's factory and tested in accordance with a detailed plan agreed upon by the purchaser and the equipment vendor." *Id.* ¶ 86. "The SAT is the next critical quality control procedure[,]" and takes place once the manufacturing equipment has been installed on site at the customer's facility. *Id.* ¶¶ 91-92. "To conduct the SAT, the equipment vendor sends representatives—typically the same engineers who designed the system and conducted the FAT— to install the equipment, configure it, conduct tests, and verify that the equipment operates correctly." *Id.* ¶ 92.

"[A]round November and December 2020, with 3 or 4 iterations of testing spaced half a month to a month apart[,]" the first FAT for the Yinghe-made Fab-1 equipment took place. *Id.* ¶ 9. The equipment failed the FAT. *Id.* Yinghe continued working on the equipment and kept testing for months, to no avail. *Id.* ¶ 10. Yinghe conducted the final FAT in April 2021, and "the equipment failed yet again." *Id.* The SAC alleges, "Due to Covid-19-related travel restrictions in late 2020 and early 2021, Enovix's engineers were never permitted to travel to China to participate in the FAT." *Id.* ¶ 8.

Meanwhile, in February 2021, Enovix announced its plans to go public by merging with

Rodgers Silicon Valley Acquisition Corp. ("RSVAC"), "a public special purpose acquisition company known as a 'SPAC' or 'blank check' company . . . whose lone stated purpose is to acquire a private company." *Id.* ¶¶ 3, 59, 64.

According to the SAC, in April 2021 "Defendants Rust and Rodgers decided to secretly waive the requirement that the equipment pass the FAT and had it airlifted to Fremont."[2] *Id.* ¶ 105. ". . . Rust called Rodgers and proposed to fly the Yinghe equipment from China to Fremont to avoid a potential three-month delay due to global shipping backlogs[.]" *Id.* Rodgers approved the plan. *Id.* They "planned to 'catch up later' with continued improvement efforts and testing after installing the equipment in Fremont. They spent $1.4 million to prematurely fly over the equipment so they could tell investors that the Fab-1 equipment had arrived and was installed as the critical Merger [with RSVAC] was awaiting shareholder approval." *Id.* ¶ 11.

On June 24, 2021, the Company issued a "Proxy Statement and Prospectus," soliciting shareholder approval of Enovix's merger with Rodgers Silicon Valley Acquisition Corp. *Id.* ¶ 65. The Company filed the Proxy Statement with the Securities and Exchange Commission on Form 424B3 the same day. *Id.* On July 14, 2021, the merger closed. *Id.* ¶ 69.

In the meantime, once the Yinghe equipment came to Fremont in late April 2021, Enovix's engineers installed the equipment at Fab-1 without the assistance of Yinghe's engineers. *Id.* ¶¶ 12, 106. Plaintiffs allege that "Enovix's engineers struggled for months to get the Fab-1 equipment operating at full capacity, but their efforts failed. Eventually the Company agreed to pay for Yinghe's engineers to travel to California and help work on and test the equipment. They fared no better." *Id.* ¶ 13. According to Former Employee 2, Yinghe's staff stayed in the United States for almost a year, from fall 2021 until September 2022. *Id.* ¶ 112. Even with a year of combined efforts, the equipment still never passed the SAT. *Id.* ¶ 124.

The SAC alleges, "In the second half of 2022, Enovix began to gradually reveal that the continued setbacks to the Fab-1 manufacturing equipment not only delayed the Company's goal of recognizing material product revenue by Q2 2022, but also pushed back the development of

---

[2] Harrold Rust was a co-founder and former CEO of Enovix. SAC ¶ 11. Thurman J. Rodgers was the RSVAC CEO and Chairman and became Enovix's Chairman post-merger. *Id.*

United States District Court
Northern District of California

Enovix's next generation of manufacturing equipment, which had been expected to build upon the original Fab-1 line's success." *Id.* ¶ 156. By June 2022, the Fab-1 equipment was producing less than 10% of the expected production rate. *Id.* ¶ 14. By December 2022, the production had increased to about 100 UPH, or less than 20% of the expected rate. *Id.* ¶¶ 14, 170.

The SAC alleges that disclosures made on November 1, 2022; January 3, 2023; and October 3, 2023, caused the share price to fall, harming investors.

On November 1, 2022, after the close of trading, Enovix released a "Letter to Our Shareholders," reporting that Enovix realized just $8,000 in revenue for Q3 2022. *Id.* ¶ 160. The letter stated that Enovix "would be 'dialing back' its work on improving the 'Gen1' lines at Fab-1 in favor of shifting its focus to its future 'Gen2' lines . . . because the supposed 'improvements' to Fab-1 that they had vaguely alluded to previously were not having the desired results. Consequently, Enovix 'anticipate[d] achieving lower overall output from Fab-1 in 2023.'" *Id.* ¶ 17. The letter stated that the total production run rate for 2023 would be under one million battery cells, which, according to plaintiffs, was "less than 10% of the production it said would result from producing a battery every two seconds[.]" *Id.* ¶ 162. Plaintiffs further allege that "the November 1, 2022 letter did not fully reveal to the market the extent of the undisclosed risks: the Company's continuing failure to achieve anywhere close to commercial production capacity and quality with its long-touted Fab-1 equipment." *Id.* ¶ 167.

On November 7, 2022, Enovix announced that defendant Rodgers, previously Chairman of the Board, would become Executive Chairman of Enovix. *Id.* ¶¶ 39, 168. That day, Rodgers released a statement, stating, "We have poorly communicated on the status of Fab-1." *Id.* ¶ 168. Rodgers explained that the decision to charter the world's largest airplane to fly the manufacturing equipment from China "violated our sacred Equipment Procurement Review (EPR) specification by waiving a key milestone called Factory Acceptance Test (FAT), which required that a team of Enovix engineers fly to multiple Chinese factories, and personally observe each piece of Fab-1 equipment running at full speed before we approved shipment. But those factories stopped receiving guests due to COVID, and we decided to waive the FAT milestone and catch up later." *Id.*

Rodgers went on to state,

4

> The catch up would have occurred at the Site Acceptance Test (SAT) milestone, which required their engineers to come to Enovix to demonstrate full functionality, but the equipment vendors were not allowed to travel and we installed our equipment with our employees and local contractors. We are still paying for the months we gained and then gave back due to equipment problems.

*Id.* On November 10, 2022, Enovix announced it would bring in Ajay Marathe as Chief Operating Officer. *Id.* ¶ 173. On December 29, 2022, Enovix announced defendant Rust would "retire" from his role as President and CEO and as a member of the Board of Directors. *Id.* ¶ 174. Enovix replaced Rust that same day. *Id.*

On January 3, 2023, after the close of trading, defendant Rodgers hosted a special presentation for shareholders. *Id.* ¶ 175. Addressing concerns about the "lack of clear and transparent investor communications" concerning Fab-1, Rodgers stated, "I think they were reasonably misled." *Id.* ¶ 20. Regarding the first production line at Fab-1, Rodgers explained that the line "is nonfunctional for [sic] automation point of view. That means its rated capacity of 550 UPH is really more like 100, and obviously, that wreaks havoc with output and promises." *Id.* Rodgers went on to state that the second production line was only half built. *Id.* ¶ 177. Rodgers explained that "we didn't want to commit to the second half of the Line 2, until Line 1 worked." *Id.* Rodgers went on to provide more detail about the output issues at Fab-1. For instance, regarding one piece of equipment that was rated to 550UPH, Rodgers stated, "[W]e don't think that machine if we worked on it forever would be over 200[.]" *Id.* ¶ 178. Rodgers stated that Fab-1 was "doing less than 10% of what it should be doing." *Id.*

On the January 3, 2023 call, Rodgers also announced further delays to the Gen2 manufacturing lines, which the complaint states "could be traced back to the problems with Fab-1 and its 'Gen1' production lines[.]" *Id.* ¶ 179. Rodgers stated the buildout of the Gen2 lines would be delayed by several months, to the end of 2023 or beginning of 2024. *Id.* ¶ 180.

On October 3, 2023, Enovix announced that it was abandoning commercial production operations at Fab-1 altogether, laying off 185 workers and writing off the value of $36 million of Fab-1 equipment. *Id.* ¶¶ 189, 191.

United States District Court
Northern District of California

5

## II.    Procedural Background

On January 6, 2023, plaintiff Maurice Twitchell filed suit on behalf of a putative class of investors who purchased or otherwise acquired Enovix or RSVAC common stock from February 22, 2021, through January 3, 2023.  Dkt. No. 1 at 2.   Following appointment of co-lead plaintiffs and plaintiff counsel, Dkt. No. 68, plaintiffs filed the Consolidated Class Action Complaint, amending the Class Period to June 24, 2021, through January 3, 2023.  Dkt. No. 84.  Plaintiffs brought their action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) promulgated thereunder by the Securities and Exchange Commission.  The consolidated complaint rested on the factual theory that Enovix waived the FAT and SAT altogether and conducted no testing of the equipment at all.  *See* Dkt. No. 97 at 15 (citing Consolidated Compl. ¶¶ 101, 115, 117).

Defendants moved to dismiss.  On January 30, 2024, the Court issued an Order granting the motion to dismiss, with leave to amend.  Dkt. No. 97.  The Court found the consolidated complaint "suffer[ed] from a lack of particularity, especially with regard to the timing of events.  As such, the allegations neither create[d] a reasonable inference that the statements were false or misleading at the time they were made, nor [did] they give rise to a strong inference of scienter." *Id.* at 14.

On March 19, 2024, plaintiffs filed the SAC, which is the operative complaint.  Dkt. No. 102.  The SAC amended the Class Period to June 24, 2021, through October 2, 2023. *See id.* ¶ 1. As described above, the SAC modified plaintiffs' theory, no longer asserting that testing was waived altogether but instead asserting that extensive testing took place—in China and in Fremont—over a period of many months, but that the equipment never passed the tests either at the FAT stage or at the SAT stage.

Defendants again moved to dismiss.  On July 23, 2024, the Court issued an order granting in part and denying in part the motion to dismiss.  Dkt. No. 116 ("MTD SAC Order").  The Court allowed the claims in the SAC to proceed with regard to Statements 4, 6, and 7, finding plaintiffs had adequately alleged the elements of a Section 10(b) claim as to those statements.  The order stated, in relevant part:

United States District Court
Northern District of California

…under the new allegations of the SAC, the Court finds plaintiffs have now alleged with particularity that Enovix brought the Fab-1 equipment to California without it ever having passed the FAT. Because the FAT by definition is to be conducted *at the vendor's factory*, SAC ¶ 86, by the time the equipment arrived in California in late April 2021, there was no way for the equipment to pass the FAT at that point.

Accordingly, the Court finds that statements made after April 2021 that implied the Fab-1 equipment had passed the FAT were false or misleading.

*Id.* at 11-12. The Court found plaintiffs had failed to sufficiently plead the necessary elements for the remaining alleged nine misstatements.

Discovery proceeded in this case, and defendants had a change in counsel. Plaintiffs filed a motion for class certification, Dkt. No. 162, for which briefing was suspended after defendants moved for partial judgment on the pleadings as to Statement 6 and 7, Dkt. No. 175. Dkt. No. 179. On October 7, 2025, the Court granted defendants' motion. Dkt. No. 193 ("MJOP Order").

This left Statement 4 as the only alleged false or misleading statement in the case. The relevant excerpt from the Court's ruling on the motion to dismiss the SAC explains Statement 4 as follows:

- **Statement 4** (August 10, 2021 "Letter to Our Shareholders"):

  In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …

  With the equipment for Line 1 installed, our factory is now undergoing qualification. <u>The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery.</u> …

  SAC ¶ 138.[] The Court agrees with plaintiffs that, if the equipment never passed the FAT, it was false and misleading for Enovix to state that the site acceptance test would "confirm" the equipment was meeting performance requirements and to state that the FAT was "already performed" without revealing that the equipment had failed the FAT.

MTD SAC Order at 12.

At a case management conference shortly thereafter, the Court ordered plaintiffs to re-file their class certification motion and set a new briefing schedule. Dkt. No. 196. The Court explained

that "the sensible thing to do is to refile the class certification motion limited to the things that are now in the case[.]" Dkt. No. 199 (Tr.) at 3:23-25.

Plaintiffs move for class certification under Federal Rule of Civil Procedure 23(a) and (b)(3). Dkt. No. 201 (Mot.). They seek to certify a class of investors "consisting of all persons and entities that purchased the publicly traded common stock of Enovix between August 11, 2021 and October 2, 2023, . . . and were damaged thereby[.]" *Id.* at 1-2. They ask that co-lead plaintiffs Discovery Global Opportunity Master Fund Ltd. and Discovery Nymeria Master Fund, Ltd. (collectively, "Discovery Funds") and Gary Kung be appointed as class representatives, along with plaintiffs Robert G. Lee and Traci Selke. They also ask the Court to appoint the Rosen Law Firm, P.A. and Rolnick Kramer Sadighi LLP as class counsel under Rule 23(g).

Defendants raise three main arguments in opposition to plaintiffs' motion. First, they argue that plaintiffs cannot satisfy the predominance element of Rule 23(b)(3) because plaintiffs are not entitled to the *Basic* presumption of reliance. *See* Dkt. No. 208 (Opp'n) at 10; *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Defendants seek to rebut the *Basic* presumption through evidence that Statement 4 had no price impact. Next, defendants argue that plaintiffs fail to show predominance because they have not established that damages are capable of measurement on a classwide basis, attacking the methodology employed by plaintiffs' expert, Dr. David Tabak. Finally, defendants argue that the proposed class representatives are not adequate representatives or "typical" of the class for myriad reasons.

The Court granted the parties leave to extend the briefing schedule and permitted defendants to file a sur-reply. Dkt. Nos. 213, 217. This matter came on for hearing on March 13, 2026.

## LEGAL STANDARDS

### I.      Class Certification

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs bear the burden of showing they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1067 (9th Cir. 2014) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001)). "[P]laintiffs

must prove the facts necessary to carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of the evidence." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) (en banc). In carrying their burden at the class certification stage, "plaintiffs may use any admissible evidence." *Id.* (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 454-55 (2016)).

The Court's "class certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 465-66 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011) (internal quotation marks omitted)). These analytical principles govern Rule 23(a) and (b). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether Rule 23 prerequisites for class certification are satisfied." *Id.*

Under Rule 23(a), the class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact exist that are common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a). A plaintiff must also establish that one or more of the grounds for maintaining the suit are met under Rule 23(b): (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. *See* Fed. R. Civ. P. 23(b).

More specifically, Rule 23(b)(3) permits a class action to be maintained if Rule 23(a) is satisfied and if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

9

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

## II. *Basic* Presumption of Reliance

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Halliburton II*"). As the Supreme Court has stated:

> Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action. The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b–5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809-10 (2011) ("*Halliburton I*") (internal quotation marks and citations omitted).

At issue here is the element of reliance. So-named after the Supreme Court's decision in *Basic Inc. v. Levinson*, "[t]he *Basic* presumption is premised on the theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 117 (2021). "When the presumption applies, investors do not need to demonstrate individual reliance" for class certification purposes. *Pardi v. Tricida, Inc.*, No. 21-cv-00076-HSG, 2024 WL 4336627, at *5 (N.D. Cal. Sept. 27, 2024) (citing *Basic*, 485 U.S. at 241-47). "[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277-78. With the exception of materiality, plaintiffs seeking to certify a class "must prove the *Basic* prerequisites before class certification[.]" *Goldman*, 594 U.S. at 119

10

(citing *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455 (2013)).

The *Basic* presumption is a rebuttable one. "The defendant may . . . rebut the presumption through '[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price.'" *Goldman*, 594 U.S. at 118 (quoting *Basic*, 485 U.S. at 248). This includes "by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Halliburton II*, 573 U.S. at 263-64. The Supreme Court has held that, although plaintiffs need not prove price impact in order to invoke the *Basic* presumption, "defendants should at least be allowed to defeat the presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price." *Id.* at 278-79. This evidence may include "direct as well as indirect price impact evidence." *Id.* at 283. "[C]ourts 'should be open to *all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" *Goldman*, 594 U.S. at 122 (citations omitted). At the class certification stage, the defendant bears the burden of persuasion to prove a lack of price impact by a preponderance of the evidence. *Id.* at 126.

## DISCUSSION

Defendants seek to rebut the *Basic* presumption of reliance by showing a lack of price impact. Defendants argue that there was no "front-end" price impact because the only alleged misstatement remaining in the case (Statement 4) created no increase in Enovix stock price. They also argue there was no "back-end" price impact because none of the three corrective disclosures identified in the SAC "match" the alleged truth and that "the second and third corrective disclosures provided no new value-relevant information regarding the alleged truth." Opp'n at 10-11.

Plaintiffs counter that they need not show a "front-end" price impact because they are proceeding on an inflation-maintenance theory. Dkt. No. 214 ("Reply") at 1 n.3. They also argue that there is a sufficient "match" between the alleged truth and the three corrective disclosures and that defendants have misunderstood plaintiffs' theory of the case. Plaintiffs state that "this case is about Defendants' concealment of the fact that its Fab-1 battery manufacturing line was not

11

commercially viable because the Yinghe-supplied part of that line was unable to produce batteries at commercial scale" and that the truth was revealed in a series of disclosures on November 1, 2022, in January 2023, and in October 2023. *Id.* at 1. Plaintiffs argue, therefore, that defendants have failed to "'sever the link' between a misrepresentation and the price paid by the plaintiff" and that plaintiffs are therefore entitled to the *Basic* presumption of reliance. *See id.* at 3 (quoting *Pardi*, 2024 WL 4336627, at *8).

## I.    Inflation Maintenance Theory

In their reply brief, plaintiffs state that they are proceeding on an inflation maintenance theory. Reply at 1 n.3. Under the inflation-maintenance theory, "price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'" *Goldman*, 594 U.S. at 123 (quoting *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015)). As the Supreme Court has explained, "Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation." *Id.* (citations omitted).

Here, plaintiffs do not allege that Statement 4 artificially increased Enovix's stock price. Defendants' expert Christopher James opines that the residual return on the trading day following the August 10, 2021 alleged misstatement was not "statistically significant[.]" *See* Dkt. No. 208-2, Kapur Decl., Ex. 1 (James Rep.) ¶ 36. Plaintiffs do not dispute this.

## II.    Mismatch Framework under *Goldman*

In *Goldman*, the Supreme Court held that courts must consider the generic nature of a misrepresentation in deciding the price impact question at class certification, "particularly in cases proceeding under the inflation-maintenance theory." 594 U.S. at 123. As articulated:

> . . . that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure. That

may occur when the earlier misrepresentation is generic (e.g., "we have faith in our business model") and the later corrective disclosure is specific (e.g., "our fourth quarter earnings did not meet expectations"). Under those circumstances, it is less likely that the specific disclosure actually corrected the generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop.

*Id.* The question "whether there is a basis to infer that the back-end price equals front-end inflation . . . is a different question than loss causation, and, in light of *Goldman*, requires a closer fit (even if not precise) between the front- and back-end statements." *Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 99 n.11 (2d Cir. 2023) ("*Goldman II*"). As the Second Circuit has observed, "*Goldman*'s mismatch framework requires careful trekking: district courts must analyze the price impact issue without drawing what might appear to be obvious conclusions for off-limits merits questions such as materiality." *Id.* at 81.

Following *Goldman*, the district court in *In re FibroGen Securities Litigation* explained, "[R]evelations that are not 'corrective' cannot form the basis for a corrective disclosure." No. 21-cv-2623-EMC, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024). Some courts in this district have thus analyzed corrective disclosures, where the defendant seeks to rebut the *Basic* presumption at class certification, using the following rubric: "A finding of 'back-end' price impact requires proof that the information disclosed [on the date of the corrective disclosure] was (i) corrective of one or more prior false statements or omissions, (ii) new (unknown to the market prior to [the date of the corrective disclosure], and (iii) 'value relevant' (i.e., caused at least some of the stock price decline)." *Id.* (citing *Goldman*, 594 U.S. at 123; *Basic*, 485 U.S. at 238, 248); *Pardi*, 2024 WL 4336627, at *7 (applying *FibroGen* factors in inflation-maintenance case).

### A.    Statement 4

To identify whether there is a mismatch, the Court first examines the alleged misrepresentation. The Court agrees with defendants that plaintiffs' reply brief is an attempt to "move the goalposts." *See* Dkt. No. 218 ("Sur-Reply") at 1. After multiple complaint amendments, and rulings on two motions to dismiss and a motion for partial judgment on the pleadings, the sole remaining alleged misstatement in the case is Statement 4. This statement is contained in the August

10, 2021 "Letter to Our Shareholders":

> In the quarter we were able to install and begin qualifying our first production line at our headquarters in Fremont. …
>
> With the equipment for Line 1 installed, our factory is now undergoing qualification. <u>The first step in this process is a site acceptance test to confirm the individual pieces of equipment are meeting performance requirements. This follows factory acceptance testing already performed at the vendor's facility before taking delivery.</u> …

SAC ¶ 138 (alleged misstatement underlined). As stated in the Court's prior order, "if the equipment never passed the FAT, it was false and misleading for Enovix to state that the site acceptance test would 'confirm' the equipment was meeting performance requirements and to state that the FAT was 'already performed' without revealing that the equipment had failed the FAT." MTD SAC Order at 12. The Court's scienter analysis also focused entirely on the failure of the Yinghe equipment to pass the FAT by April 2021, which is when Enovix executives decided to waive the FAT and fly the Yinghe equipment to Fremont. *See id.* at 20-22.

Plaintiffs' reply brief now frames Statement 4 as concealing the truth "that the Yinghe equipment *was substantively incapable of passing the FAT*, which posed a material risk to Fab-1's ability to achieve commercial production." *See* Reply at 2; *see also id.* at 1 (arguing that "this case is about Defendants' concealment of the fact that its Fab-1 battery manufacturing line was not commercially viable because the Yinghe-supplied part of that line was unable to produce batteries at commercial scale"). But nothing in the SAC or in the Court's prior orders sustains the broader theory that plaintiffs now assert. For instance, there are no allegations in the SAC that defendants knew when Statement 4 issued that the Yinghe equipment would never operate at commercially viable levels. Likewise, plaintiffs' declarations summarize the SAC as alleging that Enovix waived the passage of the FAT, rather than as claiming that Enovix knew early on that its manufacturing equipment would never function. *See* Dkt. No. 201-6 (Schreck Decl.) ¶ 11; Dkt. No. 201-7 (Kung Decl.) ¶ 9; Dkt. No. 201-8 (Lee Decl.) ¶ 8; Dkt. No. 201-9 (Selke Decl.) ¶ 8.

In support of their argument for a broader reading of Statement 4, plaintiffs point to this Court's prior ruling on loss causation at the motion to dismiss stage. *See* Reply at 4 (quoting MTD

14

SAC Order at 23). There, in finding that plaintiffs had sufficiently alleged loss causation at the pleading stage, the Court stated, "Plaintiffs' theory of the case is that Enovix's decision to rush the Yinghe manufacturing equipment to Fremont before it passed the FAT was the first step in a chain of events that led to the equipment's continued failure to perform and the company's ultimate decision in October 2023 to abandon manufacturing efforts at Fab-1." MTD SAC Order at 23. But plaintiffs conflate loss causation at the pleading stage and reliance at the class certification stage, an error the Supreme Court cautioned against in *Halliburton I*. There, the Supreme Court explained, "Loss causation addresses a matter different from whether an investor relied on a misrepresentation, presumptively or otherwise, when buying or selling a stock." *Halliburton I*, 563 U.S. at 812. The Court went on:

> The fact that a subsequent loss may have been caused by factors other than the revelation of a misrepresentation has nothing to do with whether an investor relied on the misrepresentation in the first place, either directly or presumptively through the fraud-on-the-market theory. Loss causation has no logical connection to the facts necessary to establish the efficient market predicate to the fraud-on-the-market theory.

*Halliburton I*, 563 U.S. at 813. In short, the Court's prior articulation of plaintiffs' theory of loss causation does not alter that Statement 4, which this Court now analyzes for investor reliance purposes, centers on the Yinghe equipment's failure to pass the FAT.

In sum, the only remaining misstatement in this case is the one that implied the Yinghe equipment had passed the FAT when it had not. This is the misstatement that the Court will analyze in determining whether there is a substantive "mismatch" between the alleged misstatement and the corrective disclosures.

### B.    Mismatch with the Corrective Disclosures

In *Goldman*, the Supreme Court made two holdings. First, the Court held that, at the class certification stage, "the generic nature of a misrepresentation often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory." 594 U.S. at 123. Second, the Court held that the defendant bears the burden of persuasion to prove a lack of price impact by a preponderance of the evidence. *Id.* at 126. At issue in *Goldman* was

whether Goldman Sachs had "maintained an artificially inflated stock price by making generic statements about its ability to manage conflicts—for example, 'We have extensive procedures and controls that are designed to identify and address conflicts of interest.'" *Id.* at 116.

After the Supreme Court's opinion in *Goldman*, and following further proceedings upon remand, the Second Circuit vacated the district court's certification of the class, finding there was "an insufficient link between the corrective disclosures and the alleged misrepresentations." *Goldman II*, 77 F.4th at 105. The Second Circuit distinguished *Goldman* from another case (*Waggoner*) that "presented a tight fit between corrective disclosure and misrepresentation: the NYAG Complaint targeted the same trading platform discussed by Barclays in their misleading statements, and took aim at *the same or similar statements* underlying the claims subsequently pressed by plaintiffs in *Waggoner*, alleging that those statements were false or misleading." *Id.* at 97 (citing *Waggoner v. Barclays PLC*, 875 F.3d 79, 87-88 (2d Cir. 2017)). The Second Circuit also compared the mismatch in *Goldman* to another inflation-maintenance case (*Vivendi*) in which certain corrective disclosures "did not expressly recant" the earlier statements. *Id.* at 98 (discussing *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 237 (2d Cir. 2016)). In concluding that even the latter, less-than-perfect match was still permissible under *Goldman*, the Second Circuit explained in dicta, "[T]here can be little doubt that even those corrective disclosures" that did not expressly recant the earlier statements regarding the company's comfortable cash situation "directly rendered false the company's affirmative representations." *Id.* Still, the Second Circuit cautioned courts going forward that "*Goldman* requires that any gap between the front- and back-end statements as written be limited." *Id.* at 99.

The Court now turns to the three corrective disclosures that the SAC identifies.[3] All of the corrective disclosures relate to the performance of the Fab-1 factory overall rather than to the Yinghe equipment specifically. To summarize, plaintiffs allege that the truth "finally began to come to light" on November 1, 2022, when a quarterly shareholder letter revealed that Enovix realized just $8,000 in revenue in the prior quarter. *See* SAC ¶ 17. The letter further stated that Enovix "would

---

[3] These disclosures are described in greater detail in the "Factual Background" section above.

be 'dialing back' its work on improving the 'Gen1' lines at Fab-1 in favor of shifting its focus to its future 'Gen2' lines" and that Enovix therefore "anticipate[d] achieving lower overall output from Fab-1 in 2023." *Id.* ¶ 160. On January 3, 2023, defendant Rodgers acknowledged the "'lack of clear and transparent investor communications' concerning Fab-1" and that, "[b]y my math, Fab-1 is doing less than 10% of what it should be doing." *Id.* ¶¶ 175-178. Rodgers also announced delays to the buildout of the Gen2 lines, which "could be traced back to the problems with Fab-1 and its 'Gen1' production lines." *Id.* ¶¶ 179-180. On October 3, 2023, Enovix announced it was abandoning commercial production operations at Fab-1 altogether. *Id.* ¶ 189.

The Court finds there is a "mismatch" between the alleged misstatement and the identified corrective disclosures. As discussed above, Statement 4 concerned defendants' failure to reveal that the Yinghe equipment had not passed the FAT. The later "corrective" disclosures do not match the misstatement because the disclosures are about the failure of Fab-1 broadly speaking and not about the Yinghe equipment specifically.

It is undisputed that Yinghe did not supply all of the equipment for Fab-1. When defendants moved for partial judgment on the pleadings, they asked the Court to incorporate by reference the full documents that appeared in excerpt format in the SAC. Having reviewed the full context of the documents referenced in the SAC, the Court concluded, "What has become clearer with the full context is that not every reference to 'equipment' by defendants was a reference to the Yinghe equipment." MJOP Order at 11. The SAC alleged that "the production of a large portion of the Fab-1 equipment, the critical areas of the production lines used for battery Assembly and Packaging, were outsourced to Yinghe." *See* SAC ¶ 97. But other parts of the manufacturing equipment were not from Yinghe. For instance, the June 24, 2021 Proxy Statement stated that about 30% of the battery manufacturing equipment came from Enovix's own "proprietary tools." *See* Dkt. No. 175-3 (Proxy Statement and Prospectus) at 200/482; *see also* James Rep. ¶ 35 (quoting July 7, 2021 analyst coverage that Enovix had "30% proprietary/70% industry-standard equipment"). Additionally, as the SAC alleges and defendants agree, "[t]he Fab-1 production lines comprised of four 'areas' where different parts of the battery manufacturing process would take place: Electrode Fabrication, Assembly, Packaging, and Testing and Formation." *See* SAC ¶ 96. Defendants attach

United States District Court
Northern District of California

internal documents to their opposition brief showing that Yinghe supplied the equipment for the third "area" or "zone"—battery packaging. Dkt. No. 208-6, Kapur Decl., Ex. 5 (internal Enovix slide deck) at Slides 6-12. This is not entirely consistent with what plaintiffs allege in the SAC, which is that Yinghe supplied the equipment for *two* of the four zones, assembly and packaging. *See* SAC ¶ 96. Regardless, there is no dispute that Yinghe did not supply the equipment for all four manufacturing zones at Fab-1; that Enovix proprietary equipment (rather than equipment procured from an outside vendor) comprised about 30% of the equipment; and that "[e]ach of the [manufacturing] areas were critical to complete the manufacturing process, such that all of the production areas must be running at full speed in order for Fab-1 to produce quality batteries at the specified rates."[4] *See id.* The Court further notes the allegation in the SAC that "FE7 recalled that every area of Fab-1, not just the lines from Yinghe, had problems. 'They had trouble in all the areas,' noted FE7, particularly the Electrode Fabrication, Assembly, and Packaging areas, which were all failing to produce batteries that met specifications and passed quality tests." SAC ¶ 121.

Applying the rubric laid out by the district court in *FibroGen*, this Court would reach the same conclusion. *FibroGen* analyzed whether a corrective disclosure was indeed "corrective," whether it contained "new" information, and whether the information was "value-relevant." *In re FibroGen*, 2024 WL 1064665, at *12. The disclosures here fail the *FibroGen* test because none are "corrective" of Statement 4. The November 1, 2022 shareholder letter revealed that the company made only $8,000 in revenue the prior quarter and that, due to a "wide gap in expected performance between our Gen1 and Gen2 and the slower-than-expected improvements on our Gen1 manufacturing equipment[,]" the company would be "dialing back Gen1 throughput enhancement activities and anticipate[d] achieving lower overall output from Fab-1 in 2023 in favor of focusing on the Gen2 Autoline, which is the engine for our future scaling." SAC ¶ 161 (emphases removed). Thus, the November 1, 2022 letter said nothing about the Yinghe equipment or about the waiver of or failure of the FAT for that equipment.

---

[4] Whether Yinghe supplied the equipment for one out of four or two of four manufacturing zones is the subject of heated debate in the parties' post-hearing, unsolicited letter briefs to the Court. *See* Dkt. Nos. 226, 227, 230, 232. The Court addresses those letter briefs in a separate order.

Nor did the subsequent January and October 2023 disclosures provide "new" or "value-relevant" information to the market, at least with respect to Statement 4. The January 3, 2023 disclosure "provided more information on the first production line at Fab-1 and its disappointing output[.]" SAC ¶ 176. Defendant Rodgers stated that "Line 1 is the one we brought in the airplane, . . . but it's nonfunctional for [sic] automation point of view." *Id.* On the January 3, 2023 conference call, Rodgers revealed that Line 2 at Fab-1 was only partially built and that "Fab-1 is doing less than 10% of what it should be doing." *Id.* ¶¶ 177-178. Also on the call, the company's new Chief Operating Officer confirmed the importance of the FAT and what the company would be doing differently going forward. *See id.* ¶¶ 181-183. But as discussed further below, the specific information about the waiver of the FAT regarding the Yinghe equipment had already been revealed on November 7, 2022, and the stock price *rose* following this statement. *See id.* ¶¶ 168, 172. No new information about the Yinghe equipment or the FAT came out during the January 3, 2023 conference call. Likewise, the October 3, 2023 disclosure that announced Enovix was abandoning commercial production at Fab-1 neither referenced the Yinghe equipment nor said anything about the waiver of the FAT. *See* SAC ¶ 189. The October 2023 disclosure was therefore neither "corrective" nor "new," in terms of matching Statement 4.

Importantly, there is one "disclosure" in the SAC that most closely matches Statement 4, though plaintiffs do not point to it as a corrective disclosure. On November 7, 2022, defendant Rodgers explained in a statement that "[o]ur revenue projections were lowered because our Fab-1 manufacturing ramp was delayed in our first year of production." *Id.* ¶ 168. He went on to explain that he and defendant Rust made the decision in April 2021 to waive "a key milestone called Factory Acceptance Test (FAT)" and that the company was unable to catch up at the Site Acceptance Test stage later. *Id.* He said, "We are still paying for the months we gained and then gave back due to equipment problems." *Id.* As plaintiffs acknowledge, following Rodgers's November 7, 2022 statement, the stock price actually increased $1.11 per share over the previous trading day. *See id.* ¶ 172. In their depositions, several proposed class representatives also confirmed that the November 7, 2022 press release disclosed the truth about the FAT waiver that plaintiffs argue should have been disclosed earlier. *See* Ex. 16 (Fruchter Dep.) at 166:5-12; *see also* Ex. 14 (Lee Dep.) at 80:8-24.

United States District Court
Northern District of California

Plaintiffs' inflation-maintenance theory may explain why Statement 4 did not correspond with an increase in the stock price following the misstatement. It does not, however, smooth over why the statement released on November 7, 2022, which most closely matches Statement 4 by calling out the waiver of the FAT, had no negative impact on Enovix stock price. Here, the SAC's three corrective disclosures—which revealed problems with Fab-1 writ large—present neither a "tight fit" with Statement 4 nor do they "directly render[] false" the earlier misstatement implying that the Yinghe equipment had passed the FAT when it had not. *See Goldman II*, 77 F.4th at 97-98.

Plaintiffs rely heavily on a decision from the Western District of Washington granting class certification to a group of investors in the real estate website Zillow. *See* Reply at 4 (citing *Jaeger v. Zillow Grp., Inc.*, 746 F. Supp. 3d 1025 (W.D. Wash. 2024), *aff'd*, No. 24-6605, 2025 WL 2741642 (9th Cir. Sept. 26, 2025)). In branching out into the home buying and reselling market, Zillow credited its home-valuation algorithm with its sudden significant increase in its home acquisitions. Plaintiff argues *Zillow* is analogous, arguing that Zillow was alleged to have overstated its algorithmic home-valuation model and that a series of disclosures later brought to light the consequences of those misstatements. Reply at 4-5. This oversimplifies things somewhat. Zillow was alleged not just to have overstated the algorithm's prediction capabilities but also to have hidden Zillow's new "use of systemic 'overlays,' which saw purchasing managers increasing the algorithmically determined offer price by as much as seven percent." *Jaeger*, 746 F. Supp. 3d at 1030. This more than doubled Zillow's home acquisition volume in a single quarter, creating an undisclosed backlog of housing stock. The district court rejected Zillow's argument that there was a "mismatch" between the misleading statements and the subsequent corrective disclosures when Zillow announced it would cease new housing acquisitions and then ultimately abandoned its home-buying operations altogether. Significantly, when the truth came out, "Zillow also pinned responsibility on the undisclosed backlogs[.]" *Id.* at 1031. Here, while the Court agrees generally with the principle from *Jaeger* that a corrective disclosure may be one that "merely discloses a *consequence* of concealed information," *see* Reply at 5 (quoting *Jaeger*, 746 F. Supp. 3d at 1036) (emphasis added), it is significant that the later corrective disclosures also disclosed the backlogs that had previously been hidden. In other words, the same information that was alleged to have

20

made the initial statements about Zillow's housing stock misleading also came to light when Zillow announced it would cease buying new homes.

In determining whether defendants have shown a lack of price impact, this Court is tasked with looking at "*all* probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense.'" *See Goldman*, 594 U.S. at 122. In an inflation maintenance case the Court requires "a closer fit" between the alleged misstatement and the corrective disclosures because such cases require the Court to accept plaintiffs' indirect evidence that the front-end inflation can be calculated by looking to the back-end price drop. *See Goldman II*, 77 F.4th at 99 n.11. Here, in addition to the information discussed above, defendants' expert opines that, following the August 10, 2021 shareholder letter that contained Statement 4, "although securities analysts discussed manufacturing risks, they did not discuss in their reports the FAT for Fab-1 equipment (including Fab-1 equipment supplied by Yinghe), the Alleged Misstatement, or any connection between FAT results for Fab-1 equipment and their views as to the manufacturing risks Enovix faced." James Rep. ¶ 40. And as defendants noted at the hearing, nowhere in the 56-page SAC do plaintiffs allege that Enovix *ever* attributed the problems at Fab-1 to the Yinghe equipment specifically. Even accepting the broader view of the case that plaintiffs now forward, there is nothing to indicate that Enovix ever "corrected" the falsity plaintiffs allege was contained in Statement 4: that as of August 2021 the Yinghe equipment had failed to such an extent that it threatened to derail all of Fab-1 operations.

In sum, the Court finds that there is a mismatch between Statement 4 and the three corrective disclosures sufficient to undermine confidence in plaintiffs' indirect evidence that Statement 4 caused Enovix stock to remain at an artificially inflated price. The Court is unpersuaded that the three corrective disclosures plaintiffs identify in the SAC "actually corrected" Statement 4. *See Goldman*, 594 U.S. at 123. Rather, defendants have come forward with evidence that the Yinghe equipment comprised only a portion of the Fab-1 manufacturing equipment, that the alleged misstatement triggered no Yinghe- or FAT-specific commentary among analysts, and that the closest match to a Statement 4 disclosure came in the form of a November 7, 2022 press release that resulted in an increase in stock price. The Court finds defendants have rebutted the *Basic*

presumption of reliance by showing through a preponderance of the evidence that the August 10, 2021 statement had no price impact. "And without the presumption of reliance, a Rule 10b–5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)." *Halliburton II*, 573 U.S. at 281-82 (citing *Basic*, 485 U.S. at 242); s*ee also In re Finisar Corp. Sec. Litig.*, No. 11-cv-01252-EJD, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017) (where defendants rebutted the *Basic* presumption by showing no price impact, predominance requirement was not met and class certification denied). Accordingly, the Court denies the motion for class certification.[5]

**CONCLUSION**

For the foregoing reasons, the Court hereby DENIES plaintiffs' motion for class certification.

**IT IS SO ORDERED**.

Dated: April 21, 2026

_____
SUSAN ILLSTON
United States District Judge

---

[5] The Court does not reach defendants' additional arguments against class certification.

22